# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

### CIVIL ACTION NO. 05-11803-MLW

SHENIA DANCY-STEWART as
Administratrix of the Estate of EVELINE
BARROS-CEPEDA
            Plaintiffs,

v.

THOMAS TAYLOR, Jr., and the CITY
OF BOSTON,
            Defendants.

### DEFENDANTS, CITY OF BOSTON AND THOMAS TAYLOR, JR.'s OPPOSITION TO PLAINTIFF'S MOTION TO VIDEOTAPE DEFENDANT TAYLOR'S DEPOSITION AND MOTION FOR PROTECTIVE ORDER

The Defendants, City of Boston and Thomas Taylor, Jr. hereby oppose the

Plaintiff's Motion to Videotape Defendant Taylor's Deposition and move for a protective

order pursuant to Fed. R. Civ. 26(c).  As grounds therefore, the Defendants state the

following:

1. The Defendant, Thomas Taylor, will be present and available to provide live testimony at trial, which is currently scheduled for May 24, 2008.

2. After the motion was filed, Defendants' counsel spoke with Plaintiff's counsel regarding his request to videotape Defendant Taylor's deposition.  At that time, Plaintiff's counsel stated that he intended to videotape Defendant Taylor's deposition because he intended to use such videotaped testimony in lieu of calling Defendant Taylor as a witness at trial.  Certainly, Officer Taylor, a named defendant in this action, will be present and available at the time of trial.  Any effort, therefore, to utilize his videotaped testimony when Officer Taylor would be available at trial constitiutes impermissible hearsay.  See Fed. R. Evid. 801(c).

3. Defendants also seek a protective under Fed. R. Civ. 26(c) to preclude the Defendant's videotaped deposition.  Officer Taylor's videotaped deposition is sought to embarrass, annoy and harras Officer Taylor unnecessarily.

4.  Fed. R. Civ. P. 26(c) allows a protective order to preclude "embarrassment, undue burden, oppression or annoyance." The First Circuit has held that the movant must show good cause "based on a particular factual demonstration of potential harm, not on conclusory statements." <u>Anderson v. Cryovac Inc.</u>, 805 F.2d 1 *7 (D. Mass 1986). In determining the necessity of protective orders courts generally weigh the harm to the moving party against the "relevance and necessity for the information." <u>See</u> 8 C. Wright & A. Miller, <u>Federal Practice and Procedure</u> § 2043.

5.  Here, the risk of harm to Officer Taylor is significant based on the events that have transpired during prior depositions in this matter.

6.  During the depositions conducted thus far, Plaintiff's counsel has made concerted efforts to improperly object, obstruct and disrupt the depositions.

7.  For example, during the recent deposition of a third party eyewitness to the events that gave rise to this lawsuit, Plaintiff's counsel improperly yelled at the witness and instructed him not to answer the question asked by Defendant's counsel. <u>See</u> Exhibit A.

8.  In another deposition of a third party eyewitness, Plaintiff's counsel engaged in numerous and improper objections that cover the majority of the deposition transcript pages. <u>See</u> Exhibit B.

9.  During that same deposition, Plaintiff's counsel engaged in an extended soliloquy on the record improperly mischaracterizing Defendant's counsel in an effort to influence the third party witness and paint a negative portrait of Defendant's counsel. <u>See</u> Exhibit B.

10.  Most recently, during the deposition of another third party witness, an incarcerated individual, Plaintiff's counsel improperly interjected by offering legal advice to the third party witness about his Fifth Amendment right under the United States Constitution. <u>See</u> Exhibit A.

11.  Given these most recent and consistent deposition events, it is highly likely that the videotaped deposition will be used by Plaintiff's counsel to harass, annoy and embarrass Defendant Taylor.

12.  This harm, however, can be avoided through the use of stenographic means to conduct his deposition. The necessary information sought by Plaintiff's counsel through a videotaped deposition can also be achieved through a deposition conducted by stenographic means.

13.  In the alternative, should the Court allow Plaintiff's motion, the Defendants request that the deposition be conducted in a conference room at the U.S.

Courthouse at One Courthouse Way, Boston, MA to allow easy access to the Court, should intervention during the deposition become necessary.

For all of the reasons stated herein, the Defendants respectfully request that this

Court deny Plaintiff's motion and allow Defendant's motion for a protective order.

Respectfully submitted,

DEFENDANTS THOMAS TAYLOR JR. AND
CITY OF BOSTON,

William F. Sinnott
Corporation Counsel

By their attorneys:


/s/ Helen Litsas _____
Helen Litsas BBO#644848
Evan C. Ouellette BBO#655934
Law Office of Helen Litsas
38 Main Street
Saugus MA 01906
(781) 231-8090  (Litsas)
617) 635-4048 (Ouellette)


## CERTIFICATE OF SERVICE


I, Helen G. Litsas, hereby certify that on January 25, 2008, I served the attached

documents by mailing a copy, postage prepaid, to the following:

Andrew Stockwell-Alpert
11 Beacon Street, Suite 1210
Boston, MA 02108

/s/ Helen Litsas _____

**CERTIFICATION PURSUANT TO LOCAL RULE 7.1(A)(2)**

I hereby certify that undersigned counsel for the Defendant, City of Boston, discussed the above motion with Andrew Stockwell-Alpert via  telephone both in a good faith effort to resolve and narrow the issues presented by said motion, but that counsel were unable to confer or to resolve the issues prior to filing of the motion.


1/25/08_____            _/s/ Helen G.Litsas _____
Date                                     Helen G. Litsas

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

### CIVIL ACTION NO. 05-11803-MLW

SHENIA DANCY-STEWART as
Administratrix of the Estate of EVELINE
BARROS-CEPEDA
          Plaintiffs,

v.

THOMAS TAYLOR, Jr., and the CITY
OF BOSTON,
          Defendants.

### AFFIDAVIT OF HELEN G. LITSAS

I, HELEN G. LITSAS,  do hereby state and depose as follows:

1.      I currently represent the Defendants, Thomas Taylor, and the City of Boston
in this action.

2.      During the depositions conducted thus far, Plaintiff's counsel, Andrew
Stockwell-Alpert has made concerted efforts to improperly object, obstruct
and disrupt the depositions.

3.      On January 15, 2008, the Defendants conducted the deposition of James
Nicholas, a third party eyewitness to the events that gave rise to this lawsuit.

4.      During this deposition, Plaintiff's counsel improperly yelled at the witness
and instructed him not to answer the question asked by Defendant's counsel.

5.      In another deposition of a third party eyewitness, Travo Carter, held on
January 17, 2008, Plaintiff's counsel engaged in numerous and improper
objections that cover the majority of the deposition transcript pages.  See
Exhibit B.

6.       During that same deposition, Plaintiff's counsel engaged in an extended
soliloquy on the record improperly mischaracterizing Defendant's counsel in
an effort to influence the third party witness and paint a negative portrait of
Defendant's counsel.

7.     After the motion was filed, I spoke with Plaintiff's counsel regarding his request to videotape Defendant Taylor's deposition.   At that time, Plaintiff's counsel stated that he intended to videotape Defendant Taylor's deposition because he intended to use such videotaped testimony in lieu of calling Defendant Taylor as a witness at trial.

_____

Helen G. Litsas

1                     VOLUME I

                      PAGES:   1 - 92

2                     EXHIBITS: 1 - 4

3         UNITED STATES DISTRICT COURT

              DISTRICT OF MASSACHUSETTS

4

                 C.A. NO. 05-11803-MLW

5

6    *   *   *   *   *   *   *   *   *   *      *

                                               *

7    SHENIA DANCY-STEWART, as                  *

     Administratrix of the Estate              *

8    of EVELINE BARROS-CEPEDA,                 *

                     Plaintiffs,               *

9                                              *

     vs.                                       *

10                                             *

     THOMAS TAYLOR, JR., and the               *

11   CITY OF BOSTON,                           *

                     Defendants.               *

12                                             *

     *   *   *   *   *   *   *   *   *   *      *

13

14

15

16            DEPOSITION OF TREVO CARTER,

17   taken on behalf of the Defendants, pursuant

18   to the Massachusetts Rules of Civil

19   Procedure, before Karen Borreson, RPR, Notary

20   Public within and for the Commonwealth of

21   Massachusetts, at the law offices of City of

22   Boston, City Hall, Boston, Massachusetts, on

23   Thursday, January 17, 2008, commencing at

24   2:35 p.m.

```
 1                    A P P E A R A N C E S

 2

 3       Andrew Stockwell-Alpert, Esquire
         11 Beacon Street, Suite 1210
 4       Boston, MA  02108
         Tel:  (617) 720-4244
 5              - and -
         James E. McCall, Esquire
 6       4 Longfellow Place, Suite 3203
         Boston, MA 02114
 7       Tel:  (617) 720-2900
         For the Plaintiffs
 8
 9       Evan C. Ouellette, Esquire
         Helen G. Litsas, Esquire
10       Lisa A. Skehill, Paralegal
         City of Boston Law Department
11       City Hall, Room 615
         Boston, MA  02201
12       Tel:  (617) 635-4048
         E-mail:  Evan.Ouellette@cityofboston.gov
13       For the Defendants
14
15
16
17
18
19
20
21
22
23
24
```

```
1                      I N D E X

2    DEPONENT                          PAGE

3    TREVO CARTER

4    Examination by Mr. Ouellette        4

5

6

7

8

9

10                    E X H I B I T S

11     NO.    DESCRIPTION              PAGE

12     1      Photograph               26

13     2      Photograph               26

14     3      Map                      59

15     4      Enlargement of Exhibit 3  62

16

17

18

19

20

21

22

23

24
```

```
1              P R O C E E D I N G S

2          MS. LITSAS:  Usual stipulations,

3      Counsel?

4          MR. STOCKWELL-ALPERT:  Yes.

5                    *****

6          It is stipulated and agreed between

7      the parties that all objections, except as

8      to form, including motions to strike will be

9      reserved until the time of trial.

10                   *****

11             TREVO CARTER, a witness called

12    by counsel having been satisfactorily

13    identified and been duly sworn for the

14    Defendants, testified as follows:

15             EXAMINATION BY MS. LITSAS

16    Q. Could you please state your name for the

17       record.

18    A. Trevo Carter.

19    Q. Trevo, my name is Helen Litsas.  I am an

20       attorney representing the Defendants in this

21       action.  With me is co-counsel Even

22       Ouellette, who's also representing the

23       Defendants in this action, as well as Lisa

24       Skehill, who is an employee in the City of
```

1        Boston Law Department.

2               Also present today -- if you could

3        identify yourself for the record.

4               MR. STOCKWELL-ALPERT:  Andrew

5        Stockwell-Alpert, representing the Plaintiff

6        Shenia Dancy-Stewart.

7               MR. MCCALL:  James McCall,

8        representing the Plaintiff Shenia

9        Dancy-Stewart.

10   Q. Mr. Carter, are you here pursuant to a

11       subpoena that you received?

12   A. Yes.

13   Q. I'm going to ask you a series of questions.

14       And before we get started, I'm just going to

15       go over some ground rules, so that everybody

16       is on the same page and you had understand

17       what to expect going forward.

18   A. Okay.

19   Q. In order for the stenographer to transcribe

20       what we are saying today, you have to keep

21       your voice up.

22   A. Uh-huh.

23   Q. And you cannot use nods or gestures, because

24       the stenographer can't translate that into a

```
 1        written transcript.  So if you could

 2        articulate your answers and speak clearly,

 3        so that she understands what your testimony

 4        is, that you would be very helpful.

 5   A. Okay.

 6   Q. At any point if you do not understand a

 7        question that I've asked, please let me know

 8        and I will rephrase the question.

 9   A. All right.

10   Q. At some point it may be the case that you

11        anticipate what my question is and you want

12        to tell me your answer before I finish the

13        question.  If you could wait and let me

14        finish the question first, that would be

15        very helpful, so that the stenographer is

16        not taking us down speaking at the same

17        time.  As wonderful as she is, she cannot

18        transcribe who people speaking at the same

19        time.

20   A. Okay.

21   Q. If at any point you need to take a break,

22        please let me know.  The only thing I ask is

23        if a question is pending, you answer the

24        question first and then we'll take the
```

```
 1        break.

 2    A. Okay.

 3    Q. Do you understand those instructions?

 4    A. Yes.

 5    Q. Mr. Carter, have you ever testified at a

 6        deposition like this before?

 7    A. No.

 8    Q. Have you ever given testimony before?

 9    A. No.

10    Q. Have you ever went to court and testified in

11        a court proceeding before?

12            MR. STOCKWELL-ALPERT:  Objection.

13    A. No.

14    Q. Prior to coming today to today's deposition,

15        did you talk to anybody in preparation?

16    A. Um, I forget his name, the cop that served

17        me the subpoena.

18    Q. The person who served you the subpoena?

19    A. That was it and the cops at the scene.  That

20        was a long time ago, though.

21    Q. And did you ever speak to any of the

22        attorneys that are in this room before in

23        person?

24    A. Oh, no.
```

```
 1    Q. Have you ever spoken to any investigator for

 2       the Plaintiffs before?

 3    A. Um, yes, I think I did.

 4    Q. When was that?

 5    A. Like three years ago.

 6    Q. Did you ever complete any written statement

 7       about what happened on September 8, 2002?

 8    A. No.  No, I didn't.

 9    Q. Did you ever keep any journals or notes or

10       anything like that regarding the September

11       8, 2002 incident?

12    A. No.

13    Q. Before coming in today, did you meet with

14       any lawyer or legal representative?

15    A. No.

16    Q. Did you review any documents before you came

17       in today?

18    A. No.

19    Q. Did you speak to anyone else about today's

20       deposition?

21    A. No.

22    Q. Did you ever write any e-mails or any other

23       correspondence regarding the September 8,

24       2002 incident?
```

1   A. No.

2   Q. Are you currently taking any medication?

3   A. No.

4   Q. Is there anything that you have taken within

5      the past 24 hours that would affect your

6      ability to testify today?

7   A. No.

8   Q. Is there anything that you've taken within

9      the past 24 hours that would affect your

10     ability to remember events?

11  A. No.

12  Q. Have you used any alcohol or any other

13     substances prior to coming in to today's

14     deposition?

15  A. No.

16  Q. Have you used any alcohol or other

17     substances 24 hours within today's

18     deposition?

19  A. No.

20  Q. I'm just going to ask you some general

21     background questions in the next few

22     minutes.

23          Could you please state your date of

24     birth.

1    A. 7/20/82.

2    Q. And what is your current address?

3    A. 39 Melon Street, apartment 2.

4    Q. What city?

5    A. Dorchester, Massachusetts.

6    Q. How long have you lived at that address?

7    A. It would be a year in March.

8           MS. LITSAS:  I should just note for

9       the record that today's deposition is again

10      governed by the protective order that

11      governs this case, and so the deposition

12      should be marked on the top page as governed

13      under the protective order.

14   Q. How long have you lived at that address, Mr.

15      Carter?

16   A. Which one?

17   Q. The current address that you live at now?

18   A. Almost ten months.

19   Q. Where did you live previously?

20   A. Revere.

21   Q. What was your address in Revere?

22   A. 19 Sumner Street.

23   Q. How long did you live at that address?

24   A. About seven months, maybe eight.

```
1    Q. At your current address, do you rent or own?

2           MR. STOCKWELL-ALPERT:  Objection.

3    Q. You can answer.

4    A. Oh, rent.

5    Q. Do you currently live with anyone at your

6       current address?

7           MR. STOCKWELL-ALPERT:  Objection.

8    A. Yes, I do.

9    Q. Who do you live with?

10          MR. STOCKWELL-ALPERT:  Objection.

11   A. My mother.

12   Q. What's your mother's name?

13          MR. STOCKWELL-ALPERT:  Objection.

14   A. France Carter.

15   Q. Francis Carter?

16   A. Yes.

17   Q. At the time of the incident, what was your

18      address?  So we're talking about September

19      of 2002.

20   A. Eight Woodville Park.

21   Q. In Dorchester, Mass.

22   A. I believe, yes.  That's Roxbury.  I'm sorry,

23      it's Roxbury.

24   Q. So it was 8 Woodville Park, Roxbury,
```

```
 1        Massachusetts?

 2   A. Yes.

 3   Q. Who were you living with at that address?

 4             MR. STOCKWELL-ALPERT:  Objection.

 5   A. My mother, my brother, my sister and my

 6      grandmother.

 7   Q. What's your brother's name?

 8   A. Milton.

 9   Q. What's your sister's name?

10   A. Allyson Carter.

11   Q. What's your grandmother's name?

12   A. Allyson.

13   Q. Can you tell me what your Social Security

14      number is, Mr. Carter?

15   A. Social Security number?

16             MR. STOCKWELL-ALPERT:  Objection.

17   Q. Yes.

18   A. 031-62-012.

19   Q. Are you currently married or single?

20             MR. STOCKWELL-ALPERT:  Objection.

21   A. Single.

22   Q. Have you ever been married?

23             MR. STOCKWELL-ALPERT:  Objection.

24   A. No.
```

```
 1    Q. Do you have a girlfriend or a boyfriend?

 2              MR. STOCKWELL-ALPERT:  Objection.

 3    A. I have a girlfriend.

 4    Q. What's her name?

 5    A. Latia Coney.

 6              MR. OUELLETTE:  Objection.

 7    Q. Could you spell it?

 8    A. L-A-T-I-A, C-O-N-E-Y.

 9    Q. And how long have you been together?

10              MR. STOCKWELL-ALPERT:  Objection.

11    A. Seven years.

12    Q. Was she your girlfriend at the time of the

13       incident in 2002?

14              MR. STOCKWELL-ALPERT:  Objection.

15    A. Yes.

16    Q. Was she present at the time of the incident?

17    A. No.

18    Q. Did she witness anything regarding the

19       incident, to your knowledge?

20              MR. STOCKWELL-ALPERT:  Objection.

21    A. No.

22    Q. Mr. Carter, do you have any children?

23    A. Yes.

24              MR. STOCKWELL-ALPERT:  Objection.
```

```
 1    Q. What are your children's names?

 2            MR. STOCKWELL-ALPERT:  Objection.

 3    Q. How would are your children?

 4    A. I have one.  She's how old?  Five.

 5    Q. Could you tell me a little bit about your

 6       educational background, Mr. Carter.

 7            MR. STOCKWELL-ALPERT:  Objection.

 8    A. I graduated from Boston High back in 2000.

 9       That's pretty much it.

10    Q. You went to Boston High School?

11    A. Yes.

12            MR. STOCKWELL-ALPERT:  Objection.

13    Q. And you didn't seek any further education

14       after your graduation from high school?

15            MR. STOCKWELL-ALPERT:  Objection.

16    A. No.

17    Q. And did you receive a diploma?

18            MR. STOCKWELL-ALPERT:  Objection.

19    A. Yes.

20    Q. The high school that you attended, is it a

21       specific trade school/high school or is it a

22       traditional high school?

23            MR. STOCKWELL-ALPERT:  Objection.

24    A. It was a work study high school.
```

```
 1   Q. Did you focus on any trade in particular?

 2           MR. STOCKWELL-ALPERT:  Objection.

 3   A. No.  It just transformed into a work study

 4      program when I was there.

 5   Q. What does that mean?

 6   A. I went to a regular high school.  It turned

 7      into a work study program, which we did half

 8      a days.  And it's like you have a half a

 9      day, you work for the rest of the day, but

10      it didn't really effect me.  I was a junior.

11      I was graduating that following year.  They

12      said -- so...

13   Q. Did you work at the same time that you were

14      in high school?

15           MR. STOCKWELL-ALPERT:  Objection.

16   A. No, I didn't.

17   Q. Mr. Carter, are you currently employed?

18           MR. STOCKWELL-ALPERT:  Objection.

19   A. Yes, ma'am.

20   Q. Where are you currently employed?

21           MR. STOCKWELL-ALPERT:  Objection.

22   A. JRI.

23   Q. I'm sorry, can you repeat that?

24   A. JRI Correctional Center.
```

```
 1              MR. STOCKWELL-ALPERT:  Objection.

 2    Q. What does that stand for?

 3              MR. STOCKWELL-ALPERT:  Objection.

 4    A. Justice Resource Institute.

 5    Q. And is that a facility associated with the

 6       Department of Youth Services?

 7              MR. STOCKWELL-ALPERT:  Objection.

 8    A. Yes.

 9    Q. What is your position with this facility?

10              MR. STOCKWELL-ALPERT:  Objection.

11    A. I'm a direct care counselor.

12    Q. What does that mean?

13              MR. STOCKWELL-ALPERT:  Objection.

14    A. I'm the -- the CO for the kids.  I just

15       baby-sit basically, in my opinion.  Make

16       sure they get their meals, lock them in

17       their rooms at bedtime, watch them as they

18       watch TV, play video games, something like

19       that.

20    Q. And the kids that you're overseeing, these

21       are children that have been obtained by the

22       Department of Youth Services?

23              MR. STOCKWELL-ALPERT:  Objection.

24    A. Yes.
```

```
 1    Q. And how long have you been employed in this
 2       position?
 3            MR. STOCKWELL-ALPERT:  Objection.
 4    A. Um, 12/3/07.
 5    Q. Where were you employed before then?
 6            MR. STOCKWELL-ALPERT:  Objection.
 7    A. I worked at Clery's Bar down by Dartmouth
 8       Street.
 9    Q. What was your position with Clery's?
10            MR. STOCKWELL-ALPERT:  Objection.
11    A. Door staff.
12    Q. And how long had you worked at Clery's?
13            MR. STOCKWELL-ALPERT:  Objection.
14    A. For four years.
15    Q. Did you work anywhere else other than
16       Clery's during that time?
17            MR. STOCKWELL-ALPERT:  Objection.
18    A. No.
19    Q. At the time of the incident, were you
20       working or in school?
21            MR. STOCKWELL-ALPERT:  Objection.
22    A. I was at work.  I wasn't in school.
23    Q. Were you unemployment at the time?
24    A. Yes.
```

```
 1              MR. STOCKWELL-ALPERT:  Objection.

 2    Q. How were you supporting yourself, Mr.

 3       Carter?

 4              MR. STOCKWELL-ALPERT:  Objection.

 5    A. My mother was just helping.

 6    Q. Prior to Clery's, where were you employed?

 7              MR. STOCKWELL-ALPERT:  Objection.

 8    A. Prior to Clery's?  Um, the Poor House.

 9    Q. What did you do for the Poor House?

10              MR. STOCKWELL-ALPERT:  Objection.

11    A. Door staff there.

12    Q. How long had you worked for the Poor House?

13              MR. STOCKWELL-ALPERT:  Objection.

14    A. Two years before from moving to Clery's.

15    Q. Have you ever worked for the Boston Police

16       Department?

17    A. No.

18    Q. Have you ever worked for any police

19       department?

20    A. No.

21    Q. Have you ever worked for any law firm?

22    A. No.

23    Q. Are there any other employers that we

24       haven't discussed already --
```

```
1              MR. STOCKWELL-ALPERT:  Objection.

2    Q. -- that you've had?

3    A. I used to work for Levit's Furniture Store,

4       but they went out of business.

5    Q. What did you do for them?

6              MR. STOCKWELL-ALPERT:  Objection.

7    A. Warehouse.

8    Q. When was that?

9              MR. STOCKWELL-ALPERT:  Objection.

10   A. Um, right before the Poor House.  It's a

11      couple of months.

12   Q. At the time of September 2002, you were

13      unemployed?

14             MR. STOCKWELL-ALPERT:  Objection.

15   A. Uh-huh.

16   Q. Mr. Carter, I asked you if there is anything

17      that would affect your ability to testify

18      today earlier and you said no?

19   A. No.

20   Q. Is there any other disability that I should

21      be aware of that would affect your ability

22      to testify?

23   A. No.

24   Q. Could you tell me a little bit about your
```

```
 1        eyesight.

 2                MR. STOCKWELL-ALPERT:   Objection.

 3    Q. Your vision?

 4    A. 20/20.

 5    Q. Have you ever worn glasses?

 6    A. No.

 7    Q. Have you ever worn contacts?

 8    A. No.

 9    Q. At the time of the incident back in 2002,

10        were you wearing glasses?

11    A. No.

12    Q. Were you wearing contacts?

13    A. No.

14    Q. Was your vision 20/20 at that time?

15    A. Yes.

16    Q. You don't have any physical, learning or

17        other mental disabilities?

18    A. No.

19    Q. Have you ever been a plaintiff in a lawsuit

20        before?

21    A. No.

22                MR. STOCKWELL-ALPERT:   Objection.

23    Q. Have you ever been a defendant in a lawsuit?

24                MR. STOCKWELL-ALPERT:   Objection.
```

```
 1    A. No.

 2    Q. Have you ever filed any type of claim

 3       against the city or town before?

 4    A. No.

 5    Q. Have you ever filed any complaint with the

 6       Boston Police Department?

 7    A. No.

 8    Q. Have you ever filed any complaint with any

 9       police department?

10    A. No.

11    Q. We discussed your eyesight earlier.  What

12       about your hearing, do you have any

13       disability with any hearing?

14    A. No.

15    Q. You don't have any hearing impairment

16       whatsoever?

17    A. No.

18    Q. Shifting gears a little bit and turning back

19       to 2002 on the date of the incident,

20       September 8, 2002.  Could you tell me again

21       where you were living?

22    A. 8 Woodville Park.

23    Q. And you were unemployed at that time?

24    A. Yes.
```

```
1    Q. Do you remember what was the first thing

2       that you did that day?

3    A. Ate breakfast, got dressed and headed over

4       to my friend's house.

5    Q. Who was that?

6    A. Latoya Graddy.

7    Q. I'm sorry, what was that?

8    A. Latoya Graddy.

9    Q. Could you, for the record, spell her name,

10      please?

11   A. L-A-T-O-Y-A, G-R-A-D-D-Y.

12   Q. And where did she live?

13   A. At the time it was -- I know it was Dunkeld,

14      but I'm not sure of the number.  There is

15      two building, I'm not sure of the number.

16   Q. So it is --

17   A. It was five.

18   Q. She lived at 5 Dunkeld Street?

19   A. Yes.

20   Q. How long had she been a friend of yours?

21   A. Just my high school years.

22   Q. Was she a girlfriend of yours?

23          MR. STOCKWELL-ALPERT:  Objection.

24   A. No.
```

1    Q. Approximately what time did you go over to

2       her house?

3            MR. STOCKWELL-ALPERT:  Objection.

4    A. I cannot remember that.

5    Q. Do you remember what you did that day at her

6       house?

7    A. Just watched TV, came back and watched

8       videos, that's it.

9    Q. And was there anyone else with you other

10      than Latoya?

11   A. Her son.

12   Q. What was her son's name?

13   A. Ziderious Graddy (phonetic).  I do not know

14      how to spell his name.

15   Q. How old is he?

16   A. Then he was like one or two.

17   Q. And Latoya was how old at the time of the

18      incident?

19   A. I'm not even sure.

20   Q. So to the best of the your memory, there was

21      no other people at her house that day?

22   A. Not that I can remember, no.

23   Q. Do you still keep in touch with her today?

24   A. Here and there.

```
 1    Q. Do you know where she lives?

 2    A. No, I don't.

 3    Q. Do you remember what the weather was like

 4       that day?

 5    A. No.  No, I don't.

 6    Q. Do you remember approximately what time you

 7       went over to her house?

 8              MR. STOCKWELL-ALPERT:  Objection.

 9    A. I went over there?  No, I don't.

10    Q. What did you do other than watch videos?

11       Was there any type of party or any other

12       type of gathering at her house?

13    A. No.  We just -- I went over and sat back and

14       talk and chilled.  Just to visit.  I stayed

15       longer than I was supposed to.  I got --

16       lost track of time and that was it.

17    Q. Do you remember at that time did you consume

18       any alcohol?

19              MR. STOCKWELL-ALPERT:  Objection.

20    A. No.

21    Q. Did you use any substances?

22              MR. STOCKWELL-ALPERT:  Objection.

23    A. No.

24    Q. Did you leave her house at any point during
```

```
 1        the day?

 2   A. Yes.

 3   Q. At what time did you leave her how's?

 4   A. It had to be maybe eight.  Go outside and

 5        sit on the porch and spoke a cigarette and

 6        that's pretty much it.  Just chill, that was

 7        it.

 8   Q. Were you at her house at the time of the

 9        incident?

10   A. Yes.

11   Q. Just prior to the incident on September 8,

12        2002, what had you been doing?

13   A. Meaning?

14   Q. I'll rephrase the question.

15            At some point you were outside on

16        the porch?

17   A. Yes.

18   Q. And do you remember what time you were

19        outside on the porch at 5 Dunkeld Street?

20   A. It was in the evening.  I don't remember.

21   Q. Do you remember what happened next after you

22        walked outside on the porch?

23   A. You mean like the incident?

24   Q. Yes.
```

```
 1   A. Yes.  I was out there for that.

 2   Q. And what is the first thing that you saw or

 3      heard?

 4   A. First thing I heard was a car screeching.

 5   Q. From what direction was the car screeching?

 6           MR. STOCKWELL-ALPERT:  Objection.

 7   A. From Quincy Street.

 8   Q. What was the next thing that you saw or

 9      heard after you heard the car screeching?

10   A. The car.

11   Q. And what did you see?

12   A. See a car come around the conner.

13           MR. STOCKWELL-ALPERT:  I didn't hear

14      that.

15   A. I saw a car coming around the corner.

16   Q. What type of car was it?

17   A. I'm not sure.

18   Q. Do you remember what color the car was?

19   A. I cannot remember.

20           MS. LITSAS:  Can we have this marked

21      as Exhibit No. 1.

22           (Photographs were marked as

23              Exhibit Nos. 1 and 2.)

24   Q. Mr. Carter, I'm going to place a document
```

```
 1        before you.  It's a photograph.  Can you

 2        describe what's in the photograph?

 3   A. (Peruses photograph.)  A white car.

 4   Q. Does that look familiar to you?

 5            MR. STOCKWELL-ALPERT:  Objection.

 6   A. I really can't say.

 7   Q. Does that look like the car that you saw on

 8        the night of the incident with its

 9        screeching brakes?

10            MR. STOCKWELL-ALPERT:  Objection.

11   A. I couldn't say, I'm sorry.

12   Q. At the time you heard the screeching brakes,

13        approximately what time was it?

14   A. It was just beginning of evening.  After

15        eight, I believe.  I'm not sure after eight

16        at all.  I don't remember that far back.

17   Q. You can't tell me exactly what time it was?

18   A. No, no.  I know it was evening.  It was

19        dark.

20   Q. Was it dark?

21   A. Yes.

22   Q. Do you know what the lighting conditions

23        were?

24   A. The Streetlights was on, that's the best I
```

 1        can tell you.

 2              MR. STOCKWELL-ALPERT:  One minute

 3        please.  Could you do me a favor and speak

 4        up?  I know it's difficult.

 5              THE WITNESS:  I'm sorry.

 6              MR. STOCKWELL-ALPERT:  It's not that

 7        -- I'd like to hear it.  Sometimes your

 8        voice trails off.  And you don't have to be

 9        sorry for anything.

10              MS. LITSAS:  Andrew, maybe you could

11        move your seat.

12              MR. STOCKWELL-ALPERT:  Well, I don't

13        want him to feel like I'm crowding him.

14              MS. LITSAS:  I understand that.  We

15        want you to hear it.

16              MR. STOCKWELL-ALPERT:  Fair enough,

17        thank you.

18     Q. Mr. Carter, so at the time that you heard

19        the screeching car, it was dark out?

20     A. Yes.

21     Q. There were streetlights on?

22     A. Yes.

23     Q. Do you know how many streetlights were on?

24     A. At the night of the incident?

```
1    Q. Yes.

2    A. Okay.  Um, approximately seven.

3    Q. How did you come to that conclusion?

4    A. I know the street.  I know there was no

5       streetlights off.

6    Q. So there were approximately seven

7       streetlights on?

8    A. Yes.

9    Q. At the time that you heard and saw the car

10      coming down the street, you were on the

11      porch?

12   A. I was out on the sidewalk.

13   Q. You were on the sidewalk?

14   A. Yes.

15   Q. And the sidewalk of what street?

16   A. Dunkeld.

17   Q. Where were you located on the sidewalk of

18      Dunkeld Street.  Was there a specific

19      numbered house?

20   A. It was Latoya's house and there was new

21      complexes over in between those two.

22   Q. So you were in the vicinity of 5 Dunkeld

23      Street?

24   A. Yes.
```

```
 1    Q. On the sidewalk?

 2    A. Yes.

 3    Q. What were you doing on the sidewalk?

 4    A. Just talking among people that live on the

 5       street.

 6    Q. Do you know who you were talking to?

 7    A. I didn't know their name.  I know them by

 8       face.  So it was like hi, how are you doing?

 9       That was it.  Because that I was smoking, so

10       I moved away and finished my cigarette and

11       flicked it.

12    Q. So you were smoking a cigarette outside on

13       the sidewalk?

14    A. Yes.

15    Q. On Dunkeld Street?

16    A. Uh-huh.

17    Q. And the first thing that you heard was the

18       screeching car?

19    A. Uh-huh.

20    Q. And when you heard that, did you look to see

21       what the cause of it was?

22            MR. STOCKWELL-ALPERT:  Objection.

23    A. I really didn't pay most mind to it, because

24       Dunkeld -- kids in cars do dumb things.  So
```

```
 1        you hear a car screeching, you look and look
 2        away.  That was it.
 3    Q. Did you see anything when you heard the
 4        screeching car?
 5    A. Just thought -- just the car come on to
 6        Dunkeld, yes.
 7    Q. What's the next thing that happened?
 8    A. It accelerated up the street, I know that.
 9    Q. Can you describe for me what happened next?
10    A. Um, there was two other police officers on
11        Fayston.  I don't know if they was there for
12        any other reason.  I don't know what reason
13        they were there for.  They were visiting
14        another house.  I'm not sure what house it
15        was.  And, um, as the car was accelerating
16        up the street.  One cop was outside already
17        and he was in the middle of the street
18        telling the other car to stop.  The car
19        wouldn't stop.
20    Q. And then what happened?
21    A. The right side of the hood of the car hit
22        the cop and he went onto his other side, off
23        to the side.
24    Q. What happens when the car hits the cop?
```

```
 1   A. The cop turned around and the car went

 2      around onto Fayston Street.

 3   Q. What's the next thing that happened?

 4   A. That's when the other cop came out of -- I

 5      don't know where they came out of.  And the

 6      gun was drawn and the next thing I heard

 7      shots and that's when I ran back into the

 8      house.

 9   Q. What did you do next?

10   A. I stayed in the house.

11   Q. What's the next thing happened after you

12      stayed in the house?

13   A. We hear all of these sirens were coming

14      around.  I don't know which direction.  I

15      was in the house.  Just -- that was it.  And

16      that's -- I hear the sirens, I came outside

17      and I seen what's going on.

18   Q. What did you see?

19   A. I seen cops had Dunkeld and Quincy blocked

20      off and that's probably all I remember.

21      They had the whole surrounding blocked off.

22   Q. Did you say anything to anybody when you

23      returned back into the house after initially

24      hearing the gun shots?
```

1    A. No.

2    Q. Did you say anything to Latoya?

3    A. I can't remember.  Sorry.

4    Q. What did you do after returning back outside

5       5 Dunkeld Street?

6    A. What did I do after I returned outside?

7             MR. STOCKWELL-ALPERT:  Objection.

8    Q. Yes.

9    A. At the time I was ready to go home.  After

10      -- after the whole situation, I was ready to

11      go home.  It was too much for me.  And I

12      believe somebody -- I'm not sure the -- the

13      cop came to me and asked me what happened

14      and said that I knew something.  And I said,

15      Oh.  I told him what I saw.  Took town --

16      took down information and I left to go home.

17   Q. And what happened once you got home?

18   A. I went to sleep.

19   Q. Did anything else happen the following day?

20   A. No.

21   Q. Did anyone contact you from the police

22      department?

23   A. Not for a couple of weeks, actually.

24   Q. What happened then?

```
 1   A. They came to the house.  They talked to me

 2      about the situation.  At the time I told

 3      them what I saw.  And they said like --

 4      after that I told them what I saw, they

 5      shook my hand and said, thank you, and they

 6      left.

 7   Q. Do you know who those police officers were?

 8   A. I don't remember their names.

 9   Q. Do you know if they were detectives or

10      patrolmen?

11   A. I believe they were detectives.

12   Q. Were they both male or --

13   A. Yes.

14   Q. Do you know if they were African-American or

15      Caucasian?

16   A. I can remember one was Caucasian.  I'm not

17      sure about the other one.

18   Q. What is it that you told them, the

19      detectives?

20   A. Exactly what I saw on the night of the --

21      the Dunkeld.

22   Q. That's what you testified to earlier today?

23   A. Yes, ma'am.

24   Q. At any other point did you receive any other
```

```
 1        contact from the police department?

 2   A. No.  Later on I got contacted by a private

 3        investigator.  I'm not sure of his name.  I

 4        forgot his name.  I'm not sure of his name,

 5        I'm sorry.

 6   Q. Do you know who he was working for?

 7   A. I believe you all.

 8   Q. The City of Boston?

 9   A. Yes, the City of Boston.

10   Q. Where you were contacted by an investigator

11        the Plaintiff?

12   A. No, no.

13   Q. I'm going to backtrack a little bit.

14   A. Okay.

15   Q. So at the time you're outside on the porch?

16   A. Uh-huh.

17   Q. Where are you located when you hear the

18        screeching car?

19             MR. STOCKWELL-ALPERT:  Objection.

20   A. On the sidewalk.

21   Q. On the sidewalk.

22             After you hear the screeching car,

23        do you look to see where it's coming from?

24   A. Yes, I looked back.
```

```
1    Q. So what direction are you facing when you

2       hear the screeching --

3    A. I'm walking up Dunkeld towards -- back

4       towards Latoya's house.

5    Q. So you were walking in the direction of her

6       house from Quincy Street?

7    A. No.  I was on Dunkeld.

8    Q. You were on Dunkeld Street?

9    A. So Quincy is behind me and Fayston is ahead

10      of me.

11   Q. Is the car behind you or in front of you?

12   A. Behind me.

13   Q. You turned around to see what the sound is?

14   A. Yes.

15           MR. STOCKWELL-ALPERT:  Objection.

16   Q. What do you see?

17           MR. STOCKWELL-ALPERT:  Objection.

18   A. At the time I looked back, that's when I

19      seen the car coming around onto Dunkeld.

20   Q. And where is it coming from?

21   A. Quincy Street.

22   Q. And how fast is it going?

23   A. I really can't say.

24   Q. Is it going fast at that point?
```

```
 1              MR. STOCKWELL-ALPERT:  Objection.

 2   A. It had to go fast enough to make the

 3      screeching sound.

 4   Q. At that point do you see who is in the car?

 5   A. No.

 6   Q. Do you see who's driving the car?

 7   A. No.

 8   Q. Is there any car behind it at that point?

 9   A. Not that I can -- no.

10   Q. At that point do you hear any police sirens?

11   A. Yes, I do.

12   Q. So at the point you hear and see the

13      screeching car --

14   A. Uh-huh.

15   Q. -- you also hear police sirens?

16              MR. STOCKWELL-ALPERT:  Objection.

17   A. Uh-huh.

18   Q. I'm sorry, you are going to have to answer

19      the question.

20   A. I'm sorry, yes.

21   Q. So you do hear the sirens at the same time

22      that you hear the screeching car?

23              MR. STOCKWELL-ALPERT:  Objection.

24   A. Yes, yes.
```

1   Q. When you turn around and see the car --

2   A. Uh-huh.

3   Q. -- the car is traveling down Dunkeld Street

4      from the direction of --

5   A. Quincy.

6   Q. -- Quincy Street?

7           MR. STOCKWELL-ALPERT:  Objection.

8   A. Yes.

9   Q. What's the next thing that you see?

10          MR. STOCKWELL-ALPERT:  Objection.

11  A. I really can't -- couldn't see too much in

12     the car, because on Dunkeld there is parking

13     everywhere and there is Dumpsters on the

14     opposite side of where I'm at.  So there is

15     cars on both sides and a Dumpster, so I

16     really couldn't see too much of the base of

17     the car.  I could see the windshield and the

18     top of it, so -- but further up towards

19     Fayston there was less parking, so that's

20     when I seen the incident with the cop.

21  Q. So do you see the car traveling down Dunkeld

22     Street?

23  A. Traveling --

24          MR. STOCKWELL-ALPERT:  Objection.

1    A. -- up.

2    Q. I'm sorry.  Traveling up Dunkeld Street?

3    A. Yes, up.

4    Q. How long is it traveling up Dunkeld Street

5       before you see the police officer come into

6       the street?

7    A. How long?

8    Q. Yes.

9    A. How long did I see the car going?

10   Q. Yes.  If you can remember.

11   A. It was just a look and -- as the car is

12      going by.  So it's like -- I can't even give

13      you a time, sorry.

14   Q. As the car is going up Dunkeld Street, do

15      you then see a police car following that

16      car?

17               MR. STOCKWELL-ALPERT:  Objection.

18   A. Yes.

19   Q. And is the police car that's following this

20      car, the screeching car --

21   A. Uh-huh.

22   Q. -- is it a marked cruiser?

23   A. Yes.

24   Q. What color is it?

```
 1    A. White and blue.

 2    Q. And is the cruiser's sirens on?

 3    A. Yes.

 4    Q. Do you see who is in the cruiser?

 5    A. Like facewise?

 6    Q. Yes.

 7    A. No.

 8    Q. Do you see how many people are in the

 9       cruiser?

10    A. No.

11    Q. What is the distance between the screeching

12       car and the police cruiser?

13    A. It was a few seconds delay.  He was playing

14       catchup.

15    Q. Do you know what the distance was?

16             MR. STOCKWELL-ALPERT:  Objection.

17    A. No, I can't.

18    Q. But they were separated by a few seconds?

19    A. Yes.

20    Q. After you see the screeching car followed by

21       the police cruiser --

22    A. Uh-huh.

23    Q. -- up Dunkeld Street, what is the next thing

24       that happened?
```

```
 1    A. That's when the cop was in the street.

 2    Q. How do you know it's a cop?

 3    A. He was in uniform.

 4    Q. A Boston police uniform?

 5    A. Uh-huh.

 6    Q. Do you know what he looked like?

 7    A. No.

 8    Q. Do you know if he was African-American or

 9       white?

10    A. I believe he was Caucasian.

11    Q. Are you sure about that or are you --

12    A. Yes, I'm sure.

13    Q. What happens next?

14    A. The police officer yelled, Stop.  Put his

15       hand out, ready, you know, stop.

16    Q. For the record, Mr. Carter, did you just

17       motion your hand by putting your arm out and

18       in a position that is well known as stop?

19    A. Yes.

20    Q. So the officer went into the middle of the

21       street?

22    A. Yes.

23    Q. So the police officer went into the middle

24       of Dunkeld Street?
```

```
 1    A. Uh-huh, yes.

 2    Q. And he put his hand up?

 3            MR. STOCKWELL-ALPERT:  Objection.

 4    A. Yes.

 5    Q. What is your understanding as to why he put

 6       his hand up?

 7            MR. STOCKWELL-ALPERT:  Objection.

 8    A. Like -- the reason why he put his hand up,

 9       to stop the car.

10    Q. Did you hear him say anything?

11    A. Yes.  I heard his yell, Stop.

12    Q. Did he do anything else other than put his

13       hand up to motion stop?

14    A. He got in the car's way.

15    Q. I'm sorry?

16    A. He got in the car's way.

17    Q. Did the car stop?

18    A. It slowed down for a minute like it was

19       thinking about it and then it kept going.

20    Q. Did it accelerate?

21    A. Yes.

22    Q. And this is the same screeching car you saw

23       earlier on Dunkeld Street?

24    A. Yes.
```

1    Q. Followed by a police cruiser?

2    A. Yes.

3    Q. And what happens next after the car

4       accelerates?

5    A. The car -- the cop got hit.  Um, out of view

6       for me as he got hit.  He didn't fly in the

7       air.

8            MR. STOCKWELL-ALPERT:  I didn't hear

9       that.

10   A. He was out of view for me, because the other

11      cars were parked in the street.  He didn't

12      fly in the air.  He wasn't a hit like he got

13      flipped in the air.  So I couldn't see after

14      that.  I knew he went to the ground,

15      obviously, and the car went right around

16      him.  Went around where he was at and went

17      on to Fayston.

18   Q. What hits the officer?

19   A. The car.

20   Q. The same car that's the screeching car?

21   A. Yes.

22   Q. And what part of the car hits the officer?

23      And what I'm asking you is it the driver's

24      side or the front seat passenger side, if

1          you can identify it that way?

2     A. I believe it was the passenger side.

3     Q. So that would be the right side of the car?

4     A. Yes.

5     Q. Do you hear anything when the car hits the

6          officer?

7     A. No.

8     Q. Do you hear the officer's body or belt

9          collide with the vehicle?

10              MR. STOCKWELL-ALPERT:  Objection.

11    A. No.  I'm sorry.

12    Q. Do you see the officer go on top of the hood

13         of the car?

14    A. Not the whole hood.

15              MR. STOCKWELL-ALPERT:  Objection.

16    Q. I'm sorry, so what did you see happen to the

17         officer?

18    A. He didn't hit like the hood -- not the whole

19         hood, just the side of the hood, like, where

20         the light ares is that, the front of

21         headlight, that area.

22    Q. What part of the officer's body collides

23         with that part of the hood?

24    A. I believe the left side.  No, no.  I'm

```
 1          sorry.  I'm sorry.  At the time -- let me
 2          think about this.  It's the right side, I'm
 3          sorry.
 4     Q. The right side of the officer?
 5     A. Yes.
 6     Q. The officer's right side?
 7     A. Yes.  When he's positioned, it messed me up.
 8     Q. What part of the right side of his body
 9          collided with the hood of the screeching
10          car?
11     A. The middle to upper part.
12     Q. His upper body?
13     A. Yes.
14     Q. Is that part of his body on the hood?
15     A. I wouldn't even tell.
16               MR. STOCKWELL-ALPERT:  Objection.
17     A. A couple of seconds.
18     Q. At the time that the upper right part of his
19          body is on the hood, is his head down or up?
20               MR. STOCKWELL-ALPERT:  Objection.
21     A. The impact is -- pushed him forward, so...
22     Q. So the impact of the vehicle pushed the
23          officer forward --
24               MR. STOCKWELL-ALPERT:  Objection.
```

1    Q. -- onto the vehicle?

2              MR. STOCKWELL-ALPERT:  Objection.

3    A. Yes.

4    Q. What direction is the officer move into upon

5       impact?

6    A. Meaning like?

7    Q. What direction does the officer's body move

8       into at the time of the impact of the

9       vehicle?

10   A. Moves towards -- he moves towards the right.

11      The car is coming up and he moves over to

12      the right.

13   Q. I guess my question is:  When the vehicle

14      hits the officer --

15   A. Uh-huh.

16   Q. -- does the officer's body move forward

17      towards the vehicle?

18   A. Yes.

19             MR. STOCKWELL-ALPERT:  Objection.

20   Q. So upon impact of the vehicle, which

21      direction does the officer's body move

22      towards?

23             MR. STOCKWELL-ALPERT:  Objection.

24   A. Say that again, I'm sorry.

```
 1              MS. LITSAS:  Off the record.

 2              (Discussion off the record.)

 3   Q. After the officer's upper right part of his

 4      body moves towards the direction of the

 5      screeching vehicle, what happens next at

 6      that point?

 7              MR. STOCKWELL-ALPERT:  Objection.

 8   A. Um, he roles off the car onto the floor --

 9      to the ground, sorry.

10   Q. And in what direction does he go?

11   A. In whose direction, my direction or his

12      direction?

13   Q. His direction?

14   A. To the right.

15   Q. From where you are positioned at the time of

16      the incident, does the officer move towards

17      your right or towards your left?

18   A. He moves towards the right.  He rolls off

19      the car to your right.

20   Q. That's from your perspective?

21   A. Yes.

22   Q. From the officer's perspective, whose being

23      hit by the vehicle, is it his left or is it

24      his right?
```

```
 1              MR. STOCKWELL-ALPERT:  Objection.

 2    A. It's his left.  That's confusing.  Sorry.

 3    Q. After the officer falls on the ground, what

 4       happens next?

 5    A. The car slightly moves around like it was on

 6       -- preventing to run over him and he goes on

 7       to face him.

 8    Q. Do you see the car run over him?

 9    A. No.

10    Q. Where is the officer at the time that the

11       car moves after the impact?

12    A. On the ground.

13    Q. I'm sorry?

14    A. On the round.

15    Q. In which direction is he traveling?

16    A. The car?

17    Q. The car.

18    A. Up Dunkeld and take a right onto Fayston.

19       It's a one-way street.

20    Q. Is Dunkeld a one-way street?

21    A. No.

22    Q. Dunkeld is a two-way street?

23    A. Yes.

24    Q. At the time of the incident, was Dunkeld a
```

```
 1        two-way street?

 2   A. Yes.

 3   Q. At the time that the car moves following the

 4        impact with the officer, can you see the

 5        officer that was hit?

 6   A. No, no.

 7   Q. Why is that?

 8   A. Um, well, as I say, there are other cars

 9        parked in the street.  So cars were -- it

10        was making it hard for me to see him on the

11        ground.

12   Q. When the officer is on the ground, is the

13        screeching car in between your view of the

14        officer or obstructing your view of the

15        officer?

16   A. Say that again, I'm sorry.

17   Q. I'll rephrase the question.

18             When the officer is on the ground,

19        is the screeching car obstructing your view

20        of the officer on the ground?

21             MR. STOCKWELL-ALPERT:  Objection.

22   A. No.  Only -- the screeching car, no.

23   Q. What was obstructing your view of the

24        officer?
```

```
 1              MR. STOCKWELL-ALPERT:  Objection.

 2    A. Other parked cars.

 3    Q. Where were those other parked cars located?

 4    A. On -- on Dunkeld.

 5    Q. On Dunkeld Street?

 6    A. Yes.

 7    Q. Were they parked on both sides of the

 8       street?

 9    A. There was some on both sides.

10    Q. Which were the ones that were obstructing

11       your view on the right-hand side or the

12       left-hand side?

13    A. On my view, right-hand side.

14    Q. On your right-hand side?

15    A. Yes.

16    Q. At the time that the vehicle struck the

17       officer, what was the police car doing

18       behind the screeching car?

19    A. Following.

20    Q. And do you know what the distance was?

21    A. At that time, it was close.

22    Q. Were there sirens on at that time?

23    A. Yes.

24    Q. Did you see who was in that car, the police
```

1     car?

2    A. No.

3    Q. What were the occupants of the police

4       vehicle doing at the time that the officer

5       moved into the middle of the street who was

6       eventually hit?

7           MR. STOCKWELL-ALPERT:  Objection.

8    A. Meaning?  Say that again, I'm sorry.

9    Q. I'll rephrase the question.

10        Did you see the occupants of the

11      police car doing anything at the time that

12      the other officer moved into the street?

13    A. No.  He didn't do anything.

14    Q. Were they still inside the vehicle, the

15      police vehicle?

16    A. Yes, they was.

17    Q. At any point did the occupants of the police

18      vehicle move outside the police vehicle that

19      you saw?

20    A. No.

21    Q. After the vehicle collides with the officer,

22      and the officer falls on the ground, what

23      happens next at that point?

24           MR. STOCKWELL-ALPERT:  Objection.

```
 1    A. The car takes off onto Fayston.

 2    Q. The screeching car?

 3    A. Yes.  Immediately the officer that got hit

 4       gets back up and that's when I seen the

 5       other officer that was attending to

 6       something I don't know on Fayston is coming

 7       down.  They both -- the officer that got hit

 8       ran over, the other officer come running

 9       down, too.

10    Q. What happens next?

11    A. That's when the hear the gun shots.

12    Q. How much time passes when the officer being

13       struck by the screeching car and the shots

14       are fired?

15    A. After -- after the cop got struck?  It was

16       seconds.  It all happened so fast.

17    Q. At the time that you hear the gun shots,

18       what is the officer on the ground doing?

19    A. He already left running the street towards

20       Fayston.  He ran down Fayston.

21    Q. How much time elapses between the time that

22       the officer is struck by the vehicle and the

23       time that he's on the ground?

24    A. It was seconds.
```

```
 1    Q. And how much time elapses between the time
 2       that the officer is struck and the time that
 3       the officer gets up off the ground and runs
 4       down the street?
 5    A. I'm -- I'm -- rephrase that, please.
 6    Q. Sure.  How much time elapses between the
 7       time that the officer is struck by the
 8       vehicle and the time that that same officer
 9       moves down the street?
10    A. I can't really tell.  It was like -- it was
11       -- it was -- it happened so sudden.  It was
12       really fast.
13    Q. Was it a matter of seconds?
14    A. Not like -- not like 10 seconds, like 20
15       seconds, something like that.  I'm not
16       really sure.  It was -- it was just so fast.
17    Q. Do you see any gun shots?
18            MR. STOCKWELL-ALPERT:  I didn't hear
19       the question.  What's the question?
20    Q. Did you see any gun shots?
21            MR. STOCKWELL-ALPERT:  Objection.
22    Q. Did you see any gun shots fired?
23    A. No.  I just hear it.  I don't see no gun --
24       no gun shots.  I just hear them.
```

```
 1    Q. Do you look to see where they are being

 2       fired from?

 3    A. No.

 4    Q. Do you know if the shots are being fired by

 5       a police officer or someone else?

 6    A. No.

 7    Q. Do you know today who fired those gun shots?

 8             MR. STOCKWELL-ALPERT:  Objection.

 9    A. No.

10    Q. So after you hear the gun shots, you return

11       to Latoya's house on 5 Dunkeld Street?

12    A. Uh-huh.  I mean, yes.  I'm sorry.  Yes.

13    Q. At some point you said you saw another

14       police officer running down the street.

15    A. Uh-huh.

16    Q. Is that correct?

17    A. Yes.

18    Q. When do you see that officer running down

19       the street?

20    A. Immediately right after the other officer is

21       hit.

22    Q. Is it immediately after the officer gets hit

23       or at the same time that the officer gets

24       hit?
```

```
 1              MR. STOCKWELL-ALPERT:  Objection.

 2   A. It was right after.

 3              MS. LITSAS:  Off the record.

 4              (Discussion off the record.)

 5   Q. When you say "right after," do you know if

 6      that was a matter of seconds or minutes?

 7   A. Seconds.

 8   Q. Do you see what happens to that officer

 9      that's running down the street?

10   A. Which one are you talking about?

11   Q. Let me rephrase the question.

12              Seconds after the officer that

13      motions the screeching car to stop --

14   A. Yes.

15   Q. -- you then see another officer, correct?

16              MR. STOCKWELL-ALPERT:  Objection.

17   A. No.  The officer was off, I guess from my

18      opinion, tending to something else down the

19      street.  I'm not sure what.  And the other

20      officer was outside waiting.  The other

21      officer was at the doorway.  I'm not sure

22      whether it was a he or she.  I don't know

23      what he was doing.  And that's when the

24      incident with the screeching car.
```

```
 1              The other officer was in the
 2         doorway, went to the street and yelled,
 3         Stop.  And that's when the partner -- I
 4         guess it's partner -- came down from the
 5         doorway.  So the officer then got hit, so
 6         she was coming out of the -- the fenced
 7         area.  There was a fenced area, walkway to a
 8         doorway.  And, um, came out of that area and
 9         went off down Fayston.  So everything was
10         like seconds, like mere seconds of the
11         situation.
12    Q.   That officer that you are describing coming
13         out of the fenced-in area, who was that
14         officer?
15    A.   That's not the one that got hit.
16    Q.   Okay.
17    A.   The one that got hit was already on the
18         sidewalk, like just basically posted right
19         there.  The other officer was up at the
20         doorway.  I don't know what that officer was
21         doing, I can't say.  And that's when -- we
22         really wasn't paying no mind to the
23         officers, because there was nothing really
24         going on that we know of to be watching out
```

```
 1          for police officer.  It is like, There is

 2          cops.  Oh, well.  Still talking, but there

 3          was no -- so we didn't pay no mind to the

 4          officers.

 5     Q. So what did that officer -- not the one that

 6          was hit, but the other officer, what did he

 7          do?

 8     A. Right after the other officer got hit?

 9     Q. Yes.

10     A. The time frame, he ran down towards Fayston.

11     Q. Did he run on the sidewalk?

12     A. On the street.

13     Q. And do you know what he looked like?

14     A. No.

15     Q. Where were you when you see him running down

16          the street?

17     A. I was in front of -- that's the time I got

18          back in front of the house on Dunkeld,

19          Latoya's house.

20     Q. And he was running down Dunkeld Street?

21     A. No, he was running down Fayston.

22     Q. So this officer was running down Fayston

23          Street?

24     A. Yes.
```

```
1   Q. And where were you at the time that you saw

2      this officer running down Fayston Street?

3   A. I was going back up to Latoya's house.  Not

4      inside the -- the outside area.

5   Q. At the time that you see the other officer

6      that was struck by the screeching vehicle,

7      where are you?

8   A. Just headed up to the house.

9   Q. Are you on the sidewalk on Dunkeld Street?

10  A. Yes.  Yes, the sidewalk.

11  Q. Are you on the same sidewalk as 5 Dunkeld

12     Street?

13  A. Yes.

14  Q. Are you right in front of 5 Dunkeld Street?

15  A. At the time, not right in front of it.

16     There is a little alleyway beside the

17     building, so I'm walk up towards -- there is

18     steps before you go inside of the building.

19     So I'm walking up to the steps.  And the

20     whole incident, like I said, was really

21     quick.  So imagine you walking in between

22     houses to the 5 Dunkeld.

23         MR. OUELLETTE:  Can we have this

24     marked as the next exhibit.
```

```
 1              (Map was marked

 2               as Exhibit No. 3.)

 3    Q. Mr. Carter, I'm showing you a document.  Do

 4       you recognize what this document is or can

 5       you identify it?

 6    A. (Peruses document.)  Quincy Street.  It's a

 7       -- it's a map.

 8    Q. Is's map that depicts Dunkeld Street and

 9       Quincy Street and Fayston Street?

10    A. Yes.

11    Q. And that document has been marked as Exhibit

12       No. 3, correct?

13    A. Yes.

14    Q. Can you just point on this document for me

15       where Dunkeld Street is located?

16    A. Right there.  )Indicates.)

17    Q. Looking at this map, Exhibit No. 3, can you

18       point for me where 5 Dunkeld Street is?

19    A. Right here.  (Indicates.)

20    Q. So 5 Dunkeld Street is this building?

21    A. Uh-huh.  Yes, I'm sorry.  Yes.

22    Q. I'm going to give you a pen.  And can you

23       mark the number 5 where you indicated 5

24       Dunkeld Street is located?
```

```
 1    A. (Indicates.)

 2    Q. And can you point for me where you are when

 3       you hear the screeching brakes?

 4              MR. STOCKWELL-ALPERT:  Objection.

 5    Q. Strike that.

 6              Can you point for me where you are

 7       at the time that you hear the screeching

 8       brakes on Exhibit No. 3?

 9              MR. STOCKWELL-ALPERT:  Objection.

10    A. I am here.  (Indicates.)  I can't really.

11    Q. Right in front of Dunkeld Street?

12    A. Yes.

13    Q. Can you point for me where you first see the

14       screeching car?

15              MR. STOCKWELL-ALPERT:  Objection.

16    A. Right here.  (Indicates.)

17    Q. I'm going to give you a pen and what I'd

18       like you to do is make a small S and a

19       circle around the S to indicate that.

20              MR. STOCKWELL-ALPERT:  Can we go off

21       the record for a minute, please.

22              (Discussion off the record.)

23    Q. When you first hear the car that struck the

24       officer, can you point for me where that car
```

```
 1       was?

 2    A. Do you want me to put an S, too.

 3    Q. Could you please put an S and a circle

 4       around it.

 5    A. (Indicates.)

 6    Q. Can you point for me where the officer is at

 7       the time that you see him come out and

 8       motion to the car to stop?

 9    A. Right here.  (Indicates.)

10            MR. MCCALL:  I didn't see that.

11    A. (Indicates.)

12    Q. And can you please make the letter P and put

13       a circle around it to denote where the

14       officer was at the time that you saw him

15       motion the car to stop?

16    A. (Indicates.)

17    Q. At the time that you see the officer first

18       come out and motion the car that struck the

19       officer to stop, where is that car located?

20            Strike that.  That's a poor

21       question.

22            When the officer first comes out to

23       motion the car to stop --

24    A. Uh-huh.
```

```
 1    Q. -- where is that car?  Point for me.

 2    A. Right here.  (Indicates.)

 3    Q. Can you makes an S-2 to denote where that

 4       car is located?

 5    A. S-2?

 6    Q. S-2.

 7    A. (Indicates.)

 8              MR. STOCKWELL-ALPERT:  I'm going to

 9       object to the use of the letter S.

10    A. You can't read that, I'm sorry.  It's small.

11              MR. OUELLETTE:  Why don't we just

12       take a break.

13              (Recess taken.)

14              (Enlargement of Exhibit No. 3

15                was marked as Exhibit No. 4.)

16    Q. Mr. Carter, I'm showing you what has been

17       marked as Exhibit No. 4.

18    A. Uh-huh.

19    Q. Is that correct?

20    A. (Peruses photograph.)  Yes.

21    Q. Can you identify what this is?

22    A. A map.

23    Q. And in this Exhibit No. 4, do you see

24       Wayland Street, Quincy Street, Fayston
```

```
 1          Street and Dunkeld Street --

 2     A. Yes.

 3     Q. -- depicted?

 4     A. Yes.

 5     Q. Can you point for me where you are on

 6          Dunkeld Street at the time that you see the

 7          car strike the officer?

 8     A. That's kind of the hard.  There is no

 9          buildings or anything, so I didn't want to

10          take no guess.

11                MR. STOCKWELL-ALPERT:  Objection.

12          Not the answer, object to the question.

13     A. Okay.  I really can't.  I don't want to -- I

14          don't want to -- it's -- the buildings

15          helped me out on the last one.

16     Q. So in this diagram, Exhibit No. 3, the

17          buildings help you out?

18     A. Yes.

19     Q. Can you point for me where you are at the

20          time that the car strikes the officer?

21     A. Where am I at?

22     Q. Where are you?

23     A. Right here.  (Indicates.)

24     Q. And what you're pointing to is number 5
```

```
 1        Dunkeld Street; is that correct?

 2   A. Yes.

 3   Q. Please draw a T and circle it to denote

 4      where you are at the time you see the car

 5      strike the vehicle?

 6   A. Okay.  (Indicates.)

 7            MR. STOCKWELL-ALPERT:  Objection.

 8      The car strikes the vehicle?

 9   Q. I'm sorry.  Let me rephrase the question.

10            Please draw a T with a circle around

11      it to denote where the car strikes the

12      officer?

13   A. Okay.  (Indicates.)

14   Q. Did you do that?

15   A. Yes.

16   Q. What's you've depicted there is a T with a

17      circle around it; is that correct?

18   A. Yes.

19   Q. At the time that you see the vehicle strike

20      the officer?

21   A. Uh-huh.

22   Q. What is the distance between you and that

23      car, approximately?

24   A. I can't say.
```

```
1     Q. Is it more then 100 feet?

2     A. I'm sorry, I can't say.

3     Q. What you've depicted here in Exhibit No. 3,

4        am I correct when I say at the time that the

5        vehicle strikes the officer, the car and the

6        officer are at the intersection of Fayston

7        Street and Dunkeld Street?

8     A. Yes.

9     Q. And you testified earlier that at the time

10       of the incident, there were cars parked

11       along the side of Dunkeld Street; is that

12       correct?

13    A. Yes.

14    Q. Are you outside 5 Dunkeld Street on the

15       sidewalk at the time that the vehicle

16       strikes the officer?

17              MR. STOCKWELL-ALPERT:  Objection.

18    A. Yes.

19    Q. You are standing at that time?

20    A. Yes.

21    Q. What are the weather conditions like at that

22       time?

23    A. I can't remember.

24    Q. Is it raining?
```

```
 1                    MR. STOCKWELL-ALPERT:  Objection.

 2    A. No.

 3    Q. Is it snowing?

 4    A. No.

 5    Q. Is there any precipitation obstructing your

 6       view?

 7    A. No.  I just couldn't you tell whether it's

 8       hot or cold.  I don't know the temperature.

 9    Q. At the time that the vehicle strikes the

10       officer, are you facing the direction of the

11       vehicle?

12                    MR. STOCKWELL-ALPERT:  Objection.

13    A. Yes.

14                    MS. LITSAS:  Off the record.

15                    (Discussion off the record.)

16    Q. Mr. Carter, what direction were you facing

17       at the time that the vehicle struck the

18       officer?

19    A. Say that again.

20                    MS. LITSAS:  Could you read the

21       question back.

22                    (Pending question was read.)

23    A. I was facing towards Fayston Street.

24    Q. So you were facing the direction in which
```

```
 1        the vehicle struck the officer?
 2              MR. STOCKWELL-ALPERT:  Objection.
 3   A. Yes.
 4   Q. At the time that the vehicle struck the
 5        officer, were you stationary or were you
 6        moving?
 7   A. Um, it was -- it was a little movement.  It
 8        wasn't like I wasn't still.  I was moving
 9        towards the house.
10   Q. Were you walking?
11   A. Yes.
12   Q. In what direction were you walking?
13   A. I was walking towards 5 Dunkeld.
14   Q. Was anybody with you?
15   A. No, no.
16   Q. Were you talking to anybody?
17              MR. STOCKWELL-ALPERT:  Objection.
18   A. Um, I -- I was talking to a lot of people
19        out there.  I'm not sure, like, of them by
20        name.
21   Q. At the time that you're walking in the
22        direction of Fayston Street, what are you
23        doing other than walking?
24   A. Finishing a cigarette.
```

```
 1    Q. What is the next thing that you do after you

 2       see the vehicle strike the officer?

 3            MR. STOCKWELL-ALPERT:  Objection.

 4            Do you want to know the basis?

 5       Asked and answered.

 6    Q. You may answer.

 7    A. Can you repeat that, please.

 8    Q. I'll just reask the question.

 9            What is the next thing that you do

10       after you see the vehicle strike the

11       officer?

12            MR. STOCKWELL-ALPERT:  Objection.

13    A. I was shocked.  I -- I just looked like wow,

14       that happened.

15    Q. At the time that you see the vehicle strike

16       the officer, you continued to walk; is that

17       correct?

18            MR. STOCKWELL-ALPERT:  Objection.

19    A. Yes.  I was -- I was walking towards the

20       stairs that lead into 5 Dunkeld.

21    Q. What do you have to do in order to do that?

22    A. To go into -- to get to Dunkeld?  There was

23       a couple of steps and then there is the door

24       and you ring the doorbell and then they buzz
```

```
 1      you in.
 2   Q. Did you reach the door at the time that the
 3      vehicle strikes the officer?
 4   A. No.
 5   Q. Are you still on the street at the time that
 6      the vehicle strikes the officer?
 7           MR. STOCKWELL-ALPERT:  Objection.
 8   A. Um, I have one foot on the ground on the
 9      sidewalk and one foot on the stairs, like
10      leaning against the railing.
11   Q. Is one foot still on the step and your hand
12      on the railing at the time that you see the
13      officer's upper body move on top of the hood
14      of the car?
15           MR. STOCKWELL-ALPERT:  Objection.
16   A. Yes.  My back was on the railing.
17   Q. And in what direction are you facing --
18   A. I'm still facing -- well, Fayston.
19   Q. At the time that you see the officer's upper
20      body move on top of the hood --
21           MR. STOCKWELL-ALPERT:  Objection.
22           MS. LITSAS:  Off the record.
23           (Discussion off the record.)
24   Q. At the time that you see the officer's upper
```

```
 1        body on top of the vehicle, what direction

 2        are you facing?

 3             MR. STOCKWELL-ALPERT:  Objection.

 4    A. I'm facing the direction of Fayston Street.

 5    Q. At any point do you turn your head?

 6    A. I'm sorry.  No.  No, I didn't.  It was a

 7        situation where the cop is -- attention --

 8        my attention was on that.

 9    Q. At all points during the course of the

10        incident, what direction are you facing?

11    A. I'm facing Fayston Street.

12    Q. At all points during the course of the

13        incident and the next few seconds that

14        follow, did you remain at the same position

15        in which you initially see the officer being

16        struck by the vehicle?

17    A. Yes.

18    Q. So you're not walking up the stairs during

19        the course of the incident?

20    A. No.

21    Q. When you see the officer being struck by the

22        vehicle, do you see any other officer at

23        that time?

24    A. No.  I was just focused on that situation,
```

```
 1          that's -- it was a shock to see that.
 2     Q. Do you see anybody else on Dunkeld Street at
 3          that time?
 4     A. Like what do you mean, like people?
 5     Q. Yes.
 6     A. I just -- I knew people was out there, but I
 7          wasn't focused on them.
 8     Q. Do you know what their names are?
 9     A. No.  I just know them by face, see them
10          around, hi, hi, that's it.
11     Q. At the time that the officer falls to the
12          ground after being struck by the vehicle,
13          are you still at the same location?
14     A. Yes.
15     Q. In the same position?
16     A. Yes.
17     Q. At that point is there anything obstructing
18          your view when you see the vehicle strike
19          the officer?
20     A. Just the cars parked on the street.
21     Q. Where are those cars located?  Can you point
22          for me where they are on Exhibit No. 3?
23     A. Right here all on the side.  (Indicates.)
24     Q. On the right-hand side?
```

```
 1    A. Yes.

 2    Q. Can you mark an X on Exhibit No. 3 to denote

 3       where the cars are parked, please.

 4    A. How many or just one?

 5    Q. Well, let me ask you a question:  Do you

 6       know how many cars were parked in that

 7       location?

 8    A. No.

 9    Q. Was it more than one?

10    A. Yes, it was more than one.

11    Q. Was it more than two?

12    A. I couldn't be sure.

13    Q. Was there more than three?

14    A. I'm not sure.  I know there was more than

15       one.

16    Q. Could you then note two Xs as to where the

17       cars would be located that were parked on

18       Dunkeld Street?

19    A. (Indicates.)

20    Q. At the time --

21    A. Can I ask a question?

22    Q. Yes.

23    A. Do you mean the Xs that obstructed my view

24       from the officer and the car.
```

1    Q. Yes.

2    A. Okay, those are fine.

3    Q. And are those the Xs that --

4    A. Yes.

5    Q. And do those cars that you've denoted on

6       Exhibit No. 3 as two Xs --

7    A. Yes.

8    Q. -- do those obstruct all of your view?

9    A. All of my view of what?

10   Q. Let me withdraw the question.

11              How do those cars denoted as X as

12      Exhibit No. 3 obstruct your view?

13   A. Basically from where I was standing, I could

14      see over the car, but I couldn't see

15      underneath it.

16   Q. What do you mean that you could see over the

17      car and not underneath it?

18   A. Like you see waist up of any situation, but

19      I couldn't see after the officer fell to the

20      ground.

21   Q. So you could not see what happened to the

22      officer after he fell to the ground?

23              MR. STOCKWELL-ALPERT:  Objection.

24   A. No.

1    Q. Why is that?

2    A. Because the cars parked were in the way.

3    Q. Were you able to see what the officer was

4       doing on the ground after he was struck by

5       the vehicle?

6    A. No.

7    Q. Do you remain looking in the direction of

8       the collision at the time that the officer

9       falls on the ground?

10   A. Yes.

11   Q. After the officer falls on the ground, what

12      do you see the car that struck him do, if

13      anything?

14   A. The car that struck the officer turned

15      around onto Fayston.

16   Q. Does the car turn from Dunkeld Street onto

17      Fayston Street?

18   A. Yes.

19   Q. Does the car turn right onto Fayston Street

20      or left onto Fayston Street?

21   A. Turns right.

22   Q. So the car turns right from the perspective

23      of the driver of the car, correct?

24   A. Yes.

```
 1    Q. How fast is the car going at that time?

 2    A. I couldn't tell.

 3    Q. Do you know how long the officer that was

 4       struck is on the ground for?

 5    A. Um, seconds.

 6    Q. What is the next thing that you see as the

 7       car turns right onto Fayston Street?

 8    A. I see the other officer run down Fayston and

 9       immediately after that I see the officer

10       that was struck run down Fayston, too.

11    Q. Is that occurring at the same time?

12    A. Not the same time.  The officer that was off

13       -- that was running down Fayston over here

14       was on the other side.  The other officer

15       got back up that was struck and he ran down

16       Fayston.

17    Q. As you see the car take a right onto Fayston

18       Street, do you also see the other officer

19       that was not struck by the vehicle?

20    A. Yes.

21    Q. Can you point to me on Exhibit No. 3 where

22       that officer is located at that point in

23       time?

24    A. Right here.  (Indicates.)
```

```
 1    Q. Can you put a P2 to denote the other
 2       officer's location at the time that you see
 3       the car turning?
 4    A. (Indicates.)
 5    Q. So what you've just denoted, is that P2; is
 6       that correct?
 7    A. Uh-huh.
 8    Q. And that is to denote the location of the
 9       other officer that you see?
10    A. Uh-huh.
11    Q. And what is he doing at that time?
12    A. At the time as the officer is being struck?
13    Q. Yes.
14    A. I couldn't tell you what they were doing.
15    Q. What is the officer you've denoted as P-2
16       doing?
17    A. At the time the officer is being struck?
18    Q. Yes.
19    A. My focus was on the officer.
20    Q. When do you see the other officer denoted as
21       P-2?
22    A. After the car turned onto Fayston.
23    Q. Has it completely turned onto Fayston?
24    A. Um...
```

```
 1    Q. Or is it in the process of the turn?

 2    A. No.  It was half and half.

 3    Q. So it's half on Dunkeld and half on Fayston?

 4    A. I could see the trunk and the bumper as the

 5       other cop was running down Fayston towards

 6       it.

 7    Q. At that time is the car in between the two

 8       police officers?

 9    A. Um, I don't -- between the one that got

10       struck and the other officer?

11    Q. Yes.

12    A. Yes.

13    Q. You see the other officer that is not struck

14       running down Fayston Street?

15             MR. STOCKWELL-ALPERT:  Objection.

16    A. Yes.

17    Q. And do you see what he is doing as he's

18       running down Fayston Street?

19    A. No.

20    Q. Do you see anything in his hands?

21    A. I can't remember.

22    Q. Is he saying anything?

23    A. Not to -- no.  I'm -- I can't remember.

24    Q. Are you saying anything?
```

```
 1    A. No.

 2    Q. Do you hear anything?

 3    A. Um, gun shots.

 4    Q. When you hear the gun shots, where are you

 5       located?

 6    A. Um, off -- at 5 Dunkeld.

 7    Q. So at the time that you hear the gun shots,

 8       you're located at 5 Dunkeld Street?

 9            MR. STOCKWELL-ALPERT:  Objection.

10    Q. Are you on the sidewalk?

11    A. The same position as before.

12    Q. Do you see anyone fire gun shots?

13    A. No.

14    Q. At the time that you hear the gun shots, do

15       you also see the other officer running down

16       Fayston Street?

17    A. Say that again, I'm sorry.  Repeat that.

18            MS. LITSAS:  Can you read the

19       question, please.

20            (Pending question was read.)

21            MR. STOCKWELL-ALPERT:  I'm objecting

22       to that question, just so it's on the

23       record.  I don't know by "other officer"

24       whether you mean Officer P-2 or P-1, which
```

```
 1        one is it at this particular point.

 2              MR. OUELLETTE:  Okay.  I can

 3        clarify, Counsel.

 4   Q. At the time that you hear gun shots, what is

 5        officer you denoted as P-2 doing?

 6   A. Um, running down Fayston.  I couldn't see

 7        passed this point.  (Indicates.)

 8   Q. Why don't you just point for me what you

 9        can't see.

10   A. Passed that point.  The corner of Dunkeld

11        and Fayston I couldn't see.

12   Q. Can you mark the letter W to denote where

13        you can longer see on Exhibit No. 3.

14   A. (Indicates.)

15   Q. Do you know what officer P-2 looked like?

16   A. No.

17   Q. Do you know if he was African-American or

18        Caucasian?

19   A. Caucasian.

20   Q. Do you know where P-2 is located at the time

21        that you first hear the gun shots?

22   A. No, I can't.

23   Q. Do you know where the officer that's struck

24        by the vehicle is the first time you hear
```

```
 1        the gun shots?

 2   A. No, I don't know where he is.

 3   Q. Do you know what the officer, who was struck

 4        by the vehicle, is doing at the first time

 5        you hear the gun shots?

 6   A. No, I can't tell that you.

 7   Q. Why is that?

 8   A. Um, at the time they were -- both ran out of

 9        sight, of my vision.

10   Q. When is the first time that you see the

11        officer who is struck by the vehicle run?

12   A. It was a matter of seconds after he got hit.

13   Q. How long did this whole incident last?

14   A. From the time that the car got onto Dunkeld?

15   Q. Yes.

16   A. Five -- five minutes.  No more to that.

17   Q. How much time elapsed between the time that

18        the officer is struck by the vehicle and

19        shots are fired?

20   A. Estimated guess or possibly a guess?  I

21        really can't tell exact seconds, but it was

22        very quick.

23   Q. Was it a matter of seconds?

24   A. From when the cop got hit?
```

1    Q. Yes.  And the first time you hear shots

2       fired?

3    A. Yes.

4    Q. At the first time you hear shots fired,

5       where is the car located?

6    A. Out of sight.  Which car?  The white car?

7    Q. Yes.

8    A. It's out of sight.

9    Q. So at the time that you first hear shots

10      fired, the car is out of your sight?

11           MR. STOCKWELL-ALPERT:  Objection.

12   A. Yes.

13   Q. Why is that?

14   A. Because the car turned onto Fayston.

15   Q. At the time that the first shot is fired,

16      has the car completely turned onto Fayston

17      Street?

18           MR. STOCKWELL-ALPERT:  Objection.

19           I want to go off the record.

20           (Discussion off the record.)

21   Q. Mr. Carter, at the time that you first see

22      the second police officer, who is not struck

23      by the vehicle, where is the car located?

24   A. It just turned onto Fayston.

```
 1    Q. And am I correct when I ask you that when

 2       you testified earlier when you first see the

 3       police officer, the second police officer,

 4       P-2, the car is half onto Fayston and half

 5       onto Dunkeld?

 6    A. Uh-huh.

 7    Q. How much time elapses between the car is

 8       half onto Dunkeld and half onto Fayston

 9       Street?

10            MR. STOCKWELL-ALPERT:  Objection.

11    A. Um, could you repeat that, please?  Sorry.

12            MS. LITSAS:  Read back the question,

13       please.

14            (Pending question was read.)

15    A. Seconds.

16    Q. More than one second?

17            MR. STOCKWELL-ALPERT:  Objection.

18    Q. If you don't know, that's a perfectly fine

19       answer.

20    A. I really don't know.  I know it was seconds.

21    Q. Do you see the car turn completely onto

22       Fayston Street?

23    A. Do I see it?

24    Q. Yes.
```

```
 1    A. Yes.

 2    Q. How long do you see the car completely turn

 3       onto Fayston Street for?

 4            MR. STOCKWELL-ALPERT:  Objection.

 5    A. I don't understand.

 6            MR. STOCKWELL-ALPERT:  That's why I

 7       objected.

 8    Q. It was a poor question.  I'll rephrase.

 9            At some point is your view of the

10       car traveling on Fayston Street obstructed?

11    A. You mean like -- did I have a clear view of

12       it turn?

13    Q. Yes.

14    A. Yes.

15    Q. How is it obstructed?

16    A. I'm sorry.  I'm not understanding.  Are you

17       asking me did I see the car turn on Fayston?

18    Q. Yes.

19    A. Yes, I seen it.

20    Q. And what do you see next after the car turns

21       onto Fayston Street?

22    A. Then I see P-2 run down the street.  And

23       then that's when I believe P-1 jumps up and

24       runs down the street.
```

```
 1   Q. And then what happens?

 2   A. That's when I hear gun shots.  That's when I

 3      go in the house and call it a night.

 4   Q. I'm sorry, what was that last part that you

 5      said.

 6   A. I call it a night.  I went in the house.

 7   Q. What's the last thing that you see or hear

 8      before you go into 5 Dunkeld Street?

 9   A. The last thing and I see and hear?

10   Q. See or hear?

11   A. The last thing I heard was gun shots and I

12      went in the house.

13   Q. Do you know from what direction those gun

14      shots are coming?

15            MR. STOCKWELL-ALPERT:  Objection.

16   A. No.  I could not really say.  I just know it

17      was coming from the direction of -- facing

18      towards Fayston.  I couldn't say left or

19      right.  I just heard gun shots and I got

20      out.

21   Q. Can you point for me where on Exhibit No. 3

22      you hear the gun shots coming from?

23   A. This direction.  (Indicates.)

24   Q. Can you point for me again?
```

```
 1    A. The direction I hear it coming from?

 2    Q. Yes.

 3    A. Okay.  Up here.  (Indicates.)

 4    Q. Where you're pointing to is the same

 5       location as the W?

 6    A. Yes.

 7              MR. STOCKWELL-ALPERT:  Off the

 8       record.

 9              (Discussion off the record.)

10    Q. After you go into Dunkeld Street, at some

11       point you returned outside; is that correct?

12    A. Yes.

13    Q. At the time that you hear the gun shots, do

14       you see the police cruiser that was

15       following the car?

16    A. Um, I can't remember.  I heard gun shots and

17       I went in the house.  That's -- when I heard

18       un shots I said, Let's go in the house.

19    Q. Do you know what the police cruiser was

20       doing at the time that the gun shots were

21       fired?

22    A. No, I do not.

23    Q. Do you know where the police cruiser was at

24       the time that the gun shots were fired?
```

```
 1    A. I can't remember.  Once you heard it, I took
 2       off.
 3    Q. How long were you in 5 Dunkeld Street after
 4       you had heard the gun shots?
 5    A. Um, about an hour, 45 to on an hour.
 6    Q. When you first go back into Dunkeld Street,
 7       do you hear anything?
 8    A. Just sirens.
 9    Q. Do you hear anything else other than sirens?
10    A. No.
11    Q. What did you do while you're in 5 Dunkeld
12       Street after you hear sirens?
13    A. Um, I was looking out the window to see
14       where the sirens were coming from.  I
15       couldn't see because of the buildings.  I
16       can't remember exactly, because I just sat
17       down and stayed to ourselves.
18    Q. Did you tell Latoya what you saw?
19    A. Um, no.  I don't think I did.  She was on
20       the phone.
21    Q. At some point you leave 5 Dunkeld Street; is
22       that right?
23    A. Yes.
24    Q. What did you do next?
```

```
 1    A.  Um, I come out -- come out of 5 Dunkeld.  I
 2        walked towards Dunkeld and Quincy, because
 3        that's write live towards, that direction.
 4        And, um, I was walking with a friend of
 5        mine, but I can't remember the name.  He was
 6        just on the street.  He was, like, on the
 7        street, but not a personal friend.
 8            And, um, an officer walked up to me
 9        and that's when I told him what happened.  I
10        don't know how the conversation came about.
11        Like, eh knew that I knew something, but I
12        just told him what happened.  And I gave him
13        my information whether I lived at and my
14        number and he let me go and I just walked on
15        home.
16    Q.  Do you know who that officer was?
17    A.  No, I can't remember his name.
18    Q.  When I walked outside of 5 Dunkeld Street,
19        what did you see, if anything?
20    A.  I just seen the officer that was on Quincy
21        Street and Dunkeld, the corner of Quincy and
22        Dunkeld.  I believe they had it blocked off
23        and that was it.  I told him -- I talked to
24        the officer and he took down any statement
```

1    and everything and so he told me to go on

2    home and I went home.

3    Q. Do you know approximately what time this

4       was?

5    A. That he talked to me?

6    Q. Yes.

7    A. I couldn't remember.

8    Q. Do you know how much time it was since the

9       incident with the car and the police

10      officer?

11              (Interruption by cell phone.)

12              THE WITNESS:  I'm sorry.  Can I

13      answer this, please?

14              MS. LITSAS:  We can take a break.

15              (Recess taken.)

16              MS. LITSAS:  For purposes of the

17      record, we are suspending today's deposition

18      because Mr. Carter has some childcare issues

19      and he has agreed to return for the second

20      day of his deposition on Thursday, January

21      24 at 12:30 p.m.  And Counsel has also

22      agreed with that on that date.  So we will

23      suspend today's deposition and continue it

24      on Thursday, January 24 at 12.30 p.m., at

```
1       City Hall.

2                  (Whereupon the deposition

3                   suspended at 4:50 p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

1              C E R T I F I C A T E

2

3    COMMONWEALTH OF MASSACHUSETTS

4    MIDDLESEX, SS.

5

6              I, Karen Borreson, RPR, a Notary

7    Public in and for the Commonwealth of

8    Massachusetts, do hereby certify that TRAVO

9    CARTER, the witness whose deposition is

10   hereinbefore set forth, was duly sworn by me

11   and that such deposition is a true and

12   accurate record, to the best of my knowledge,

13   skills, and ability, of the testimony given

14   by such witness.

15              IN WITNESS WHEREOF, I have

16   hereunto set my hand and affixed my seal of

17   office this 18 th day of January, 2008.

18

19

20                        Karen Borreson, RPR

21                        Notary Public

22

23   My commission expires:

24   May 21, 2010

```
 1      DEPONENT'S ERRATA SHEET

 2      AND SIGNATURE INSTRUCTIONS

 3

 4              The original of the Errata Sheet

 5      has been delivered to HELEN LITSAS, Esq.

 6              When the Errata Sheet has been

 7      completed by the deponent and signed, a copy

 8      thereof should be delivered to each party of

 9      record and the ORIGINAL delivered to HELEN

10      LITSAS, Esq. to whom the original deposition

11      transcript was delivered.

12

13              INSTRUCTIONS TO DEPONENT

14

15              After reading this volume of

        your deposition, indicate any corrections or

16      changes to your testimony and the reasons

        therefor on the Errata Sheet supplied to you

17      and sign it.  DO NOT make marks or notations

        on the transcript volume itself.

18

19      REPLACE THIS PAGE OF THE TRANSCRIPT WITH THE

20      COMPLETED AND SIGNED ERRATA SHEET WHEN

21      RECEIVED.

22

23

24
```

```
1       ATTACH TO THE DEPOSITION OF TREVO CARTER
        CASE:  DANCY-STEWART V. TAYLOR
2       TAKEN ON THURSDAY, JANUARY 27, 2008
3                       ERRATA SHEET
4       INSTRUCTIONS:  After reading the transcript
        of your deposition, note any change or
5       correction to your testimony and the reason
        therefor on this sheet.  DO NOT make any
6       marks or notations on the transcript volume
        itself.  Sign and date this errata sheet
7       (before a Notary Public, if required).  Refer
        to Page 91 of the transcript for errata sheet
8       distribution instructions.
9       PAGE    LINE
                    CHANGE:
10                  REASON:
                    CHANGE:
11                  REASON:
                    CHANGE:
12                  REASON:
                    CHANGE:
13                  REASON:
                    CHANGE:
14                  REASON:
                    CHANGE:
15                  REASON:
                    CHANGE:
16                  REASON:
                    CHANGE:
17                  REASON:
                    CHANGE:
18                  REASON:
                    CHANGE:
19                  REASON:
20              I have read the foregoing
        transcript of my deposition and except for
21      any corrections or changes noted above, I
        hereby subscribe to the transcript as an
22      accurate record of the statements made by me.
23
                        TREVO CARTER
24                      DATE:_____
```