# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

### CIVIL ACTION NO. 05-11803-MLW

SHENIA DANCY-STEWART as
Administratrix of the Estate of EVELINE
BARROS-CEPEDA,
        Plaintiffs,

v.

THOMAS TAYLOR, Jr., and the CITY
OF BOSTON,
        Defendants.

## DEFENDANTS CITY OF BOSTON'S AND THOMAS TAYLOR'S MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO COMPEL NONPARTY WITNESS CARLOS FERNANDES' DEPOSITION TESTIMONY

Defendants, City of Boston and Thomas Taylor, Jr. ("Defendants"), hereby move this Honorable Court for an Order requiring Mr. Carlos Fernandes to answer various deposition questions he has refused to answer because such questions either do not implicate his Fifth Amendment right against self-incrimination, and/or assuming arguendo that if they do have such application, Mr. Fernandes has effectively waived such privilege. During Mr. Fernandes' deposition, held on February 21, 2008, Mr. Fernandes invoked his Fifth Amendment privilege not only to innocuous, inapplicable questions, but also to questions in which the Fifth Amendment privilege had been effectively waived. See Exhibit A, Deposition Transcript of Carlos Fernandes. The Defendants now seek an Order compelling Mr. Fernandes to answer the myriad of deposition questions posed to him that have no bearing on his Fifth Amendment right and/or on questions in which the privilege has been effectively waived.

## I. Factual Backdrop

By way of background, the Plaintiff brings this civil rights suit following the death of the decedent, Eveline Barros-Cepeda. At the time of her death on September 8, 2002, the decedent was traveling with Maria DaRosa, Luis Carvalho and Carlos Fernandes in a vehicle driven by Brima Wurie. When the Wurie vehicle failed to heed police commands to stop, and then deliberately struck Boston Police Officer Michael Paillant, Officer Taylor discharged his firearm to apprehend Wurie and prevent further injury to Officer Paillant. Following this incident, Ms. Barros-Cepeda, a back seat passenger in the vehicle, suffered fatal wounds. Carlos Fernandes, therefore, is an individual who may offer relevant eyewitness testimony to the September 8, 2002 incident.

## II.    The Fifth Amendment Privilege Is Inapplicable to the Majority of Mr. Fernandes' Deposition Questions.

Over the course of his deposition, Mr. Fernandes invoked his Fifth Amendment privilege well beyond questions appropriate for such an assertion. It is well-established that simply because an individual invokes the Fifth Amendment privilege does not mean it must necessarily be recognized. Hoffman v. United States, 341 U.S. 479, 486-87 (1951). Rather, "[i]t is for the court to say whether his silence is justified, and to require [the claimant] to answer if 'it clearly appears to the court that he is mistaken' " Hoffman, 341 U.S. at 486. "If it 'clearly' appears to the court that the witness is 'mistaken' or is advancing his or her claim as a subterfuge, the court should compel the witness to answer." In re Brogna, 589 F.2d 24, 27 (1st Cir. 1978).

The Fifth Amendment privilege against self-incrimination cannot be used inappropriately in blanket fashion to foreclose discovery efforts. See McIntyre's Mini Computer Sales Group,

Inc. v. Creative Synergy Corp., 115 F.R.D. 528, 529-530 (D. Mass.1987), citing de Antonio v. Solomon, 41 F.R.D. 447, 449 (D. Mass.1966); see also Gatoil, Inc. v. Forest Hill State Bank, 104 F.R.D. 580, 581 (D.Md.1985); E.F. Hutton & Co. v. Jupiter Development Corp. Ltd., 91 F.R.D. 110, 114 (S.D.N.Y.1981). "[T]he Federal Rules of Civil Procedure do not contemplate a complete refusal to participate in any discovery pertaining to an action which may have criminal overtones." McIntyre's Mini Computer Sales Group, Inc. v. Creative Synergy Corp., 115 F.R.D. 528 (D. Mass.1987), citing de Antonio v. Solomon, 41 F.R.D. at 449; Gatoil, Inc. v. Forest Hill State Bank, 104 F.R.D. at 581; Guy v. Abdulla, 58 F.R.D. 1, 2 (N.D. Ohio 1973).

While the Defendants recognize that Mr. Fernandes arguably may have a valid privilege with respect to questions that focus on the September 8, 2002 alleged shooting on Cushing Avenue, see, e.g. Exhibit A at 39-41, his Fifth Amendment privilege is not viable with respect to the specific Dunkeld Street incident that gives rise to this lawsuit. That is, no Fifth Amendment privilege is valid with respect to Mr. Fernandes' eyewitness observations as to what occurred when the driver of the vehicle in which he was purportedly traveling in struck Boston Police Officer Paillant, including what observations he made, if any, as to the alleged shooting by Officer Taylor, nor of the events that followed. Moreover, Mr. Fernandes' privilege assertion is also not valid with respect to the myriad of other deposition questions he refused to answer, such as about his presence at the decedent's funeral, his statements to the police department, whether anyone contacted him following the incident, whether the Plaintiff's investigator contacted him, and whether he has ever testified before, etc. See Exhibit A.

By his expansive invocation of the Fifth Amendment during the majority of his deposition questioning, Mr. Fernandes "sought to exercise a privilege which would effectively shut the door to any pretrial discovery from him. Such a blanket exercise of the privilege is

insufficient to relieve [Fernandes] of the duty to respond to the questions put to him." McIntyre's Mini Computer Sales Group, Inc., supra at 530; see also S.E.C. v. First Financial Group of Texas, Inc., 659 F.2d 660, 668 (5th Cir.1981); United States v. Gomez-Rojas, 507 F.2d 1213, 1219-20 (5th Cir.), cert. denied, 423 U.S. 826 (1975); Carter-Wallace, Inc. v. Hartz Mountain Industries, Inc., 553 F. Supp. 45, 50 (S.D.N.Y.1982).

Under governing precedent, Mr. Fernandes may assert his Fifth Amendment privilege against self-incrimination only when "a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result." Hoffman v. United States, 341 U.S. 479, 486-87 (1951). It does not appear that the deposition questions centered specifically on the events regarding the Wurie vehicle's collision with Boston Police Officer Michael Paillant and the shooting incident involving the decedent are "dangerous" for Fifth Amendment purposes with respect to Mr. Fernandes. See id. The questions posed to Mr. Fernandes do not suggest that any "injurious disclosure" could occur with respect to Mr. Fernandes. Moreover, it is undisputed that on May 12, 2006 the driver of the vehicle, Brima Wurie, pled guilty to various charges stemming from the September 8, 2002 incident, including assault and battery with a dangerous weapon, driving to endanger, leaving the scene of an injury, and operating without a license. Furthermore, at no point has the District Attorney's office sought to bring any charges against Mr. Fernandes nor is there any indication that further charges are pending now, some six years later since the incident.

### III.    Even Assuming Arguendo That The Fifth Amendment Privilege Was Applicable to the Majority of Mr. Fernandes' Deposition Questions, Mr. Fernandes Has Effectively Waived That Privilege.

#### A. Mr. Fernandes Waived His Fifth Amendment Privilege During His Deposition.

During his deposition, Mr. Fernandes did not assert his Fifth Amendment privilege to all

questions surrounding the September 8, 2002 incident. Notably, he did answer deposition questions that provided him with an opportunity to contend that the Wurie vehicle did not, in fact, strike Officer Paillant. See Exhibit A at 43:15-18. Additionally, he also answered certain questions about who was driving the vehicle --- clearly in an effort to affirmatively establish that he was not the driver of the vehicle on that evening. See id. at 45: 8-15.

Having voluntarily testified in response to questions about the September 8, 2002 incident without asserting his privilege, Mr. Fernandes has effectively waived this privilege with respect to the remaining questions about the September 8, 2002 events.[1] As the Supreme Court has recognized, "To uphold a claim of privilege in this case would open the way to distortion of facts by permitting a witness to select any stopping place in the testimony." See Rogers v. United States, 340 U.S. 367, 373 (1951). If Mr. Fernandes "desired the protection of the privilege against self-incrimination, []he was required to claim it." See id. Moreover, "[t]he privilege is deemed waived unless invoked." Id. "[W]here a witness has voluntarily answered as to materially criminating facts, it is held with uniformity that he cannot then stop short and refuse further explanation, but must disclose fully what he has attempted to relate." Id. at 373-374 (omitting citations and internal quotations). Of course, "[i]t is hornbook law that the waiver is limited to the particular proceeding in which the witness appears." United States v. Gary, 74 F.3d 304 (1st Cir. 1996).

Accordingly, in the above-captioned matter, Mr. Fernandes must answer all questions that relate to the September 8, 2002 incident and provide full disclosure as he has effectively waived his privilege during his deposition.

**B. Mr. Fernandes Waived His Fifth Amendment Privilege About the September 8, 2002 Incident When He Provided A Statement To The Boston Police Department On October 2, 2002 About That Same Incident.**

On October 2, 2002, Mr. Fernandes voluntarily provided a statement to the Boston Police Department during the investigation of the September 8, 2002 incident. See Exhibit B, Statement by Carlos Fernandes, dated October 2, 2002. He disclosed numerous facts about this incident and before doing so, was fully apprised of his Miranda rights. See id. In fact, Mr. Fernandes voluntarily signed a Miranda waiver before providing his verbal statement to the Boston Police Department. See Exhibit C, Fernandes Miranda Waiver. Under such circumstances, Mr. Fernandes waived his Fifth Amendment privilege. As discussed supra, "[In instances when] criminating facts have been voluntarily revealed, the privilege cannot be invoked to avoid disclosure of the details." Rogers, 340 U.S. at 373 (1951). Accordingly, in the above-captioned matter, Mr. Fernandes must answer all questions that relate to the September 8, 2002 incident and provide full disclosure as he has effectively waived his privilege.

*WHEREFORE*: The Defendants City of Boston and Thomas Taylor, Jr. respectfully request that this Honorable Court allow their motion.

---

For purposes of argument sake here, the Defendants assume that Mr. Fernandes has a valid Fifth Amendment privilege with respect to the September 8, 2002 events that surround the incident with Officer Paillant. As discussed supra, the Defendants maintain in the first instance that no such privilege is valid.

DEFENDANTS, THOMAS TAYLOR, JR.
AND CITY OF BOSTON,

By their attorneys:


/s/ Helen G. Litsas
_____
Helen G. Litsas #644848
Special Assistant Corporation Counsel
Hollett Building
38 Main Street
Saugus, MA 01906
(781) 231-8090


Evan C. Ouellette, BBO # 655934
Assistant Corporation Counsel
City of Boston Law Department
Room 615, City Hall
Boston, MA 02201
(617)635-4048


## CERTIFICATE OF SERVICE

I, Helen G. Litsas, hereby certify that on this date I served a copy of the foregoing
documents upon lead plaintiff's counsel, Andrew Stockwell-Alpert, by electronic filing
and by postage prepaid, first class, U.S. Mail, and to counsel for Mr. Fernandes by
regular mail and facsimile.


3/2/08          /s/ Helen G. Litsas


Date            Helen G. Litsas

COMMONWEALTH OF
MASSACHUSETTS
RE.  P. O. THOMAS TAYLOR
SPECIAL – 9/8/02

Oct. 2, 2002, 9:10 p.m.
Boston Police Homicide Unit

(PLEASE NOTE:....dots indicate transcriber could not get what was said).

Conducting this interview is Det. Michael Primm, Boston Police Homicide Unit.
Present is Det. Russell Grant, Boston Police Homicide Unit.

## STATEMENT OF CARLOS FERNANDES

Q.   Four, testing, testing.  One, two, three, four.  Testing.  Testing.  You bored

already. ............(Not clear).  on my tape, huh?  Hold on.  (TAPE OFF).

Today's date  is October 2nd, the year 2002.  The time now is 9:10 p.m.

Speaking is Detective Mike Primm, of the Boston Police Homicide Unit.  Also

present is Detective Russell Grant, of the Homicide Unit.  We're currently

located in the interview room of the Homicide Unit.  We're speaking with one

Carlos Fernandes in regards to a police involved shooting that took place in the

area of, ah, Dunkeld and Fayston Street in Dorchester.  Russell, do you

remember the date of that incident?

DET. GRANT:                         It was September 8th, 2002.

Q.   September 8th of 2002 a one, ah,  Miss, ah, Evelena Cepedas Bells was shot and

killed on that date.  Carlos, would you say your name and spell your last name

for the purposes of the tape?

A.   Carlos Fernandes, F-E-R-N-A-N-D-E-S.

Q.   Okay. Carlos, is it fair to say that we probably spoke to you for fifteen, twenty

minutes prior to going on tape?

2

A.   Yes.

Q.   All right.  Nobody threatened you, or beat you up, or promised you anything, right?

A.   Nope.

Q.   Ah, is it fair to say that I read you your Miranda Warnings and you stated you understood what your rights were?

A.   Yes, you did.

Q.   All right.  And I read them to you anyway, correct?

A.   Yes, you did.

Q.   And then we filled out a form here and you put your initials and all that on there, then you signed the form, correct?

A.   Yes.

Q.   All right.  Is it fair to say that prior to us going on tape now I briefly played a part of another tape for you that you listened to along with myself and Detective Grant?

A.   Yes.

Q.   Okay.  And we discussed an incident that may or may not have happened up on Cushing Ave.  Is that correct?

A.   Yes.

Q.   Okay.  Do you remember the day that, ah, Evelena was shot and killed?

A.   Yes.

Q.   Okay.  Ah, were you in the car that day that she was shot and killed?

3

A.    Yes, I was.

Q.    Okay. I'm going to ask you to keep your voice up for the tape. Ah, who was in the car with you on that day?

A.    Me, B.J. Elevena, Lenny, and Zeto (Sounds like).

Q.    And who?

A.    Zeto.

Q.    Zeto?

A,.   Yes,

Q    Zeto would be, ah, Louise (Sounds like).

A.    I don't know his name. I just know it as.

Q.    Okay. We know who he is. That's okay. Ah, where were you seated in the car?

A.    I was seated in the front passenger.

Q.    Front passenger and B. J. to us he's known as Brima Wurie. Is that who you're talking about?

A.    Yes.

Q.    Can you describe B. J.?

A.    He's about six foot, dark skinned, low cut.

Q.    He's black American?.

A.    Yes.

Q.    Is that correct?

A.    Yes.

4

Q.   Okay.  It's fair to say you're Cape Verdian?

A.   Yes.

Q.   Everyone else in the car was Cape Verdian?

A.   Yes.

Q.   Okay. Carlos, were you born in America or ..............(Not clear).

A.   America.

Q.   America.  All right.  Ah, how old are you, Carlos?

A.   Twenty-three.

Q.   Twenty (Cuts off).  All right.  You had some girls in the car, you guys were going to the movies or a date?

A.   Yeah.

Q.   All right.  What time did you pick up the girls or the girls picked you up and where they picked you up at?

A.   We met them at, ah, ........(Not clear) Hamilton, I think it was Hamilton Homes Ave., (Sounds like) I'm not.  I'm not too sure where. I just know it was either Hamilton Homes Ave.

Q.   You met them on Hamilton Homes Ave.?

A.   Yeah.

Q.   Who has the car, them or you, you guys?

A.   The girls.

Q.   The girls have the car?

A.   Yeah.

5

Q.   Okay.  At what point does Brima start driving the car?

A.   Oh, about.  We went to Lenny's.  We went to Lenny's mother's house.  So on

Hancock, stopped there.  I think that's when he took over driving.

Q.   Okay.........(Not clear).

A.   I know one of the girls had to use the bath..  So I don't know, something.

Q.   One of the girls had to use the bathroom, -

A.   Yeah.

Q.   at some point Brima starts driving?

A.   Yeah.

Q.   All right.  We'll cut through the chase.  At some point you guys end up around

Cushing Ave.?

A.   Yes.

Q.   All right.  Tell me what takes place up there then.

A.   Well, we stop by, we seen somebody.  I got out to go see who it was and I just

start hearing shots, start I ran back, got back inside the car, and we took off.

Q.   Okay.  So you took off, you got.  What kind of car were you in?

A.   A white, white Taurus.

Q.   White Taurus.  Well, I know that and we already know that.  But for this

purpose I need to ask you.  A white four-door, Ford Taurus.  Right?

A.   Yeah.

Q.   All right.  So you say you got out of the car, you went around to check the

dudes who were on the street, and somebody started.

A.    ......(Not clear).  Got out right there.  I opened the door and got out.  When I
       got out that's when I started hearing shots.  That's when I got back in the car.  I
       didn't even close the door.  I just got out to see who it was.  Then I got back in
       after I heard the shots and we just took off.

Q.    How many shots did you hear?

A.    Not.  Not too.  I don't.  I don't remember.  It was a couple.  Probably like five.
       Something like that.  Four.  About four.

Q.    Four?

A.    Four or five.

Q.    Four or five shots?

A.    Yeah, something like that.

Q.    All right.  And at the time that you guys were up on the hill and these shots
       start ringing out all of you were still in the car, you, Brima, the two girls, and
       Zeto (Sounds like)?  You're all still in the car?

A.    Yeah.  I was getting in the car when I heard the shots.  That's when I got back
       in the car.

Q.    Okay., Exactly where up on the hill are you guys? Everybody keeps telling me
       Cushing Ave.  But where, where are you guys?

A.    I don't know the name of that street.   Oh, what's the name of that street.
       Which one's Cushing Ave.?

Q.    Cushing's the one when you get up to the top by the hospital.

A.    A long street?

Q.   Yes. That's the one by the hospital.

A.   We was right, ah. Instead of the left, as you take the left that leads to Hancock right there. There's a corner store right there as you turn..

Q.   You're talking about going back down the hill?

A.   Cause coming down Cushing you take a left.

Q.   Larland  (Sounds like) Street …………(Not clear).

A.   I'm not sure of the street.

Q.   Okay. So you. Is that the street you're on, the one that's coming back down, -

A.   Yeah.

Q.   down the hill? Is that where your car is at?

A.   Yeah.

Q.   Okay. Where are the shots coming from?

A.   I don't even know. I just heard shots. I'm not, I'm not sure where they're coming from or not. I ………..(Not clear) just start hearing shots when I got out the vehicle. I'm not sure where it was coming from, what direction or not. I'm not too sure.

Q.   Okay., So when you guys are leaving after hearing the shots is that because you think they're shooting at you, it's heated up on the hill? Why do you guys?

A.   Yeah, I thought they was shooting at us. That's my common reaction to just leave, to take off.

Q.   Okay. So when you get back in the car after the shots are ringing off what do you tell, tell the driver? What do you tell B. J.?

A.   Told nobody nothing. We just got back in the car. I just ducked. Everybody start taking off and we just took off.

Q.   Okay. So from the time that you hear the shots and then you get down to Hancock where you guys come out on Columbia Road, and you go past 5-0, you go past the police that are parked there, how long after the shots is it that you guys have the unfortunate incident of going past the police?

A.   It was right there at the set of lights on Columbia Road.

Q.   Right.

A.   at …………..(Not clear) lights.

Q.   Carlos, I know where that is. What I'm saying, was it a minute after the shots, five minutes, ten minutes, right after the shots?

A.   As soon as we, as soon as they shot we came down, banged a right, came to take the left and was right there parked. That's like about.

Q.   Less then a minute.

A.   Less then a minute, yeah.

Q.   Less then a minute. So immediately after these shots are fired you guys, Brima runs the light by 5-0. Why didn't he stop?

A.   I don't know. He had no license. He was on parole. …………….(Not clear, both talking at once).

Q.   That's kind of like what he said. He ran a light because he was on parole. He didn't want. Are you guys telling him to stop?

A.   Well, I can't remember what was going on. It was just so much shit going on,

the girls. I don't know. I don't know. They were, I guess. I don't know. I

don't know if they told him stop .........(Speaks too soft) I don't know. I don't

remember. I'm not too sure.

Q.   Did you tell him to stop?

A.   I didn't say nothing.

Q.   Huh?

A.   I didn't tell him nothing.

Q.   You didn't tell him nothing. Okay.

A.   He was just driving.

Q.   All right. Let see if we can get more to the point here. When you're up on

Cushing Ave. did you have a gun?

A.   No, I didn't.

Q.   All right. You're positive of that?

A.   Yes, I am.

Q.   All right. You didn't shoot, get out and do any shooting -

A.   No.

Q.   at anybody?

A.   No, I didn't.

Q.   All right. And if anybody suggested that you had got out and started shooting

at somebody they'd probably not be telling us the truth?

A.   Yes, they will be not telling you the truth.

Q.   All right. You say they would not be telling the truth and you really need to

10

keep your voice up. Ah, how about the girls that are in the car with you, if they come in here and they kind of like go on tape and tell us that you got out and had a gun I guess they'd be lying?

A.    Yes, they will.

Q.    Okay. Did you know the girl that got killed?

A.    Yeah, I did.

Q.    Okay. How long did you know her?

A.    I know her approximately about a month, four weeks. Something like that.

Q.    How have you been feeling since she got killed now? ·

A.    It's been bothering me a lot.

Q.    Right. Is it important to you we have the whole truth in regards to what happened when she got killed or?

A.    They killed ...........(Not clear) her. They killed her.

DET. GRANT (?):

Q.    Did you have a relationship with her?

DET. PRIMM:

Q.    If you shake your head saying yes that you had a relationship with her the tape doesn't pick that up. Ah, Carlos, after you guys go by 5-0 at the light tell me what happens that leads up to the girl getting shot.

A.    Oh, the ............(Not clear) I don't remember all.

Q.    All the streets.

A.    All the streets we went through. But I just remember coming up Dunkeld and I

just seen the police.  They was like towards on the left-hand side -

Q.    Yes.

A.    as we was coming up and the dude he just, he just came, came running with his

gun out........(Not clear, both talking at once)..

Q.    All right.  For the purposes of the tape you're raising your right arm up,

holding up like somebody's got a gun out.

A.    Yeah.

Q.    I got to say that cause the tape can't pick that up.

A.    The officer came out with a gun. He started pointing it at the front of the car

like the windshield.

Q.    Right.

A.    So I just ducked.

Q.    Yeah.

A.    …………(Not clear).   He came running to the side like towards the window

side.

Q.    The officer?

A.    Yeah.,

Q.    The window side of which?

A.    The window side of the car, the right side of the car.

Q.    Would that be the driver or passenger?

A.    The passenger side of the car.

Q.    Okay.

12

A.    On the right-hand side.

Q.    You say he came running towards the car?

A.    Yeah.

Q.    Okay. Go.

A.    He came running toward the car like, Pull over. Pull over. We just went right

by him ........(Not clear) side. I don't. I didn't see nothing. So I ducked. As

soon as I seen him come out with a gun I ducked. I thought he was going to

shoot so I ducked. As soon as he took that left like five seconds later I just

heard shots and I looked in the back.

Q.    When you heard shots you looked in the back. I know this is difficult. I'm not

there. I don't know what happened. When you looked in the back you knew

that Evelena had been hit?

A.    No, I didn't see no........... (Not clear). She was laying down.

Q.    She was laying down. (Pause) Carlos, you say it's like five seconds after you

go around the corner that the shots ring out?

A.    ..............(Not clear) Not exactly. But I'm just saying like, you know.

Q.    Okay.

A.    I'm not telling you the exact time anyways.-

Q.    Right. Are the shots coming from the front or the rear of the car?

A.    The rear. Because I heard, I heard the back window break or something. I

heard some glass shatter.

Q.    All right. You were telling me that when you looked back that. Do you call

13

her Evelyn or do you call her Angela?

A.  Angela.

Q.  Okay. When you looked back you say Angela is laying on the seat? Is she talking? Is she saying anything?

A.  I didn't say nothing to her. But I didn't, I didn't know they were shot. I just know, I thought they were just ducking down. I didn't know nobody was shot.

Q.  All right. I know that at some point you guys end up bailing out of the car. Tell me what happened.

A.  I jumped out. I jumped out the car.

Q.  Did somebody jump out the car before you?

A.  I'm not sure. Cause, I'm not even sure. It just went so fast. I just know I jumped. I just jumped out.

Q.  Okay. Was the car stopped when you jumped out or still rolling?

A.  It's still rolling.

Q.  Still rolling. Do you know where it was that you jumped out of the car?

A.  Right where we took a left like.

Q.  Quincy Street?

A.  Yeah, right before we took a left on Quincy. Somewhere around there. I'm not too.

Q.  You're not too sure?

A.  About the exact spot. It was around there. That's all I know.

Q.  All right. You jumped out, you bounce. Where do you go?

14

A.   I ran.

Q.   I know that part. Where did you go?

A.   I ran in, I ran .............(Not clear). I don't know where I ended up. I just know I ended up by a pay phone. I used the phone and called somebody to come pick me up.

Q.   All right. So you ran to a pay phone, you called somebody to pick you up?

A.   Yup.

Q.   Do you know who you called?

A.   A friend of mine.

Q.   All right. We'll leave that alone, all right. When did you find out that Angela had been killed?

A.   The next morning like afternoon.

Q.   The afternoon. Okay. Is tonight the first night that you've actually spoken to the police about what happened?

A.   Yes.

Q.   All right. And I take it that you were picked up earlier by the police on possibly some warrants?

A.   Yes.

Q.   Okay. Ah, did you see Brima Wurie with a gun that night?

A.   No, I didn't.

Q.   Okay. Did anybody in the car with you have a gun that night?

A.   No, we didn't.

15

Q.    Have you talked to the family about Angela since this happened?

A.    I didn't speak to ...............(Not clear). I haven't.

Q.    You haven't spoken to the family?

A.    No.

Q.    Okay. Ah, Detective Grant?

      DET. GRANT:

Q.    When you came around the corner in the car, you see the policeman pointing

      his gun and you duck down, do you hear any bangs, do you hear anything in

      front of the car?

A.    No.

Q.    Did you ever see the car strike the policeman?

A.    No, I didn't.

Q.    Did you ever see the car not strike him?

A.    I was down. The last time I seen the officer is when he was coming by the side

      of the car. That's the last time I seen him. I'm not. I can't say exactly, cause

      I'm not too positive cause I ducked. As soon as I seen the gun I ducked down,

      so I can't tell you positive. I can't say, cause I didn't really see. I just seen

      him coming towards the side of the car.

Q.    Okay. He's standing in front of the car with a gun pointed at you?

A.    No, they was towards the left. When we came up Dunkeld they was, I seen the

      police car on the left-hand side of us.

Q.    Right.

A.    We're coming up the street, they're on the left-hand side of us. There was a cop standing by the cop car. We're coming up the street so he start running, and then he pulled out his gun. He came running to the side of the car like this while we was turning.

Q.    Now he's on the right-hand side of the car?

A.    Yeah, he's on the right-hand side of the car.

Q.    And you ducked down?

A.    Yeah.

Q.    Then you hear the shots and glass?

A.    (Heard no answer).

Q.    On that Saturday night going into Sunday, right? That Saturday night going into Sunday, morning, late Saturday night, early Sunday morning?.

A.    Yeah, whatever day it was. I don't know what day it was.

Q.    You say you had some type of relationship with Angela?

A.    Yeah, we was good friends.

Q.    Did you think it could have been more than that?

A.    Huh?,

Q.    Could it have been more than that eventually?

A.    I can't. I can't say. I don't know. I can't look into the future.

Q.    Right. Well, were you ever in that car before?

A.    The white car. Did she ever have a white car. I don't think..................(Not clear).

DET. PRIMM:            Russ, you both need to keep your voices up. The

tape's not picking it up.

A..    ...............(Not clear) One other time I think.

Q.    You were in that car one other time?

A.    I think so. That's her mother's car.

Q.    Right.

A.    Cause she can borrow her mother's car.

Q.    Were you in that car Friday of that week?

A.    Friday.

Q.    Friday before the shooting.

A.    I can't remember. I'm not too positive about that..

Q.    How about the Saturday during the day?

A.    No.

Q.    Before you.

A.    No.

Q.    Before the girls arrive?.

A.    No.. ;

Q.    Never?

A.    No.

Q.    The first time you got in the car that weekend was when they picked you up -

A.    Yeah.

Q.    on either Hamilton or?

18

A.    Yeah.

Q.    Okay.  Any reason why Brima Wurie would tell us you had a gun?

A.    I don't know.

Q.    Is he mad at you for anything?

A.    I don't know.  I haven't spoke to him.......(Not clear).  I don't know.

Q.    Did you recognize anyone from Hancock Street?

A.    No.

Q.    Do you know those boys up there?

A.    I know a couple of them.  I got a cousin up there.

Q.    Do you have a beef with anybody up there?

A.    No.  A cousin.  I be seeing my cousin up there.  That's it.

Q.    But you don't have a beef?  You've never been up there in a shoot out before
      with anyone?

A.    No.

Q.    Nobody up there has ever shot at you before?

A.    No.

      DET. PRIMM:

Q.    Your cousin, is that Roy?

A.    No.  Got a cousin Freddie.

Q.    What's Roy relationship to you?

A.    Which one's Roy?

Q.    He lives at 39 Lonsdale (Sounds like) Street?

19

A.   Roy. That's Freddie. Roy.

Q.   You think that's Freddie?

A.   I know Freddie. I don't know anyone Roy. The dude lives on the first floor.

That's my aunt that live on the first floor. That's my cousin I'm talking about.

Q.   Light skinned. Kind of little chubby kind of?

A.   Nah. Skinny. He wears braids. He got braid. ..........(Not clear).

Q.   Okay. How about the kid on the second floor there at 39?

A.   Second floor. Which one. That's my uncle. That's my uncle that live there.

He ain't got no kids. ...............(Not clear)..

Q.   Okay.

.    DET. GRANT:

Q.   I know it hurts to talk about it. But you're still unclear. Once again, how long

did you know Angela?

A.   I know her for about a month, a month.

Q.   Was she girlfriend?

A.   Huh?

Q.   Was she going to be your girlfriend?

A.   No, we were just cool. Just hang out, .........(Not clear).

.    DET. PRIMM:

Q.   Anybody have any weed, or any coke, or anything like that night?

A.   ...............(Not clear) probably smoke a blunt or something.

Q.   Okay. So there might have been some weed in the car. Let me ask you this, let

me ask you, why do you think that and I know you already said why, why do you think Brima just kept driving and wouldn't stop for 5-0?

A.   He didn't have no license. That's the only thing I can see.

Q.   How fast was he driving when he's trying to get away?

A.   He wasn't driving that fast.

Q,   Well, that's what I don't understand. All right. Ah, Carlos, is there anything else you want to tell us that you want to make clear on the tape that we haven't asked you or anything?

A.   Nope.

Q.   No. Are you sure?

A.   Yeah.

Q.   Okay . Russ, do you have any more questions for Carlos?

DET. GRANT:                I don't have any more questions for Carlos.

Q.   Carlos, I don't know where you're going from here. But when you get a chance you should at least speak to the girl's family.

A.   .........(Not clear)..

Q.   Good news or bad news, you know. You owe it to the family to at least.

A.   I spoke to Lenny.

Q.   Speak to them and give them some kind of idea what happened, you know. All right. Look, thanks for coming in. Thanks for cooperating. We appreciate all .

that.  The time is 9:30.  We're going to conclude this interview.


JS.........................................0.......................................

# Boston Police Department
## Miranda Warning

Name: _CARLOS FERNANDES_

Address: _39 Lonsdale St.    Dorchester._

Date: _10/2/02_                Time: _9:05 P.M._

Before we ask you any questions, you must understand your rights:

You have the right to remain silent. _CF_
<u>Initials</u>

Anything you say can be used against you in a court of law or other proceedings. _CF_
<u>Initials</u>

You have the right to talk to a lawyer for advice before we ask you any questions and to have him/her with you during questioning. _CF_
<u>Initials</u>

If you cannot afford a lawyer and you want one, a lawyer will be provided for you by the Commonwealth without cost to you. _CF_
<u>Initials</u>

If you decide to answer questions now without a lawyer present, you will still have the right to stop answering at any time until you talk to a lawyer. _CF_
<u>Initials</u>

I, _____, have read and understand the above rights as explained to me by _____, and I am willing to make a statement at this time without a lawyer being present.

Signed _____

Witness _Russell Grant_

BPD Form 2550  7/91

GOVERNED BY PROTECTIVE ORDER    1

1                       VOLUME I
                     PAGES:   1 - 73
2                     EXHIBITS: 1 - 3

3              UNITED STATES DISTRICT COURT
               DISTRICT OF MASSACHUSETTS
4
                 C.A. NO. 05-11803-MLW
5

6        * * * * * * * * * *  *
                              *
7        SHENIA DANCY-STEWART, as      *
         Administratrix of the Estate   *
8        of EVELINE BARROS-CEPEDA,      *
                     Plaintiffs,    *
9                                   *
         vs.                        *
10                                  *
         THOMAS TAYLOR, JR., and the   *
11        CITY OF BOSTON,             *
                     Defendants.    *
12                                  *
         * * * * * * * * * *  *
13

14

15

16              DEPOSITION OF CARLOS FERNANDES,

17      taken on behalf of the Defendants, pursuant

18      to the Massachusetts Rules of Civil

19      Procedure, before Karen Borreson, RPR, Notary

20      Public within and for the Commonwealth of

21      Massachusetts, at the law offices of City of

22      Boston, City Hall, Boston, Massachusetts, on

23      Thursday, February 21, 2008, commencing at

24      2:35 p.m.

GOVERNED BY PROTECTIVE ORDER    2

```
1              A P P E AR AN C E S

2

3      William Keefe, Esquire
       406 South Huntington Avenue
4      Jamaica plain, MA  02130
       Tel:  (617) 983-9200
5      E-mail:  wkeefelaw@yahoo.com
       For the Plaintiffs
6

7      Evan C. Ouellette, Esquire
       Helen G. Litsas, Esquire
8      City of Boston Law Department
       City Hall, Room 615
9      Boston, MA  02201
       Tel:  (617) 635-4048
10     E-mail:  Evan.Ouellette@cityofboston.gov
       For the Defendants
11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

GOVERNED BY PROTECTIVE ORDER   3

1                    I N D E X

2    DEPONENT                         PAGE

3    CARLOS FERNANDES

4    Examination by Ms. Litsas            4

5

6

7

8

9

10                  E X H I B I T S

11   NO. DESCRIPTION                     PAGE

12   1   Photocopy of driver's license     4

13   2   Statement of Carlos Fernandes     4

14   3   Subpoena                    4

15

16

17

18

19

20

21

22

23

24

GOVERNED BY PROTECTIVE ORDER    4

1           P R O C E E D I N G S

2           (Photocopy of driver's license

3               was marked as Exhibit No. 1.)

4           (Statement of Carlos Fernandes

5               was marked as Exhibit No. 2.)

6           (Subpoena was marked

7               as Exhibit No. 3.)

8                   *****

9           It is stipulated and agreed between

10       the parties that all objections, except as

11       to form, including motions to strike will be

12       reserved until the time of trial.

13                  *****

14          CARLOS FERNANDES, a witness called

15       by counsel having been satisfactorily

16       identified and been duly sworn for the

17       Defendants, testified as follows:

18          EXAMINATION BY MS. LITSAS

19       Q. Good afternoon, Mr. Fernandez. My name is

20          Helen Litsas and I represent the City of

21          Boston and Officer Thomas Taylor in this

22          lawsuit that's been filed by the Estate of

23          Eveline Barros-Cepeda.

24          Could you please state and spell

               GOVERNED BY PROTECTIVE ORDER    5


1       your name for the record.

2    A. Carlos Fernandes.  C-A-R-L-O-S,

3       F-E-R-N-A-N-D-E-S.

4    Q. Are you the same Carlos Fernandes depicted

5       in Exhibit No. 1?

6    A. (Peruses document.)  Yes.

7    Q. Could you please state for the record your

8       current address, Mr. Fernandes.

9    A. I don't have a stable address right now.

10      I'm moving around.

11   Q. What are the locations in which you're --

12   A. 39 Lonsdale Street.

13   Q. Do you have a telephone number?

14   A. Yes.

15   Q. What's your number?

16   A. (617) 474-0481.

17   Q. What about the other addresses that you can

18      be located at?

19   A. 1 -- at my mother's address.

20   Q. What is your mother's address?

21   A. 185 Westfield Street.

22   Q. What apartment is that?

23   A. Apartment 1.

24   Q. Is that in Dorchester, Mass?

GOVERNED BY PROTECTIVE ORDER   6

1    A. Yes.

2    Q. What is your mother's name?

3    A. Maria Fernandes.

4    Q. Can you spell that, please?

5    A. M-A-R-I-A, F-E-R-N-A-N-D-E-S.

6    Q. Mr. Fernandes, I'm going to ask you a series

7       of questions.

8          Have you ever taken a deposition

9       before?

10   A. Nope.

11   Q. What I'm going to do is ask you a series of

12      questions. There is a stenographer here

13      that's transcribing your testimony in the

14      form of a written transcript.

15         The testimony you give can only be

16      transcribed if you articulate your answers.

17      That means you need to verbalize your

18      answers. You can't provide nods or gestures

19      because our wonderful stenographer cannot

20      take that down, as wonderful as she is. So

21      if you could articulate those answers

22      verbally, that would be a great help.

23         And speak loudly, for purposes of

24      assisting our stenographer.

GOVERNED BY PROTECTIVE ORDER   7

1    A. Okay.

2    Q. Do you understand those instructions thus

3       far?

4    A. Yes.

5    Q. The other instruction I will give you is

6     that in the event that you don't understand

7     a question, I would ask that you ask me to

8     rephrase the question so that the record is

9     clear. Because, otherwise, the transcript

10    is going to be produced and it's going to be

11    assumed that you understood the question

12    that was asked.

13        Does that make sense?

14    A. Yes.

15    Q. I don't want you to guess or speculate. I

16    just want you to give the answer to the best

17    of your memory.

18        Again, if you do not understand the

19    question, please ask me to rephrase the

20    question and I will do so.

21        The only thing I would ask is that

22    in the event that you anticipate what my

23    question is, please let me finish the

24    question first before you interrupt me and

GOVERNED BY PROTECTIVE ORDER    8

1     answer the question.

2    A. All right.

3    Q. Is that fair?

4    A. Yes.

5    Q. And please wait until I finish talking,

6        because she can't take us both talking at

7        the same time.

8            Do you understand that?

9    A. Yes.

10    Q. Mr. Fernandes, are you here pursuant to a

11        subpoena that was served upon you?

12    A. Yes.

13    Q. And I'm going to show you what's been marked

14        as Exhibit No. 3. Could you just take a

15        moment to review the document?

16    A. (Peruses document.) I've seen this before.

17    Q. You have seen this before?

18    A. It's for – it was delivered to me, right?

19    Q. And that was what was delivered to you?

20    A. The subpoena.

21    Q. And this was the subpoena that you received

22        requiring your attendance here today; is

23        that correct?

24    A. Yes.

GOVERNED BY PROTECTIVE ORDER    9

1    Q. Did you happen notice with respect to the

2        subpoena, that the subpoena also asked you

3        to provide certain documents?

4    A. Oh, no.

5    Q. What I want you to do is take a look at

6    Schedule A. You don't have any problems

7    reading or writing?

8    A. No.

9    Q. If you could just take a look at Schedule A.

10    A. (Peruses document.) I don't know none of

11    that stuff.

12        MS. LITSAS: For the purposes of the

13    record, Attorney William Keefe, who is

14    counsel for the Plaintiffs, has just

15    entered.

16    A. I don't got any of that.

17    Q. Do you have any of the documents that are

18    listed in Schedule A, 1 through 11?

19    A. Nope.

20    Q. I want you to now turn to Page 5 and look

21    through Request Nos. 12 through 24.

22    A. (Peruses document.) Nope.

23    Q. So you don't have any documents that have

24    been listed in Request Nos. 12 through 24?

GOVERNED BY PROTECTIVE ORDER   10

1    A. No.

2    Q. What about any documents listed in Request

3    Nos. 25 through 32 on Page 6.

4    A. (Peruses document.) Nope.

5    Q. So is it my understanding that you have no

6    documents that would fall under Document

7       Requests Nos. 1 through 32 in Exhibit No. 3;

8       is that correct?

9    A. Yes.

10   Q. Mr. Fernandes, did you keep any notes

11      following the incident that occurred on

12      September 8, 2002?

13   A. Nope.

14   Q. Did you keep any documents related to the

15      incident on September 8, 2002?

16   A. Nope.

17   Q. Did you keep any journals regarding the

18      incident –

19   A. Nope.

20   Q. – on September 8, 2002?

21   A. No.

22   Q. Mr. Fernandes, have you ever kept a diary?

23   A. No.

24   Q. Have you ever kept any type of journal?

GOVERNED BY PROTECTIVE ORDER    11

1    A. Nope.

2    Q. Are you aware of any documents, photographs,

3       notes, letters, anything of that sort

4       related to September 8, 2002?

5    A. Nope.

6    Q. So you have no such documents in your

7       possession or custody or control related to

8       the incident on September 8, 2002?

9    A. Nope.

10   Q. Mr. Fernandes, prior to coming in to today's

11      deposition, did you speak to anyone,

12      excluding any attorneys?

13   A. Nope.

14   Q. Is it my understanding that you did speak

15      with Attorney Michael Dooling — and I don't

16      want to know what the extent of your

17      conversation was, but you were provided with

18      an opportunity to speak to him prior to

19      coming in to today's deposition?

20   A. Yes.

21   Q. And he indicated to you that he was not

22      coming today?

23   A. Yes.

24   Q. And that it was not necessary to come today;

GOVERNED BY PROTECTIVE ORDER   12

1       is that correct?

2    A. Yes.

3    Q. Did you do anything to prepare for today's

4       deposition?

5    A. Nope.

6    Q. Did you speak to anybody?

7    A. Nope.

8    Q. So you spoke to nobody, other than your

9      attorney, about today's deposition?

10     A. Yes.

11     Q. Did you speak to Maria Derosa?

12     A. Nope.

13     Q. Did you speak to Luis Carvalho?

14     A. Nope.

15     Q. Did you speak to Brima Wurie?

16     A. Nope.

17     Q. Did you speak to a person named Lenny?

18     A. No.

19     Q. Did you speak to a person named Z-2?

20     A. Nope.

21     Q. Did you speak to a person named BJ?

22     A. Nope.

23     Q. Did you speak to Dimingas DePina?

24     A. No.

GOVERNED BY PROTECTIVE ORDER    13

1      Q. Did you speak to any relatives of Eveline

2        Barros-Cepeda?

3      A. No.

4      Q. Did you speak to any attorneys representing

5        the Estate of Eveline Barros-Cepeda?

6      A. Nope.

7      Q. Did you speak to any other attorneys, other

8        than Attorney Michael Dooling, excluding the

9        substance of your conversations?

10 A. Nope.

11 Q. Did you speak to any investigators prior to

12  coming to today's deposition?

13 A. The guy at that brung me...

14 Q. The process server?

15 A. Yes.

16 Q. Did you speak to anyone else other than that

17  individual?

18 A. Nope.

19 Q. Did you speak to any family prior to coming

20  to today's deposition?

21 A. Like, whose family?

22 Q. Your family?

23 A. My family?

24 Q. Yes.

GOVERNED BY PROTECTIVE ORDER 14

1 A. No.

2 Q. Did you speak to any friends prior to coming

3  to today's deposition?

4 A. No.

5 Q. So is it my understanding that you spoke to

6  no one about today's deposition, other than

7  your attorney, Michael Dooling; is that

8  correct?

9 A. Yes.

10 Q. Did you do anything to prepare for today's

11    deposition?

12    A. Nope.

13    Q. Did you review any documents?

14    A. Nope.

15    Q. Did you review any notes?

16    A. Nope.

17    Q. Did you review any news articles?

18    A. No.

19    Q. So you conducted no review whatsoever prior

20    to coming to today's deposition?

21    A. Nope.

22    Q. And you conducted no preparation prior to

23    coming to today's deposition?

24    A. Nope.

GOVERNED BY PROTECTIVE ORDER    15

1    Q. Other than speaking with Mr. Dooling, did

2    you have the opportunity to meet with him in

3    person?

4    A. Yes.

5    Q. When was that?

6    A. About – maybe two, three weeks ago.

7    Q. And it was in reference to today's

8    deposition?

9    A. Yes.

10    Q. Did you review any documents in his company?

11    A. No.

12  Q. Did you speak to anyone else about today's

13      deposition?

14  A. Nope.

15  Q. Are there any documents or any other notes

16      that would refresh your memory regarding the

17      incident on September 8, 2002?

18  A. Any notes or?

19  Q. Or any documents, photographs?

20  A. I don't know.

21  Q. Mr. Fernandes, are you currently taking any

22      medication?

23  A. No.

24  Q. Did you take any prescription medication or

GOVERNED BY PROTECTIVE ORDER    16

1       any other substances within the last 24

2       hours?

3   A. Nope.

4   Q. Did you consume any alcohol within the

5       preceding 24 hours?

6   A. Nope.

7   Q. Is there anything that would affect your

8       ability to testify today truthfully?

9   A. Nope.

10  Q. Is there anything that would affect your

11      ability to recall events today?

12  A. Yes. Yes. My memory is not too good, man.

13    Q. Do you have any diagnosis regarding a memory

14      problem?

15    A. No, I don't -- I don't have any diagnosis.

16    Q. And what kind of problems do you have with

17      your memory, Mr. Fernandes?

18    A. Just for me, I -- I can barely remember what

19      happened last week.

20    Q. Is there a reason why that is?

21    A. Smoke a lot.

22    Q. What do you smoke?

23    A. Some marijuana.

24    Q. How long have you been doing that?

GOVERNED BY PROTECTIVE ORDER    17

1    A. The last, maybe, ten years.

2    Q. How often do you smoke marijuana?

3    A. About maybe, like, every other day.

4    Q. How much marijuana do you smoke per day?

5    A. A couple blunts. A couple, like two, three.

6    Q. You have been doing that for the past ten

7      years?

8    A. Yes.

9    Q. Did you smoke any marijuana today?

10    A. No.

11    Q. Did you smoke any marijuana yesterday?

12    A. Maybe -- yes, in the morning.

13    Q. How much marijuana did you smoke yesterday

14    morning?

15    A. A little -- a little bit. How do you want

16    me to answer that? A little joint. I don't

17    know. A little.

18    Q. How many joints do you smoke?

19    A. Yesterday, one when I woke up.

20    Q. What time was that?

21    A. About ten o'clock, 10 in the morning.

22    Q. That was about ten o'clock yesterday

23    morning?

24    A. Yes.

GOVERNED BY PROTECTIVE ORDER    18

1    Q. And you smoked no pot today?

2    A. Nope.

3    Q. Is there anything else that would affect

4    your ability to recall or testify today?

5    A. No. That would be it really.

6    Q. Have you received any type of diagnosis from

7    a doctor that indicates that your memory is

8    affected by your consumption of marijuana?

9    A. No, I haven't.

10    Q. What do you base that opinion on?

11    A. Myself. Knowing myself, I guess.

12    Q. Is there anything else?

13    A. No.

14    Q. Mr. Fernandes, I'm just going to ask you a

15    couple of background questions.

16        Could you please tell me what your

17    bate of birth is?

18    A. 3/5/79.

19    Q. What is your current address?

20    A. 39 Lonsdale Street.

21    Q. Do you rent or own?

22    A. No. I live with my uncle.

23    Q. Who's your uncle?

24    A. Andre DePina.

GOVERNED BY PROTECTIVE ORDER   19

1    Q. Is he any relation to Dimingas DePina?

2    A. Dimingas, no.

3    Q. How do you spell DePina, D-E-P --

4    A. D-E-P-I-N-A.

5    Q. Do you have any plans on moving, Mr.

6    Fernandes?

7    A. Nope.

8    Q. Do you have any intention on moving to

9    Tennessee?

10    A. No.

11    Q. Do you have any intention on moving at any

12    time in the next 12 months?

13    A. Nope.

14    Q. Have you always lived in Massachusetts?

15    A. Yes, I have.

16    Q. At the time of the incident on September 8,

17      2003, where were you living?

18    A. I'm not sure. I can't remember. I don't

19      know.

20    Q. Do you have a Social Security --

21    A. I don't have a stable living area. I've

22      been around a lot like -- like, I bounce

23      from lots of places.

24    Q. Is there a reason why you don't have a

GOVERNED BY PROTECTIVE ORDER    20

1      stable address?

2    A. I don't know. I don't know. Sometimes -- I

3      don't know. I don't get along with my

4      parents, I don't get along with my uncle

5      sometimes. I have to keep moving around.

6    Q. Do you have a Social Security number?

7    A. Yes, I do.

8    Q. What's the Social Security number?

9    A. 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.

10    Q. Are you married or single, Mr. Fernandes?

11    A. Single.

12    Q. Have you ever been married?

13    A. No.

14    Q. Do you have a girlfriend?

15    A. Nope.

16    Q. Do you have any children?

17    A. Nope.

18    Q. What is your educational background?

19    A. Graduate, high school.

20    Q. Where did you graduate?

21    A. Randolph High.

22    Q. When did you graduate?

23    A. '98.

24    Q. Were you living in Randolph at the time?

GOVERNED BY PROTECTIVE ORDER    21

1    A. Yes, I was.

2    Q. How long did you live in Randolph for?

3    A. A couple of years.

4    Q. Who did you live in Randolph with?

5    A. My parents.

6    Q. What are your parents' names?

7    A. Maria and Manuel Fernandes.

8    Q. What's your father's name?

9    A. Manual.

10    Q. What's your mother's name?

11    A. Maria.

12    Q. You received a diploma from Randolph High

13      School?

14    A. Yes.

15    Q. Did you pursue any further education?

16    A. Nope.

17    Q. So you have no other further education other

18    than Randolph High School?

19    A. Yes.

20    Q. Have you taken any certifications or

21    participate in any trade classes or anything

22    of that sort?

23    A. No.

24    Q. What do you do for work?

GOVERNED BY PROTECTIVE ORDER    22

1    A. I work at United Liquors Warehouse.

2    Q. Where is that located?

3    A. In Braintree, Mass.

4    Q. How long have you been working?

5    A. About the last two and a half years.

6    Q. United Liquors, is that U-N-I-T-E-D?

7    A. Yes.

8    Q. Who is your supervisor there?

9    A. Oh, Bishop. I just know him as Bishop.

10    That's my boss's last name. That's what I

11    call him.

12    Q. What do you do for --

13    A. Timmy. Timmy Bishop.

14    Q. How long have you worked there, two and a

15    half years?

16    A. Yes.

17    Q. What are your responsibilities there?

18    A. Just like load, stock, warehouse work.

19    Q. How long have you been working there? I'm

20    sorry. How often do you work there?

21    A. About four days a week.

22    Q. Is it full-time or part-time?

23    A. It's full-time. It's full-time.

24    Q. About 40 hours a week?

GOVERNED BY PROTECTIVE ORDER    23

1    A. Yes. Depends on overtime and stuff like

2    that.

3    Q. What's your shift?

4    A. Midnight. About nine to 5:30 in the

5    morning.

6    Q. Midnight to --

7    A. Nine o'clock. The night shift.

8    Q. Nine p.m. to 5:30 in the morning?

9    A. Yes.

10    Q. Prior to working at United Liquors, did you

11    work anywhere else?

12    A. No. I was incarcerated, I believe, for a

13    while.

14    Q. How long were you incarcerated for?

15    A. I believe -- what was it? A year or so.

16    Q. What were you incarcerated for?

17    A. Then I got that job. Um, distributing.

18    Q. Distributing marijuana?

19    A. Marijuana, yes.

20    Q. And had you been incarcerated at any other

21        point?

22    A. Yes. I've been incarcerated a lot when I

23        was young.

24    Q. Where?

GOVERNED BY PROTECTIVE ORDER    24

1    A. Dedham, South Bay. I've been a lot of

2        places. I mean, anywhere basically.

3    Q. What were the charges that you were

4        incarcerated for?

5    A. Larceny, assault and battery on a police

6        officer. Basically a lot of probation

7        stuff.

8    Q. So assault and battery, larceny,

9        distribution. Are there any other charges?

10    A. Driving out without a license.

11    Q. Driving out without a license.

12    A. It's all little, little stuff.

13    Q. Do you currently have a license?

14    A. I do.

15    Q. And it's active?

16    A. It's active.

17    Q. So other than working for United Liquors,

18        you've never had any other employment?

19    A. I had employment. Like, I've only been

20        there for like a month or – nothing...

21    Q. Can you tell me a little bit about those

22      jobs?

23    A. If I can remember. I worked for a cleaning

24      company. I worked at a gas station. But

GOVERNED BY PROTECTIVE ORDER    25

1      those are all really, like, for like a

2      month.

3    Q. Why did you leave those positions?

4    A. I don't know. I just didn't want to work

5      there no more.

6    Q. Were you ever fired from a position?

7    A. Was I? No. I don't believe so.

8    Q. Do you have any disabilities, Mr. Fernandes,

9      that would affect your testimony today?

10    A. No.

11    Q. Do you have any learning disabilities?

12    A. No.

13    Q. Any mental disabilities?

14    A. No.

15    Q. Any physical disabilities?

16    A. Nope.

17    Q. Have you ever been a plaintiff in a lawsuit

18      before, Mr. Fernandes?

19    A. No.

20    Q. So you've never sued anybody?

21    A. Oh, as a matter of fact, yes, I have.

22    Q. Who have you sued?

23    A. I got into a car accident when I was – like

24       '98, back in '98.

GOVERNED BY PROTECTIVE ORDER    26

1    Q. Did someone represent you in that?

2    A. Yes.

3    Q. Who was that?

4    A. I think Dane Shulman, I believe.

5    Q. And did you receive a settlement?

6    A. Yes.

7    Q. How much was that settlement for?

8    A. It was like $3,000 or something. Not too

9       sure. Around that.

10   Q. Who did you sue?

11   A. I don't remember that. It was a car

12      accident. I'm not sure.

13   Q. Have you ever sued a police officer before?

14   A. Nope.

15   Q. Have you ever sued the City of Boston

16      before?

17   A. No.

18   Q. Have you ever sued any town or city?

19   A. No.

20   Q. Has anyone ever sued you?

21   A. Nope.

22   Q. Mr. Fernandes, I noticed you're not wearing

23    glasses. Do you have 20/20 vision?

24    A. Yes.

GOVERNED BY PROTECTIVE ORDER    27

1    Q. Have you always had 20/20 vision?

2    A. Yes.

3    Q. So you don't wear glasses?

4    A. No.

5    Q. Do you have any difficulty hearing?

6    A. No.

7    Q. Do you have any impairment whatsoever?

8    A. No.

9    Q. At some point you knew Eveline

10    Barros-Cepeda?

11    A. Yes.

12    Q. How long had you known her for prior to her

13    death on September 8, 2003?

14    A. Oh, for about a -- maybe like eight months,

15    six months. Six to eight months. I knew

16    her -- well, we wasn't really close. Like,

17    before I just knew of her.

18    Q. What did you know about her?

19    A. I just knew her from being around.

20    Q. Is that from the neighborhood?

21    A. Yes.

22    Q. And that's the Dorchester neighborhood?

23    A. Yes.

24    Q. And you knew her because you guys hung out

GOVERNED BY PROTECTIVE ORDER    28

1     on the street?

2    A. Family and friends.

3    Q. Do you have any family in common?

4    A. Cape Verdian, I don't know. It's tough.

5     Most likely, maybe.

6    Q. Because a lot of people are related?

7    A. Yes.

8    Q. Are you Cape Verdian, Mr. Fernandes?

9    A. Yes.

10   Q. And Eveline Barros-Cepeda was Cape Verdian?

11   A. Yes.

12   Q. So were you guys dating at the time that she

13    passed away on September 8, 2002?

14   A. We was friends.

15   Q. Was that girlfriend and boyfriend or --

16   A. Good friends.

17   Q. Were you romantically involved with her?

18   A. Yes.

19   Q. Yes?

20   A. Yes.

21   Q. How long had you been romantically involved

22    with her?

23   A. Like six months, five months, about that.

24   Q. Did you guys go out on dates, to the movies?

GOVERNED BY PROTECTIVE ORDER   29

1    A. Yes. We went out.

2    Q. Did you smoke pot together?

3    A. I don't remember. I don't even think she

4       smoked. I don't remember. I don't believe

5       she smoked.

6    Q. Did you know Maria Derosa?

7    A. Lenny?

8    Q. Lenny, yes.

9    A. Yes.

10   Q. How long had you known Maria Derosa?

11   A. I don't know. For a long time from being

12      around the neighborhood.

13   Q. Was that more than a year?

14   A. Yes.

15   Q. More than two years?

16   A. Yes. Just like...

17   Q. More than ten years?

18   A. No, no.

19   Q. More than five years?

20   A. Just about that, yes.

21   Q. About five years. And it was because you

22      guys knew each other in the neighborhood?

23   A. Yes.

24   Q. What about Brima Wurie?

GOVERNED BY PROTECTIVE ORDER   30

1    A. I know him.

2    Q. How long had you known him for?

3    A. Maybe about eight, nine years.

4    Q. How did you know him?

5    A. From the neighborhood.

6    Q. How would you describe your friendship?

7    A. We was good friends.

8    Q. Did you guys have any business

9      relationships?

10    A. No.

11    Q. You guys hung out a lot?

12    A. Yep.

13    Q. Did you still keep in touch with him?

14    A. No.

15    Q. Do you know where he is now?

16    A. Yes.

17    Q. Where is he?

18    A. He is incarcerated, I believe.

19    Q. Do you know where he's incarcerated?

20    A. No, I don't.

21    Q. When is the last time that you spoke to him?

22    A. A while ago. Before he got incarcerated, I

23      seen him.

24    Q. A year ago, two years ago?

1    A. Maybe like eight -- six, eight months ago.

2    Q. What did you guys talk about?

3    A. Nothing much.  Just what was going on.

4    Q. You guys are still friends?

5    A. Yes.

6    Q. What about Luis Carvalho, how long had you

7       known Luis Carvalho for prior to the

8       incident on September 8, 2002?

9    A. About around the same time, six to eight

10      years.

11   Q. Six to eight years.

12   A. Knew him for a while, yes.

13   Q. Who usually hung out together, was it you,

14      Brima Wurie and Luis Carvalho or you and

15      Maria and Luis Carvalho?

16   A. We just all hung around.  It's all people

17      from the same area.

18   Q. So you all knew each other for a long time?

19   A. Yes.

20   Q. But including –

21   A. Except – except them.  I meet them through

22      Z-2, because that's her cousin or something.

23   Q. You met Eveline through --

24   A. And Lenny and them through Z-2, because

GOVERNED BY PROTECTIVE ORDER   32

1    that's his family.

2    Q. Z-2 is Luis Carvalho?

3    A. Yes.

4    Q. What kinds of things did you guys do to hang

5    out together?

6    A. Just hung around.

7    Q. On the streets?

8    A. Yes.  Just kicked it, movies, something to

9    eat.

10    Q. Is your nickname Duborg, D-U-B-O-R-G?

11    A. No.

12    Q. Do you have any nicknames?

13    A. No.

14    Q. I noticed you have a tattoo on your neck.

15    What does that tattoo stand for?

16    A. It's a movie.

17    Q. What is it?  Carlito's Way?

18    A. Yes.

19    Q. Why do you have that tattoo?

20    A. I liked the movie.

21    Q. I haven't seen the movie.

22    A. It's a good movie.

23    Q. You liked the movie?

24    A. Yes.

GOVERNED BY PROTECTIVE ORDER    33

1    Q. Is there a reason why you put it on your

2      neck?

3      A. No.  It's just young, dumb.

4      Q. How long had you had that for?

5      A. Wow, I don't know.  Maybe like six, seven

6         years.

7      Q. Do you have any other tattoos?

8      A. Yes.

9      Q. Are any of those tattoos related to Eveline

10        Barros-Cepeda?

11     A. No.

12     Q. When is the last time that you saw Maria

13        Derosa?

14     A. I can't recall.  It must have been a while.

15     Q. Two weeks, three weeks?

16     A. No.  Longer than that.

17     Q. Months?

18     A. Yes.

19     Q. Like six months?

20     A. Maybe even more than that.  Maybe eight,

21        nine months.

22     Q. Did you and Maria ever talk about the

23        incident that happened on September 8, 2002?

24     A. No.

GOVERNED BY PROTECTIVE ORDER    34


1      Q. Did you ever talk about the incident with

2         Luis Carvalho?

3    A. No.

4    Q. Did you ever talk about the incident with

5    Brima Wurie?

6    A. Nope.

7    Q. Do you know a Shenia Dancy-Stewart?

8    A. Excuse me?

9    Q. Do you know a Shenia Dancy-Stewart?

10    A. Do I know her?

11    Q. Yes.

12    A. No.

13    Q. Do you know a Carlos Cepeda?

14    A. No.

15    Q. So you don't know Carlos Cepeda or Shenia

16    Dancy-Stewart?

17    A. No.

18    Q. When is the last time you talked about the

19    incident with Brima Wurie?

20    A. When is the last time I talked about -- I

21    just said, I didn't talk about the incident.

22    Q. I'm sorry, I didn't hear that.

23    Have you discussed the incident with

24    any of the people that were involved on

GOVERNED BY PROTECTIVE ORDER    35

1    September 8, 2002, with anybody?

2    A. Nope.

3    Q. Did you ever talk to Eveline's mother?

4    A. No, I haven't.

5    Q. Do you know any of the police officers that

6        were involved in the incident on September

7        8?

8    A. No.

9    Q. Do you know an Officer Michael Paillant?

10    A. No.

11    Q. Do you know an Officer Thomas Taylor?

12    A. No.

13    Q. Do you know an Officer Deborah Flaherty?

14    A. No.

15    Q. Do you know an Officer Robert Connolly?

16    A. No.

17    Q. Do you know where Maria Derosa works?

18    A. No.

19    Q. Do you know where she lives?

20    A. No.

21    Q. Do you have her telephone number?

22    A. No.

23    Q. What about Luis Carvalho?

24    A. No.

GOVERNED BY PROTECTIVE ORDER    36

1    Q. What about Brima Wurie, you just know he's

2        incarcerated?

3    A. I just know he's incarcerated.

4    Q. Do you know anything about Maria Derosa's

5      criminal activity?

6      A. No.

7      Q. What about Luis Carvalho?

8          MR. KEEFE:  Objection.

9      A. No.

10     Q. What about Brima Wurie?

11         MR. KEEFE:  Objection.

12     A. No.

13     Q. Do you know if they've had any trouble with

14     law enforcement?

15         MR. KEEFE:  Objection.

16         MS. LITSAS:  What's the basis of

17     your objection?

18         MR. KEEFE:  Form and in trouble.

19         MS. LITSAS:  Okay.  I'll rephrase.

20     Q. Do you know if Maria Derosa has ever been

21     incarcerated?

22     A. I don't know.

23     Q. Do you know if Maria Derosa has ever been

24     arrested?

               GOVERNED BY PROTECTIVE ORDER   37


1          MR. KEEFE:  Objection.

2      A. I don't know.

3      Q. And do you know if she's ever been convicted

4      of any crime?

5      A. I don't know.

6    Q. What about Luis Carvalho?

7        MR. KEEFE: Objection.

8    A. I don't know.

9    Q. Do you know if Luis Carvalho has ever been

10    arrested?

11    A. I don't know. You'll have to ask him.

12    Q. Do you know if Luis Carvalho has ever been

13    convicted of any crime?

14    A. I have no idea.

15    Q. And you understand, Mr. Fernandes, you're

16    here under oath to testify truthfully?

17    A. Yes.

18    Q. Did you ever know an Erika Cummings?

19    A. No.

20    Q. Back in 2002, in September of 2002, you

21    don't remember where you were living at the

22    time?

23    A. No.

24    Q. Do you know if you were working at the time?

GOVERNED BY PROTECTIVE ORDER    38


1    A. I don't remember.

2    Q. Do you remember what the first thing is you

3    did that day?

4    A. No. Definitely no.

5    Q. What's the first thing that you remember

6    about that day?

7    A. I don't — I don't know.

8    Q. You and Brima Wurie, Lenny, Maria Derosa,

9       and Luis Carvalho and Eveline were all going

10      out that night, right?

11   A. I plead the 5th.

12   Q. You and Brima Wurie were picked up by Maria

13      Derosa and Eveline Barros-Cepeda that night,

14      correct?

15   A. I plead the 5th.

16   Q. What were you going to do that day?

17   A. I plead the 5th.

18   Q. Do you remember what the weather was like

19      that day?

20   A. Plead the 5th.

21   Q. Who were you with before the incident

22      happened on September 8, 2002?

23   A. I plead the 5th.

24   Q. What was the plan that day?

GOVERNED BY PROTECTIVE ORDER    39

1    A. Plead the 5th.

2    Q. Do you know who was driving the car that

3       day?

4    A. Plead the 5th.

5    Q. What were you doing before the incident that

6       occurred on September 8, 2002?

7    A. Plead the 5th.

8    Q. Did you at any point travel to Cushing

9        Avenue?

10   A. Plead the 5th.

11   Q. How long were you at Cushing Avenue?

12   A. I plead the 5th.

13   Q. What were you doing there?

14   A. Plead the 5th.

15   Q. Who else was there at Cushing Avenue with

16       you?

17   A. Plead the 5th.

18   Q. Did you say anything to anybody while you

19       were at Cushing Avenue?

20   A. Plead the 5th.

21   Q. What did you say?

22   A. Plead the 5th.

23   Q. How long were you at that location?

24   A. Plead the 5th.

GOVERNED BY PROTECTIVE ORDER    40

GOVERNED BY PROTECTIVE ORDER   42

1    Q. Did you see any police car at all on

2       September 8, 2002?

3    A. Plead the 5th.

4    Q. Did you say anything to anybody while you

5       were being pursued by a police vehicle?

6    A. Plead the 5th.

7    Q. Did you do anything?

8    A. Plead the 5th.

9    Q. What were you thinking?

10    A. Plead the 5th.

11    Q. Where were you going at the time that your

12       vehicle was pursued by the police vehicle?

13    A. Plead the 5th.

14    Q. What were you doing at that time?

15    A. I plead the 5th.

16    Q. Did anybody at any point say anything while

17       in the vehicle?

18    A. Plead the 5th.

19    Q. At some point did you see a police officer

20       come running in front of the vehicle

21       attempting to stop the vehicle?

22    A. Plead the 5th.

23    Q. At some point did the vehicle in which you

24       were driving then strike Officer Michael

GOVERNED BY PROTECTIVE ORDER   43

1    Paillant?

2    A. No.

3    Q. At some point did the vehicle in which you

4      were driving strike anybody?

5    A. No.

6    Q. At any point did you hear shots from a gun?

7    A. Plead the 5th.

8    Q. At some point did you see the vehicle in

9      which you were driving hit a police officer?

10        MR. KEEFE:  Objection.

11    A. I plead the 5th.

12    Q. At some point did you hear the vehicle in

13      which you were driving hit a police officer?

14    A. Can you repeat that?

15    Q. At some point did you hear the vehicle in

16      which you were driving in strike a police

17      officer?

18    A. No.

19    Q. What is your knowledge about what happened

20      on the evening of September 8, 2002?

21        MR. KEEFE:  Objection.

22    A. I plead the 5th.

23    Q. Can you please describe what happened on

24      September 8, 2002?

GOVERNED BY PROTECTIVE ORDER    44

1    A. Plead the 5th.

2    Q. Are you aware that Brima Wurie pled guilty

3        to assault and battery with a dangerous

4        weapon with respect to the incident on

5        September 8, 2002?

6            MR. KEEFE:  Objection.

7    A. I was not aware.

8    Q. Are you aware that Brima Wurie pled guilty

9        to hitting the police officer on September

10       8, 2002?

11   A. I was not aware of that.

12           MR. KEEFE:  Objection.

13   Q. How long did the incident occur on September

14       8?

15   A. I plead the 5th.

16   Q. Do you know how many officers were involved

17       in the incident?

18   A. Plead the 5th.

19   Q. Do you know if they were wearing a uniform?

20   A. Plead the 5th.

21   Q. Do you know what the officers looked like?

22   A. I plead the 5th.

23   Q. Do you know if anybody else was with the

24       officers at the time of the incident on

                GOVERNED BY PROTECTIVE ORDER    45


1        September 8, 2002?

2          MR. KEEFE:  Objection.

3     A. I plead the 5th.

4     Q. What did you hear on September 8, 2002?

5          MR. KEEFE:  Objection.

6          MS. LITSAS:  Strike that.  I'll

7        withdraw the question.

8     Q. Where was your vehicle located on September

9        8, 2002, when it encountered Boston police

10       officers.

11         MR. KEEFE:  Objection.

12    A. It wasn't my vehicle.  I never had a

13       vehicle.

14    Q. What vehicle were you driving in?

15    A. I wasn't driving.

16    Q. Who was driving?  Was it Brima Wurie?

17    A. What vehicle are you talking about?  I'm not

18       sure.  You're asking about my vehicle.  The

19       vehicle I was in?

20    Q. The vehicle you were in on September 8,

21       2002?

22    A. What is the question?

23    Q. Who was driving?

24    A. I plead the 5th.

GOVERNED BY PROTECTIVE ORDER    46

1     Q. So you were in the vehicle on September 8,

2        2002?

3       MR. KEEFE:  Objection.

4    A. I plead the 5th.

5    Q. You just stated, didn't you, that you were

6       in a vehicle on September 8, 2002, correct?

7    A. Did I just say that now?

8       MR. KEEFE:  Objection.

9    A. No, I didn't.  I plead the 5th right now.

10   Q. Did you see any Boston police officers on

11      Dunkeld Street on September 8, 2002?

12   A. I plead the 5th.

13   Q. Do you see any Boston police officers on

14      Fayston Street on September 8, 2002?

15   A. I plead the 5th.

16   Q. Did you hear any shots fired on the night of

17      September 8, 2002?

18      MR. KEEFE:  Objection.

19   A. I plead the 5th.

20      MS. LITSAS:  What's the basis of

21      your objection?

22      MR. KEEFE:  It's been asked and

23      answered.

24   Q. What did you do when shots were fired on

GOVERNED BY PROTECTIVE ORDER    47

1      September 8, 2002?

2    A. I plead the 5th.

3    Q. At any point did you duck while in the

4      vehicle on September 8, 2002?

5      A. I plead the 5th.

6          MR. KEEFE:  Objection.

7      Q. What did you do when shots were fired on

8        September 8, 2002?

9          MR. KEEFE:  Objection.

10     A. Plead the 5th.

11     Q. Do you know why Brima Wurie kept driving

12       despite the police officers behind his

13       vehicle?

14         MR. KEEFE:  Objection.

15     A. Plead the 5th.

16     Q. Do you know why Brima Wurie did not stop for

17       police officers on September 8, 2002?

18         MR. KEEFE:  Objection.

19     A. I plead the 5th.

20     Q. Do you know what the passengers did in the

21       vehicle on September 8, 2002?

22         MR. KEEFE:  Objection.

23     A. Plead the 5th.

24     Q. Do you know what the passengers in the

GOVERNED BY PROTECTIVE ORDER    48

1      vehicle were doing on September 8, 2002?

2          MR. KEEFE:  Objection.

3      A. I plead the 5th.

4      Q. What happened on September 8, 2002?

5       MR. KEEFE: Objection.

6    A. Plead the 5th.

7    Q. Are you aware that Eveline Barros-Cepeda

8       passed away on September 8, 2002?

9    A. Plead the 5th.

10   Q. Do you know if Eveline Barros-Cepeda was

11      shot on September 8, 2002?

12   A. Plead the 5th.

13   Q. Did you at any point ever see Eveline

14      Barros-Cepeda on the night of September 8,

15      2002?

16   A. Plead the 5th.

17   Q. At any point did you leave or exit the

18      vehicle on September 8, 2002?

19   A. I plead the 5th.

20   Q. At any point on September 8, 2002, did you

21      give any statements to any police officers?

22   A. Plead the 5th.

23   Q. At any point did you exit the vehicle on

24      September 8, 2002?

GOVERNED BY PROTECTIVE ORDER    49

1       MR. KEEFE: Objection.

2    A. Plead the 5th.

3    Q. At any point did you see any individual exit

4       the vehicle on September 8, 2002?

5    A. I plead the 5th.

6        MR. KEEFE:  Objection.

7   Q. What did you do after shots were fired on

8    September 8, 2002?

9        MR. KEEFE:  Objection.

10   A. Plead the 5th.

11   Q. Where did you go on September 8, 2002, after

12    shots were fired?

13        MR. KEEFE:  Objection.

14   A. Plead the 5th.

15   Q. What were you thinking at the time of the

16    incident on September 8, 2002?

17   A. Plead the 5th.

18        MR. KEEFE:  Objection.

19   Q. What were you feeling at the time of the

20    incident on September 8, 2002?

21        MR. KEEFE:  Objection.

22   A. Plead the 5th.

23   Q. Did you speak to anybody after the incident

24    on September 8, 2002?

GOVERNED BY PROTECTIVE ORDER    50

1        MR. KEEFE:  Objection.

2   A. Plead the 5th.

3   Q. At any point did a police officer ask for

4    your contact information on September 8,

5    2002?

6   A. Plead the 5th.

7    Q. Did you call anybody after the incident on

8        September 8, 2002, and tell them what

9        happened?

10   A. Plead the 5th.

11   Q. Who was that?

12   A. I plead the 5th.

13   Q. Did an incident like this on September 8,

14       2002, ever happen before?

15   A. Plead the 5th.

16   Q. Do you know if anybody was treated for any

17       injuries on September 8, 2002?

18   A. Plead the 5th.

19   Q. By whom?

20   A. Plead the 5th.

21   Q. Do you know what years?

22   A. I plead the 5th.

23   Q. Do you know how they incurred those

24       injuries?

GOVERNED BY PROTECTIVE ORDER    51

1    A. Plead the 5th.

2    Q. Did you see any officers injured on

3        September 8, 2002?

4    A. Plead the 5th.

5    Q. Were you injured on September 8 --

6    A. Plead the 5th.

7    Q. -- 2002?

8          Do you know of any witnesses to the

9      incident on September 8, 2002?

10         MR. KEEFE:  Objection.

11     A. Plead the 5th.

12     Q. Did you make any statements to any police

13         officers after this incident on September 8,

14         2002?

15     A. Plead the 5th.

16     Q. Isn't it true, Mr. Fernandes, that you gave

17         a statement to detectives several days after

18         the incident on September 8, 2002?

19     A. Plead the 5th.

20     Q. Do you know if anybody else made any

21         statements?

22     A. Plead the 5th.

23     Q. Did the police ever contact you again?

24     A. Plead the 5th.

GOVERNED BY PROTECTIVE ORDER   52

1      Q. Did anyone contact you about the incident?

2      A. I plead the 5th.

3      Q. What about anyone from the Cepeda family?

4      A. I plead the 5th.

5      Q. What about Dimingas DePina?

6      A. I plead the 5th.

7      Q. Did you give any interview by Internal

8         Affairs with the Boston Police Department?

9    A. Excuse me?

10   Q. Did you ever give any interview of

11      statements to Internal Affairs of the Boston

12      Police Department?

13   A. Plead the 5th.

14   Q. Did you give any statements to anybody about

15      the incident?

16   A. Plead the 5th.

17   Q. Have you ever given a statement to the

18      Plaintiffs' attorney?

19   A. Plead the 5th.

20   Q. Did you ever give any statements to the

21      Plaintiffs investigator?

22   A. Plead the 5th.

23   Q. Has anyone asked you about this case

24      recently?

GOVERNED BY PROTECTIVE ORDER    53

1    A. Plead the 5th.

2    Q. Did you provide any testimony regarding this

3       incident?

4    A. Plead the 5th.

5    Q. Have you ever testified in court about this

6       incident?

7    A. Plead the 5th.

8    Q. Have you ever testified before?

9    A. Plead the 5th.

10    Q. Have you ever testified in any criminal

11       case?

12    A. Plead the 5th.

13    Q. Are you currently on probation, Mr.

14       Fernandes?

15    A. I'm not sure. It's supposed to end --

16       either I think this first week -- or this

17       first week of March or it might be -- be

18       over. I'm not really sure. It was just

19       unsupervised.

20    Q. Who was your probation officer?

21    A. Unsupervised. I just had to stay out of

22       trouble for six months or something.

23    Q. What was the last conviction, was it for

24       distribution?

GOVERNED BY PROTECTIVE ORDER    54

1    A. Mine?

2    Q. Yes.

3    A. Yes. I believe so.

4    Q. Were you ever arrested or charged in

5       connection with any criminal activity

6       regarding the activity on September 8, 2002?

7    A. Repeat that?

8    Q. Were you ever arrested for any activity

9       regarding the incident on September 8, 2002?

10    A. I plead the 5th.

11    Q. Do you have any pending criminal trials

12      coming up?

13    A. Nope.

14    Q. What about any appeals?

15    A. Nope.

16    Q. You stated earlier that you were convicted

17      of assault and battery on a police officer?

18    A. I'm not sure if I -- because I got

19      probation, I might have pleaded down to just

20      assault and battery. I don't remember.

21    Q. Do you know if that was a Boston police

22      officer?

23    A. I don't -- it wasn't. It was -- it was in

24      Quincy court, so no.

GOVERNED BY PROTECTIVE ORDER    55

1    Q. It wasn't a Boston police officer?

2    A. No, no.

3    Q. Have you had any interaction with the Boston

4      Police Department?

5        MR. KEEFE:  Objection.

6    A. I've been arrested before.

7    Q. By Boston police?

8    A. Yes.

9    Q. How would you describe your relationship

10     with the Boston Police Department?

11       MR. KEEFE:  Objection.

12    Q. Do you have a relationship with the Boston

13      Police Department?

14    A. No.

15        MR. KEEFE:  Objection.

16    Q. Do you like the Boston Police Department?

17        MR. KEEFE:  Objection.

18    Q. You have to answer.

19    A. I guess I like them. They do their job.

20    Q. It's fair to say that Boston police officers

21      have arrested you previously?

22    A. Yes.

23    Q. And they've been responsible for your

24      convictions in part?

GOVERNED BY PROTECTIVE ORDER    56

1    A. Um, I don't even believe I got convicted

2      from.

3    Q. From the Boston --

4    A. From the Dorchester court, no.

5    Q. Do you have any bias whatsoever against the

6      Boston Police Department?

7    A. No.

8    Q. Have you had any bad experiences with the

9      Boston Police Department?

10        MR. KEEFE:  Objection.

11    A. No.

12    Q. What about police officers in general, have

13    you had any bad experiences?

14        MR. KEEFE:  Objection.

15    A. No.

16    Q. Have you had any bad experiences with police

17        officers?

18    A. What do you mean by "bad experience"?  Like

19        going to jail is a bad experience.  So yes,

20        I have had bad experiences.  I went to jail.

21    Q. I'm going to show you a document that's been

22        marked as Exhibit No. 2.  Can you just take

23        a moment and look at it and I'd like you to

24        look through every page.

              GOVERNED BY PROTECTIVE ORDER    57

1    A. (Peruses document.)

2    Q. Mr. Fernandes, have you had an opportunity

3        to review Exhibit No. 2?

4    A. Yes.

5    Q. Do you recognize what it is?

6    A. It looks like a report.

7    Q. I'll read to you what's on the front page of

8        the document.  It says, "Statement of Carlos

9        Fernandes"; is that correct?

10    A. Yes.

11    Q. You are the same Carlos Fernandes,

12        correct --

13    A. Yes.

14    Q. – that gave this statement?

15    A. Uh-huh.

16    Q. Do you remember giving this statement?

17    A. No.

18    Q. Does this refresh your memory?

19    A. A little bit.

20    Q. So you gave that statement to the Boston

21        Police Department after the incident on

22        September 8, 2002, correct?

23    A. Yes.

24    Q. Would you agree with me that it's a fair and

GOVERNED BY PROTECTIVE ORDER    58

1        accurate representation of your statement on

2        September 8, 2002?

3            MR. KEEFE:  Objection.

4    A. I plead the 5th.

5    Q. Who interviewed you during this statement on

6        September 8, 2002?

7    A. Plead the 5th.

8    Q. Do you remember what you said on September

9        8, 2002?

10    A. I plead the 5th.

11    Q. I'm going to show you again Exhibit No. 2

12        and ask you if this statement refreshes your

13        recollection of the incident on the

14        September 8, 2002.  Does it refresh your

15      recollection?

16      A. Plead the 5th.

17      Q. Do you remember stating in this interview on

18      October 2, 2002, after the incident on

19      September 8, 2002, that you were in the

20      vehicle on September 8, 2002, with Brima

21      Wurie, Eveline Barros-Cepeda, Maria Derosa

22      and Luis Carvalho?

23      A. Plead the 5th.

24      Q. Do you remember stating during your

GOVERNED BY PROTECTIVE ORDER    59

1      interview that you traveled to Cushing

2      Avenue on September 8, 2002?

3      A. Plead the 5th.

4      Q. Do you remember stating during this

5      interview that on September 8, 2002, Brima

6      Wurie was driving the vehicle?

7      A. Plead the 5th.

8      Q. Do you remember stating during this

9      interview that Brima Wurie did not heed or

10      stop for the Boston police officers that

11      were traveling behind the vehicle on

12      September 8, 2002?

13      A. I plead the 5th.

14      Q. Do you remember stating during this

15      interview that while you were on Dunkeld

16      Street you observed a Boston police officer

17      coming towards your vehicle?

18   A. Plead the 5th.

19   Q. Do you remember indicating during this

20      interview that the police officer raised his

21      right arm up in an attempt to halt your

22      vehicle that you were traveling in?

23   A. Plead the 5th.

24   Q. Do you remember stating that he came towards

GOVERNED BY PROTECTIVE ORDER    60

1      the passenger right-hand side of the vehicle

2      on Dunkeld Street?

3   A. Plead the 5th.

4   Q. Do you remember stating that you heard shots

5      on September 8, 2002?

6   A. Plead the 5th.

7   Q. Do you remember stating that at the time

8      that you saw the Boston police officer come

9      towards your vehicle, you ducked in the

10      vehicle?

11   A. Plead the 5th.

12   Q. Have you ever spoken to anyone about the

13      events that occurred on September 8, 2002,

14      other than your attorney, Michael Dooling?

15          MR. KEEFE:  Objection.

16   A. Plead the 5th.

17    Q. Did you ever attend a funeral service of

18        Eveline Barros-Cepeda following her death on

19        September 8, 2002?

20    A. No.

21    Q. Did you ever attend a peace walk following

22        her death on September 8, 2002?

23    A. No.

24    Q. Did you ever participate in any fundraising

GOVERNED BY PROTECTIVE ORDER    61

1        activities regarding Eveline Barros-Cepeda?

2    A. No.

3    Q. Did you ever go to Dimingas DePina's

4        residence following the death of Eveline

5        Barros-Cepeda?

6    A. No.

7        MS. LITSAS: For purposes of the

8        record, Attorney Evan Ouellette, co-counsel

9        for the City of Boston and Thomas Taylor,

10        has entered the room.

11        Can we go off the record.

12        (Recess taken.)

13    Q. Following the incident on September 8, 2002,

14        where did you go?

15    A. Plead the 5th.

16    Q. Did you make any observations of what

17        happened on Dunkeld Street or Fayston Street

18      following the incident on the September 8,

19      2002?

20          MR. KEEFE:  Objection.

21      A. Plead the 5th.

22      Q. What did you see on September 8, 2002,

23      following the firing of shots?

24      A. Plead the 5th.

GOVERNED BY PROTECTIVE ORDER    62

1           MR. KEEFE:  Objection.

2       Q. Do you know if anybody else in the vehicle

3       with you on September 8, 2002, made any

4       statements to anybody following the

5       incident?

6       A. Plead the 5th.

7           MR. KEEFE:  Objection.

8       Q. Is there anything else you think I should

9       know that I have not asked you already

10      today?

11      A. Nope.

12      Q. Are you aware that Eveline Barros-Cepeda had

13      a son --

14      A. Yes.

15      Q. -- on September 8, 2002?

16          Were you aware that Eveline

17      Barros-Cepeda was married at the time on

18      September 8, 2002?

19    A. No. I wasn't -- no, I wasn't aware of that.

20    Q. Have you had any contact whatsoever with her

21      family following the incident on the

22      September 8, 2002?

23    A. No, I haven't.

24    Q. Have you had any contact with her friends

GOVERNED BY PROTECTIVE ORDER    63

1      following the incident on September 8, 2002?

2    A. No.

3        MS. LITSAS: Just off the record.

4        (Recess taken.)

5    Q. Her cousin?

6    A. Yes.

7    Q. And who is that, Maria Derosa?

8    A. I told you earlier I seen Maria and Z-2.

9    Q. You've seen Maria and Z-2. Do you know

10     where Z-2 works?

11    A. No.

12    Q. Do you know where Maria works?

13    A. No.

14    Q. Have you guys ever talked about the incident

15     on September 8, 2002?

16        MR. KEEFE: Objection.

17    A. No.

18    Q. Did Maria know that you were coming in for

19     today's deposition?

20   A. No.

21   Q. Did Z-2 know that you were coming in for

22      today's deposition?

23   A. No.

24      MS. LITSAS: Off the record.

         GOVERNED BY PROTECTIVE ORDER   64

1          (Recess taken.)

2    Q. On September 8, 2002, did you shoot anybody?

3    A. Plead the 5th.

4    Q. On September 8, 2002, did you at any point

5       shoot a gun?

6    A. Plead the 5th.

7    Q. On September 8, 2002, did you see anybody

8       shoot a firearm?

9    A. Plead the 5th.

10   Q. On Cushing Avenue, did you shoot your

11      firearm?

12   A. Plead the 5th.

13   Q. On September 8, 2002, at Cushing Avenue, did

14      you see anybody else shoot a firearm?

15       MR. KEEFE: Objection.

16   A. Plead the 5th.

17   Q. On September 8, 2002, did you flee Cushing

18      Avenue in a vehicle?

19   A. Plead the 5th.

20       MR. KEEFE: Objection.

21  Q. Isn't it true, Mr. Fernandes, that the

22      reason that Brima Wurie did not stop for

23      police officers on September 8, 2002, was

24      because you and Brima and the other

GOVERNED BY PROTECTIVE ORDER    65

1      passengers in the vehicle had been involved

2      in a shooting on Cushing Avenue?

3          MR. KEEFE:  Objection.

4   A. Plead the 5th.

5   Q. Isn't it true the reason Brima Wurie did not

6      stop for the police on September 8, 2002,

7      was because of your involvement in a

8      shooting on Cushing Avenue on September 8,

9      2002?

10         MR. KEEFE:  Objection.

11  A. I plead the 5th.

12  Q. Were you on Cushing Avenue on September 8,

13     2002?

14         MR. KEEFE:  Objection.

15  A. Plead the 5th.

16  Q. Do you know if Brima Wurie was on Cushing

17     Avenue on September 8, 2002?

18         MR. KEEFE:  Objection.

19  A. Plead the 5th.

20  Q. Earlier in your deposition today, Mr.

21     Fernandes, I asked you whether the vehicle

22      in which you were traveling in on September

23      8, 2002, struck Officer Michael Paillant,

24      correct?

GOVERNED BY PROTECTIVE ORDER    66

1      A. Yes.

2      Q. And you answered no, correct?

3      A. Yes.

4      Q. I'm a little confused. Why did you answer

5          no to that question and then plead the 5th

6          on all of the other questions about that

7          evening?

8          MR. KEEFE: Objection.

9      A. Because I can remember that. We didn't hit

10          no cop, that I remember.

11     Q. And so the reason that you're pleading the

12          5th is because you don't remember anything

13          else that happened other than that?

14          MR. KEEFE: Objection.

15     A. I don't...

16     Q. I'm a little confused.

17     A. Repeat that.

18     Q. Sure. So you just said that the reason that

19          you could answer that question was because

20          you could remember that the car that you

21          were traveling in and what happened to it

22          with the police officer; is that correct?

23    A. Yes. I remember not hitting a cop.

24    Q. Why is it that you're pleading the 5th to

GOVERNED BY PROTECTIVE ORDER    67

1     all of the other questions?

2         MR. KEEFE:  Objection.

3     A. I plead the 5th.

4     Q. Do you remember what happened on September

5     8, 2002?

6     A. Plead the 5th.

7     Q. Prior to September 8, 2002, how often had

8     you seen Eveline Barros-Cepeda?

9     A. Plead the 5th.

10    Q. What did you do with Eveline Barros-Cepeda

11    prior to September 8, 2002?

12        MR. KEEFE:  Objection.

13    A. Plead the 5th.

14    Q. Did you go to the movies together prior to

15    September 8, 2002?

16        MR. KEEFE:  Objection.

17    A. Plead the 5th.

18    Q. What activities did you do together --

19    A. Plead the 5th.

20    Q. -- prior to September 8, 2002?

21        MR. KEEFE:  Objection.

22    A. I already answered that.

23    Q. I don't remember.

24    A. Plead the 5th.

GOVERNED BY PROTECTIVE ORDER    68

1    Q. What was your answer?

2    A. I said we went to the movies, we hung

3      around. You asked me what we did before.

4    Q. I'm sorry. How often did you do that?

5    A. I don't know.

6    Q. More than once?

7    A. Maybe, like, the weekends or something. A

8      couple of days out of the week.

9    Q. So you saw each other about twice a week for

10      about the six to eight months that you knew

11      her?

12    A. I'd see her maybe once every week or twice a

13      week. Yes, about that.

14    Q. And then you guys would go to the movies

15      together?

16    A. We did a lot.

17    Q. You did a lot of things together?

18    A. Stuff. Hung around. We were friends.

19    Q. And then you went out to eat?

20    A. We -- we hung around a lot of friends. It

21      wasn't just like me and her. It was a lot

22      of friends, a lot of associates.

23    Q. Associates?

24    A. Yes. A lot of people we knew together. So

GOVERNED BY PROTECTIVE ORDER    69

1      it wasn't just like me and her that went to

2       the movies.

3     Q. Why did you use the term "associates"?

4     A. Mutual friends. Like, we have mutual -- we

5        knew people that she knew and I knew.

6     Q. Who are they?

7     A. That was a lot of people. Neighborhood

8        people.

9     Q. Like who?

10     A. People that lived around there.

11     Q. Like who?

12     A. I'm not sure. Just friends.

13     Q. Can you give me the name of one person?

14          MR. KEEFE: Objection.

15     A. Let's see. A name of a mutual friend, Z-2,

16        her cousin.

17     Q. Anybody else other than Z-2 and Maria

18        Derosa?

19     A. There was a lot of people.

20     Q. Can you give me an example?

21     A. An example, let me see. Mike. She knew

22        Mike; I knew Mike.

23     Q. What's Mike's last name?

24     A. I'm not sure.

GOVERNED BY PROTECTIVE ORDER   70

1    Q. How long have you known Mike?

2    A. I don't know. Neighborhood, years.

3    Q. Where does Mike live?

4    A. Around the same area.

5    Q. Have you ever met Carlos Cepeda?

6    A. No.

7        MR. KEEFE:  Objection.

8    A. Do you know anybody who has met Carlos

9      Cepeda?

10       MR. KEEFE:  Objection.

11   A. No.

12   Q. Do you know Carlos Cepeda?

13       MR. KEEFE:  Objection.

14   A. No.

15   Q. Did Eveline ever mention Carlos Cepeda?

16   A. I know that was her baby's father. I never

17     knew him.

18   Q. You didn't know that she was married?

19   A. No, I didn't know she was married.

20   Q. Did Eveline Barros-Cepeda ever give you the

21     impression that she was married?

22       MR. KEEFE:  Objection.

23   A. No.

24   Q. So she never told you that she was married?

GOVERNED BY PROTECTIVE ORDER   71

1    A. No.

2    Q. Did you ever have an intimate relationship

3       with Eveline Barros-Cepeda?

4         MR. KEEFE:  Objection.

5    A. Yes.

6    Q. And that was prior to September 8, 2002?

7    A. Yes.

8    Q. And that was for about six to eight months

9       prior to September 8, 2002?

10   A. About that.  Around that.

11        MS. LITSAS:  I have nothing further.

12        MR. KEEFE:  No questions.

13        MS. LITSAS:  I will suspend today's

14      deposition for purposes of filing a motion

15      to compel with the court.  Thank you.

16        (Whereupon the deposition

17          concluded at 3:50 p.m.)

18

19

20

21

22

23

24

GOVERNED BY PROTECTIVE ORDER    72

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

GOVERNED BY PROTECTIVE ORDER    73

1        C E R T I F I C A T E

2

3    COMMONWEALTH OF MASSACHUSETTS

4    MIDDLESEX, SS.

5

6        I, Karen Borreson, RPR, a Notary

7    Public in and for the Commonwealth of

8    Massachusetts, do hereby certify that CARLOS

9    FERNANDES, the witness whose deposition is

10   hereinbefore set forth, was duly sworn by me

11   and that such deposition is a true and

12   accurate record, to the best of my knowledge,

13   skills and ability, of the testimony given by

14   such witness.

15       IN WITNESS WHEREOF, I have hereunto

16   set my hand and affixed my seal of office

17   this 26th day of February, 2008.

18

19

20            Karen Borreson, RPR

21            Notary Public

22   My Commission expires:

23   May 21, 2010

24