**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

**CIVIL ACTION NO. 05-11803-MLW**

SHENIA DANCY-STEWART as
Administratrix of the Estate of EVELINE
BARROS-CEPEDA,
     Plaintiffs,

v.

THOMAS TAYLOR, Jr., and the CITY
OF BOSTON,
     Defendants.

**DEFENDANTS CITY OF BOSTON'S AND THOMAS TAYLOR'S MEMORANDUM OF
LAW IN SUPPORT OF DEFENDANTS' EMERGENCY MOTION TO COMPEL
NONPARTY WITNESS MARIA DAROSA'S DEPOSITION TESTIMONY**

After several attempts to obtain Ms. DaRosa's assistance voluntarily through her counsel
have proved futile, the Defendants, City of Boston and Thomas Taylor, Jr. ("Defendants"), now
hereby move this Honorable Court for an Order requiring Maria DaRosa to answer various
deposition questions that do not implicate her Fifth Amendment right against self-incrimination.
During Ms. DaRosa's deposition, she asserted her Fifth Amendment so expansively that she
refused to answer the majority of the questions posed to her.  See Exhibit A, Deposition
Transcript of Maria DaRosa.  The Defendants now seek an Order compelling Ms. DaRosa to
answer the myriad of deposition questions posed to her that have no bearing on her Fifth
Amendment right.

**I.  Factual Backdrop**

By way of background, the Plaintiff brings this civil rights suit following the death of the
decedent, Eveline Barros-Cepeda.  At the time of her death on September 8, 2002, the decedent
was traveling with the deponent Maria DaRosa as well as other individuals, including Luis

Carvalho and Carlos Fernandes.  The vehicle was driven by Brima Wurie.  When the Wurie vehicle failed to heed police commands to stop, and then deliberately struck Boston Police Officer Michael Paillant, Officer Taylor discharged his firearm to apprehend Wurie and prevent further injury to Officer Paillant.  Following this incident, Ms. Barros-Cepeda, a back seat passenger in the vehicle, suffered fatal wounds.  Maria DaRosa, therefore, is an individual who may offer relevant eyewitness testimony to the September 8, 2002 incident.  Moreover, at the inception of this litigation, Ms. DaRosa was a plaintiff in this action.  Her claims against the Defendants, however, were voluntarily dismissed.

## II.  Ms. DaRosa's Deposition

At  her deposition, Ms. DaRosa, accompanied by her own counsel, refused on Fifth Amendment grounds to answer the majority of questions posed to her, including questions regarding the events of September 8, 2002 as well as innocuous background questions and other questions unrelated to the events of September 8, 2002.  Ms. DaRosa, for example, refused to answer questions regarding whether she spoke to certain individuals prior to her deposition, whether she was previously a plaintiff in this action, whether she participated in any investigation regarding the death of the decedent, and whether she spoke to the media following the incident, etc.  See Exhibit A.

While it is well-established that Ms. DaRosa, as a non-party witness in a civil case, may assert her Fifth Amendment privilege against self-incrimination in the course of pretrial discovery, she cannot use the privilege in blanket fashion to foreclose all discovery efforts. McIntyre's Mini Computer Sales Group, Inc. v. Creative Synergy Corp., 115 F.R.D. 528, 529-530 (D.  Mass.1987), citing de Antonio v. Solomon, 41 F.R.D. 447, 449 (D.  Mass.1966); see also Gatoil, Inc. v. Forest Hill State Bank, 104 F.R.D. 580, 581 (D.Md.1985); E.F. Hutton & Co.

v. Jupiter Development Corp. Ltd., 91 F.R.D. 110, 114 (S.D.N.Y.1981). "[T]he Federal Rules of Civil Procedure do not contemplate a complete refusal to participate in any discovery pertaining to an action which may have criminal overtones." McIntyre's Mini Computer Sales Group, Inc. v. Creative Synergy Corp., 115 F.R.D. 528 (D. Mass.1987), citing de Antonio v. Solomon, 41 F.R.D. at 449; Gatoil, Inc. v. Forest Hill State Bank, 104 F.R.D. at 581; Guy v. Abdulla, 58 F.R.D. 1, 2 (N.D. Ohio 1973).

Moreover, simply because an individual invokes the privilege does not mean it must necessarily be recognized. Rather, "[i]t is for the court to say whether her silence is justified, and to require [the claimant] to answer if 'it clearly appears to the court that [s]he is mistaken.' " Hoffman, 341 U.S. at 486. "If it 'clearly' appears to the court that the witness is 'mistaken' or is advancing his or her claim as a subterfuge, the court should compel the witness to answer." In re Brogna, 589 F.2d 24, 27 (1 st Cir.1978).

Over the course of her deposition, Ms. DaRosa invoked her Fifth Amendment privilege well beyond the appropriate questions. Certainly, the background questions asked of her, her knowledge of certain individuals, her involvement in any investigation regarding the death of the decedent, and her participation in this lawsuit as a plaintiff, inter alia, do not reasonably implicate the Fifth Amendment. See McIntyre's Mini Computer Sales Group, Inc., supra at 530. Additionally, while the Defendants recognize that Ms. DaRosa may have a valid privilege with respect to questions that focus on the September 8, 2002 alleged shooting on Cushing Avenue, see, e.g. Exhibit A at 103-104, her Fifth Amendment privilege is not viable with respect to the specific Dunkeld Street incident that gives rise to this lawsuit. See, e.g., Exhibit A at 55-97. That is, no Fifth Amendment privilege is valid with respect to Ms. DaRosa's eyewitness observations as to what occurred when the driver of the vehicle in which she was purportedly

traveling in struck the Boston Police Officer Paillant, including what observations she made, if any, as to the alleged shooting by Officer Taylor, nor of the events that followed.

By her expansive invocation of the Fifth Amendment during the majority of her deposition questioning, Ms. DaRosa "sought to exercise a privilege which would effectively shut the door to any pretrial discovery from h[er]. Such a blanket exercise of the privilege is insufficient to relieve [DaRosa] of the duty to respond to the questions put to h[er]." McIntyre's Mini Computer Sales Group, Inc., supra at 530; see also S.E.C. v. First Financial Group of Texas, Inc., 659 F.2d 660, 668 (5th Cir.1981); United States v. Gomez-Rojas, 507 F.2d 1213, 1219-20 (5th Cir.), cert. denied, 423 U.S. 826, 96 S.Ct. 41 (1975); Carter-Wallace, Inc. v. Hartz Mountain Industries, Inc., 553 F. Supp. 45, 50 (S.D.N.Y.1982).

Under governing precedent, Ms. DaRosa may assert her Fifth Amendment privilege against self-incrimination only when "a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result." Hoffman v. United States, 341 U.S. 479, 486-87 (1951). It does not appear that the deposition questions centered specifically on the vehicle's collision with Boston Police Officer Michael Paillant and the shooting incident involving the decedent are "dangerous" for Fifth Amendment purposes. See id. Moreover, it is undisputed that on May 12, 2006 the driver of the vehicle, Brima Wurie, pled guilty to various charges stemming from the September 8, 2002 incident, including assault and battery with a dangerous weapon, driving to endanger, leaving the scene of an injury, and operating without a license. Furthermore, at no point has the District Attorney's office sought to bring any charges against Ms. DaRosa nor is there any indication that further charges are pending now, some six years later since the incident. The questions posed to Ms. DaRosa, therefore, do not suggest that any "injurious disclosure" could occur.

4

Accordingly, the Defendants request that Ms. DaRosa be compelled to answer those deposition questions which would not elicit incriminating disclosures and which she refused to answer.

 *WHEREFORE*:  The Defendants City of Boston and Thomas Taylor, Jr. respectfully request that this Honorable Court allow their motion.

         DEFENDANTS,  THOMAS  TAYLOR,  JR.
         AND CITY OF BOSTON,

         By their attorneys:


         /s/ Helen G. Litsas
         _____
         Helen G. Litsas #644848
         Special Assistant Corporation Counsel
         Hollett Building
         38 Main Street
         Saugus, MA 01906
         (781) 231-8090


         Evan C. Ouellette, BBO # 655934
         Assistant Corporation Counsel
         City of Boston Law Department
         Room 615, City Hall
         Boston, MA 02201
         (617)635-4048

<u>**CERTIFICATE OF SERVICE**</u>

I, Helen G. Litsas, hereby certify that on this date I served a copy of the foregoing documents upon Maria DaRosa's counsel, Eduardo Masferrer, Esq., and lead plaintiff's counsel, Andrew Stockwell-Alpert, by facsimile, electronic mail, electronic filing and by postage prepaid and first class, U.S. Mail.

5/2/08          /s/ Helen G. Litsas
_____     _____

Date            Helen G. Litsas

1

1                                    Volume:    I

2                                    Pages:   1-143

3                                    Exhibits:  1-5

4              UNITED STATES DISTRICT COURT

5              DISTRICT OF MASSACHUSETTS

6                  C. A. NO. 05-11803

7    **********************************

8    SHENIA DANCY-STEWART as          *

9    Administratrix of the Estate of  *

10   EVELINE BARROS-CEPEDA,           *

11             Plaintiff,             *

12   v.                               *

13   THOMAS TAYLOR, JR., and the      *

14   CITY OF BOSTON,                  *

15             Defendants.            *

16   **********************************

17             DEPOSITION of MARIA DaROSA, a witness

18   called on behalf of the Defendants, taken pursuant to

19   the Federal Rules of Civil Procedure, before Marie T.

20   Williams, Professional Court Reporter and Notary

21   Public, in and for the Commonwealth of Massachusetts,

22   at the offices of the City of Boston Law Department,

23   City Hall, Boston, Massachusetts, on Wednesday, March

24   12, 2008, commencing at 1:41 p.m.

2

```
 1                    A P P E A R A N C E S

 2

 3   LAW OFFICE OF HELEN G. LITSAS

 4   38 Main Street

 5   Saugus, Massachusetts  01906

 6   BY:  Helen Litsas, Esquire

 7        781.231.8090

 8        helen@litsaslaw.com

 9        Counsel for the Defendants

10

11   MASFERRER & ASSOCIATES, P.C.

12   6 Beacon Street, Suite 720

13   Boston, Massachusetts  02108

14   BY:  Eduardo A. Masferrer, Esquire

15        617.531.0135

16        masferrer@madefenders.com

17        Counsel for Maria DaRosa

18

19

20

21

22

23

24
```

3

```
1                    I N D E X

2

3   WITNESS:                          MARIA DaROSA

4

5   EXAMINATION BY:                        PAGE:

6   Ms. Litsas                               6

7

8                  E X H I B I T S

9
```

```
10  NO.  DESCRIPTION                        PAGE:

11  1 - Subpoena...................................18

12  2 - Boston Police Department Homicide Unit

13      Investigation Report.......................128

14  3 - Memo to Sergeant Detective Wyse

15      from Detective Primm.......................128

16  4 - Memo from Detective Russell Grant to File...128

17  5 - Digital Color Photo........................128
```

```
18

19  (Original exhibits retained by Attorney Litsas.)

20

21

22

23

24
```

4

```
 1              P R O C E E D I N G S
 2              MARIA DaROSA, first having been duly
 3   sworn, under oath, deposes and says as follows:
 4              MS. LITSAS:  Maria DaRosa appears
 5   before us today for her deposition.  The
 6   witness does not present -- does not at present
 7   have adequate documentation attesting to her
 8   identity that satisfies the standards required
 9   by the Commonwealth of Massachusetts for
10   notaries public in administering oaths.
11              The parties in this action therefore
12   stipulate and agree to hold harmless the notary
13   public if this witness is later discovered to
14   have falsified her identity.
15              Counsel, do you agree with that?
16              MR. MASFERRER:  I do.
17              MS. LITSAS:  All set.  Counsel, I
18   imagine usual stipulations?
19              MR. MASFERRER:  I'm sorry?
20              MS. LITSAS:  The usual stipulations?
21              MR. MASFERRER:  Which would be what
22   in this particular case?
23              MS. LITSAS:  Well, all objections are
24   waived, except as to form.
```

5

```
 1                MR. MASFERRER:  Sure.
 2                MS. LITSAS:  Motions to strike are
 3        reserved until the time of trial.
 4                MR. MASFERRER:  Sure.
 5                MS. LITSAS:  Will the witness read
 6        and sign her deposition transcript in 30 days
 7        and will you waive the notary?  You don't need
 8        to have --
 9                MR. MASFERRER:  I'll waive the
10        notary, but yes, she will review and sign.
11                MS. LITSAS:  For the record, counsel
12        for the plaintiff have been informed of
13        Ms. DaRosa's deposition.  Mr. Stockwell-Alpert
14        indicated to me that because Ms. DaRosa will be
15        represented by counsel, it would not be
16        necessary for him to appear at today's
17        deposition.
18                I, again, informed either plaintiff's
19        counsel of Ms. DaRosa's deposition, including
20        Jim McCall and Del DeMiranda and Manny Pires.
21        They indicated to me that they will not be
22        present.  Mr. DeMiranda was here for a previous
23        deposition and indicated that he did not
24        anticipate being present for Ms. DaRosa's
```

6

```
 1       deposition.

 2   EXAMINATION BY MS. LITSAS:

 3   Q.   Ms. DaRosa, I'm going to ask you a series of

 4        questions.  Before I do so, I'm just going to

 5        go over some of the ground rules so that we

 6        understand what goes forward and so that we're

 7        on the same page.

 8              First off, you are not here

 9        voluntarily; is that correct?

10   A.   Yes.

11   Q.   You were here pursuant to a subpoena that was

12        served on you by the defendants, the City of

13        Boston and Thomas Taylor, in this action?

14   A.   Yes.

15   Q.   And as you are aware, I represent the

16        defendants in this action, the City of Boston

17        and Thomas Taylor, correct?

18   A.   Yes.

19   Q.   Ms. DaRosa, have you ever had a deposition

20        taken before?

21   A.   No.

22   Q.   You understand that all the questions that I

23        will ask you will be under oath, and you have

24        to testify truthfully.  Do you understand those
```

7

1      instructions?

2  A.   Yes.

3  Q.   Because the stenographer is here transcribing

4       your testimony, there's going to be a paper

5       record of your testimony.  And for there to be

6       the clearest record, you need to wait until I

7       complete my question before you answer.  You

8       may anticipate what my question is, but please

9       let me finish so that it allows the

10      stenographer to transcribe your answer and

11      there's not two people speaking at the same

12      time.  You understand that instruction?

13 A.   Yes.

14 Q.   You need to verbalize all your answers.  Hand

15      gestures, whether they're nods or hand

16      movements, they cannot be transcribed.  So you

17      really need to articulate your answers.  "Um"

18      and "ah" are not sufficient.  You have to

19      answer with an appropriate response that is

20      clear and articulate.

21           If at any point if you don't

22      understand a question, please let me know and I

23      will rephrase the question.  Otherwise, I'm

24      going to expect that you understand the

8

```
 1        question and that you're going to answer it and
 2        your response is in response to the question
 3        you understood.  Is that clear?
 4   A.   Yes.
 5   Q.   If you would like to speak to your attorney or
 6        take a break, I'm happy to accommodate you.
 7        The only ground rule I have with respect to
 8        that is if there's a question that is pending,
 9        I ask that you answer the question first and
10        then you can take a break.
11             MS. LITSAS:  Mr. Masferrer, you're
12        here representing Ms. DaRosa in today's
13        deposition?
14             MR. MASFERRER:  Yes.
15   Q.   I don't want to know the extent -- I don't want
16        to know any communications you've had with
17        Mr. Masferrer, your attorney, Ms. DaRosa, when
18        I ask you this question, but what did you do
19        today other than speak with Mr. Masferrer to
20        prepare for your deposition?
21   A.   Under the advice of my counsel, I exercise my
22        Fifth Amendment.
23   Q.   I'll ask the question again, what did you do to
24        prepare for your deposition, Ms. DaRosa, aside
```

9

```
 1        from speaking with your attorney?
 2   A.   On the advice of counsel, I exercise my Fifth
 3        Amendment.
 4   Q.   Did you talk to anyone, Ms. DaRosa, in
 5        preparation for today's deposition, excluding
 6        your attorney?
 7   A.   I exercise my Fifth Amendment.
 8   Q.   In preparation for your deposition, Ms. DaRosa,
 9        did you speak to any attorney representing the
10        plaintiff in this action?
11   A.   Under the advice of my counsel, I exercise my
12        Fifth Amendment.
13   Q.   Excluding your conversation with Mr. -- with
14        your attorney, Ms. DaRosa, did you speak to
15        anybody in preparation for today's deposition
16        such as an attorney for the plaintiff or an
17        investigator for the plaintiff?
18   A.   On the advice of counsel, I exercise my Fifth
19        Amendment.
20   Q.   In preparation for today's deposition,
21        Ms. DaRosa, did you talk to any family or
22        friends before you came today?
23   A.   Under the advice of my counsel, I exercise my
24        Fifth Amendment.
```

10

```
 1   Q.   I notice today you came with Mr. Courtney

 2        Forde.  Did you speak with him about today's

 3        deposition?

 4   A.   On the advice of my counsel, I exercise my

 5        Fifth Amendment.

 6   Q.   Who is Courtney Forde?

 7   A.   My child's father.

 8   Q.   Do you live with Mr. Forde?

 9   A.   No.

10   Q.   Where do you live, Ms. DaRosa?

11   A.   12 Greenheys Street.

12   Q.   That's in Dorchester, Mass.?

13   A.   Correct.

14   Q.   How long have you lived at that address?

15   A.   For one year.

16   Q.   Where did you live previously, prior to that

17        address?

18   A.   20 Victory Road.

19   Q.   Where's that located?

20   A.   In Dorchester.

21   Q.   How long had you lived at that address?

22   A.   For a year.  One year.

23   Q.   Who did you live with at that address?

24   A.   Me and my children.
```

11

```
 1    Q.    How many children do you have?
 2    A.    Three.
 3    Q.    What are their names and ages?
 4    A.    Freddie, Jr. Fernandes, and he's 11; Jazmyne
 5          Courtney Forde, she's two; and then Ali
 6          Courtney Forde, she's seven months.
 7    Q.    Do you have any other children other than those
 8          three children?
 9    A.    No.
10    Q.    And Mr. Courtney Forde is the father of one of
11          your children?
12    A.    Two of my children.
13    Q.    Who is the father of your other child?
14    A.    Frederico Fernandes.
15    Q.    Does he have any relationship to a Carlos
16          Fernandes?
17    A.    No.
18    Q.    Do you know --
19    A.    Not that I know of.
20    Q.    Frederico Fernandes is the father of your other
21          child?
22    A.    Yes, my first child.
23    Q.    Where does he live?
24    A.    19 East Cottage Street.
```

12

```
 1    Q.    In Dorchester?

 2    A.    Roxbury.

 3    Q.    Do you still keep in contact with him?

 4    A.    No.

 5    Q.    Are you married or single?

 6    A.    Single.

 7    Q.    How long have you been in a relationship with

 8          Mr. Courtney Forde?

 9    A.    About three years.

10    Q.    Who do you live with at 12 Greenheys Street in

11          Dorchester?

12    A.    Me and my children.

13    Q.    Is that a two family or a one family?

14    A.    It's a two family.

15    Q.    Who lives on the first floor?

16    A.    Tenants.

17    Q.    Do you know who they are?

18    A.    Yes.

19    Q.    Who are they?

20    A.    Brianna Forde.  She is the sister of Courtney

21          Forde.  She's a tenant of the first floor.

22    Q.    Who else lives with Brianna Forde?

23    A.    I'm not sure.  She's the actual tenant, so I

24          don't know who else lives with her.
```

13

```
 1   Q.   Do you own 12 Greenheys Street?

 2   A.   No.

 3   Q.   Who owns 12 Greenheys Street?

 4   A.   Louis Anjos is the owner.

 5   Q.   Does he have any relationship to you?

 6   A.   Yes.

 7   Q.   What is your relationship with him?

 8   A.   He's my brother.

 9   Q.   Louis Anjos is your brother, but you have two

10        different last names?

11   A.   Yes.

12   Q.   Do you have different fathers?

13   A.   Yes.

14   Q.   Who was your mother?

15   A.   Maria DePina.

16   Q.   Is she the sister of Domingas DePina?

17   A.   Yes.

18   Q.   Who is the mother of Eveline Barros-Cepeda?

19   A.   Yes.

20   Q.   So Louis Anjos and you share the same mother?

21   A.   Yes.

22   Q.   But you have separate fathers?

23   A.   Yes.

24   Q.   Who is Mr. Anjos' father?
```

14

```
 1   A.   He's deceased at the moment.  He lived in Cape
 2        Verde, so I really don't know his name, his
 3        full name.
 4   Q.   What part of the name do you know?
 5   A.   Mareno (ph.sp.).  I don't know how to say -- I
 6        don't know what he goes by.  I don't know his
 7        full name, so I can't give you that
 8        information.
 9   Q.   Who is your father?
10   A.   John DaRosa.
11   Q.   Where does he live?
12   A.   At 11 Greenheys Street with my mom.
13   Q.   I'm sorry.  With who?
14   A.   He lives with my mom.
15   Q.   Do you have any siblings, Maria?
16   A.   Yes.
17   Q.   Who are your siblings?
18   A.   Ineida Anjos, Claudina Anjos, and Louis Anjos.
19   Q.   And they are all the siblings also of your --
20        also Louis Anjos' siblings?
21   A.   Yes.
22   Q.   Did you speak to Louis Anjos prior to coming in
23        for today's deposition?
24   A.   On the advice of counsel, I have exercised my
```

15

```
 1          Fifth Amendment.
 2   Q.     Does Mr. Anjos know anything about the lawsuit
 3          that is currently involving my clients, the
 4          defendants, the City of Boston and Officer
 5          Thomas Taylor?
 6               MR. MASFERRER:  I object.  It's not
 7          her personal knowledge.
 8   Q.     You can still answer.
 9   A.     Under the advice of my counsel, I exercise my
10          Fifth Amendment.
11   Q.     Prior to coming into today's deposition,
12          Ms. DaRosa, did you review any documents?
13   A.     On the advice of my counsel, I exercise my
14          Fifth Amendment.
15   Q.     Prior to coming into today's deposition, did
16          you speak with Luis Carvalho?
17   A.     On the advice of counsel, I exercise my Fifth
18          Amendment.
19   Q.     Prior to coming into today's deposition, did
20          you speak with Domingas DePina?
21   A.     On the advice of counsel, I exercise my Fifth
22          Amendment.
23   Q.     Prior to coming into today's deposition, did
24          you speak with Brima Wurie?
```

16

```
 1   A.   On the advice of counsel, I exercise my Fifth
 2        Amendment
 3   Q.   Prior to coming into today's deposition, did
 4        you speak with Carlos Fernandes?
 5   A.   On the advice of counsel, I exercise my Fifth
 6        Amendment.
 7   Q.   Prior to coming into today's deposition, did
 8        you speak with James Nicholas?
 9   A.   On the advice of counsel, I exercise my Fifth
10        Amendment.
11   Q.   Prior to coming into today's deposition, did
12        you speak with Carlos Cepeda?
13   A.   On the advice of counsel, I exercise my Fifth
14        Amendment.
15   Q.   Prior to coming into today's deposition, did
16        you speak to anyone at all who has any
17        connection to this case?
18   A.   On the advice of counsel, I exercise my Fifth
19        Amendment.
20   Q.   Excuse me.  I notice, Ms. DaRosa, you're
21        looking at a pad of paper, is that a note from
22        your counsel?
23             MR. MASFERRER:  You can answer.
24   A.   Yes.
```

17

```
 1   Q.   Is that something that's assisting you in your
 2        deposition -- actually, I won't ask that
 3        question if it's a communication between you
 4        and your counsel.
 5             Do you have any notes or documents
 6        that you brought today to your deposition
 7        pursuant to the deposition subpoena?
 8   A.   On the advice of counsel, I exercise my Fifth
 9        Amendment.
10   Q.   Do you have any documents or any materials
11        related to this particular case?
12   A.   On the advice of counsel, I exercise my Fifth
13        Amendment.
14   Q.   Did you draft any notes after the incident on
15        September 8, 2002?
16   A.   On the advice of counsel, I exercise my Fifth
17        Amendment.
18   Q.   And did you keep a journal after the events of
19        February 8, 2002?
20   A.   On the advice of counsel, I exercise my Fifth
21        Amendment.
22   Q.   Could I see the subpoena that you were served
23        with?
24   A.   I don't have the -- because they brought a new
```

18

```
 1      one there.  I have the other one.
 2  Q.  Okay.  Thank you.
 3          MS. LITSAS:  Can we just have this
 4      marked as Exhibit 1.
 5          (Subpoena marked Deposition Exhibit
 6          No. 1.)
 7  Q.  (By Ms. Litsas)  Ms. DaRosa, I'm showing you a
 8      document that's been marked as Exhibit 1.  This
 9      is the document you just handed to me; is that
10      correct?
11  A.  Yes.
12  Q.  This is a subpoena for your testimony on March
13      5th at eleven o'clock in the morning?
14  A.  Yes.
15  Q.  And on that date you did appear, correct?
16  A.  Yes, correct.
17  Q.  But you appeared without counsel?
18  A.  Yes.
19  Q.  You indicated to me that your counsel was
20      unable to appear that date; is that correct?
21  A.  No.  I had short notice to rehire him.  He was
22      not my attorney at the moment.  So I had to
23      rehire him to show up for this date here.
24  Q.  I see.  But you did indicate to me that you had
```

19

```
 1        hired him; isn't that correct?
 2   A.   Yes, yes.
 3   Q.   But that's not, in fact, what happened?  You
 4        had not had the chance to rehire him?
 5   A.   Yes.
 6   Q.   Did you receive any other subpoenas other than
 7        the subpoena, Exhibit 1?
 8   A.   Under the advice of my counsel, I plead the
 9        Fifth Amendment.
10   Q.   At any point did you receive a subpoena that
11        was marked on your door at your residence --
12        marked in an envelope?
13   A.   On advice of counsel, I exercise my Fifth
14        Amendment.
15   Q.   At any point did you receive any other
16        subpoenas at your residence, other than the one
17        marked on your door?
18   A.   On the advice of counsel, I exercise my Fifth
19        Amendment.
20   Q.   I am showing you Schedule A as part of Exhibit
21        1.  And I'm just going to ask you to take a
22        moment to review numbers 1 through 38.  If you
23        could just take a moment to do that.
24             MR. MASFERRER:  Up to 28?
```

20

```
 1                    MS. LITSAS:  Up to the end.  One
 2         through 38.
 3                    MR. MASFERRER:  Oh, 38.  I'm sorry.
 4    A.   (Witness complies.)
 5    Q.   Ms. DaRosa, have you had an opportunity to
 6         review document Request 1 through 38 in Exhibit
 7         A?
 8    A.   Yes.
 9    Q.   Do you have any documents responsive to the
10         Request 1 through 38?
11    A.   On advice of counsel, I exercise my Fifth
12         Amendment.
13    Q.   Is there any document or item that would
14         refresh your memory regarding the incident on
15         September 8, 2002?
16    A.   On the advice of my counsel, I exercise the
17         Fifth Amendment.
18    Q.   Have you had any conversations about the
19         incident that occurred on September 8, 2002,
20         with anyone excluding your attorney?
21    A.   On the advice of my attorney, I exercise the
22         Fifth Amendment.
23    Q.   Recently -- strike that.
24                    You're aware that your aunt Domingas
```

21

```
 1          DePina came in for a deposition related to this
 2          case, correct?
 3                    MR. MASFERRER:  If she's aware?
 4                    MS. LITSAS:  Is she aware.
 5     A.   Yes.
 6     Q.   And you were aware that Ms. DePina testified at
 7          her deposition in this case, correct?
 8     A.   Correct.
 9     Q.   And are you also aware that Ms. DePina
10          indicated to me during her deposition that she
11          informed you -- you had informed her that you
12          had received a deposition subpoena and you
13          intended on coming in for a deposition; isn't
14          that correct?
15     A.   On the advice of my counsel, I exercise my
16          Fifth Amendment.
17     Q.   You told Ms. DePina that you would come in and
18          you would tell the truth, correct?
19     A.   On the advice of my counsel, I exercise my
20          Fifth Amendment.
21     Q.   Ms. DaRosa, within the past 24 hours have you
22          taken any medication?
23     A.   Yes.
24     Q.   What medication has that been?
```

22

```
 1   A.   I have to take a look at it.  I'm not sure.  I
 2        have them with me.  If you want to take a look
 3        at it?
 4   Q.   Sure.  Phenazopyridine and I can't even
 5        pronounce that.  I'm just going to spell it for
 6        the record.
 7             Ms. DaRosa has indicated -- has shown
 8        me two medicine bottles.  For the record, she
 9        has indicated to me that they are P-H-E-N-A-Z-
10        O-P-Y-R-I-D-I-N-E.  And the other medicine is
11        S-U-L-F-A-M-E-T-H-/-T-R-I-M-E-T-H-O-P-R-I-M.
12        That latter one says take one tablet by mouth
13        every 12 hours.  It's prescribed by Dr. Dunbar.
14        The date for this bottle was 3/10/08.  The
15        former bottle indicates 200 milligrams, take
16        one tablet by mouth every eight hours.  And
17        again, it was prescribed by Dr. Dunbar and it
18        was dated 3/10/08.  Thank you very much,
19        Ms. DaRosa.
20   Q.   For what purpose are you taking these
21        medications?
22             MR. MASFERRER:  I'll object to the
23        question.  I'll tell you off the record, but I
24        won't --
```

23

```
 1              MS. LITSAS:  Off the record.
 2              (A discussion was held off the
 3         record.)
 4              MS. LITSAS:  Back on the record.
 5    Q.   (By Ms. Litsas)  Ms. DaRosa, the medications
 6         that you have just shown me, are any of them
 7         affecting your ability to testify truthfully
 8         today?
 9    A.   No.
10    Q.   Are those medications in any way affecting your
11         ability to recall events?
12    A.   No.
13    Q.   Is there anything else that would affect your
14         ability to testify or recall events today?
15    A.   No.
16    Q.   Within the past 24 hours, have you taken any
17         alcohol?
18    A.   No.
19    Q.   Within the past 24 hours have you taken any
20         drugs?
21    A.   No.
22    Q.   Or any other substances that would affect your
23         ability to testify truthfully today?
24    A.   No.
```

24

```
 1   Q.   I'm just going to turn to some background
 2        questions, Ms. DaRosa.
 3              Could you please tell me what your
 4        age and date of birth is?
 5   A.   Twenty-seven.  3/4/81.
 6              MS. LITSAS:  Off the record.
 7              (A discussion was held off the
 8        record.)
 9              MS. LITSAS:  Back on the record.
10   Q.   (By Ms. Litsas)  Ms. DaRosa, you indicated to
11        me that you live at 12 Greenheys Street in
12        Dorchester?
13   A.   Correct.
14   Q.   Is that on the second floor?
15   A.   Yes.
16   Q.   You lived previously -- prior to that at
17        Victory Road?
18   A.   Yes.
19   Q.   Where did you live prior to Victory Road?
20   A.   East Boston.
21   Q.   What was your address in East Boston?
22   A.   252 Maverick Street.
23   Q.   How long had you lived at that address?
24   A.   One year.
```

25

```
 1   Q.   Prior to that address, where did you live?

 2   A.   In Roslindale.

 3   Q.   What was your address there?

 4   A.   It was Washington Street, but I forgot the

 5        number, the door number.

 6   Q.   How long had you lived at that address?

 7   A.   A year.

 8   Q.   Prior to living in Roslindale, where did you

 9        live?

10   A.   At 11 Greenheys.

11   Q.   That's where your mother and father currently

12        live?

13   A.   Yes.

14   Q.   Who lives with your mother and your father?  Is

15        that your siblings?

16   A.   Excuse me?

17   Q.   I'm sorry.  Who lives with your mother and your

18        father?  Is it your siblings?

19   A.   Just my mom and father and grandmother.

20   Q.   What's your grandmother's name?

21   A.   Maria DePina as well.

22   Q.   Why is your last name DaRosa?

23   A.   I have my father's last name.

24   Q.   How long did you live at 11 Greenheys Street
```

26

```
 1        prior to moving to Roslindale?

 2   A.   All my life.

 3   Q.   Since you were a child?

 4   A.   Since I was a child.  Sorry.

 5   Q.   Do you have any plans on moving in the future,

 6        Ms. DaRosa?

 7   A.   Yes.

 8   Q.   Where do you plan on moving?

 9   A.   Not sure.

10   Q.   Do you plan on moving out of state?

11   A.   No.

12   Q.   At the time of this incident on September 8,

13        2002, where were you living?

14   A.   Roslindale.

15   Q.   On Washington Street?

16   A.   Yes, in -- yes.

17   Q.   Ms. DaRosa, could you tell me what your social

18        security number is?

19   A.   ███████████ .

20   Q.   I'm sorry.  One more time.  ████████
██ ██ █████
22   Q.   Thank you.  You indicated to me that you're

23        single, Ms. DaRosa; is that correct?

24   A.   Correct.
```



27

```
 1   Q.   Have you ever been married before?
 2   A.   No.
 3   Q.   Do you have any plans on getting married?
 4   A.   No.
 5   Q.   And you have three children?
 6   A.   Yes.
 7   Q.   Can you please tell me about your educational
 8        background.
 9   A.   I completed up to the eleventh grade.  I
10        haven't finished school yet.  I have attended
11        Bryman's Institute for Medical Administrative
12        Assistant.  I haven't finished that either
13        because I had children, so I had to stop
14        because of medical leave.  So I'll be attending
15        soon.
16   Q.   Did you graduate -- so you didn't graduate from
17        high school?
18   A.   No.
19   Q.   Where did you go to high school?
20   A.   Jeremiah Burke.
21   Q.   How long did you go to the Jeremiah Burke
22        School?  From freshman year to junior year?
23   A.   Yes.
24   Q.   And you haven't received any further education
```

28

```
1        other than that?
2    A.  No.
3    Q.  Did you ever get your GED?
4    A.  No.
5    Q.  Do you plan on getting your GED?
6    A.  Yes.
7    Q.  When do you plan on doing that?
8    A.  Soon.
9    Q.  Do you currently work?
10   A.  No.
11   Q.  How do you support yourself financially?
12   A.  My mom.  My mother helps me financially at the
13       moment.
14   Q.  What about public assistance?  Do you receive
15       any public assistance?
16   A.  Just food stamps.  I don't collect any other
17       assistance.
18   Q.  Have you ever received welfare?
19   A.  Years ago, yeah.
20   Q.  Did you ever receive social security
21       disability?
22   A.  No.
23   Q.  Or supplemental security income benefits?
24   A.  No.
```

29

```
1   Q.   Is there a reason why you don't currently work,
2        Ms. DaRosa?
3   A.   Yes.
4   Q.   And what is that reason?
5   A.   Because I have to get my kids into school.  And
6        once they're in school, I'm able to look for a
7        job.  But right now I can't because they're not
8        in school and they're still young, and she's
9        not in the age of getting accepted into school
10       yet at the moment.
11  Q.   Do you pay rent at your current address?
12  A.   Yes.
13  Q.   And your landlord is Mr. Anjos?
14  A.   Yes.
15  Q.   How much do you pay rent?
16  A.   133 a month of my portion.
17  Q.   Who pays the other portion?
18  A.   Section 8.
19  Q.   What is the last job that you had?
20  A.   Boston Market.
21  Q.   Did you work there along with Eveline Barros-
22       Cepeda?
23  A.   No.
24  Q.   Where was your job at Boston Market?
```

30

```
 1   A.   Where was it?  Oh, Morrissey Boulevard.

 2   Q.   When's the last time you worked there?

 3   A.   In 2005, I believe.

 4   Q.   How long had you worked there for?

 5   A.   For about a year.

 6   Q.   Did you work full time?

 7   A.   Yes.

 8   Q.   Why did you leave?

 9   A.   Because I got pregnant.  I was working while I

10        was pregnant, and then when I was far along I

11        stopped.

12   Q.   Did you work anywhere else other than Boston

13        Market?

14   A.   Yes.

15   Q.   And where else have you worked?

16   A.   At Supercuts on Boylston Street.

17   Q.   You were a stylist?

18   A.   No, I was a receptionist.

19   Q.   How long did you work there for?

20   A.   For a year.

21   Q.   Why did you leave there?

22   A.   Medical reasons.

23   Q.   Do you have any type of medical impairment that

24        would affect your ability to testify today?
```

31

```
 1   A.   No.
 2   Q.   Do you have any disabilities that would affect
 3        your ability to testify today?
 4   A.   No.
 5   Q.   Does your medical impairment have anything to
 6        do with the incident on September 8, 2002?
 7              MR. MASFERRER:  I'm sorry.  What --
 8   A.   I didn't hear.  I didn't get --
 9              MS. LITSAS:  I can repeat it.
10              MR. MASFERRER:  In what --
11   Q.   You stated to me that you had a medical
12        impairment at the time that you worked at
13        Supercuts.
14   A.   That didn't have anything to do with it.
15   Q.   So your testimony is the medical impairment
16        that you had back on -- when you working at
17        Supercuts did not have anything to do with the
18        incident on September 8, 2002, correct?
19   A.   Correct.
20   Q.   At one point, Ms. DaRosa, you were a plaintiff
21        in this lawsuit, correct?
22   A.   Correct.
23   Q.   Yes.  Is there a reason you're no longer a
24        plaintiff in this lawsuit?
```

32

```
 1                    MR. MASFERRER:  Is there a reason
 2          why?
 3                    MS. LITSAS:  Yes.
 4                    MR. MASFERRER:  Is there a reason,
 5          not what is the reason?
 6                    Is there a reason?
 7                    THE WITNESS:  I don't know.
 8     Q.   If you don't understand the question, you can
 9          ask me to rephrase.
10                    MR. MASFERRER:  Yeah, yeah.
11     A.   Yeah.  Can you rephrase it please, because I
12          really...
13     Q.   Why did you -- let me ask you this first:  Why
14          did you file the lawsuit initially against the
15          City of Boston and Officer Thomas Taylor?
16     A.   Under the advice of my counsel, I exercise my
17          Fifth Amendment.
18     Q.   Why did you subsequent to your filing the
19          lawsuit then dismiss the lawsuit against the
20          City of Boston and Thomas Taylor?
21     A.   On the advice of counsel, I exercise my Fifth
22          Amendment.
23     Q.   Have you ever been a defendant in a lawsuit?
24          Has anyone ever sued you?
```

33

```
 1   A.   No.
 2   Q.   Have you ever filed any claim against the City
 3        of Boston, other than with respect to this
 4        case?
 5   A.   No.
 6   Q.   Have you ever filed any claim with respect to
 7        any town or city?
 8             THE WITNESS:  Of this case?
 9             MR. MASFERRER:  No, just have you
10        ever filed --
11   Q.   Excluding this case.
12             THE WITNESS:  Like a car accident or
13        something like that?
14             MR. MASFERRER:  No.
15   Q.   I'm just talking about towns and cities.
16   A.   Oh.  No.
17   Q.   Have you ever filed any lawsuit against anyone
18        other than this case?
19   A.   No.
20   Q.   Have you filed any claim against anyone,
21        excluding this case?
22   A.   No.
23   Q.   Including car accidents?
24   A.   No.
```

34

```
 1    Q.    I notice, Ms. DaRosa, you don't wear glasses.

 2          Do you wear contact lenses?

 3    A.    No.

 4    Q.    How is your vision?  20/20?

 5    A.    20/20.

 6    Q.    When's the last time you went to the doctor and

 7          had your eyes checked?

 8    A.    It's been a while.  I don't remember.

 9    Q.    More than a year?

10    A.    Yeah, more than a year.

11    Q.    More than two years?

12    A.    Yeah, more than two years.

13    Q.    More than five years?

14    A.    No, probably less than five but more than two.

15    Q.    Have you ever worn glasses before?

16    A.    No.

17    Q.    Have you ever worn contact lenses before?

18    A.    No.

19    Q.    Do you have any difficulty hearing?

20    A.    No.

21    Q.    Turning to the day of the incident, September

22          8, 2008 [sic] you were living at -- in

23          Roslindale at the time?

24    A.    Yes.
```

35

```
 1   Q.   Were you living with anybody?

 2   A.   Just me and my son.

 3   Q.   Were you working at that time?

 4   A.   I'm trying to think of where -- I'm trying to

 5        think, because I was working at U-Haul.  I

 6        worked -- I'm trying to think.  I'm not sure.

 7   Q.   You told me that you worked at Boston Market,

 8        Supercuts and U-Haul.  Have you worked anywhere

 9        else other than those three places?

10   A.   Yes.

11   Q.   Where have you worked?

12   A.   U-Haul in Cambridge.

13   Q.   What were you doing for U-Haul in Cambridge?

14   A.   I was a receptionist.

15   Q.   How long did you work for U-Haul?

16   A.   A year.

17   Q.   Are there any other places that you worked

18        other than U-Haul, Supercuts, Boston Market and

19        that's it?

20   A.   Yeah.  I worked for a temp agency before, but I

21        forgot the name of the company.

22   Q.   What did you do for the temp agency?

23   A.   Telemarketing.

24   Q.   How long did you work for them?
```

36

```
 1   A.   Not long.  A few months.
 2   Q.   Did you work anywhere else other than what we
 3        talked about today?
 4   A.   No, not that I remember.  Not that I can
 5        remember.  No.
 6   Q.   Have you ever been fired from a job?
 7   A.   No.
 8   Q.   How old was your son at the time of the
 9        incident?
10             MR. MASFERRER:  I'm sorry?  September
11        8, 2002?
12   Q.   September 8, 2002.
13   A.   Five.
14   Q.   And it was just the two of you living together
15        in Roslindale?
16   A.   Yes.
17   Q.   Do you recall what's the first thing you did
18        that day?
19   A.   What day?
20   Q.   September 8, 2002.
21   A.   No.
22   Q.   Do you recall anything that you did on the
23        morning of September 8, 2002?
24   A.   No.
```

37

```
 1   Q.   Did you recall anything that you did on the
 2        afternoon of September 8, 2002?
 3   A.   No.
 4   Q.   What is the first thing that you remember doing
 5        on September 8, 2002?
 6   A.   I don't remember.
 7   Q.   Do you remember meeting Eveline Barros-Cepeda
 8        on September 8, 2002?
 9   A.   Yes.
10   Q.   Can you just describe for me what the purpose
11        of your meeting was?
12   A.   On the advice of counsel, I exercise my Fifth
13        Amendment.
14   Q.   Do you recall going out with Eveline Barros-
15        Cepeda on the night of September 8, 2002?
16   A.   Under the advice of counsel, I exercise my
17        Fifth Amendment.
18   Q.   Can you describe for me who Eveline Barros-
19        Cepeda is?
20   A.   She's my cousin.
21   Q.   Can you describe for me what your relationship
22        was other than as cousins?
23   A.   Best friends, close.
24   Q.   What did you guys do together?
```

38

```
 1                    MR. MASFERRER:  Not talking about
 2          September 8, 2002?
 3     Q.   Excluding September 8, 2002.
 4     A.   Used to go shopping, hang out, go to movies.
 5          We did a lot together.
 6     Q.   How often did you spend time with Eveline?
 7     A.   Since I was a child.  Her mother used to baby-
 8          sit me while my mother would work, so she's
 9          always -- I've always been at their house when
10          I was younger, at my aunt's house when I was
11          younger.  So we was always around each other
12          when I was younger.
13     Q.   Would you describe your relationship like
14          sisters?
15     A.   Like sisters, yeah.
16     Q.   How often did you see her?  Once a day?  Once a
17          week?
18     A.   Once a day, mostly every day.
19     Q.   What were the things that you guys did
20          together?
21     A.   We went clubbing.  Hang out at home, watch the
22          kids.  She had little siblings, so we would
23          stay home and watch them.  Mostly have fun,
24          hang out with friends at her mom's.
```

39

```
 1   Q.   And this was at the time of the incident in
 2        2002?
 3   A.   Excuse me?
 4   Q.   I'm sorry.  You spent this amount of time
 5        together even at the time closer to the
 6        incident on September 8, 2002?
 7   A.   Yes.
 8   Q.   You said that you went clubbing.  Where did you
 9        guys go?
10   A.   Where did we used to go?
11   Q.   Yes.  Where did you used to go?
12   A.   Well, the clubs have shut.  They're not -- what
13        used to be Club Joy, that was one of the clubs
14        we used to go to.
15   Q.   Where's that?
16   A.   That was downtown.
17   Q.   Landsdowne Street?
18   A.   Mm-hmm -- no, no.  Not Landsdowne Street.  More
19        like -- I don't know.  It's downtown, but I
20        don't know the name of the street.
21   Q.   Was it near Fenway Park?
22            MR. MASFERRER:  Near like what, Park
23        Street and stuff like that?  The --
24            THE WITNESS:  Like over there more
```

40

```
 1        like Chauncy Street, I think.  On that -- where
 2        the...
 3                   MR. MASFERRER:  Yeah.
 4                   THE WITNESS:  Yeah.  So it's more
 5        like --
 6                   MR. MASFERRER:  It's downtown.
 7                   THE WITNESS:  Downtown.
 8                   MR. MASFERRER:  Downtown.
 9   Q.   What would you guys do there?  Go dancing?
10   A.   Mm-hmm, yes.
11   Q.   About what time would you guys go?  Ten,
12        eleven?
13   A.   Yeah.
14   Q.   In the evening?
15   A.   Mm-hmm, yes.
16   Q.   And you did this during 2002?
17   A.   Yes.
18   Q.   And 2001?
19   A.   Yes.
20   Q.   2000?
21   A.   Yes.
22   Q.   In the late 1990s?
23   A.   Yes.
24   Q.   How often would you do that?
```

41

```
 1   A.   I didn't go too often at the time.  A few

 2        times.

 3   Q.   A few times a month?

 4   A.   A month, yes.

 5   Q.   Did anyone else go with you when you went

 6        clubbing?

 7   A.   Yeah, a whole bunch of girls, like all of our

 8        girlfriends.

 9   Q.   Who was yours and Eveline's friends?

10   A.   Then?

11   Q.   Yes.

12             MR. MASFERRER:  Then, 2002, or before

13        that?

14             MS. LITSAS:  Both.

15   Q.   First 2002 and then --

16   A.   And I have to name all the people --

17             (Reporter interruption.)

18   Q.   And if you can just get closer to her, she can

19        hear you better.  Because you're bringing this

20        hand up so she can't hear.

21             Yeah, if you can just tell me some of

22        the names.

23   A.   Sandra Andrade, Lisa Andrade, Amica Andrade.

24        There was more -- they were all more of the
```

42

```
 1          same -- the same girl but all her family
 2          basically.  It wasn't like we had a whole bunch
 3          of friends.  It was just Sandra Andrade and all
 4          her family, her cousins.
 5      Q.  Were they relatives of yours?
 6      A.  No.
 7      Q.  Were they relatives of Eveline?
 8      A.  No.
 9      Q.  Did Eveline have a nickname?
10      A.  Yes.
11      Q.  What was her nickname?
12      A.  Angela.
13      Q.  So if we talk about Eveline or Angela, it's the
14          same person; is that correct?
15      A.  Yes.
16      Q.  What other activities did you like to do other
17          than go clubbing and watch the kids?  Did you
18          go to the movies?
19      A.  Yes, we went to the movies.
20      Q.  How would you describe Eveline as a person?
21      A.  She was a fun person.  She's very outspoken.
22          She's fun to be around.  I'd kind of say she
23          wasn't always too happy, but she was -- I don't
24          know.  She's just a fun person to be around.
```

43

```
 1        She's a great person.  I can't describe it.
 2   Q.   And you had said she's not always too happy.
 3        What did you mean by that?
 4   A.   Because she has, like -- like, just the person
 5        that she is.  She's not like -- she's not --
 6        like, she doesn't have too many friends.  Like,
 7        she don't -- I really can't explain that
 8        question.  Maybe you can rephrase it.
 9             MR. MASFERRER:  Now that she's
10        answered it, just to see if I can...
11             MS. LITSAS:  Just for the record,
12        Ms. DaRosa is just speaking to her counsel.
13   A.   What I meant by that question is because she
14        wasn't really a happy person after having her
15        son because she was going through difficulties
16        with her child's father.  So that's kind of
17        what I meant.
18   Q.   And her child's father is Carlos Cepeda?
19   A.   Correct.
20   Q.   What kind of difficulties were they having?
21   A.   Because he wasn't taking care of his
22        responsibility, his son, and helping her out
23        when she needed help.
24   Q.   Did they live together at 75 Wayland Street?
```

44

```
 1    A.    She lived there, but I'm not sure if he lived
 2          there with her.  I'm not too sure of that.
 3    Q.    She was living at 75 Wayland Street at the time
 4          of the incident?
 5    A.    Yes.
 6    Q.    And she was living there with her son?
 7    A.    Yes.
 8    Q.    Along with her mother and her too younger
 9          brothers?
10    A.    Yes.
11    Q.    And her stepfather, Gabriel?
12    A.    Yes.
13    Q.    Was there anyone else living there?
14    A.    No, not that I know of.
15    Q.    Did you ever live there with her?
16    A.    No.
17    Q.    And you're not sure if Carlos ever did?
18    A.    No, I'm not sure.
19    Q.    Did you know Carlos Cepeda?
20    A.    Yes.
21    Q.    And how did you know Carlos?
22              MR. MASFERRER:  I'm sorry.  What do
23          you mean how did -- like, how did she meet him?
24    Q.    How did you meet Carlos Cepeda?
```

45

```
 1   A.   Through friends at the time -- before he
 2        started dating my cousin.
 3   Q.   What was your impression of Mr. Cepeda?
 4   A.   He was all right.  He was all right to me.
 5   Q.   What did you know about Carlos Cepeda?
 6   A.   I didn't know much about him.
 7   Q.   What did you know?
 8   A.   That he had kids.  I did know one of -- his
 9        first child's mother before.  I knew his -- one
10        of his kid's mother, I knew before.  I don't
11        know too much about Carlos.  I mean, I know
12        that he has a brother named George.  I don't
13        really know much about him.  I never really
14        hung out with him or -- so I don't know too
15        much about him.
16   Q.   Were you there when Carlos and Eveline got
17        married?
18   A.   Yes.  I got there late.
19   Q.   You were at their wedding?
20   A.   Yes.
21   Q.   Where was their wedding?
22   A.   It was outside.  I really don't remember where
23        the location was.
24   Q.   Was Eveline happy that she was getting married?
```

46

```
 1   A.   Yes.
 2   Q.   When did they -- Eveline experienced
 3        difficulties after they got married?
 4   A.   Yes.
 5   Q.   How soon after they got married did she
 6        experience difficulties?
 7   A.   I'm not sure.
 8   Q.   What did Eveline tell you about Mr. Cepeda?
 9   A.   Not much, other than the fact at the moment he
10        wasn't taking care of his son or, you know,
11        helping her out.  She was pretty upset about
12        that.  But not much.  She was just not having a
13        happy marriage at that time because he wasn't
14        doing anything to help out the kids -- with his
15        son.  That was just --- so mostly because he
16        wouldn't help out with the child.  That's all
17        she basically told me about.
18   Q.   At the time of the incident, did she know that
19        he was seeing anyone else other than her?
20   A.   Can you give me a second, please?
21   Q.   You're going to have to answer the question.
22             MR. MASFERRER:  Did she know?
23   Q.   If you don't understand, I can rephrase.
24   A.   Yeah.  Can you rephrase?
```

47

```
 1   Q.   At the time of the incident, did she, did
 2        Eveline, know that Mr. Cepeda was seeing
 3        anybody else other than her?
 4   A.   No, not that --
 5                 MR. MASFERRER:  If it was expressed
 6        to her?
 7                 MS. LITSAS:  Yes.
 8   A.   No.
 9   Q.   Did Eveline express to you that she knew
10        Mr. Cepeda was seeing somebody else?
11   A.   No.
12   Q.   Did you subsequently learn that he was?
13   A.   Yes.
14   Q.   Do you know who he was seeing at the time?
15   A.   Yes.
16   Q.   Who was that?
17   A.   Diana.
18   Q.   Cepeda?
19   A.   Cepeda.
20   Q.   What was her maiden name?
21   A.   I don't remember.
22   Q.   She was a friend of Eveline and yours?
23   A.   Yes.
24   Q.   Is she the current wife of Mr. Cepeda?
```

48

```
 1   A.   Yes.

 2   Q.   And was Eveline seeing anybody at the time of

 3        the incident on September 8, 2002?

 4             MR. MASFERRER:  If you know.

 5   Q.   You're going to have to answer the questions

 6        truthfully, Ms. DaRosa.  And I would caution

 7        you that you have to answer the questions

 8        without the coaching or assistance of counsel.

 9             MR. MASFERRER:  She's not --

10             THE WITNESS:  I'm just looking at

11        him --

12             MR. MASFERRER:  -- coaching or

13        anything like that.

14             THE WITNESS:  I didn't say anything.

15             MS. LITSAS:  Okay.  I just --

16   A.   Could you repeat the question?  I'm lost.

17   Q.   Do you know if Ms. Eveline Barros-Cepeda was

18        seeing anybody other than Mr. Cepeda at the

19        time of the incident?

20   A.   Yes.

21   Q.   Who was she seeing?

22   A.   Carlos Fernandes.

23   Q.   How long had she been seeing him for?

24   A.   On the advice of counsel, I exercise my Fifth
```

49

```
 1       Amendment.

 2  Q.   Was Carlos Fernandes the same person that was

 3       in the vehicle with you and Eveline Barros-

 4       Cepeda and Luis Carvalho and Brima Wurie at the

 5       time of the incident on September 8, 2002?

 6  A.   On the advice of counsel, I exercise my Fifth

 7       Amendment.

 8  Q.   Did you ever meet Carlos Fernandes?

 9             MR. MASFERRER:  Before --

10  Q.   Prior to September 8, 2002, did you ever meet

11       Carlos Fernandes?

12  A.   Yes.

13  Q.   How did you know Carlos Fernandes?

14  A.   Through some friends.

15  Q.   And who is that?  Brima Wurie?

16  A.   No.  More like -- well, he's one of them, but

17       more like Nelson -- my cousin's child's

18       father -- Nelson Burgo.  Nelson Burgo.  I knew

19       him from my cousin's child's father.

20  Q.   I see.  And --

21  A.   And I guess he's friends with...

22  Q.   How long prior to September 8, 2002 -- how long

23       had Eveline and Carlos been seeing each other?

24  A.   I'm not sure how long.
```

50

```
 1   Q.   Do you know what activities they did together,
 2        Carlos Fernandes and Eveline Barros-Cepeda?
 3   A.   I'm not sure.
 4   Q.   Did you ever join Carlos Fernandes and Eveline
 5        Barros-Cepeda when they went out prior to
 6        September 8, 2002?
 7   A.   No.
 8   Q.   Do you know if anybody else did?
 9   A.   I don't know.
10   Q.   Do you know if Eveline Barros-Cepeda was seeing
11        anybody else other than Carlos Fernandes?
12   A.   No.
13   Q.   Had she seen anybody else other than Carlos
14        Fernandes during her marriage?
15   A.   No.
16   Q.   Did you see Eveline Barros-Cepeda and Carlos
17        Fernandes together on September 8, 2002?
18   A.   On the advice of counsel, I exercise my Fifth
19        Amendment.
20   Q.   Did you and Eveline Barros-Cepeda ever talk
21        about Carlos Fernandes?
22             MR. MASFERRER:  Prior to that date?
23   Q.   Prior to September 8, 2002.
24   A.   Yes.
```

51

```
 1   Q.   What did you talk about?
 2   A.   She just told me that she thought he -- you
 3        know, girl stuff.  She thought he was cute.
 4        She was starting to kind of like him, you know,
 5        a little bit.  It was just basically probably
 6        dating at the moment.  I don't think it was
 7        anything serious.  She was just -- she was
 8        liking him.  She found him attractive at the
 9        time.  I don't know.  I can't -- other than
10        that, she didn't mention anything else to me.
11   Q.   Did you know anything else about Carlos
12        Fernandes?
13   A.   No.
14   Q.   Did you know if he had ever been convicted of
15        any crime?
16   A.   No.
17   Q.   Did you know where he lived?
18   A.   No.
19   Q.   Did you know where he worked?
20   A.   No.
21   Q.   Did Eveline know any of those things?
22   A.   I'm not sure.
23   Q.   At the time of the incident on September 8,
24        2002, Eveline was seeing Carlos Fernandes.
```

52

```
1        Were you seeing anybody else -- were you seeing

2        anybody?

3   A.   No.

4   Q.   Were you seeing Brima Wurie?

5   A.   No.

6   Q.   Were you seeing anybody else that was in the

7        vehicle September 8, 2002?

8   A.   No.

9   Q.   Do you know were Eveline was working on the

10       day -- strike that.

11            Do you know at the time of the

12       incident was Eveline working?

13  A.   I don't think she was working at the time.

14  Q.   Do you know where she had worked in the past?

15  A.   Yes.

16  Q.   Where had she worked in the past?

17  A.   Boston Market as well.

18  Q.   Do you know how long she had worked there?

19  A.   Probably a few years.  About two years I could

20       say.

21  Q.   Do you know if she worked anywhere else other

22       than Boston Market?

23  A.   No, not that I know of.

24  Q.   Did you know if she had graduated high school?
```

53

```
1   A.   Yes.

2   Q.   Did you know if she was going to pursue any

3        other education?

4   A.   Yes.

5   Q.   What education was she going to pursue?

6   A.   Business.  I wasn't sure what business, but she

7        wanted to --

8   Q.   How long had she been out of work at the time

9        of the incident on September 8, 2002?

10  A.   Not sure.

11  Q.   Do you know how Eveline spent her time during

12       the day?

13  A.   In the house with the kids.

14  Q.   Who were the kids?

15  A.   Well, her son at the time and her two little

16       brothers.

17  Q.   What were her little brothers' names?

18  A.   Christopher and Steven.

19  Q.   What did she do?

20  A.   She would cook for them.  She would bathe them.

21       Just like house stuff.  She had to clean the

22       house and make sure that it was clean before

23       her mom got home.  Stuff like that.  Not much.

24       Watch TV, videos.
```

54

```
 1   Q.   Do you know if she had any hobbies or she liked
 2        to do any activities in particular?
 3   A.   Just sit home, watch TV, and eat sunflower
 4        seeds all day.  She used to love sunflower
 5        seeds.  That's all.  That was her hobby.
 6        That's what she'd do every day.
 7   Q.   Turning back to the date of the incident.  At
 8        some point you talked to Eveline and discussed
 9        going out with Carlos Fernandes and your cousin
10        Luis Carvalho and Brima Wurie?
11   A.   On the advice of counsel, I exercise my Fifth
12        Amendment.
13   Q.   Your cousin is Luis Carvalho, correct?
14   A.   Correct.
15   Q.   How would you describe your relationship with
16        him other than as cousins?
17   A.   We had -- well, he was incarcerated for a
18        while.  So we have a good relationship.
19   Q.   Are you still close?
20   A.   Well, for now -- I mean, I have my family.  He
21        has his, so we don't see each other much,
22        often, like.
23   Q.   Did you speak to him after he came in and
24        testified at his deposition?
```

55

```
 1   A.   On the advice of counsel, I exercise my Fifth
 2        Amendment.
 3   Q.   Have you spoken to him at all about the
 4        incident on September 8, 2002?
 5   A.   Under the advice of counsel, I exercise my
 6        Fifth Amendment.
 7   Q.   Did you and Luis Carvalho hang out a lot prior
 8        to September 8, 2002?
 9   A.   No.
10   Q.   But you and Eveline hung out a lot --
11   A.   Yes.
12   Q.   -- prior to September 8, 2002?
13                  Prior to the incident on September 8,
14        2002, you knew Brima Wurie, correct?
15   A.   Yes.
16   Q.   How long had you known him for?
17   A.   A few years.
18   Q.   What were the circumstances in which you knew
19        him or you met him?
20   A.   Through an ex-boyfriend.
21   Q.   Who was that?
22   A.   David Burgo.
23   Q.   How long had you -- had you hung out with Brima
24        Wurie before September 8, 2002?
```

56

```
 1   A.   No.

 2   Q.   Had you ever socialized together with Brima

 3        Wurie prior to September 8, 2002?

 4   A.   No more than probably a "hi" or a "bye."  Like

 5        "hi," "bye."  We never socialized.

 6   Q.   Prior to the incident on September 8, 2002,

 7        what did you do?

 8             MR. MASFERRER:  I'm sorry.  Don't

 9        understand that question.

10   Q.   Prior to -- on the day of September 8, 2002,

11        what did you do before the incident involving

12        Ms. Barros-Cepeda?

13             MR. MASFERRER:  Could you give a

14        better time?  Like before what?  Before she got

15        in the car?  Before they met up?

16   Q.   Before you got in the car.

17   A.   We were in the house at her mom's.

18   Q.   So you were in the house together?

19   A.   Mm-hmm.

20   Q.   At her house, 75 Wayland Street?

21   A.   Mm-hmm.

22   Q.   What time did you go over to see her?

23   A.   I'm not sure of the time.

24   Q.   What did you do in the house?
```

57

```
1   A.   Hung out in the house with her and her
2        stepfather and my cousin's baby's father at the
3        time.
4   Q.   What were you guys doing?  Watching TV,
5        talking, eating?
6   A.   Talking on the back porch.  Just talking.  It
7        was a nice day out so we was just hanging out.
8   Q.   At some point you left the house?
9   A.   Yes.
10  Q.   How long had you been in the house before you
11       left?
12  A.   For a long period of time, for a long time.
13  Q.   And were you guys drinking any alcohol?
14  A.   Not that I can remember.
15  Q.   Were you taking any substances?
16  A.   No.
17  Q.   Were you drinking or eating anything?
18  A.   I don't remember.
19  Q.   Were you there for more than an hour?
20  A.   Yes.
21  Q.   More than two hours?
22  A.   Yeah.
23  Q.   More than five hours?
24  A.   Yeah.
```

58

```
 1   Q.   What was the purpose for your visit at

 2        Eveline's house?

 3   A.   I always visited.  I was always over.  There

 4        was no purpose.  I just always --

 5   Q.   Hung out there?

 6   A.   -- hung out.

 7   Q.   At that point you decided to leave the house?

 8   A.   Yes.

 9   Q.   Where did you go after you left the house?

10   A.   Under the advice of counsel, I plead the Fifth

11        Amendment.

12   Q.   At some point you and Eveline Barros-Cepeda

13        left together at the house?

14   A.   On the advice of counsel, I plead the Fifth

15        Amendment.

16   Q.   At the time you left the house on September 8,

17        2002, Angela was with you, correct?

18   A.   Yes.

19   Q.   And at the time you left the house with Angela,

20        you got into her mother's car, correct?

21   A.   Under the advice of counsel, I exercise the

22        Fifth Amendment.

23   Q.   And after you got into the car at Eveline's

24        house, you left that location, correct?
```

59

```
 1   A.   Under the advice of counsel, I exercise my

 2        Fifth Amendment.

 3   Q.   Did you get into any vehicle after you left

 4        Eveline's house on September 8, 2002?

 5   A.   On the advice of counsel, I exercise my Fifth

 6        Amendment.

 7   Q.   What did you do after you got into the vehicle

 8        on September 8, 2002?

 9   A.   On the advice of counsel, I exercise my Fifth

10        Amendment.

11   Q.   Who drove the vehicle on September 8, 2002 --

12   A.   On the advice of counsel --

13   Q.   You need to let me finish the question.

14   A.   I thought you was finished.

15   Q.   On September 8, 2002 when you left the house --

16        strike that.

17             On September 8, 2002, when you left

18        Eveline's house, did you get into a vehicle?

19   A.   On the advice of counsel, I exercise my Fifth

20        Amendment.

21   Q.   After you left the house on September 8, 2002,

22        where did you go?

23   A.   On the advice of counsel, I exercise my Fifth

24        Amendment.
```

60

```
 1   Q.   After you got into the vehicle on September 8,
 2        2002, who drove the vehicle?
 3   A.   On the advice of counsel, I exercise my Fifth
 4        Amendment.
 5   Q.   On September 8, 2002, when you got into the
 6        vehicle after leaving Eveline's house, did you
 7        drive the vehicle?
 8   A.   On the advice of counsel, I exercise my Fifth
 9        Amendment.
10   Q.   Where did you go after you left 75 Wayland
11        Street?
12   A.   On the advice of counsel, I exercise my Fifth
13        Amendment.
14   Q.   Did you go to Cushing Avenue after you left 75
15        Wayland Street?
16   A.   On the advice of counsel, I exercise the Fifth
17        Amendment.
18   Q.   After you left 75 Wayland Street, did you meet
19        up with anybody else?
20   A.   On the advice of counsel, I exercise my Fifth
21        Amendment.
22   Q.   After you left 75 Wayland Street, did you meet
23        up with Luis Carvalho?
24   A.   On the advice of my counsel, I exercise my
```

61

```
 1        Fifth Amendment.
 2   Q.   After you left 75 Wayland Street, did you meet
 3        up with Carlos Fernandes?
 4   A.   On the advice of counsel, I exercise my Fifth
 5        Amendment.
 6   Q.   After you left 75 Wayland Street on September
 7        8, 2002, did you meet up with Brima Wurie?
 8   A.   On the advice of counsel, I exercise my Fifth
 9        Amendment.
10   Q.   On September 8, 2002, after you left 75 Wayland
11        Street, did you then meet up with Luis
12        Carvalho, Brima Wurie and Carlos Fernandes?
13   A.   On the advice of counsel, I exercise my Fifth
14        Amendment.
15   Q.   After you left 75 Wayland Street on September
16        8, 2002, were you in a vehicle with Carlos
17        Fernandes, Brima Wurie, Eveline Barros-Cepeda
18        and Luis Carvalho?
19   A.   On the advice of counsel, I exercise my Fifth
20        Amendment.
21   Q.   At some point did Brima Wurie drive the vehicle
22        in which you were traveling in on September 8,
23        2002?
24   A.   On the advice of counsel, I exercise my Fifth
```

62

```
 1       Amendment.
 2   Q.  After you left 75 Wayland Street at some point,
 3       did you then travel to Cushing Avenue?
 4   A.  On the advice of counsel, I exercise my Fifth
 5       Amendment.
 6   Q.  How long were you there?
 7   A.  On the advice of counsel, I exercise my Fifth
 8       Amendment.
 9   Q.  What did you do there?
10   A.  On the advice of counsel, I exercise my Fifth
11       Amendment.
12   Q.  Did anybody get out of the car at Cushing
13       Avenue?
14   A.  On the advice of counsel, I exercise my Fifth
15       Amendment.
16   Q.  Who got out of the car at Cushing Avenue?
17   A.  On the advice of counsel, I exercise my Fifth
18       Amendment.
19   Q.  Did anybody else get out of the car other than
20       that person?
21   A.  On the advice of counsel, I exercise my Fifth
22       Amendment.
23   Q.  At that time did you say anything to anybody?
24   A.  On the advice of counsel, I exercise my Fifth
```

63

```
 1      Amendment.
 2   Q.   Did you do anything at Cushing Avenue?
 3   A.   On the advice of counsel, I exercise my Fifth
 4        Amendment.
 5   Q.   What did you do?
 6   A.   On the advice of counsel, I exercise my Fifth
 7        Amendment.
 8   Q.   What did you say?
 9   A.   On the advice of counsel, I exercise my Fifth
10        Amendment.
11   Q.   At some point at Cushing Avenue, did you see
12        Brima Wurie exit his vehicle?
13   A.   On the advice of counsel, I exercise my Fifth
14        Amendment.
15   Q.   At some point did you see Brima Wurie discharge
16        his firearm?
17   A.   On the advice of counsel, I exercise my Fifth
18        Amendment.
19   Q.   At some point while you were at Cushing Avenue,
20        did you see Carlos Fernandes fire a gun?
21   A.   On the advice of counsel, I exercise my Fifth
22        Amendment.
23   Q.   At Cushing Avenue did you see anybody else fire
24        any gun?
```

64

```
 1   A.   On the advice of counsel, I exercise my Fifth
 2        Amendment.
 3   Q.   Did you see anybody shoot anything or anybody
 4        on September 8, 2002?
 5   A.   On the advice of counsel, I exercise my Fifth
 6        Amendment.
 7   Q.   For how long were you there at that location,
 8        Cushing Avenue, on September 8, 2002?
 9   A.   On the advice of counsel, I exercise my Fifth
10        Amendment.
11   Q.   Did you hear anything while you were at Cushing
12        Avenue?
13   A.   On the advice of counsel, I exercise my Fifth
14        Amendment.
15   Q.   At any point did you hear any gunshots while
16        you were at Cushing Avenue?
17   A.   On the advice of counsel, I exercise my Fifth
18        Amendment.
19   Q.   What happened next after you heard gunshots at
20        Cushing Avenue?
21   A.   On the advice of counsel, I exercise my Fifth
22        Amendment.
23   Q.   Who was driving the car when you were at
24        Cushing Avenue?
```

65

```
 1   A.   On the advice of counsel, I exercise my Fifth
 2        Amendment.
 3   Q.   What happened at Cushing Avenue?
 4   A.   On the advice of counsel, I exercise my Fifth
 5        Amendment.
 6   Q.   What happened after you left Cushing Avenue?
 7   A.   On the advice of counsel, I exercise my Fifth
 8        Amendment.
 9   Q.   What did you do, if anything, at Cushing
10        Avenue?
11             MR. MASFERRER:  Asked and answered.
12   Q.   Go ahead.
13   A.   On the advice of counsel, I exercise my Fifth
14        Amendment.
15   Q.   What were you thinking while you were at
16        Cushing Avenue?
17   A.   On the advice of counsel, I exercise my Fifth
18        Amendment.
19             MR. MASFERRER:  I believe that's the
20        answer to your question, a truthful answer to
21        what she was doing at Cushing Avenue.
22   Q.   What happened after you left Cushing Avenue?
23   A.   On the advice of counsel, I exercise my Fifth
24        Amendment.
```

66

```
 1   Q.   At some point did the vehicle in which you were
 2        traveling in go through a red light?
 3   A.   On the advice of counsel, I exercise my Fifth
 4        Amendment.
 5   Q.   At some point did the vehicle you were
 6        traveling in become pursued by a police
 7        vehicle?
 8   A.   On the advice of counsel, I exercise my Fifth
 9        Amendment.
10   Q.   What happened after the vehicle you were
11        traveling in went through a red light?
12   A.   On the advice of counsel, I exercise my Fifth
13        Amendment.
14   Q.   Did the vehicle you were traveling in stop --
15        strike that.
16             After your vehicle went through the
17        red light, did you hear police sirens?
18   A.   On the advice of counsel, I exercise my Fifth
19        Amendment.
20   Q.   Did you hear any -- strike that.
21             Did you see any police lights
22        flashing?
23   A.   On the advice of counsel, I exercise my Fifth
24        Amendment.
```

67

```
 1   Q.   Were you aware that a police cruiser was
 2        following your vehicle?
 3   A.   On the advice of counsel, I exercise my Fifth
 4        Amendment.
 5   Q.   Did the vehicle stop for the police?
 6   A.   On the advice of counsel, I exercise my Fifth
 7        Amendment.
 8   Q.   At any point did you hear police sirens?
 9   A.   On the advice of counsel, I exercise my Fifth
10        Amendment.
11   Q.   Did you hear anything else?
12   A.   On the advice of counsel, I exercise my Fifth
13        Amendment.
14   Q.   Did you say anything to the driver of the
15        vehicle you were traveling in?
16   A.   On the advice of counsel, I exercise my Fifth
17        Amendment.
18   Q.   Did you do anything at that point when the
19        vehicle failed to stop for police?
20   A.   On the advice of counsel, I exercise my Fifth
21        Amendment.
22   Q.   After the vehicle went through the red light,
23        where did you go?
24   A.   On the advice of counsel, I exercise my Fifth
```

68

```
 1       Amendment.
 2   Q.  Where were you going on the night of September
 3       8, 2002?
 4   A.  On the advice of counsel, I exercise my Fifth
 5       Amendment.
 6   Q.  Why were you going there?
 7   A.  On the advice of my counsel, I exercise my
 8       Fifth Amendment.
 9   Q.  Who was driving there?
10   A.  On the advice of counsel, I exercise my Fifth
11       Amendment.
12   Q.  Did anybody say anything at all after you left
13       75 Wayland Street?
14   A.  On the advice of counsel, I exercise my Fifth
15       Amendment.
16   Q.  After the vehicle you were traveling in failed
17       to stop for police on September 8, 2002, did
18       the vehicle you were traveling in continue to
19       be pursued by a police officer?
20   A.  On the advice of counsel, I exercise my Fifth
21       Amendment.
22   Q.  Did the vehicle you were traveling in continue
23       to evade police for a period of time on
24       September 8, 2002?
```

69

```
 1   A.   On the advice of counsel, I exercise my Fifth
 2        Amendment.
 3   Q.   Did the vehicle you were traveling in continue
 4        to evade police through the course of numerous
 5        city streets on September 8, 2002?
 6   A.   On the advice of counsel, I exercise my Fifth
 7        Amendment.
 8   Q.   At any point did you see the vehicle you were
 9        traveling in -- strike that.
10             At any point did you see while you
11        were traveling in the vehicle on September 8,
12        2002, a police officer stand in the middle of
13        the road commanding the vehicle you were
14        traveling in to stop?
15   A.   On the advice of counsel, I exercise my Fifth
16        Amendment.
17   Q.   Did you see the car that you were traveling in
18        hit a police officer?
19   A.   On the advice of counsel, I exercise my Fifth
20        Amendment.
21   Q.   Did you hear the vehicle you were traveling in
22        hit a police officer?
23   A.   On the advice of counsel, I exercise my Fifth
24        Amendment.
```

70

```
 1   Q.   What is your knowledge about what happened to
 2        Brima Wurie after September 8, 2002?
 3   A.   On the advice of counsel, I exercise my Fifth
 4        Amendment.
 5   Q.   Are you aware that Brima Wurie pled guilty to
 6        striking a police officer on September 8, 2002?
 7   A.   Yes.
 8   Q.   And do you know the reasons why he pled guilty?
 9   A.   On the advice of counsel, I exercise my Fifth
10        Amendment.
11   Q.   What do you know about Brima Wurie pleading
12        guilty to striking a police officer on
13        September 8 --
14   A.   On advice --
15   Q.   -- 2002?
16   A.   I'm sorry.  On advice of counsel, I exercise my
17        Fifth Amendment.  Sorry.
18   Q.   How do you know that Brima Wurie pled guilty to
19        striking a police officer on September 8, 2002?
20   A.   My aunt Domingas DePina mentioned it to a
21        family member.
22   Q.   When did you learn that?  Back in 2002?
23   A.   I'm not even sure.  I probably found out not
24        too long ago.  So I don't know when he took the
```

71

```
 1        plea.  I don't know anything about his case.
 2   Q.   Have you ever spoken to Brima Wurie since the
 3        incident on September 8, 2002?
 4   A.   On the advice of counsel, I exercise the Fifth
 5        Amendment.
 6   Q.   Have you talked to Domingas DePina about what
 7        happened on September 8, 2002?
 8   A.   No.
 9   Q.   Have you ever told Domingas DePina what
10        happened on September 8, 2002?
11   A.   No.
12   Q.   Why not?
13   A.   Just never talked about it.
14   Q.   Have you wanted to tell her what happened to
15        her daughter?
16   A.   She knows what happened to her daughter.
17   Q.   But did you ever tell her what happened to her
18        daughter while you were in the vehicle on
19        September 8, 2002?
20   A.   We never discussed anything about the incident
21        that day.
22   Q.   Is there a reason why?
23   A.   No.  She just never asked me and I never...
24   Q.   Did you ever offer to tell her?
```

72

```
 1   A.   No.
 2   Q.   Did you ever tell Gabriel Robalo about what
 3        happened?
 4   A.   No.
 5   Q.   Did you ever tell Carlos Cepeda about what
 6        happened?
 7   A.   No.
 8   Q.   Did you tell anybody else what happened other
 9        than your attorney?
10   A.   On the advice of my counsel, I exercise the
11        Fifth Amendment.
12   Q.   How long did the incident occur involving the
13        vehicle striking a police officer on September
14        8, 2002?
15   A.   On the advice of counsel, I exercise my Fifth
16        Amendment.
17   Q.   How many officers were involved in the incident
18        on September 8, 2002?
19   A.   On the advice of counsel, I exercise my Fifth
20        Amendment.
21   Q.   Were they wearing uniforms?
22   A.   On the advice of counsel, I exercise my Fifth
23        Amendment.
24   Q.   What did the officers look like on September 8,
```

73

```
 1      2002?

 2  A.  On the advice of counsel, I exercise my Fifth

 3      Amendment.

 4  Q.  Was there anybody else with them on September

 5      8, 2002?

 6  A.  On the advice of counsel, I exercise my Fifth

 7      Amendment.

 8  Q.  What did you hear happened on September 8,

 9      2002?

10  A.  On the advice of counsel, I exercise my Fifth

11      Amendment.

12  Q.  Did you see anyone fire any gunshots on

13      September 8, 2002?

14  A.  On the advice of counsel, I exercise my Fifth

15      Amendment.

16  Q.  Did you hear anyone fire any gunshots on

17      September 8, 2002?

18  A.  On the advice of counsel, I exercise my Fifth

19      Amendment.

20  Q.  What did you do when shots were fired on

21      September 8, 2002?

22  A.  On the advice of counsel, I exercise my Fifth

23      Amendment.

24  Q.  At any point did you duck while in the vehicle
```

74

```
 1        on September 8, 2002?
 2    A.  On advice of counsel, I exercise my Fifth
 3        Amendment.
 4    Q.  At any point did you see anyone else duck in
 5        the vehicle on September 8, 2002?
 6    A.  On the advice of counsel, I exercise my Fifth
 7        Amendment.
 8    Q.  What did you do next after you heard gunshots
 9        fired on September 8, 2002?
10    A.  On the advice of counsel, I exercise my Fifth
11        Amendment.
12    Q.  What did Brima Wurie do on September 8, 2002?
13    A.  On the advice of counsel, I exercise my Fifth
14        Amendment.
15    Q.  Do you know why Brima Wurie kept driving after
16        striking a police officer on September 8, 2002?
17    A.  On the advice of counsel, I exercise my Fifth
18        Amendment.
19    Q.  What did Brima Wurie do after striking a police
20        officer on September 8, 2002?
21    A.  On the advice of counsel, I exercise my Fifth
22        Amendment.
23    Q.  Why did Brima Wurie strike a police officer on
24        September 8, 2002?
```

75

```
 1    A.    On the advice of counsel, I exercise my Fifth
 2          Amendment.
 3    Q.    Why did the vehicle you were traveling in on
 4          September 8, 2002, fail to stop for police?
 5    A.    On the advice of counsel, I exercise my Fifth
 6          Amendment.
 7    Q.    Why did the vehicle you were traveling in on
 8          September 8, 2002, fail to heed the stop
 9          commands of a police officer on September 8,
10          2002?
11    A.    On the advice of counsel, I exercise my Fifth
12          Amendment.
13    Q.    On September 8, 2002, after you left 75 Wayland
14          Street, what did the passengers in your vehicle
15          do?
16    A.    On the advice of counsel, I exercise my Fifth
17          Amendment.
18    Q.    What did Brima Wurie do while in the vehicle on
19          September 8, 2002?
20    A.    On the advice of counsel, I exercise my Fifth
21          Amendment.
22    Q.    What did Carlos Fernandes do on September 8,
23          2002?
24    A.    On the advice of counsel, I exercise my Fifth
```

76

```
 1        Amendment.
 2   Q.   What did Angela -- Eveline Barros-Cepeda do on
 3        September 8, 2002, while in the vehicle?
 4   A.   On the advice of counsel, I exercise my Fifth
 5        Amendment.
 6   Q.   Was Eveline Barros-Cepeda with you on September
 7        8, 2002, when you were at Cushing Avenue?
 8   A.   On the advice of counsel, I exercise my Fifth
 9        Amendment.
10   Q.   Was Eveline Barros-Cepeda with you when Carlos
11        Fernandes fired gunshots at Cushing Avenue?
12   A.   On the advice of counsel, I exercise my Fifth
13        Amendment.
14   Q.   Was Eveline Barros-Cepeda with you at Cushing
15        Avenue when Brima Wurie fired gunshots on
16        September 8, 2002?
17   A.   On the advice of counsel, I exercise my fifth
18        amendment.
19   Q.   Was Luis Carvalho with you when either Carlos
20        or Brima or both fired gunshots at Cushing
21        Avenue on September 8, 2002?
22   A.   On the advice of counsel, I exercise my Fifth
23        Amendment.
24   Q.   At any point during the incident on September
```

77

```
 1         8, 2002, did you exit your vehicle?
 2    A.   On the advice of counsel, I exercise my Fifth
 3         Amendment.
 4    Q.   At any point after -- strike that.
 5              At any point during the incident on
 6         September 8, 2002, did you exit the vehicle in
 7         which you were traveling?
 8    A.   On the advice of counsel, I exercise my Fifth
 9         Amendment.
10    Q.   Did you see anybody else exit the vehicle on
11         September 8, 2002?
12    A.   On the advice of counsel, I exercise my Fifth
13         Amendment.
14    Q.   Why?
15    A.   On the advice of counsel, I exercise my Fifth
16         Amendment.
17    Q.   Who?
18    A.   On the advice of counsel, I exercise my Fifth
19         Amendment.
20    Q.   Did anybody else exit the vehicle on September
21         8, 2002?
22    A.   I'm sorry.  Can you repeat that please?  Sorry.
23    Q.   Did anybody else exit the vehicle on September
24         8, 2002?
```

78

```
 1  A.   On the advice of counsel, I exercise my Fifth
 2       Amendment.
 3  Q.   Where did you go after you exited the vehicle
 4       on September 8, 2002?
 5  A.   On the advice of counsel, I exercise my Fifth
 6       Amendment.
 7  Q.   At some point did you go to the hospital on
 8       September 8, 2002?
 9  A.   On the advice of counsel, I exercise my Fifth
10       Amendment.
11  Q.   At any point on September 8, 2002, did you see
12       Eveline Barros-Cepeda receive any injuries?
13  A.   On the advice of counsel, I exercise my Fifth
14       Amendment.
15  Q.   At any point during the incident on September
16       8, 2002, did you see anything happen to Eveline
17       Barros-Cepeda while in the vehicle?
18  A.   On the advice of counsel, I exercise my Fifth
19       Amendment.
20  Q.   At any point did anyone in the vehicle on
21       September 8, 2002, duck while inside the
22       vehicle?
23  A.   On the advice of counsel, I exercise my Fifth
24       Amendment.
```

79

```
 1   Q.   Who did?
 2   A.   On the advice of counsel, I exercise my Fifth
 3        Amendment.
 4   Q.   When?
 5   A.   On the advice of counsel, I exercise my Fifth
 6        Amendment.
 7   Q.   For how long?
 8   A.   On the advice of counsel, I exercise my Fifth
 9        Amendment.
10   Q.   Did they duck at the time -- did anybody duck
11        at the time the vehicle you were traveling in
12        struck Officer Michael Paillant?
13   A.   On the advice of counsel, I exercise my Fifth
14        Amendment.
15   Q.   What were you thinking at the time of the
16        incident on September 8, 2002, when Officer
17        Palliant was struck by the motor vehicle in
18        which you were traveling in?
19   A.   On the advice of counsel, I exercise my Fifth
20        Amendment.
21   Q.   How long have you known Luis Carvalho?
22   A.   Since a child.
23   Q.   Did you ever live with Luis Carvalho?
24   A.   No.
```

80

```
 1  Q.  Did you ever live with Eveline Barros-Cepeda?

 2  A.  No.

 3  Q.  You recall what the weather was like on

 4      September 8, 2002?

 5  A.  No.

 6  Q.  Do you recall if there were any drugs in the

 7      vehicle on September 8, 2002?

 8  A.  On the advice of counsel, I exercise my Fifth

 9      Amendment.

10  Q.  Do you recall if there was a firearm in that

11      car on September 8, 2002?

12  A.  On the advice of counsel, I exercise my Fifth

13      Amendment.

14  Q.  Do you recall at any point that evening going

15      to 51 Speedwell Street?

16  A.  On the advice of counsel, I exercise my Fifth

17      Amendment.

18  Q.  Do you recall any point that evening going to

19      Hancock Street that evening?

20  A.  On the advice of counsel, I exercise my Fifth

21      Amendment.

22  Q.  Do you recall at any point going to your aunt's

23      house that evening?

24  A.  On the advice of counsel, I exercise my Fifth
```

81

```
 1          Amendment.
 2    Q.    Do you recall any point on the evening of
 3          September 8 going to the corner of Jerome
 4          Street and Cushing Avenue in Roxbury?
 5    A.    On the advice of counsel, I exercise my Fifth
 6          Amendment.
 7    Q.    What were you doing at the corner of Jerome and
 8          Cushing?
 9    A.    On the advice of counsel, I exercise my Fifth
10          Amendment.
11    Q.    Who was driving the Ford Taurus at the corner
12          of Cushing Avenue and Jerome on September 8,
13          2002?
14    A.    On the advice of counsel, I exercise my Fifth
15          Amendment.
16    Q.    Did you see Carlos Fernandes get back into the
17          Ford -- the vehicle you were traveling in on
18          September 8, 2002?
19    A.    On the advice of counsel, I exercise my Fifth
20          Amendment.
21    Q.    Did you see Brima Wurie get back in the vehicle
22          on September 8, 2002, after being at Cushing
23          Avenue?
24                MR. MASFERRER:  Haven't we already
```

82

```
 1        covered all these areas?
 2              MS. LITSAS:  I'm actually going back,
 3        Ed.  There are a couple questions that I didn't
 4        answer [sic].  I'm sorry.
 5              MR. MASFERRER:  I thought we'd
 6        covered in this level of detail.
 7              MS. LITSAS:  Off the record.
 8              (A discussion was held off the
 9        record.)
10   Q.   (By Ms. Litsas)  After leaving Cushing Avenue,
11        you go to Columbia Avenue?
12   A.   On the advice of counsel, I exercise my Fifth
13        Amendment.
14   Q.   At some point did you go to Columbia Road?
15   A.   On the advice of counsel, I exercise my Fifth
16        Amendment.
17   Q.   Did you have a plan on September 8, 2002?
18   A.   On the advice of counsel, I exercise my Fifth
19        Amendment.
20   Q.   Did you know if anybody had a plan on September
21        8, 2002?
22   A.   On the advice of counsel, I exercise my Fifth
23        Amendment.
24   Q.   What did that plan involve?
```

83

```
 1    A.   On the advice of counsel, I exercise my Fifth
 2         Amendment.
 3    Q.   Were there any other individuals involved in
 4         that plan as to what was going to happen that
 5         evening?
 6    A.   On the advice of counsel, I exercise my Fifth
 7         Amendment.
 8    Q.   Did that plan involve driving around in a Ford
 9         Taurus?
10    A.   On the advice of counsel, I exercise my Fifth
11         Amendment.
12    Q.   Did that plan involve using drugs?
13    A.   On the advice of counsel, I exercise my Fifth
14         Amendment.
15    Q.   Did that plan involve using a firearm?
16    A.   On the advice of counsel, I exercise my Fifth
17         Amendment.
18    Q.   At any time that evening, did you observe
19         anyone use any drugs?
20    A.   On the advice of counsel, I exercise my Fifth
21         Amendment.
22    Q.   At any time that evening, did you observe
23         anyone in possession of any drugs?
24    A.   On the advice of counsel, I exercise my Fifth
```

84

```
 1       Amendment.
 2   Q.  At any time that evening, were you in
 3       possession of any drugs?
 4   A.  On the advice of counsel, I exercise my Fifth
 5       Amendment.
 6   Q.  At any time that evening, were you in
 7       possession of a firearm?
 8   A.  On the advice of counsel, I exercise my Fifth
 9       Amendment.
10   Q.  At any time that evening, did you observe
11       anybody else in the possession of a firearm?
12   A.  On the advice of counsel, I exercise my Fifth
13       Amendment.
14   Q.  At any time that evening, did you use a
15       firearm?
16   A.  On the advice of counsel, I exercise my Fifth
17       Amendment.
18   Q.  At any time that evening, did you observe
19       anyone else use a firearm?
20   A.  On the advice of counsel, I exercise my Fifth
21       Amendment.
22   Q.  At any time that evening, did you observe
23       Carlos Fernandes use a firearm?
24   A.  On the advice of counsel, I exercise my Fifth
```

85

```
 1        Amendment.
 2    Q.  Did you observe a police cruiser while you were
 3        on Columbia Road?
 4    A.  On the advice of counsel, I exercise my Fifth
 5        Amendment.
 6    Q.  At the time of the incident on September 8,
 7        2002, did you know Brima Wurie's driver's
 8        license was suspended?
 9    A.  On the advice of counsel, I exercise my Fifth
10        Amendment.
11    Q.  Did you have a driver's license on September 8,
12        2002?
13    A.  On the advice of counsel, I exercise my Fifth
14        Amendment.
15    Q.  Did you drive the vehicle on September 8, 2002?
16    A.  On the advice of counsel, I exercise my Fifth
17        Amendment.
18    Q.  Did you have any open criminal cases on
19        September 8, 2002?
20    A.  No.
21    Q.  Do you know if Eveline Barros-Cepeda had any
22        open criminal cases on September 8, 2002?
23    A.  No, not sure.
24    Q.  Did you know if Brima Wurie had any open
```

86

```
 1        criminal cases on September 8, 2002?
 2   A.   No.
 3   Q.   Did you know if Luis Carvalho had any open
 4        criminal cases on September 8, 2002?
 5   A.   Not sure.
 6   Q.   What about Carlos Fernandes?
 7   A.   No.
 8   Q.   You don't know or --
 9   A.   No, I don't know.
10   Q.   Were you aware of anyone in the vehicle on
11        September 8, 2002, being on probation or
12        parole?
13   A.   On the advice of my counsel, I exercise my
14        Fifth Amendment.
15   Q.   Do you recall traveling on Quincy Street on
16        September 8, 2002?
17   A.   On the advice of counsel, I exercise my Fifth
18        Amendment.
19   Q.   Do you recall traveling onto Dunkeld Street on
20        September 8, 2002?
21   A.   On the advice of counsel, I exercise my Fifth
22        Amendment.
23   Q.   Where were you going on September 8, 2002?
24   A.   On the advice of counsel, I exercise my Fifth
```

87

```
 1        Amendment.
 2   Q.   Who was driving the Ford Taurus at the time you
 3        went onto Dunkeld Street?
 4   A.   On the advice of counsel, I exercise my Fifth
 5        Amendment.
 6   Q.   What were you able to see while you were inside
 7        the Ford Taurus on Dunkeld Street?
 8              MR. MASFERRER:  What were you what?
 9        I'm sorry.
10   Q.   What were you able to see --
11              MR. MASFERRER:  Able to see.
12   Q.   -- while you were inside the Ford Taurus on
13        Dunkeld Street?
14   A.   On the advice of counsel, I exercise my Fifth
15        Amendment.
16   Q.   Did you hear any police officers give any
17        commands while you were on Dunkeld Street?
18   A.   On the advice of counsel, I exercise my Fifth
19        Amendment.
20   Q.   What was going on inside the Ford Taurus while
21        you were on Dunkeld Street?
22   A.   On the advice of counsel, I exercise my Fifth
23        Amendment.
24   Q.   Did you see a police cruiser behind you while
```

88

```
 1        on Dunkeld Street?
 2   A.   On the advice of counsel, I exercise my Fifth
 3        Amendment.
 4   Q.   Did you see any other police cruisers other
 5        than the one that was behind you while you were
 6        on Dunkeld Street?
 7   A.   On the advice of counsel, I exercise my Fifth
 8        Amendment.
 9   Q.   Did the Ford Taurus strike a police officer on
10        Dunkeld Street?
11   A.   On the advice of counsel, I exercise my Fifth
12        Amendment.
13   Q.   Did the vehicle you were traveling in strike a
14        police officer?
15   A.   On the advice of counsel, I exercise my Fifth
16        Amendment.
17   Q.   Did you hear the vehicle you were traveling in
18        strike a police officer on Dunkeld Street on
19        September 8, 2002?
20   A.   On the advice of counsel, I exercise my Fifth
21        Amendment.
22   Q.   Was that police officer in uniform?
23   A.   On the advice of counsel, I exercise my Fifth
24        Amendment.
```

89

```
 1   Q.   What was that police officer doing as the
 2        vehicle you were traveling in approached?
 3   A.   On the advice of counsel, I exercise my Fifth
 4        Amendment.
 5   Q.   How many police officers did you see on Dunkeld
 6        Street on September 8, 2002?
 7   A.   On the advice of counsel, I exercise my Fifth
 8        Amendment.
 9   Q.   Did you hear any shots fired on Dunkeld Street
10        on September 8, 2002?
11   A.   On the advice of counsel, I exercise my Fifth
12        Amendment.
13   Q.   What did you do when you heard gun shots fired
14        on Dunkeld Street?
15   A.   On the advice of counsel, I exercise my Fifth
16        Amendment.
17   Q.   What did other passengers inside the vehicle
18        do?
19   A.   On the advice of counsel, I exercise my Fifth
20        Amendment.
21   Q.   Where did the vehicle you were traveling in go
22        next?
23   A.   On the advice of counsel, I exercise my Fifth
24        Amendment.
```

90

```
 1   Q.   Did you exit the vehicle you were traveling in?
 2   A.   On the advice of counsel, I exercise my Fifth
 3        Amendment?
 4   Q.   When did you exit the vehicle?
 5   A.   On the advice of counsel, I exercise my Fifth
 6        Amendment.
 7   Q.   Did anyone else exit?
 8   A.   On the advice of counsel, I exercise my Fifth
 9        Amendment.
10   Q.   Are you aware that Eveline Barros-Cepeda died
11        that evening on September 8, 2002?
12   A.   Excuse me.  Can you repeat the question,
13        please?
14   Q.   Are you aware that Eveline Barros-Cepeda died
15        on September 8, 2002?
16   A.   Yes.
17   Q.   And how do you know she died on September 8,
18        2002?
19   A.   In the hospital.
20   Q.   Were you at the hospital at the time that she
21        passed away on September 8, 2002?  Strike that.
22             Were you -- did you go to the
23        hospital on September 8, 2002?
24   A.   On the advice of counsel, I exercise my Fifth
```

91

1       Amendment.

2   Q.  Are you aware of how Eveline Barros-Cepeda was

3       killed on September 8, 2002?

4   A.  On the advice of counsel, I exercise my Fifth

5       Amendment.

6   Q.  What observations did you make of Eveline

7       Barros-Cepeda while inside the vehicle in which

8       you were traveling on September 8, 2002?

9   A.  On the advice of counsel, I exercise my Fifth

10      Amendment.

11  Q.  Where did you go after exiting the vehicle you

12      were traveling in on September 8, 2002?

13  A.  On the advice of counsel, I exercise my Fifth

14      Amendment.

15  Q.  Did you speak to anyone that evening on

16      September 8, 2002, after exiting the vehicle?

17  A.  On the advice of counsel, I exercise my Fifth

18      Amendment.

19  Q.  Did you see any police officers --

20  A.  On the advice of counsel, I exercise my Fifth

21      Amendment.

22  Q.  I didn't finish.  Did you see any police

23      officers after the incident on September 8,

24      2002?

92

```
 1   A.   On the advice of counsel, I exercise my Fifth
 2        Amendment.
 3   Q.   Did you see any other people from the
 4        neighborhood that evening on September 8, 2002?
 5   A.   On the advice of counsel, I exercise my Fifth
 6        Amendment.
 7   Q.   Are you aware whether or not there was an
 8        internal affairs division investigation into
 9        this incident on September 8, 2002?
10   A.   On the advice of counsel, I exercise my Fifth
11        Amendment.
12   Q.   Were you contacted by the police department and
13        requested to give a statement regarding your
14        knowledge of the incident on September 8, 2002?
15   A.   Excuse me.  Repeat that one more time, please.
16        Sorry.
17   Q.   Where you contacted by the police department
18        and requested to give a statement regarding
19        your knowledge of the incident on September 8,
20        2002 incident?
21   A.   No, not that -- no.
22   Q.   Were you ever interviewed by the Boston Police
23        Department regarding the incident on September
24        8, 2002?
```

93

```
 1   A.   No, not that I remember.

 2   Q.   Were you ever interviewed by anybody about the

 3        incident on September 8, 2002?

 4   A.   On the advice of my counsel, I exercise the

 5        Fifth Amendment.

 6   Q.   Do you recall being interviewed by reporters

 7        about the incident on September 8, 2002?

 8   A.   On the advice of counsel, I exercise my Fifth

 9        Amendment.

10   Q.   Do you recall giving statements to the

11        newspapers about the incident on September 8,

12        2002?

13   A.   On the advice of counsel, I exercise the Fifth

14        Amendment.

15   Q.   Were you injured at all during the incident on

16        September 8, 2002?

17   A.   On the advice of counsel, I exercise my Fifth

18        Amendment.

19   Q.   Are you aware of anyone who was injured on

20        September 8, 2002, as a result of the incident?

21   A.   On the advice of counsel, I exercise my Fifth

22        Amendment.

23   Q.   Are you aware that Eveline Barros-Cepeda was

24        injured on September 8, 2002, during the
```

94

```
 1        incident involving the Boston Police?
 2   A.   On the advice of counsel, I exercise my Fifth
 3        Amendment.
 4   Q.   Have you spoken with anyone in Ms. Barros-
 5        Cepeda's family about the incident on September
 6        8, 2002?
 7   A.   On the advice of counsel, I exercise my Fifth
 8        Amendment.
 9   Q.   Are you aware -- strike that.
10             Do you have any nicknames?
11   A.   Yes.
12   Q.   What are your nicknames?
13   A.   Lenny.
14   Q.   Do you have any other nicknames other than
15        Lenny?
16   A.   No.
17   Q.   Did anyone else have any nicknames in the
18        vehicle?
19   A.   On the advice of counsel, I exercise my Fifth
20        Amendment.
21   Q.   Did Brima Wurie have any nicknames?
22   A.   On the advice of counsel, I exercise my Fifth
23        Amendment.
24   Q.   Did he have the nickname B.J.?
```

95

```
 1   A.   On the advice of counsel, I exercise my Fifth
 2        Amendment.
 3   Q.   Did Luis Carvalho have the nickname of Zito?
 4   A.   On the advice of counsel, I exercise my Fifth
 5        Amendment.
 6   Q.   Are you aware that Luis Carvalho's nickname is
 7        Zeto (ph.sp.)?
 8   A.   On the advice of counsel, I exercise my Fifth
 9        Amendment.
10   Q.   Were you ever asked to testify before a grand
11        jury regarding this incident?
12   A.   No.
13   Q.   Did you ever testify in front of a grand jury
14        about this incident on September 8, 2002?
15   A.   Yes.
16   Q.   Who asked you to testify before a grand jury
17        regarding this incident?
18             MR. MASFERRER:  You're using "asked."
19        You're not asked to sit for the grand jury.
20             MS. LITSAS:  Off the record.
21             (A discussion was held off the
22        record.)
23   Q.   (By Ms. Litsas)  Ms. DaRosa, you testified
24        before a grand jury regarding this incident?
```

96

```
1   A.   Yes.

2   Q.   When did you do that?

3   A.   I don't remember.

4   Q.   Were you represented by counsel at the time?

5   A.   I believe so.

6   Q.   What were you asked to testify about?

7   A.   On the advice of counsel, I exercise my Fifth

8        Amendment.

9   Q.   Did you assert your Fifth Amendment at the

10       proceedings before the grand jury?

11  A.   On the advice of counsel, I exercise my Fifth

12       Amendment.

13  Q.   When was the first time that you heard gunshots

14       on September 8, 2002?

15  A.   On the advice of counsel, I exercise my Fifth

16       Amendment.

17  Q.   Did you see any police officer shoot at any

18       point on September 8, 2002 a firearm?

19  A.   On the advice of counsel, I exercise my Fifth

20       Amendment.

21  Q.   Did you ever hear anybody shoot their firearm?

22  A.   On the advice of counsel, I exercise my Fifth

23       Amendment.

24  Q.   What is the next thing that you saw after
```

97

```
 1      hearing the first gunshot?
 2   A.  On the advice of counsel, I exercise my Fifth
 3      Amendment.
 4   Q.  What is the next thing that happened after
 5      that?
 6   A.  On the advice of counsel, I exercise my Fifth
 7      Amendment.
 8   Q.  Did you see any police officers after you heard
 9      gunshots?
10   A.  On the advice of counsel, I exercise my Fifth
11      Amendment.
12   Q.  Prior to September 8, 2002, what experiences
13      have you had with the police department?
14   A.  On the advice of counsel, I exercise my Fifth
15      Amendment.
16   Q.  Had you ever been arrested before September 8,
17      2002?
18   A.  Yes.
19   Q.  What were you arrested for?
20   A.  I'm not sure.
21   Q.  When was the last time that you were arrested?
22   A.  I'm not sure.  I don't remember.  I'm not sure.
23   Q.  You don't remember what you were arrested for?
24   A.  No.
```

98

```
1    Q.    And you don't remember when the last time you

2          were arrested is?

3    A.    No.

4    Q.    And you understand, Ms. DaRosa, you have to

5          testify truthfully today?

6    A.    Yes.

7    Q.    Have you had any encounters with the police

8          department subsequent to September 8, 2002, up

9          until today?

10   A.    Have I had any --

11   Q.    Encounters.  Any interaction with the police

12         department.

13   A.    No.

14               MS. LITSAS:  Just for the record,

15         Mr. Masferrer is consulting with Ms. DaRosa.

16               MR. MASFERRER:  Yeah, I'm sorry.

17               MS. LITSAS:  Mr. Masferrer --

18               THE WITNESS:  Oh, okay, I didn't

19         understand the question.  I'm sorry.

20               MR. MASFERRER:  Yeah.

21   A.    I didn't understand the question --

22               MR. MASFERRER:  The last question you

23         asked.

24   A.    -- the last question you asked.
```

99

```
 1   Q.   What encounters?

 2                   MR. MASFERRER:  No.  You said have

 3        you had any encounters with the police since

 4        September 8, 2002.

 5   Q.   Yes.  Have you had any encounters with the

 6        police since September 8, 2002?

 7   A.   Yes, I believe so.

 8   Q.   What were those encounters?

 9   A.   I'm trying to think.  I know it was nothing

10        serious.  Probably my license or something.  It

11        has to do with my license.

12   Q.   Anything else other than your license?

13   A.   No.  Since when?

14                   MR. MASFERRER:  September 8, 2002.

15   Q.   Since September 8, 2002.

16   A.   Yes.

17   Q.   What were those encounters?

18   A.   I had got a ride from a friend -- I didn't get

19        charged with anything, but I had to go to court

20        because I was in a vehicle that was reported

21        stolen at the time.  So I got arrested along

22        with anyone that was in the vehicle, but they

23        dismissed everything.

24   Q.   When was that incident?
```

100

```
 1    A.    When I was living in Maverick.

 2    Q.    When was that?

 3    A.    Three years ago.

 4    Q.    Maverick.  Where is Maverick?

 5    A.    East Boston.

 6    Q.    East Boston.  Are there any other incidents

 7          other than what you just described?

 8    A.    No.

 9    Q.    Has anyone in your family had any negative

10          encounters with members of the Boston Police

11          Department?

12    A.    No.

13    Q.    Have you ever been convicted of any crime,

14          Ms. DaRosa?

15    A.    Yes.

16    Q.    What have you been convicted of?

17    A.    Assault and battery with a shod foot.  I had to

18          plead guilty to a charge.  That's the only

19          thing that I --

20    Q.    Why do you say you had to plead guilty?

21    A.    On the advice of counsel, I plead the Fifth

22          Amendment.

23    Q.    When was that that you plead guilty?

24    A.    About five, six years ago.
```

101

```
 1   Q.   Are there any other convictions other than that
 2        assault and battery with a shod foot?
 3   A.   No.
 4   Q.   Were you ever incarcerated?
 5   A.   No.
 6   Q.   Were you ever on probation?
 7   A.   Yes.
 8   Q.   What was your sentence for the conviction of
 9        the A&B and -- with the shod foot?
10   A.   It was just probation.  I didn't get a sentence
11        or anything.  I never did time for it.
12   Q.   Have you ever been incarcerated?
13   A.   No.
14   Q.   Were you ever charged with a crime regarding
15        this incident on September 8, 2002?
16   A.   No.
17   Q.   Were you ever arrested with respect to this
18        incident on September 8, 2002?
19   A.   No.
20   Q.   Do you have any criminal cases that are
21        currently pending?
22   A.   No.
23   Q.   Does Courtney Forde have any cases that are
24        currently pending?
```

102

```
 1   A.   On the advice of counsel, I exercise the Fifth

 2        Amendment.

 3   Q.   Do you have any criminal cases that are

 4        currently under appeal?

 5   A.   No.

 6   Q.   Do you know anyone by the name of Deborah

 7        Flaherty?

 8   A.   No.

 9   Q.   Do you know anyone by the name of Thomas

10        Taylor?

11   A.   No.

12   Q.   Do you know anyone by the name of Robert

13        Connolly?

14   A.   No.

15   Q.   Do you know anyone by the name of Michael

16        Paillant?

17   A.   No.

18   Q.   Do you know anyone by the name of Erica

19        Cummings?

20   A.   No.

21   Q.   Do you know anyone by the name of Travo Carter?

22   A.   No.

23   Q.   Do you know anyone by the name of James

24        Nicholas?
```

103

```
 1   A.   No.
 2   Q.   Do you know if anyone else with respect to this
 3        case has written anything down in notes or any
 4        other documents?
 5   A.   On the advice of counsel, I exercise my Fifth
 6        Amendment.
 7   Q.   Have you seen any writings or notes or
 8        documents regarding this incident other than
 9        what's been marked as Exhibit 1?
10   A.   On the advice of counsel, I exercise my Fifth
11        Amendment.
12   Q.   On September 8, 2002, Ms. DaRosa, were you
13        involved in a shooting on Cushing Avenue?
14   A.   On the advice of counsel, I exercise the Fifth
15        Amendment.
16   Q.   On September 8, 2002, did you see a shooting
17        take place on Cushing and Jerome Avenue in
18        Roxbury?
19   A.   On the advice of counsel, I exercise the Fifth
20        Amendment.
21   Q.   Did you observe Brima Wurie leave the scene of
22        a shooting that took place on Cushing Avenue in
23        Roxbury?
24   A.   On the advice of counsel, I exercise the Fifth
```

104

```
 1        Amendment.
 2   Q.   Did you participate in any shooting that took
 3        place on Cushing Avenue in Roxbury on September
 4        8, 2002?
 5   A.   On the advice of counsel, I exercise my Fifth
 6        Amendment.
 7   Q.   Were you in a vehicle that left the scene of a
 8        shooting that took place on Cushing Avenue on
 9        September 8, 2002?
10   A.   Under advice of counsel, I exercise my Fifth
11        Amendment
12   Q.   Please identify all of the individuals who
13        witnessed any shooting that took place on
14        Cushing Avenue on September 8, 2002?
15   A.   On the advice of counsel, I exercise my Fifth
16        Amendment.
17   Q.   Who was the target of the shooting that took
18        place on September 8, 2002?
19   A.   On the advice of counsel, I exercise my Fifth
20        Amendment.
21   Q.   Was anyone shot on Cushing Avenue on September
22        8, 2002?
23   A.   On the advice of counsel, I exercise my Fifth
24        Amendment.
```

105

```
 1   Q.   Was the vehicle in which you were traveling in
 2        struck with any bullets on Cushing Avenue on
 3        September 8, 2002?
 4   A.   On the advice of counsel, I exercise my Fifth
 5        Amendment.
 6   Q.   Was the vehicle in which you were traveling in
 7        struck with any bullets at any time on
 8        September 8, 2002?
 9   A.   On the advice of counsel, I exercise my Fifth
10        Amendment.
11   Q.   At any point has Louis Anjos discussed the
12        incident of September 8, 2002, with you?
13   A.   On the advice of counsel, I exercise my Fifth
14        Amendment.
15   Q.   Have you ever spoken to Louis Anjos about the
16        incident on September 8, 2002?
17   A.   On the advice of counsel, I exercise my Fifth
18        Amendment.
19   Q.   Were any homes struck with bullets during the
20        incident on September 8, 2002?
21   A.   On the advice of counsel, I exercise my Fifth
22        Amendment.
23   Q.   Did you observe any vehicles struck on
24        September 8, 2002, by any bullets?
```

106

```
 1   A.   On the advice of counsel, I exercise my Fifth
 2        Amendment.
 3   Q.   Did you observe anyone get struck with a bullet
 4        on September 8, 2002?
 5   A.   On the advice of counsel, I exercise my Fifth
 6        Amendment.
 7   Q.   Did you observe whether Eveline Barros-Cepeda
 8        was in possession of any marijuana on September
 9        8, 2002?
10   A.   On the advice of counsel, I exercise my Fifth
11        Amendment.
12   Q.   Did you observe whether anyone in the vehicle
13        you were traveling in was in the possession of
14        any drugs on September 8, 2002?
15   A.   On the advice of counsel, I exercise my Fifth
16        Amendment.
17   Q.   Do you recall what speed the vehicle you were
18        traveling was on Cushing Avenue on September 8,
19        2002?
20   A.   On the advice of counsel, I exercise my Fifth
21        Amendment.
22   Q.   Do you recall what speed the vehicle was
23        traveling at at any time on September 8, 2002?
24   A.   On the advice of counsel, I exercise my Fifth
```

107

1       Amendment.

2   Q.  Did you observe the vehicle you were traveling

3       in accelerate prior to striking the officer on

4       September 8, 2002?

5   A.  On the advice of counsel, I exercise my Fifth

6       Amendment.

7   Q.  Do you recall what speed the vehicle you were

8       traveling in was -- strike that.

9           Do you recall what speed the vehicle

10      you were traveling in was traveling on Hancock

11      Street?

12  A.  On the advice of counsel, I exercise my Fifth

13      Amendment.

14  Q.  And what point did you observe a police cruiser

15      behind the vehicle you were traveling in on

16      September 8, 2002?

17  A.  On the advice of counsel, I exercise my Fifth

18      Amendment.

19  Q.  Who was sitting in the front seat of the

20      vehicle on September 8, 2002?

21  A.  On the advice of counsel, I exercise my Fifth

22      Amendment.

23  Q.  Who, if anyone, was sitting in the rear of the

24      vehicle on September 8, 2002?

108

```
 1  A.  On the advice of counsel, I exercise my Fifth
 2      Amendment.
 3  Q.  Who's sitting in the -- strike that.
 4              Who, if anyone, was sitting in the
 5      middle of the back seat on September 8, 2002?
 6  A.  On the advice of counsel, I exercise my Fifth
 7      Amendment.
 8  Q.  Who, if anyone, was sitting in the right rear
 9      seat of the vehicle you were traveling on
10      September 8, 2002, behind the front seat
11      passenger?
12  A.  On the advice of counsel, I exercise my Fifth
13      Amendment.
14  Q.  At what speed was the vehicle you were
15      traveling in traveling at on Dunkeld Street on
16      September 8, 2002?
17  A.  On the advice of counsel, I exercise my Fifth
18      Amendment.
19  Q.  Do you recall the vehicle you were traveling in
20      turning onto Dunkeld Street on September 8,
21      2002?
22  A.  On the advice of counsel, I exercise my Fifth
23      Amendment.
24  Q.  At any time prior to turning onto Dunkeld
```

109

```
 1       Street, did the vehicle you were traveling in
 2       come to a stop?
 3   A.  On the advice of counsel, I exercise my Fifth
 4       Amendment.
 5   Q.  At any time prior to turning onto Dunkeld
 6       Street, did the vehicle you were traveling in
 7       encounter a police officer motioning for the
 8       vehicle to stop?
 9   A.  On the advice of counsel, I exercise my Fifth
10       Amendment.
11   Q.  What was the police officer doing in front of
12       the vehicle you were traveling in?
13   A.  On the advice of counsel, I exercise my Fifth
14       Amendment.
15   Q.  What part of the vehicle struck the police
16       officer on September 8, 2002?
17   A.  On the advice of counsel, I exercise my Fifth
18       Amendment.
19   Q.  Where were you seated in the vehicle?
20   A.  On the advice of counsel, I exercise my Fifth
21       Amendment.
22   Q.  Where were any of the other passengers inside
23       the vehicle seated?
24   A.  On the advice of counsel, I exercise my Fifth
```

110

```
 1         Amendment.
 2    Q.   Did you hear any shots strike the vehicle you
 3         were traveling in on September 8, 2002?
 4    A.   On the advice of counsel, I exercise my Fifth
 5         Amendment.
 6    Q.   Who was seated next to you in the vehicle when
 7         you heard gunshots on September 8, 2002?
 8    A.   On the advice of counsel, I exercise my Fifth
 9         Amendment.
10    Q.   What were you doing when you heard gunshots on
11         September 8, 2002?
12    A.   On the advice of counsel, I exercise my Fifth
13         Amendment.
14    Q.   What did you do in response to hearing gunshots
15         on September 8, 2002?
16    A.   On the advice of counsel, I exercise my Fifth
17         Amendment.
18    Q.   Were you able to see outside the windows of the
19         vehicle when you heard the gunshots?
20    A.   On the advice of counsel, I exercise my Fifth
21         Amendment.
22    Q.   What were you looking at when you heard the
23         gunshots?
24    A.   On the advice of counsel, I exercise my Fifth
```

111

```
 1        Amendment.
 2   Q.   What were the other passengers in the vehicle
 3        doing when you heard gunshots?
 4   A.   On the advice of counsel, I exercise my Fifth
 5        Amendment.
 6   Q.   What positions were they in when you heard the
 7        gunshots?
 8   A.   On the advice of counsel, I exercise my Fifth
 9        Amendment.
10   Q.   What was Eveline Barros-Cepeda doing when you
11        heard gunshots?
12   A.   On the advice of counsel, I exercise my Fifth
13        Amendment.
14   Q.   Where was Ms. Barros-Cepeda seated when you
15        heard the gunshots?
16   A.   On the advice of counsel, I exercise my Fifth
17        Amendment.
18   Q.   Was she crouching down when you heard gunshots?
19   A.   On the advice of counsel, I exercise my Fifth
20        Amendment.
21   Q.   What was Carlos Fernandes doing when you heard
22        gunshots?
23   A.   On the advice of counsel, I exercise my Fifth
24        Amendment.
```

112

```
 1   Q.   Where was Carlos Fernandes seated when you
 2        heard gunshots?
 3   A.   On the advice of counsel, I exercise my Fifth
 4        Amendment.
 5   Q.   Was Carlos Fernandes crouching down when you
 6        heard gunshots?
 7   A.   On the advice of counsel, I exercise my Fifth
 8        Amendment.
 9   Q.   Was Brima Wurie crouching down when you heard
10        gunshots?
11   A.   On the advice of counsel, I exercise my Fifth
12        Amendment.
13   Q.   Was Carlos Fernandes able to see outside the
14        windows of the vehicle when you heard the
15        gunshots?
16   A.   On the advice of counsel, I exercise my Fifth
17        Amendment.
18   Q.   Where was Brima Wurie seated in the vehicle
19        when you heard the gunshots?
20   A.   On the advice of counsel, I exercise my Fifth
21        Amendment.
22   Q.   Was Brima Wurie crouching down when you heard
23        gunshots?
24   A.   On the advice of counsel, I exercise my Fifth
```

113

```
 1          Amendment.
 2     Q.   Was Brima Wurie looking out the windows of the
 3          vehicle when you heard the gunshot?
 4     A.   On the advice of counsel, I plead the -- I
 5          exercise my Fifth Amendment.
 6     Q.   At any time did the Ford Taurus accelerate
 7          after you heard gunshots?
 8     A.   On the advice of counsel, I exercise my Fifth
 9          Amendment.
10     Q.   What did you do after the vehicle was struck
11          with bullets?
12     A.   On the advice of counsel, I exercise my Fifth
13          Amendment.
14     Q.   Did you exit the vehicle?
15     A.   On the advice of counsel, I exercise my Fifth
16          Amendment.
17     Q.   Did you speak with Brima Wurie on September 8,
18          2002, after the incident?
19     A.   On the advice of counsel, I exercise my Fifth
20          Amendment.
21     Q.   Did you speak to Brima Wurie after the incident
22          on September 8, 2002?
23     A.   On the advice of counsel, I exercise my Fifth
24          Amendment.
```

114

```
1   Q.   Do you know where Brima Wurie went after the
2        incident on September 8, 2002?
3   A.   Under advice of counsel, I exercise my Fifth
4        Amendment.
5   Q.   Do you know where Carlos Fernandes went after
6        the incident on September 8, 2002?
7   A.   On the advice of counsel, I exercise my Fifth
8        Amendment.
9   Q.   Do you know where Luis Carvalho went after the
10       incident on September 8, 2002?
11  A.   On the advice of counsel, I exercise my Fifth
12       Amendment.
13  Q.   Who was the first person you spoke to about the
14       incident on September 8, 2002?
15  A.   Under advice of counsel, I exercise my Fifth
16       Amendment.
17  Q.   Did you participate in any peace march that was
18       held after the death of Eveline Barros-Cepeda?
19  A.   Yes.
20  Q.   When did you do that?
21  A.   Shortly after she passed.  A couple of days.
22  Q.   Who organized that?
23  A.   How do you organize it?
24  Q.   No.  Who organized it?
```

115

```
 1   A.   One of our family members.

 2   Q.   Who was that?

 3   A.   Antonio Nunes.

 4   Q.   Why was the peace march organized?

 5   A.   I'm not -- well, at the time -- can I -- I'm

 6        not sure.

 7   Q.   You're not sure why a peace march was organized

 8        for your cousin?

 9   A.   I'm not the one that organized it.  I'm not

10        sure.

11   Q.   Did you walk on her behalf?

12   A.   Yes.

13   Q.   During that peace march?

14   A.   Yes.

15   Q.   Who participated in the peace march?

16   A.   The whole family, everyone.

17   Q.   Did Carlos Cepeda participate in the peace

18        march?

19   A.   I'm not sure.

20   Q.   Did her son participate in the peace march?

21   A.   I believe so.

22   Q.   What do you know about her son?

23   A.   He's a great kid.

24   Q.   Do you have a lot of contact with him?
```

116

```
1   A.   Yes.

2   Q.   And how often do you see him?

3   A.   A few times a week.

4   Q.   Do you know who told your nephew -- strike

5        that.

6               Do you know who told Eveline's son

7        about his mother?

8   A.   Not sure.

9   Q.   Do you know what he was told about his mother?

10  A.   Not sure.

11  Q.   Did you see him immediately after Eveline

12       Barros-Cepeda passed away?

13  A.   Yes.

14  Q.   And do you know when he was told about his

15       mother?

16  A.   No.

17  Q.   Do you know how he was doing after his mother

18       died?

19  A.   Yes.

20  Q.   How was he doing?

21  A.   Doing good.  He was okay.

22  Q.   He was only two at the time?

23  A.   Yes.

24  Q.   At the time Eveline passed away, her son did
```

117

```
 1       not see his father often?
 2   A.  No.
 3   Q.  His father didn't have a role in his
 4       caretaking?
 5   A.  Not really.
 6   Q.  Nazee is Eveline's son?
 7   A.  Yes.
 8   Q.  And his grandmother, Domingas DePina, cared for
 9       her grandson?
10   A.  Yes.
11   Q.  So primarily it was at the time of Eveline's
12       death Domingas DePina and Eveline caring for
13       Nazee; is that correct?
14   A.  Correct.
15   Q.  Currently Nazee's being cared for by Domingas
16       DePina?
17   A.  Yes.
18   Q.  Do you know if Nazee sees his father?
19   A.  Yes.
20   Q.  Do you know how often he sees his father?
21   A.  Once a week.
22   Q.  Do you know how that goes?
23   A.  Every Friday.
24   Q.  How would you describe their relationship?
```

118

```
 1   A.   I can't describe it.  I'm not around his

 2        father.

 3   Q.   Do you know what Nazee knows about the death of

 4        his mother?

 5   A.   No, I never asked him.

 6   Q.   Do you know if there was a custody dispute

 7        between Mr. Cepeda and Domingas DePina?

 8   A.   Yes.

 9   Q.   Can you describe for me what you know about

10        that?

11   A.   Yes.  They was going through custody of the

12        child, but I don't know what he did on his

13        part.  I don't know really much about it, but I

14        know that she won custody of the child.  But I

15        didn't get details of why and how.

16   Q.   Did you ever testify in family court?

17   A.   No.

18   Q.   Do you know if anybody else did testify?

19   A.   Not sure.

20   Q.   Did you know if Carlos Cepeda had any

21        involvement with the peace march after

22        September 8, 2002?

23   A.   No.

24   Q.   No, you don't know, or, no, he did not?
```

119

```
 1   A.   No, I don't know.

 2   Q.   Do you know if Carlos Cepeda had any

 3        involvement in the funeral arrangements for

 4        Eveline Barros-Cepeda?

 5   A.   No, he didn't.

 6   Q.   How do you know that?

 7   A.   Because the family would have said something.

 8        There was another young gentleman that helped

 9        out with the funeral that was a friend.

10   Q.   And that was Antonio Nunes?

11   A.   No, no, no.

12   Q.   Who was that?

13   A.   I think his first name is Moses.  He helped out

14        with -- I don't know his full name.

15   Q.   Why did he help out?

16   A.   Because he was a good friend of Eveline's, I

17        guess.  She used to date him back then, but she

18        was a good friend -- he was a good friend of

19        the mom.  So he came and helped out with --

20        like gave some money towards the funeral.  He

21        helped out.

22   Q.   So Moses was also dating Eveline at the time?

23   A.   No, not at the time.  This was a while ago.

24        I'm just saying at the time -- he was dating --
```

120

```
 1        this was way before any of this.
 2   Q.   I see.
 3   A.   But he was a good friend of her mom, and he
 4        came by and helped out with the funeral.
 5        That's the only person that I know.
 6   Q.   Financially?
 7   A.   Financially, yeah.
 8   Q.   Did he also participate in the peace march?
 9   A.   Not sure.
10   Q.   How many people were at the peace march?
11   A.   Hundreds.
12   Q.   And you don't know if Carlos Cepeda was there
13        at the peace march?
14   A.   No.
15   Q.   You don't know, or, no, he was not?
16   A.   I don't know.
17   Q.   Do you know if Brima Wurie was ever the member
18        of a gang?
19   A.   On the advice of counsel, I exercise my Fifth
20        Amendment.
21   Q.   Do you know if Carlos Fernandes was ever the
22        member of any gang?
23   A.   On the advice of counsel, I exercise my Fifth
24        Amendment.
```

121

```
 1   Q.   Do you know if Luis Carvalho was ever a member
 2        of any gang?
 3   A.   On the advice of counsel, I exercise my Fifth
 4        Amendment.
 5   Q.   Do you know if Eveline Barros-Cepeda was ever a
 6        member of any gang?
 7   A.   On the advice of counsel, I exercise my Fifth
 8        Amendment.
 9   Q.   Were you ever a member of any gang?
10   A.   No.
11   Q.   Have you ever been involved in any gang
12        activity?
13   A.   No.
14   Q.   Do you know if Eveline Barros-Cepeda was ever
15        involved in any gang activity?
16   A.   No, not that I know of.
17   Q.   Did you ever take part in any way in any
18        investigation into the death of Eveline Barros-
19        Cepeda?
20   A.   On the advice of counsel, I exercise my Fifth
21        Amendment.
22   Q.   Are you aware of any investigation into the
23        shooting that occurred on Cushing Avenue on
24        September 8, 2002, prior to the death of
```

122

```
 1        Eveline Barros-Cepeda?
 2   A.   On the advice of counsel, I exercise my Fifth
 3        Amendment.
 4   Q.   Were you involved in any way into any
 5        investigation into the shooting that took place
 6        on Cushing Avenue on September 8, 2002?
 7   A.   On the advice of counsel, I exercise my Fifth
 8        Amendment.
 9   Q.   Do you know a Dana Grant?
10   A.   No.
11   Q.   Have you ever heard of a Dana Grant?
12   A.   No.
13   Q.   Did you ever speak with a Dana Grant as part of
14        this case?
15   A.   No.
16   Q.   Did you ever speak with any investigator
17        regarding this case?
18   A.   On the advice of counsel, I exercise my Fifth
19        Amendment.
20   Q.   Have you ever spoken with any other attorney
21        other than Mr. Masferrer?
22   A.   On the advice of counsel, I exercise my Fifth
23        Amendment.
24   Q.   Were you dating anyone in the vehicle on
```

123

```
 1        September 8, 2002?
 2    A.  On the advice of counsel, I exercise my Fifth
 3        Amendment.
 4                 MS. LITSAS:  Can we go off the
 5        record.
 6                 (Recess taken.)
 7    Q.  (By Ms. Litsas)  You stated Eveline was not
 8        working at the time of the incident?
 9    A.  Not sure.
10    Q.  Do you know how she was supporting herself
11        financially?
12    A.  Not sure.
13    Q.  Do you remember the last thing that you said to
14        her was?
15    A.  On the advice of my attorney, I exercise my
16        Fifth Amendment.
17    Q.  When was the last time you saw Eveline alive?
18    A.  On the advice my attorney, I exercise my Fifth
19        Amendment.
20    Q.  How would you describe your relationship with
21        Domingas DePina?
22    A.  We have a good relationship.
23    Q.  She's your aunt?
24    A.  Yes.
```

124

```
 1   Q.   You're very close?

 2   A.   Yes.

 3   Q.   You spend holidays together?

 4   A.   Yes.

 5   Q.   You spend birthdays together?

 6   A.   Yes.

 7   Q.   Christmases?

 8   A.   Yes, every holiday.

 9   Q.   Do you know a Manny Pires, P-I-R-E-S?

10             MR. MASFERRER:  Are you referring to

11        the attorney?

12             MS. LITSAS:  Yes.

13   A.   Yes.

14   Q.   He was your attorney at one point?

15   A.   I believe so.

16   Q.   And you know who Andrew Stockwell-Alpert was --

17        is?

18   A.   I believe so.

19   Q.   And he was your attorney at one point?

20   A.   I believe so.

21   Q.   What about Jim McCall?  Do you know him?

22   A.   No.

23   Q.   What about Bill Keefe?

24   A.   No.
```

125

```
 1   Q.   William Keefe?

 2   A.   No.

 3   Q.   Did you give any interview to the internal

 4        affairs division of the Boston Police

 5        Department?

 6   A.   No.

 7   Q.   Did you give any statements to anybody about

 8        the incident?

 9   A.   On the advice of my counsel, I exercise the

10        Fifth Amendment.

11   Q.   Who went with you to the grand jury

12        proceedings?

13   A.   On the advice of my counsel, I exercise the

14        Fifth Amendment.

15   Q.   Did you give any other testimony other than

16        testimony here today and at the grand jury

17        proceedings regarding this incident on

18        September 8, 2002?

19   A.   No.

20   Q.   Do you know if Eveline Barros-Cepeda was ever

21        charged with a crime?

22   A.   Yes.

23   Q.   Do you know what she was charged with?

24   A.   The same -- when I was telling you about
```

126

```
 1      earlier.

 2  Q.  Assault and battery with a shod foot?

 3  A.  Yes.

 4  Q.  Was she with you at the time of the incident?

 5  A.  Yes.

 6  Q.  What did that incident involve?

 7  A.  It was a fight.

 8  Q.  With another woman?

 9  A.  Mm-hmm.

10  Q.  What was it about?

11  A.  Not too sure.  We just -- two girls that never

12      really liked each other.

13  Q.  Was anyone injured in the incident?

14  A.  Yes.

15  Q.  Who was injured?

16  A.  A municipal police officer.

17  Q.  A municipal --

18  A.  A municipal officer.

19  Q.  Was that the target of the fight, or was the

20      police officer injured as a result of trying to

21      separate?

22  A.  Trying to separate.

23  Q.  I see.  Do you know if there was any other

24      crimes that Eveline Barros-Cepeda was convicted
```

127

```
 1      of?
 2  A.  No.
 3  Q.  Do you know if she was a U.S. citizen?
 4  A.  No.
 5  Q.  At the time -- subsequent to the incident, you
 6      retained an attorney, correct?
 7  A.  Yes.
 8  Q.  Why did you do that?
 9  A.  On the advice of my counsel, I exercise the
10      Fifth Amendment.
11  Q.  At that point approximately -- you retained an
12      attorney about a month after the incident or
13      was it before that?
14  A.  Don't remember.
15  Q.  You decided not to be interviewed by the Boston
16      Police Department with respect to the
17      investigation; is that correct?
18  A.  On the advice of counsel, I exercise my Fifth
19      Amendment.
20  Q.  Why is that?
21  A.  On the advice of counsel, I exercise my Fifth
22      Amendment.
23  Q.  Were you ever charged with resisting arrest?
24  A.  I believe so, yes.
```

128

```
 1   Q.   Were you ever charged with any other crimes?

 2   A.   I probably have, but I don't remember.

 3              MS. LITSAS:  Can you mark this as the

 4        next exhibit, please.

 5              (Boston Police Department Homicide

 6              Unit Investigation Report marked

 7              Deposition Exhibit No. 2.)

 8              MS. LITSAS:  So then this will be the

 9        next one and then the next one.

10              (Memo to Sergeant Detective Wyse from

11              Detective Primm marked Deposition

12              Exhibit No. 3.)

13              (Memo from Detective Russell Grant to

14              File marked Deposition Exhibit

15              No. 4.)

16              (Digital Color Photo marked

17              Deposition Exhibit No. 5.)

18   Q.   (By Ms. Litsas)  I'm showing you what's been

19        marked as Exhibit 2.  Can you just take a

20        moment to review it.

21   A.   (Witness complies.)

22              MR. MASFERRER:  Okay.

23   Q.   Have you ever seen that document, what's been

24        marked as Exhibit 2 before?
```

129

```
 1   A.   No.
 2   Q.   Do you recognize what that document is?
 3   A.   On the advice of counsel, I exercise my Fifth
 4        Amendment.
 5             MS. LITSAS:  For the record, the
 6        document is entitled, Exhibit 2, "Boston Police
 7        Department Homicide Unit Investigation Report."
 8        In the "RE" line, it says, "Interview of Maria
 9        DaRosa."
10   Q.   Would you agree with me that this document
11        represents to be a summary of an interview you
12        gave on the night of the incident, September 8,
13        2002?
14   A.   On the advice of counsel, I exercise my Fifth
15        Amendment.
16   Q.   You've had an opportunity to read Exhibit 2?
17   A.   Yes.
18   Q.   And on Exhibit 2 it states that September 8th
19        at approximately 6:45 a.m. Detective Michael
20        Devane and Sergeant Detective Timothy Duggan
21        went to the Boston Medical Center to interview
22        Maria DaRosa regarding the police-involved
23        shooting which took place earlier that morning.
24             Do you recall meeting with Detective
```

130

```
 1        Devane and Detective Duggan on the morning of
 2        September 8, 2002?
 3    A.  On the advice of counsel, I exercise my Fifth
 4        Amendment.
 5    Q.  Do you recall going to the Boston Medical
 6        Center after the incident on September 8, 2002?
 7    A.  On the advice of counsel, I exercise my Fifth
 8        Amendment.
 9    Q.  Why did you go to the Boston Medical Center on
10        September 8, 2002?
11    A.  On the advice of counsel, I exercise my Fifth
12        Amendment.
13    Q.  Do you recall receiving treatment in the
14        emergency room on September 8, 2002?
15    A.  On the advice of counsel, I exercise my Fifth
16        Amendment.
17    Q.  Do you recall exiting your vehicle by jumping
18        out of the vehicle on September 8, 2002?
19    A.  On the advice of counsel, I exercise my Fifth
20        Amendment.
21    Q.  Do you recall Detective Devane and Duggan
22        introducing themselves and Detective Duggan
23        asking you if you could -- if they could speak
24        with you?
```

131

```
 1    A.    On the advice of counsel, I exercise my Fifth
 2          Amendment.
 3    Q.    Do you recall stating during this interview
 4          that you were riding in the back seat of your
 5          aunt's car, a white Ford Taurus, with your
 6          cousins Eveline Cepeda and Luis Carvalho?  Do
 7          you recall making that statement?
 8    A.    On the advice of counsel, I exercise my Fifth
 9          Amendment.
10    Q.    Do you recall making the statement that you
11          were seated behind the driver's seat with
12          Eveline in the middle and Luis on the other
13          side behind the front seat passenger on
14          September 8, 2002?
15    A.    On the advice of counsel, I exercise my Fifth
16          Amendment.
17    Q.    Do you recall stating that the driver of the
18          vehicle was a black male who you identified as
19          an A.J.?
20    A.    On the advice of counsel, I exercise my Fifth
21          Amendment.
22    Q.    Do you recall stating that the front seat
23          passenger was an individual named Carlos?
24    A.    On the advice of counsel, I exercise my Fifth
```

132

```
 1          Amendment.
 2    Q.    Do you recall stating that you did not know
 3          their last names or where they lived but that
 4          you had met those individuals during the last
 5          week?
 6    A.    On the advice of counsel, I exercise my Fifth
 7          Amendment.
 8    Q.    Do you recall stating that the car belonged to
 9          your -- to Eveline Barros-Cepeda's mother?
10    A.    On the advice of counsel, I exercise my Fifth
11          Amendment.
12    Q.    Did the car belong to Eveline Barros-Cepeda's
13          mother, Domingas DePina?
14    A.    On the advice of counsel, I exercise my Fifth
15          Amendment.
16    Q.    Do you recall stating that you were driving the
17          vehicle before you met up with A.J. and Carlos
18          on Hamilton Street?
19    A.    On the advice of counsel, I exercise my Fifth
20          Amendment.
21    Q.    Do you recall stating that after you met with
22          these two individuals, A.J. and Carlos, you got
23          in the back seat with Eveline and Luis
24          Carvalho?
```

133

```
 1   A.   On the advice of counsel, I exercise my Fifth
 2        Amendment.
 3   Q.   Do you recall stating that you saw the police
 4        car behind your car on Columbia Road and that
 5        you knew the police wanted you to stop?
 6   A.   On the advice of counsel, I exercise my Fifth
 7        Amendment.
 8   Q.   Do you recall stating that you did not know why
 9        A.J. wouldn't stop?
10   A.   On the advice of counsel, I exercise my Fifth
11        Amendment.
12   Q.   Do you recall stating that you turned onto a
13        side street off Quincy Street and that there
14        was a police cruiser parked at the top of the
15        street?
16   A.   On the advice of counsel, I exercise my Fifth
17        Amendment.
18   Q.   Do you recall stating that you saw a police
19        officer waving his arms to get you to stop?
20   A.   On the advice of counsel, I exercise my Fifth
21        Amendment.
22   Q.   Do you recall stating that you heard the police
23        officer yelling but that you didn't know what
24        they were saying?
```

134

```
1   A.   On the advice of counsel, I exercise my Fifth
2        Amendment.
3   Q.   Do you recall stating that you did not see the
4        car you were riding in hit the police officer?
5   A.   On the advice of counsel, I exercise my Fifth
6        Amendment.
7   Q.   Do you recall stating that you heard several
8        gunshots and then you heard your cousin groan
9        and make a statement?
10  A.   On the advice of counsel, I exercise my Fifth
11       Amendment.
12  Q.   Do you recall Eveline Barros-Cepeda saying "Oh,
13       shit" on September 8, 2002?
14  A.   On the advice of counsel, I exercise my Fifth
15       Amendment.
16  Q.   Do you recall stating that at that point after
17       you heard Eveline Barros-Cepeda make the
18       statement "Oh, shit" that you jumped out of the
19       moving vehicle?
20  A.   On the advice of counsel, I exercise my Fifth
21       Amendment.
22  Q.   Do you recall -- strike that.
23            I'm showing you what's been marked as
24       Exhibit 3.  Have you ever seen that document
```

135

```
1        before?

2    A.  No.

3    Q.  Can you just take a moment to review it,

4        please.

5    A.  (Witness complies.)

6    Q.  You've never seen that document before?

7    A.  No.

8    Q.  What's been marked as Exhibit 3?

9    A.  Yes.

10   Q.  So you've never seen Exhibit 3 before?

11   A.  No.

12   Q.  Do you recall the detectives involved in the

13       investigation of the shooting on September 8,

14       2002, attempting to contact you during that

15       week after the incident?

16   A.  On the advice of my counsel, I exercise my

17       Fifth Amendment.

18   Q.  Do you recall these detectives attempting to

19       contact you repeatedly regarding the

20       investigation on September 8, 2002?

21           MR. MASFERRER:  Ms. DaRosa's answer

22       to every question regarding that document and

23       anything contained within that document will be

24       on the advice of counsel, she refuses to answer
```

136

```
 1        it under her Fifth Amendment right.

 2              MS. LITSAS:  Okay.  I'll still ask

 3        them.

 4              MR. MASFERRER:  Then we're going to

 5        have to continue the deposition.

 6              MS. LITSAS:  Why?

 7              MR. MASFERRER:  You said 10 or 15

 8        more minutes when you took the break.  You

 9        said, I had five or ten minutes when you took

10        the break --

11              MS. LITSAS:  Can we go off the

12        record.

13              (A discussion was held off the

14        record.)

15   Q.   (By Ms. Litsas)  Ms. DaRosa, do you recall

16        refusing to answer any questions about the

17        investigation of September 8, 2002?

18   A.   On the advice of my counsel, I exercise my

19        Fifth Amendment.

20   Q.   Is the answer to any questions I will ask you

21        about Exhibit 3 that you are going to assert

22        your Fifth Amendment?

23   A.   Yes.

24   Q.   I'm showing you what's been marked as Exhibit
```

137

```
 1        4.  Have you seen that document before?
 2   A.   No.
 3   Q.   Will you just take a moment to review it
 4        please.
 5   A.   (Witness complies.)
 6   Q.   You've never seen Exhibit 4 before?
 7   A.   No.
 8   Q.   Do you recall giving an interview to Detective
 9        Russell Grant regarding the incident on
10        September 8, 2002, at 4:50 in the morning on
11        September 8, 2002?
12   A.   On the advice of counsel, I exercise my Fifth
13        Amendment.
14             MR. MASFERRER:  Off the record for a
15        second.
16             (Off the record.)
17             MS. LITSAS:  Just for the record,
18        Mr. Masferrer consulted with his client,
19        Ms. DaRosa.
20   Q.   (By Ms. Litsas)  Ms. DaRosa, do you recall
21        having stomach cramps on September 8, 2002?
22   A.   On the advice of my counsel, I exercise the
23        Fifth Amendment on all questions pertaining to
24        Exhibit 3.
```

138

```
 1   Q.   On September 8, 2002, do you recall bending
 2        over the back seat of the vehicle you were
 3        traveling in because of stomach cramps?
 4   A.   Under advice of counsel, I exercise my Fifth
 5        Amendment.
 6   Q.   Do you recall stating, Ms. DaRosa, that on
 7        September 8, 2002, you did not remember what
 8        happened before you jumped out of the vehicle
 9        on September 8, 2002?
10   A.   On the advice of counsel, I exercise my Fifth
11        Amendment.
12   Q.   Do you recall stating that during the interview
13        on September 8, 2002, you cannot recall the
14        events that occurred prior to the police
15        pursuit of your vehicle?
16   A.   On the advice of my counsel, I plead the Fifth
17        Amendment.
18   Q.   Do you recall meeting with a Detective Russell
19        Grant at any point on September 8, 2002?
20   A.   On the advice of counsel, I exercise my Fifth
21        Amendment.
22             THE WITNESS:  Are we off?
23             (Reporter responds.)
24             MS. LITSAS:  We're off the record.
```

139

```
 1                (Off the record.)
 2   Q.   (By Ms. Litsas)  Ms. DaRosa, do you know why
 3        the estate of Domingas -- strike that.
 4                Do you know why the estate of Eveline
 5        Barros-Cepeda brought this lawsuit?
 6   A.   On the advice of my counsel, I exercise my
 7        Fifth Amendment.
 8   Q.   Is there anything else, Ms. DaRosa, that I have
 9        not asked you that you think would be important
10        for me to know?
11   A.   No.
12                MS. LITSAS:  I have no further
13        questions.  I will suspend the deposition to
14        evaluate a motion to compel.  Thank you.
15                That's it.
16                MR. MASFERRER:  So you're not
17        considering it over?  You want to suspend it?
18                (Reporter interruption.)
19                MS. LITSAS:  No, we're off the
20        record.
21                (Off the record.)
22                MR. MASFERRER:  Can you go on the
23        record.
24                I'd object to suspending the
```

140

```
 1        deposition.  Ms. DaRosa has answered the
 2        questions.  If there is something further
 3        that's needed, you can let me know.  But for
 4        our purposes the deposition is completed.
 5                MS. LITSAS:  Again, we will suspend
 6        today's deposition to evaluate whether we will
 7        pursue a motion to compel.
 8                MR. MASFERRER:  Until when?  You
 9        suspended it until when?  You want to resume it
10        tomorrow or the next day or when?
11                MS. LITSAS:  Can we go off the
12        record.
13                (Whereupon, the deposition suspended
14        at 4:20 p.m.)
15
16
17
18
19
20
21
22
23
24
```

141

```
1              ERRATA SHEET DISTRIBUTION INFORMATION
2          DEPONENT'S ERRATA AND SIGNATURE INSTRUCTIONS
3
4              ERRATA SHEET DISTRIBUTION INFORMATION
5                      The original of the Errata Sheet has
6       been delivered to G&M Court Reporters.
7                      When the Errata Sheet has been
8       completed by the deponent and signed, a copy thereof
9       should be delivered to each party of record and the
10      ORIGINAL delivered to Helen G. Litsas, Esq. to whom
11      the original deposition transcript was delivered.
12
13                     INSTRUCTION TO DEPONENT
14                     After reading this volume of your
15      deposition, indicate any corrections or changes to
16      your testimony and the reasons therefor on the
17      Errata Sheet supplied to you and sign it.  DO NOT
18      make marks or notations on the transcript volume
19      itself.
20
21
22        REPLACE THIS PAGE OF THE TRANSCRIPT WITH THE
23        COMPLETED AND SIGNED ERRATA SHEET WHEN RECEIVED.
24
```

142

```
 1        ATTACH TO THE DEPOSITION OF MARIA DaROSA

 2          CASE: DANCY-STEWART v. TAYLOR 3/12/08

 3                      ERRATA SHEET

 4   INSTRUCTIONS:  After reading the transcript of your

 5   deposition, note any change or correction to your

 6   testimony and the reason therefor on this sheet.  DO

 7   NOT make any marks or notations on the transcript

 8   volume itself.  Sign and date this Errata Sheet

 9   (before a Notary Public, if required).  Please refer

10   to page 141 for errata sheet distribution

11   instructions:

12   PAGE    LINE    CHANGE          REASON

13   _____

14   _____

15   _____

16   _____

17   _____

18            I have read the foregoing transcript

19   of my deposition and except for any corrections or

20   changes noted above, I hereby subscribe to the

21   transcript as an accurate record of the statements

22   made by me.

23            _____

24            MARIA DaROSA                DATE
```

143

```
 1                 C E R T I F I C A T E

 2   COMMONWEALTH OF MASSACHUSETTS          PLYMOUTH, SS.

 3

 4        I, Marie T. Williams, a Professional Court

 5   Reporter and Notary Public in and for the

 6   Commonwealth of Massachusetts, do hereby certify

 7   that the foregoing deposition of Maria DaRosa was

 8   taken before me on Wednesday, March 12, 2008.  The

 9   said witness was duly sworn before the commencement

10   of her testimony; that the said testimony was taken

11   audiographically by myself and transcribed under my

12   direction.  To the best of my knowledge, the within

13   transcript is a complete, true and accurate record

14   of said deposition.

15        I am not connected by blood or marriage with

16   any of the said parties, nor interested directly or

17   indirectly in the matter at hand.

18        In witness whereof, I have hereunto set my hand

19   and Notary Seal this 27th day of March, 2008.

20

21

22        _____

23        Marie T. Williams, Notary Public

24        My Commission Expires:  April 7, 2011
```