UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
CIVIL ACTION NO. 05-11803-MLW

SHENIA DANCY-STEWART as
Administratrix of the Estate of EVELINE
BARROS-CEPEDA,
        Plaintiffs,

v.

THOMAS TAYLOR, Jr., and the CITY
OF BOSTON,
        Defendants.

DEFENDANT THOMAS TAYLOR'S MEMORANDUM IN SUPPORT OF HIS
MOTION FOR SUMMARY JUDGMENT[1]

I.    INTRODUCTION

The Defendant, Boston Police Officer Thomas Taylor, Jr.("Officer Taylor") should be

granted summary judgment because discovery produced no facts to support actionable claims

against him. In her Third Amended Complaint, the Plaintiff alleges the following against Officer

Taylor: (1) Count I: Violation of 42 U.S.C. § 1983; (2) Count II-Survival Action /Violation of 42

U.S.C. § 1983; (3) Count IV-Wrongful Death/Violation of G.L. c. 229; and (4) Count VI-

Survival Action.  Officer Taylor moves for summary judgment on all counts because the Plaintiff

fails to satisfy the requisite elements of her claims;and because qualified immunity applies.

II.    ARGUMENT

A.    NO GENUINE ISSUE OF MATERIAL FACT EXISTS WITH RESPECT TO
      PLAINTIFF'S CLAIMS.

Pursuant to Fed. R. Civ. P. 56(b), a party against whom a claim is asserted may, at any

time, move for a summary judgment in the party's favor. If the Defendant's "pleadings,

---

[1]    The Defendant, Officer Taylor, hereby incorporates Defendants Thomas Taylor and City of Boston's Local Rule
56.1 Statement Of Facts And Supporting Documentation.

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact," the Defendant is entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56(c); see also Pure Distrib., Inc. v. Baker, 285 F.3d 150 (1st Cir. 2002).  Summary judgment is appropriate when Plaintiff fails to show sufficient evidence to establish an essential element of his case on which he bears the burden of proof.  See Cleveland v. Policy Mgmt. Sys. Corp., 526 U.S. 795, 805-06 (1999).

**B.    BECAUSE NO SEIZURE OF THE *DECEDENT* OCCURRED, OFFICER TAYLOR IS ENTITLED TO SUMMARY JUDGMENT ON COUNT I.**

The Plaintiff has no reasonable expectation of proving the requisite elements of Count I because she failed to adduce any evidence that Officer Taylor intended to specifically seize Eveline Barros-Cepeda, the decedent ("decedent").  In this claim, the Plaintiff alleges that Officer Taylor's actions in shooting at the moving vehicle unreasonably seized the passenger decedent in violation of her rights under the Fourth Amendment.  The Plaintiff, however, has no reasonable expectation of proving this Fourth Amendment claim because the evidence will incontrovertibly establish that the decedent was not "seized" under the Fourth Amendment.

It has long been recognized that the Fourth Amendment prohibits unreasonable seizures and does not generally prohibit all conduct that may be deemed unreasonable, unjustified or outrageous.  See Carter v. Buscher, 973 F.2d 1328, 1332 (7th Cir. 1992).  Therefore, the first step in addressing the Plaintiff's Section 1983 claim predicated on the Fourth Amendment is to ascertain whether there has been a constitutionally cognizable seizure.  See Michigan v. Summers, 452 U.S. 692, 696 (1981).  No such seizure exists here in the case at bar.

In evaluating whether a seizure has occurred, the Supreme Court has astutely recognized that "[t]he writs of assistance that were the principal grievance against which the Fourth Amendment was directed did not involve unintended consequences of government action."

Brower v. County of Inyo, 489 U.S. 593, 596 (1989); see also Landol-Rivera v. Cruz, 906 F.2d 791 (1st. Cir. 2000). The Fourth Amendment is centered on "the 'misuse of power'," not the accidental effects of otherwise lawful government conduct." Brower, supra at 596 (citations omitted). Accordingly, there must be evidence of a willful detention as "this is implicit in the word 'seizure,' which can hardly be applied to an unknowing act." Id. at 596 (citations omitted).

A constitutionally cognizable seizure therefore requires proof of "an intentional acquisition of physical control." Id. at 596. Put another way, not every police officer action that results in a restraint of liberty constitutes an actionable seizure under the Fourth Amendment. Id. at 597. To be actionable, the restraint must be effectuated by means "intentionally applied." Id. As the Brower Court explained,

> It is clear, in other words, that a Fourth Amendment seizure does not occur whenever there is a governmentally caused termination of an individual's freedom of movement (the innocent passerby), nor even whenever there is a governmentally desired termination of an individual's freedom of movement (the fleeing felon), but only when there is a governmental termination of freedom of movement through means *intentionally applied*.

Brower, supra at 596-597.

Applying Brower in a case closely analogous to the case at bar, the First Circuit held that it is an erroneous conclusion that "a law enforcement officer 'seizes' someone by shooting him." See Landol-Rivera v. Cruz, 906 F.2d 791 (1st. Cir. 2000) (omitting citation); see also Tennesee v. Garner, 471 U.S. 1 (1985) (an officer shooting at a moving vehicle does not constitute a constitutional violation per se). The First Circuit also concluded that a seizure under the Fourth Amendment occurs only when there has been an intentional attempt to gain control over *the person who suffered the harm*. Landol-Rivera, supra at 795 (emphasis added).

In Landol, the plaintiff had been taken hostage by a suspect in a fleeing moving vehicle when he was accidentally struck by a bullet fired by the police officers who gave chase. Id. at

792.  When the police officer discharged his firearm on the moving vehicle, the officer, unlike the case at bar, knew that the hostage passenger was seated on the driver suspect's lap.  Id.  In dismissing the plaintiff's Fourth Amendment claim, the First Circuit recognized that the police officer's deliberate act of shooting at the fleeing vehicle was done for the purposes of gaining control over the *felon*, not the plaintiff passenger in the vehicle, and that the plaintiff was therefore not the intended target of the shooting.  Id. (emphasis added).

The Landol court reiterated the Supreme Court's view in Brower that "an intentional acquisition of physical control" is required for Fourth Amendment seizure purposes, and held that the plaintiff passenger had not satisfied this requirement.  Id. at 795 citing Brower, supra at 596 (1989).  The Landol court explained as follows:

> We reject the notion that the 'intention' requirement is met by the deliberateness with which a given action is taken.  A police officer's deliberate decision to shoot at a car containing a robber and a hostage for the purpose of stopping the robber's flight does not result in the sort of willful detention of the hostage that the Fourth Amendment was designed to govern.

Landol, supra at 795.  Thus, in the First Circuit's view, the police officer's deliberate decision to shoot at the moving vehicle did not rise to the level of "willful detention" that the Fourth Amendment requires.  Id.  Additionally, multiple circuits throughout the country have similarly concluded that the Fourth Amendment demands evidence of an intentional physical acquisition of control.[2]

It is undisputed that at the time of the incident, Officer Taylor did not even know that at the time he discharged his firearm at the fleeing vehicle driven by Brima Wurie ("Wurie") on

---

[2]    See Claybrook v. Birchwell, 199 F.3d 350, 355, 359 (6th Cir.2000) (determining that plaintiff, who was struck by errant bullet during police shootout with her father-in-law, was not seized because officers were aiming at her father-in-law and did not realize she was hiding in nearby parked car); Childress v. City of Arapaho, 210 F.3d 1154, 1156-57 (10th Cir.2000) (finding, in hostage shooting case, no Fourth Amendment "seizure" because "[t]he officers intended to restrain the minivan and the fugitives, not [the hostages]"); Medeiros v. O'Connell, 150 F.3d 164, 167-69 (2nd Cir.1998) (holding that where a hostage is struck by an errant bullet, the governing principle is that such consequences cannot form the basis of a Fourth Amendment violation); see also Rucker v. Harford County, 946 F.2d 278, 281 (4th Cir.1991).

September 8, 2002, the decedent was traveling in the Wurie vehicle. L.R. 56.1 SOF ¶ 70. Officer Taylor also did not know that the Wurie vehicle contained any occupants other than the driver. Id. Officer Taylor did know, however, that Wurie had evaded the police cruiser driven by Officer Flaherty and had failed to heed the commands of his partner, Officer Michael Paillant. L.R. 56.1 SOF ¶ 31-50; 51-59. Moreover, Officer Taylor observed Wurie's vehicle strike Officer Paillant and observed Officer Paillant fall to the ground. L.R. 56.1 SOF ¶ 31-50; 59-63. When Officer Taylor then lost sight of Officer Paillant and observed the Wurie vehicle continue to flee, he made every effort to prevent Wurie from causing injury to Officer Paillant and others by discharging his firearm. L.R. 56.1 SOF ¶ 59-68, 71-76.

In doing so, Officer Taylor targeted Wurie only. Id. Even Wurie himself acknowledges that when the police officer discharged his firearm, he aimed at him. Id. The bullets, in fact, caused Wurie's driver's side window to shatter. L.R. 56.1 SOF ¶ 72. Moreover, after Officer Taylor discharged his firearm, Wurie heard bullets pass by his head. L.R. 56.1 SOF ¶ 73. In sum, the summary judgment record incontrovertibly establishes that when Officer Taylor discharged his weapon, he was not attempting to restrain the decedent's freedom, but was attempting only to apprehend Wurie, the driver, and prevent further injury to Officer Paillant and to others.

## C.    OFFICER TAYLOR'S ACTIONS WERE ALSO CONSTITUTIONALLY REASONABLE UNDER THE FOURTH AMENDMENT.

### 1.   Wurie's Actions Posed A Serious Threat of Injury And Death To Paillant.

In determining a seizure's reasonableness, the Court "balances the nature and quality of the intrusion on personal security against the importance of the governmental interests alleged to justify the intrusion." U.S. v. Hensley, 469 U.S. 221, 228 (1985) (omitting citation). The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable

officer on the scene, rather than with the 20/20 vision of hindsight." Graham v. Connor, 490 U.S. 386, 396 (1989). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." Graham, 490 U.S. at 396-397. Moreover, "[b]oth the Supreme Court and the First Circuit have afforded a comparatively generous standard of reasonableness to the police in cases where potential danger, emergency conditions, or other exigent circumstances are present." Medeiros v. Town of Dracut, 21 F.Supp.2d 82, 86 (D. Mass.1998)(omitting citation).

"Because the test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application, ... its proper application requires careful attention to the facts and circumstances of each particular case." Graham, 490 U.S. at 396-397, citing Tennessee v. Garner, 471 U.S. 1, 8-9 (1985). Use of deadly force it is not constitutionally unreasonable "[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." Garner, 471 U.S. at 11. If such probable cause exists, deadly force may be used to either defend the individual threatened or prevent the suspect's escape. Id.

The Supreme Court's recent decision in Scott v. Harris effectively elucidated this point. Scott v. Harris, 127 S.Ct. 1769 (2007). The Scott Court explained, "[D]eadly force may be used 'if necessary to prevent escape' when the suspect is known to have 'committed a crime involving the infliction or *threatened* infliction of serious physical harm,' so that his mere being at large poses an inherent danger to society." Id. (emphasis added). The Court stated further that deadly force is also reasonably employed where the suspect's manner of flight (i.e. reckless use of a vehicle), is dangerous in and of itself, so that it poses a threat of serious physical harm to others.

Scott, 127 S.Ct. at 1777, n.9.  Also considered is the "relative culpability" of the suspect and the officer using deadly force in creating the threat to which that officer is responding.  Id. at 1778.

Additionally, when evaluating the use of deadly force in police shooting cases, the First Circuit applies this reasonableness standard "to surround the police who make these on-the-spot choices in dangerous situations with a fairly *wide zone of protection* in close cases."  Natal v. City of New Bedford, 37 F.Supp.2d 74, 76 (D.  Mass.  1999), citing Roy v. Inhabitants of City of Lewiston, 42 F.3d 691, 695 (1st Cir.1994) (emphasis added).  The First Circuit therefore "do[es] not 'second-guess' officers, even if, in retrospect, a situation could have been handled differently."  Natal, 37 F.Supp.2d  at 76 (omitting citation).

When Officer Taylor used deadly force to stop Wurie's vehicle, Wurie had clearly established that his reckless driving and intention to evade the law at all costs posed a substantial and ongoing threat not only to Officer Paillant, but also to the public.  Officer Taylor was not aware that Wurie had, prior to turning onto Dunkeld Street, already led police on a chase that was extremely lengthy in both time and distance.  L.R. 56.1 SOF ¶ 14.[3]  Officer Taylor also did not know that Wurie's motivation for fleeing from the police included that he was had just been involved in a shooting, had no license, and was on federal parole.  L.R. 56.1 SOF ¶10.  However, what Officer Taylor did know about Wurie's unlawful actions at the time he discharged his firearm establishes that his use of deadly force was more than reasonable in a rapidly unfolding series of events.

At the time of the incident, Officer Taylor, who was located at or near 85 Fayston Street, observed something capture Officer Paillant's attention as Officer Paillant was standing by their cruiser at or near 77 Fayston Street.  L.R. 56.1 SOF ¶ 19-20, 51.  Officer Taylor also heard

---

[3]  In evaluating the probable cause calculus, this information nonetheless can be attributed to Officer Taylor through application of the fellow officer rule even if such information was not communicated to Officer Taylor.  See Burns v. Loranger, 907 F.2d 233, 236 (1st Cir. 1990).

Officer Paillant yelling and putting his hands to signal the Wurie vehicle to stop as it proceeded down Dunkeld Street followed a marked Boston Police cruiser with its lights activated.  L.R. 56.1 SOF 51-59. ¶ Officer Taylor also observed Officer Paillant step into the street, in front of Wurie vehicle, in an effort to aid in the vehicle stop.  L.R. 56.1 SOF ¶ 55.  Then, almost instantaneously, Officer Taylor heard a car engine "rev up" and then noticed Officer Paillant withdraw his firearm.  L.R. 56.1 SOF ¶ 55-56.  Officer Taylor next observed Officer Paillant move his gun in a pumping motion in the direction of the Wurie vehicle.  L.R. 56.1 SOF ¶ 55-57. Officer Taylor then withdrew his firearm and advised the alleged victim with whom he was walking to wait on the sidewalk.  L.R. 56.1 SOF ¶ 55-58.

After unholstering his firearm, Officer Taylor observed the Wurie vehicle travel up Dunkeld Street and strike Officer Paillant head on as Officer Paillant was trying to move to his left (the vehicle's right).  L.R. 56.1 SOF ¶ 59-61.  Taylor then saw Officer Paillant's body move onto the Wurie vehicle's hood and then fall to the vehicle's right passenger side, which was out of Officer Taylor's view.  L.R. 56.1 SOF ¶ 31-50; 59-61; 89-92.  Officer Taylor lost sight of Officer Paillant as the Wurie vehicle continued to turn onto Fayston Street and he did not know if Officer Paillant would be run over or dragged by the Wurie vehicle.  L.R. 56.1 SOF ¶ 31-50; 61-63.  Accordingly, Officer Taylor raised his arm to discharge his firearm at the driver, but first took precautions to avoid hitting James Nicholas, a passenger in his cruiser.  L.R. 56.1 SOF ¶ 61-66.  He then aimed his firearm at the driver's side of the Wurie vehicle and discharged his firearm in an effort to disable Wurie and prevent further injury to Officer Paillant and others. L.R. 56.1 SOF ¶ 61-77.  Officer Taylor believed that as long as the Wurie vehicle continued to move, Officer Paillant was still in danger.  L.R. 56.1 SOF ¶ 67. Even after discharging his firearm, the Wurie vehicle continued along Fayston Street in an effort to prolong its flight

through the residential neighborhood.  L.R. 56.1 SOF ¶ 75.  Because the incident unfolded rapidly, Officer Taylor was required to make a split second decision involving life and death. L.R. 56.1 SOF ¶ 74.

Given the totality of these circumstances, Officer Taylor's discharge of his firearm was more than reasonable.  The Plaintiff cannot adduce any evidence to the contrary.  Use of deadly force is reasonable "[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm to a fellow officer."  <u>Garner</u>, 471 U.S. at 11.  Probable cause refers to a "fair probability."  <u>Illinois v. Gates</u>, 462 U.S. 213, 238 (1983).  Here, Officer Taylor was more than reasonable in believing that at the minimum, a fair probability existed that Wurie's vehicle posed a threat of serious physical harm not only to Officer Paillant, but also to the public.  In fact, in his guilty plea to the crime of assault and battery by means of a dangerous weapon, to wit a motor vehicle (M.G.L. c. 265, §15A), Wurie himself acknowledged that he struck Officer Paillant and that he operated his vehicle in a manner that threatened struck Officer Paillant and that he operated his vehicle to endanger.  L.R. 56.1 SOF ¶ 93; <u>see</u> <u>Commonwealth v. Tevlin</u>, 433 Mass. 305, 310 (2001) (defining this offense as using the vehicle in a manner "capable of producing serious bodily harm").  The law is clear that if an individual is threatened in such a way, an officer may respond with deadly force.  Indeed, from Officer Taylor's perspective, Officer Paillant faced possible death, not simply bodily harm.

Moreover, Officer Taylor could not have used a lesser degree of force to stop Wurie's vehicle.  Given Taylor's distance from Wurie's vehicle at the time it struck Paillant, and the rapid speed with which the situation unfolded, Taylor's only means of stopping Wurie was to discharge his firearm. him with serious bodily harm.  L.R. 56.1 SOF ¶ 27-77.  It would be unreasonable to suggest that any lesser level of force, such as a warning, would have been

effective in stopping the vehicle. The officers inside the cruiser that was following Wurie and Officer Paillant had made multiple attempts to warn Wurie to stop, to no avail. L.R. 56.1 SOF ¶ 3-11. Indeed, even Taylor's shots did not immediately succeed in stropping Wurie's vehicle. L.R. 56.1 SOF ¶ 75, 85. Despite the shots shattering the driver's door window, Wurie continued his flight along Fayston Street and Perth Street until he finally reached Quincy Street where he exited the still-moving vehicle. L.R. 56.1 SOF ¶ 72, 80.

   **2. <u>Wurie's Actions Not Only Posed A Serious Threat Of Injury To The Public, But Also Constituted Numerous Unlawful Offenses.</u>**

   Wurie's actions also demonstrate that his continued escape from the police posed a significant threat to any members of the public who may have crossed the path of his flight. "Street pursuits always place the public at some risk." <u>California v. Hodari D.</u>, 499 U.S. 621, 626 (1991). Indeed, Wurie has admitted that his driving caused a significant threat to the public. After the incident, Wurie was charged with and subsequently plead guilty to the crime of operating to endanger (M.G.L. c. 90, §24(2)(a)) and thereby admitted that he "operat[ed] a motor vehicle recklessly, or operat[ed] such a vehicle negligently so that the lives or safety of the public might be endangered." M.G.L. c. 90, §24(2)(a). L.R. 56.1 SOF ¶ 93.

   It is undisputed that Wurie led police on a lengthy chase through small residential streets, had continued to operate his vehicle directly toward a uniformed police officer commanding him to stop and had maintained his flight through a densely populated residential neighborhood even after his vehicle struck Officer Paillant. L.R. 56.1 SOF ¶ 3-77, 93. Moreover, the incident occurred on a Saturday evening in the summer and there were many neighborhood residents who were outside of their homes near the street. L.R. 56.1 SOF ¶16. It was therefore more than reasonable for Officer Taylor to perceive that Wurie's actions and in particular, his willingness

to strike a uniformed police officer whose gun was drawn demonstrated that Wurie posed a grave danger to any civilian who might cross his path during his escape.

In addition to eliminating the threat of harm that Wurie's continued flight posed, there also existed an important governmental interest in apprehending Wurie. At the time Officer Taylor discharged his firearm, Wurie was a fleeing felon. Based on what Officer Taylor observed, Officer Taylor would have been aware that Wurie had committed numerous felonies. assault and battery upon a public employee, (M.G.L. c. 265, §13D); assault and battery by means of a dangerous weapon (M.G.L. c. 265, §15A); and possibly, assault with intent to maim or murder (M.G.L. c. 265, §15); and the following misdemeanors: operating to endanger (M.G.L. c. 90, §24(2)(a)); failure to stop after causing personal injury (M.G.L. c. 90, §, 24(2)(a 1/2)(1)); and refusal to submit to an officer (M.G.L. c. 90, §, 25). A reasonable officer in Officer Taylor's shoes would have recognized the public interest in the enforcement of these laws.

As for the relative culpability of the parties, it is clear that Wurie alone was responsible for creating the dangerous situation in which Officer Taylor sought to intervene. By failing to stop for the pursuing cruiser, engaging in a lengthy and unlawful chase, and striking Officer Paillant with his vehicle, Wurie intentionally placed himself, the public, and certainly Officer Paillant, in grave danger. Officer Taylor essentially had two options: attempt to stop Wurie's car by force or ignore both the imminent threat of bodily harm or death posed to Officer Paillant and the continuing threat posed to public safety. It was Wurie's actions alone which forced Taylor into having to make this choice. Given the totality of the circumstances, including Wurie's felonious conduct, the imminent threat posed to Officer Paillant's life, and the ongoing threat posed to the safety of any members of the public who may have crossed the path of Wurie's determined flight, Officer Taylor's use of deadly force was reasonable.

**D.  OFFICER TAYLOR IS ENTITLED TO QUALIFIED IMMUNITY.**

Even assuming arguendo that this Court determines that Officer Taylor's actions violated the decedent's Fourth Amendment right, he is entitled to qualified immunity on several fronts. The First Circuit applies a three-part test for qualified immunity.  Defendants are entitled to qualified immunity unless "(1) the facts alleged show the defendants' conduct violated a constitutional right, and (2) the contours of this right are 'clearly established' under then-existing law (3) such that a reasonable officer would have known that his conduct was unlawful." Berube v. Conley, 506 F.3d 79, 82 (1st Cir. 2007), citing Santana v. Calderon, 342 F.3d 18, 23 (1st Cir.2003).  Qualified immunity protects government officials unless the law preexisting the defendant official's supposedly wrongful act was already established to such a high degree that every objectively reasonable official standing in the defendant's place would be on notice that what the defendant official was doing would be clearly unlawful given the circumstances."  Pace v. Capobianco, 283 F.3d 1275, 1282 (11th Cir. 2002).

**1.  No Constitutional Violation Occurred.**

As discussed supra in Sections B and C of this *Memorandum*, Officer Taylor did not commit any violation of the decedent's Fourth Amendment.  The Defendant's argument in Sections B and C therefore apply with equal force here.

**2.  The Law Was Not Clearly Establish That Officer Taylor's Use Of Force At The Time Constituted A Seizure Violative Of The Fourth Amendment.**

As the Supreme Court's decision in Brower and the First Circuit's 1990 decision in Landol made clear, it was not clearly established in 2002 that Officer Taylor's conduct in discharging his firearm at the Wurie vehicle constituted an actionable seizure of the decedent. See supra at Section B.  Accordingly, qualified immunity bars the Plaintiff's claims.

**3.  The Law Also Did Not Clearly Establish That Officer Taylor's Use Of Force Was Unconstitutional.**

Even assuming arguendo that Officer Taylor's use of force was unreasonable, Officer Taylor is entitled to qualified immunity because it was not clearly established at the time of the incident Officer Taylor's use of force violated the Fourth Amendment and a reasonable officer, standing in Officer Taylor's shoes, would not have known that his actions were unlawful. The Supreme Court in <u>Brosseau v. Haugen</u>, examined what the "clearly established" law was in 1999 (just three years prior to the Taylor shooting) with respect to police using deadly force by firing at the driver of a motor vehicle.  <u>Brosseau v. Haugen</u>, 543 U.S. 194, 125 S.Ct. 596 (2004).  After doing so, the Court held that the police officer was entitled to qualified immunity. <u>Id.</u> at 200.  In 1999, when Officer Brosseau responded to a report by Plaintiff Haugen's mother of an altercation, she observed Haugen struggling with two men.  <u>Id.</u> at 195-196.  Upon Officer Brosseau's arrival, Haugen, who had a no-bail warrant for drug offenses, fled on foot and hid. <u>Id.</u> at 196.  Brosseau requested assistance, and two officers arrived to locate Haugen.  <u>Id.</u>  When Haugen later resurfaced from hiding, he ran to his Jeep parked in the driveway, and locked the doors.  <u>Id.</u>  At this time, the two men Haugen had previously been fighting with as well as Haugen's girlfriend and her three-year-old daughter were seated in vehicles parked in close proximity to the Jeep.  <u>Id.</u>  There was no indication, however, that Haugen was armed.  <u>Id.</u>

Officer Brosseau, alone, approached the Jeep, pointed her gun at Haugen and ordered him out of the vehicle.  <u>Id.</u>  When Haugen ignored the Officer's commands, she shattered the driver's side window with her handgun, unsuccessfully attempted to grab Haugen's keys, and struck him on the head her gun barrel. <u>Id.</u>  Haugen, still undeterred, succeeded in starting the Jeep.  <u>Id.</u>  "As the Jeep started or shortly after it began to move, Brosseau jumped back and to the left.  She fired one shot through the rear driver's side window at a forward angle, hitting Haugen in the

back." Id. at 196-197.  Officer Brosseau's reason for the shooting was that *even though she did not know the whereabouts* of her fellow officers, she was "fearful for the other officers on foot who [she] believed were in the immediate area, [and] for the occupied vehicles in [Haugen's] path and for any other citizens who might be in the area." Id. (emphasis added).

The Court held that under these circumstances, qualified immunity applied because the law was not clearly established.  Id. at 200.  The Court reasoned further that "[b]ecause the focus is on whether the officer had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct.  If the law at that time did not clearly establish that the officer's conduct would violate the Constitution, the officer should not be subject to liability or, indeed, even the burdens of litigation."  Id.

In addition to Brousseau, by 1990, the First Circuit had established that a police shooting at a fleeing vehicle that injured the vehicle's passenger was not unreasonable.  See Landol-Rivera v. Cruz Cosme, 906 F.2d 791 (1ˢᵗ Cir. 1990).  Indeed, the Court stated that "it is beyond doubt," that the use of deadly force was justified against the driver.  Id. at 793.  Additionally, by 2002, numerous cases crossing multiple Federal Circuits had consistently held that an officer may fire at the driver at a vehicle when he reasonably perceives that vehicle to pose a danger to a fellow officer or the public. [4]  Strikingly, none of these cases involved the circumstances Taylor

---

[4]    See Scott v. Clay County, 205 F.3d 867 (6th Cir. 2000) (use of deadly force reasonable where after lengthy vehicle chase, officer fired five times at driver and four times at tires but hit in the head a female passenger, whom the officer did not know was in vehicle, in effort to stop fleeing vehicle from re-entering roadway and resuming flight); Pace v. Capobianco, 283 F.3d 1275 (11th Cir. 2002) (decided in March of 2002; held that use of deadly force was reasonable where officer, at the end of a lengthy vehicle chase, fired multiple times at unarmed driver while driver was in a stationary vehicle on a cul-de-sac, surrounded by four police vehicles, and was not aiming vehicle at or driving toward officers.); Cole v. Bone, 993 F.2d 1328 (8th Cir. 1993) (use of deadly force reasonable where, during high-speed highway chase, officer fired from the rear of his police vehicle toward the front of suspect's vehicle, striking suspect driver in forehead.); Smith v. Freland, 954 F.2d 343 (6th Cir. 1992) (use of deadly force reasonable where officer, during vehicle chase, shot and killed suspect driver on dead-end road to prevent suspect from exiting road and resuming flight).

Further, the Courts have not diverged from this pattern of holding since 2002.  See, e.g. Long v. Slaton, 508 F.3d 576 (11th Cir. 2007) (use of deadly force reasonable where officer fired three shots, killing mentally unstable

confronted ---where at the precise moment the police officer employed deadly force, his fellow officer was simultaneously confronting serious injury or death.

The Sixth Circuit's decision in <u>Scott v. Clay County</u> is also rather illustrative given its analogous facts to the case at bar and its holding that the police officer's shooting at a moving vehicle was objectively reasonable despite the risk to the vehicle's passenger. <u>See</u> <u>Scott v. Clay County</u>, 205 F.3d 867 (6th Cir. 2000). In <u>Scott</u>, the suspect led police on a dangerous and lengthy vehicle chase and toward the end of the chase, the suspect's vehicle nearly struck the defendant officer who was on-foot. <u>Id.</u> at 871-872. Despite avoiding injury by the vehicle, the officer shot five times at the driver and four additional times at the moving vehicle in an effort to stop the vehicle from re-entering roadway and resuming its flight. <u>Id.</u> Consequently, a female passenger was stuck twice in the head by the officer's rounds. <u>Id.</u> at 872-873. However, at the time of the shooting, like the case at bar, the shooting officer did not know whether any passengers occupied the vehicle. <u>Id.</u>

Given this analytical backdrop, it was not clearly established in 2002 that Officer Taylor's actions were constitutionally unreasonable. Certainly, the circumstances faced by Taylor were far more dire and involved a much more definitive threat to the safety of a fellow officer and the public than those faced by Officer Brosseau. When Officer Taylor employed deadly force, he had observed the fleeing Wurie vehicle strike Officer Paillant, then saw Officer Paillant move onto the vehicle's hood and then fall off along the vehicle's passenger side onto the ground in close proximity to the vehicle's wheels. L.R. 56.1 SOF51-77. When in <u>Brousseau</u>, the police officer employed deadly force, she shot an unarmed driver in the back as he was moving at a slow speed away from her because the driver's flight posed a threat to her fellow

---

suspect driver who had stolen and begun to operate police cruiser, despite fact that suspect driver was on his own property and had never used vehicle in threatening manner.)

officers located somewhere in the vicinity.  Id.  Moreover, the officers' proximity to the fleeing vehicle was unknown at the time Brousseau shot and the only known individuals in the area were seated inside parked vehicles.  Id. at 196.

Additionally, unlike Officer Taylor, the officer in Landol-Rivera who fired at the fleeing driver knew that there was an innocent passenger in the vehicle sitting in the driver's lap.  Id. at 792.  Certainly, this use of force in Landol was far more likely to injure an unintended innocent than that which Officer Taylor employed.  Moreover, in Scott , the Court upheld the officer's shooting as reasonable even where the immediate threat against the officer had arguably dissipated and the officer's sole objective was to prevent the fleeing vehicle from reentering the roadway.  Given this multitude of precedent, it cannot be said that the existing law at the time of the incident clearly established that Officer Taylor's use of deadly force was unlawful.

**4. Officer Taylor Is Entitled To Qualified Immunity Because A Reasonable Officer In His Shoes Would Not Have Known That His Use Of Deadly Force Was Unconstitutional.**

It is well-established that qualified immunity does not apply to an officer when, in light of clearly established then-existing law, a reasonable officer in his shoes would have known that his conduct was unlawful.  Berube, 506 F.3d at 82.  The inquiry into whether an officer is entitled to qualified immunity "focuses on an evaluation of the defendant's conduct "in light of the particular circumstances known at the time the challenged conduct took place."  Cookish v. Powell, 945 F.2d 441, 443 (1st Cir.1991), quoting Brennan v. Hendrigan, 888 F.2d 189, 192 (1st Cir.1989).  "Although qualified immunity normally turns on objective circumstances, not subjective intent, this likely means objective circumstances actually known to the officer."  Bilida v. McCleod, 211 F.3d 166 (1st Cir. 2000), citing Anderson v. Creighton, 483 U.S. 635,

641, (1987). "The relevant, dispositive inquiry ... is whether it would be clear to a reasonable officer that his conduct was unlawful." Saucier v. Katz, 533 U.S. 194, 202 (2001).

A "reasonable, although mistaken, conclusion about the lawfulness of one's conduct does not subject a government official to personal liability." Lowinger v. Broderick, 50 F.3d 61, 65 (1st Cir. 1995). The "qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" Lowinger, 50 F.3d at 65. "This accommodation for reasonable error exists because 'officials should not err always on the side of caution' because they fear being sued." Hunter v. Bryant, 502 U.S. 224, 229 (1991). "In tense, uncertain, and rapidly evolving situations, officers are insulated from judicial second-guessing." Medeiros v. Town of Dracut, 21 F.Supp.2d 82, 87 (D. Mass.1998), citing Graham, 490 U.S. at 396.

In applying this qualified immunity standard, the courts are "discourage[d] … from assessing what a reasonable officer could or could not believe beyond asking whether his conduct was plainly incompetent." Medeiros, 21 F.Supp.2d at 88. Indeed, the courts will defer to the officer's judgment where "a jury could not find that his conduct was so deficient that no reasonable officer could have made the same choice." Medeiros, 21 F.Supp.2d at 87. Here, it cannot be said that Officer Taylor's use of deadly force in reacting to the highly dangerous, rapidly evolving threat posed by Wurie's vehicle was plainly incompetent or involved a knowing violation of the Constitution. Therefore, Officer Taylor is entitled to qualified immunity.[5]

**E    DISMISSAL OF THE PLAINTIFF'S STATE CLAIMS IS WARRANTED.**

**1.  This Court Lacks Jurisdiction Over The Plaintiff's Pendent State Claims.**

---

[5] Because Count II also asserts a Section 1983 claim that is duplicative of Count I, the Defendant's arguments to dismiss Count I apply with equal force to Count II.

The Plaintiff asserts claims in Counts IV, under the Massachusetts Wrongful Death Act, M.G.L. c. 229, § 2, and Count VI, under the Massachusetts Survival Statute, M.G.L. c. 228, § 1. Given the Plaintiff's failure of proof on her federal claims, this Court lacks jurisdiction over her pendent state claims.  "[I]t is the settled rule in this Circuit that in a non-diversity case, where pendent state claims are joined with a federal cause of action and that federal cause of action is the subject of a successful summary judgment motion, the pendent state claims should be dismissed."  Cullen v. Mattaliano, 690 F.  Supp. 93, 99 (D. Mass.1988); accord St. Hilaire, 885 F.Supp. at 358 (dismissing plaintiff's state law claims after granting summary judgment to defendants on section 1983 claims). Accordingly, dismissal of the Plaintiffs remaining claims is warranted.  See 28 U.S.C. § 1367(c) (1998).

### 2.  **The Plaintiff's Massachusetts Wrongful Death Claim Is Also Not Viable.**

In Count IV, the Plaintiff alleges that Officer Taylor's "deliberate and willful" conduct caused the decedent, Ms. Barros-Cepeda's, death.  It appears clear that by using the terms "deliberate and willful," the Plaintiff has based her wrongful death action on a theory of intent, and not on a lesser degree of culpability such as recklessness, which is barred by the Massachusetts Tort Claims Act.[6]  See Jackson v. Town of Milton, 41 Mass. App. Ct. 908, 908-909 (1996) (under MTCA , public employees are immune from claims alleging recklessness).

To the extent that the Plaintiff's wrongful death claim is based on a theory of intentional acts, rather than a lesser degree of culpability, it must fail as a matter of law because the voluminous discovery taken in this matter has produced absolutely no evidence which might

---

[6] Indeed, the procedural history of this case demonstrates that Plaintiff's wrongful death claim against Officer Taylor *must* be based solely on a theory of intentional acts.  Plaintiff first asserted her wrongful death claim against Taylor as Count VIII in her initial Complaint (EFC Document No. 1, filed 9/1/05).  In this Court's August 25, 2006 Order (EFC Document No. 26, filed 8/25/06) in response to the Defendants' Motions to Dismiss, the Court agreed with Taylor and ruled that "the motion concerning Count VIII, the wrongful death claim against Officer Taylor in violation of M.G.L. c. 229, is DENIED with regard to the allegation that the shooting was 'deliberate' and ALLOWED with regard to the allegation that the shooting was 'wanton' and 'reckless.'"

demonstrate that Officer Taylor intended to shoot Evelyn Barros-Cepeda or cause her death or

that he was even aware of her presence in the vehicle.  See infra at Section B.

While the Plaintiff may argue that Officer Taylor need only to intend the act of shooting

at the vehicle, not the consequence of hitting the decedent, to create a viable claim of wrongful

death based upon Taylor's intentional acts, this argument would not be actionable.  Intending an

act but not its consequence, even where the commission of the act creates a strong likelihood that

the consequence will occur, is the classic example of what constitutes recklessness rather than

intent:

> Reckless misconduct differs from intentional wrongdoing in a very important particular.
> While an act to be reckless must be intended by the actor, the actor does not intend to
> cause the harm which results from it.  It is enough that he realizes or, from facts which he
> knows, should realize that there is a strong probability that harm may result, even though
> he hopes or even expects that his conduct will prove harmless.  However, a strong
> probability is a different thing from the substantial certainty without which he cannot be
> said to intend the harm in which his act results.

Jackson, 41 Mass. App. Ct. at 909, n.5, citing, Forbush v. Lynn, 35 Mass. App. Ct. 696, 700

(1994), quoting from Restatement (Second) of Torts § 500 comment f (1964).

To the extent that the Plaintiff contends that although there is no evidence that Taylor

intended to shoot the decedent or cause her death by firing at the moving vehicle, Taylor

nevertheless created a strong likelihood that an unknown passenger could be struck, such an

argument is devoid of merit.  Such a purported claim derives not from intent but from a theory of

recklessness.  Accordingly, the Plaintiff's claim must fail as the MTCA provides immunity for

Taylor from tort claims based on a theory of recklessness.

### 3.  The Plaintiff's Massachusetts Survival Claim Is Also Not Actionable.

In Count VI, the Plaintiff ambiguously asserts a claim entitled, "survival action" against

Officer Taylor in which she seeks to recover "expenses for the medical treatment [Ms. Baros-

Cepeda] received prior to death" and for the "conscious pain and suffering." A "survival action" is not, in and of itself, an independent cause of action. Rather, a survival action describes a category of claims which, under the "Massachusetts Survival Statute," M.G.L. c. 228, § 1, survive the death of the claimant.[7] The Plaintiff does not specify upon which claim(s) enumerated within M.G.L. c. 228, § 1, her "survival action" is based. However, it appears clear that no "survival action" which could be asserted by Plaintiff against Taylor could be legally viable. To the extent Plaintiff's "survival action" is based on a tort theory of negligence against Taylor, he is exempt from liability from such a claim under M.G.L. c. 258, § 2. To the extent Plaintiff's "survival action" is based on an intentional tort theory such as assault or battery, such a claim also cannot survive because, as previously discussed, it is undisputed that Thomas Taylor did not intend to shoot Ms. Barros-Cepeda. Accordingly, the Plaintiff's claim must fail as a matter of law.[8]

## III.  CONCLUSION

Based on the foregoing reasons, Officer Taylor requests that summary judgment enter in his favor on all counts of the Plaintiff's Complaint with prejudice.

**DEFENDANT REQUESTS ORAL ARGUMENT FOR THIS MOTION**

[signature next page]

---

[7] M.G.L. c. 228, § 1 states in pertinent part: "In addition to the actions which survive by the common law, the following shall survive:- Actions of tort (a) for assault, battery, imprisonment or other damage to the person; (b) for consequential damages arising out of injury to the person and consisting of expenses incurred by a husband, wife, parent or guardian for medical, nursing, hospital or surgical services in connection with or on account of such injury."

[8] The Defendants note that although there appears to be minimal case law on the issue, a plain reading of M.G.L. 229, §6 demonstrates that a claim for pain and suffering damages incurred by a decedent as a result of an act which caused the decedent's death is to be brought under § 6 of the Wrongful Death Statute not as a separate M.G.L. 228, §1 "survival action." See M.G.L. 229, §6, See also Lyon v. Triram Corp., 18 Mass.L.Rptr. 419, 2004 WL 2451408, *5 (Mass. Super. 2004)  Moreover, any such claim is not viable because the Plaintiff has not adduced any cognizable evidence of the decedent's conscious pain and suffering. See L.R. 56.1 SOF ¶ 81, 85.

Respectfully submitted,
DEFENDANTS, THOMAS TAYLOR, JR.
AND CITY OF BOSTON,

By their attorneys:

/s/ Helen G. Litsas
_____
Helen G. Litsas #644848
Special Assistant Corporation Counsel
Hollett Building
38 Main Street
Saugus, MA 01906
(781) 231-8090

/s/ Evan Ouellette
Evan C. Ouellette, BBO # 655934
Assistant Corporation Counsel
City of Boston Law Department
Room 615, City Hall
Boston, MA 02201
(617)635-4048

## CERTIFICATE OF SERVICE

I, Helen G. Litsas, hereby certify that on this date I served a copy of the foregoing documents upon lead plaintiff's counsel, Andrew Stockwell-Alpert, by electronic filing and by postage prepaid, first class, U.S. Mail.

6/2/08          /s/ Helen G. Litsas
_____      _____
Date             Helen G. Litsas