# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

### CIVIL ACTION NO. 05-11803-MLW

SHENIA DANCY-STEWART as
Administratrix of the Estate of EVELINE
BARROS-CEPEDA,
<u>Plaintiffs</u>,

v.

THOMAS TAYLOR, Jr., and the CITY
OF BOSTON,
<u>Defendants</u>.

## <u>DEFENDANTS CITY OF BOSTON'S AND THOMAS TAYLOR'S LOCAL RULE 56.1 STATEMENT OF FACTS AND SUPPORTING DOCUMENTATION[1]</u>

Pursuant to L.R. 56.1, Defendants Thomas Taylor and the City of Boston submit the following statement of undisputed material facts.[2]  The Defendants state that the Plaintiff cannot adduce any evidence to support any of her claims contained in the Plaintiff's Third Amended Complaint.

## I.    <u>Officers Flaherty And Connolly's Encounter With The White Taurus Prior to Dunkeld Street.</u>

1.    During the early morning hours of September 8, 2002, shortly after Boston Police Officers Robert Connolly and Debra Flaherty began their midnight to 7:30 a.m. shift, were traveling in a marked Boston Police Department cruiser patrolling the area of Columbia Road, Dorchester, MA.  Exhibit B, Debra Flaherty Deposition at 30:15-24 ("Exhibit B"); 31:1-5; Exhibit B, Robert Connolly Deposition at 45:9-21 ("Exhibit C").

---

[1] All of the supporting documentation attached hereto are true and accurate copies.  <u>See</u> <u>Exhibit A</u>, <u>Affidavit of Helen G. Litsas</u>.

[2] These facts are deemed undisputed for purposes of Defendants' Motions for Summary Judgment only.

2.      Officer Debra Flaherty was driving and Officer Connolly sat in the front seat passenger side of the police vehicle.  Exhibit B at 32:1-8; Exhibit C at 48:8-16.

3.      At one point, when Officers Flaherty and Connolly were stopped on Columbia Road, a white Ford Taurus traveled to the intersection of Columbia Road and Hancock Street. Exhibit B at 31:3-24; Exhibit C at 48:17-24; 49:1-21; 50:1-2; Exhibit D, Carlos Fernandes Deposition ("Exhibit D"), at 103:3-24; Exhibit D, Brima Wurie Deposition ("Exhibit E") at 114:14-20.

4.      Prior to reaching the intersection of Columbia and Hancock, the Wurie vehicle had traveled to Cushing Avenue in Dorchester, MA where shots had been fired.  Exhibit D at 19:17-24; 90:1-8; 96:18-24; 97:1-2.

5.      Officers Flaherty and Connolly then observed the white Ford Taurus fail to stop for a red traffic light.  Exhibit B at 31:3-24; Exhibit C at 48:17-24; 49:1-21; 50:1-2; Exhibit D at 103:3-24.

6.      After making this observation, Officers Flaherty and Connolly believed that the operator of the white Ford Taurus, Brima Wurie, had violated the traffic laws and they activated their cruiser's lights and sirens and attempted to stop the vehicle ("Wurie vehicle").  Exhibit B at 31:18-24, 32:1-24; Exhibit C at 48:17-24; 49:1-21; 50:1-2; 55:11-14; Exhibit E at 101:17-18.

7.      The police cruiser's lights and sirens were activated throughout Officers Flaherty and Connolly's pursuit of the Wurie vehicle through various city streets, including Dunkeld Street.  Exhibit D at 109:1-8; Exhibit F, Luis Carvalho Deposition ("Exhibit F") at 149:8-15; 166:19-21.

8.     Wurie, however, did not heed the police instruction and failed to stop his vehicle for Officers Flaherty and Connolly.  Exhibit B at 33:3-21; Exhibit C at 56:7-14; Exhibit D at 108:16-18; Exhibit E at 72:22-24; 101:17-18; 105:2-4.

9.     Wurie continued to evade Officers Connolly and Flaherty as he navigated various city streets, including Bird Street, Dudley, Magnolia, Wayland, Howard, Quincy & Dunkeld Streets.  Exhibit F at 151-160.

10.     While Wurie recognized that that the Boston police were attempting to pull him over, he refused to stop his vehicle because his driver's license had been suspended, he was on parole and he did not want to return to incarceration.  Exhibit E at 77:1-9; 101:3-5; 109:15-20; 121:4-13; 122:9-13.

11.     Wurie continued to evade Officers Flaherty and Connolly as he drove onto Dunkeld Street in Dorchester, MA toward the direction of Fayston Street.  Exhibit E at 108:6-19.

12.     Throughout the pursuit of the Wurie vehicle, Officer Flaherty notified the Boston Police Department's Operations Department of their location and of their attempt to apprehend Wurie's vehicle.  Exhibit B at 37:5-11; Exhibit C at 38:11-22.

13.     Officer Flaherty conducted these broadcasts over Channel Six of the BPD radio. Exhibit C at 92:1-23.

14.     Officer Flaherty's broadcasts of Wurie's fleeing vehicle were not heard by her fellow officers, Officers Thomas Taylor and Michael Paillant because Officers Taylor and Paillant were assigned to District B-3, a different district than Officers Flaherty and Connolly's District 11 with a different radio channel, Channel Eleven, than her.  Exhibit B at 24: 13-15; Exhibit C at 92:1-23.

## II.    The Backdrop of Dunkeld Street and Fayston Street

15.    Dunkeld Street is a narrow and very short street approximately 200 feet in distance, which intersects with Fayston Street.  Exhibit G, Officer Michael Officer Michael Paillant Deposition ("Exhibit G") at 156: 12-13; Exhibit E at 141:2-9;

16.    Dunkeld Street is also a densely populated residential neighborhood that is very busy with many buildings and apartment complexes and on the night of the incident, there were many people on or near Dunkeld Street.  Exhibit E at 160:13-19; Exhibit D at 124:2-5..

17.    At the time the Wurie vehicle traveled onto Dunkeld Street, there were many parked cars lining the street.  Exhibit E at 141:2-9.

18.    As the Wurie vehicle traveled onto Dunkeld Street, it was dark out.  Exhibit D at 112:15; 118:4.

## III.    Officers Taylor And Paillant's Assignment On Dunkeld Street

19.    At the time that the Wurie vehicle traveled onto Dunkeld Street on September 8, 2002, Boston Police Officers Taylor and Paillant, officers assigned to District B-3, were conducting an unrelated sexual assault investigation near 85 Fayston Street, Dorchester, MA. Exhibit G at 8:22-23; 9:1-9; 68:19-24; 69:1-5.

20.    Officer Paillant was standing outside on Fayston Street standing by his marked police cruiser, which was located at the top of Dunkeld Street, at its intersection with Fayston Street.  Exhibit G at 71:8-24; 72:1-2; Exhibit H, Thomas Taylor Deposition ("Exhibit H") at 57:20-24; 58:1-14.

21.    Sitting inside Paillant's cruiser was the suspect in the alleged assault, James Nicholas.  Exhibit G at 69:1-19; Exhibit J, James Nicholas Deposition  at 51:22-24; 52:1-13; 18-24 ("Exhibit J").

22.     While Officer Paillant stood outside his cruiser, his partner, Officer Taylor was located away from the cruiser, near 85 Fayston Street meeting with the alleged victim in the assault.  Exhibit G at 69:2-5; Exhibit H, Thomas Taylor Deposition ("Exhibit H") at 56: 12-20; 57:16.

23.     At all times during September 8, 2002, Officers Taylor and Paillant broadcast from Channel Three on the BPD radio and did not have any radio contact with Channel Six. Exhibit C at 92:1-23.

## IV.   The Occupants Of The Wurie Vehicle

24.     As the Wurie vehicle traveled onto Dunkeld Street, the decedent, Eveline Barros Cepeda ("decedent"), was sitting in the backseat of the Wurie vehicle along with Luis Carvalho and Maria DaRosa.  Exhibit E at 102:1-2; Exhibit F at 170:19-21.

25.     Carlos Fernandes was sitting in the front passenger seat of the vehicle.  Exhibit E at 101:12-24; 102:1-2.

26.     Carvalho a passenger in the back seat of the Wurie vehicle, remained in a "ducked" position as the vehicle traveled up Dunkeld Street.  Exhibit F at 170:11-16.

## V.   The Wurie Vehicle's Flight Onto Dunkeld Street

27.     Officer Paillant immediately took notice of the Wurie vehicle and the BPD cruiser, with its lights flashing, following closely behind it, as it traveled up Dunkeld Street. Exhibit G at 71:222-24; 72:1-2.

28.     As the Wurie vehicle traveled onto Dunkeld Street, a bystander, Travo Carter, was standing on the sidewalk near 5 Dunkeld Street and heard the vehicle screeching and accelerating up the street.  Exhibit I, Travo Carter Deposition ("Exhibit I") at 29:9-24; 30:17-19; 31:3-19

29.     Officer Paillant, after observing the Wurie vehicle evade the cruiser, determined that the vehicle had committed the crime of refusing to stop for police.  Exhibit G at 83:14-20. with its lights flashing,

30.     To assist with the cruiser's attempt to stop the Wurie vehicle, Officer Paillant stepped into the street in front of the Wurie vehicle.  Exhibit G at 71:8-24; 72:1-2; 72:13-24; 73:1-3; Exhibit I at 29:9-24; 30:17-19; 31:3-19.

31.     As Officer Paillant stood in the roadway, he directed Wurie stop his vehicle using verbal and hand commands.  Exhibit G at 72:13-24; 73:1-3; Exhibit B at 68:7-8; Exhibit E at 114: 14-20; 124:5-24; 128:14-18; Exhibit I at 29:9-24; 31:3-19.

32.     Wurie refused to do so despite observing, at the intersection of Dunkeld and Fayston Streets, the police officer waving his hand at him in an effort to stop his vehicle.  Exhibit E at 114: 14-20; 124:5-24; 128:14-18.

33.     At no time did Wurie heed Officer Paillant's commands nor did he stop his vehicle as Wurie traveled up Dunkeld Street.  Exhibit G at 73:7-10; Exhibit D at 105:2-4.

34.     In Wurie's view, the police officer had seen the cruiser, with its flashing lights, following the Wurie vehicle. Exhibit D at 130:10-18.


**VI.    <u>The Wurie Vehicle's Encounter With Officer Paillant On Dunkeld Street</u>**

35.     Nonetheless, Wurie continued to disregard Officer Paillant's commands and consequently, Officer Paillant withdrew his firearm, Exhibit G at 73:7-21, and pointed it at the Wurie vehicle, again commanding the Wurie vehicle to stop.  Exhibit G at 76:22-24; Exhibit D at 109: 14-20; Exhibit E at 131:2-17.

36.     The Wurie vehicle did not stop for Officer Paillant.  Exhibit D at 109: 14-20; Exhibit E at 131:2-17; Exhibit G at 76:22-24.

37.    At the time, Officer Paillant was located near the intersection of Dunkeld and Fayston Street and the Wurie vehicle was located approximately halfway up Dunkeld Street. Exhibit G at 73:11-21.

38.    After again failing to heed Officer Paillant's commands, the Wurie vehicle continued to travel in Officer Paillant's direction, despite Officer Paillant's position directly in front of the Wurie vehicle.  Exhibit G at 115:17-24.

39.    As the vehicle moved closer, Officer Paillant believed that the Wurie vehicle was going to strike him.  Exhibit G at 101:17-20.

40.    James Nicholas, who remained in Paillant's cruiser, also thought the Wurie vehicle was going to strike him.  Exhibit J at 30: 23-24; 31:1-7.

41.    The Wurie vehicle was then right upon Officer Paillant ---"right up on [him]." Exhibit G at 93:5-8.

42.    As the Wurie vehicle continued to travel in the direction of Officer Paillant, Exhibit G at 78:16-17, Officer Paillant attempted to move to his left (the vehicle's right passenger side), in an effort to move out of the way of the Wurie vehicle.  Exhibit G at 92:3-24; 93:1-14; Exhibit D at 111: 1-19; Exhibit E at 124:5-24; Exhibit I at 46:7-18.

43.    Wurie observed the police officer in front of his vehicle moving in a frenzy and moving to Wurie's right.  Exhibit E at 139:2-24.

44.    Despite Paillant's efforts, the front right side of the Wurie vehicle struck Officer Paillant.  Exhibit B at 45:24; 46:1-6; Exhibit C at 70:19-24; 73:1-3; Exhibit D at 110:19-24, 111:1-12; Exhibit G at 92:3-24;93:1-14; Exhibit H at 73:5-8;  Exhibit I at 43:22-24;44:1-4;16-23; 46:7-18; Exhibit L, Affidavit of Elizabeth Ziolkowski ("Exhibit L"); Exhibit M, Transcript of Commonwealth v. Brima Wurie Plea Hearing  ("Exhibit M") at 15-27.

7

45.     The vehicle made contact with Officer Paillant's body.  Exhibit G at 114: 8-11; Exhibit E at 127:20-24; 128:1.

46.     During impact, Officer Paillant's body moved onto the hood of the Wurie vehicle. Exhibit G at 112:20-24; 113: 1; Exhibit C at 73:18-24; 75: 21-24; Exhibit I at 43:22-24; 44:1-4;16-23.

47.     After the Wurie vehicle made contact with Officer Paillant, Officer Paillant fell off the vehicle to the ground, along the passenger side of the Wurie vehicle, and for a few seconds remained bent down on the ground with his knees bent while the Wurie vehicle continued to move and turn onto Fayston Street from Dunkeld Street.  Exhibit C at 76:6-24; Exhibit G at 127:1-22, 129:4-11, 130:11-24; 131:1-21, 145:16-19; Exhibit I at 31: 20-23; 43:3-21.

48.     Carter observed the right side of the Wurie vehicle strike the police officer, causing the officer to fall to the side of the vehicle onto the ground.  Exhibit I at 31: 20-23; 43:3-21.

49.     Meanwhile, Carlos Fernandes, seated in the front seat of the Wurie vehicle, first observed a police officer in front of their vehicle and then observed the police officer dive towards the passenger side of the vehicle.  Exhibit D at 111:1-19.

50.     Wurie, however, lost sight of the officer after the vehicle made contact with the officer's hand.  Exhibit E at 139:2-24.

## VII.   Officer Taylor's Efforts To Protect Officer Paillant And The Public From Harm By The Fleeing Wurie Vehicle On Dunkeld Street

51.     While Officer Taylor was walking back towards the cruiser along with the alleged assault victim, from approximately 85 Fayston Street, he observed Officer Paillant standing outside the cruiser on Fayston Street near 77 Fayston Street.  Exhibit H at 56:17-21; 57:14-24;

58:3-14.

52.     Immediately after making this observation, he next observed Officer Paillant look down Dunkeld Street and make a noise, "What the?"  Exhibit H at 60:3-7.

53.     Officer Taylor then observed Officer Paillant walking more towards Dunkeld Street to more in the middle of Fayston Street.  Exhibit H at 60:13-16.

54.     Officer Taylor then stepped off the curb to the location of where the line of parked cars would be.  Exhibit H at 66: 5-15.

55.     Officer Taylor next observed Officer Paillant step in front of the vehicle yelling at the Wurie vehicle to stop and putting his hands up.  Exhibit H at 66:16-20.

56.     Then, almost instantly, Officer Taylor heard a car engine "rev up" and getting louder and then noticed Officer Paillant withdraw his firearm.  Exhibit H at 67:7-12; 68:1-9.

57.     Officer Taylor then observed Officer Paillant move his gun in a pumping motion. Exhibit H at 68:13-24; 69:1-12.

58.     When Officer Taylor observed Officer Paillant take out his firearm, Officer Taylor then withdrew his firearm and advised the alleged victim to wait on the sidewalk.  Exhibit H at 69:17-22.

59.     Officer Taylor also simultaneously observed a white car travel up Dunkeld Street and collide with Officer Paillant as Paillant was trying to move to his left (the vehicle's right). Exhibit H at 72:8-11; 73:9-13.

60.     From Officer Taylor's vantage point, it appeared that the front of the Wurie vehicle had struck Officer Paillant and caused Officer Paillant to gasp for air.  Exhibit H at 73:5-8.

61.     Officer Taylor also observed the Wurie vehicle strike Officer Paillant on the front

passenger side of the hood and struck him near the knees, and Officer Paillant fell forward onto the car with his torso.  Exhibit H at 92:17-24; 98:1-3.

62.    From Officer Taylor's view, when the Wurie vehicle struck Officer Paillant, the vehicle was turning onto Fayston Street and Officer Paillant's feet were kicking "as if he was met with a stronger force and he was trying to keep himself up from being run over.  And I can see his hands on the hood and the car was turning." Exhibit H at 94:20-24; 95:1-3; .

63.    From that point on, however, as the Wurie vehicle continued to turn onto Fayston Street, Officer Taylor, who was located down Fayston Street on the other side of the Wurie vehicle,  lost sight of Officer Paillant and did not know if he would be run over or dragged by the Wurie vehicle.  Exhibit H at 56:17-21; 57:14-24; 58:3-14; 97:1; 98:1-6, 112:24, 113:1-6.

64.    When Officer Taylor lost sight of Officer Paillant, he raised his arm to discharge his firearm, but first took note of James Nicholas in his cruiser.  Exhibit H at 98:2-11; 99:20-24.

65.    To reduce the possibility of hitting Nicholas, Officer Taylor stepped into the street so he could discharge his firearm from that location, rather than from the middle of parked cars.  122:1-10.

66.    After taking note of Mr. Nicholas and after raising his arm, Officer Taylor stepped from the parked cars to the street, took a breath, asked God to be with him, and then discharged his firearm.  Exhibit H at 98:2-16.

67.    Officer Taylor believed that as long as the Wurie vehicle continued to move, Officer Paillant was still in danger.  Exhibit H at 126:7-11.

68A.    Officer Flaherty, who also lost sight of Officer Paillant when he fell to the ground following his contact with the Wurie vehicle, believed that Officer Paillant's life was threatened because the Wurie vehicle drove right into Officer Paillant.   Exhibit B at 80:5-11; Officer

Flaherty.  Exhibit B at 82:5-9.

68B.    When Officer Taylor discharged his firearm, he could see the driver's side of the Wurie vehicle and aimed his firearm in that direction because he was attempting to disable the driver, Brima Wurie.  Exhibit H at 106:12-23; Exhibit E at 140:6-13.

69.    Officer Taylor received use of deadly force training from the Boston Police Department.  Exhibit H at 107:5-7.

70.    When Officer Taylor discharged his firearm, he had not seen any passengers in the vehicle and was not aware of the presence of any passengers in the vehicle.  Exhibit H at 108:20-22; 109:1-4.

71.    When he discharged his firearm, Officer Taylor was looking at the Wurie vehicle's driver's side window and that is where he aimed.  Exhibit H at 100:22-24; 101:1-3; Exhibit E at 140:6-13.

72.    Wurie himself acknowledged that the police targeted him, that the bullets were aimed right at him and that the driver's side window was shattered by the police bullets.  Exhibit E at 140:6-13; 198:7-17; 199:6-12.

73.    Wurie also heard shots by his head.  Exhibit E at 211:9-11.

74.    Officer Taylor made the split second decision to stop the Wurie vehicle by discharging his firearm because he believed that Officer Paillant's life was in danger and he believed that discharging his firearm was the only decision he had.  Exhibit H at 109:15-24; 114:23-24; 115:1-8.

75.    After Officer Taylor discharged his firearm, the Wurie vehicle continued to travel down Fayston Street.  Exhibit H at 124:12-24; 124:1-4; 136: 20-24; 137: 1-3.

76.    When Officer Taylor regained sight of Officer Paillant and the vehicle slowed,

Officer Taylor ceased discharging his firearm.  Exhibit H at 126:24; 127: 1-12, 124:12-24; 124:1-4; 136: 20-24; 137: 1-3.

77.    The incident unfolded very quickly.  Exhibit E at 151:15-20; 152:6-15; Exhibit G at 108:4-9; Exhibit H at 72:6;Exhibit J at 30:19-21.75.

78.    At not time did Officer Paillant discharge his firearm during the incident.  Exhibit G at 108:10-14.

## VIII.    Wurie's Continued Flight Following Officer Taylor's Discharge Of His Firearm

79.    Wurie accelerated down Fayston Street.  Exhibit E at 146:17-24; 152:6-15.

80.    Wurie continued to drive down Fayston Street and Perth Street until Quincy Street where he exited the vehicle.  Exhibit E at 161:5-6.

81.    After gunshots were fired, the decedent did not say anything.  Exhibit E at 230:16-21.

82.    After Officer Taylor discharged his firearm, he saw Officer Paillant get up off the ground and travel down Fayston Street.  Exhibit H at 139: 13-22.; 140:3-7.

83.    After Officer Taylor observed Officer Paillant travel down Fayston Street, Officer Taylor followed and also ran down Fayston Street in pursuit of the Wurie vehicle.  Exhibit  H  at 139: 13-22.; 140:3-7.

84.    At or near Quincy Street, Officer Paillant observed several of the Wurie vehicle occupants jump a fence to avoid capture.  Exhibit G at 157:1-10.

85.    Officers Flaherty and Connolly also continued to pursue the Wurie vehicle after Officer Taylor discharged his firearm and observed the Wurie vehicle rolling on Quincy Street, with its doors open and the decedent inside in the back seat unconscious.  Exhibit B at 76:3-24.

86.    Officer Flaherty subsequently called for an ambulance.  Exhibit B at 76:3-24.

87.     At the hospital, the decedent was pronounced dead and it was determined that she had been shot by one of Officer Taylor's bullets.    Exhibit K, Plaintiff's Third Amended Complaint at ¶ 15.

88.     As a result of the collision with the Wurie vehicle, Officer Paillant suffered injuries to his knee, elbow and calf and was transported to the hospital following the incident. Exhibit G at 166:1-13.

## IX.    Post-September 8, 2002 Events

89.     Following the incident, a forensic examination of the Wurie vehicle revealed black markings on the hood and front side.    Exhibit L, Affidavit of Elizabeth Ziolkowski ("Exhibit L").

90.     A forensic examination of Officer Paillant's gun and holster was also conducted as a control sample was taken and examined visually and microscopically.    Exhibit L.

91.     After these examinations, it was determined that the black markings on the Wurie vehicle's hood and the control sample from the bottom of Officer Paillant's holster contained a black polymer consistent in all measured physical and microscopic properties and chemical composition. Exhibit L.

92.     It was further determined that this material obtained from the vehicle's hood and Officer Paillant's holster could have come from the same source.    Exhibit L.

93.     In connection with the September 8, 2002 incident, Wurie pled guilty to several offenses stemming from the September 8, 2002 incident, assault and battery with a dangerous weapon, operating a motor vehicle to endanger so that the lives or safety of the public might be endangered, leaving the scene after causing personal injury, accessory after the fact to assault by means of a dangerous weapon, and operating a motor vehicle without being licensed.    Exhibit M,

Transcript of <u>Commowealth v Brima Wurie</u>, Plea Hearing ("Exhibit M"). at 15-27

      94.    Wurie received a three year to a three year and one day sentence of incarceration.

<u>Id.</u>

                         Respectfully submitted,
                         DEFENDANTS, THOMAS TAYLOR, JR.
                         AND CITY OF BOSTON,

                         By their attorneys:

                         /s/ Helen G. Litsas
                         _____
                         Helen G. Litsas #644848
                         Special Assistant Corporation Counsel
                         Hollett Building
                         38 Main Street
                         Saugus, MA 01906
                         (781) 231-8090

                         /s/ Evan C. Ouellette
                         _____
                         Evan C. Ouellette, BBO # 655934
                         Assistant Corporation Counsel
                         City of Boston Law Department
                         Room 615, City Hall
                         Boston, MA 02201
                         (617)635-4048

## <u>CERTIFICATE OF SERVICE</u>

I, Helen G. Litsas, hereby certify that on this date I served a copy of the foregoing documents upon lead plaintiff's counsel, Andrew Stockwell-Alpert, by electronic filing and by postage prepaid, first class, U.S. Mail.

6/2/08          /s/      Helen G. Litsas

_____        _____

Date            Helen G. Litsas

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

### CIVIL ACTION NO. 05-11803-MLW

SHENIA DANCY-STEWART as
Administratrix of the Estate of EVELINE
BARROS-CEPEDA
          Plaintiffs,

v.

THOMAS TAYLOR, Jr., and the CITY
OF BOSTON,
          Defendants.

### APPENDIX OF EXHIBITS IN SUPPORT OF DEFENDANTS, THOMAS TAYLOR, JR. AND CITY OF BOSTON'S MOTION FOR SUMMARY JUDGMENT

| Exhibit Letter | Description of Exhibit |
|---|---|
| **Exhibit A**: | Affidavit of Helen G. Litsas, Esq. |
| **Exhibit B:** | Deposition Transcript of Deborah Flaherty |
| **Exhibit C:** | Deposition Transcript of Robert Connolly |
| **Exhibit D:** | Deposition Transcript of Carlos Fernandez |
| **Exhibit E:** | Deposition Transcript of Brima Wurie |
| **Exhibit F:** | Deposition Transcript of Luis Carvahlo |
| **Exhibit G:** | Deposition Transcript of Michael Paillant |
| **Exhibit H:** | Deposition Transcript of Thomas Taylor |
| **Exhibit I:** | Deposition Transcript of Travo Carter |
| **Exhibit J:** | Deposition Transcript of James Nicholas |
| **Exhibit K:** | Plaintiff's Third Amended Complaint |
| **Exhibit L:** | Affidavit of Elizabeth Ziolkowski |
| **Exhibit M:** | Transcript of Commonwealth v. Brima Wurie, Plea Agreement |
| **Exhibit N:** | Maps of Dunkeld and Fayston Streets |

### UNITED STATES DISTRICT COURT
### DISTRICT OF MASSACHUSETTS

### CIVIL ACTION NO. 05-11803-MLW

SHENIA DANCY-STEWART as
Administratrix of the Estate of EVELINE
BARROS-CEPEDA,
        <u>Plaintiffs</u>,

v.

THOMAS TAYLOR, Jr., and the CITY
OF BOSTON,
        <u>Defendants</u>.

### <u>AFFIDAVIT OF ATTORNEY HELEN G. LITSAS</u>

I, Helen G. Litsas, hereby state and depose as follows:

      1.     I am counsel of record for the Defendants in the above-captioned matter, and make this affidavit on personal knowledge in support of the <u>Defendants' Motion for Summary Judgment.</u>

      2.     I hereby certify that the exhibits attached to <u>Defendants' Local Rule 56.1 Statement of Facts and Supporting Documentation</u> are true and accurate copies.

     Signed under the pains and penalties of perjury this 2nd day of June 2008.

<u>/s/ Helen G. Litsas</u>
Helen G. Litsas

Respectfully submitted,
DEFENDANTS, THOMAS TAYLOR, JR.
AND CITY OF BOSTON,


By their attorneys:



/s/ Helen G. Litsas
_____
Helen G. Litsas #644848
Special Assistant Corporation Counsel
Hollett Building
38 Main Street
Saugus, MA 01906
(781) 231-8090

/s/ Evan C. Ouellette
_____
Evan C. Ouellette, BBO # 655934
Assistant Corporation Counsel
City of Boston Law Department
Room 615, City Hall
Boston, MA 02201
(617)635-4048



## CERTIFICATE OF SERVICE

I, Helen G. Litsas, hereby certify that on this date I served a copy of the foregoing documents upon lead plaintiff's counsel, Andrew Stockwell-Alpert, by electronic filing and by postage prepaid, first class, U.S. Mail.



| 6/2/08 | /s/ | Helen G. Litsas |
|--------|-----|------------------|
| Date   |     | Helen G. Litsas |

# EXHIBIT B

1
2

VOL. I
PAGES 1-88
EXHIBITS:  A-F

3
4

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

5

Civil Action No. 05-11803-MLW

6
7

SHENIA DANCY-STEWART
as Administratrix of the Estate of
EVELINE BARROS-CEPEDA
        Plaintiff
vs.

8
9
10

THOMAS TAYLOR, JR. AND THE
CITY OF BOSTON
        Defendants

11

        C O N F I D E N T I A L

12
13
14
15
16
17

        DEPOSITION OF **DEBRA A. FLAHERTY,** taken on
behalf of the plaintiff, pursuant to the
applicable provisions of the Federal Rules of
Civil Procedure, before Irma Widomski, a
Registered Merit Reporter, and Certified
Shorthand Reporter, No. 131593 in and for the
Commonwealth of Massachusetts, at the Law
Offices of Andrew Stockwell-Alpert, 11 Beacon
Street, Suite 1210, Boston, Massachusetts, on
Monday, February 11, 2008, commencing at 1:00
p.m.

18
19
20
21
22
23
24

WIDOMSKI COURT REPORTING ASSOCIATES
ONE SUNSET DRIVE
WAKEFIELD, MASSACHUSETTS 01880
(781) 246-0710

1   A.   Yes, we received training in Rule 303.

2   Q.   Now, how often would you say in the course of

3        your tenure as a police officer that you

4        received training with regard to Rule 303?

5   A.   Well, at last twice a year.  Every time I went

6        to the range for the inservice training, we

7        would have to review Rule 303.

8   Q.   And in September 8, 2002, did you have your own

9        understanding of when Rule 303 permitted you to

10       discharge a firearm at a moving or fleeing

11       vehicle?

12               MS. LITSAS:  Objection.

13   A.   Did I have my own understanding?

14   Q.   Yes.

15   A.   Yes, I did.

16   Q.   Would that be based on the training that you

17       received inservice?

18   A.   Yes, it would.

19   Q.   By the way, before you came into this

20       deposition, did you review any written

21       materials?

22   A.   Yes, I did.

23   Q.   Did you review the transcript of your testimony

24       before the homicide unit?

1    A.    I don't know him.

2    Q.    How about your partner, Officer Connolly?

3    A.    I haven't seen Bobby Connolly in years.

4    Q.    Other than the document you already outlined,

5          are there any other documents you recollect

6          reviewing or diagrams or photos of any type

7          before coming in to testify today?

8    A.    No.

9    Q.    Do you have a memory of the events of September

10         8, 2002, prior to reviewing your transcript of

11         your testimony?

12   A.    Yes.

13   Q.    One minute, please.

14                   (Discussion off the record.)

15   Q.    Do you recollect the date of the incident that's

16         brought us here today?

17   A.    September 8, 2002.

18   Q.    And at approximately 12:30 at night, do you

19         recollect whether you were on duty or not?

20   A.    Yes, I do.

21   Q.    And were you in a cruiser?

22   A.    Yes, I was.

23   Q.    Was it a marked cruiser?

24   A.    Yes, it was.

| 1 | Q. | Was your partner Officer Connolly? |
|---|---|---|
| 2 | A. | He was. |

3   Q.   At some point in the course of the night, did
4        something draw your attention to a white Taurus?

5   A.   Yes.

6   Q.   Were you -- you recollect where you were
7        situated in district is it 11, did you say, or
8        ten, where you were situated on the streets when
9        something drew your attention to the white
10       Taurus?

11   A.   Yes, I was.

12   Q.   Where were you?

13   A.   I was sitting at a red light outside St. Paul's
14        Church on Columbia Road.  I was sitting in the
15        cruiser at a red light outside of Saint Paul's
16        Church on the district two side of Columbia Road
17        at Hancock Street.

18   Q.   And what drew your attention to the white
19        Taurus?

20   A.   What drew my attention was the fact that it came
21        out of Hancock Street, and it should have pulled
22        behind me at the red light when in fact it
23        pulled up beside me and proceeded to go through
24        the red light.

1   Q.   Who was operating the cruiser?

2   A.   I was.

3   Q.   And where was Officer Connolly sitting?

4   A.   Beside me in the passenger seat.

5   Q.   And did you or he say anything to each other at

6        the point that you made that observation of the

7        white Taurus?

8   A.   I believe I said something to Officer Connolly.

9   Q.   What did you say?

10  A.   That he had just gone through the red light, and

11       I was going to pull him over, attempt to pull

12       him over.

13  Q.   In connection with that, did you activate your

14       red light, your overhead light?

15  A.   I did.

16  Q.   And you proceeded to follow him?

17  A.   I followed him.

18  Q.   Now, when you followed him at the moment that he

19       went through the red light and you started to

20       follow him, were you able to make any

21       observations as to how many individuals were in

22       the vehicle?

23  A.   I knew there were at least three or four people,

24       maybe more in the vehicle.

1   Q.   And you made that observation right at the same

2        point that you started to follow him from the

3        red light?

4   A.   Yes.

5   Q.   Could you determine approximately how many were

6        in the back and how many were in the front?

7   A.   No, I couldn't.

8   Q.   Could you determine whether they were black or

9        white?

10   A.   I couldn't.

11   Q.   Do you know whether they were male or female?

12   A.   I could not.

13   Q.   As you followed them, which way did the vehicle

14        go and which way did you go?

15   A.   The vehicle proceeded up Columbia Road.  I was

16        right behind it.  He made a motion like he was

17        pulling over at Bird Street and he took a right

18        onto Bird Street.  At which point I thought he

19        was stopping.  And then he took a sharp right

20        onto Virginia Street when I realized he wasn't

21        stopping.

22   Q.   Throughout that period of time, did his speed

23        ever exceed 20 or 25 miles an hour?

24               MS. LITSAS:  Objection.

1      like he was stopping at Magnolia Street and to

2      pass the car?

3               MS. LITSAS:  Objection.

4  A.  Approximately four blocks, five blocks.

5  Q.  Then what happened?

6  A.  He proceeded down Magnolia Street.  I continued

7      to notify operations of our location when he

8      took a right onto Wayland Street.

9  Q.  Okay, then what?

10 A.  He still refused to stop.  I still continued to

11     notify operations that he was refusing --

12 Q.  Approximately how much time --

13          MS. LITSAS:  Objection.  Can you let

14     her finish the answer, Andrew?

15 Q.  Approximately how much time had gone by from the

16     time you first began to follow him to this point

17     now where you're on Wayland Street and he still

18     hasn't stopped?

19          MS. LITSAS:  Objection.

20 A.  I don't know how much time.  Not a long time.

21     Probably minutes, but it seemed like forever.

22 Q.  Then what happened?

23 A.  I continued down Wayland Street.  I believe we

24     got to Howard Ave., he took a left towards

1          Quincy Street.

2    Q.   Then what?

3    A.   I continued to notify operations that he was

4        refusing to stop.  He took a left onto Quincy

5        Street.  Then he banged a right up onto Dunkeld

6        Street.

7    Q.   At no point up until then were you aware of any

8        other police, were you aware of any other police

9        cruisers attempting to stop this man besides

10       you?

11              MS. LITSAS:  Objection.

12   Q.   To stop this person besides you?

13   A.   No.  I hadn't seen any cruisers up to this

14       point.

15   Q.   Were you advised by headquarters that any other

16       cruisers were joining in the pursuit at all?

17   A.   I had asked headquarters to notify district two

18       that we were on their district at the initial

19       onset of us going up Virginia Street, I believe.

20   Q.   And at some point, did you turn onto Dunkeld

21       Street?

22   A.   Yes.

23   Q.   Was that a right or a left onto Dunkeld Street?

24   A.   It was a right onto Dunkeld from Quincy.

1           crossing Fayston Street, where exactly was the

2           location of the vehicle that you were following?

3    A.     In front of me.

4    Q.     Could you, please, put a little box on the map

5           in the place where that vehicle was to the best

6           of your recollection when you first saw

7           Paillant?

8    A.     Right there.

9    Q.     And please label that V-1?

10   A.     Okay.

11   Q.     And as you approached Fayston Street, you

12          recollect whether you saw any dumpsters on

13          either the left-hand side or the right-hand side

14          of Dunkeld Street?

15   A.     I don't recall any dumpsters.

16   Q.     Do you recollect any vehicles at the corner or

17          at the intersection of Fayston and Dunkeld?

18   A.     No, I don't recall.

19   Q.     As you continued to follow the vehicle, did

20          Officer Paillant continue to move in the

21          direction he was starting to move in?

22                    MS. LITSAS:   Objection.

23   A.     I don't know.

24   Q.     Well, what were the next series of observations

46

1          that you made after you first saw Officer

2          Paillant walking as he was walking towards

3          Fayston?

4     A.   My next observation was the vehicle turned onto

5          Fayston Street.  The vehicle I was trying to

6          stop, the white car, he hit Officer Paillant.

7     Q.   Wait, please.  At the point that the vehicle

8          turned onto Fayston Street, okay, and hit

9          Officer Paillant, could you please put a circle

10         where Officer Paillant was?

11    A.   I already have that circle.

12    Q.   Where the vehicle struck him?

13    A.   Right here.  Which circle do you want me to put?

14         There's already a circle for Officer Paillant.

15                   MS. LITSAS:  It's a little difficult

16         because it's so small.  It's not really an

17         accurate representation.

18                   MR. STOCKWELL-ALPERT:  Because it's

19         small.

20                   MS. LITSAS:  You're trying to put

21         everything in here.  It's a very small, confined

22         location.

23                   MR. STOCKWELL-ALPERT:  Could you

24         please mark this Exhibit B?

1    the car after Paillant got shot.  I said I

2    couldn't put it because I didn't know where he

3    was.

4                MR. STOCKWELL-ALPERT:  Could you,

5    please, go back and find out what the first

6    questions were with regard to Exhibit F?

7                I want on the record every question so

8    that it's clear that she was asked a series of

9    questions and responded to those with regard to

10    the positioning immediately prior to the

11    shooting so that we have it clear as to what

12    went on before the break which became a 10- to

13    15-minute break, during which time she was out

14    in the hall talking to go other people about

15    this matter.

16                MS. LITSAS:  Objection.

17                MR. STOCKWELL-ALPERT:  I would like

18    you to read back the line of questions so it was

19    very clear what she was putting on that diagram.

20                (Questions and answers read back.)

21    Q.  Now, on the same diagram that you already drew,

22    what you drew at the point immediately prior to

23    the first shot being fired, I would also like

24    you to draw the position of the white Taurus

1              night to your recollection?

2      A.     I really don't know.

3      Q.     Okay.  And please describe the nature of any

4              further involvement that you had -- let's start

5              with after you regained visual contact with the

6              vehicle -- what's the next thing that happened?

7      A.     I broadcast to operations that the vehicle was

8              on Quincy Street with the doors open and it was

9              rolling in the middle of the street, I believe.

10     Q.     And then what happened?

11     A.     My partner alighted from out of our department

12             vehicle, went after the people that were running

13             from the Taurus, and I ran up to the Taurus.

14     Q.     And then?

15     A.     Then I observed somebody in the back seat

16             slumped over.

17     Q.     Did you go up to that person physically?

18     A.     Yes, I did.

19     Q.     And did you, were you able to determine whether

20             or not they were conscious at the time?

21     A.     I believe the person was unconscious.  I asked

22             for an ambulance.

23     Q.     Could you tell whether they were still

24             breathing?

1     from what you observed that Officer Paillant's

2     life was threatened?

3                MS. LITSAS:  Objection.

4  A.  I'm sorry, say that question again.

5  Q.  Was there anything about the way the vehicle

6     struck Officer Paillant or any of the

7     observations that you made that caused you to

8     think that Officer Paillant's life was in

9     danger?

10               MS. LITSAS:  Objection.

11 A.  Sure, the guy drove right at him.

12 Q.  After the guy hit him and he fell down, okay,

13    was there anything further about the situation

14    that caused you to think that Officer Paillant's

15    life may be in danger?

16 A.  Shots were being fired.  I had no idea who was

17    firing them.

18 Q.  So was it the shots that caused you to be

19    concerned for his life or was it the actions of

20    the motor vehicle?

21               MS. LITSAS:  Objection.

22 A.  What's the question?  Was I more concerned his

23    life was in danger from the car or the guns or

24    the fires, the gunshots?

1         coming to a close.

2             MS. LITSAS: Okay.

3             (Recess.)

4     BY MR. STOCKWELL-ALPERT:

5   Q.  Did you testify in this deposition that you lost

6       sight of Officer Paillant for some period of

7       time after the car struck him?

8            MS. LITSAS: Objection.

9   A.  Yes, when he landed on the ground.

10  Q.  Did you testify about how long you lost sight of

11      him for?

12  A.  No. I don't believe I testified as to how long

13      I lost sight of him.

14  Q.  So let me ask you, do you now have any

15      recollection as to how long you lost sight of

16      him for?

17  A.  No.

18  Q.  What was it, what was going on at the time that

19      caused you to lose sight of him?

20          MS. LITSAS: Objection.

21  A.  What do you mean what was going on?

22  Q.  What was going on that caused you to lose sight

23      of him?

24          MS. LITSAS: Objection.

# EXHIBIT C

Volume:  1
Pages:  1 to 97
Exhibits:  None

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

C.A. No. 05-11803-MLW


SHENIA DANCY-STEWART as Administratrix
of the Estate of EVELINE BARROS-CEPEDA,
                Plaintiff


        vs.

THOMAS TAYLOR, JR., AND THE CITY OF
BOSTON,
                Defendants


   C O N F I D E N T I A L


        **DEPOSITION of ROBERT CONNOLLY,**
a witness called on behalf of the
Plaintiff, pursuant to the applicable
provisions of the Massachusetts Rules of
Civil Procedure, before Judith R. Sidel,
Professional Court Reporter and Notary
Public, in and for the Commonwealth of
Massachusetts, at the Office of Andrew
Stockwell-Alpert, 11 Beacon Street, Suite
220, Boston, Massachusetts 02108, on
Friday, February 1, 2008, commencing at
1:55 p.m.




        *   *   *   *

WIDOMSKI REPORTING SERVICE
One Sunset Drive
Wakefield, Massachusetts 01880
(781) 246-0710

```
 1        written materials that you just discussed

 2        that you reviewed prior to coming here

 3        today?

 4                   MS. LITSAS:  Objection.

 5   A.   It was last night at my house.

 6   Q.   Did you also review them again this

 7        morning, or some time after this morning?

 8   A.   Just this morning.

 9   Q.   Now, do you have a recollection as to

10        how -- strike that.  On that particular

11        night, okay, of the incident, were you

12        in an unmarked cruiser?

13   A.   Marked.

14   Q.   What was your shift?

15   A.   Midnight.

16   Q.   To?

17   A.   7:30.

18   Q.   Do you recollect what area you were

19        patrolling prior to this incident

20        occurring?

21   A.   All of Dorchester.

22   Q.   Are you assigned an area to patrol at

23        roll call when you come in?

24   A.   Yes.
```

1       assigned different partners on a regular

2       basis, or you customarily have the same

3       partner?

4   A.  You mostly have the same partner.

5   Q.  Was Debra Flaherty mostly your partner

6       most of the time?

7                   MS. LITSAS:   Objection.

8   A.  She was.

9   Q.  Would there be occasions when you might

10      be manning a vehicle by yourself?

11  A.  There were.

12  Q.  But on this particular night Debra

13      Flaherty was your partner in the vehicle?

14  A.  Yes.

15  Q.  Who was driving?

16  A.  She was.

17  Q.  What drew your attention to the white

18      Taurus?

19  A.  The way it came at us, and came beside

20      us.

21  Q.  Where were you, if you recollect, when

22      you first became aware of the white

23      Taurus?

24  A.  We were on Columbia Road at a red light.

1    Q.   Now, Columbia Road at a red light, you

2         mean there was an intersection with the

3         other road.  What was the other road that

4         it was at an intersection with?

5                   MS. LITSAS:   Objection.

6    A.   Hancock Street.

7    Q.   You say that when the vehicle came at

8         you, what do you mean by that?

9    A.   As we were at the red light on Columbia

10        Road, we noticed the car come down

11        Hancock.  It kind of made a crazy turn,

12        and then it turned back again, and it

13        came beside us.

14   Q.   Could you be more specific about what you

15        mean by characterization of "crazy turn"?

16   A.   We were at the red light on Columbia and

17        Hancock.  The car came down Hancock,

18        started turning towards the right to go

19        the opposite direction of us, but then he

20        turned again towards the left and came

21        beside us.

22   Q.   Was that the sum total of the activity of

23        the vehicle that drew your attention to

24        it at that point in time?

```
 1                    MS. LITSAS:  Objection.

 2    A.   Then it went through the red light.

 3    Q.   I mean, at the red light up to that

 4         point, that's what drew your attention

 5         to the vehicle?

 6    A.   Yes, just the way he was turning, and

 7         then came back at us.

 8    Q.   Now, you said it pulled up next to you?

 9    A.   Yes.

10    Q.   On the left side of your vehicle, or the

11         right side of your vehicle?

12    A.   On the left side.

13    Q.   So that would mean that the right

14         passenger side of that vehicle was next

15         to the driver's side of your vehicle,

16         correct?

17                    MS. LITSAS:  Objection.

18    A.   Yes, it was.

19    Q.   Did it come to a stop at the red light?

20    A.   It did.

21    Q.   Then what happened?

22    A.   Then it went through the red light.

23    Q.   Now, up to that point did you perceive

24         any reason, based on the driving behavior
```

1        violation?

2     A.  Civil.

3     Q.  And what was your purpose in following

4         the vehicle after it went through the red

5         light?

6     A.  To stop it, and give it a ticket.

7     Q.  In connection with that, did your partner

8         activate the red light or the overhead

9         light?

10    A.  They were already on.

11    Q.  And why were they on prior to the vehicle

12        going through the red light?

13    A.  Oh, I'm sorry.  Right when they went

14        through the light, Debbie activated.

15    Q.  What was the approximate rate of speed of

16        the vehicle as you were following it?

17    A.  It was not that fast.

18    Q.  And if I said facing on Dunkeld Street,

19        would the names of those streets mean

20        anything to you today, as we're sitting

21        here at this deposition?

22               MS. LITSAS:  Objection.

23    A.  Those streets I remember.

24    Q.  As we sit here today, do you have any

1       knowledge or recollection as to where --

2       strike that -- as to what streets or

3       intersections the shooting occurred?

4   A.   I do.

5   Q.   What streets?

6   A.   It was on Dunkeld and Fayston.

7   Q.   And your partner and you in the vehicle

8       continued to follow the white Taurus for

9       some period of time, right?

10   A.   We did.

11   Q.   And would it be fair to say that you made

12       various turns along the way on different

13       streets?

14   A.   We did.

15   Q.   During the course of time that you

16       were following that vehicle, do you

17       recollect whether it turned onto Fayston

18       Street at some point?

19   A.   It did.

20   Q.   But prior to it turning onto Fayston

21       Street, do you recollect whether or not

22       it changed its rate of speed at all?

23   A.   I don't recall.

24   Q.   Well, do you recollect whether it went

1    A.   Yes.

2    Q.   And how close to the intersection of

3         Fayston and Dunkeld with respect to you

4         did that officer come?

5    A.   He was right there at the corner.

6    Q.   That would be with respect to you.  It

7         would be the right corner, right?

8    A.   Yes.

9    Q.   Now, did you make any observation as to

10        whether or not there was any car parked

11        at the corner of Fayston -- at the corner

12        of Dunkeld, okay, where the officer was

13        moving towards?

14   A.   I don't remember.

15   Q.   As this was going on, how far behind the

16        white Taurus were you?

17                  MS. LITSAS:  Objection.

18   A.   Still two- to three-car lengths.

19   Q.   Were you able to maintain visual contact

20        with both officers throughout this series

21        of events up to this point?

22                  MS. LITSAS:  Objection.

23   A.   I was fixed on watching the car hitting

24        the officer.

1    Q.   What transpired -- what happened as the

2         car started to turn?

3    A.   It hit the police officer.

4    Q.   Now, how far into the actual turn onto

5         Fayston Street was the car before it

6         struck the officer?

7    A.   It was like half and half.

8    Q.   Half into Fayston and half in Dunkeld?

9    A.   Yeah.

10   Q.   And what exactly did you see happen?

11        Let's break this down.  Did you see what

12        part of the vehicle hit what part of the

13        officer's body from where you were?

14                 MS. LITSAS:   Objection.

15   A.   I did.

16   Q.   Were you still two-car lengths or so

17        behind?

18   A.   At this point when we saw the car going

19        towards the officer, Debbie had slowed

20        down even more and watched, and we were

21        kind of like watching what was going on.

22   Q.   Why?

23   A.   Because all of a sudden the officer went

24        up over the hood, and we didn't want to

```
 1        going to stop.
 2   Q.   But you don't know what he realized.
 3                 MS. LITSAS:  Objection.
 4   A.   I shouldn't say that.
 5   Q.   With respect to the time that you
 6        observed, okay, how much time elapsed
 7        from the time he put up his hands to the
 8        time he actually started to move to the
 9        right?
10   A.   Seconds.
11   Q.   And what part of the vehicle did you see
12        strike what part of the officer first?
13                 MS. LITSAS:  Objection.
14   A.   The front part of the car, the fender
15        grill area hit the officer in his chest
16        and lower body.
17   Q.   And did you see any other part of the
18        vehicle come in contact with the officer
19        after that?
20   A.   Yes.
21   Q.   What other part of the vehicle came
22        in contact with the other part of the
23        officer's body after that?
24   A.   The hood.  He went up onto the hood.
```

1    Q.   Now, did he go up -- when he went up onto

2         the hood, what part of his body went up

3         onto what part of the hood?

4    A.   The whole body went up.

5    Q.   Did it go up -- if you want to divide the

6         car in half, okay, so you have got a left

7         half of the hood, and the right half of

8         the hood, okay, what part of the hood

9         did the officer's body go up on, the

10        right half or?

11   A.   The right half.

12   Q.   Okay.  And what part of the right half?

13        Was it closer to, say, the headlight, or

14        was it closer to the center?

15   A.   It was more like the whole right side of

16        the hood he went up over it.

17   Q.   You mean over it.  You mean he landed on

18        it, or he actually went flying over the

19        hood?

20                  MS. LITSAS:   Objection.

21   A.   He got hit.  He went up onto the hood.

22        The car is turning.  As his car is

23        turning, he's on the hood, and then he

24        came off the hood onto the ground.

```
1   Q.  I just have some follow-up questions.

2       Officer Connolly, why is it that you

3       didn't hear Officer Paillant on your

4       radio transmission on the night of

5       September 8th, 2002?

6                   MR. STOCKWELL-ALPERT:

7       Objection.

8   A.  Two different stations.

9   Q.  Could you please explain what you mean by

10      that?

11  A.  There are five districts, and every

12      district has their own radio station.

13  Q.  So if Officer Paillant was transmitting

14      a radio transmission on his radio, would

15      you have been able to hear it on the

16      night of September 8th, 2002?

17  A.  No.

18  Q.  Why is that?

19  A.  Because we were on a different station.

20  Q.  What station was that?

21  A.  We were on Channel 6.

22  Q.  What channel was he on?

23  A.  He's on Channel 3.

24  Q.  At the point that you see a body exit out
```

# EXHIBIT D

ORIGINAL

VOLUME I

PAGES:    1 - 73

EXHIBITS: 1 - 3

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

C.A. NO. 05-11803-MLW

* * * * * * * * * *    *
                      *
SHENIA DANCY-STEWART, as    *
Administratrix of the Estate    *
of EVELINE BARROS-CEPEDA,    *
            Plaintiffs,    *
                      *
vs.                   *
                      *
THOMAS TAYLOR, JR., and the    *
CITY OF BOSTON,    *
            Defendants.    *
                      *
* * * * * * * * * *    *

            DEPOSITION OF CARLOS FERNANDES,
taken on behalf of the Defendants, pursuant
to the Massachusetts Rules of Civil
Procedure, before Karen Borreson, RPR, Notary
Public within and for the Commonwealth of
Massachusetts, at the law offices of City of
Boston, City Hall, Boston, Massachusetts, on
Thursday, February 21, 2008, commencing at
2:35 p.m.

```
 1   Q. Is he any relation to Dimingas DePina?

 2   A. Dimingas, no.

 3   Q. How do you spell DePina, D-E-P --

 4   A. D-E-P-I-N-A.

 5   Q. Do you have any plans on moving, Mr.

 6      Fernandes?

 7   A. Nope.

 8   Q. Do you have any intention on moving to

 9      Tennessee?

10   A. No.

11   Q. Do you have any intention on moving at any

12      time in the next 12 months?

13   A. Nope.

14   Q. Have you always lived in Massachusetts?

15   A. Yes, I have.

16   Q. At the time of the incident on September 8,

17      2003, where were you living?

18   A. I'm not sure.  I can't remember.  I don't

19      know.

20   Q. Do you have a Social Security --

21   A. I don't have a stable living area.  I've

22      been around a lot like -- like, I bounce

23      from lots of places.

24   Q. Is there a reason why you don't have a
```

2nd Day Carlos Fernandes

74

1                                      VOLUME II
                                    PAGES 74 TO 137
2                                  EXHIBITS:  SEE INDEX

3                        UNITED STATES DISTRICT COURT
                           DISTRICT OF MASSACHUSETTS
4
                              C.A. NO. 05-11803MLW
5

6       SHENIA DANCY-STEWART, as        )
        Administratrix of the           )
7       Estate of EVELINE               )
        BARROS-CEPEDA,                   )
8            Plaintiff,                   )
                                         )
9       vs.                              )
                                         )
10      THOMAS TAYLOR, JR., and          )
        the CITY OF BOSTON,              )
11           Defendants.                 )

12

13

14                    CONTINUED DEPOSITION OF CARLOS FERNANDES,

15      a witness called on behalf of the Defendants,

16      pursuant to the Federal Rules of Civil Procedure

17      before Lisa Abdo, Certified Shorthand Reporter and

18      Notary Public in and for the Commonwealth of

19      Massachusetts, at the offices of City of Boston Law

20      Department, City Hall, Room 615, Boston,

21      Massachusetts, on Tuesday, May 13, 2008, commencing

22      at 11:28 a.m.

23

24

75

1       APPEARANCES:

2

Page 1

2nd Day Carlos Fernandes

10   passed away until the -- until he came and

11   told me.  We didn't know none of that

12   happened until the next following day, the

13   following day.

14   Q.  There were shots fired at two different locations

15       that night, correct?

16   A.  Yeah.

17   Q.  There were shots fired at Cushing Ave., correct?

18   A.  Yes.

19   Q.  And there were shots fired on Dunkeld Street,

20       correct?

21   A.  Yes.

22   Q.  And prior to arriving at Dunkeld Street, you were

23       previously -- all of you in the vehicle were at

24       Cushing Ave., correct?

90

1   A.  Yes.

2   Q.  And based on your testimony on the first day of

3       your deposition, February 21, 2008, the people in

4       the vehicle that night on September 8, 2002 were

5       yourself, Brima Wurie, Maria DaRosa, Luis

6       Carvalho -- is that everybody? -- and Eveline

7       Barros-Cepeda?

8   A.  Yes.

9   Q.  Was there anybody else in the car?

10   A.  No.

11   Q.  And you were sitting in the front passenger's seat?

12   A.  Yes, I was.

13   Q.  And Brima Wurie was driving?

14   A.  Yes, he was.

Page 14

2nd Day Carlos Fernandes

15    Q.  And what was the purpose in going to Cushing Ave.

16         that night on September 8, 2002?

17    A.  We was just driving through.  We probably

18         just driving by.  We had no reason to be

19         going there.

20    Q.  Did you stop at Cushing Avenue at any point?

21    A.  Yes, we did.

22    Q.  And what did you do -- who was driving at that

23         point?

24    A.  Brima Wurie.

91

1    Q.  And where were you sitting?

2    A.  I was in the front passenger.

3    Q.  Okay.  Please keep your voice up.

4    A.  Okay.

5    Q.  Who was in the back seat behind the driver's side?

6    A.  The driver's side?  I don't know which -- I

7         don't know which one.  I just know Eveline

8         was in the middle.  It could have either been

9         Yito's seat or Lenny.  I'm not too sure.

10   Q.  And just so that the record is clear, Yito is Luis

11        Carvalho?

12   A.  Yes, Luis Carvalho.

13   Q.  And Maria DaRosa is Lenny?

14   A.  Yeah.

15   Q.  Now, did you have a nickname?

16   A.  No.

17   Q.  And Brima Wurie had a nickname; it's B.J., correct?

18   A.  Yes.

19   Q.  Did he have any other nicknames?

2nd Day Carlos Fernandes

```
 9      chased him.

10   Q. What were you doing that got you guys in trouble?

11   A. We got pulled over and he just took off.  I

12      have no idea what we did.  They just

13      handcuffed me and I went to court.

14   Q. Were you charged with anything?

15   A. What was I charged with?  I don't remember

16      what I was charged with.  I think I was just

17      charged with resisting arrest.

18   Q. Were you then ultimately convicted, or were the

19      charges dismissed?

20   A. I think I plea bargained because I was on

21      probation or something.  So I ended up taking

22      a plea bargain, I believe.  I'm not too sure.

23      There's a lot of cases.

24   Q. There's been a lot of cases.  I understand.  Let's
```

96

```
 1      turn back to the Cushing Ave. incident.  So at some

 2      point you arrived at Cushing Avenue, correct?

 3   A. Yes.

 4   Q. On September 8th?

 5   A. Yes.

 6   Q. And what do you do there when you get there?

 7   A. We was driving by and we thought we

 8      recognized somebody we knew.  So we just

 9      pulled over to say "Hi" to some dude.  And

10      then as soon as we pulled over, I get to step

11      out the car, we heard gunshots.  That's when

12      I got back in the car and we just took off.

13   Q. Did anyone else get out of the car at that same
```

Page 19

2nd Day Carlos Fernandes

14    time at Cushing Ave.?

15   A.  I'm not sure.  I just opened the door.  As

16       soon as I heard gunshots, I dove back in.

17   Q.  Were you actually out of the car?

18   A.  I just opened the door and took a step out.

19       I didn't really actually -- I don't believe I

20       got out the car completely.  Just as I was

21       stepping out.  I don't know if they

22       thought -- I don't know if they were shooting

23       at us or somebody else was shooting.  I

24       didn't know what was going on.  I just heard

97

1        gunshots, got back in the car, and we took

2        off.

3    Q.  Now, did you have a gun with you at Cushing Ave.?

4    A.  No, I didn't.

5    Q.  Did anyone else have a gun in the car?

6    A.  No, they didn't.

7    Q.  Did you participate in any shooting at Cushing

8        Ave.?

9    A.  No, I didn't.

10   Q.  So you step out of the car and you hear shooting.

11       Where are the shots coming from?

12   A.  I didn't see all that.  I just got back in

13       the car to get out of there.

14   Q.  And where is the guy that you recognize and say

15       hello to?

16   A.  We pulled over.  I don't know.  Everybody

17       just scattered.  As soon as I was about to

18       get out, we heard a shot and everybody just

Page 20

2nd Day Carlos Fernandes

19    scattered.

20    Q. And what happened to that guy that you saw that you

21       recognized? He scattered, too?

22    A. Yeah, I guess. As soon as -- I just

23       turned -- was just about to step out. I

24       didn't really -- I lost sight. Because he

98

1     pulled over for me to get out. I had to turn

2     around because he was behind us. As soon as

3     I even opened the door to get out, there were

4     gunshots as I came out. So I just got back

5     in the car.

6     Q. And where on Cushing Ave. did you get out?

7     A. It was a left. I'm not sure what's the name

8        of the street. It was right -- as soon as we

9        pulled over, we pulled over on the left, and

10       it was right on the corner right there.

11    Q. Was there a house that was nearby?

12    A. At the top of the turn. I forget the name of

13       that street. I think it's -- there's a

14       corner store at the end of that street that

15       I know you come up to go to Cushing. But I'm

16       not sure of the name of the street. I know

17       it's the second turn over there.

18    Q. Did you know anybody on Cushing Avenue at that

19       time?

20    A. Yeah. I've got a couple of cousins that hang

21       around there, a couple of people.

22    Q. And what are their names?

23    A. Freddie.

                    Page 21

2nd Day Carlos Fernandes

12    point where we was leaving Angela's, B.J. was

13    driving.  I'm not sure if he was driving the

14    whole way or if they switched.  I can't

15    remember that.

16  Q.  At some point you arrive at Cushing Ave. because

17      you see somebody you know and you hear shots fired?

18  A.  Yes.

19  Q.  You're getting out the car at the time you hear

20      shots fired, correct?

21  A.  Yes.

22  Q.  And then you get back in the car?

23  A.  Yes.

24  Q.  And then you -- B.J. starts driving away, correct?

103

1   A.  Yes.

2   Q.  And where are you going at that point?

3   A.  I think we took a right -- we took a right

4       onto Hancock, and then we was taking a left

5       back up onto Columbia Road.

6   Q.  And at any point do you see any police cruiser?

7   A.  As soon as we took that right.

8   Q.  From where?

9   A.  From Hancock to Columbia Road.

10  Q.  And then what happens after that?

11  A.  As soon as we took that right, they just came

12      right behind us.

13  Q.  Was there a red light or a green light?

14  A.  I think it was a red light.

15  Q.  So B.J. went through the red light?

16  A.  I'm not sure.  I'm not sure if it was red or

Page 25

2nd Day Carlos Fernandes

17    green.  It's one of them lights that they

18    just switched on Columbia Road.  It's funny.

19    I can't explain it.  If you go there, you'll

20    understand what I'm saying.  I can't explain.

21    I don't know.  I don't know if it was green

22    or red.

23  Q.  Was there a discussion in the car about whether it

24    was a red light or a green light?

                                                    104

1   A.  Was there?  I can't remember.  I can't

2     remember that.

3   Q.  So you can't remember if anyone said "Is that a red

4     light or a green light?," "B.J., you just went

5     through a red light" or anything like that?

6   A.  It's a long time.  I can't really remember

7     the details if somebody said it or not.

8     Somebody could have said it.  I'm not sure.

9   Q.  So what happens after you -- do you look back and

10    see the police cruiser?

11  A.  Yes.

12  Q.  And do you see who's driving the police cruiser?

13  A.  No, I don't.

14  Q.  It's a marked cruiser, blue and white?

15  A.  Yeah, a blue and white.

16  Q.  And what does B.J. do?  Does he stop?

17  A.  He just kept driving.

18  Q.  And do you say anything to him about why he keeps

19    driving?

20  A.  Did I?  I don't know.  I don't remember.  I

21    don't think I said anything to him.

                    Page 26

2nd Day Carlos Fernandes

22    Q.  Does anyone else in the car say anything to him

23        about why he keeps driving and doesn't stop for the

24        police?

105

1    A.  I think I might have heard people saying

2        something.  But there was just a lot of

3        commotion.  So I really don't know what --

4        there was a lot of people.  There was five

5        people in the car.  I can't really pinpoint

6        right now who said what or did somebody say

7        that.  There was just a lot of commotion

8        going on.  We just got shot at, the police,

9        he doesn't want to stop.  So there's a lot of

10       commotion.  So I really can't pinpoint what

11       was said by each person, who said what.

12   Q.  So after you leave Cushing Avenue, you guys wanted

13       to get out of there because you had just been shot

14       at, correct?

15   A.  Yes.

16   Q.  So B.J. is driving to get away from Cushing Ave.,

17       correct?

18   A.  Yes.

19   Q.  And then he goes through what possibly could be a

20       red light?

21   A.  Yes.

22   Q.  And the police cruiser follows you?

23   A.  Yes.

24   Q.  And it's possible that the police may think that

106

2nd Day Carlos Fernandes

6      out of there, you couldn't get out of there.

7   Q.  Because the car didn't drive that fast?

8   A.  Yeah, yeah.

9   Q.  And what kind of car again was it?

10  A.  I just know it was old.  I'm not sure.

11  Q.  It was a Taurus?

12  A.  Yeah, a Taurus.

13  Q.  A white Taurus?

14  A.  Yeah, it could have been.

15  Q.  And at all points that night you were sitting in

16      the front seat?

17  A.  Yes.

18  Q.  And so you are in the car while the police follow

19      you.  And at any point does the car -- the car

20      you're driving in stop?

21  A.  No.

22  Q.  And do you know why?

23  A.  I'm not sure.  You'd have to ask B.J. that.

24  Q.  You don't why you don't stop for the police?

108

1   A.  I didn't have an option.  I was in the

2       passenger's seat.  You'll have to ask him

3       that.  I'm not sure.

4   Q.  Did you ask B.J. to stop the car at any point?

5   A.  Yeah, I think I did.  I think I did.  I think

6       he didn't have his license or something like

7       that.  And he was on parole or something,

8       something dumb.

9   Q.  So B.J. was driving the car without a license and

10      he was on parole and so that's why he didn't want

Page 29

2nd Day Carlos Fernandes

```
11        to stop?
12    A.  I believe so.
13    Q.  And at some point you reached Dunkeld Street,
14        correct?
15    A.  Yes.
16    Q.  At any point prior to reaching Dunkeld Street, does
17        B.J. stop the car for the police?
18    A.  No.
19    Q.  And is there any other car -- is there any time
20        that the car you're driving in slows down?
21    A.  Yeah, when we was coming to the top of
22        Dunkeld, a Boston police officer I guess was
23        already up there.  He seen us coming up.  And
24        the other cruiser was still behind us.
```

109

```
 1    Q.  And did the cruiser have lights and sirens on at
 2        that time?
 3    A.  Yes, it did.
 4    Q.  So the cruiser had lights and sirens on the whole
 5        time that you were traveling in the car from the
 6        point of the red light or the green light to
 7        Dunkeld Street, correct?
 8    A.  Yeah, I believe so.  It was steadily behind
 9        us.
10    Q.  It was steadily behind you?
11    A.  Yeah.
12    Q.  And what do you see when you are driving up Dunkeld
13        Street?
14    A.  I see a cruiser at the top, and then I seen a
15        cop running to the front of the car we was in
```

Page 30

2nd Day Carlos Fernandes

16    with his gun drawn.

17  Q. And what is he doing?

18  A. I think he was yelling to stop or pull over

19    or something like that.  I couldn't really

20    hear him.

21  Q. Is he raising his hands up in the air?

22  A. He had the gun pointed at the windshield.

23  Q. At any point does he put his hands up like this

24    where he -- where you're putting your open-faced

110

1    palms in your direction?

2  A. So I can see his palm?

3  Q. Yes.

4  A. No.  All I seen was the gun.

5  Q. And when is the first time that you see him?  Where

6    are you?

7  A. Maybe a little bit past coming up the street.

8    Maybe a little bit less than halfway maybe

9    from Dunkeld that I seen him.

10  Q. And did you say anything when you see him?

11  A. Yeah, "The police."

12  Q. And who do you say that to?

13  A. Probably B.J., the people in the car.

14  Q. And did the people in the car say anything to you?

15  A. I don't know.  Probably a whole lot of

16    commotion going on.  I can't really...

17  Q. I don't want you to guess.  If you remember.

18  A. Oh, no, I can't.  I can't remember.

19  Q. And what happens when you see the police officer

20    draw his gun?

Page 31

2nd Day Carlos Fernandes

21   A.  He just kept coming forward towards the car,

22       so I kind of ducked down a little bit.

23   Q.  And what happens next?

24   A.  I guess B.J. kept going.  He wasn't stopping.

111

1      So I kind of ducked down because I didn't

2      know if he was going to shoot or not.  So I

3      kind of ducked a little bit.  But I could

4      kind of see a little bit off my other eye.

5      And I see him coming across from the other

6      side because I was on the passenger's side.

7      So I could see him coming across the front of

8      the vehicle because he was coming towards my

9      side.  And then as we was driving by, I was

10     looking out the side of the window, the side

11     of the car.  And I just seen him dive.  He

12     dove over.  And then after that, we just took

13     that right, kept going a little bit.  Then I

14     looked back.  I seen the other cop on his

15     knees with his gun pointed at us.  And he

16     just started shooting.  And after that, we

17     just took that right.  And everybody -- I

18     thought people -- I didn't know.  I just

19     hopped out.  I just ran.

20   Q.  So what happens -- after you see one police officer

21     dive, what happens next after that?

22   A.  We kept going.  We took a right because

23     there's only one way.  You can only just take

24     a right.  It's a sharp, sharp right.  It's

Page 32

2nd Day Carlos Fernandes

112

1    like a dead end. You have to really like
2    (demonstrating), I'm saying. As soon as we
3    took that right, I kind of looked back in the
4    rearview a little bit. And I seen the
5    officer on his knees. But this is when we
6    kind of got up the street a little bit. And
7    then he just started shooting.
8  Q. And you saw him in the rearview mirror on your
9    passenger's side?
10 A. Yes.
11 Q. And do you see what he looked like?
12 A. No. It was too far and it was dark.
13 Q. And was it a Caucasian or an African American or a
14    Hispanic officer?
15 A. I don't even know. It was too dark. I just
16    seen the uniform.
17 Q. A Boston police uniform?
18 A. Yeah.
19 Q. Do you know if it was the same police officer that
20    you saw in front of the car?
21 A. I don't know. It happened too fast. I can't
22    really -- I don't think it was him. I don't
23    think he moved from there to there. I don't
24    think it was him. But I don't know.

113

1  Q. You don't know?
2  A. I can't answer that. I don't know.
3  Q. And so what happens after you look in the rearview

Page 33

2nd Day Carlos Fernandes

24   A.  All right.

118

1    Q.  But the distance was sufficient enough that you
2        could not identify if it was an African American
3        officer or any other ethnicity?
4    A.  It was too dark.
5    Q.  How do you know he was firing the shots?
6    A.  I seen the uniform.
7    Q.  Did you actually see the shots fired?  Did you see
8        the gun?
9    A.  Yeah, I seen the gun.  Yeah, I seen the gun
10       drawn.  When he was shooting, I might have
11       seen like the first couple -- you know how
12       you see the fire coming out?  I seen sparks.
13       That's when I ducked.
14   Q.  And so what happens after that?  That's when you
15       exit the car?
16   A.  Yeah.  I exited the car at Quincy.  We took
17       that right first.  And then when I got to the
18       end of Quincy, I hopped out.
19   Q.  Do any of the shots you hear hit the car that you
20       know of?
21   A.  Do I remember hearing them?
22   Q.  Yes.
23   A.  I'm not sure.  There was a lot of commotion.
24       I don't know if it hit the car.  I think I

119

1        heard glass break.
2    Q.  And where was the glass breaking?

Page 38

2nd Day Carlos Fernandes

23   Q.  Did you see anybody else in the area on Dunkeld

24       Street at the time that you were traveling up

124

1       Dunkeld Street?

2   A.  It was crowded outside because something had

3       happened because the police was already at

4       the scene, so there was people already

5       outside.

6   Q.  And do you know how many people?

7   A.  Oh, no, I don't know.

8   Q.  You would be guessing?

9   A.  Yeah.

10  Q.  At any point did you see the car hit the police

11     officer that was pointing his gun in your car?

12  A.  I don't believe we hit him.  He dove.  I seen

13     him kind of like dive.  But I can't say.  We

14     might have hit his leg or something.  But I

15     just seen like the front of his body like

16     dive towards the floor.  So I can't actually

17     tell you if we hit him or not.

18  Q.  It's possible that you could have hit him?

19  A.  We could have but I believe we didn't.

20  Q.  And why do you believe that you didn't?

21  A.  Because I seen him kind of dive, so I'm

22     figuring he dove on the sidewalk.

23  Q.  Are you aware that Brima Wurie plead guilty to

24     assault and battery with a dangerous weapon with

125

Page 43

2nd Day Carlos Fernandes

1    respect to the incident of hitting the police

2    officer with the vehicle?

3                    MR. DE MIRANDA:  Objection.

4    A.  No, not until you told me last time I was

5        here.  You asked me the question.

6    Q.  Do you know what the officer looked like that was

7        pointing the gun when you were traveling up Dunkeld

8        Street?

9    A.  No, I don't remember that.

10   Q.  You don't know if he was Caucasian or African

11       American?

12   A.  I just remember the blue suits.

13   Q.  He wearing a police uniform?

14   A.  Uniform, yes.

15   Q.  Do you know what B.J. did when shots were fired?

16   A.  What do you mean?

17   Q.  Did you see B.J. do anything when the shots were

18       fired?

19   A.  No.  I just know we took a right because we

20       went down that street.  I was ducking.  We

21       took a right and I hopped out.

22   Q.  Did you speak to any police officers -- strike

23       that.

24                    Following the incident, were you injured

                                                        126

1        in any way?

2    A.  No.

3    Q.  Do you know if anyone else was injured as a result

4        of the incident?

5    A.  Yeah.  I think Lenny -- I think something had

                        Page 44

2nd Day Carlos Fernandes
21    doesn't include any reference to you seeing a

22    police officer shooting from the passenger's side

23    view mirror, correct?

24  A.  I don't see it in there, no.


                                                    130

1   Q.  And the reason that you didn't say that is because

2       you didn't want to get into it?

3   A.  I didn't say it.  I don't know why I didn't

4       say it.

5   Q.  Is that something that you remember now --

6   A.  Yeah, I remember now.

7   Q.  -- that maybe you didn't remember then?

8   A.  Maybe.  I definitely remember it, though.

9   Q.  So your memory is better now than it was back in

10      October 2, 2002?

11  A.  No.  I just don't know why I didn't state --

12      at this particular moment, I don't know why I

13      didn't state that.  I'm not sure.

14  Q.  You would agree with me that would be pretty

15      important to tell them that, correct?

16  A.  Yeah.  But I probably just gave them a quick

17      rundown of what really happened.  I probably

18      didn't get in so much detail with them.

19  Q.  So is it your testimony, Mr. Fernandes, that you

20      didn't see -- that you saw the officer dive in

21      front of the car, correct?

22  A.  Yeah.

23  Q.  And dive towards the direction of your passenger

24      side, correct?

# EXHIBIT E

ORIGINAL

VOLUME I

PAGES:    1 - 15

EXHIBITS: NONE

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


C.A. NO. 05-11803-MLW


\*   \*   \*   \*   \*   \*   \*   \*   \*   \*     \*
                             \*

SHENIA DANCY-STEWART, as        \*
Administratrix of the Estate    \*
of EVELINE BARROS-CEPEDA,      \*
            Plaintiffs,      \*
                             \*
vs.                             \*
                             \*
THOMAS TAYLOR, JR., and the    \*
CITY OF BOSTON,               \*
            Defendants.      \*
                             \*

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*     \*



        DEPOSITION OF BRIMA WURIE, taken
on behalf of the Defendants, pursuant to the
Massachusetts Rules of Civil Procedure,
before Karen Borreson, RPR, Notary Public
within and for the Commonwealth of
Massachusetts, at the Nashua Street Jail, 200
Nashua Street, Boston, Massachusetts, on
Friday, January 18, 2008, commencing at 12:35
p.m.

VOLUME II

PAGES:   16 - 262

EXHIBITS: 1 - 2

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

C.A. NO. 05-11803-MLW

\* \* \* \* \* \* \* \* \* \*    \*
                                      \*
SHENIA DANCY-STEWART, as              \*
Administratrix of the Estate          \*
of EVELINE BARROS-CEPEDA,             \*
            Plaintiffs,               \*
                                      \*
                                      \*  ORIGINAL
vs.                                   \*
                                      \*
THOMAS TAYLOR, JR., and the           \*
CITY OF BOSTON,                       \*
            Defendants.               \*
                                      \*
\* \* \* \* \* \* \* \* \* \*    \*

        DEPOSITION OF BRIMA WURIE, taken
on behalf of the Defendants, pursuant to the
Massachusetts Rules of Civil Procedure,
before Karen Borreson, RPR, Notary Public
within and for the Commonwealth of
Massachusetts, at the Nashua Street Jail, 200
Nashua Street, Boston, Massachusetts, on
Friday, January 25, 2008, commencing at 11:45
a.m.

```
1    Q. Did you at any point know whose care it was?

2    A. No.  Me?  Did I know whose car it was?  No,

3       not that I recall.

4    Q. Do you remember who was driving when you got

5       to Hancock Street?

6    A. I think -- I think I could have been driving

7       or -- I don't remember.  I think either I

8       was driving or -- because I know Lenny

9       wasn't feeling good.  She had to go to the

10      bathroom or something.  That's all I

11      remember.

12   Q. When did you start driving?

13   A. From that point on.

14   Q. From Hancock on?

15   A. I think so.  That's what I'm saying, I can't

16      recall.  Like, this is, like, six years go.

17   Q. I understand.

18   A. I don't know if I was driving before.  I

19      don't know if I -- I don't know if I drove

20      to Hancock or not.  I could have.  That's

21      what I mean, I really don't remember.

22   Q. Do you remember driving away from Hancock

23      though?

24   A. Yes.
```

```
 1   Q. Do you recall where you were incarcerated?

 2   A. South Bay.

 3   Q. Were you on --

 4   A. I was out on parole, yes.

 5   Q. Were you on parole on that date?

 6   A. I think so, yes.

 7   Q. And your license was suspended as of that

 8      date?

 9   A. Yep.

10   Q. Were you concerned about that when you

11      started driving the car?

12   A. I wasn't really concerned until...

13   Q. Later?

14   A. Yes.  Later, but...

15   Q. Then it became a concern.

16            What was the plan to do that night?

17      Where were you going?

18   A. We were just hanging out.  We were just

19      going to go out -- just -- just have fun,

20      just relax.

21   Q. Where is Goodtimes?

22   A. I think Somerville.  I would say Somerville.

23   Q. Did you have a plan to as where you were

24      going to when you left Hancock?
```

```
 1        vehicle had any drugs?
 2   A. No.
 3   Q. Fair to say that night you were on parole
 4        and you didn't have a license?
 5   A. Uh-huh.
 6   Q. You pled guilty to that charge of operating
 7        a vehicle without a license?
 8   A. Yes.
 9   Q. Did you know if anyone in the vehicle had a
10        firearm?
11   A. No.
12   Q. Do you remember where everybody was seated
13        in the vehicle?  And I guess I'm saying when
14        you leave Hancock, where is everybody
15        seated?
16   A. I can't recall.
17   Q. Were you in the driver's seat?
18   A. Yes.
19   Q. Who was in the passenger seat?
20   A. I think -- I think Carlos was.
21   Q. Carlos Fernandez?
22   A. Yes.
23   Q. Who was in the back seat?
24   A. I don't know the order.
```

1   Q. Who total was in the back seat?

2   A. Angela, Lenny and Luis.

3   Q. Do you remember who was sitting behind you?

4   A. Uh-uh.

5   Q. Do you remember who was sitting in the

6      middle?

7   A. I don't -- like, I don't recall the order.

8   Q. Do you remember where you were sitting in

9      the car before you started driving?

10  A. No.  That's the thing, I think from that

11     point -- from when I was driving, I don't

12     remember if I was not driving.  I might have

13     been in the -- I think I was in the back

14     probably.  Yes, I think I was sitting in the

15     back.

16  Q. Do you remember what part of the back seat?

17  A. Behind the driver, because I think Lenny was

18     driving first.  Yes.  Like, it was weird.  I

19     don't -- I can't recall, but I remember I

20     was sitting in the back at one time before

21     Hancock.  I don't know.  It was just a while

22     ago.  I really don't know.

23  Q. Did you go to Speedwell Street that night at

24     all while you had the car?

```
 1    A. No.

 2    Q. Do you remember the next time you stopped

 3       the vehicle after you left Hancock?

 4    A. Not until the tragedy, no.

 5    Q. Did Carlos Fernandez have any beef with

 6       anybody from earlier that day?

 7    A. No.  He was at a cookout.  I didn't see him.

 8    Q. Did he have any beef at the cookout with

 9       anybody that you were at?

10    A. No.

11    Q. Any problems at any of those cookouts?

12    A. No.

13    Q. Did Carlos Fernandez have any problems with

14       anybody up around Cushing Avenue?

15    A. Not that I know of, no.

16    Q. Did you ever get out of the car around

17       Cushing Avenue?

18    A. No.  I never got out of the car.  That's why

19       I said, I really don't want to get into

20       details with this.  Because there's lot in

21       this case that is -- is like cohorsed

22       criminally.  Because like -- like Dan Keller

23       played a big part in a lot of this case that

24       I really don't want to get into details
```

```
 1        that my lawyer could advise me going forward
 2        with this deposition.
 3   Q. My question is:  At some point did you see
 4        the police on Columbia Road?
 5   A. Yes.
 6   Q. Were you driving the car, the Ford Taurus,
 7        when you saw the police?
 8   A. Yes.
 9   Q. Where were the police?
10   A. Behind me.
11   Q. Were they in a vehicle, too?
12   A. Yes.
13   Q. What kind?  Was it a cruiser?
14   A. I seen flashing lights, so...
15   Q. Were you able to tell, other than the
16        lights, if it was a police vehicle, a police
17        cruiser, like a marked cruiser?
18   A. I think so, yes.
19   Q. I think you had indicated earlier that one
20        of the charges that you had intended to plea
21        guilty to was failure to stop.
22   A. Yes.
23   Q. When did you fail to stop?  Was that on
24        Columbia Road?
```

1  A. It could have been.

2  Q. Where were you when you saw the lights?  You

3     saw the police lights?

4  A. Yes.

5  Q. And by that do you mean the red and blue

6     wigwags?

7  A. Activation.

8  Q. Did you hear any sirens?

9  A. No.

10 Q. Did you hear anything?

11 A. I never heard sirens, no.  Not that I

12    recall, no.  It was just flashing lights

13    there.  I never heard no -- noise, not that

14    I recall.

15 Q. Did you understand that they were trying to

16    pull you over?

17 A. I mean, yes.  I know common-sense-wise.  But

18    they really didn't use no speaker and say,

19    Pull over.  And I didn't hear no sirens.

20    But they are following, yes.

21 Q. Do you know why they were following you?

22 A. No.

23 Q. Do you know why they were trying to pull you

24    over?

```
 1        it was green?
 2    A.  Which set of lights?
 3    Q.  The one on Columbia Road --
 4    A.  It was green.
 5    Q.  -- after you had already taken the left?
 6    A.  Yes, it was green.
 7    Q.  So I may have already asked you this, but
 8        I'm not sure I understand what you're
 9        saying.  When did you first notice the
10        police?
11    A.  I noticed the lights, but I was taking a
12        right.  I didn't know if they were
13        activating me or not.
14    Q.  Did you see the police car before they
15        activated their lights?
16    A.  Yes.  They were at the lights.  Like, they
17        was at the intersection at the right,
18        stopped at their light.  That's what I mean.
19        When I got to Hancock, the police was
20        stopped because their light was red.
21    Q.  Were they on the same side of the street as
22        you?
23    A.  All right, if you -- if you're on Columbia
24        Road, there is an inbound and an outbound.
```

```
 1        with common sense, did you realize that they

 2        were trying to pull you over?

 3   A.  Yes.  The lights was flashing.

 4   Q.  Did you pull over at that time?

 5   A.  No.

 6   Q.  Why weren't you pulling over?

 7   A.  Because of my license was suspended and I

 8        just came home from prison and I...

 9   Q.  What did you think would happen if you were

10        pulled over?

11   A.  Going to jail.

12   Q.  How long had you been out of jail?

13   A.  Not even a month.

14   Q.  I think before it seemed as though you knew

15        it exactly?

16   A.  Like three weeks.  Well, I calculated it

17        before.  It was an embarrassment to me.

18        Because I was -- like, I was only home for,

19        like, three weeks and four days.  I would

20        never forget that because it was like I was

21        home an extremely short period of time.  It

22        was, like, an embarrassment to my family.

23   Q.  Do you remember what road you turned onto

24        next?
```

```
 1   A. I don't know the roads.  Like, I can't
 2      remember.
 3   Q. Do you remember what direction you turned
 4      next?
 5   A. Uh-uh.
 6   Q. Were you going anywhere in particular at
 7      this point?
 8   A. No.
 9   Q. What was your intention when you were
10      driving on these streets?
11   A. Well, my mental state was, I don't know, get
12      away from the police because they was
13      following me.
14   Q. At some point did you see any other police
15      officers?
16   A. Yes.
17   Q. When did you see another police officer?
18   A. Like, the street was Dunkeld.
19   Q. Are you familiar with that area?
20   A. I mean, not really.  I never, like, been
21      around there.  I don't know nobody that
22      lives around there or nothing, but...
23   Q. Do you know where Dunkeld Street, Fayston
24      Street and Perth Street are?
```

1    know if there was a car there.  It's -- it's

2    -- it's a while ago.  I don't know if there

3    was -- I think there was a car on Dunkeld.

4  Q. What kind of car, a police car?

5  A. No.  I'm not sure.  About -- I don't think

6    it went out of the way.  But then I remember

7    the police coming in the middle of the

8    street like, Hey, waving his hand.

9          Then -- like, I can't recall if the

10    car was -- I don't know if there was a car

11    in the middle of the street or not, but I --

12    to my recollection, I think there was a car

13    in the middle of the street that vanished,

14    that ended up driving way once they seen the

15    car coming up with the flashing lights

16    behind it.  I think that car disappeared

17    somewhere.

18          And then there was the police that

19    came in the street and waving his right hand

20    and pointing a gun at me.  That's what I

21    remember.  And talking about stop.  I slowed

22    up to, like, a stop and he went to the right

23    of the car.  He moved to the right of the

24    car.

1          Where did you first notice that

2     there was this car in front of you?

3  A. As soon as I came on Dunkeld, because I

4     slowed up.

5  Q. Was that car in front of you while you were

6     on the street?

7  A. There was no car -- there was no car in

8     front of me.  And when -- all I remember is

9     traffic was coming.  I came into traffic and

10    the cop wasn't right behind me.  And I went

11    onto Dunkeld and the cop eventually came up

12    behind me.

13         And then the car in front of me left

14    and the police came in the middle of the

15    street and was pointing a gun at me and

16    talking about stop.  And I slowly kept on

17    going.  And, like, I was moving to the side

18    slowing of the -- closer to the left side of

19    the car, trying not to hit of car.

20         And the police walked out of the

21    way, because he was not going to get hit.

22    He walked out of the way and he was pointing

23    the gun at the car.  And I remember he was

24    slapping the hood with his hand like, stop

1    the car.

2  Q. When did you first see that police officer

3    in the street?

4  A. When -- basically when that other car -- I

5    think he was -- he was -- I don't know if he

6    was in the middle of the street or in

7    between two cars, but that car -- from the

8    time that car that was in front of me that

9    left or whatever, there was an officer that

10   just came in the middle of the street

11   pointing the gun. Like, he was there -- I

12   think he was there the whole time when I

13   seen him.

14        As a matter of fact, as soon as I

15   turned onto Dunkeld, he was there in the

16   middle of the street. And the car was

17   behind him that drove off, I guess. And

18   then he was pointing his gun.

19  Q. How do you know he was a police officer?

20  A. He was in plain clothes.

21  Q. He was in --

22  A. I mean, he was in his uniform, I would say.

23  Q. He was wearing a police uniform?

24  A. Yes.

```
 1        see what you're doing.
 2                Are you extending your arm forward?
 3   A. He, like, extended his arm in front of his
 4      body, like, waving with the gun.  He had the
 5      other gun -- he had a gun in one hand and
 6      his hand free with the other hand like
 7      basically signaling to stop.
 8   Q. And am I reflecting this accurately, you put
 9      your arm out straight with your elbow locked
10      and your palm is open and palm facing away
11      from you?
12   A. Something to that effect, yes.
13   Q. The international sign for stop?  You know
14      what I mean by that?
15   A. Yes, yes.
16   Q. So he indicated to you to stop the vehicle?
17   A. Yes.
18   Q. How far from him were you when you saw him
19      doing that?
20   A. It was, like, two cars.  But then I was just
21      driving, like, two, three, four -- like,
22      rolling material.  Like, the car was just
23      rolling forward.  And he seen that the car
24      wasn't coming to a complete stop, so he went
```

1    with his free hand, which would be his left.

2 Q. When did you lose sight of that officer?

3 A. After he slapped the hood of the car and

4    then he had his gun still pointing at me --

5    like, I was looking over to the right, that

6    was it.  And then -- like, then I made it to

7    Fayston and took a right.

8 Q. And he was on the passenger side?

9 A. Yes.

10 Q. When he was in the street signaling you to

11    stop, where is he on the street?  Is he in

12    the middle, to the side?

13 A. Like, before the car got close to him, he

14    was, like, in the -- like, not in a frenzy,

15    but, like, urging you to stop.  Like, his

16    body was moving like, Stop the car, Stop the

17    car, yelling with his gun pointing at me,

18    but he was moving over to the right.

19        Because I guess he seen I was, like,

20    trying to go to the left.  Because I could

21    see he was moving like, Stop the car.  And

22    he was moving towards the right as the car

23    was coming.  Like, he was steady moving,

24    like slowly moving off to -- off to my right

1      towards the passenger side of the car.

2  Q. Were your windows open, do you remember?

3  A. No.  Because the -- no, because the windows

4      got shot out.

5  Q. I mean, you know --

6  A. The whole time.  No, the whole time the

7      windows was up, the door windows.  I think

8      mine was probably cracked a little bit.  But

9      they were up, because he shattered them.  I

10      remember he shattered the windows.  He

11      shattered the driver's side window, but the

12      window was cracked a little bit.  But it got

13      hit with the bullets, so it shattered.

14  Q. You could hear him, though?

15  A. Yes.  He was yelling.

16  Q. Even though the windows were up, you could

17      still hear him?

18  A. I said mine was cracked, but it was up.  But

19      there was no music playing.  He was yelling

20      like you could hear somebody.  It wasn't

21      like a soundproofed car.  And they weren't

22      using no sirens.

23  Q. I was going to ask you, was there music

24      playing?

```
1    A. No.
2    Q. Were there cars parked on either side of the
3       street?
4    A. Yes.  Dunkeld is, like, a narrow street.
5       But cars are parked on both sides, if I can
6       remember.
7    Q. Is Dunkeld a one-way or a two-way, if you
8       know?
9    A. I think it's two -- it's a two-way.
10   Q. So if there is a --
11   A. If you're on Quincy, you can go up Dunkeld.
12      If you're on Fayston, you can come down
13      Dunkeld.
14   Q. So cars can pass each other on Dunkeld
15      Street?
16   A. No.  You have to reverse or back out.  They
17      should make it a one-way or a two, whatever.
18      But, no.  If two cars are on the street, one
19      driving down and one driving up, the person
20      coming from Fayston would likely have to
21      back up because how would you expect them to
22      back up on Quincy, which is a busier street.
23      Or if there is no car parked, go off to the
24      side.
```

1    towards the top.  And that's when that's

2    happening.

3         Like, I'm not even near Fayston yet.

4    And when I'm -- when he moves off to the

5    right and pointing the gun, like, I still

6    had to drive up some and then take a right

7    once he's behind me.  And he's, like,

8    running towards the car.

9         So when I get on Fayston, I'm going

10   forward and all I hear is shots and that's

11   when I, like, kind of ducked.

12 Q. Why didn't you stop on Dunkeld?

13 A. I don't know.  Because in -- in my mind, I

14   just wanted to get away from that cruiser

15   just enough to -- I don't know.

16 Q. When did you start to accelerate?

17 A. I accelerated as soon as -- after -- after I

18   heard the cop say, Stop, and I knew that he

19   was out of sight not to be hit, that's when

20   I kept going.  That's when I went.  And then

21   he was like, Stop the car.  And I, like,

22   looked in the rearview and he was, like,

23   turning towards the car.

24         And I went on Fayston.  And I don't

```
 1        coming towards the car yelling, Stop the
 2        car.
 3               Once I got on Fayston, I didn't see
 4        no cruiser or nothing.  And I looked up real
 5        quick and there was no cruise behind me.
 6        And I seen the officer, like, in the kneel
 7        position shooting the car and that's...
 8   Q. Where is that officer now?
 9   A. I don't know whose officer.  Oh, you mean in
10        -- in the picture or where he is now, like?
11   Q. Where is he when you looked in the mirror?
12   A. Oh, in the middle of the street shooting at
13        the car.  Like, the cruiser, he's not even
14        behind us no more because...
15   Q. The middle of what street?
16   A. Fayston, the intersection of Fayston and
17        Dunkeld.  Like, when you take a right, he's
18        in the street.  And it was -- it was so
19        quick.  Like, I looked up and he's -- and
20        then shots is being fire.
21   Q. Is that the same officer you saw before?
22   A. I don't know.  That's what I'm saying.  I
23        don't know if it's the same.  It's weird.
24        Once I went passed the officer, I looked in
```

```
1      the rearview mirror quickly.  And the blue
2      and whites -- the flashing lights were still
3      behind me.  But the officer was still
4      saying, Stop the car, coming towards the
5      car.
6             And I'm accelerating now.  So when I
7      take a right on Dunkeld, the next thing you
8      know, I look up again and before -- it was
9      really quick.  The next thing you know, they
10     were shooting out the car.  So I don't know
11     if it was the same officer or a different
12     officer.  I don't know.  I can't -- it
13     wasn't like I was in too much detail.  It's
14     like everything is, like, a split fraction
15     and everything is happening real fast.
16   Q. Do you lose site of the officer who's trying
17      to get you to stop on Dunkeld?
18   A. Yes.  When I took a right, I -- like, he's
19      coming, he's yelling, Stop the car.  But
20      when I take that right -- once I get on
21      Dunkeld and take that right on Fayston, I'm
22      like, all right.  Like, that -- or in my
23      head it's so quick.  Like, I was like, all
24      right, that ordeal is over with.
```

1       you, were you looking in the rearview behind

2       you, were you looking to the left, the

3       right?  What were you looking at?

4    A. I don't know if you've had that feeling.  I

5       was looking blank.  Like, I'm thinking I'm

6       about to die.  I can't -- like, once those

7       shots started firing, I didn't know where I

8       was at until the shots stopped firing.  Then

9       I'm looking, like, in the road.  But once

10      that first shot started -- because it was

11      rapid.  Like, you're startled, shot.

12             It's like when a person crosses the

13      street right before you get hit by a car,

14      like the shock that a person gets hit.  It

15      was a startled shock.  It was a scary

16      feeling.

17   Q. Did you see anybody exit the vehicle on

18      Perth Street?

19   A. No.  I mean, I want to say I think I seen

20      Lenny get out of the car, but I can't -- I

21      can't -- I -- I can't recall.  All I

22      remember is that I looked back and I seen

23      the door open.

24   Q. When did you first see somebody exit the

```
 1        car?  Strike that question.
 2              You exited the car at some point,
 3        right?
 4  A. Yes.
 5  Q. Where was the car when you exited?
 6  A. Quincy Street.
 7  Q. Who was in the car when you exited it?
 8  A. To be honest, you -- it's -- you're only
 9        thinking --like, at that point I was just
10        thinking -- I was like, it's all over.  I
11        didn't know what to do.  Like, I wasn't even
12        paying attention to nobody else.  So I -- I
13        wouldn't have known if people were still in
14        the car or they left the car at that point.
15  Q. Well, Carlos was sitting right next to you,
16        right?
17  A. I think so, yes.
18  Q. The Ford Taurus -- actually, a Ford Taurus,
19        it's a pretty small car?
20  A. It's a mid-sized.  It's not an Escort.
21  Q. Did you see Carlos exit the car?
22  A. I really can't remember.  I could have.  It
23        could have been simultaneously.  I don't
24        know.  Like, I was just thinking about
```

1    gun pointing at me the whole time.  Like,

2    why would you wait until I'm gone to shoot

3    at me?

4          And prior history of watching TV or

5    anything, cops usual put nails in the

6    streets or anything to do to stop a car

7    vehicle.  I feel like I was targeted.

8  Q. How do you know that no one else in the car

9    was targeted?

10 A. Because I was driving.  And, I mean, I feel

11   -- why would anyone else be targeted in the

12   car, for what reason?

13 Q. Do you think that they could have put down

14   some nail strips in the street to stop you?

15 A. Absolutely.  The car was no more than 20 --

16   like, the car never accelerated probably 20,

17   25 miles an hour.  The pursuit was very,

18   very slow.

19         And that's why you have radio

20   broadcast.  Like, you can -- if a cruiser,

21   anybody is following you, you can broadcast

22   his direction.  Or a barricade.  Like I

23   said, the car was in front of me.  It wasn't

24   like I rammed into the car.  Like, if that

1        car never moved, I would have stopped.

2    Q. Were you able to pull around that car if you

3        wanted to?

4    A. No.  The car -- no, you wouldn't be able to

5        move it.

6    Q. Is there anything else that made you believe

7        that the officer was trying to shoot you?

8    A. Yes.  Because my window shot out.  Like, it

9        was -- like, when I was driving, the

10       driver's side window was shot out.  The

11       bullets felt -- it felt like they were

12       aiming right at me, my head.

13   Q. What made you feel like that?

14   A. Because...

15   Q. I mean, was there anything you saw that made

16       you feel like that?

17   A. What you do mean?  The cop was pointing the

18       gun at my face.  I mean, yes.  I mean, I

19       thought he was going to shoot me right then

20       and there.  And when he didn't, I was

21       like -- I mean, I was allowed to go by.  And

22       the next thing you know, I'm hearing shots.

23       That's a really scary feeling hearing

24       bullets go by your ear, windows being shot

1    Q. You weren't shot?

2    A. No.

3    Q. Were you able to hear the shots fired while

4       you were in the car?

5    A. Yes.

6    Q. Could you see the shots fired?

7    A. No.

8    Q. You don't --

9    A. I was seeing shattered glass and I heard

10      bullets going by my head, yes.

11   Q. When you were looking in the rearview mirror

12      and you were able to see the officer on

13      Fayston, could you see him firing?

14   A. To be honest, I -- I mean, I can't -- I

15      don't know if I remember seeing a spark or

16      not.  I don't know.  I don't want to say yes

17      or no.  I can't remember.

18   Q. Did you see any flame or explosion coming

19      out of the gun?

20   A. I could say yes and no.  Because, I mean,

21      it's a question that I can't really recall.

22      Because that first shot, I don't know.  But,

23      like, that's what I'm saying.  I don't --

24      I've had nightmares behind this thing, so I

1   A. I mean, as far as like -- yes, but not from
2      -- I want to say from -- yes, I -- yes, I
3      did.
4   Q. What types of injuries did you suffer?
5   A. I mean, once the ordeal was over from the
6      glass, me running. Like I told, you glass
7      was all over me, shattered all over me when
8      they shot the car up.
9   Q. Were you cut?
10  A. Yes.
11  Q. Do you know if anyone else was injured?
12  A. I mean, all I heard of was what the police
13     ever told me -- all I remember was they told
14     me that Lenny was in the hospital, but I
15     don't know from what injuries.
16  Q. Did you ever hear Eveline Baros-Cepeda say
17     anything while she was in the car?
18  A. No.
19  Q. Did you ever hear her say anything to
20     indicate that she had been shot?
21  A. No.
22  Q. Did you ever hear anyone else in the car say
23     anything to indicate that she had been shot?
24  A. No. Like I said, I didn't know until the

# EXHIBIT F

VOL. I
PAGES 1-100
EXHIBITS -1
IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

Civil Action No. 05-11803-MLW

SHENIA DANCY-STEWART
as Administratrix of the Estate of
EVELINE BARROS-CEPEDA
     Plaintiff
vs.
THOMAS TAYLOR, JR., AND THE
CITY OF BOSTON
     Defendants

C O N F I D E N T I A L

     DEPOSITION OF LUIS A. CARVALHO, taken
on behalf of the defendant, pursuant to the
applicable provisions of the Federal Rules of
Civil Procedure, before Irma Widomski, a
Registered Merit Reporter, and Certified
Shorthand Reporter, No. 131593 in and for the
Commonwealth of Massachusetts, at the Law
Department, City Hall, Boston, Massachusetts, on
Wednesday, January 16, 2008, commencing at 2:20
p.m.

ORIGINAL

ORIGINAL

VOLUME:    II
PAGES:     101-243
EXHIBITS:  1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. NO. 05-11803-MLW

\* \* \* \* \* \* \* \* \* \* \* \*

                                        \*

SHENIA DANCY-STEWART, AS                \*
ADMINISTRATRIX OF THE ESTATE            \*
OF EVELINE BARROS-CEPEDA,               \*
                 Plaintiff,             \*
                                        \*
vs.                                     \*
                                        \*
THOMAS TAYLOR, JR., AND THE             \*
CITY OF BOSTON,                         \*
                 Defendants.            \*
                                        \*

\* \* \* \* \* \* \* \* \* \* \*


        CONTINUED DEPOSITION OF LUIS CARVALHO,
taken on behalf of the Defendants, pursuant to
the Massachusetts Rules of Civil Procedure,
before Melinda M. Piccirilli, Certified
Shorthand Reporter and Notary Public within and
for the Commonwealth of Massachusetts, at the
City of Boston Law Department, City Hall,
Boston, Massachusetts, on Wednesday, April 23,
2008, commencing at 2:05 p.m.

```
 1              (Sketch marked as Exhibit No. 1)
 2    Q. When did you first notice that the police
 3       cruiser was behind you?
 4    A. Once we fully got onto Columbia Road.
 5    Q. Do you recall if the police cruiser's lights
 6       or sirens were on?
 7    A. No, not at the time.
 8    Q. When did the lights and sirens come on, if
 9       they did?
10    A. Once we approached like Bird Street.
11    Q. Were you still on Columbia Road when the
12       lights and sirens came on?
13    A. No.  Once we turned onto Bird Street, the
14       lights and sirens came on, but the cop car
15       was right behind us through the whole time.
16    Q. At any time on Columbia Road was there any
17       car between you and the cruiser that was
18       behind you?
19    A. No.  There was no other cars out there at
20       all.
21    Q. At any time on Columbia Road did anybody in
22       the car talk about how there was a police
23       cruiser behind you?
24    A. Yes.
```

1   Q. What was said at that point?

2   A. That he had the right of way.

3   Q. Who said that he had the right of way?

4   A. Maria said it once and I told him it was

5      green also.

6   Q. Is that when Brima continued onto Columbia

7      Road?

8   A. Yes.

9   Q. Other than Maria DeRosa, did anyone else say

10     anything about the police cruiser being

11     behind you while you were on Columbia Road?

12  A. No.

13  Q. Do you know why you turned onto Bird Street?

14  A. Why did we turn onto Bird Street?

15  Q. Yes.

16  A. No.

17  Q. Did Brima Wurie say anything about why he

18     was turning onto Bird Street?

19  A. No.

20  Q. Was it when you turned onto Bird Street that

21     you saw the lights of the police cruiser

22     turn on?

23  A. Yes.

24  Q. Do you recall hearing the police sirens turn

```
 1      on?
 2  A.  No.  Just the lights.
 3  Q.  What happened next when you turned onto Bird
 4      Street?
 5  A.  I'm not sure if it's Alexander Street or --
 6      I don't know the name of the street, but
 7      then he took a right down the street.
 8  Q.  Did the police cruiser follow you onto Bird
 9      Street?
10  A.  Yes.
11  Q.  Was there any car between the Taurus and the
12      cruiser while you were on Bird Street?
13  A.  No.
14  Q.  Do you remember what people were saying in
15      the car, if anything, while you were on Bird
16      Street?
17  A.  I don't remember.
18  Q.  Do you remember anybody saying anything
19      about the police cruiser turning its lights
20      on and attempting to pull you over?
21  A.  I don't remember.
22  Q.  Did it ever become clear to you that the
23      police cruiser was attempting to pull over
24      the car?
```

1    A. Yes.

2    Q. When did that happen?  When did it become

3       clear to you that the cruiser was trying to

4       pull you over?

5    A. When he turned on the lights.

6    Q. That was when the car was turning from

7       Columbia onto Bird Street?

8    A. When we was on Bird Street.

9    Q. Do you remember which street you took next?

10   A. I don't know the name of the street but it

11      was a right.  I'm not sure if it's -- I

12      don't want to say the wrong name but we took

13      a right as soon as we came to Bird Street.

14      It wasn't Monadnock.  It was the street

15      before Monadnock.

16   Q. Did the Taurus stop for the police cruiser

17      on Bird Street?

18   A. No.

19   Q. Was there ever any discussion in the car as

20      to whether people wanted Brima to pull over

21      or not pull over?

22   A. I don't remember.

23   Q. Do you know why the car didn't pull over on

24      Bird Street?

1    A. No.

2    Q. Do you remember the next street you went on?

3    A. After Bird Street..

4    Q. Well, after Bird Street there was another

5        street.  I think you said you took a right

6        but you weren't sure the name of the street;

7        is that correct?

8    A. Yes.

9    Q. Do you remember taking another street after

10       that street?

11   A. Yes.

12   Q. Do you remember the name of that street?

13   A. Dudley Street.

14   Q. While you were on Dudley Street, do you

15       remember anybody talking about the police

16       cruiser still being behind you?

17   A. I don't remember.

18   Q. Was the police cruiser still behind you on

19       Dudley Street?

20   A. Yes.

21   Q. Were its lights still illuminated?

22   A. Yes.

23   Q. Were there any cars between you and the

24       cruiser?

```
 1   A. I don't remember at that time.

 2   Q. Did anyone say anything to Brima Wurie,

 3      other than Maria DeRosa previously, about

 4      the cruiser being behind the vehicle he was

 5      driving?

 6   A. Don't remember.

 7   Q. Did you know why the vehicle still wasn't

 8      stopping while it was on Dudley Street?

 9   A. No.

10   Q. Did you know the status of Brima Wurie's

11      license?

12   A. No.

13   Q. Did you know anything about Brima Wurie's

14      criminal history at that point?

15   A. No.

16   Q. Do you remember what street you went on

17      next?

18   A. After Dudley?

19   Q. After Dudley.

20   A. Took a left up Magnolia.

21   Q. Do you remember while you were on Magnolia

22      anybody saying anything about the police

23      cruiser being behind you?

24   A. I don't remember.
```

1   Q. On the street that you took prior to Dudley,
2      did the vehicle ever stop for the police
3      cruiser?
4   A. No.  The street after Bird Street, correct?
5   Q. The street between Bird and Dudley.
6   A. No.
7   Q. On Dudley did the Taurus ever stop for the
8      cruiser?
9   A. No.
10  Q. What was the name of the next street you
11     took?
12  A. After Dudley, Magnolia.
13  Q. On Magnolia did the car ever stop for the
14     police cruiser?
15  A. No.
16  Q. Do you remember if the car ever up to that
17     point had slowed down?
18  A. Yes, I remember slowing down because there
19     was a car that was turning off of one of the
20     streets that was ahead of us.
21  Q. Did you have to slow down because that car
22     was in front of you?
23  A. Yes.
24  Q. Was the car slowing down for the police

1    cruiser or because there was a car in front

2    of it that was in its way?

3              MR. PULLER:  Objection.

4    Q.  You can still answer.

5    A.  I exercise my Fifth Amendment.

6    Q.  Do you remember the car ever accelerating,

7    increasing speed, while you were on any of

8    those streets?

9    A.  You mean increasing, like speeding up on any

10   of the streets other than that what?

11   Q.  On Bird or Dudley or Magnolia.

12   A.  No.  It was all like going into traffic

13   streets, so if you -- you're coming down on

14   Bird Street, you go to the next street.

15   There's buildings in front of it so you

16   don't speed, basically.

17   Q.  Do you remember where you went after

18   Magnolia?

19   A.  Took a right onto Eveline's street.  I don't

20   know the name.

21   Q.  The street that Eveline was living on at the

22   time?

23   A.  Yes.

24   Q.  But you don't remember the name of that

1       street?

2   A. No, I don't remember the name.

3   Q. Do you remember where you went next after

4       that?

5   A. Took a left down Howard Avenue.

6   Q. Do you remember where you went after that?

7   A. Then we took a left onto Quincy Street.

8   Q. Is it fair to say that the time when you

9       were on Columbia and Bird and Dudley and

10      Magnolia and Eveline's street and Howard and

11      Quincy that you were no longer going to Good

12      Times?

13  A. Can you repeat that?

14  Q. At that point when you turned onto Quincy,

15      were you still going to Good Times?

16  A. No.

17  Q. During the time between when you turned from

18      Columbia onto Bird to when you got to Quincy

19      Street, do you remember anyone talking about

20      whether or not you were going to pull over

21      for the police cruiser?

22  A. On Quincy Street?

23  Q. Any time between Columbia and Quincy Street.

24  A. Yes.

```
 1    Q.  When was that?
 2    A.  When we got to -- as we was passing
 3        Eveline's house.
 4    Q.  What was said when you were passing
 5        Eveline's house?
 6    A.  I can't remember who -- somebody said, Don't
 7        pull over here.
 8    Q.  You don't remember who said that?
 9    A.  No.
10    Q.  Do you remember between the time from when
11        the vehicle went from Columbia to Quincy, do
12        you remember Brima Wurie saying anything?
13    A.  No.
14    Q.  Do you remember him saying about whether or
15        not he intended to pull over for the
16        cruiser?
17    A.  No.
18    Q.  At any time between Columbia and Quincy did
19        the vehicle pull over for the cruiser?
20    A.  He seemed like he was attempting to pull
21        over near Eveline's house until someone
22        says, Don't pull over.
23    Q.  Did the car slow down near Eveline's house?
24    A.  Yes.
```

```
 1   Q. Do you remember what was going on when it
 2      slowed down?
 3   A. What do you mean?
 4   Q. Do you remember what people were saying or
 5      what people were doing?
 6   A. It was a bunch of commotion.  I just
 7      remember someone said not to pull over and
 8      he kept going.
 9   Q. Then onto Howard and then to Quincy?
10   A. Yes.
11   Q. What happened when you got onto Quincy?
12   A. They took a right onto Dunkeld.
13   Q. What did you see when the car took a right
14      onto Dunkeld?
15   A. There was people outside.
16   Q. Do you remember where those people were?
17   A. Some were on the sidewalk, on the steps.  It
18      was like people everywhere.  It was like a
19      really busy neighborhood.
20   Q. Sidewalk and steps to homes?
21   A. Yes.  There's like buildings there,
22      apartment complexes.
23   Q. Did you know any of those people?
24   A. As we was driving, I didn't, like, recognize
```

1   A. No.

2   Q. Were you looking to see the cruiser behind

3      you?

4   A. I had glanced once but it wasn't behind us.

5   Q. When was the last time you saw it?

6   A. Coming off of Howard Ave.  From Eveline's

7      street as we took the right, it was coming

8      down Eveline's street as we was on Howard

9      Ave.

10  Q. So the last time you saw it was when it was

11     turning from Wayland onto Howard?

12  A. As we was turning from Wayland.

13  Q. As you were turning from Wayland to Howard?

14  A. It was still up top of Wayland.

15  Q. From the time when you were on Columbia Road

16     up until Dunkeld Street, did the Taurus ever

17     stop for that police cruiser?

18  A. No, it never stopped.

19  Q. Did the cruiser ever turn off its lights, if

20     you're aware?

21  A. From as far as I could see, no.

22  Q. At any time on Dunkeld Street, were you able

23     to see a member of the Boston Police

24     Department?  While the car that you were in

```
 1        car was on Dunkeld Street, did you ever see
 2        a member of the Boston Police Department?
 3   A.  On Dunkeld Street?
 4   Q.  Yes.
 5   A.  Before we passed the cruiser or while we was
 6        on Dunkeld?
 7   Q.  While you were on Dunkeld Street, did you
 8        ever see a member of the Boston Police
 9        Department?
10   A.  No, I don't recall.
11   Q.  What were you doing while you were in the
12        car on Dunkeld Street?
13   A.  I was just sitting.  I was ducked down just
14        sitting slouched down.
15   Q.  Why were you slouched down?
16   A.  That's how I sit in the car basically.
17   Q.  What was Maria DeRosa doing in the car?
18   A.  I can't tell you.
19   Q.  You were in the back seat with her, right?
20   A.  Yes.  I was near the passenger's side.
21   Q.  What was Eveline Barros-Cepeda doing while
22        you were on Dunkeld Street?
23   A.  I couldn't tell you.
24   Q.  You were sitting next to her?
```

# EXHIBIT G

1                           VOL. I
                          PAGES 1-197

2                          EXHIBITS 1-3

3          IN THE UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF MASSACHUSETTS

4

     Civil Action No. 05-11803-MLW

5       _____

6     SHENIA DANCY-STEWART
     as Administratrix of the Estate of
     EVELINE BARROS-CEPEDA

7         Plaintiff
     vs.

8

     THOMAS TAYLOR, JR. AND THE

9     CITY OF BOSTON
         Defendants

10     _____

11           **C O N F I D E N T I A L**

12         DEPOSITION OF **MICHAEL PAILLANT**, taken on
     behalf of the plaintiff, pursuant to the

13     applicable provisions of the Federal Rules of
     Civil Procedure, before Irma Widomski, a

14     Registered Merit Reporter, and Certified
     Shorthand Reporter, No. 131593 in and for the

15     Commonwealth of Massachusetts, at the Law
     Offices of Andrew Stockwell-Alpert, 11 Beacon

16     Street, Suite 1210, Boston, Massachusetts, on,
     Thursday, January 31, 2008, commencing at 10:00

17     a.m.

18

19

20

21

22       WIDOMSKI COURT REPORTING ASSOCIATES
              ONE SUNSET DRIVE

23      WAKEFIELD, MASSACHUSETTS 01880
           (781) 246-0710

24

1          who's at that location.

2    Q.   How many years did you do security work?

3    A.   Maybe three.  Maybe three or four.

4    Q.   This is all before Curry college?

5    A.   Yes.

6    Q.   Did you work anyplace else other than the

7         security job that you said you worked at for

8         about three years before going to Curry College?

9    A.   Not that I recall, no.

10   Q.   Did you have any firearms weapons training when

11        you were working for the security company?

12   A.   No.

13   Q.   Was that because you didn't carry a weapon?

14   A.   That's correct.

15   Q.   Now, you're familiar with some of the facts and

16        circumstances regarding an incident that

17        occurred in the area of Dunkeld and Fayston

18        Streets that resulted in the death of Eveline

19        Barros-Cepeda.  Would that be fair to say,

20        Officer?

21   A.   Yes.

22   Q.   Where were you assigned on September 8, 2002?

23   A.   Area B-3 Mattapan.

24   Q.   Were you assigned to a particular detail or tour

1          of duty on September 8, 2002?

2    A.    I was assigned to the last half tour of duty.

3    Q.    What does that mean?

4    A.    That would be the shift that starts at 11:45

5          p.m. to 7:30 a.m.

6    Q.    And was anyone assigned with you on that detail?

7    A.    I was in a unit, I had a partner with me, yes.

8    Q.    Who was your partner?

9    A.    Officer Taylor.

10   Q.    Prior to September 8, 2002, on how many duties

11         or details had you worked with Officer Taylor?

12                   MS. LITSAS:  Objection.

13   Q.    You can answer the question.

14   A.    I don't normally work with him.  If I did, it

15         might have been once.

16   Q.    Are you aware of any instances in which Officer

17         Taylor was reprimanded by the Boston Police

18         Department?

19   A.    No.

20   Q.    Are you aware of any instances in which Officer

21         Taylor was -- received any type of disciplinary

22         action by the Boston Police Department?

23   A.    No.

24   Q.    Have you ever been reprimanded by the Boston

```
 1              Taylor in January?
 2    A.   If it was, okay, most likely it might have been
 3         before I spoke with Officer Taylor in January.
 4    Q.   So knowing that, Officer, and knowing that you
 5         had just spoke with members of the law
 6         department for the City of Boston, is it your
 7         testimony here today that when you talked to
 8         Officer Taylor in January of this year, you did
 9         not talk to Officer Taylor about the facts and
10         circumstances having to do with this case, is
11         that your testimony?
12              MS. LITSAS:  Objection.
13    A.   I didn't talk about the facts of the case.
14    Q.   Did you talk to Officer Taylor about anything
15         having to do with this case when you talked to
16         him in January of 2008?
17    A.   No.
18    Q.   Other than your attorneys, have you talked to
19         anybody having to do with the facts and
20         circumstances of this case after you became
21         aware that you had to come to this deposition?
22    A.   Other than getting a slip signed to come to
23         court or to come for a meeting, no.
24    Q.   These incidents in which you talked to Officer
```

```
 1              Taylor in January of this year, you said they
 2              were both at the station, right?
 3      A.      I don't remember saying both.  I said I spoke to
 4              him in January.  I didn't even say specifically
 5              how many times.
 6      Q.      How many times did you talk to him in January of
 7              this year?
 8      A.      A couple of times.
 9      Q.      And what do you mean by a couple?
10      A.      Several times.
11      Q.      What do you mean by several?
12      A.      More than two.
13      Q.      Less than ten?
14      A.      Most likely.
15      Q.      So somewhere between two and ten times you
16              talked to Officer Taylor in January of this
17              year?
18      A.      Roughly, yes.
19      Q.      Where did you talk to Officer Taylor sometime
20              between two and ten times in January of 2008?
21      A.      About music.
22      Q.      Anything else other than music?
23      A.      Music, and possibly things to do with booking
24              prisoners.  That is all we mainly discussed.
```

```
1    Q.    Where did these conversations take place?

2    A.    At the station.

3    Q.    And all of these conversations took place after

4          your meeting with the law department for the

5          City of Boston and after you realized that you

6          had to come to this deposition, is that correct?

7                    MS. LITSAS:    Objection.

8    A.    All of these conversations took place in

9          January.

10   Q.    It took place after your meeting with the City

11         of Boston law department, correct?

12   A.    That's correct.

13   Q.    And they took place at some point in time --

14   A.    Well, I'm not going to say that's correct.

15         You're not referring to which meeting, so it's

16         kind of throwing things off.

17   Q.    How many meetings did you have with the City of

18         Boston, with the lawyer for the City of Boston?

19   A.    A couple.

20   Q.    By a couple, you mean how many?

21   A.    I can't think of an exact number now.  Maybe

22         two, three.

23   Q.    Were they all in the same room?

24   A.    No.
```

1    A.    Personally, yes.

2    Q.    Could you explain to us, please, in detail, the

3          rules and regulations concerning the discharge

4          of firearms and moving vehicles between 2002 and

5          the present day?

6                      MS. LITSAS:   Objection.  Asked and

7          answered.

8    A.    I believe you asked me what it was prior to 2002

9          and after 2002 so...

10   Q.    Other than what you have told us between 2002

11         and the present day, is there anything that you

12         would like to add concerning the policy of the

13         Boston Police Department with regard to the

14         discharge of firearms in moving vehicles?

15                      MS. LITSAS:   Objection.

16   Q.    Other than what you have told us?

17                      MS. LITSAS:   Objection.

18   A.    I have nothing else to add, sir.

19   Q.    Officer, could you describe the facts, some of

20         the facts and circumstances that brought you to

21         the area of Dunkeld and Fayston Streets on

22         September 8, 2002?

23   A.    I was participating in an investigation along

24         with Officer Taylor in regards to a sexual

```
 1              assault.
 2   Q.   What happened in the course of that
 3        investigation?
 4   A.   Officer Taylor along with -- Officer Taylor went
 5        to the building that we were investigating.
 6   Q.   What happened after?
 7   A.   I was standing by my police cruiser and I had an
 8        individual on board.
 9   Q.   What was that individual's name?
10   A.   Nicholas, I can't recall his full name.
11   Q.   James Nicholas?
12   A.   That could be correct.
13   Q.   What was your purpose in having Mr. Nicholas in
14        your vehicle at that time?
15   A.   Like I said, it was an investigation and we was
16        looking into the allegations.
17   Q.   What did Mr. Nicholas have to do with these
18        allegations?
19   A.   It was an allegation of sexual assault.
20   Q.   What did he have to do with these allegations of
21        sexual assault as far as you could tell?
22   A.   He was being accused of it.
23   Q.   So why was he in your car?
24   A.   He was doing a bring back to the location.
```

1          investigation?

2    A.    I don't think specifically, no.

3    Q.    What was your understanding of the purpose of

4          this individual being present with Officer

5          Taylor during the course of this investigation?

6    A.    I was under the impression she was the mother of

7          the victim.

8    Q.    Tell us what happened when Officer Taylor --

9          strike the question.

10               Where was your cruiser parked as

11         Officer Taylor and the mother of this victim was

12         approaching your cruiser?

13   A.    At the top of Fayston and Dunkeld Street.

14   Q.    Tell us what happened as Officer Taylor was

15         walking outside the building, and I think this

16         building was located at 85 Fayston Street?

17   A.    Yes.

18   Q.    Tell us what happened as Officer Taylor was

19         exiting the building with the mother of the

20         alleged victim concerning this sexual assault

21         investigation?

22   A.    I was standing outside my police cruiser and

23         from a distance there was lights flashing from a

24         police cruiser and the suspect's vehicle came

1          speeding up Fayston -- speeding up Dunkeld

2          Street.

3     Q.   Where was this cruiser in relationship to the

4          suspect's vehicle?

5     A.   Behind the suspect's vehicle.

6     Q.   On Dunkeld Street?

7     A.   Yes.

8     Q.   How close to the suspect's vehicle was the

9          cruiser when you first noticed the cruiser

10         behind the suspect's vehicle?

11    A.   I would say it was behind it.  I don't have an

12         exact distance.  It was close enough.

13    Q.   What did you do after you saw this officer?

14    A.   I proceeded to assist with the traffic stop.

15    Q.   What did you do?  Please, explain what you did

16         when you said you attempted to assist in this

17         traffic stop?

18    A.   I raised my hand and gave the suspect's vehicle

19         some strong verbal commands and ordered the

20         vehicle to stop.

21    Q.   I'm sorry, Officer, you said you raised your

22         hand in the air?

23    A.   Yes.

24    Q.   And with an open palm?

1    A.    Yes.

2    Q.    And that was your right hand or your left hand?

3    A.    My left hand.

4    Q.    What did you do with your right hand, if

5          anything?

6    A.    Nothing.

7    Q.    Tell us what happened after you raised your left

8          hand?

9    A.    The vehicle continued towards the top of the

10         street.   I then withdrew my firearm.

11   Q.    When you withdrew your firearm, how close was

12         the vehicle to you?

13   A.    Halfway up the street.

14   Q.    Halfway up Dunkeld Street?

15   A.    Yes.

16   Q.    Where were you on Dunkeld Street when you

17         withdrew your weapon?

18   A.    Dunkeld and Fayston Street.

19   Q.    You were at the intersection of Dunkeld and

20         Fayston Streets?

21   A.    Yes.

22   Q.    Your cruiser was directly across from you, where

23         you were standing at the intersection of Dunkeld

24         and Fayston Streets?

1    rerenew my objection.  You can ask him questions

2    but --

3  Q.    I want you to tell me, Officer, where was your

4       vehicle?  In what direction was your vehicle

5       parked when you raised your hand and withdrew

6       your weapon as this vehicle was approaching you

7       on Dunkeld Street?

8                 MS. LITSAS:  Objection.

9  A.    You said explain to you where my vehicle was

10       parked?

11  Q.    Yes.  I want you to tell me, tell me where, in

12       what direction was your vehicle pointed when you

13       had your left hand up and your vehicle --

14       withdrawn -- as his vehicle was coming down

15       Dunkeld Street, which direction was vehicle?

16  A.    On Fayston Street.

17  Q.    In which direction?

18  A.    Facing the incorrect way.

19  Q.    So facing in the opposite direction of traffic

20       on Fayston Street?

21  A.    That's correct.

22  Q.    And when your gun was withdrawn, were you

23       pointing it at the suspect vehicle?

24  A.    That's correct.

1      standing at the intersection of Dunkeld and

2      Fayston Streets, you withdrew your weapon and

3      pointed it at the motor vehicle and said Stop,

4      would that be fair to say?

5                 MS. LITSAS:   Objection.

6   A.  From the time I saw the motor vehicle, I raised

7      my hand and gave it strong verbal commands.

8   Q.  Right, and that was at the beginning of Dunkeld

9      Street, right?

10  A.  The beginning of Dunkeld and Quincy Streets.

11  Q.  And about halfway down Dunkeld Street, you

12     withdrew your weapon.

13  A.  Halfway up the street, I withdrew my weapon.

14  Q.  And you pointed it at the vehicle?

15  A.  That's correct.

16  Q.  And what happened after you pointed your weapon

17     at the vehicle?

18  A.  The vehicle continued in my direction.

19  Q.  Were there cars parked on both sides of Dunkeld

20     Street as the vehicle approached you with your

21     weapon drawn?

22  A.  Yes.

23  Q.  Were there vehicles parked on both sides of

24     Fayston Street as this vehicle approached you

1           almost as if it was going to stop.

2     Q.    So approximately what, one or two miles per

3           hour?

4     A.    I don't know.

5                       MS. LITSAS:  Objection.

6     Q.    But it was definitely at a speed that gave you

7           the impression that this motor vehicle was going

8           to stop, right?

9     A.    That's correct.

10    Q.    Then something changed?

11    A.    That's correct.

12    Q.    Before we talk about that change, I'm going to

13          ask you a few more questions, Officer.

14                      Officer, at the time that you withdrew

15          your gun at the vehicle, did you have any reason

16          to believe that the driver or any of its

17          occupants committed a crime?

18    A.    Yes.

19    Q.    What crime was that?

20    A.    Failure to stop for a police officer.

21    Q.    And you, would it be fair to say, Officer, that

22          you made that determination during the first 100

23          feet on Dunkeld Street?

24                      MS. LITSAS:  Objection.

1           AFTERNOON SESSION    (1:35 P.M.)

2       BY MR. DEMIRANDA:

3   Q.  We're back on the record.

4           Officer, I think one of the things we

5       were talking about before the break was this

6       motor vehicle was less than 20 feet as you

7       indicated from you when you thought it was going

8       to stop, is that a fair statement?

9           MS. LITSAS:  Objection.

10  A.  Yes.  That's what I said.

11  Q.  Tell us what happened, Officer, right after

12      that?

13  A.  The vehicle accelerated quickly.

14  Q.  What do you mean accelerated quickly?

15  A.  The driver stepped on the gas, floored it and I

16      just heard the engine roaring and the car just

17      came toward me very quickly.

18  Q.  And then what happened?

19  A.  I went to jump out of my way, I jumped to my

20      left.

21  Q.  And where were you standing on -- were you on

22      Dunkeld Street when you jumped to your left?

23  A.  At the intersection of Dunkeld and Fayston.

24  Q.  Where were you, were you like in the middle of

```
 1              the road in the intersection?

 2    A.        The middle of Dunkeld right at the top.

 3    Q.        Right where Dunkeld and Fayston meet?

 4    A.        About, yes.

 5    Q.        Well, before you jumped to your left, how far

 6              was the suspect's vehicle from your person?

 7    A.        It was right upon me.  The vehicle was right up

 8              on me.

 9    Q.        And when you say right up on me, approximately

10              how many feet away was this vehicle from your

11              body when you jumped to your left?

12    A.        As I started to move, the vehicle made contact

13              with me, the vehicle basically struck me as I

14              was moving.

15    Q.        I want you to concentrate, if you would,

16              Officer.  Just a couple of questions I want to

17              ask you.

18                   Before the vehicle actually came in

19              contact with you, okay, I would like to know

20              when you jumped to your left, how far away was

21              this vehicle from your body?

22    A.        As I was moving, my hand was out, the vehicle

23              had already struck me on my hand area and I was

24              bracing myself as I was moving over so the
```

1    for the deposition.

2    Q.    Where was Officer Taylor after the vehicle

3          accelerated and was moving in your direction?

4    A.    I don't know, I don't know where he was

5          standing.

6    Q.    Could you tell us, Officer, what were you

7          thinking after the vehicle accelerated and you

8          heard this loud engine of the vehicle as it was

9          coming, as it was moving directly at you?

10               MS. LITSAS:  Objection.

11   A.    I just reacted.  I didn't have time to stand and

12         think about too much.  My reaction was to move.

13   Q.    Did you think that the vehicle was going to

14         strike you?

15   A.    At what point, what point are you asking me

16         that?  Where I was?  What, at what time?

17   Q.    At any point in time, did you think that vehicle

18         was going to strike you?

19   A.    After it got real close to me, yes, I did think

20         it was going to strike me.

21   Q.    After, the closer it got to you, the more you

22         thought that it was going to strike you, is that

23         correct?

24               MS. LITSAS:  Objection.

```
 1          went by?

 2    A.    The vehicle struck me after I made my first

 3          initial movement.

 4    Q.    But how much time went by, Officer, between the

 5          time that you hear the engine, the vehicle

 6          accelerates, you move to the left, and then the

 7          vehicle strikes you, how much time went by?

 8                    MS. LITSAS:  Objection.

 9    A.    Maybe three seconds, three.

10    Q.    And at some point in time, Officer, as you were

11          moving to the left with your gun on your person

12          somewhere, you didn't discharge your firearm,

13          did you?

14    A.    No.

15    Q.    Why not?

16    A.    My main thing, objective at that time was to get

17          out of the way.

18    Q.    But you didn't get out of the way, did you,

19          Officer?

20                    MS. LITSAS:  Objection.

21    Q.    Is that correct?

22                    MS. LITSAS:  Objection.

23    Q.    You can answer the question.

24    A.    Well, however you perceive it, but I did move
```

1                MS. LITSAS:  Objection.

2    A.    It means I put my fire -- put my firearm down by

3          my side.  I was about to approach the vehicle

4          and I could not after -- when I say approach the

5          vehicle, that means to conduct a traffic stop.

6          Now, assisting with the traffic stop, I stated

7          to you before ever since the vehicle was coming

8          up the street, that's what I said I was doing

9          and I was basically assisting further.

10   Q.    In any event, the vehicle, that situation was

11         not over?

12   A.    No, it was not.

13   Q.    And a new situation was about to begin, would

14         that be fair?

15   A.    Yes.

16   Q.    And that new situation you have indicated

17         included this motor vehicle striking you, is

18         that correct?

19   A.    That's correct.

20   Q.    And what part of the vehicle struck what part of

21         your body?

22   A.    The front of the vehicle.

23   Q.    What part of the front of the vehicle?

24   A.    The front hood area, the bumper area, the tire,

1     the right front tire.

2  Q.   Just go step by --

3            MS. LITSAS:  You have to let him

4       finish his answer, Del.  Thanks.

5  Q.   I'm going to draw a box on this diagram.

6            Officer, that box represents the

7       vehicle, the suspect vehicle that struck you.  I

8       know it's not very good, but I want you to tell

9       me, Officer, what part of that vehicle first

10      strike what part of your body?

11           MS. LITSAS:  Objection.

12  A.   The front of the vehicle struck my hand area.

13  Q.   Which hand?

14  A.   I don't know which hand.  I know it was both

15      hands but it was my hand.

16  Q.   And what part of the front of the vehicle struck

17      your hand or hands?

18  A.   From the beginning or from the beginning to end?

19  Q.   From the very beginning?

20  A.   The front end of the vehicle.

21  Q.   *I want you to draw an X on that box and tell me

22      what part of that vehicle struck your hand or

23      hands?

24           MS. LITSAS:  I object.  The witness is

1      here to provide oral testimony, not to provide

2      anything written and in written form.

3                      MR. DeMIRANDA:  Mark that, please.

4                      This is the same basis, the basis for

5      your objection is the same as your earlier

6      objection, correct?

7                      MS. LITSAS:  Mm-hmm.

8  Q.   What part of the front of the vehicle struck

9      your hand, Officer, what part of the front?  You

10     said it was the hood?

11 A.   The hood area, yes.

12 Q.   The hood and the bumper?

13 A.   I didn't say the bumper struck my hand.

14 Q.   Just the hood?

15 A.   At that point?

16                     MS. LITSAS:  Objection.

17 Q.   Yes, at that point.  What part of the hood

18     struck your hand or hands?

19 A.   The front part of the hood.

20 Q.   What part of the front of the hood, the

21     passenger side of the hood or the middle part of

22     the hood, the driver's side, what part of the

23     hood struck your hand or hands?

24 A.   The middle part towards the right passenger

```
 1              side.
 2    Q.    So the middle towards the right passenger side,
 3          so if I were to split that motor vehicle in
 4          half, half being the driver's side and half
 5          being the passenger's side, are you telling us
 6          that the middle of the driver's side of the hood
 7          was the first part of that vehicle that strike
 8          your hand or hands, is that correct?
 9                   MS. LITSAS:   Objection.
10    A.    Somewhere between the middle and the right
11          passenger side.
12    Q.    And when that vehicle, that vehicle struck, the
13          middle part of the passenger side of that
14          vehicle struck your hand or hands, where were
15          you standing?
16    A.    In front of the vehicle.
17    Q.    And what part of your body was standing in front
18          of the vehicle?
19    A.    My whole body was standing in front of the
20          vehicle.
21    Q.    Where was your body in the roadway just before
22          impact?
23    A.    Standing in the middle of the vehicle -- the
24          middle of the street.
```

```
 1                    MS. LITSAS:  The vehicle struck the --
 2    Q.   I'm sorry, I keep saying -- I'm sorry.
 3                    MS. LITSAS:  His body.
 4    Q.   What part of the vehicle struck what part of
 5         your body as your body came into contact with
 6         the hood of the vehicle?
 7    A.   My elbow area and my leg area.
 8    Q.   And then what happened?
 9    A.   When I landed on the side of the car, the tire
10         rotated, the right passenger tire rotated into
11         my calf.  I pulled my leg away from the tire.
12    Q.   So as you rolled off the hood of the vehicle, as
13         you were coming down, what part of your body
14         struck what part of the vehicle?
15    A.   As I came off?
16    Q.   Yes.
17    A.   My foot landed on the ground and the tire
18         rotated into my leg.
19    Q.   Which foot hit the ground first?
20    A.   I don't know which foot hit the ground first.  I
21         do know that when my leg hit the ground, the
22         tire was upon my leg rotating into my left leg.
23    Q.   When your foot hit the ground or one of your
24         feet hit the ground, you were standing?
```

```
 1            part of the vehicle came into contact with what

 2            part of your body?

 3   A.       That's what I recall.  That's about it.

 4   Q.       When your vehicle hit the door and fender area,

 5            were you standing?

 6   A.       No.

 7   Q.       Where were you?

 8   A.       I was bent down.

 9   Q.       By bent down, what do you mean?

10   A.       I braced myself.  I was down on the ground,

11            knees bent, prone down.

12   Q.       And on the ground knees bent, what were you

13            doing on the ground, knees bent?

14   A.       Protecting myself.

15   Q.       Protecting yourself from what?

16   A.       From the vehicle.

17   Q.       Did you come in contact with the vehicle after

18            your elbow hit the front door and fender area as

19            you were crouched down on the ground?

20   A.       That's -- it was all one, it was all one motion,

21            yes.  It was about the same time.

22   Q.       When you say you were crouched down, were you

23            able to look inside of the windows of the

24            vehicle as it passed you?
```

```
 1                    MS. LITSAS:  Objection.

 2    A.   I was too low to do that.

 3    Q.   Where was your head in relationship to the

 4         windows of the vehicle as you were crouched down

 5         on the side of the vehicle?

 6    A.   It was below the -- below the window sill.

 7    Q.   How long were you crouched down on the side of

 8         the window before the vehicle continued moving

 9         forward?

10    A.   A couple seconds.

11    Q.   Where was the vehicle after you rolled over the

12         hood?

13    A.   Still going straight about to turn.  That wasn't

14         my concentration.

15    Q.   And where was the vehicle as you, as your left

16         elbow struck the door, front door and fender of

17         the vehicle?

18    A.   Where was what?

19    Q.   Where was the vehicle when -- after your elbow

20         struck the door and the fender with the vehicle?

21    A.   In the process of turning.

22    Q.   How much of the vehicle was on Dunkeld Street

23         and how much of the vehicle was on Fayston

24         Street after your elbow hit the side of the
```

```
 1              vehicle?

 2    A.    That I don't know.

 3    Q.    Was the vehicle at an angle turning right as

 4          you -- as your elbow struck the door and fender

 5          of the vehicle?

 6    A.    Yes.

 7    Q.    How much of an angle was the vehicle as you --

 8          after your elbow struck the door and fender of

 9          the vehicle?

10    A.    I would have to guess that.

11    Q.    How much of the tires were turned to the right

12          after your elbow struck the door and fender of

13          the vehicle?

14    A.    Enough so that the tire treads would cut into my

15          skin.

16    Q.    Which means that the tires were turned to a

17          large extent in order for you to receive the

18          injuries that you received to your left calf,

19          would that be fair to say?

20              MS. LITSAS:  Objection.

21    A.    The wheel was turned in order to have made

22          contact with me, yes.

23    Q.    How tall are you, Officer?

24    A.    Five-ten.
```

WIDOMSKI COURT REPORTING ASSOCIATES (781) 246-0710

1   Q.   Did you have your head up?

2   A.   No.

3   Q.   Where was your head, what were you looking at?

4        Were you looking at the ground?

5   A.   I was looking towards the ground.  I was

6        protecting myself.  Obviously I heard gunshots,

7        I stayed low to the ground.

8   Q.   Were you looking forward?

9   A.   No.

10  Q.   After you heard the gunshots?

11  A.   No.

12  Q.   What point in time did you make these

13       observations of the vehicle on Fayston Street

14       after you were struck?

15  A.   After I got up.

16  Q.   How long were you on the ground before you made

17       your first observation of this vehicle on

18       Fayston Street?

19  A.   It was a couple of seconds.

20  Q.   A couple of seconds, so you were on the ground

21       for a couple of seconds, the car continues down

22       on Fayston Street, you stand up, is that

23       correct?

24            MS. LITSAS:  Objection.

1           front of me, so that's a negative.

2    Q.    How long is Fayston Street?  You said a couple

3           of blocks?

4    A.    Yes.  It's real long.

5    Q.    Fayston Street is real long?

6    A.    Yes.

7    Q.    How long is Perth Street?

8    A.    It's short.  It's about the length of Dunkeld

9           Street.

10   Q.    Which is how long?

11   A.    I would have to guess.

12   Q.    You told us before that Dunkeld Street was about

13          200 feet?

14   A.    That's what I said before, yes.

15   Q.    Is Perth Street about the same length as Dunkeld

16          Street?

17   A.    Well, they are adjacent to each other so my

18          guess, they would be roughly around the same

19          length.

20   Q.    When the car went to Perth Street, did you make

21          any other observations of the vehicle or the

22          occupants of that vehicle?

23   A.    No.

24   Q.    Did you at any point in time see the occupants

```
 1           exit the vehicle?
 2    A.     Not on Perth Street.
 3    Q.     Where did you make that observation?
 4    A.     On Quincy Street.
 5    Q.     Tell us what you saw.
 6    A.     I saw three occupants exit the vehicle.
 7    Q.     And what happened after you saw the three
 8           occupants exit the vehicle?
 9    A.     They ran to adjacent yards and then over a
10           fence.
11    Q.     Were these males or females?
12    A.     It appeared to be males.
13    Q.     Black males, white males?
14    A.     They appeared to be dark-skinned males.
15    Q.     What kind of clothes were they wearing?
16    A.     They were just dark clothing.  I don't have any
17           specifics on these individuals.
18    Q.     Did you continue walking down Perth Street after
19           you saw these vehicles exit the vehicle on
20           Quincy?
21    A.     I continued hobbling down Perth Street, yes.
22    Q.     As you were walking down Perth Street, or
23           hobbling down Perth Street, did you see the
24           cruiser, the original cruiser that you saw with
```

```
 1    Q.   What caused you and Officer Taylor to be -- what

 2         caused you to seek medical assistance from the

 3         ambulance personnel after they arrived on the

 4         scene?

 5                   MS. LITSAS:   Objection.

 6    A.   I was transported to the hospital because I

 7         needed to seek treatment for the injuries I

 8         stated about earlier.

 9    Q.   What was it, what was going on with your

10         injuries at the time you spoke with the

11         ambulance personnel?

12    A.   I had injuries to my knee, my elbow and my calf

13         area.

14    Q.   Had your injuries gotten any worse or were they

15         pretty much the same as they were when you --

16         after you were struck by the vehicle?

17    A.   They had gotten worse.

18    Q.   How much worse?

19    A.   It was swelled.

20    Q.   What's swelling?

21    A.   My knee area.

22    Q.   The left side of your knee?

23    A.   Yes.

24    Q.   The left side of your knee got worse and began
```

# EXHIBIT H

1                          VOL. I
                        PAGES 1-155
2                        EXHIBITS A-F

3       IN THE UNITED STATES DISTRICT COURT
        FOR THE DISTRICT OF MASSACHUSETTS

4

    Civil Action No. 05-11803-MLW

5    _____

SHENIA DANCY-STEWART
6    as Administratrix of the Estate of
    EVELINE BARROS-CEPEDA
7         Plaintiff
    vs.
8

    THOMAS TAYLOR, JR. AND THE
9    CITY OF BOSTON
         Defendants
10   _____

11          C O N F I D E N T I A L

12       VIDEOTAPED DEPOSITION OF **THOMAS TAYLOR,**
    **JR.**, taken on behalf of the plaintiff, pursuant
13   to the applicable provisions of the Federal
    Rules of Civil Procedure, before Irma Widomski,
14   a Registered Merit Reporter, and Certified
    Shorthand Reporter, No. 131593 in and for the
15   Commonwealth of Massachusetts, at the Law
    Offices of Andrew Stockwell-Alpert, 11 Beacon
16   Street, Suite 1210, Boston, Massachusetts, on,
    Monday, February 4, 2008, commencing at 10:00
17   a.m.

18

19

20

21

22      WIDOMSKI COURT REPORTING ASSOCIATES
            ONE SUNSET DRIVE
23    WAKEFIELD, MASSACHUSETTS 01880
          (781) 246-0710

24

1        (Telephone ringing.)

2   Q.   -- what if anything did you do with your

3        vehicle?

4               MS. LITSAS:  Objection.

5   Q.   Did you park?

6   A.   The vehicle was parked but not at 85 Fayston.

7   Q.   Where did you -- where was the vehicle parked?

8   A.   It was parked, I believe, in front of 77 or 75

9        Fayston Street.

10  Q.   And James Nicholas, he was still in the vehicle?

11  A.   Yes.

12  Q.   And did one or both of you go to speak to the

13       alleged victim at 85 Fayston?

14  A.   One of us did.

15  Q.   Which one?

16  A.   That would be me.

17  Q.   What actions did you engage in, what did you do?

18  A.   I proceeded to walk towards 85 Fayston and

19       before I actually made it to the stairs of 85

20       Fayston, the woman that we had spoke with on

21       Harvard Street had walked up to me.

22  Q.   Did you see whether she came out of a building

23       or did she walk down the street towards you?

24  A.   I don't remember if she came out of a building.

WIDOMSKI COURT REPORTING ASSOCIATES (781) 246-0710

```
 1    Q.   And what was the substance of your conversation

 2         with her?

 3    A.   I asked her to come back to the police cruiser

 4         with me because we had someone in the car that

 5         we wanted her to look at.

 6    Q.   How far had you traveled -- strike that.  Did

 7         you walk down the sidewalk when you got out of

 8         the car at about 77 Fayston?

 9    A.   Yes.

10    Q.   And you walked towards, down towards 85 Fayston?

11    A.   Yes.

12    Q.   Did she meet you somewhere along the way?

13    A.   Yes.

14    Q.   Approximately what was the distance that you

15         walked before she actually came and met you?

16    A.   I don't know.  I almost made it to 85 Fayston.

17    Q.   And did she proceed to walk back to the vehicle

18         with you?

19    A.   Yes, she did.

20    Q.   And what's the next thing that you remember

21         happening?  Strike that.  Were you able to

22         observe whether or not Officer Paillant was

23         still in the vehicle or not?

24    A.   Yes.
```

1    Q.    Was he?

2    A.    No, he had exited the vehicle.

3    Q.    Did you see where he was at the point that you

4          first made eye contact with him?

5                    MS. LITSAS:    Objection.

6    A.    I saw him standing next to the vehicle.

7    Q.    And how close to the vehicle was he standing?

8    A.    About as close as you are to -- about a foot.

9    Q.    Was he in the street or on the sidewalk?

10   A.    He was in the street.

11   Q.    And how far in the street was he with respect to

12         the curb?

13   A.    The width of the police cruiser, and he was

14         probably a foot away from that.

15   Q.    Do you recollect where the vehicle was parked,

16         the right way or the wrong way on Fayston

17         Street?

18   A.    Was it parked which way?

19   Q.    Right way or wrong way on Fayston Street?

20   A.    I didn't know whether it was the right way or

21         the wrong way.

22   Q.    Did you have any knowledge, did you learn at any

23         point after that incident as to whether the

24         vehicle was parked the right way or the wrong

WIDOMSKI COURT REPORTING ASSOCIATES (781) 246-0710

```
 1            immediately after you saw your partner on

 2            Fayston Street?

 3     A.     Something got his attention.  He was looking

 4            down Dunkeld Street and he made a noise like

 5            what the --

 6     Q.     And you heard that, the "what the"?

 7     A.     Yes.

 8     Q.     About how far away were you when you heard that?

 9     A.     I'm not sure.

10     Q.     And was the alleged victim of the sexual assault

11            still with you at the time?

12     A.     Yes.

13     Q.     What is the next thing that happened?

14     A.     Officer Paillant started walking towards, more

15            towards Dunkeld Street to more in the middle of

16            the street of Fayston.

17     Q.     From your vantage point at around 77, 78, 80

18            Fayston Street, was Officer Paillant diagonally

19            into your left?

20                      MS. LITSAS:  Objection.

21     Q.     Was to your left?

22     A.     When I was coming back?

23     Q.     Right.

24     A.     No.
```

1    Q.    And did you change your location with respect to

2          the curb in any way while you continued to

3          observe Officer Paillant?

4                      MS. LITSAS:  Objection.

5    A.    I did change my position.

6    Q.    How?

7    A.    I had stepped off the curb.  After I had walked,

8          I was walking up the sidewalk, then I stepped

9          off the curb.

10   Q.    And how far -- strike that.  When you stepped

11         off the curb, did you step into the street?

12   A.    No.

13   Q.    So what did you do, where did you step to?

14   A.    I was in the line of where the parked cars would

15         be.  I wasn't in the street.

16   Q.    What is the next thing that you saw happen in

17         connection with this incident?

18   A.    Officer Paillant started yelling to stop and put

19         his hands up, both hands up, and he was yelling

20         stop.

21   Q.    Had you changed your position with respect to

22         the curb between the time you saw something draw

23         Officer Paillant's attention and the time you

24         saw him putting his hands up and yelling stop?

```
 1                        MS. LITSAS:  Objection.

 2    A.    No.

 3    Q.    Did you make any observations in Officer

 4          Paillant's direction at the point that he raised

 5          his hands and said stop?

 6    A.    I'm sorry, can you rephrase that?

 7    Q.    What, if anything, did you observe happening at

 8          the moment that Officer Paillant raised his

 9          hands and yelled stop or said stop?

10    A.    I heard a noise.  And then I heard a car engine

11          revving up, kind of getting louder.  That's when

12          Officer Paillant pulled out his gun.

13    Q.    Prior to hearing the engine noise revving up,

14          were you aware of any engine noise at all coming

15          from the direction that you heard the revving up

16          sound?

17    A.    No, I was not aware of any noise.

18    Q.    When you saw Officer -- prior to seeing Officer

19          Paillant -- strike that.  When you saw Officer

20          Paillant raising his hands in a stop gesture and

21          saying stop, did you have occasion to see

22          anything that he might be directing his

23          attention to at that time?

24    A.    No.
```

1    Q.    How soon after you saw Officer Paillant's hands

2          go up did you become conscious of the revving up

3          noise?

4    A.    I don't know.  Almost instantly.  It was very

5          fast.

6    Q.    Was it a second?

7    A.    I don't know.

8    Q.    Was it less than five seconds?

9    A.    It was almost instantly.

10   Q.    And you say you observed Officer Paillant draw

11         his gun or raise his gun?

12   A.    Yes.

13   Q.    And in what manner did he raise his gun?  You

14         can demonstrate for that.  Did he hold it over

15         his head, did he hold it straight out?  Please

16         describe how he raised his gun?

17              MS. LITSAS:  I'll object for the

18         purposes of the record.

19   A.    He pulled it out.

20   Q.    Please demonstrate.

21              MS. LITSAS:  I object again.

22   Q.    Okay.

23   A.    He pulled it from his holster.  And I remember

24         his other hand still up in a stop gesture, and

WIDOMSKI COURT REPORTING ASSOCIATES (781) 246-0710

```
 1              he was doing it like a pumping motion with the
 2              stop gesture.  That hand with the gun in it was
 3              also doing the same thing.
 4       Q.    Could you please demonstrate with your hands?
 5       A.    Kind of like this.  (Demonstrating.)
 6       Q.    Okay.  The hand with the gun, what was that
 7              doing?
 8       A.    The same thing that he was holding the gun.
 9                    MS. LITSAS:  I object again.
10       Q.    Was the gun pointed in the air or was the gun
11              pointed somewhere else?
12       A.    I guess it would be moving.
13       Q.    Were you able to observe whether at any point he
14              was actually pointing it towards anything other
15              than in the air?
16       A.    I don't recall.
17       Q.    And when he took his gun out, what did you do?
18       A.    I took mine out and I turned to Ms. Cummings who
19              I was walking with.  I put my hand back.  I told
20              her to wait there.
21       Q.    Where was there that you are referring to?
22       A.    Where I left her on the sidewalk.
23       Q.    Did you make any observations as to what she did
24              in response to that?
```

```
 1          take this second by second.  The very next thing

 2          that happened?

 3                    MS. LITSAS:  Objection.

 4   A.    I couldn't tell you second by second.

 5   Q.    What's the next thing that happened?

 6   A.    This all unfolded rather quickly.

 7   Q.    What is the next thing that happened?

 8   A.    After I stepped in front of Ms. Cummings and

 9          told her to stay and pulled my gun out, I saw

10          the white car come up Dunkeld and strike Officer

11          Paillant as he was trying to move to his left.

12   Q.    How soon after you pulled your gun out did you

13          first see the white car?

14   A.    It seemed almost as soon as I did.

15   Q.    And from what direction was the white car

16          coming?

17   A.    It was coming up Dunkeld on to, up to Fayston.

18   Q.    Did you change your position at all on Fayston

19          Street during any of the time that you were

20          observing the white car coming down Dunkeld

21          Street towards Officer Paillant?

22   A.    I didn't see it coming towards him.  I saw it

23          hitting him.

24   Q.    At any time prior to your seeing the car hit
```

1      Officer Paillant, did you change your position

2      with respect to the speed of the car on Fayston

3      Street?

4                  MS. LITSAS:   Objection.

5   A.  I was off the sidewalk in between, like, in the

6      road side, a parked car, I was in that kind of

7      row.  He got hit, slammed onto the front of the

8      car and gasped for air.

9   Q.  When you saw the white car, did you make any

10     observations of whether or not Officer Paillant

11     was moving in any direction with respect to it

12     as it was approaching him?

13  A.  He was moving to his left.

14  Q.  And did you have any -- what did you interpret

15     that movement of his to be for?

16                  What did you think he was trying to

17     do, in other words?

18  A.  Get out of the way.

19  Q.  And did you say anything to him at that point?

20  A.  No.

21  Q.  Did he say anything to you at that point?

22  A.  No.

23  Q.  We can take a minute break if you want it?

24  A.  I'm okay.

1              of it was on Fayston Street?

2                         MS. LITSAS:  Objection.

3    A.    No.

4    Q.    Well, why did you change your answer from most

5          of it to all of it to most of it?

6                         MS. LITSAS:  Objection.

7    A.    The incident happened so quickly and the car was

8          moving fast.  It depends on what time during

9          this incident, what split second, whether it was

10         on or off on Fayston.

11   Q.    The detective didn't change his question with

12         regard to at what point in time, did he?

13                        MS. LITSAS:  Objection.

14   Q.    He simply rephrased the question?

15                        MS. LITSAS:  Objection.

16   A.    Nope.

17   Q.    Thank you.  Can I have that back?

18                         And from where you were standing --

19         strike that.  How far away were you -- when you

20         were observing the car strike Officer Paillant,

21         exactly what part of the white Taurus came into

22         contact with what part of Officer Taylor's body?

23   A.    The Taurus hit Officer Paillant on the front

24         passenger side of the hood and it struck him

```
 1   A.   I don't think I understand the question.
 2   Q.   If you think about the hood and you divide the
 3        car in the middle so there's right side and a
 4        left side, and the right side is the passenger
 5        side from the middle to the end, right end of
 6        the car, the right part of the car, what
 7        specific part of the hood came in contact with
 8        what specific part of his torso?
 9             MS. LITSAS:  Objection.
10   A.   I don't know.
11   Q.   Was it the headlight area?
12   A.   I don't know.
13   Q.   Was it the right fender?  Can you answer that?
14   A.   I don't know.
15   Q.   Were you able to see with any clarity what
16        actual part of the hood, other than the right
17        passenger part, came in contact with the part of
18        his body?
19   A.   It looks like his whole body was on the hood.
20   Q.   And for how long -- strike that.  What's the
21        next thing that you observed?
22   A.   When it was striking him, it was turning onto
23        Fayston and I could see his feet kind of kicking
24        as if he was met with a stronger force and he
```

1       was trying to keep himself up from being run

2       over.  And I can see his hands on the hood and

3       the car was turning.

4    Q.  To your knowledge, is this the first time you

5       have ever used the phrase you could see his feet

6       moving as though he was trying to keep something

7       of greater force running over him?

8               MS. LITSAS:  Objection.

9    A.  I'm sorry, what was that?

10   Q.  To your knowledge, is this the first time that

11      you have ever used the phrase kicking in a way

12      as to keep something with greater force from

13      running him over?

14              MS. LITSAS:  Objection.

15   A.  Is the first time I have ever used that phrase?

16   Q.  That you have characterized the contact like

17      that?

18              MS. LITSAS:  Objection.

19   A.  No, it's not the first time I have used it.

20   Q.  And do you recollect any other occasions since

21      2002 that you actually characterized the contact

22      with the vehicle in that fashion?

23              MS. LITSAS:  Objection.  I would just

24      instruct my client not to answer any

1    Q.    So --

2                      MS. LITSAS:  I renew my objection to

3          the question that was just answered.  I again

4          move to strike that answer.

5    Q.    What's the next thing that you saw?

6    A.    I saw the car turn on, turning onto Fayston.

7    Q.    And that's when you started -- you saw the car

8          turning onto Fayston?

9    A.    Yes.

10   Q.    So how far into the turn on Fayston, was it at

11         the point of contact between officer Paillant

12         and the vehicle?

13   A.    I would say it had just begun the turn.

14   Q.    Begun the turn.  One minute.  And so he's

15         kicking and his hands are on the hood trying to

16         stop something of greater force, what happened

17         next?

18                     MS. LITSAS:  Objection.

19   A.    Well, I wouldn't say he was trying to stop it.

20         You can't stop a car.  I think he was just

21         trying to keep himself up.

22   Q.    What happened next?

23   A.    The car was turning onto Fayston.

24   Q.    And at that point, did you lose sight of him?

```
 1    A.    Yes.

 2    Q.    And that's when you started shooting, right?

 3                MS. LITSAS:  Objection.

 4    A.    That's when I lost sight of him.  I raised my

 5          arm to shoot, and I could see Mr. Nicholas in

 6          the cruiser.

 7                MS. LITSAS:  I would ask that you let

 8          him finish his answer.

 9    A.    I saw Mr. Nicholas, as my arm is raised and I

10          stepped from the parked cars to the street and I

11          started -- I took a breath.

12    Q.    Okay.  Time to take a break.

13    A.    I took a breath.  And I had to aim, I took a

14          breath, and I asked God to be with me.

15    Q.    Yes.

16    A.    And I started shooting.

17    Q.    Let's take a break.

18                THE VIDEOGRAPHER:  The time is 2:23.

19          We're off the record.

20                (Recess.)

21                THE VIDEOGRAPHER:  The time is 2:30.

22          We are back on the record.

23    Q.    Could you read back the last answer, please?

24                (Answer read back as requested.)
```

```
 1   Q.   After Officer Paillant was struck by the
 2        vehicle, you lost sight of him, right?
 3                  MS. LITSAS:  Objection.
 4   A.   At some point, I did lose sight of him.
 5   Q.   He fell off the hood and back, it was at that
 6        point that you lost sight of him?
 7                  MS. LITSAS:  Objection.
 8   A.   I'm sorry, could you rephrase that?
 9   Q.   Right.  How soon after Officer Paillant, part of
10        his torso landed on the hood did he fall away
11        from the hood?
12                  MS. LITSAS:  Objection.
13   A.   I never saw him fall away from the hood.
14   Q.   What exactly, what movement did Officer
15        Paillant's body go through that you saw after
16        he -- after his body hit the hood?
17                  MS. LITSAS:  Objection.
18   A.   I saw his feet kind of kicking.  And he was on
19        the hood as the car was turning.
20   Q.   And at some point, his body was no longer on the
21        hood, right?
22                  MS. LITSAS:  Objection.
23   A.   I don't know where his body was when the car
24        turned and I lost sight of him.
```

```
 1    Q.    That's what I was trying to ask.  And how

 2          soon --

 3                    MS. LITSAS:  Objection.

 4    Q.    After you saw his body strike the hood, how soon

 5          after that did you lose sight of him?

 6    A.    I don't know.

 7    Q.    Was it a second?  Was it two seconds?

 8    A.    I don't know.  It was quick.

 9    Q.    Was it less than five seconds?

10                    MS. LITSAS:  Objection.

11    A.    I just know it was fast.

12    Q.    And was it simultaneously with your losing sight

13          of him that you began -- that you prayed to God

14          and started to shoot?

15                    MS. LITSAS:  Objection.

16    A.    When I lost sight?

17    Q.    Yes.

18    A.    I raised my arm.

19    Q.    Right.

20    A.    I could see Mr. Nicholas, I stepped from the

21          parked cars, and that's when I started shooting.

22    Q.    When you started shooting, you were looking at

23          the vehicle, right?

24                    MS. LITSAS:  Objection.
```

```
 1    A.   Which vehicle were you talking about?

 2    Q.   The white Taurus.

 3    A.   Yes.

 4    Q.   And as you were shooting at the white Taurus,

 5         the white Taurus was diagonally across the

 6         street from you, correct?

 7    A.   Somewhat.

 8    Q.   And with what eye or eyes did you see what

 9         portion of James Nicholas while you were

10         shooting at the vehicle?

11                   MS. LITSAS:   Objection.

12    A.   Which eye did I see him with?

13    Q.   Yes.   In other words, did you look to the left,

14         did you look to the right, did you look straight

15         ahead?   How did you become aware that

16         Mr. Nicholas was out of the vehicle?

17    A.   He wasn't out of the vehicle.

18                   MS. LITSAS:   Objection.

19    Q.   Is it your testimony that prior to actually

20         starting to shoot and after you prayed to God,

21         you looked in James Nicholas' direction?

22                   MS. LITSAS:   Objection.

23    A.   No.

24    Q.   In what order did you do those things, did you
```

```
 1              over like that.  That's how I was aiming and I

 2              didn't want -- I started stepping forward.

 3    Q.        How far forward did you step before you

 4              discharged the first shot?

 5    A.        I don't know.  I don't know how far forward it

 6              was.

 7    Q.        I would like you to stand up.  I wanted a few

 8              more questions with regard to that.

 9                        MS. LITSAS:  Again, I'll note my

10              continuing standing objection to the physical

11              demonstration.

12    Q.        Now, please put your hand out there.  Now, with

13              your arm in that direction with the gun pointing

14              outward, what part of the vehicle, if any, were

15              you attempting to hit aiming straight out as you

16              were up in the air like that, what part?

17                        MS. LITSAS:  Objection.

18    A.        The driver's side.

19    Q.        The driver's side.  Were you trying to kill the

20              driver?

21                        MS. LITSAS:  Objection.

22    A.        I was trying to disable the driver from driving

23              the vehicle?

24    Q.        Is that a procedure that you're taught in
```

WIDOMSKI COURT REPORTING ASSOCIATES (781) 246-0710

```
 1           connection with the discharge of weapons in a
 2           moving vehicle, to shoot to disable the driver?
 3                    MS. LITSAS:  Objection.
 4      A.   We're not taught to shoot at moving vehicles.
 5           We're taught to shoot to stop any force that's
 6           greater than yours that may cause you death or
 7           serious bodily injury or someone else.
 8      Q.   And so at that particular point, it was a matter
 9           of indifference to you whether you killed the
10           driver?
11                    MS. LITSAS:  Objection.
12      A.   I'm sorry, I don't understand the question.
13      Q.   At that point in time, you didn't really care
14           whether you killed the driver or not?
15                    MS. LITSAS:  Objection.
16      A.   No, that's not true.
17      Q.   You could have aimed at the tires, right?
18      A.   No.
19                    MS. LITSAS:  Objection.
20      Q.   You could have aimed at the inside of the
21           vehicle?
22                    MS. LITSAS:  Objection.
23      A.   I'm sorry, aimed where?  You still need me
24           standing up?
```

WIDOMSKI COURT REPORTING ASSOCIATES (781) 246-0710

1   Q.   Yes, I do.

2   A.   Okay.  Could I aim where?

3   Q.   At the inside of the vehicle?  I'll strike the

4        question.

5                  MS. LITSAS:  Objection.

6   Q.   You never saw --

7                  MS. LITSAS:  Andrew, I will ask that

8        he sit down unless you're going to ask him to do

9        any other physical demonstrations.

10                 MR. STOCKWELL-ALPERT:  Okay, but I may

11       ask him to stand again in time.

12                 MS. LITSAS:  But to the extent while

13       you're questioning him while he's standing.

14  Q.   Okay.  You can sit down but I may ask you to get

15       up in a second.

16                 MS. LITSAS:  Thank you.

17  Q.   You had no idea, you hadn't seen any driver of

18       the vehicle at any point, had you?

19  A.   No.

20  Q.   You hadn't seen any passengers in the vehicle at

21       any point, had you?

22  A.   No, I did not.

23  Q.   You didn't know how many people were in the

24       vehicle, right?

1    A.    No.

2    Q.    You didn't know anything about the number or

3          nature of the occupants in the vehicle, did you?

4    A.    No.

5    Q.    And you had never received any training in other

6          methods of stopping a moving vehicle?

7                MS. LITSAS:   Objection.

8    Q.    Up to that point, right?

9    A.    Can you rephrase that?

10   Q.    You had never received any training with regard

11         to methods of stopping a moving vehicle in the

12         use of a firearm, right?

13               MS. LITSAS:   Objection.

14   A.    No.

15   Q.    So this was your split second decision that you

16         made about how you thought it was appropriate to

17         stop this vehicle under the circumstances,

18         right?

19               MS. LITSAS:   Objection.

20   A.    It was the only decision I had.

21   Q.    And it was very important to you to stop this

22         vehicle, right?

23               MS. LITSAS:   Objection.

24   A.    I would say it was important to save a life.

```
 1            you were involved in different locations doing
 2            different things and wanted to talk back and
 3            forth with each other?
 4    A.      Yes.
 5    Q.      So that would be the same equipment that you
 6            could use if you wanted to say, hey, is
 7            everything okay, for example?
 8                      MS. LITSAS:  Objection.
 9    A.      You can use it for that but not in that time
10            frame.  It's much too slow.
11    Q.      And did you consider the possibility that --
12            strike that.
13                      You didn't know at the time you shot
14            whether your partner had actually succeeded in
15            getting out of the way of the vehicle?
16                      MS. LITSAS:  Objection.
17    Q.      After he was struck, right?
18                      MS. LITSAS:  Objection.
19    A.      He didn't get out of the way.  He got hit.
20    Q.      After he got hit, you are aware that he got up
21            within seconds after that?
22                      MS. LITSAS:  Objection.
23    A.      I'm aware that he did get up.
24    Q.      And you don't know what he did, if anything, on
```

1        his own to make himself safe from being further

2        struck or run over or dragged by the vehicle

3        before you shot at it, did you?

4                    MS. LITSAS:  Objection.

5    A.   No.  I don't know where he was.  I didn't see

6         him.

7    Q.   And so although he might have been having a

8         problem with the vehicle at that point in time,

9         he might have been perfectly safe at the point

10        you started shooting, right?

11                   MS. LITSAS:  Objection.

12   A.   I don't know.  That's just, that's a

13        speculation.

14   Q.   Well, a woman is dead as a result of your

15        shooting, right?

16                   MS. LITSAS:  Objection.

17   A.   I understand.

18   Q.   And the question is did you consider the

19        possibility that maybe you didn't need to shoot

20        because the situation wasn't what you decided it

21        was when you immediately decided to shoot?

22                   MS. LITSAS:  Objection.

23   A.   Everything happened very quickly and we are

24        trained to make decisions in a split second.

```
 1              And if we don't make decisions, people will die,

 2              people can die, but if we freeze, things can

 3              turn out differently.  I didn't know where my

 4              partner was at the time and I'm trained to

 5              react.  I wouldn't be a normal bystander who

 6              could stand there and look and not react because

 7              that would be a neglect of my duty.  I had to

 8              react.

 9    Q.   Wouldn't yelling out to your partner to find out

10         if he was safe kind of reaction that might be

11         more appropriate than immediately shooting?

12              MS. LITSAS:  Objection.

13    A.   No.

14    Q.   Well, as part of your -- strike that.

15              You said you're trained to react

16         quickly in situations, right?

17    A.   Yes.

18    Q.   But you have never been trained about the

19         situations in which to react at shooting at a

20         moving vehicle, right?

21              MS. LITSAS:  Objection.

22    A.   When we're trained, they said this is the job

23         from A to Z.  You'll be called to do many

24         different things and they're going to teach us a
```

```
 1              lot of different things in the academy.  They

 2              said you know what, there's going to be stuff

 3              that each one of you that will go through that

 4              will be different from what we can tell you.

 5              And you have to determine how to handle it.

 6      Q.      If the same situation occurred today with

 7              exactly the same circumstances, sir, surrounding

 8              it, would you make exactly the same decision?

 9                      MS. LITSAS:   Objection.

10      A.      That's a hypothetical question.

11      Q.      I'm asking you a hypothetical.

12      A.      I can't answer that, sir.

13      Q.      I need to know if you would do it again?

14                      MS. LITSAS:   Objection.  He answered

15              the question.

16      A.      I don't know what I would do.  It's

17              hypothetical.  Do you know what you would do,

18              sir?

19      Q.      Well, I'm not the one that killed an innocent

20              person in the vehicle, Officer?

21                      MS. LITSAS:   Objection.

22      Q.      Anyway, so you started shooting, right?

23      A.      Yes.

24      Q.      Now, at the time that you were interviewed by
```

1   A.   I considered James Nicholas, that's why I

2          stepped into the street instead of firing from

3          standing in the middle of parked cars.

4   Q.   So you think you cured the possibility of

5          ricocheting bullets killing James Nicholas

6          because you stepped out into the street?

7                  MS. LITSAS:  Objection.

8   A.   I definitely know I took him out of my sight,

9          out of the picture which would seriously

10         decrease the chances of him getting hit.

11   Q.   Well, what data do you have to support your

12         statement that taking him out of the picture

13         meant he was safe from ricocheting bullets?

14               MS. LITSAS:  Objection.

15   A.   I don't have any data on the ricocheting

16         bullets.

17   Q.   In fact, wouldn't it be fair to say your many

18         years as a police officer, you're aware of

19         instances in which drive-by shootings in the

20         streets have resulted in innocent civilians in

21         apartment buildings several stories up being

22         killed by ricocheting bullets?

23               MS. LITSAS:  Objection.

24   A.   No.

```
 1   Q.   But you didn't consider any of that when you
 2        opened fire on this vehicle?
 3                 MS. LITSAS:  Objection.
 4   A.   Of course, I did.
 5   Q.   And decided it was still okay to shoot, right?
 6                 MS. LITSAS:  Objection.
 7   A.   I'm shooting to save the life of my partner.
 8   Q.   And you continued to shoot to save the life of
 9        your partner five times, right?
10                 MS. LITSAS:  Objection.
11   A.   I shot until the vehicle appeared to stop.
12   Q.   And that was some distance down Fayston Street,
13        right?
14                 MS. LITSAS:  Objection.
15   A.   I don't know how far down it was.
16   Q.   But it was down Fayston Street some distance,
17        right?
18   A.   It was --
19                 MS. LITSAS:  Objection.
20   A.   -- on Fayston Street.
21   Q.   Was it before or after the intersection with
22        Perth?
23   A.   Okay, what's the question you're asking?
24   Q.   The point at which you decided that you had
```

```
 1            being shot at and you were not a target, right?
 2                  MS. LITSAS:   Objection.
 3      Q.    Did you apply that same training to the
 4            situation where the vehicle was moving away from
 5            you?
 6                  MS. LITSAS:   Objection.
 7      A.    I applied the training that we were taught.  You
 8            use it to overcome the force that's being --
 9            that you're being met with, and as long as the
10            car is still driving, my partner is still in
11            danger so I shot.
12      Q.    Well, let's --
13      A.    Until it stopped.
14      Q.    Let's talk about that.  My understanding from
15            what you told the homicide unit, correct me if
16            I'm wrong, is that the moment you put your gun
17            back down --
18      A.    Hm-mmm.
19      Q.    -- You saw your partner out of the corner of
20            your eye?
21      A.    Correct.
22      Q.    So you shot these bullets, okay?
23      A.    Mm-hmm.
24      Q.    And put the gun down and then you saw your
```

```
 1          partner?

 2   A.     Yes.

 3   Q.     And your partner was getting up?

 4                 MS. LITSAS:   Objection.

 5   Q.     Right.

 6   A.     It appeared he was getting up from the ground.

 7   Q.     Right.  And which eye did you see him out of the

 8          corner of?

 9   A.     My right.

10   Q.     Which means if I'm not mistaken, that you would

11          have been looking down Fayston Street shooting

12          down Fayston Street?

13                 MS. LITSAS:   Objection.

14   Q.     And then saw your partner out of the corner of

15          your eye, right?

16                 MS. LITSAS:   Objection.

17   A.     I saw him in my peripheral vision.

18   Q.     So, would it be fair to say if you had put your

19          gun down before firing a third shot or fourth

20          shot or second shot, you might have been able to

21          determine that your partner was okay before you

22          killed an innocent person?

23                 MS. LITSAS:   Objection.

24   A.     It's not fair to say that.
```

```
 1          because he went out on the hood of the car and

 2          the car was still moving when he disappeared.

 3     Q.   After he disappeared --

 4               MS. LITSAS:  Counsel, I would ask you

 5          to let him finish his answer.

 6     Q.   Fine, okay.

 7     A.   When he disappeared, he would have been on

 8          Fayston.

 9     Q.   And you continued to walk as you were shooting

10          further down Fayston behind the vehicle, right?

11               MS. LITSAS:  Objection.

12     A.   I don't know how far I walked.

13     Q.   Certainly far enough to know that your partner

14          was no longer under the vehicle and being

15          dragged by it while you were shooting, right?

16               MS. LITSAS:  Objection.

17     A.   Is that a question?

18     Q.   Yes.

19     A.   No.

20     Q.   No?  And you said you stopped shooting when you

21          realized that your efforts had succeeded in

22          stopping the vehicle, right?

23               MS. LITSAS:  Objection.

24     A.   I stopped shooting when the car slowed down and
```

1          one of the doors opened.

2     Q.   Did the doors open on Fayston Street?

3     A.   Yes.

4     Q.   Did you have any idea if or how many people you

5          killed by that time?

6                    MS. LITSAS:  Objection.

7     A.   I didn't know I killed anyone.

8     Q.   Did you see whether or not you shot the rear

9          windshield out of the vehicle at the time?

10    A.   Yes.

11    Q.   You succeeded in shattering the glass in the

12         windshield, right?

13    A.   The rear windshield.

14    Q.   Which means a bullet any time you fired after

15         that could have gone straight through the

16         vehicle, right?

17                   MS. LITSAS:  Objection.

18    A.   Just because the rear window was shattered --

19         what are you trying to say?

20    Q.   I think you answered the question.  And the

21         vehicle turned onto Perth Street?

22    A.   I'm sorry.

23    Q.   The vehicle turned onto Perth Street, right?

24    A.   After the door opened, yes.

WIDOMSKI COURT REPORTING ASSOCIATES (781) 246-0710

```
 1    A.    At some point, I saw him getting up.

 2    Q.    And he ran down the street to follow the

 3          vehicle, right?

 4                   MS. LITSAS:  Objection.

 5    A.    I'm sorry, say that again.

 6    Q.    He ran down the street, Fayston Street?

 7    A.    Yes.

 8    Q.    And when he ran down Fayston Street, was he

 9          behind you or ahead of you as you were going

10          down Fayston Street shooting?

11                   MS. LITSAS:  Objection.

12    A.    He was not running when I was shooting.

13    Q.    Okay.  After you stopped shooting, you saw

14          Officer Paillant running down the street, did he

15          ever catch up with you?

16                   MS. LITSAS:  Objection.

17    A.    After I stopped shooting, Officer Paillant was

18          not running.  He was on the ground.

19    Q.    And how soon after you made the observation that

20          he was on the ground did he get up?

21    A.    As soon as I saw him out of the corner of my

22          eye.

23    Q.    You were surprised that he got up so quickly,

24          right?
```

```
 1                    MS. LITSAS:  Objection.

 2    A.    I was surprised he got up.

 3    Q.    Well, and how soon after he got up did he start

 4          running down Fayston Street?

 5    A.    As soon as he got up.

 6    Q.    Did he ever catch up with you?

 7    A.    He was in front of me.

 8    Q.    How did he get from behind you nearer to the

 9          intersection of Fayston and Dunkeld to in front

10          of you?

11                    MS. LITSAS:  Objection.

12    A.    I never said he was behind me or in front of me.

13          The car was always in front of me and I believe

14          he was on the car.  I never said --

15    Q.    Are you saying the --

16                    MS. LITSAS:  Counsel, again, could you

17          please let Mr. Officer Taylor answer.

18    A.    I never said he was behind me.

19    Q.    Well, did you see him carried down Fayston

20          Street on the hood of the vehicle?

21                    MS. LITSAS:  Objection.

22    A.    Did I see him carried down Fayston Street?

23    Q.    Was he transported down Fayston Street on the

24          hood of the vehicle?
```

WIDOMSKI COURT REPORTING ASSOCIATES  (781) 246-0710

# EXHIBIT I

ORIGINAL

VOLUME I

PAGES:    1 - 92

EXHIBITS: 1 - 4

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

C.A. NO. 05-11803-MLW

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*      \*

                                              \*

SHENIA DANCY-STEWART, as                       \*

Administratrix of the Estate                   \*

of EVELINE BARROS-CEPEDA,                       \*

              Plaintiffs,                      \*

                                              \*

vs.                                            \*

                                              \*

THOMAS TAYLOR, JR., and the                    \*

CITY OF BOSTON,                                 \*

              Defendants.                      \*

                                              \*

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*      \*

DEPOSITION OF TREVO CARTER,
taken on behalf of the Defendants, pursuant
to the Massachusetts Rules of Civil
Procedure, before Karen Borreson, RPR, Notary
Public within and for the Commonwealth of
Massachusetts, at the law offices of City of
Boston, City Hall, Boston, Massachusetts, on
Thursday, January 17, 2008, commencing at
2:35 p.m.

1    Q. Yes.

2    A. Okay.  Um, approximately seven.

3    Q. How did you come to that conclusion?

4    A. I know the street.  I know there was no

5       streetlights off.

6    Q. So there were approximately seven

7       streetlights on?

8    A. Yes.

9    Q. At the time that you heard and saw the car

10      coming down the street, you were on the

11      porch?

12   A. I was out on the sidewalk.

13   Q. You were on the sidewalk?

14   A. Yes.

15   Q. And the sidewalk of what street?

16   A. Dunkeld.

17   Q. Where were you located on the sidewalk of

18      Dunkeld Street.  Was there a specific

19      numbered house?

20   A. It was Latoya's house and there was new

21      complexes over in between those two.

22   Q. So you were in the vicinity of 5 Dunkeld

23      Street?

24   A. Yes.

```
 1   Q. On the sidewalk?

 2   A. Yes.

 3   Q. What were you doing on the sidewalk?

 4   A. Just talking among people that live on the

 5      street.

 6   Q. Do you know who you were talking to?

 7   A. I didn't know their name.  I know them by

 8      face.  So it was like hi, how are you doing?

 9      That was it.  Because that I was smoking, so

10      I moved away and finished my cigarette and

11      flicked it.

12   Q. So you were smoking a cigarette outside on

13      the sidewalk?

14   A. Yes.

15   Q. On Dunkeld Street?

16   A. Uh-huh.

17   Q. And the first thing that you heard was the

18      screeching car?

19   A. Uh-huh.

20   Q. And when you heard that, did you look to see

21      what the cause of it was?

22           MR. STOCKWELL-ALPERT:  Objection.

23   A. I really didn't pay most mind to it, because

24      Dunkeld -- kids in cars do dumb things.  So
```

```
1       you hear a car screeching, you look and look

2       away.  That was it.

3   Q.  Did you see anything when you heard the

4       screeching car?

5   A.  Just thought -- just the car come on to

6       Dunkeld, yes.

7   Q.  What's the next thing that happened?

8   A.  It accelerated up the street, I know that.

9   Q.  Can you describe for me what happened next?

10  A.  Um, there was two other police officers on

11      Fayston.  I don't know if they was there for

12      any other reason.  I don't know what reason

13      they were there for.  They were visiting

14      another house.  I'm not sure what house it

15      was.  And, um, as the car was accelerating

16      up the street.  One cop was outside already

17      and he was in the middle of the street

18      telling the other car to stop.  The car

19      wouldn't stop.

20  Q.  And then what happened?

21  A.  The right side of the hood of the car hit

22      the cop and he went onto his other side, off

23      to the side.

24  Q.  What happens when the car hits the cop?
```

```
 1   Q. Followed by a police cruiser?

 2   A. Yes.

 3   Q. And what happens next after the car

 4      accelerates?

 5   A. The car -- the cop got hit.  Um, out of view

 6      for me as he got hit.  He didn't fly in the

 7      air.

 8            MR. STOCKWELL-ALPERT:  I didn't hear

 9      that.

10   A. He was out of view for me, because the other

11      cars were parked in the street.  He didn't

12      fly in the air.  He wasn't a hit like he got

13      flipped in the air.  So I couldn't see after

14      that.  I knew he went to the ground,

15      obviously, and the car went right around

16      him.  Went around where he was at and went

17      on to Fayston.

18   Q. What hits the officer?

19   A. The car.

20   Q. The same car that's the screeching car?

21   A. Yes.

22   Q. And what part of the car hits the officer?

23      And what I'm asking you is it the driver's

24      side or the front seat passenger side, if
```

```
 1        you can identify it that way?

 2   A.  I believe it was the passenger side.

 3   Q.  So that would be the right side of the car?

 4   A.  Yes.

 5   Q.  Do you hear anything when the car hits the

 6        officer?

 7   A.  No.

 8   Q.  Do you hear the officer's body or belt

 9        collide with the vehicle?

10             MR. STOCKWELL-ALPERT:  Objection.

11   A.  No.  I'm sorry.

12   Q.  Do you see the officer go on top of the hood

13        of the car?

14   A.  Not the whole hood.

15             MR. STOCKWELL-ALPERT:  Objection.

16   Q.  I'm sorry, so what did you see happen to the

17        officer?

18   A.  He didn't hit like the hood -- not the whole

19        hood, just the side of the hood, like, where

20        the light ares is that, the front of

21        headlight, that area.

22   Q.  What part of the officer's body collides

23        with that part of the hood?

24   A.  I believe the left side.  No, no.  I'm
```

```
 1    Q. -- onto the vehicle?
 2              MR. STOCKWELL-ALPERT:  Objection.
 3    A. Yes.
 4    Q. What direction is the officer move into upon
 5       impact?
 6    A. Meaning like?
 7    Q. What direction does the officer's body move
 8       into at the time of the impact of the
 9       vehicle?
10    A. Moves towards -- he moves towards the right.
11       The car is coming up and he moves over to
12       the right.
13    Q. I guess my question is:  When the vehicle
14       hits the officer --
15    A. Uh-huh.
16    Q. -- does the officer's body move forward
17       towards the vehicle?
18    A. Yes.
19              MR. STOCKWELL-ALPERT:  Objection.
20    Q. So upon impact of the vehicle, which
21       direction does the officer's body move
22       towards?
23              MR. STOCKWELL-ALPERT:  Objection.
24    A. Say that again, I'm sorry.
```

# EXHIBIT J

UNITED STATES BANKRUPTCY COURT

DISTRICT OF MASSACHUSETTS

Civil Action

ORIGINAL

Case No. 05-11803-MLW

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

SHENIA DANCY-STEWART AS                    \*

ADMINISTRATRIX OF THE ESTATE OF            \*

EVELINE BARROS-CEPEDA                       \*

        -v-                                 \*

THOMAS TAYLOR, JR., AND THE                 \*

CITY OF BOSTON                              \*

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

DEPOSITION OF JAMES NICOLAS

Examination taken at the Offices of the City

Solicitor, One City Hall Plaza, Elm Street,

Manchester, New Hampshire, on Tuesday, January 15,

2008, commencing at 11:45 a.m.

Court Reporter:

Elaine J. Ritsema, CCR, RPR

CCR No. 92 (RSA 331-B)

1    that's the house.  That was the house.  The car

2    (indicating) --

3         Q.    Okay.  Why don't you mark an X where the

4    house was that you were -- where you were in the car,

5    in the police cruiser.  Can you just mark an X so that

6    we can understand what your testimony is when you --

7    when you are drawing this and when we read this

8    transcript.

9              So why don't we do this --

10        A.    I'm bad in drawing.  It's better for me

11   to talk about it and then -- you know, me drawing, to

12   be honest with you.  'Cause me drawing something, you

13   know -- 'cause I already swear an oath.  What about if

14   I draw something and it's not the right way, you know,

15   the street look like?

16             (Speakers overlap)

17        Q.    We understand that.  We're only asking

18   you to do the best of your ability.  Why don't you

19   tell me what happened; and then if we need to draw it,

20   we can do that.

21        A.    Thank you.

22        Q.    Okay.

23        A.    When I was -- like I said, when I was in

24   the car after he finish talk to me or whatever, you

```
 1    know, after the lady -- you know what I'm saying --
 2    see my face, it wasn't me, he was about to let me go.
 3                  But it was a car who was speeding.  It
 4    was going fast.  I don't remember exactly if they hit
 5    him on his leg, you know; but the car almost take his
 6    leg off.
 7                  So the officer who was with me, I didn't
 8    see him do any shooting.  Okay?  If I told you I see
 9    him shoot, shoot anybody, I be lying to you.  I didn't
10    see him do any shooting.  But I do hear the shotgun.
11    I do hear the shotgun and everything.
12                  So it was -- and after -- after --
13    actually, it was another car, too, who was chasing
14    that car --
15          Q.    And what --
16          A.    -- you know, the officer.  The cruiser
17    who was chasing that car.
18          Q.    Mm-hmm.
19          A.    So it was like everything happened so
20    fast, you know; and it was like after all that
21    happened, I was still --
22                  (Reporter asks to repeat)
23          A.    I was still in the same street.  'Cause
24    after that shooting or whatever it is, I couldn't go
```

1   nothing like that.

2        Q.      When did you hear the gunfire,

3   Mr. Nicolas?

4        A.      Actually, it was when the car passing by

5   to be honest with you, if I remember exactly hundred

6   percent.  That was when the car passed by.  After the

7   car passed by because I was in the back of the car.

8               (Reporter asks to repeat)

9        A.      It's not like I could just get out to

10  see, you know, what color the car was or nothing like

11  that.  The only thing I know after the lady see it

12  wasn't me or the officer was trying to speak to me, he

13  was going to try to let me go, you know, that didn't

14  happen; and I have to stay there for longer, longer,

15  longer, longer time.

16              And on top of that and have I have to go

17  to the headquarters, you know, for two people -- you

18  know what I'm saying -- and just like, you know,

19  question me about this situation when that wasn't my

20  mess, when I didn't have nothing to do with that

21  situation.

22       Q.      Mr. Nicolas, when you were in the back

23  seat of the police cruiser, were you -- do you

24  remember if you remember sitting on the right or the

1    left of the back seat in the cruiser?

2         A.    If I refresh my memory, if the officer

3    was right here (indicating) and the house was right

4    here, so I probably was sitting right here.  Because

5    how the lady was gonna see my face?

6              So I'm not sure if it was -- I don't

7    think I was sitting in the same -- you know, like in

8    the same -- like you know where the officer drive?

9    Like this is the passenger -- those --

10             (Reporter asks witness to speak slower)

11        A.    I don't remember exactly if I was in the

12   left or I was in the right.  I'm just aggravated with

13   this whole thing, you know.

14             MS. LITSAS:  Can we go off the record.

15             (Discussion off the record)

16             MS. LITSAS:  Back on the record.

17   BY MS. LITSAS:

18        Q.    Mr. Nicolas, you were sitting in the

19   back seat of the cruiser?

20        A.    Yes.

21        Q.    Okay.  Were you sitting behind the

22   driver or the passenger?

23        A.    That I know.  I was in -- behind the

24   driver.

# EXHIBIT K

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SHENIA DANCY-STEWART as Administratrix of the Estate of EVELINE BARROS-CEPEDA, Plaintiff | Civil Action Docket No. 05-11803MLW |
| v. | **PLAINTIFFS' THIRD AMENDED COMPLAINT AND JURY TRIAL DEMAND** |
| THOMAS TAYLOR, Jr., and the CITY OF BOSTON Defendants | |

## INTRODUCTION

1.       This is an action for monetary damages brought pursuant to 42 U.S.C. §§1983 and

1988 and the Fourth Amendment to the United States Constitution against Thomas Taylor, Jr.,

(hereinafter, "Officer Taylor"), a police officer of the City of Boston, in his individual capacity

and against the City of Boston. Jurisdiction is founded upon 28 U.S.C. §§1331 and 1343 and on

the pendent jurisdiction of this Court to entertain claims arising under state law.

2..       It is alleged that Officer Taylor shot and killed Eveline Barros-Cepeda without legal

cause or excuse and made an unreasonable seizure of her person, violating her rights under the

Fourth Amendments to the United States Constitution and Article XIV of the Massachusetts

Declaration of Rights.   It is further alleged that these violations were committed as a result of

policies and customs of the City of Boston.

## PARTIES

3.     Eveline Barros-Cepeda, (hereinafter, Ms. Barros-Cepeda) was a black Cape Verdian

who, at all times material to this complaint, lived in Dorchester, Massachusetts with her mother,

Domingas DePina..  Ms. Barros-Cepeda was only twenty-five years old when she was shot and

killed by Defendant Officer Taylor. She left behind her husband, Carlos Cepeda and her two

year old son, Nazee Barros-Cepeda. Domingas DePina, her mother, sought to be and was

subsequently appointed legal guardian of Nazee Barros-Cepeda. She has been caring for him

since he lost his mother.

4.      Plaintiff, Shenia Dancy-Stewart, (hereinafter, "Ms. Dancy-Stewart") is the Administratrix

of the Estate of Ms. Barros-Cepeda by appointment of the Suffolk Probate & Family Court.

5       Defendant, Thomas Taylor, Jr., (hereinafter, "Officer Taylor") is and was, at all times

material to this complaint, a duly appointed and acting police officer of the police department of

the City of Boston, acting under color of law, to wit, under color of the statutes, ordinances,

regulations, policies, customs and usages of the Commonwealth of Massachusetts and/or the City

of Boston..

6       Defendant, City of Boston, is a municipal corporation, duly organized under the laws of

the Commonwealth of Massachusetts and located in Suffolk County. The City of Boston is the

public employer of Defendant Officer Taylor.

## FACTUAL ALLEGATIONS

7       On September 8, 2002, at around 12:30 A.M., Ms. Barros-Cepeda was a passenger in the

rear seat of a motor vehicle being operated on Dunkel Street towards Fayston Street in

Dorchester, Massachusetts.

8.      At that same time, Officer Taylor was on foot at the intersection of Dunkel and Fayston

Street.

9.      When the motor vehicle turned onto Fayston Street, Defendant Officer Taylor

temporarily lost sight of a fellow police officer who had been standing across the street from

him. Without first doing anything to verify that the other police officer had been or was being

2

injured by the motor vehicle, Defendant Officer Taylor drew his service revolver and shot at

least three bullets in the general direction of the vehicle and its operator.

10.    Defendant Officer Taylor's firing at the operator and the motor vehicle under the

circumstances violated the then-existing policies of the City of Boston police department on the

use of deadly force.

11.    There was no threat to Defendant Officer Taylor's life or safety from either the vehicle or

any of its occupants.

12.    Defendant Officer Taylor had no knowledge of and did not observe anything that would

lead him to believe that anyone in the vehicle was armed or dangerous.

13.    Defendant Officer Taylor had no prior knowledge and did not observe anything that

would lead him to believe that anyone in the vehicle had been or was presently involved in any

criminal wrongdoing.

14.    Defendant Officer Taylor knew or should have known that he had little or no likelihood

of hitting the driver or otherwise bringing the vehicle to a stop by shooting at it and a strong

likelihood of causing injury or death to its passengers, bystanders and building residents.

15.    One bullet passed through both the vehicle and Ms. Barros-Cepeda's body but did not

immediately kill her. She was subsequently pronounced dead at the hospital. A copy of the

death certificate is annexed hereto as "Exhibit A".

16.    As a direct and proximate result of the acts of Defendant Officer Taylor, Ms. Barros-

Cepeda suffered the following injuries and damages:

       a)   Violation of her constitutional rights under the Fourth Amendment to the United

States Constitution to be free from an unreasonable seizure of her person;

       b)   Loss of her life;

3

c)  Physical pain and suffering and emotional trauma and suffering.

d)  Funeral expenses.

17.    Nazee Barros-Cepeda has suffered the untimely end of his relationship with his mother,

with the corresponding loss of her love, care, affection, nurturing, companionship guidance,

advice, assistance and financial and emotional support.

18.    Carlos Cepeda has suffered the untimely end of his relationship with his spouse, with the

corresponding loss of her services, affection, assistance, society, companionship, comfort, advice

and guidance.

19.    The actions of Defendant Officer Taylor violated Ms. Barros-Cepeda's clearly

established and well settled federal constitutional right of freedom from the unreasonable seizure

of her person.

## COUNT I  42 U.S.C. §1983 - WRONGFUL DEATH – Officer Taylor

20    Paragraphs 1–19 are incorporated herein by reference as though fully set forth.

21.    Plaintiff, Ms. Dancy-Stewart, claims damages against defendant Officer Taylor for the

Estate of Ms. Barros-Cepeda for her wrongful death and for the loss of her income, services,

protection, care, assistance, society, companionship, comfort, guidance, counsel and advice and

for funeral expenses under 42 U.S.C. §1983.

## COUNT II  42 U.S.C. §1983 - SURVIVAL ACTION – Officer Taylor

22.    Paragraphs 1–21 are incorporated herein by reference as though fully set forth.

23.    Ms. Barros-Cepeda was forced to endure great conscious pain and suffering and to incur

expenses for the medical treatment she received prior to her death.

24.    Ms. Barros-Cepeda filed no action during her lifetime, but under the laws of the

4

Commonwealth of Massachusetts, this action survives and may be asserted by her Estate.

25.    Plaintiff, Ms. Dancy-Stewart, claims damages against Officer Taylor for the conscious

pain and suffering and necessary medical expenses incurred by Eveline Barros-Cepeda, under 42

U.S.C. §1983.

### COUNT III   42 U.S.C. §1983 – MUNICIPAL LIABILITY – City of Boston

26.    Paragraphs 1–25 are incorporated herein by reference as though fully set forth.

27.    Prior to September 8, 2002, the City of Boston developed and maintained policies or

customs exhibiting deliberate indifference to the constitutional rights of persons in Boston,

which caused the violation of Ms. Barros-Cepeda's rights.

28.    It was the policy and/or custom of the City of Boston to inadequately and improperly

investigate citizen complaints of police misconduct, and acts of misconduct were instead

tolerated by the City of Boston, including but not limited to the unlawful, unreasonable and

unjustified stopping of moving vehicles by shooting at them and the people inside them.

29.    It was the policy and/or custom of the City of Boston to inadequately supervise and train

its police officers, including the Defendant Taylor, thereby failing to adequately discourage

further constitutional violations on the part of its police officers. The City did not require

appropriate in-service training or re-training of officers who were known to have engaged in

police misconduct.

30.    As a result of the policies and customs, police officers of the City of Boston, including

the Defendant Taylor, believed that their actions would not be properly monitored by supervisory

officers and that misconduct would not be investigated or sanctioned, but would be tolerated.

31.    A Suffolk County Grand Jury returned no indictment against Defendant Officer Taylor

for the unjustified, unlawful killing of Ms. Barros-Cepeda and he was neither disciplined nor

ordered to receive additional training in the discharge of firearms. In fact, in a press conference

following the Grand Jury investigation, Suffolk County District Attorney Daniel Conley blamed

the "unfortunate" death of Ms. Barros-Cepeda on the operator of the motor vehicle. Shortly

thereafter, however, Boston Police Commissioner Paul Evans announced a change in the policy

of the Boston Police Department regarding the discharge of firearms at moving vehicles.

32.    The aforementioned policies and customs demonstrated a deliberate indifference on the

part of policymakers of the City of Boston to the constitutional rights of persons within the City,

and were the cause of the violations of Ms. Barros-Cepeda's rights alleged herein.

## COUNT IV – VIOLATION OF M.G.L. c.229 – WRONGFUL DEATH – Officer Taylor

33.    Paragraphs 1–32 are incorporated herein by reference as though fully set forth.

34.    Defendant Officer Taylor's shooting at the moving vehicle was deliberate and willful and

in total disregard for the lives and safety of any of the passengers within it.

35.    As a direct and proximate result thereof, Ms. Barros-Cepeda suffered the loss of her life.

36.    Plaintiff, Ms. Dancy-Stewart, claims damages against defendant Officer Taylor for the

Estate of Ms. Barros-Cepeda for her wrongful death and for the loss of her income, services,

protection, care, assistance, society, companionship, comfort, guidance, counsel and advice and

for funeral expenses.

## COUNT V  SURVIVAL ACTION – City of Boston

37.    Paragraphs 1–36 are incorporated herein by reference as though fully set forth.

38.    Ms. Barros-Cepeda was forced to endure great conscious pain and suffering and to incur

expenses for the medical treatment she received prior to her death.

39     Ms. Barros-Cepeda filed no action during her lifetime, but under the laws of the

Commonwealth of Massachusetts, this action survives and may be asserted by her Estate.

6

40.     Plaintiff, Ms. Dancy-Stewart, claims damages against the defendant City of Boston for

the conscious pain and suffering and necessary medical expenses incurred by Ms. Barros-

Cepeda.

## COUNT VI  SURVIVAL ACTION – Officer Taylor

41.     Paragraphs 1–40 are incorporated herein by reference as though fully set forth.

42.     Ms. Barros-Cepeda was forced to endure great conscious pain and suffering and to incur

expenses for the medical treatment she received prior to her death.

43.     Ms. Barros-Cepeda filed no action during her lifetime, but under the laws of the

Commonwealth of Massachusetts, this action survives and may be asserted by her Estate.

44.     Plaintiff, Ms. Dancy-Stewart, claims damages against the defendant Officer Taylor for

the conscious pain and suffering and necessary medical expenses incurred by Ms. Barros-

Cepeda.

## PRAYER FOR RELIEF

The Plaintiff pray that this Honorable Court:

a)      Enter judgment in her favor on each and every count of this Complaint, and,

b)      Award compensatory damages, and;

c)      Award punitive damages against defendant Officer Taylor: and;

d)      Award the costs of this action, including reasonable attorney fees pursuant to 42

        U.S.C. §1988 and M.G.L. c. 12, §111, and,

e)      Award costs and interest, and;

f)      Award such other and further relief as this Court may deem appropriate.

**THE PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

Respectfully submitted,
For the Plaintiff Shenia Dancy-Stewart, Adminstratratrix

_____
Andrew Stockwell-Alpert
11 Beacon Street – Suite 1210
Boston, MA 02108
(617) 720-4244
B.B.O. #481190

_____
Manuel R. Pires
DeMiranda & Pires, L.L.C.
1212 Hancock Street
Quincy, MA 02169
(617) 479-8222
B.B.O. #563967

_____
Adelio DeMiranda
DeMiranda & Pires, L.L.C.
1212 Hancock Street
Quincy, MA 02169
(617) 479-8222
B.B.O. #120210

_____
Rudolph F. Miller
One McKinley Square
Boston, MA 02109
(617) 723-9500
B.B.O. #

_____
William Keefe
390 Centre Street
Jamaica Plain, MA 02130
(617) 983-9200
B.B.O. #556817

_____
James E. McCall
4 Longfellow Place – Suite 3703
Boston, MA 02114
(617) 720-2900
B.B.O. #327365

# EXHIBIT  L

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

### CIVIL ACTION NO. 05-11803-MLW

SHENIA DANCY-STEWART as
Administratrix of the Estate of EVELINE
BARROS-CEPEDA,
      Plaintiffs,

v.

THOMAS TAYLOR, Jr., and the CITY
OF BOSTON,
      Defendants.

## AFFIDAVIT OF ELIZABETH ZIOLKOWSKI

I, ELIZABETH ZIOLKOWSKI, do hereby on oath depose the following:

1.    I have been employed by the Boston Police Department as a Senior Criminalist since 1994.

2.    In this capacity, I serve as the supervisor of the Trace Evidence Section and am responsible for the quality of all trace evidence casework, for the quality assurance and control of all the equipment in the section (Py-GC/MS, FTIR, microspec, GRIM2, SEM/EDXA, microscopes and accessories), for writing and putting into effect the standard operating procedures, for occasionally applying for grants for new equipment, for training new personnel, and for planning for the future needs of the section.

3.    My general duties in the laboratory include testifying in court, processing crime scenes, performing casework in several disciplines, including debris and polymer analysis, general criminalistics, bloodstain pattern analysis, toolmark comparisons, footwear comparisons, glass, fiber, paint, hair, gunshot residue, tape, and serological screening techniques, performing nine proficiency tests/year (fiber, hair, glass, paint, gunshot residue distance determination, toolmark, footwear, serological screening, and bloodstain pattern analysis), and supervising/performing research as necessary.

4.    I have attached hereto as Exhibit A my curriculum vitae for further information about my professional and educational background.

5.    In my capacity as a Senior Criminalist for the Boston Police Department, I examined evidence related to the September 8, 2002 shooting.

6.      On September 11, 2002, I along with Forensic Technologist Amy Kraatz, assisted in the processing of a white 4-door Ford Taurus, license plate number 5742PE, at Boston Police Department Headquarters under the direction of Sgt. Det. Wyse.

7.      During this processing, I examined, among other items, long black scrapes on the passenger's side doors and black scrapes/swipes on the right front of the white Taurus extending from the headlight along the hood to the windshield.

8.      In addition, I performed a gel lift of the black scrapes from the hood of the white Taurus and catalogued these gel lifts as Items 15, 16, and 17.

9.      A gel lift consists of an adhesive gel on a plastic backing with a clear protective cover. Gel lifts are used to collect various types of evidence, such as impressions or trace.

10.     On September 12, 2002, Detective Russell Grant submitted several clothing and equipment items, including Items 28 and 30

11.     Item 28 consisted of navy blue police pants labeled "LawPro Quartermaster UnifoiLus &. Equipment...size 36," with a lighter blue stripe on the outer side of each leg.

12.     I examined Item 28 and determined that there was damage to the pants, including a dirt/dust mark measuring approximately 30 by 2.5 centimeters running on the rear left leg from behind the knee area towards the hem.

13.     I also observed three areas of fabric damage on the pants.  On the front left upper leg I observed an abrasion that penetrates the fabric creating a hole about 0.5 centimeter long. On the rear left leg towards the inseam below the seat area I observed a jagged hole measuring approximately 2 centimeters by 1 centimeter, and on the lower rear left leg I observed an abraded area covering approximately 2 centimeters by 0.5 centimeters penetrating one layer of fabric about 2.9 'centimeters from the bottom edge of the pants.  A clear and slightly shiny deposit also surrounded the abrasion.

14.     Item 30 consisted of one black leather police belt labeled "Strong B730-36" with the following attachments:

        1.      Leather gun holster (empty);
        2.      Snapped leather loop with black plastic loop;
        3.      Two leather bands marked "Say-Pee" snapped together around belt;
        4.      Plastic black cylindrical holder (empty) marked "Monadnock";
        5.      One leather pepper spray holder with canister;
        6.      One cloth radio holder (empty) labeled "Motorola"; and
        7.      One leather ammunition holder marked "Gould & Goodrich ERG" containing two clips with bullets.

15.     I examined Item 30 and determined that there was damage to the gun belt and accessories, including, among other things, indentations on one end of the belt, scratches and scrapes on the gun holster (1), scratches and a whitish deposit on the plastic black cylindrical holder (4), and scratches and a whitish deposit on the exterior leather of the belt.

16.     After examining Item 30, I obtained a control sample from the belt exterior, and from attachments 1 and 4 to conduct further testing, including a debris and polymer analysis.

17.     When I conduct a debris and polymer analysis, I examine the physical properties and chemical composition of the item's materials.

18.     As a result of this testing, I determined that the black lines from Items 16 and 17 located on the hood of the Taurus and the control sample from the bottom of Officer Paillant's holster from Item 30 were all found to contain a black polymer consistent in all measured physical and microscopic properties and chemical composition.

19.     In my opinion, based on a reasonable degree of scientific certainty and after examining and comparing these items visually, microscopically, and instrumentally using a stereoscope and FTIR, the black lines from Items 16 and 17, which were located on the white Taurus, and control sample from the bottom of Officer Paillant's holster, could have come from the same source.


        SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY ON THIS  30th
DAY OF MAY  IN THE YEAR 2008.


                                                /s/ Elizabeth Ziolkowski

                                                Elizabeth Ziolkowski

# EXHIBIT M

COMMONWEALTH OF MASSACHUSETTS


SUFFOLK, SS.                     SUPERIOR COURT DEPARTMENT
                                OF THE TRIAL COURT
                                CRIMINAL BUSINESS
                                No. SUCR02-11321


```
* * * * * * * * * * * * * * * * * *
                                  *
COMMONWEALTH OF MASSACHUSETTS     *
                                  *
          v.                      *
                                  *
BRIMA WURIE                       *
                                  *
* * * * * * * * * * * * * * * * * *
```


                        Before:  Staffier Holtz, J.
                        Suffolk Superior Court
                        Boston, Massachusetts
                        Date:  Friday, May 12, 2006



                        CHANGE OF PLEA




                        Ellen Roscoe

                        Court Reporter

APPEARANCES:

    ASSISTANT DISTRICT ATTORNEY MASSAI-MALIEK KING on behalf of

        the Commonwealth

    CHRISTOPHER P. BELEZOS, ESQUIRE on behalf of the Defendant


ALSO PRESENT:

    Margaret Thompson on behalf of the Probation Department

1          THE CLERK:  At this time, Your Honor, we have

2     before the Court the matter of Brima Wurie, Docket No.

3     2002-11321.  001, He's charged with accessory after the

4     fact to assault by means of a dangerous weapon; 002, he's

5     charged with accessory after the fact possession of a

6     firearm; 003, he's charged with operating a motor vehicle

7     without being licensed; 004, he's charged with operating a

8     motor vehicle so that the lives and safety of the public

9     might be in danger; 005, he's charged with operating a

10    motor vehicle and going away after causing injury to a

11    person; 006, he's charged with assault and battery by means

12    of a dangerous weapon.

13          Representing the Defendant is Attorney Chris

14    Belezos.  Representing the Commonwealth, Assistant District

15    Attorney Massai King.  Mr. King wishes to address the

16    Court.

17          MR. KING:  Good morning, Your Honor.  The

18    Defendant and the Commonwealth are here because we've

19    reached a plea agreement with respect to the six

20    indictments before the Court.  The only thing that we are

21    in disagreement about are the terms of probation.

22          THE COURT:  Okay.  Do I have his record?

23          THE CLERK:  Margaret Thompson is the probation

24.   officer.

1        THE PROBATION OFFICER:  Hello, Your Honor.

2        THE COURT:  Okay.  Just so the terms of probation

3    make some sense to me, first tell me a little bit about the

4    case.

5        MR. KING:  Sure, Your Honor.  A brief summary of

6    the facts that on September the 8th of the year 2002, about

7    1:30 a.m., Officers Flaherty and Connolly were in a marked

8    Boston Police cruiser near a park at Columbia Road at a red

9    light facing outbound at the intersection of Hancock

10   Street.

11       While parked there, they observed a white Ford

12   Taurus drive through that intersection and turn right onto

13   Columbia Road.  They observed the operator then drove over

14   an island at the location and turned left on Columbia Road,

15   changing his direction so he's now headed in the same

16   direction as the officers, outbound.

17       THE COURT:  Can I just interrupt you for a

18   minute.  You're going to read through all those facts when

19   we do the colloquy.  I'm just more interested just so we

20   can, at least on the probation part, get a sense how those

21   terms connect to the crimes he's pleading to.

22       MR. KING:  Certainly, Judge.  In short, Your

23   Honor, Mr. Wurie was in a car with four other individuals.

24   All the other individuals were -- some of them were

1     related, some of them weren't.

2          There was a shooting that happened near Fayston

3     Street and Jerome Avenue.  Mr. Wurie was seen driving this

4     white Ford Taurus shortly thereafter.  There was a traffic

5     violation, the officers attempted to stop that car that led

6     them on a slow-speed chase until they reached -- they drove

7     down Magnolia, I believe, until almost Dunkeld Street.

8          The officers did have their lights and sirens at

9     that point.  They reached 76 -- whatever the address is on

10    that street.  I apologize.  The car then accelerated to a

11    rapid amount of speed.

12         Another officer who was in that area on an

13    unrelated matter saw the lights and sirens, heard them, saw

14    the white Taurus coming down the street in his direction.

15    He was a uniformed officer, attempted to stop the white

16    Taurus that Mr. Wurie was operating, put his hand up,

17    shouted his command.  The car continued to accelerate.

18         That officer, Officer Paillant, then drew

19    his service weapon at the car.  The car continued to come

20    at Officer Paillant and struck Officer Paillant on the

21    right front passenger side of the car.  Officer Paillant

22    went over the hood of the car onto near where the front

23    passenger tire was as the car was turning.

24         Officer Paillant's partner, Officer Taylor, saw

1        this
2     happening, saw his partner disappear, assumed he was being
3     dragged under the car as the car fled down Dunkeld Street.
4     Officer Taylor discharged his firearm at that car as it was
5     fleeing.  His discharged shot did cause the death of the
6     rear middle passenger of that car.
7            All the occupants of the car, at that point,
8     continued on.  They fled the car and they were eventually
9     apprehended.  And these are the charges.  The reason for
10    the probation --
11           THE COURT:  Who are these people?  Are these co-
12    defendants?
13           MR. KING:  No one was charged in this case, Your
14    Honor, except Mr. Wurie.  But, Mr. Wurie lives on 51
15    Speedwell Street.  51 Speedwell Street is adjacent to
16    Hamilton Street.  Hamilton Street, that area, is a very,
17    shall we say, hot area of the City of Boston at this point.
18    There was just a homicide at 196 Hamilton Street this past
19    weekend.  There have been several shootings at that house.
20    That's been part of --  There's been known to be some gang
21    activity between that area, CVO, and Wendover Street
22    individuals.
23           Part of the terms and conditions of probation
24    that the Commonwealth is seeking, some of the known

1      associates, or alleged associates of Mr. Wurie, some of the

2      individuals that have been involved in some of the violence

3      that has been going on.

4              THE COURT: These various Fernandeses?

5              MR. KING: That's correct, Your Honor. We're

6      attempting to stem that by keeping Mr. Wurie separate from

7      those individuals.

8              THE COURT: And these are all people -- none of

9      these people have been -- these are not -- obviously,

10     they're not victims, they're just people that you describe

11     as, not ne'er-do-wells, but just people you think are

12     unsavory or somehow --

13             MR. KING: I believe three of those individuals

14     are in custody, people who have been known to frequent that

15     area, the Hamilton Street area, who have been involved in

16     some criminal activity themselves.

17             THE COURT: Okay. Well, let me -- And what do

18     you object to? I should have asked you that first so I

19     know what the areas of disagreement are.

20             MR. BELEZOS: Your Honor, I object to the stay-

21     away. The only party who was involved in the case before

22     you is Carlos Fernandes. Carlos Fernandes is the gentleman

23     who allegedly fired the shot for which Mr. Wurie is charged

24     as an accessory after the fact. Mr. Fernandes,

1    interestingly enough, was never charged for that alleged
2    shooting.
3              So, I can understand there might be some
4    connection between this particular crime and a stay-away
5    from Carlos Fernandes. As far as the rest of these people,
6    Your Honor, I'm objecting to that. I'd also object to a
7    curfew situation with Mr. Wurie.
8              There's a lot that went on in this case -- What
9    I'm asking for probation, Your Honor, is two years
10   probation, one year to be supervised. If the Defendant is
11   in compliance with that probation, then the second year to
12   be unsupervised.
13             In addition, Your Honor, it is the hope of Mr.
14   Wurie and his mother, who's here in court today -- And his
15   family's been with him throughout this case as well as
16   other cases, which we can get into in a bit. What the
17   family's hoping is to allow Mr. Wurie to move to Florida.
18   He has a sister who has a home in Florida, there is work
19   lined up for him down in Florida, and we are anxious,
20   because of all the things that Mr. King noted, to have Mr.
21   Wurie out of Boston. It would be safest for him and, I
22   suggest, safest for all parties involved if he were to be
23   able to get out of here.
24             I don't want to put a pile of conditions on him

```
 1        with all sorts of other people, some of which he grew up

 2        with, some of which are almost like family.  The DoSouto --

 3        not the DoSouto family, but the Deburgo family is almost

 4        like a family to him.  The Fernandes family.  Not Carlos,

 5        but Mike Fernandes who's on that list who's not on

 6        probation or parole in any way, except I happen to know him

 7        as someone that essentially grew up with his family, a

 8        stone's throw from his house.

 9             So, I don't want to put a bunch of conditions on

10        him where, you know, he's in front of his house and talking

11        to his neighbors and all of a sudden he's back before this

12        Court facing a significant felony on probation violation.

13             THE COURT:  Right.  I understand.

14             MR. BELEZOS:  Can I give the Court his

15        background?  I don't want to --

16             THE COURT:  No.  I just want to get a flavor of

17        the conditions and what the concerns are.  I will tell you

18        that based on --  I commend the creativity in the

19        Commonwealth's request, but I have to say I would not --

20        These are not victims, these are not people who are known

21        Confederates.  I don't think it's appropriate for me by

22        judicial fiat --

23             MR. KING:  Known Confederates, Judge?

24             THE COURT:  Yeah.  Of the Defendant.  That they
```

1  were defendants in this case, co-defendants. I don't think

2  that -- I'm just telling you what I'm going to do, so you

3  don't have -- I just am not going to tell him -- I mean,

4  I think he should use his own common sense. If these are

5  people who are not good for him, he should stay away from

6  them. But, I'm not, by judicial fiat, going to order the

7  Defendant who to associate with and not associate with

8  based on what I've heard.

9  And similarly, on the curfew, I would not be

10 inclined to issue a curfew that onerous in nature that he

11 just -- I think he can only go to work, school, or medical

12 emergencies. If he does his time and he's otherwise in

13 compliance, I don't know why the Defendant, then

14 Probationer, ought not be able to go to a movie or go to a

15 mall or something like that. So, I would not apply a

16 curfew.

17 With regard to the suggestion that there be two

18 years probation, one be supervised and the other

19 unsupervised, I wouldn't do that. I certainly would -- If

20 he has a year under his belt -- we can put as a condition

21 that it could be reviewable at the one-year anniversary,

22 and if Probation felt that he was absolute, flying colors,

23 not a problem in the world, he would be certainly free to

24 make that pitch to the judge, and maybe even the

1    Commonwealth would not even oppose it.  Maybe he's in
2    Florida, and he's doing great, what have you.
3            But, I wouldn't make it one year supervised and
4    the second year unsupervised.  And it will be two years
5    supervised, but I will, given your request, I would make it
6    reviewable on a year.  That's between him and Probation.
7            MR. BELEZOS:  Thank you, Judge.  I appreciate
8    that.
9            THE COURT:  Let Probation decide how they feel at
10   that point, what his performance has been, and if there are
11   concerns --
12           MR. BELEZOS:  Petition the Court to certainly re-
13   hear that issue in a year.
14           THE COURT:  Yeah.  Come into the First Session
15   and that would be so indicated that that issue of whether
16   further supervision is appropriate.  It might be self-
17   evident, depending on what he's doing or where he is in his
18   life.  That usually is the case.
19           MR. BELEZOS:  Sure.  There is one other issue
20   with probation, Your Honor.  We discussed it briefly with
21   Probation.  Mr. King and I are in complete agreement that
22   it would be best for Mr. Wurie to be able to leave the
23   state.  The difficulty is the review process for the
24   interstate compact can take five to six months, is what I'm

```
 1          being told.  It is possible to give the Defendant a 30-day
 2          pass to go, if he has a house set up and we can prove all
 3          this to Probation.  Probation is reluctant, obviously, for
 4          good policy reasons, to issue multiple passes.
 5               I'm of the feeling, and I believe Mr. King's of
 6          the feeling, it would be best for Mr. Wurie not to be
 7          around this summer, given all that's going on.  But, I
 8          don't want to put Probation in a position where they're
 9          doing something that they're not willing to do.  Probation
10          indicated that they'd be willing to do it if the Court
11          would be willing to indicate to them that that would be an
12          appropriate manner of supervision and to allow him --
13               THE COURT:  Well, I think that you've kind of
14          given me a lot of "ifs".  If those things all happen, then
15          I think you can come back before the Court and say he does
16          have the job, he does have the housing.  And I don't think
17          that's unreasonable.  But, at this point, I think once he
18          lines up his ducks, that certainly sounds like that would
19          be a workable model, because that addresses the
20          Commonwealth's concern that he just get away from the
21          danger and the crowd that he probably maybe shouldn't be
22          hanging around with.  But, I have to have that formally
23          presented to me.
24               MR. BELEZOS:  Thank you.  Would the Court hold on
```

1    to it, would it go to the First Session?

2         THE COURT:  I'd probably say probably just go to

3    the First Session because if I'm not in the county, then it

4    just slows things down.  And I can't imagine that a First

5    Session judge would have a problem with that.  There's no

6    opposition.  Probation is, in principle, not concerned

7    about that model.

8         THE PROBATION OFFICER:  I think that the issue

9    becomes that the permits that we can give are 30-day

10   permits, and I've seen in the past that that has not worked

11   well.

12        The person is basically unsupervised in Florida,

13   or wherever state they're going to.  They then have to

14   report back to the Probation Office every 30 days.  It

15   becomes expensive, and more times than not it just doesn't

16   happen and it doesn't work and we end up issuing warrants

17   because people do fail to return.

18        And so, the process is that he would reside at

19   whatever address, if it's the Speedwell address, and it

20   would be assigned to an officer.  It would immediately go

21   to the interstate compact to Florida, but the process can

22   be lengthy.

23        THE COURT:  Well, I don't have something before

24   me now.  He doesn't have a problem yet.  There's an

1    anticipation of that.  Certainly, if you want to find me,

2    that's fine, but I'm not going to formally keep

3    jurisdiction of it.  But, I can't imagine that --  It

4    sounds to me like it's what the Commonwealth wants is him

5    not in among that part of the city.  So, it's just a

6    question of logistics.  But, once you get that all lined

7    up, you should deal with it.

8                    MR. BELEZOS:  Thank you.

9                    THE COURT:  All right.  So, are we ready to go?

10                   THE CLERK:  Your Honor, I note that on the three

11   and a day, it's time served.  Is that correct, counsel?

12                   MR. KING:  That's correct.

13                   THE CLERK:  It's not noted on there.

14                   MR. BELEZOS:  Your Honor, he's actually served --

15                   THE COURT:  I assumed that he's --

16                   MR. BELEZOS:  -- by my count three years and 68

17   days already.

18                   THE COURT:  Okay.

19                   MR. KING:  Is Your Honor inclined to give a stay-

20   away from 196 Hamilton Street?

21                   THE COURT:  Who's at 196 Hamilton Street?  All

22   these people?

23                   MR. KING:  Some of those people, Judge.

24                   THE COURT:  No.  I just question --  I think that

1    that's pretty broad inasmuch as that's not the scene of the

2    crime, there's not a victim living there, there're not co-

3    defendants that are living there.  It's just not -- If he

4    wants to stay out of trouble and doesn't want to get

5    violated, it sounds to me that he would be wise to stay

6    away from people who might be causing problems for him.

7             But, I just think it's too -- it's kind of

8    squishy and I think it's a misuse of the point of

9    probation.  I'm concerned it's too broad given what I've

10   heard.  So, why don't we go.

11            THE CLERK:  Mr. Wurie, would you please stand.

12   Mr. Wurie, as to Indictment No. 2002-11321 001, charging

13   accessory after the fact to assault by means of a dangerous

14   weapon.  How do you offer to plead to this indictment, sir?

15            THE DEFENDANT:  Guilty.

16            THE CLERK:  003, charging operating a motor

17   vehicle without being licensed.  How do you offer to plead

18   to this indictment, sir?

19            THE DEFENDANT:  Guilty.

20            THE CLERK:  004, charging operating a motor

21   vehicle so that the lives and safety of the public might be

22   in danger.  How do you offer to plead to this indictment,

23   sir?

24            THE DEFENDANT:  Guilty.

1          THE CLERK:  005, charging operating a motor

2     vehicle and going away after causing injury to a person.

3     How do you offer to plead to this indictment, sir?

4          THE DEFENDANT:  Guilty.

5          THE CLERK:  006, charging assault and battery by

6     means of a dangerous weapon.  How do you offer to plead to

7     this indictment, sir?

8          THE DEFENDANT:  Guilty.

9

10    (Defendant Sworn.)

11

12          THE CLERK:  For the record, Your Honor, I have a

13    "Waiver of Defendant's Rights" signed by the Defendant and

14    his attorney, Mr. Belezos.

15          MR. BELEZOS:  Your Honor, may I approach?

16          THE COURT:  Yes.  Good afternoon, sir.  My name

17    is Judge Nancy Staffier Holtz, and I need to ask you some

18    questions.

19          THE DEFENDANT:  Yes.

20          THE COURT:  And the reason I'm doing that is to

21    make sure that your decision to plead guilty and waive a

22    jury trial is made knowingly, voluntarily, and

23    intelligently, with a full knowledge of the nature of the

24    charges against you and the consequences of pleading

1    guilty.  If at any time I ask you any questions and you

2    don't understand them, if you want to take a minute, you

3    can talk to your attorney, or if you want me to try to say

4    it in different wording, I'll do that.

5              And also, please bear in mind that the court

6    reporter cannot get when you say uh-huh or you shake your

7    head, so you have to give audible answers.  Do you

8    understand that?

9              THE DEFENDANT:  Yes.

10             THE COURT:  You should be aware that if you're

11   not a citizen of the United States, by pleading guilty you

12   may be denied entry into the United States, denied

13   naturalization, or be deported.

14             Now, first I'd like to ask if you would state

15   your full name.

16             THE DEFENDANT:  Brima Wurie.

17             THE COURT:  When and where were you born?

18             THE DEFENDANT:  Boston, Mass.

19             THE COURT:  When?

20             THE DEFENDANT:  2/22/79.

21             THE COURT:  And did you go to school?

22             THE DEFENDANT:  Yes.

23             THE COURT:  How far did you go in school?

24             THE DEFENDANT:  Twelfth grade.  I got my high

```
1          school diploma.
2                    THE COURT:  Okay.  And are you married or single?
3                    THE DEFENDANT:  Single.
4                    THE COURT:  Do you have any children?
5                    THE DEFENDANT:  No.
6                    THE COURT:  And what's the last job you've held?
7                    THE DEFENDANT:  The last job I held?
8                    THE COURT:  Well, are you working now?
9                    THE DEFENDANT:  No, Your Honor.
10                   THE COURT:  What's the last job you held?
11                   THE DEFENDANT:  It's been a while.  I probably
12         would say --  I would say construction.
13                   THE COURT:  Construction?  Just doing just
14         general construction work?
15                   THE DEFENDANT:  Yes.
16                   THE COURT:  Okay.  Have you ever been treated for
17         a mental illness or condition?
18                   THE DEFENDANT:  At one point.  Yes.
19                   THE COURT:  When was that?
20                   THE DEFENDANT:  2002.
21                   THE COURT:  And what was the nature of the
22         treatment?
23                   THE DEFENDANT:  PTSD.  Post traumatic stress
24         disorder.
```

```
 1              THE COURT:  And as far as you know, are you
 2         currently being treated -- suffer from that condition?
 3              THE DEFENDANT:  No.
 4              THE COURT:  Have you ever been treated for any
 5         other mental illness or condition?
 6              THE DEFENDANT:  No.
 7              THE COURT:  In the past 24 hours, have you
 8         consumed any alcohol or any drugs?
 9              THE DEFENDANT:  No.
10              THE COURT:  Has your attorney reviewed with you
11         the elements of each of these indictments?
12              THE DEFENDANT:  Yes.
13              THE COURT:  And has he gone over the sentencing
14         that each of these indictments carry?
15              THE DEFENDANT:  Yes.
16              THE COURT:  By pleading guilty, you give up
17         certain important constitutional rights, which I now wish
18         to review with you and ask if you understand you're waiving
19         these rights.
20              You have the right to a fair and impartial trial,
21         either by a jury or, if you choose, by a judge, to decide
22         whether you are guilty or not guilty.  By pleading guilty,
23         you're giving up that right.  Do you understand that?
24              THE DEFENDANT:  Yes.
```

1           THE COURT:  You have the right not to incriminate

2       yourself, that is, to remain silent.  But, by pleading

3       guilty, you're giving up that right.  Do you understand

4       that?

5                   THE DEFENDANT:  Yes.

6           THE COURT:  You have the right to confront, that

7       is to look at, and cross examine, that is to question, any

8       witnesses against you.  You also have the right at trial to

9       present witnesses and evidence on your own behalf if you

10      chose to, but by pleading guilty, you're giving up this

11      right.  Do you understand that?

12                  THE DEFENDANT:  Yes.

13          THE COURT:  I want to show you a form and ask

14      you, is this your signature on that page?

15                  THE DEFENDANT:  Yes.

16          THE COURT:  And were you able to read and

17      understand this document?

18                  THE DEFENDANT:  Yes.

19          THE COURT:  It's pretty much the same, some of

20      the same things I'm saying to you now?

21                  THE DEFENDANT:  Yes.

22          THE COURT:  All right.  Now, what I'm going to do

23      is ask the assistant district attorney to recite the

24      evidence that the Commonwealth would have introduced if the

1    case had gone to trial.  I want to ask that you listen to

2    this evidence, because at the end I'm going to ask you if

3    that's accurate.  Counsel.

4         MR. KING:  Thank you, Your Honor.  As I started

5    to say earlier that on September the 8th in the year 2002,

6    shortly after one o'clock in the morning, or just before

7    one o'clock in the morning, Officers Flaherty and Connolly

8    were in patrol in the area of Hancock Street and Columbia

9    Ave.  They then saw a white Ford Taurus commit a traffic

10   violation and drive over what they described as an island,

11   and change directions, so now they were heading in the same

12   direction as Officers Flaherty and Connolly.

13        The officers activated their emergency lights and

14   sirens in an attempt to stop the vehicle.  The operator of

15   the vehicle disregarded their attempt to stop them and

16   continued on Columbia Road toward Bird Street, to Barring

17   Street, to Virginia Avenue, eventually ending up on Fayston

18   Street, continued at a slow speed.  Once that white Taurus

19   hit Fayston Street, it then picked up speed.

20        At the bottom of Fayston Street was another

21   officer, Officer Michael Paillant, and his partner, Tommy

22   Taylor.  They were conducting a separate investigation.

23   Officer Paillant observed the white Taurus coming down the

24   street at a high rate of speed with the marked Boston

1   Police transport vehicle behind it with lights and sirens

2   going. Officer Paillant attempted to stop that vehicle by

3   standing in the middle of the road, raising his hand to

4   stop the vehicle. He was in full uniform at that time.

5          The Taurus continued to pick up speed as it got

6   to the intersection of Fayston and Dunkeld Streets. Officer

7   Taylor drew his weapon in an attempt to protect himself.

8   He then was struck as he attempted to move out of the way

9   of that white Ford Taurus.

10         The officer behind him, Officer Flaherty,

11  immediately put on over the air that an officer had just

12  been struck by a white Taurus. Officer Taylor, at that

13  point, seeing his partner disappear on the other side of

14  that front passenger side of the Taurus as it rounded the

15  corner of Dunkeld Street, discharged his weapon, firing at

16  that white Taurus.

17         He shattered the back windshield. Unknown to him,

18  he also struck Eveline Cepeda Barros, who was the rear

19  passenger, rear middle seat passenger, of the five

20  individuals in the car.

21         The car took a couple more turns. All the

22  Individuals, except for Ms. Eveline Cepeda Barros,

23  eventually abandoned that vehicle and left Ms. Cepeda

24  Barros. That injury to Ms. Cepeda Barros was fatal.

```
 1              Also, at the same time, just as Officer Flaherty

 2      and Connolly were following the -- Excuse me.  Eventually,

 3      Mr. Wurie was arrested.  He was not licensed at the time,

 4      did not have a proper driver's license.  And eventually,

 5      there was also an investigation into some shots fired from

 6      Cushing Avenue that happened just prior to Officers

 7      Flaherty and Connolly seeing that white Ford Taurus.

 8              The investigation led to recovering ballistics

 9      evidence in which a firearm had been discharged shortly

10      just before they observed that white Taurus.  The

11      investigation concluded, or indicated that that white

12      Taurus had been up in that area, Cushing Avenue, and that

13      one of the passengers in that motor vehicle, Carlos

14      Fernandes, was a person who discharged a firearm.  He was a

15      front seat passenger in that car.

16              THE COURT:  That's the John Doe indictment?

17              MR. KING:  Excuse me?

18              THE COURT:  This was the indictment of John Doe

19      that did assault John Doe --

20              MR. KING:  That's correct, Your Honor.  No victim

21      was found.  And therefore, that's the charge for accessory

22      after the fact.

23              Also, Paillant did have to go to the hospital.  He

24      was released a short time later, due to his injuries.
```

1              And that is a summary of the fact that the

2       Commonwealth would offer at trial.

3              THE COURT:  Okay.  All right.  Sir, did you hear

4       those facts?

5              THE DEFENDANT:  Yes.

6              THE COURT:  Do you understand that by pleading

7       guilty, you are admitting that those facts are true?

8              THE DEFENDANT:  Yes.

9              THE COURT:  Has anyone forced you to plead guilty,

10      or offered you anything, other than the sentencing

11      recommendations, to cause you to plead guilty?

12             THE DEFENDANT:  Can you repeat that again.

13             THE COURT:  Has anyone forced you to plead guilty?

14             THE DEFENDANT:  No.

15             THE COURT:  Okay.  Has anyone threatened you or

16      induced you to plead guilty to these charges upon facts

17      which are not true?

18             THE DEFENDANT:  No.

19             THE COURT:  Have you discussed this matter and

20      your options and the possible consequences of pleading

21      guilty with your attorney?

22             THE DEFENDANT:  Yes.

23             THE COURT:  And you should be aware that these

24      charges, or at least some of these charges, will require

1    you to provide a DNA sample.

2            Understanding everything I've said, do you still

3    wish to plead guilty?

4            THE DEFENDANT:  Yes.  I already took a DNA --

5            THE COURT:  You already did?  Okay.  Just so

6    you're aware.  If you already did, another one's not

7    necessary.  That will be up to the corrections people.

8            I find the Defendant is not presently under the

9    influence of drugs or alcohol.  I find that the Defendant

10   is not presently suffering from any mental illness or

11   condition.  I find the Defendant's guilty plea is made

12   voluntarily and intelligently with full knowledge and

13   understanding of the consequences and that there is a

14   factual basis for the guilty plea.  And therefore, the

15   guilty plea is accepted.  Thank you, sir.  You can step

16   down.

17           THE DEFENDANT:  Thank you.

18           THE COURT:  The Commonwealth, I assume, moves for

19   sentencing.

20           MR. KING:  That's correct, Your Honor.

21   Commonwealth moves for sentencing.

22           THE CLERK:  Mr. Wurie, would you please stand.

23   As to Indictment No. 2002-11321 001, charging accessory

24   after the fact to assault by means of a dangerous weapon,

1    how do you now plead to this indictment, sir?

2              THE DEFENDANT:  Guilty.

3              THE CLERK:  003, charging operating a motor

4    vehicle without being licensed.  How do you now plead to

5    this indictment, sir?

6              THE DEFENDANT:  Guilty.

7              THE CLERK:  004, charging operating a motor

8    vehicle so that the lives and safety of the public are in

9    danger.  How do you now plead to this indictment, sir?

10              THE DEFENDANT:  Guilty.

11              THE CLERK:  005, charging operating a motor

12    vehicle and going away after causing injury to a person.

13    How do you now plead to this indictment, sir?

14              THE DEFENDANT:  Guilty.

15              THE CLERK:  006, charging with assault and

16    battery by means of a dangerous weapon.  How do you now

17    plead to this indictment, sir?

18              THE DEFENDANT:  Guilty.

19              THE CLERK:  You may be seated.

20              THE COURT:  Does the Commonwealth move for

21    sentencing?

22              MR. KING:  We do, Your Honor.  As it's an

23    agreed-upon plea, the Commonwealth does not wish to be

24    heard.  I would just like to make a recommendation, that's

1   all.

2           THE COURT:  Okay.  All right.  And we have the

3   written recommendation, but why don't you present it onto

4   the record.

5           MR. KING:  Thank you.  With respect to Indictment

6   001, the accessory after the fact, the Commonwealth and the

7   Defendant agree to a guilty two years straight probation

8   from and after Indictment 006; with respect to Indictment

9   003, operation of a motor vehicle without a license, we

10  agree to a guilty file; 004, negligent operation of a motor

11  vehicle, we agree to guilty two years committed to the

12  Suffolk County House of Corrections concurrent with

13  Indictment 006; with respect to 005, leaving the scene

14  after personal injury, we agree to guilty two years

15  committed to the Suffolk County House of Corrections

16  concurrent with Indictment 006; and Indictment 006, the

17  assault and battery dangerous weapon on Officer Michael

18  Paillant, guilty not more than three years and one day, nor

19  less than three years committed to state prison, deemed

20  served.

21          THE COURT:  Okay.  And can I just have that

22  listing back.  You have a copy for me; right?

23          MR. KING:  In light of the Defendant's

24  willingness to plead, the Commonwealth would move to dismiss

1    Indictment No. 002.

2            THE COURT:  Okay.  And my understanding that with

3    regard -- the Commonwealth had a series of requested terms

4    of probation, but based on my colloquy earlier, I'll just

5    impose, as part of the sentence, the usual terms of

6    probation, Frank, and then I guess that would be it.

7    Whatever the usual terms are.

8            MR. BELEZOS:  Your Honor, might the Docket note

9    that the Defendant could petition for review after one year.

10   The Court had indicated earlier --

11           THE COURT:  Right.  Yeah.  We'll set that.  I

12   mean legally without prejudice.  When we impose the sentence

13   it would be a two-year probationary period with a review at

14   one year to reassess.

15           MR. BELEZOS:  I know the Court has already looked

16   at the sentencing.  The Defendant does wish --  Just to

17   remind the Court, he did actually do 68 days more than the

18   three years while incarcerated waiting for trial.  In

19   addition, he does have a family event on May the 28th in

20   Florida.  I want to make that clear to all parties that he

21   will be moving to ask Probation permission to travel down.

22           THE COURT:  Okay.  Well, I don't have that in

23   front of me now and I guess I would just say with regard to

24   the recommendation, I appreciate that he served more than

1      the committed term that's been recommended, but I also

2      appreciate, based on the prosecution's presentation of the

3      facts of the case, that it was miraculous that it wasn't

4      worse than it was for all involved.

5              And I guess I would just also note that I've

6      indicated, despite the Commonwealth's urging, and I don't

7      think it was an unreasonable request, but I'm not going to

8      impose those terms of probation, but I would certainly just

9      suggest that -- I don't think that the prosecutor is much

10     concerned about the comings and goings and the social life

11     of the Defendant/Probationer-to-be, but these recommended

12     terms of probation are designed to protect the public and

13     to protect the Defendant, the Probationer ultimately.

14             And while they're not required conditions of

15     probation, I think that the Defendant ought to take to

16     heart the sentiment that is behind the request for the

17     curfew and the request for the stay-away.  I don't think it

18     was proffered in a mean-spirited way or to trip up the

19     Defendant because of a chance meeting, but rather a bona

20     fide concern for the violence that has occurred in that

21     part of the city and to try to stave that off.

22             So, the Defendant ought to, again, not legally

23     required, ought to take -- I would urge him to take to

24     heart the sentiment that's behind that request because I

1    think it would go a long way to make sure he quickly get

2    through his probationary period and get on with his life.

3            MR. BELEZOS:  I appreciate the Court's

4    consideration.

5            THE CLERK:  Mr. Wurie, would you please stand.

6    You have pleaded guilty to Indictment No. 2002-11321 006,

7    charging assault and battery by means of a dangerous weapon.

8    The Court, in consideration of the said offense, sentences

9    you to the Massachusetts Correctional Institution at Cedar

10    Junction for a term of not more than three years and one

11    day, not less than three years.  You now stand committed

12    pursuant to the said sentence.

13            As to Indictment No. 2002-11321 005, charging

14    operating a motor vehicle and going away after causing

15    injury to a person, the Court, in consideration of said

16    offense, sentences you to the Suffolk County House of

17    Correction at South Bay for a period of two years.  This

18    sentence is to be served concurrent with 006.

19            You have pleaded guilty to Indictment No.

20    2002-11321 004, charging operating a motor vehicle so that

21    the lives and safety of the public might be in danger.  The

22    Court, in consideration of said offense, sentences you to

23    the Suffolk County House of Correction at South Bay for a

24    period of two years.  This sentence to be served concurrent

1    with offense 006.

2              As to each of these indictments, you have ten

3    days within which to file an appeal to the appellate

4    division for review of the said sentence.  The Court

5    further orders you to have been deemed to have served

6    whatever time you have spent in custody awaiting

7    disposition of said offense.  The Court has been informed

8    you have 1159 days of the said sentence.

9              As to 001, charging accessory after the fact to

10   assault by means of a dangerous weapon, the Court, in

11   consideration of said offense, places you on probation for

12   a period of two years.  This probation is to take effect

13   from and after 006.

14             As to 003, operating a motor vehicle without being

15   licensed, the Court orders this indictment be filed.  Do

16   you consent to the filing of this indictment, sir?

17             THE DEFENDANT:  Yes.

18             THE CLERK:  As to 11321 002, charging accessory

19   after the fact to possession of a firearm, the Court orders

20   this indictment be dismissed at the request of the

21   Commonwealth.  Do you consent to the dismissal of this

22   indictment, sir?

23             THE DEFENDANT:  Say that again.

24             THE CLERK:  Do you consent to the dismissal of

1       this indictment, sir?

2                   THE DEFENDANT:  Oh, yes.  Yes.

3                   THE CLERK:  You are assessed 90 dollars for the

4       victim witness assistance fund; you are to provide DNA

5       samples to the Massachusetts State Police Department; you

6       are assessed 65 dollars per month probation fee, or in the

7       alternative, community service.  Please see the Probation

8       Office before you leave here today.  You now stand

9       committed.  The Court orders time deemed being served,

10      too, as to each.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1

## C E R T I F I C A T E

2

3

4              I, Ellen Roscoe, do hereby certify that the

5    foregoing record, pages 1 through 32, inclusive, is a true

6    and accurate transcription of the aforementioned matter to

7    the best of my skill and ability.

8

9

10    _____

11    Ellen Roscoe

12    Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

# EXHIBIT N



Boston Police
Department

Fayston/Quincy/Dacia Area

Prepared by the Boston Police Department
Office of Research & Evaluation
October 2, 2002



