UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

SHENIA DANCY-STEWART as
Administratrix of the Estate of EVELINE
BARROS-CEPEDA,

    Plaintiff,

v.

THOMAS TAYLOR, Jr., and the CITY
OF BOSTON,

    Defendants.

CIVIL ACTION NO. 05-11803-MLW

## PLAINTIFF'S RESPONSE TO DEFENDANTS' LOCAL RULE 56.1 STATEMENT OF FACTS AND PLAINTIFF'S STATEMENT OF ADDITIONAL UNDISPUTED MATERIAL FACTS

Pursuant to Local Rule 56.1 and in support of her Opposition to Defendant Thomas Taylor's Motion for Summary Judgment, the Plaintiff, Shenia Dancy-Stewart as Administratrix of the Estate of Eveline Barros-Cepeda, hereby submits her Response to Defendants City of Boston's and Thomas Taylor's Local Rule 56.1 Statement of Facts.[1] The Plaintiff also submits her Statement of Additional Undisputed Material Facts, under the designation "2._."

**I.**     **Plaintiff's Response to Defendants' Local Rule 56.1 Statement of Facts**

    1.    Undisputed.

    2.    Undisputed.

    3.    Undisputed.

---

[1] All of the supporting documentation attached hereto are true and accurate copies. See Exhibit A, Affidavit of Andrew Stockwell-Alpert.

4. Disputed. Brima Wurie testified that he did not recall travelling to Cushing Avenue on the evening of September 8, 2002. Brima Wurie Deposition ("Exhibit B") at 103: 15-24; 104: 1-24.

5. Disputed. Wurie testified that the traffic light at Columbia Road indicated he could make a lawful left turn. Exhibit B at 110: 2-24; 111: 1-18. He further testified that he did not know why the police officers were following his vehicle or why they were attempting to pull over his vehicle. Exhibit B at 109: 21-24; 110: 1.

6. Disputed in part. Wurie testified that the officers activated their cruiser's lights, but that he did not hear any sirens or any other noise coming from the cruiser. Exhibit B at 109: 2-20. Moreover, both police officers in the cruiser testified only that the cruiser's lights were activated when it started to follow Wurie's vehicle. Debra Flaherty Deposition ("Exhibit C") at 32: 5-15; Robert Connolly Deposition ("Exhibit D") at 55: 3-14.

7. Disputed. See Plaintiff's response to Defendants' Statement of Facts Number 6.

8. Disputed. The Defendants' use of the phrase "police instruction" is ambiguous. Wurie testified that the officers did not use any speaker on the cruiser to instruct him to pull over his vehicle. Exhibit B at 109: 10-20.

9. Disputed. The Defendants' use of the word "evade" is misleading. The officers in the police cruiser that followed Wurie's vehicle testified that Wurie never exceeded the speed limit as they followed him from Columbia Road to the intersection of Dunkeld and Fayston Streets. Exhibit C at 34: 3-6; Exhibit D at 55: 15-17; 56: 20-24; 57: 1-16. Officer Robert Connolly testified that Wurie's vehicle "went fast" only as it turned from Dunkeld Street onto Fayston Street. Exhibit D at 58: 10-24; 59: 1-14. Officer Debra Flaherty testified that "[n]ot a

long time," "[p]robably minutes," had passed from the time they first began to follow Wurie to the time his vehicle reached Wayland Street. Exhibit C at 37: 15-21.

10. Undisputed.

11. Disputed. See Plaintiff's response to Defendants' Statement of Facts Number 9.

12. Undisputed.

13. Undisputed.

14. Disputed in part because of the Defendants' use of the phrase "fleeing vehicle." This phrase is suggestive, inappropriate in a Local Rule 56.1 Statement of Undisputed Facts, and not present in any of the documentation cited to by the Defendants.

15. Disputed because the Defendants' do not indicate that this description of Dunkeld Street is in the opinion of Paillant and is, as he testified, a "guess." Michael Pailiant Deposition ("Exhibit E") at 156: 7-19.

16. Disputed. The documents to which the Defendants cite do not support this statement. The page and line numbers cited to in Defendants' Exhibit E do not concern the character of Dunkeld Street. The page and line numbers cited to in Defendants' Exhibit D support only the assertion that Carlos Fernandez observed people on Dunkeld Street.

17. Undisputed.

18. Undisputed.

19. Undisputed.

20. Undisputed.

21. Undisputed.

22. Undisputed.

23. Undisputed.

24. Undisputed.

25. - Undisputed.

26. Disputed in part because the Defendants' characterization of Luis Carvalho's position is suggestive and taken out of context. Mr. Carvalho's whole testimony was that he "ducked down just sitting slouched down" because that is "how [he] sit[s] in the car basically." Luis Carvalho Deposition ("Exhibit F") at 170: 11-16.

27. Undisputed.

28. Disputed in part. The Plaintiff does not dispute the Defendants' paraphrasing of Travo Carter's testimony on this point. However, Robert Connolly testified that Wurie's vehicle did not accelerate until it started to turn from Dunkeld Street onto Fayston Street. Exhibit D at 58: 10-24; 59: 1-14. Wurie also testified that he was traveling very slowly up Dunkeld Street and pressed the gas pedal only once Paillant got out of the way of Wurie's vehicle. Exhibit B at 136: 16-24; 137: 1-14.

29. Undisputed.

30. Undisputed.

31. Undisputed.

32. Disputed. Wurie testified not only that a police officer was waving his hand at him at this point, but also that the officer was pointing a gun at him. Exhibit B at 124: 4-24. Additionally, the Plaintiff takes issue with the Defendants' use of the word "refused." This word does not appear in the Exhibit to which they cite.

33. Undisputed.

34. Undisputed.

35. Disputed in part because of the argumentative and suggestive phrasing of the first half of the Defendants' statement. It is undisputed that Paillant withdrew his firearm at the intersection of Dunkeld and Fayston Streets, Exhibit E at 73: 7-21; however, Paillant did not testify and could not have testified as to the nature of Wurie's intent or frame of mind as he drove up Dunkeld Street.

36. Undisputed.

37. Undisputed.

38. Disputed. The Defendants' use of the word "again" in this statement implies a protracted exchange between Paillant and Wurie that is unsupported by the documents to which they cite. Officer Thomas Taylor testified that the events at issue in this case "all unfolded rather quickly." Thomas Taylor Deposition ("Exhibit G") at 71: 23-24; 72: 1-6. Additionally, Wurie testified that Paillant was running toward Wurie's vehicle. Exhibit B at 144: 20-24; 145: 1-6, 11-24; 146: 1-11.

39. Undisputed.

40. Disputed. The Defendants' statement is not supported by the documents to which they cite. See James Nicholas Deposition ("Exhibit H") at 30: 23-24; 31: 1-7.

41. Undisputed.

42. Disputed. Wurie testified that Paillant ran into the street, waving his right hand and pointing his gun at Wurie, then moved to the right of Wurie's vehicle (from Wurie's perspective), while still pointing his gun, and slapped the hood of the vehicle. Exhibit B at 124: 18-24; 125: 1-3; 133: 15-24; 134: 1-6.

43. Disputed. Wurie testified that he observed the police officer "<u>not</u> in a frenzy, but, like, urging [me] to stop" (emphasis added). Exhibit B at 139: 10-24.

44. Disputed. Wurie testified that he did not hit Paillant. Exhibit B at 137: 19-20.

45. Disputed. Wurie testified that he did not hit Paillant. Exhibit B at 137: 19-20.

46. Disputed. Wurie testified that he did not hit Paillant. Exhibit B at 137: 19-20.

47. Disputed. Wurie testified that he did not hit Paillant. Exhibit B at 137: 19-20. Paillant testified that he was crouched down on the ground for "a couple seconds." Exhibit E at 130: 7-10.

48. Disputed in part because Carter testified that Paillant was "out of view for [him] as he got hit . . . because the other cars were parked in the street." Travo Carter Deposition ("Exhibit I") at 43: 3-11.

49. Undisputed.

50. Disputed. Wurie testified not that his vehicle made contact with Paillant's hand, but rather that Paillant slapped Wurie's vehicle with his hand. Exhibit B at 139: 2-7.

51. Undisputed.

52. Undisputed.

53. Undisputed.

54. Undisputed.

55. Undisputed.

56. Undisputed.

57. Undisputed.

58. Undisputed.

59. Disputed in part because Taylor testified that he observed Wurie's vehicle "strike," rather than "collide with" Paillant. Exhibit G at 72: 7-11.

60. Undisputed.

61.  Undisputed.

62.  Undisputed.

63.  Disputed. The documentation to which the Defendants' cite does not support the assertion that Taylor did not know if Paillant would be "run over or dragged by" the Wurie vehicle; in fact, these words were used by the Plaintiff's lead-counsel in a question posed to Taylor during his deposition. See Exhibit G at 112: 24; 113: 1-3.

64.  Disputed because of the Defendants' use of the phrase "but first took note." Taylor testified only that he could see James Nicholas in the cruiser as he raised his arm to shoot. Exhibit G at 98: 2-11; 100: 12-21.

65.  Disputed because it is unclear from the Defendants' statement that it was Taylor's personal opinion that the act of stepping into the street before firing his gun would decrease the chances of Nicholas getting hit with a bullet. Exhibit G at 122: 1-16. Additionally, the Defendants' statement does not make clear that Taylor testified that he remained "tight against the parked cars" when he "stepped to the right more into the street." Exhibit G at 102: 12-16.

66.  Disputed to the extent that the repetition of previously asserted facts in the Defendants' statement implies a relatively long passage of time that is belied by the whole of Taylor's testimony. Taylor testified that "[e]verything happened very quickly" and that he was trained to make split decisions. Exhibit G at 113: 18-24; 114: 1-8. Officer Flaherty testified that she heard shots being fired "immediately" after Paillant was struck by the vehicle: "It was like he got hit and bang, bang, bang, bang." Exhibit C at 59: 21-24; 60: 1-6.

67.  Undisputed.

68A. Undisputed.

68B. Undisputed.

69. Undisputed.

70. Disputed as to whether Taylor was "aware of the presence of any passengers in the vehicle." Taylor testified only that he did not see any driver of the vehicle at any point and that he did not see any passengers in the vehicle at any point. Exhibit G at 108: 17-22.

71. Undisputed, although the particular citations to Taylor's deposition testimony provided by the Defendants do not support the statement.

72. Disputed only to the extent that Wurie more accurately testified that "it felt like [the police] were aiming right at me." Exhibit B at 199: 6-12.

73. Undisputed.

74. Undisputed.

75. Undisputed.

76. Disputed in part. It is undisputed that Taylor testified that he stopped shooting when Wurie's vehicle slowed down and one of the doors opened. Exhibit G at 136: 20-24; 137: 1. The Plaintiff disputes, however, the Defendants' assertion that Taylor stopped shooting when he regained sight of Paillant. More accurately, Taylor testified that the moment he put his gun down, he saw Paillant getting up off the ground. Exhibit G at 126: 14-24; 127: 1-2; 141: 12-17.

77. Undisputed.

78. Undisputed.

79. Undisputed.

80. Undisputed.

81. Disputed in part. More accurately, Wurie testified that he did not hear Eveline Barros-Cepeda say anything while she was in the car. Exhibit B at 230: 16-21.

82. Disputed in part. More accurately, Taylor testified that he saw Paillant get up off the ground and "just start running" down Fayston Street. Exhibit G at 141: 2-7.

83. Undisputed.

84. Disputed in part. Paillant did not testify as to the reason three of the occupants exited the vehicle on Quincy Street. Exhibit E at 157: 3-10.

85. Undisputed.

86. Undisputed.

87. Undisputed.

88. Undisputed.

89. Undisputed.

90. Undisputed.

91. Undisputed.

92. Undisputed.

93. Undisputed.

94. Undisputed.

II. **Plaintiff's Statement of Additional Undisputed Material Facts**

A. **The Shooting.**

2.1 Travo Carter testified that in his opinion, it seemed as though Brima Wurie "really didn't really want to hit [Paillant], but [Paillant] wasn't getting out of his way." Exhibit I at 126: 7-24; 127: 1-17.

2.2 Officer Flaherty stopped her cruiser after Paillant came in contact with Wurie's vehicle, to see if Paillant was all right. Exhibit C at 52: 19-24: 53: 1-4.

2.3   Paillant made a motioning gesture with his hand, leading Flaherty to believe that he wanted her to go after Wurie's vehicle. Exhibit C at 52: 19-24; 53: 1-9.

2.4   Carter observed Paillant get back up off the ground immediately after he came in contact with the vehicle, and then observed both Taylor and Paillant "come running down" Fayston Street, with Wurie's vehicle in between them. Exhibit I at 51: 21-24; 52: 1-9; 131: 19-24; 132: 1-5.

2. 5   Carter testified that he then heard the gun shots. Exhibit I at 52: 10-11; 132: 6-10; 146: 14-21.

2.6   Taylor testified that he was shooting as he was walking down Fayston Street, with Wurie's vehicle in front of him. Exhibit G at 135: 2-19.

2.7   Taylor had never received any police training with regard to shooting at moving vehicles. Exhibit G at 109: 10-14.

2.8   Taylor does not remember calling out to Paillant or contacting him on his portable radio before shooting at Wurie's vehicle. Exhibit G at 110: 1-18.; 111: 10-14.

2.9   A bullet hole in the back of Wurie's vehicle was consistent with a shot fired through the back of the vehicle. Tyrone Camper Deposition ("Exhibit J") at 29: 5-8.

2.10   In the opinion of ballistician John Murphy, Taylor's fourth shot was "a straight on shot," fired after Wurie's vehicle had turned onto Fayston Street and after Wurie's vehicle had traveled past Paillant. John Murphy Deposition ("Exhibit K") at 36: 3-19; 138: 11-24; 139: 1-24; 140: 1-24; 141: 1-2.

2. 11   Relying on the information contained in a diagram depicting the trajectory of the shots discharged by Taylor, Murphy testified that Taylor's fourth shot was the shot that fatally wounded Eveline Barros-Cepeda. Exhibit K at 103: 9-22; 145: 22-24: 146: 1-9. .

2.12   In Murphy's opinion, at the time of the fourth shot, Taylor could have seen Paillant. Exhibit K at 173: 5-24; 174: 1.

2.13   Taylor testified that he was trained to shoot at least two or three bullets rapidly at a time, not one. Exhibit G at 125: 7-22.

2.14   Taylor testified that he did not put his arm down and look for Paillant before discharging five bullets. Exhibit G at 131: 18-23.

**B.    Rule 303.**

2.15   At the time of the incident, the regulations of the Boston Police Department regarding the use of deadly force ("Rule 303") prohibited officers from discharging firearms at a moving or fleeing vehicle unless the officer or another person was currently being threatened with deadly force by an occupant of the target vehicle. Exhibit G at 28: 9-24; 29:1-24; 30: 1-24; 31: 5-24; 32: 1-19; Exhibit E at 57: 5-24; 58: 1-24; 59:1-3; Exhibit C at 22: 17-24; 23: 1.

2.16   Rule 303 further stated that the moving vehicle itself did not constitute the threatened use of deadly force unless there were no reasonable or apparent means of escape. Exhibit G at 32: 4-19.

2.17   Rule 303 specified two reasons for this prohibition: (1) the probability that bullets will ricochet and cause injury to innocent persons; and (2) the probability that the vehicle will crash and cause injury to innocent persons if the bullets do not ricochet, but disable the operator. Exhibit G at 32: 4-24; 33: 1-4.

2.18   Arthur Stratford, a Lieutenant Detective with the Internal Affairs Department of the Boston Police who concluded that Taylor's discharge of his weapon in this incident was in compliance with the provisions of Rule 303, testified that there existed a probability that Taylor

might have killed an innocent bystander during the incident. Arthur Stratford Deposition ("Exhibit L") at 15: 9-21; 45: 9-14; 69: 16-19.

2.19   The alleged sexual assault victim was standing behind Taylor at the time of the shooting, at his direction. Exhibit G at 120: 19-24: 121: 1-6.

2.20   Officer Flaherty testified that at the time of the incident she thought Paillant's life may have been in danger because shots were being fired. Exhibit C at 80: 12-17.

2.21   Flaherty also testified after the incident, she thought that if she had not stopped her cruiser to see how Paillant was, that she would have been hit as well. Exhibit C at 63: 21-24; 64: 1-24; 65: 1-10.

2.22   Taylor testified that at the time he began shooting he did not consider that if he had succeeding in disabling the driver of the vehicle, he might have caused further or greater injury to Paillant. Exhibit G at 119: 6-13.

2.23   Shortly after this incident, Rule 303 was revised. Exhibit D at 28: 11-24; 29: 1-7.

2.24   Officer Connolly presently understands Rule 303 to mean that it is now not appropriate to shoot at a moving vehicle, Exhibit D at 25: 16-24; 26: 1; 28: 11-24; 29: 1-7, while Officer Paillant presently understands Rule 303 to mean that the moving vehicle can no longer be the threatened use of deadly force. Exhibit E at 58: 2-24; 59: 1-11.

C.   **Eveline Barros-Cepeda's Death**

2.25   Barros-Cepeda suffered one gunshot wound as a result of the shooting, and that gunshot wound was the cause of her death. Jennifer K. Lipman, M.D. Deposition ("Exhibit M") at 69: 13-19.

2.26   She was alive at the time she received the gunshot wound. Exhibit M at 69: 20-23.

2.27    In the opinion of Dr. Jennifer K. Lipman, a former medical examiner for the Commonwealth of Massachusetts, the gunshot wound did not cause immediate unconsciousness; rather Barros-Cepeda, in Dr. Lipman's estimation, was conscious for "maybe less than a minute" or "[m]aybe a minute." Exhibit M at 15: 24; 16: 1-2; 94: 22-24; 95: 1-24; 96: 1-7.

2.28    Emergency medical personnel that responded by ambulance to the scene observed that Barros-Cepeda was unconscious and nonresponsive by the time they arrived. Exhibit M at 74: 23-24; 75: 1-24; 76: 1.

2.29    According to Dr. Lipman, Barros-Cepeda experienced conscious pain and suffering during the time between she was shot and when she expired. Exhibit M at 83: 1-14.

2.30    Dr. Lipman's opinion is based in part on the fact that the path of the bullet was through her left lung, the aortic arc, and the pulmonary artery, resulting in extensive blood loss but not direct injury to the heart muscle which could have caused a more sudden death. Exhibit M at 84: 11-22.

2.31    Barros-Cepeda did not have any major problems with any of her organs prior to the shooting and appears to have been in the opinion of Dr. Lipman, generally healthy. Exhibit M at 61: 14-24: 62: 1-5.

2.32    No intoxicating substances were found in Barros-Cepeda's blood at the time of the shooting. Exhibit M at 61: 14-24: 62: 1-5.

Respectfully submitted,

PLAINTIFF, SHENIA DANCY-STEWART as Administratrix of the Estate of EVELINE BARROS-CEPEDA,

By her attorney:


/s/ Andrew Stockwell-Alpert
_____
Andrew Stockwell-Alpert, BBO#481190
11 Beacon Street, Suite 1210
Boston, MA 02108
(617) 720-4244


## CERTIFICATE OF SERVICE

I, Andrew Stockwell-Alpert, hereby certify that on this date I served a copy of the foregoing documents upon defendant's lead counsel, Helen G. Litsas, by electronic filing and by postage prepaid, first class, United States mail.

7/7/08  7/8/08            /s/ Andrew Stockwell-Alpert
_____         _____
Date                      Andrew Stockwell-Alpert

14