## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

SHENIA DANCY-STEWART as
Administratrix of the Estate of EVELINE
BARROS-CEPEDA,

Plaintiff,

v.

CIVIL ACTION NO. 05-11803-MLW

THOMAS TAYLOR, Jr., and the CITY
OF BOSTON,

Defendants.

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF HER OPPOSITION TO DEFENDANT THOMAS TAYLOR'S MOTION FOR SUMMARY JUDGMENT

### I.  INTRODUCTION

On September 8, 2002, Eveline Barros-Cepeda was shot and killed by the Defendant,

Boston Police Officer Thomas Taylor, Jr. The Plaintiff, Shenia Dancy-Stewart as Administratrix

of the Estate of Eveline Barros-Cepeda, alleges that Taylor deprived Barros-Cepeda of rights

secured by the United States Constitution in violation of 42 U.S.C. § 1983, namely her right

under the Fourth Amendment to be secure in her person against unreasonable seizures (Counts I

and II). The Plaintiff further claims damages against Defendant Taylor for Barros-Cepeda's

wrongful death pursuant to Chapter 229 of the General Laws of Massachusetts (Count IV) and

for the conscious pain and suffering and necessary medical treatment incurred by Barros-Cepeda

as a result of the Defendant's conduct (Count VI). See Defs. SOF, Exhibit K.

1

The Defendant selectively chooses facts and engages in unsupportable hyperbole in an attempt to persuade this Court that he is entitled to judgment as a matter of law. The evidence will show that trialworthy issues exist and that a reasonable jury could find Taylor's conduct to be "so deficient that no reasonable officer could have made the same choice[s]" under the circumstances. Roy v. Inhabitants of City of Lewiston, 42 F.3d 691, 695 (1st Cir. 1994). At a minimum, the evidence gathered by the Plaintiff in discovery, when viewed in the light most favorable to her, demonstrates that this is not a case "so lacking in either factual foundation or legal merit that trial would be a useless exercise." Conward v. Cambridge School Committee, 171 F.3d 12, 18 (1st Cir. 1999).

## II. UNDISPUTED AND DISPUTED MATERIAL FACTS

Boston Police Officers Robert Connolly and Debra Flaherty were patrolling Columbia Road in Dorchester in a marked cruiser shortly after midnight on September 8, 2002, when they noticed a white Ford Taurus at the intersection of Columbia Road and Hancock Street. Defendants' Statement of Facts ("Defs. SOF") 1, 3. Connolly and Flaherty began to follow the vehicle, believing it had failed to stop at a red traffic light. Defs. SOF 5, 6, 7. According to Brima Wurie, the driver of the vehicle, the traffic light indicated he could make a lawful left turn. Defs. SOF 6; Plaintiff's Response to Defs. SOF ("Pl. Resp.) 5. The cruiser's lights were activated, but Wurie did not know why the police officers were following his vehicle or why they were attempting to pull over his vehicle. Pl. Resp. 5, 6. Carlos Fernandes was sitting in the front passenger seat of Wurie's vehicle. Defs. SOF 25. Eveline Barros-Cepeda, Luis Carvalho, and Maria DaRosa were seated in the vehicle's backseat. Defs. SOF 24.

Connolly and Flaherty followed Wurie's vehicle as it traveled within the speed limit down several streets. Defs. SOF 9; Pl. Resp. 9. By the time the vehicle reached Wayland Street,

2

"[n]ot a long time," "probably minutes," had passed. Pl. Resp. 9. Wurie did not stop his vehicle because his driver's license had been suspended and he did not want to return to jail. Defs. SOF 10. Connolly and Flaherty continued to follow Wurie's vehicle as it traveled up Dunkeld Street in the direction of Fayston Street. Defs. SOF 11.

Boston Police Officers Thomas Taylor and Michael Paillant were conducting an unrelated investigation of an alleged sexual assault near 85 Fayston Street when Wurie's vehicle turned onto Dunkeld Street. Defs. SOF 19. Taylor was near 85 Fayston Street with the alleged victim of the sexual assault. Defs. SOF 22. Paillant was standing in the street by his marked cruiser, which was located at the intersection of Dunkeld and Fayston Streets. Defs. SOF 20. James Nicholas, the suspect in the alleged sexual assault, was sitting inside Paillant and Taylor's cruiser. Defs. SOF 21. Although Flaherty notified the Boston Police Department's Operations Department of their location and of their attempt to pull over Wurie's vehicle throughout the pursuit, neither Taylor nor Paillant heard these broadcasts. Defs. SOF 12, 13, 14.

Paillant saw Wurie's vehicle being followed by the police cruiser and directed Wurie to stop his vehicle by using verbal and hand commands. Defs. SOF 29, 30, 31. Paillant withdrew his firearm. Defs. SOF 35; Pl. Resp. 35. Taylor saw Paillant step in front of Wurie's vehicle and order the vehicle to stop. Defs. SOF 55. When Taylor saw Paillant withdraw his firearm, he withdrew his firearm and directed the alleged sexual assault victim to stand behind him. Defs. SOF 58; Pl. SOF 2.19. There is significant dispute as to what transpired next. According to Paillant, Wurie's vehicle was going to strike him and so he attempted to move to his left to move out of the way of the vehicle. Defs. SOF 39, 42. According to Wurie, Paillant ran into the street, waving his right hand and pointing his gun at Wurie, then moved to the right of Wurie's vehicle (from Wurie's perspective), while still pointing his gun, and slapped the hood of the vehicle. Pl.

3

Resp. 42. The vehicle made contact with Paillant's body, although Wurie testified that he did not hit Paillant. Defs. SOF 45; Pl. Resp. 45. A forensic examination conducted after the incident concluded that black markings on the hood and front side of Wurie's vehicle and a control sample taken from the bottom of Paillant's holster could have come from the same source. Defs. SOF 89, 90, 91, 92.

According to Travo Carter, a bystander, it seemed as though Wurie "really didn't really want to hit [Paillant], but [Paillant] wasn't getting out of his way." Plaintiff's Statement of Additional Undisputed Material Facts ("Pl. SOF") 2.1. According to Taylor, the front of Wurie's vehicle struck Officer Paillant as the vehicle turned onto Fayston Street, causing Paillant to gasp for air. Defs. SOF 60, 61, 62. Taylor testified that he then lost sight of Paillant. Defs. SOF 63; Pl. Resp. 63. In Paillant's estimation, he was crouched down on the ground for "a couple seconds." Defs. SOF 47; Pl. Resp. 47. Taylor believed that Paillant was still in danger as long as Wurie's vehicle continued to move, and he stepped into Fayston Street, "tight against the parked cars," took a breath, asked God to be with him, and then discharged his firearm. Defs. SOF 65, 66, 67; Pl. Resp. 65, 66. According to Officer Flaherty, shots were fired "immediately" after Paillant was struck by the vehicle. Pl. Resp. 66. Taylor does not remember calling out to Paillant or contacting him on his portable radio before shooting at Wurie's vehicle. Pl. SOF 2.8. At no point did Taylor see any driver of the vehicle or any passengers in the vehicle. Defs. SOF 70; Pl. Resp. 70.

Flaherty and Connolly stopped their cruiser to see if Paillant was all right. Pl. SOF 2.2. Paillant made a motioning gesture with his hand, leading Flaherty to believe that he wanted her to go after Wurie's vehicle. Pl. SOF 2.3. At no time did Paillant discharge his firearm during the incident. Defs. SOF 78. Taylor stopped shooting when Wurie's vehicle slowed down and

4

one of the doors opened. Defs. SOF 76, Pl. Resp. 76. According to Taylor, he saw Paillant getting up off the ground the moment he put his gun down. Pl. Resp. 76. Travo Carter observed Paillant get back up off the ground immediately after he came in contact with the vehicle, and then observed both Taylor and Paillant "come running down" Fayston Street, with Wurie's vehicle in between them. Pl. SOF 2.4. Carter testified that it was at this point that he then heard gun shots. Pl. SOF 2.5.

It is undisputed that Taylor received use of deadly force training from the Boston Police Department, but never received any police training with regard to shooting at moving vehicles. Defs. SOF 69; Pl. SOF 2.7. Taylor testified that he aimed his firearm at the driver's side of the vehicle because he was attempting to disable the driver. Defs. SOF 68B. A bullet hole in the back of Wurie's vehicle was consistent with a shot fired through the back of the vehicle. Pl. SOF 2.9. Ballistician John Murphy opined that Taylor's fourth shot—the shot that fatally wounded Eveline Barros-Cepeda—was "a straight on shot," fired after Wurie's vehicle had turned onto Fayston Street and after Wurie's vehicle had traveled past Paillant. Pl. SOF 2.10, 2.11. Taylor testified that he was shooting as he was walking down Fayston Street, with Wurie's vehicle in front of him. Pl. SOF 2.6. In Murphy's opinion, at the time of the fourth shot, Taylor could have seen Paillant. Pl. SOF 2.12. Taylor did not put his arm down and look for Paillant before discharging five bullets. Pl. SOF 2.14.

Wurie's vehicle continued to travel down Fayston Street and Perth Street until it reached Quincy Street, where three of the occupants were seen exiting the vehicle. Defs. SOF 80, 84; Pl. Resp. 84. Wurie testified that he exited the vehicle at this point. Defs. SOF 80. Flaherty observed Barros-Cepeda on the back seat unconscious and called for an ambulance. Defs. SOF 85, 86. Barros-Cepeda was pronounced dead at the hospital, where it was determined that she

had been fatally shot by a bullet that was subsequently determined to have come from Taylor's firearm. Defs. SOF 87. Paillant was transported to the hospital as well, having suffered injuries to his knee, elbow, and calf. Defs. SOF 88.

Wurie pleaded guilty to the following charges: assault and battery with a dangerous weapon, operating a motor vehicle to endanger so that the lives or safety of the public might be endangered, leaving the scene after causing personal injury, accessory after the fact to assault by means of a dangerous weapon, and operating a motor vehicle without being licensed. Defs. SOF 93.

At the time of the shooting, Rule 303 of the Boston Police Department regulations prohibited officers from discharging firearms at a moving or fleeing vehicle unless the officer or another person was currently being threatened with deadly force by an occupant of the target vehicle. Pl. SOF 2.15. Rule 303 further stated that the moving vehicle itself did not constitute the threatened use of deadly force unless there were no reasonable or apparent means of escape. Pl. SOF 2.16. Two reasons for this prohibition were specified: (1) the probability that bullets will ricochet and cause injury to innocent persons; and (2) the probability that the vehicle will crash and cause injury to innocent persons if the bullets do not ricochet, but disable the operator. Pl. SOF 2.17. Arthur Stratford, a Lieutenant Detective with the Internal Affairs Department of the Boston Police who concluded that Taylor's discharge of his weapon in this incident was in compliance with the provisions of Rule 303, testified that there existed a probability that Taylor might have killed an innocent bystander during the incident. Pl. SOF 2.18. At the time of the shooting, the alleged sexual assault victim was standing behind Taylor, at his direction, and there were people and numerous parked cars on Dunkeld Street. Pl. SOF 2.19; Defs. SOF 16, 17; Pl. Resp. 16. Officer Flaherty believed that Paillant's life may have been in danger because shots

were being fired, and, after the incident, thought that if she had not stopped her cruiser to see how Paillant was, that she would have been hit as well. Pl. SOF 2.20, 2.21. Taylor testified that at the time he began shooting he did not consider that if he had succeeded in disabling the driver of the vehicle, he might have caused further or greater injury to Paillant. Pl. SOF 2.22.

Shortly after this incident, Rule 303 was revised. Pl. SOF 2.23. Officer Connolly presently understands Rule 303 to mean that it is now not appropriate to shoot at a moving vehicle. Pl. SOF 2.24. Officer Paillant presently understands Rule 303 to mean that the moving vehicle can no longer be the threatened use of deadly force. Pl. SOF 2.24.

In the opinion of Dr. Jennifer K. Lipman, a former medical examiner for the Commonwealth of Massachusetts, Barros-Cepeda's gunshot wound did not cause immediate unconsciousness; rather Barros-Cepeda was conscious for "maybe less than a minute or "[m]aybe a minute." Pl. SOF 2.27.

## III.    ARGUMENT

### A. Standard of Review

Summary judgment is appropriate when the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party bears the initial burden to show through materials of evidentiary quality the absence of a genuine issue of material fact and then the burden shifts to the non-moving party, who must demonstrate that a trialworthy issue exists. Mulvihill v. Top-Flite Golf Co., 335 F.3d 15, 19 (1st Cir. 2003). In this context, "material fact" refers to any fact "that might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A "genuine issue" exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. This Court "must scrutinize the record in

7

the light most flattering to the party opposing the motion, indulging all reasonable inferences in

that party's favor." Mulvihill v. Top-Flite Golf Co., 335 F.3d at 19.

### B. Taylor Is Not Entitled To Summary Judgment On Counts I And II Because There Exists A Genuine Issue Of Material Fact As To Whether Taylor Effected An Unreasonable Seizure Upon Barros-Cepeda By Shooting Her, And Because Taylor Is Not Entitled To Qualified Immunity.

Counts I and II of the Plaintiff's Third Amended Complaint allege that Eveline Barros-

Cepeda's rights under the Fourth Amendment to the United States Constitution were violated by

Defendant Thomas Taylor. See Defs. SOF, Exhibit K. The Fourth Amendment protects

individuals from unreasonable seizures. "Whenever an officer restrains the freedom of a person

to walk away, he has seized that person." Tennessee v. Garner, 471 U.S. 1, 7 (1984); see also

Graham v. Connor, 490 U.S. 386, 395 n. 10 (1989). It is unquestionable that "apprehension by

the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth

Amendment." Tennessee v. Garner, 471 U.S. at 7. Viewing the facts of the instant case in the

light most favorable to the Plaintiff, a reasonable jury could find that Taylor seized Barros-

Cepeda when he shot at the moving vehicle in which she was a passenger, and that this seizure

was objectively unreasonable.

### 1. The Evidence Demonstrates A Genuine Issue Of Material Fact As To Whether Taylor Seized Barros-Cepeda By Shooting Her.

The Defendant argues that the Plaintiff has no reasonable expectation of prevailing on

Counts I and II of her Complaint because the evidence "incontrovertibly establish[es]" that

Barros-Cepeda was not "seized" under the Fourth Amendment. See Defendant Thomas Taylor's

Motion for Summary Judgment ("Def. Taylor Motion") at 2. To support this argument, the

Defendant relies almost exclusively on the First Circuit's decision in Landol-Rivera v. Cruz, 906

F.2d 791 (1st Cir. 2000). See Def. Taylor Motion at 3-4. In that case, the Court held that "the

8

Fourth Amendment is implicated only when the individual alleging harm was the object of the challenged police conduct." -Id. at 798. The Plaintiff concedes that Landol-Rivera is controlling in this Circuit. However, the facts found by the jury in that case are vastly different from the facts presented here and, as such, the holding has dubious applicability to this case. In Landol-Rivera, the plaintiff was taken hostage by an armed robber and held at gunpoint. Id. at 791-792. When the armed robber commandeered a car and took over the driver's position with the plaintiff on his lap, the pursuing officers fired, severely injuring the plaintiff. Id. at 792. It is "beyond doubt that the conditions for the use of deadly force were met in [Landol-Rivera] . . . with respect to the fleeing suspect."[1] Id. at 793. With this factual framework in mind, the Court went on to analyze the plaintiff's Fourth Amendment claim, concluding that "[a] police officer's deliberate decision to shoot at a car containing a robber and a hostage for the purpose of stopping the robber's flight does not result in the sort of willful detention of the hostage that the Fourth Amendment was designed to govern." Id. at 795 (emphasis in original).

In the case at bar, there is no fleeing armed robber and there is no hostage taken at gunpoint. Indeed, it is questionable whether the conditions for the use of deadly force were even met with respect to Brima Wurie. Viewed in the light most favorable to the Plaintiff, the relevant facts are as follows: Unbeknownst to Officer Taylor, Officers Connolly and Flaherty began following Wurie's vehicle on Columbia Road. Defs. SOF 12, 13, 14, 6; Pl. Resp. 14, 6. Taylor first noticed Wurie's vehicle when he saw his partner Michael Paillant step in front of the vehicle at the intersection of Dunkeld and Fayston Streets and put his hands up and yell at the

---

[1] The District Court in Landol-Rivera concluded that "[a]t the time the police employed the alleged 'deadly force,' they were aware of the following: that the suspect had committed armed robbery in a public restaurant and was fleeing from the police; that the suspect was keeping the plaintiff hostage at gunpoint and had threatened to kill plaintiff if he was not allowed to 'get out;' that he had attempted to hijack a private vehicle at gunpoint; and that he had successfully hijacked a second vehicle and its driver at gunpoint, in a public traffic intersection." Landol-Rivera v. Cruz, 906 F.2d 791, 793 (1st Cir. 1990).

9

vehicle to stop. Defs. SOF 53, 55. Paillant withdrew his gun and moved it in a pumping motion. Defs. SOF 57. Taylor withdrew his gun. Defs. SOF 58. Wurie's vehicle made accidental contact with Paillant's body as Wurie was attempting to get out of Paillant's way and turn onto Fayston Street. Defs. SOF 45; Pl. Resp. 45; Pl. SOF 2.1. Taylor discharged his firearm "immediately" after Paillant's body made contact with the vehicle. Pl. Resp. 66. Paillant got back up off the ground immediately after he came in contact with the vehicle, and both he and Taylor then came running down Fayston Street. Pl. SOF 2.4. Such circumstances are a far cry from the events that led up to the shooting in Landol-Rivera. This Court cannot at this juncture state that the Plaintiff can prove no set of facts that will allow a jury to find that Barros-Cepeda's death resulted from a "misuse of power" and was not an "accidental effect[ ] of otherwise lawful government conduct." Landol-Rivera v. Cruz, 906 F.2d at 795, quoting Brower v. County of Inyo, 489 U.S. 593, 596 (1989) (internal quotations omitted).

Furthermore, as the Sixth Circuit has noted, the police officers in Landol-Rivera were clearly attempting to distinguish between the armed robber and the hostage when they began firing at the vehicle. See Fisher v. City of Memphis, 234 F.3d 312, 318 n. 3 (6th Cir. 2000) (affirming jury verdict in analogous § 1983 Fourth Amendment claim where police officer fired at car to avoid being struck and shot passenger-plaintiff, and distinguishing situation "from cases involving hostages, where an officer is attempting to shoot one individual (the fleeing felon) and avoid another (the hostage)"). "Indeed," observed the Court in Landol-Rivera, Landol-Rivera's "presence in the car arguably gave the police officers a more compelling need to stop the suspect than if there had been no hostage." Landol-Rivera v. Cruz, 906 F.2d at 795. In the instant case, Taylor cannot claim such a compelling need and cannot argue that he was attempting to distinguish between Wurie and Barros-Cepeda. Although Taylor testified that he aimed at the

10

driver's side of the vehicle and attempted to disable the driver, see Defs. SOF 68B, it is undisputed that Taylor did not even see the driver at any point during the shooting. Pl. Resp. 70. Nor did he see any passengers in the vehicle. Pl. Resp. 70. Moreover, Taylor testified that at some point he was shooting as he was walking down Fayston Street, with Wurie's vehicle in front of him. Pl. SOF 2.6. The location of the bullet hole of the "straight on shot" that fatally wounded Barros-Cepeda is consistent with this testimony. Pl. SOF 2.6, 2.9, 2.10. Such evidence belies Taylor's assertion that he was aiming solely at the driver's side of the vehicle. "[Wurie's] car was the intended target of Defendant's intentionally applied exertion of force," and thus everyone inside, including Barros-Cepeda, was effectively seized. Fisher v. City of Memphis, 234 F.3d at 318-319.

## 2. The Evidence Demonstrates A Genuine Issue Of Material Fact As To Whether The Seizure of Barros-Cepeda Was Objectively Reasonable.

A genuine issue of material fact also exists as to whether Taylor's actions were objectively reasonable under the Fourth Amendment. See Graham v. Connor, 490 U.S. at 397 ("[T]he 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation"). The Defendant argues that his conduct was objectively reasonable because Wurie's "reckless driving and intention to evade the law at all costs" posed a significant threat to Paillant and to the public at large. See Def. Taylor Motion at 7. The Defendant adopts this "significant threat" language from the Supreme Court's decision in Tennessee v. Garner. See Tennessee v. Garner, 471 U.S. at 11 (holding that "[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force"). Garner, however, concerned a police

officer acting under the authority of a state statute that provided that an officer was entitled under certain conditions to use deadly force to effect the arrest of a fleeing or forcibly resisting criminal suspect. Id. at 4. The facts in the instant case are simply not analogous and thus the Supreme Court's analysis in Garner is of limited assistance here.

There is no "easy-to-apply legal test in the Fourth Amendment context" and, ultimately, the reviewing court "must still slosh [its] way through the fact-bound morass of 'reasonableness.'" Scott v. Harris, 127 S.Ct. 1769, 1777-1778 (2007). "Determining whether the force used to effect a particular seizure is 'reasonable'... requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." Graham v. Connor, 490 U.S. at 396 (internal citation and quotation omitted). Although it is clear that the Supreme Court "intends to surround the police who make... on-the-spot choices in dangerous situations with a fairly wide zone of protection in close cases," "[j]udgments about reasonableness are usually made by juries in arguable cases." Roy v. Inhabitants of City of Lewiston, 42 F.3d at 695, 694. Precisely "[b]ecause the test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application," resolution of the question of reasonableness "requires careful attention to the facts and circumstances of each particular case." Graham v. Connor, 490 U.S. at 396 (internal citations and quotations omitted). In cases such as the present one, where a significant number of material facts are in dispute, the question of the reasonableness of Taylor's actions must be decided by the jury.

Even assuming arguendo that the test articulated in Garner is applicable to the case at bar, there is ample evidence to support a jury finding that Taylor nonetheless acted unreasonably on the evening of September 8, 2002. Even under the Defendant's version of the facts, it is clear

12

that this was no reckless, high-speed police chase that posed a significant risk of physical harm to the general public. In Scott v. Harris, 127 S.Ct. at 1775-1776, a case cited by the Defendant, the plaintiff-driver, among other things, raced down narrow streets at "shockingly fast" speeds, "forc[ed] cars traveling in both directions to their respective shoulders to avoid being hit," ran several red lights, and forced the numerous police cruisers chasing him "to engage in the same hazardous maneuvers just to keep up." Here, the officers present in the lone police cruiser following Wurie testified that they observed Wurie commit a minor civil motor vehicle violation. Defs. SOF 5, 6. They then activated their lights, but not their sirens, and followed Wurie's vehicle as it traveled within the speed limit to the intersection of Dunkeld and Fayston Streets. Defs. SOF 6, 7, 9; Pl. Resp. 6, 7, 9. There is no evidence that Officers Flaherty and Connolly felt compelled to call for backup or that they feared that Wurie's driving posed a risk of physical harm to the public at large. Of course, in the end, any event that transpired prior to Wurie turning onto Dunkeld Street is completely irrelevant, as the Defendant concedes that he was not aware of Wurie's vehicle until that point. Def. Taylor Motion at 7.

Viewing the facts in the light most favorable to the Plaintiff, the evidence demonstrates that Wurie posed no substantial threat of serious physical harm to Officer Paillant either. While Wurie's vehicle does appear from the evidence to have made contact with Paillant's body as Wurie was attempting to get out of Paillant's way and turn onto Fayston Street, the minimal contact that occurred is more consistent with that associated with simple negligence than a deliberate intent to strike Paillant. Clearly, Wurie could have caused far greater injury or even death had he intended to hit Paillant or run him down in his effort to continue his travel. Also, with a police cruiser directly behind him, deliberately striking or running over a police officer would not have been in his best interest at all. Wurie's guilty plea to assault and battery with a

13

dangerous weapon (M.G.L. c. 265, § 15A) does not establish in any way that Wurie intended to cause serious bodily harm to Paillant. To support a conviction under M.G.L. c. 265, § 15A, the Commonwealth need only prove "an assault by means of a dangerous weapon ... and also an intentional, unjustified touching, however slight, by means of that dangerous weapon." Commonwealth v. Appleby, 380 Mass. 296, 306 (1980) (emphasis added). An "assault" is defined under Massachusetts law as "'an attempt or offer with force and violence to do injury to a person either from malice or wantonness.'" Id., quoting Commonwealth v. Ruggles, 6 Allen 588, 590-591 (1863). "Section 15A does not require specific intent to injure; it requires only general intent to do the act causing injury." Id. at 307. Thus, Taylor's decision to use deadly force in effecting a seizure of Wurie and the other passengers in the vehicle is neither validated nor rendered magically lawful by the mere fact of Wurie's guilty plea. Nor can Wurie's subsequent guilty plea to M.G.L. c. 90, § 24(2)(a), which punishes drivers who operate vehicles "recklessly" or "negligently so that the lives or safety of the public might be endangered," be relied upon to justify Taylor's conduct. That statute imposes criminal penalties for operation of a motor vehicle that falls within the ambit of civil motor vehicle negligence of a type that "might" endanger lives and safety, such as driving down a narrow winding country road at an unreasonably high rate of speed or rapidly and continually changing lanes on a heavily trafficked expressway or turnpike.

Taylor's subjective belief that Paillant was in danger as long as Wurie's vehicle continued to move is also not germane to Fourth Amendment analysis. The question in this case "is whether [Taylor's] actions [were] 'objectively reasonable' in light of the facts and circumstances confronting [him], without regard to [his] underlying intent or motivation."

14

Graham v. Connor, 490 U.S. at 397. "[A]n officer's good intentions [will not] make an objectively unreasonable use of force constitutional." Id. (citations omitted).

There is sufficient evidence to support a jury finding that Taylor's actions were objectively unreasonable in spite of his good intentions. Taylor did not attempt to call out to Paillant or to contact him on his portable radio before discharging his weapon, and he did not consider whether disabling the driver of the vehicle might have caused further or greater injury to Paillant. Pl. SOF 2.8, 2.22. Although Boston Police Department regulations prohibited officers from firing at moving vehicles unless the moving vehicle constituted a threatened use of deadly force and there were no reasonable or apparent means of escape,[2] Taylor shot multiple times at Wurie's vehicle without "reassess[ing] whether, and to what extent, [Wurie's vehicle] constituted a threat while he continued to shoot." Pl. SOF 2.15, 2.16, 2.14. Parker v. Town of Swansea, 310 F.Supp.2d 356, 367 (D. Mass. 2004). There existed a probability that Taylor might have killed an innocent bystander during the incident. Pl. SOF 2.18. Paillant's life and the lives of Officers Connolly and Flaherty were also at risk as a result of Taylor's conduct. Pl. SOF 2.20, 2.21. Taylor did not put his weapon down and look for Paillant before firing the last bullet, even though at the time of the fourth and fatal shot, Taylor could have seen Paillant. Pl. SOF 2.14., 2.10, 2.11, 2.12.

Additionally, the presence of three other officers at the scene may offer some insight into what the "reasonable police officer" would have done under the circumstances facing Taylor. Neither Officer Flaherty nor Officer Connolly fired at Wurie's vehicle, even after witnessing the vehicle come in contact with Paillant. Pl. SOF 2.2; Def. SOF 85. It is also undisputed that

---

[2] Shortly after this incident, this regulation was revised. It is Officer Connolly's understanding that the regulation now prohibits officers from shooting at moving vehicles. Pl. SOF 2.23, 2.24.

Officer Paillant himself never discharged his firearm during the incident. Def. SOF 78. Rather, he got back up off of the ground immediately or within "a couple seconds" after he came in contact with the vehicle and began running down Fayston Street. Pl. SOF 2.4; Pl. Resp. 47. In sum, a genuine issue of material fact remains as to whether a reasonable officer presented with the same circumstances would have made Taylor's choices.

## 3. Taylor Is Not Entitled To Qualified Immunity; Or, In The Alternative, The Issue Of Qualified Immunity Cannot Be Resolved On Summary Judgment.

The First Circuit has developed a three-part test for qualified immunity. See Jennings v. Jones, 499 F.3d 2, 10-11 (1st Cir. 2007). The Court must inquire "(1) whether the claimant has alleged the deprivation of an actual constitutional right; (2) whether the right was clearly established at the time of the alleged action or inaction; and (3) if both of these questions are answered in the affirmative, whether an objectively reasonable official would have believed that the action taken violated that clearly established constitutional right." Id. The Court is obligated to evaluate the evidence in the light most favorable to the Plaintiff. Scott v. Harris, 127 S.Ct. at 1774.

### a. The Facts Alleged Show That Taylor's Conduct Violated Barros-Cepeda's Fourth Amendment Rights.

As previously discussed, a reasonable jury could find that Taylor deprived Barros-Cepeda of her Fourth Amendment right to be free from unreasonable seizure. Specifically, the Plaintiff's version of the facts demonstrates that Taylor began shooting at the vehicle in which Barros-Cepeda was a passenger immediately after Wurie accidentally struck Paillant while Wurie was attempting to get out of Paillant's way and turn onto Fayston Street. Defs. SOF 61, 62, 66; Pl. SOF 2.1. Paillant was up and running again immediately after he came in contact with Wurie's vehicle. Pl. SOF 2.4. By the time Taylor discharged the fourth bullet—the bullet that fatally

16

wounded Barros-Cepeda—it would have been possible to see Paillant and realize he was out of harm's way. Pl. SOF 2.10, 2.1 Г, 2.12. Paillant never discharged his weapon, and neither did Flaherty or Connolly. Defs. SOF 78. In choosing to shoot at the vehicle, he put the lives of innocent bystanders and his fellow officers at risk. Pl. SOF 2.18, 2.20, 2.21. A reasonable jury could conclude that the totality of the circumstances did not warrant Taylor's use of deadly force. See Graham v. Connor, 490 U.S. at 395-396.

## b. The Contours Of This Right Were Clearly Established At The Time Of The Shooting.

The second prong of the qualified immunity analysis asks "whether existing case law gave the defendants 'fair warning that their conduct violated the plaintiff's constitutional rights.'" Jennings v. Jones, 499 F.3d at 16, quoting Suboh v. Dist. Attorney's Office of Suffolk, 298 F.3d 81, 93 (1st Cir. 2002). A law is clearly established for the purposes of qualified immunity "either if courts have previously ruled that materially similar conduct was unconstitutional, or if 'a general constitutional rule already identified in the decisional law [applies] with obvious clarity to the specific conduct' at issue." Id., quoting United States v. Lanier, 520 U.S. 259, 271 (1997). The strikingly similar Sixth Circuit case of Fisher v. City of Memphis, 234 F.3d 312 (6th Cir. 2000), helps to demonstrate that the law protecting Barros-Cepeda from Taylor's conduct was clearly established at the time of the shooting.[3] In Fisher, a Memphis police officer stopped in the middle of a street to speak to two women. Fisher v. City of Memphis, 234 F.3d at 315. As they spoke, a vehicle approached in their direction. Id. The officer jumped onto the hood of his police car to avoid being hit and at the same time, fired his

---

[3] The Plaintiff acknowledges that she cannot cite any Supreme Court or First Circuit cases with facts materially similar to the facts of the case at bar. In addressing the second prong of the qualified immunity analysis, however, the First Circuit has considered the case law of other Circuits. See, e.g., Jennings v. Jones, 499 F.3d 2, 16-17 (1st Cir. 2007).

17

gun at the vehicle. Id. The bullet hit and injured the plaintiff-passenger of the vehicle. Id. A jury found for the plaintiff on her Fourth Amendment claim under 42 U.S.C. § 1983. Id. On appeal, the defendant argued inter alia that the Fourth Amendment was the wrong constitutional standard for analyzing the plaintiff's claims. Id. at 317-318. The Sixth Circuit disagreed, holding that "[b]y shooting at the driver of the moving car, [the officer] intended to stop the car, effectively seizing everyone inside, including the [p]laintiff."[4] Id. at 318-319. In a footnote, the court distinguished this case from Landol-Rivera, noting that the situation was "different from cases involving hostages, where an officer is attempting to shoot one individual (the fleeing felon) and avoid another (the hostage)." Id. at 318 n.3. Because the facts of Landol-Rivera are also vastly different from the facts presented in the case at bar, that decision cannot be relied on to demonstrate that Taylor had fair warning at the time of the shooting that his conduct was constitutional.

The Defendant's reliance on Brosseau v. Haugen, 543 U.S. 194 (2004) is similarly misplaced. See Def. Taylor Motion at 13-14. In that case, the Supreme Court found no cases clearly establishing that a police officer violated the Fourth Amendment when she shot "a disturbed felon, set on avoiding capture through vehicular flight, when persons in the immediate area are at risk from that flight." Brosseau v. Haugen, 543 U.S. at 200-201. The officer in Brosseau knew prior to the shooting that the plaintiff had a felony no-bail warrant out for him. Id. at 195. During the plaintiff's attempt to avoid capture by locking himself in a Jeep, the officer made at least three attempts to stop the plaintiff (by hitting the driver's side window several times with her handgun and ordering him to get out of the vehicle) before shooting at the vehicle. Id. at 195-197. Again, the facts are not analogous to the instant case and the decision

---

[4] The court did not discuss whether the police officer's seizure was objectively reasonable, but its affirmation of the jury's verdict on the plaintiff's Fourth Amendment claim implies that it found no error in the jury's findings.

does not preclude this Court from denying the Defendant's motion for summary judgment on the grounds of qualified immunity.

In addition to Fisher, supra, general Fourth Amendment principles demonstrate that Taylor's conduct was unconstitutional. See United States v. Lanier, 520 U.S. 259, 271 (1997) (holding that in some instances, "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has [not] previously been held unlawful") (internal quotations and citation omitted). Viewing the facts in the light most favorable to the Plaintiff, Taylor's conduct was arguably an obvious violation of the Fourth Amendment's general prohibition on excessive force. "[U]nder clearly established law, the use of deadly force is constitutional only if, at a minimum, a suspect poses an immediate threat to police officers or civilians." Jarrett v. Town of Yarmouth, 331 F.3d 140, 148 (1st Cir. 2003). Wurie's vehicle made accidental contact with Paillant's body as Wurie was attempting to get out of Paillant's way and turn onto Fayston Street. Defs. SOF 45; Pl. Resp. 45; Pl. SOF 2.1. At most, such conduct constitutes a misdemeanor. See, e.g., M.G.L. c. 90, § 25 (refusal to submit to police officer); M.G.L. c. 90, § 24(2)(a 1/2)(1) (failure to stop after causing personal injury); M.G.L. c. 90, § 24(2)(a) (operating to endanger). The use of deadly force to effectuate a misdemeanor arrest was at the time of the incident so patently excessive as to defeat the Defendant's present assertion of qualified immunity without citation to a case analyzing materially similar conduct. See Tennessee v. Garner, 471 U.S. at 11-19 (finding unconditional use of deadly force to prevent escape of even felony suspects constitutionally unreasonable).

### c. An Objectively Reasonable Officer Would Have Known That Taylor's Conduct Was Unlawful.

Although closely intertwined with the excessive force inquiry under Fourth Amendment

19

law, the third prong of the qualified immunity analysis "has a further dimension." Saucier v.

Katz, 533 U.S. 194, 205 (2001). As explained by the Supreme Court in Saucier:

> The concern of the immunity inquiry is to acknowledge that reasonable mistakes can be
> made as to the legal constraints on particular police conduct. It is sometimes difficult for
> an officer to determine how the relevant legal doctrine, here excessive force, will apply to
> the factual situation the officer confronts. An officer might correctly perceive all of the
> relevant facts but have a mistaken understanding as to whether a particular amount of
> force is legal in those circumstances. If the officer's mistake as to what the law requires is
> reasonable, however, the officer is entitled to the immunity defense.

Id. "Thus, qualified immunity affords protection to officers who reasonably, yet mistakenly,

employ excessive force in violation of the Fourth Amendment." Jennings v. Jones, 499 F.3d at

19.

Based on the evidence viewed most favorably to the Plaintiff, no police officer could

have reasonably believed that the law allowed him to shoot at Barros-Cepeda under the

circumstances. Again, the evidence demonstrates that Taylor overreacted to Wurie's accidental

striking of Officer Paillant and that he failed to reassess the situation while continuously

shooting. See Section III, B, 3, a of this Memorandum.

For all these reasons, Officer Taylor is not entitled to qualified immunity.

### d. In The Alternative, The Issue Of Qualified Immunity Cannot Be Resolved On Summary Judgment.

Although the Plaintiff maintains that Taylor is not entitled to qualified immunity as a

matter of law, she argues in the alternative that the existence of disputed issues of material fact

may preclude a ruling on the qualified immunity question at this juncture. As the First Circuit

has observed:

> To be sure, qualified immunity claims may often be resolved in a defendant's favor as a
> matter of law, after the court first assumes all facts in plaintiff's favor, as conventional
> summary judgment practice requires. But in those perhaps rare cases when this is
> impossible--when only a fact finder's determination of the conflicting evidence as to the

20

underlying historical facts will permit resolution of the immunity issue--summary judgment ceases to be an appropriate vehicle.

Prokey v. Watkins, 942 F.2d 67, 73 (1st Cir. 1991). Here, as in Prokey, the facts are "complex, intricate and in key areas contested," namely what information Taylor knew prior to the seizure and whether such information would lead a reasonable police officer to believe that Taylor's conduct was lawful. Id. at 73-74 (qualified immunity question cannot be decided on summary judgment where resolution "depends upon [unresolved] answers to fact-specific questions concerning the officers' knowledge at the time of arrest"). More importantly, "the inferences to be drawn from the web of facts are disputed and unclear—and are likely to depend on credibility judgments." Id. at 73 (noting, however, that the subjective good faith of the defendant is irrelevant under the objectively reasonable standard of the Fourth Amendment).

As such, a ruling on the Defendant's motion for summary judgment on the basis of qualified immunity is not possible at this juncture. See id. at 74 n.7 (adding that, "as the action continues," the district court still maintains the authority to "further consider the legal status of the claim against any defendant, or to dispose of any claim by directed verdict, in light of further development of the facts"). See also, Acevedo-Garcia v. Monroig, 351 F.3d 547, 563 (1st Cir. 2003) ("The availability of qualified immunity after a trial is a legal question informed by the jury's findings of fact, but ultimately committed to the court's judgment").

## C. The Defendant's Motion For Summary Judgment As To The Plaintiff's State Law Claims Should Be Denied

The Plaintiff claims damages against Defendant Taylor for the wrongful death of Barros-Cepeda pursuant to M.G.L. c. 229 (Count IV) and for the conscious pain and suffering and the necessary medical expenses incurred by Barros-Cepeda under the laws of the Commonwealth of Massachusetts (Count VI). See Defs. SOF, Exhibit K. These pendent state

21

claims survive if this Court denies summary judgment on the Plaintiff's federal claims. See Cullen v. Mattaliano, 690 F. Supp. 93, 99 (D. Mass 1988). Count IV alleges deliberate and willful, i.e., intentional, wrongdoing on the part of Taylor, thus precluding his immunity from liability under the Massachusetts Tort Claims Act. See Jackson v. Town of Milton, 41 Mass. App. Ct. 908, 908-909 (1996). It is undisputed that Taylor committed an act intentionally designed to harm Brima Wurie. Defs. SOF 68B. See Forbush v. Lynn, 35 Mass. App. Ct. 696, 700 (1994) (explaining the difference between "reckless misconduct," which exempts the actor from liability, and "intentional wrongdoing," which warrants no such exemption). But see Jesionowski v. Beck, 937 F.Supp. 95, 105 (D. Mass. 1996) (holding that Massachusetts law defines assault and battery as "the intentional and unjustified use of force upon the person of another, however slight, or the intentional doing of a wanton or grossly negligent act causing personal injury to another") (emphasis added)). Contrary to the Defendant's assertion, the Plaintiff in the case at bar need not produce evidence that demonstrates that Taylor intended to shoot Barros-Cepeda. See Def. Taylor Motion at 18-20. The Restatement (Second) of Torts explains:

> The intention which is necessary to make the actor liable [for battery] is not necessarily an intention to cause a harmful or offensive contact or an apprehension of such contact to the plaintiff himself or otherwise to cause him bodily harm. It is enough that the actor intends to produce such an effect upon some other person and that his act so intended is the legal cause of a harmful contact to the other. It is not necessary that the actor know or have reason even to suspect that the other is in the vicinity of the third person whom the actor intends to affect and, therefore, that he should recognize that his act, though directed against the third person, involves a risk of causing bodily harm to the other so that the act would be negligent toward him.

Restatement (Second) of Torts § 16, comment b (1964) (emphasis added). See also Sebago, Inc. v. Beazer East, Inc., 18 F. Supp.2d 70, 84 and 84 n.4 (D. Mass. 1998) (suggesting that a plaintiff may also become an intended victim because of substantial certainty that plaintiff would be

22

harmed even if not the direct target of defendant's conduct). Accordingly, it is sufficient that the evidence demonstrates that Taylor intended to shoot Wurie and that his act so intended was the legal cause of Barros-Cepeda's death. Moreover, a plaintiff's assault and battery claims have been held to "rise or fall in the same manner as his Fourth Amendment claims." See Jesionowski v. Beck, 937 F.Supp. at 105. As the evidence demonstrates a trialworthy issue as to the Plaintiff's Fourth Amendment claims in this matter, so too does it demonstrate a trialworthy issue as to the Plaintiff's wrongful death claim under state law. For the same reasons, the Defendant is not entitled to summary judgment on Count VI of the Plantiff's Complaint, as it too is based on a theory of intentional tort.[5]

## IV. CONCLUSION

For the foregoing reasons, the Plaintiff respectfully requests that this Court deny Defendant Officer Taylor's motion for summary judgment.

---

[5] In a footnote, the Defendant maintains that "the Plaintiff has not adduced any cognizable evidence of the decedent's conscious pain and suffering." Def. Taylor Motion at 20 n.8. This is not the case. In the opinion of Dr. Jennifer K. Lipman, a former medical examiner for the Commonwealth of Massachusetts, Barros-Cepeda's gunshot wound did not cause immediate unconsciousness; rather Barros-Cepeda was conscious for "maybe less than a minute or "[m]aybe a minute." Pl. SOF 2.27.

Respectfully submitted,
PLAINTIFF, SHENIA DANCY-STEWART as
Administratrix of the Estate of EVELINE
BARROS-CEPEDA,

By her attorney:

/s/ Andrew Stockwell-Alpert

Andrew Stockwell-Alpert, BBO#481190
11 Beacon Street, Suite 1210
Boston, MA 02108
(617) 720-4244

## CERTIFICATE OF SERVICE

I, Andrew Stockwell-Alpert, hereby certify that on this date I served a copy of the
foregoing documents upon defendant's lead counsel, Helen G. Litsas, by electronic filing and by
postage prepaid, first class, United States mail.

7/7/08                          /s/ Andrew Stockwell-Alpert

Date                            Andrew Stockwell-Alpert

24