UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

SHENIA DANCY-STEWART as
Administratrix of the Estate of EVELINE
BARROS-CEPEDA,

      Plaintiff,

v.

      CIVIL ACTION NO. 05-11803-MLW

THOMAS TAYLOR, Jr., and the CITY
OF BOSTON,

      Defendants.

## APPENDIX OF EXHIBITS IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT THOMAS TAYLOR'S MOTION FOR SUMMARY JUDGMENT

| **Exhibit Letter** | **Description of Exhibit** |
| --- | --- |
| Exhibit A: | Affidavit of Andrew Stockwell-Alpert |
| Exhibit B: | Excerpts from Deposition of Brima Wurie |
| Exhibit C: | Excerpts from Deposition of Debra Flaherty |
| Exhibit D: | Excerpts from Deposition of Robert Connolly |
| Exhibit E: | Excerpts from Deposition of Michael Paillant |
| Exhibit F: | Excerpts from Deposition of Luis Carvalho |
| Exhibit G: | Excerpts from Deposition of Thomas Taylor |
| Exhibit H: | Excerpts from Deposition of James Nicholas |
| Exhibit I: | Excerpts from Deposition of Travo Carter |
| Exhibit J: | Excerpts from Deposition of Tyrone Camper |
| Exhibit K: | Excerpts from Deposition of John Murphy |

1

Exhibit L:        Excerpts from Deposition of Arthur Stratford

Exhibit M:        Excerpts from Deposition of Jennifer K. Lipman, M.D.

# EXHIBIT A

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

SHENIA DANCY-STEWART as
Administratrix of the Estate of EVELINE
BARROS-CEPEDA,

      Plaintiff,

v.

                             CIVIL ACTION NO. 05-11803-MLW

THOMAS TAYLOR, Jr., and the CITY
OF BOSTON,

      Defendants.

## AFFIDAVIT OF ATTORNEY ANDREW STOCKWELL-ALPERT

I, Andrew Stockwell-Alpert, hereby state and depose as follows:

    1.    I am counsel of record for the Plaintiff in the above-captioned matter, and make

this affidavit on personal knowledge in support of the Plaintiff's Opposition to Defendant

Thomas Taylor's Motion for Summary Judgment.

    2.    I hereby certify that the exhibits attached to Plaintiff's Response to Defendants'

Local Rule 56.1 Statement of Facts and Plaintiff's Statement of Additional Undisputed Material

Facts are true and accurate copies.

    Signed under the pains and penalties of perjury this 7th day of July 2008.

                           /s/ Andrew Stockwell-Alpert

                           Andrew Stockwell-Alpert

Respectfully submitted,
PLAINTIFF, SHENIA DANCY-STEWART as
Administratrix of the Estate of EVELINE
BARROS-CEPEDA,

By her attorney:

/s/ Andrew Stockwell-Alpert

Andrew Stockwell-Alpert, BBO#481190
11 Beacon Street, Suite 1210
Boston, MA 02108
(617) 720-4244

## CERTIFICATE OF SERVICE

I, Andrew Stockwell-Alpert, hereby certify that on this date I served a copy of the foregoing documents upon defendant's lead counsel, Helen G. Litsas, by electronic filing and by postage prepaid, first class, United States mail.

7/7/08                      /s/ Andrew Stockwell-Alpert

Date                        Andrew Stockwell-Alpert

# EXHIBIT B

```
00016
  1                                  VOLUME II
                                  PAGES:    16 - 262
  2                               EXHIBITS: 1 - 2
  3             UNITED STATES DISTRICT COURT
                 DISTRICT OF MASSACHUSETTS
  4
                        C.A. NO. 05-11803-MLW
  5
  6    *   *   *   *   *   *   *   *   *   *        *
                                                   *
  7    SHENIA DANCY-STEWART, as                    *
       Administratrix of the Estate               *
  8    of EVELINE BARROS-CEPEDA,                   *
                         Plaintiffs,               *
  9                                                *
       vs.                                         *
 10                                                *
       THOMAS TAYLOR, JR., and the                 *
 11    CITY OF BOSTON,                             *
                         Defendants.               *
 12                                                *
       *   *   *   *   *   *   *   *   *   *        *
 13
 14
 15
 16              DEPOSITION OF BRIMA WURIE, taken
 17    on behalf of the Defendants, pursuant to the
 18    Massachusetts Rules of Civil Procedure,
 19    before Karen Borreson, RPR, Notary Public
 20    within and for the Commonwealth of
 21    Massachusetts, at the Nashua Street Jail, 200
 22    Nashua Street, Boston, Massachusetts, on
 23    Friday, January 25, 2008, commencing at 11:45
 24    a.m.
```

00103

```
 1   A. I don't remember.  All I remember is from
 2      the cookout to Hancock?
 3   Q. Did whatever plan that you had that night
 4      involve smoking weed?
 5   A. No, I didn't smoke weed.  I can't smoke
 6      weed.  So I don't remember.  I wasn't
 7      smoking.
 8   Q. Do you remember if anybody else was planning
 9      to smoke weed that night?
10   A. No.  Not that I can recall, because I wasn't
11      smoking.  I couldn't, so...
12   Q. Do you know of anybody that night had weed
13      on them when they were in the car?
14   A. No.
15   Q. Do you remember going over in the area of
16      Cushing Avenue after you left Hancock?
17   A. No.
18   Q. Do you remember the next time you went
19      anywhere after you left Hancock Street?
20   A. That's what I mean.  Like, I don't want to
21      get into details but -- because I would
22      rather my lawyer be here.
23   Q. Do you remember pulling over on Cushing
24      Avenue?
```

00104

```
 1   A. No.
 2   Q. Do you remember Carlos Fernandez ever
 3      getting out of the Ford Taurus in that area
 4      of Cushing Avenue or Jerome Avenue?
 5   A. That's what I mean, I don't want to get into
 6      details because my lawyer is not here.
 7   Q. Is it Cushing Avenue or Cushing Street?
 8   A. I don't know.  I'm not familiar around there
 9      as far as streets goes.
10   Q. Is it Jerome Avenue or Jerome Street?
11   A. I don't know where Jerome is.
12   Q. Do you know the streets Jerome or Cushing
13      Avenue?
14   A. Uh-uh.
15   Q. Are you familiar with that area on that side
16      of Columbia Road?
17   A. I'm -- I'm -- I used to the area up by where
18      I live.  Where me and my mother stay, where
19      my family lives, as far as streets and
20      details.
21   Q. Do you remember pulling over the vehicle
22      after you left Hancock?
23   A. Pulling over?
24   Q. Pulling over or stopping the vehicle?
```

00109

 1    A. It could have been.

 2    Q. Where were you when you saw the lights?  You

 3       saw the police lights?

 4    A. Yes.

 5    Q. And by that do you mean the red and blue

 6       wigwags?

 7    A. Activation.

 8    Q. Did you hear any sirens?

 9    A. No.

10    Q. Did you hear anything?

11    A. I never heard sirens, no.  Not that I

12       recall, no.  It was just flashing lights

13       there.  I never heard no -- noise, not that

14       I recall.

15    Q. Did you understand that they were trying to

16       pull you over?

17    A. I mean, yes.  I know common-sense-wise.  But

18       they really didn't use no speaker and say,

19       Pull over.  And I didn't hear no sirens.

20       But they are following, yes.

21    Q. Do you know why they were following you?

22    A. No.

23    Q. Do you know why they were trying to pull you

24       over?

00110

```
 1   A. No.
 2   Q. Do you remember pulling through a red light
 3      on Columbia Road?
 4   A. There was a red light.  And when I came to
 5      Columbia Road, like, it was red with a left
 6      signal.  Like, that's what I remember.
 7      Like, you could turn left.  If I could
 8      recall, like, the light -- like, I can't
 9      remember.  But I know the lights was a sign
10      for me that I could go.  Because I know I
11      could take a left onto Columbia Road when
12      the lights -- the traffic signs was saying
13      that I could go through the lights.  It
14      wasn't a red light.
15   Q. So were you already on Columbia Road or were
16      you turning onto Columbia Road?
17   A. I was turning onto Columbia Road.
18   Q. Do you remember what street you were turning
19      from?
20   A. Hancock.
21   Q. Oh, that was Hancock?
22   A. Yes.  Hancock comes into Columbia Road.
23   Q. If you're coming out of Hancock, are you
24      taking a left or a right on Columbia Road?
```

00111

```
 1    A. A left.
 2    Q. Columbia Road, actually it's a major street?
 3    A. Uh-huh.
 4    Q. It's two ways.  And I think there is at
 5       least one -- I think there·are more than one
 6       lane going each way, does that sound right?
 7    A. Uh-huh.
 8    Q. Do you have to cross lanes to get to the
 9       lane that you pulled into on Columbia Road?
10    A. Yes.
11    Q. Does that make sense?
12    A. It's an intersection.  Like, cars will go
13       this way and cars will go that way.  Like,
14       cars will go to the right and cars will go
15       to the left.
16    Q. Did you pull --
17    A. I pulled into the intersection and took a
18       left onto Columbia Road.
19    Q. Did you cross the lanes that were going the
20       other way?  You know what I mean?  Could you
21       have taken a right onto Columbia Road there?
22    A. Yes.  You can take a right or a left.
23    Q. Did you have to cross those lanes that you
24       would have taken a right in to get to the
```

00124

1    _  know if there was a car there.  It's -- it's
2       -- it's a while ago.  I don't know if there
3       was -- I think there was a car on Dunkeld.
4    Q. What kind of car, a police car?
5    A. No.  I'm not sure.  About -- I don't think.
6       it went out of the way.  But then I remember
7       the police coming in the middle of the
8       street like, Hey, waving his hand.
9            Then -- like, I can't recall if the
10      car was -- I don't know if there was a car
11      in the middle of the street or not, but I --
12      to my recollection, I think there was a car
13      in the middle of the street that vanished,
14      that ended up driving way once they seen the
15      car coming up with the flashing lights
16      behind it.  I think that car disappeared
17      somewhere.
18           And then there was the police that
19      came in the street and waving his right hand
20      and pointing a gun at me.  That's what I
21      remember.  And talking about stop.  I slowed
22      up to, like, a stop and he went to the right
23      of the car.  He moved to the right of the
24      car.

00125

1                And all I remember is his gun keep
2            following me and then he slapped the hood
3            like, stop, and I kept going.
4        Q. So how did you get onto Dunkeld?
5        .A. I came off Howard and took a left on Quincy
6            and took a right on Dunkeld.  And I don't
7            know.  Like, it's so fast-paced, but I'm not
8            sure if -- at first I slowed up because --
9            yes, there was a car in front of me.  Yes.
10           There was a car in front of me, because I
11           slowed up.
12       Q. What street were you coming from when you
13           turned onto Dunkeld?
14       A. Howard -- I mean Quincy.  I came off Howard
15           Avenue took a left on Quincy and took a
16           right on Dunkeld.  And there was a car and
17           -- because I'm like, Oh.  Well, in my mind,
18           I was like, I got to stop now.  That's what
19           happened, a car was there.  But it ended up
20           going because, I guess, the flashing lights
21           made it move.
22       Q. Where was the police cruiser at this point
23           when you turned on --
24       A. I never seen the police cruiser.  The police

00133

1   A. Ever since he got my attention.

2   Q. And when you first saw that officer, what

3      were you thinking?

4   A. Stop. And then he moved out of my way, so I

5      kept on going.

6   Q. When you saw that officer, were you still

7      thinking about what was going to happen if

8      you got pulled over?

9   A. I was just like, I'm going to jail. I said

10     that in my head, I'm going to jail. But he

11     was pointing his gun at me. So when he

12     cleared the way, I kept going.

13  Q. What did you do when you saw him point the

14     gun?

15  A. Got nervous. I thought he was going to

16     shoot me. But I was -- I was like -- it was

17     like -- not a bluff thing, but he was moving

18     out of the way pointing his gun. It was all

19     in motion. Like, the car left, I was still

20     going.

21          And if I'm driving, I'm going over

22     to my left, but not hitting the cars that's

23     parked and he's moving out of the way to his

24     right, but still pointing his gun, like

00134

```
 1       following me.  Like, he's aiming it at the
 2       driver, me, and kept on, like, following.
 3              So when he moved over to the right
 4       of the car, like, he -- all I remember is
 5       him slapping the hood with his hand like,
 6       stop the car.  And I kept on going.
 7    Q. Did you stop the car on Dunkeld Street?
 8    A. No.  They did.  But it kept on rolling.  And
 9       what I mean by that is because they shot the
10       car up so bad, that the car shut off on its
11       own.
12    Q. Do you know what the other people in the car
13       were doing while you were on Dunkeld Street?
14    A. No.
15    Q. Was anybody saying anything?
16    A. It was all a shocking thing.  I don't
17       remember, no.
18    Q. I mean, you had somebody in the passenger
19       seat with you?
20    A. They were just -- weren't saying nothing.
21       They were just like -- they were shocked.
22       Like, nobody was saying nothing.
23    Q. Did Carlos Fernandez say anything while you
24       were on Dunkeld Street?
```

00136

```
 1   A. I wasn't paying attention to it because -- I
 2      mean, if I was him, I probably would have.
 3      But my focus was on the police officer.  It
 4      really wasn't like I was looking to see what
 5      everybody else in the car was doing, because
 6      I was too busy watching the police officer.
 7   Q. Did you hit the breaks at all?
 8   A. Yes.  I was -- I told you, I was going like
 9      two, three.  I was -- I was going real slow
10      at that time, like not even five miles an
11      hour.  The car was, like, basically rolling
12      up the hill.  And he was telling me to stop.
13      But he seen the motion of the car, so he
14      moved to the right of the car but his gun
15      was still on me.
16   Q. So you were going how fast?
17   A. Very slow.  The whole time it was slow.  But
18      when I got on Dunkeld, it was very slow.
19      Basically rolling up the hill.
20   Q. Less than five miles an hour?
21   A. Yes.
22   Q. Less than four miles an hour?
23   A. Between that.  It was really -- it was
24      really slow, like, mostly.  All I remember
```

00137

1      is going up.  Because I didn't want to hit
2      the cop, so I was going really slow.  So
3      when he got out of the way, he was still --
4      he seen the car still rolling in motion.
5      But he kept his gun fixed on me, so he moved
6      out of the way.
7    Q. Were you pressing the gas?
8    A. I was more on the brake.
9    Q. You remember pressing the brake?
10   A. Yes.  Like -- you know if you're in a car
11      and you take your foot off the brake, you
12      just keep rolling, that's what I was doing.
13      But once he got out of the way, that's when
14      I pressed on the gas.
15   Q. Were you able to see the officer, that
16      officer, the entire time you were driving on
17      Dunkeld Street?
18   A. Yes.
19   Q. Did you hit the officer?
20   A. No.
21   Q. How do you know you didn't hit the officer?
22   A. Because he had his gun fixed on me.  And the
23      reason I could say that is because when I
24      drove by him, I seen his body in the

00139

```
 1      with his free hand, which would be his left.
 2   Q. When did you lose sight of that officer?
 3   A. After he slapped the hood of the car and
 4      then he had his gun still pointing at me --
 5      like, I was looking over to the right, that
 6      was it. And then -- like, then I made it to
 7      Fayston and took a right.
 8   Q. And he was on the passenger side?
 9   A. Yes.
10   Q. When he was in the street signaling you to
11      stop, where is he on the street? Is he in
12      the middle, to the side?
13   A. Like, before the car got close to him, he
14      was, like, in the -- like, not in a frenzy,
15      but, like, urging you to stop. Like, his
16      body was moving like, Stop the car, Stop the
17      car, yelling with his gun pointing at me,
18      but he was moving over to the right.
19           Because I guess he seen I was, like,
20      trying to go to the left. Because I could
21      see he was moving like, Stop the car. And
22      he was moving towards the right as the car
23      was coming. Like, he was steady moving,
24      like slowly moving off to -- off to my right
```

00144

```
 1      Quincy and there is an intersection of
 2      Dunkeld and Fayston.  Where are you when --
 3   A. More of the middle right before probably --
 4      because there is brick houses on your left,
 5      the apartment buildings.  I'm in the middle,
 6      because the cruiser is on me.  It's not like
 7      the cruiser is stuck on the street.  The
 8      cruiser was behind me.  So I was in the
 9      middle closer towards the top towards
10      Fayston.
11   Q. Where are you when you lose sight of the
12      police officer?
13   A. I lost sight -- the police -- I never lost
14      sight of it.  To the right -- like, if
15      you're driving by and you see a person
16      standing on the side of your car, he's -- I
17      was still looking at him because he had a
18      gun in his hand.  You know what I'm saying?
19      I'm thinking he's going to shoot.
20   Q. When the police officer is to the right of
21      your car, the passenger side --
22   A. Yes.
23   Q. -- and you're going by him --
24   A. As soon as -- as soon as -- I lose sight of
```

00145

```
 1      him as soon as like -- like, the passenger,
 2      but the rearview.  He was still there.
 3      Like, he was standing.  Like, if you mean
 4      lose sight of him, I never lost, like,
 5      complete sight of him, because he was
 6      running towards the car.
 7   Q. Let me ask it this way.  At the point where
 8      the police officer is to the right of your
 9      car on the passenger side of your car --
10   A. Yes.
11   Q. -- where is your car on Dunkeld when that's
12      happening?  Is it, I guess using these
13      landmarks, the intersection of Dunkeld and
14      Fayston?
15   A. The intersection of Fayston and Quincy
16      Street, I'm in the middle of -- like, if
17      you're -- if the length is -- if the length
18      is 10 yards -- all right.  Say it's a
19      football field, I'm on the 50 yard line.
20      I'm in the middle.
21              Basically what I'm trying to say is
22      of that intersection between Dunkeld and
23      Quincy Street -- I mean, Fayston and Quincy
24      Street, I'm in the middle, but still rolling
```

00146

```
 1        towards the top.  And that's when that's
 2        happening.
 3             Like, I'm not even near Fayston yet.
 4        And when I'm -- when he moves off to the
 5        right and pointing the gun, like, I still
 6        had to drive up some and then take a right
 7        once he's behind me.  And he's, like,
 8        running towards the car.
 9             So when I get on Fayston, I'm going
10        forward and all I hear is shots and that's
11        when I, like, kind of ducked.
12     Q. Why didn't you stop on Dunkeld?
13     A. I don't know.  Because in -- in my mind, I
14        just wanted to get away from that cruiser
15        just enough to -- I don't know.
16     Q. When did you start to accelerate?
17     A. I accelerated as soon as -- after -- after I
18        heard the cop say, Stop, and I knew that he
19        was out of sight not to be hit, that's when
20        I kept going.  That's when I went.  And then
21        he was like, Stop the car.  And I, like,
22        looked in the rearview and he was, like,
23        turning towards the car.
24             And I went on Fayston.  And I don't
```

00199

```
 1      car never moved, I would have stopped.
 2   Q. Were you able to pull around that car if you
 3      wanted to?
 4   A. No.  The car -- no, you wouldn't be able to
 5      move it.
 6   Q. Is there anything else that made you believe
 7      that the officer was trying to shoot you?
 8   A. Yes.  Because my window shot out.  Like, it
 9      was -- like, when I was driving, the
10      driver's side window was shot out.  The
11      bullets felt -- it felt like they were
12      aiming right at me, my head.
13   Q. What made you feel like that?
14   A. Because...
15   Q. I mean, was there anything you saw that made
16      you feel like that?
17   A. What you do mean?  The cop was pointing the
18      gun at my face.  I mean, yes.  I mean, I
19      thought he was going to shoot me right then
20      and there.  And when he didn't, I was
21      like -- I mean, I was allowed to go by.  And
22      the next thing you know, I'm hearing shots.
23      That's a really scary feeling hearing
24      bullets go by your ear, windows being shot
```

00230

1   A. I mean, as far as like -- yes, but not from
2      -- I want to say from -- yes, I -- yes, I
3      did.
4   Q. What types of injuries did you suffer?
5   A. I mean, once the ordeal was over from the
6      glass, me running.  Like I told, you glass
7      was all over me, shattered all over me when
8      they shot the car up.
9   Q. Were you cut?
10  A. Yes.
11  Q. Do you know if anyone else was injured?
12  A. I mean, all I heard of was what the police
13     ever told me -- all I remember was they told
14.    me that Lenny was in the hospital, but I
15     don't know from what injuries.
16  Q. Did you ever hear Eveline Baros-Cepeda say
17     anything while she was in the car?
18  A. No.
19  Q. Did you ever hear her say anything to
20     indicate that she had been shot?
21  A. No.
22  Q. Did you ever hear anyone else in the car say
23     anything to indicate that she had been shot?
24  A. No.  Like I said, I didn't know until the

# EXHIBIT C

1

1                            VOL. I
                            PAGES 1-88
2                           EXHIBITS:  A-F

3           IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF MASSACHUSETTS
4
          Civil Action No. 05-11803-MLW
5      _____
       SHENIA DANCY-STEWART
6      as Administratrix of the Estate of
       EVELINE BARROS-CEPEDA
7           Plaintiff
       vs.
8
       THOMAS TAYLOR, JR. AND THE
9      CITY OF BOSTON
            Defendants
10     _____

11          C O N F I D E N T I A L

12          DEPOSITION OF **DEBRA A. FLAHERTY**, taken on
       behalf of the plaintiff, pursuant to the
13     applicable provisions of the Federal Rules of
       Civil Procedure, before Irma Widomski, a
14     Registered Merit Reporter, and Certified
       Shorthand Reporter, No. 131593 in and for the
15     Commonwealth of Massachusetts, at the Law
       Offices of Andrew Stockwell-Alpert, 11 Beacon
16     Street, Suite 1210, Boston, Massachusetts, on
       Monday, February 11, 2008, commencing at 1:00
17     p.m.

18

19

20

21
                WIDOMSKI COURT REPORTING ASSOCIATES
22                     ONE SUNSET DRIVE
                   WAKEFIELD, MASSACHUSETTS 01880
23                      (781) 246-0710

24

22

```
 1    A.    Twice a year.
 2    Q.    Did you, on your own, return to Moon Island over
 3          and beyond the two times a year that you were
 4          required to do so?
 5    A.    No.
 6    Q.    Approximately how many targets would you shoot
 7          at Moon Island when you would go there?
 8    A.    How many targets?
 9    Q.    Yes.
10    A.    You had one target that you were shooting at.
11    Q.    How many bullets were you allowed to discharge
12          at the target?
13    A.    In excess of 100 rounds.
14    Q.    And what would it mean if you were recertified
15          in connection with your shooting at Moon Island?
16    A.    What do you mean?
17                    MS. LITSAS:  Objection.
18    Q.    How do you get recertified at Moon Island?
19    A.    You have to pass.
20    Q.    What does it take to pass, so to speak?
21    A.    You have to hit the target.
22    Q.    How many times?
23    A.    Well, there's a certain amount.  I don't know
24          how many they require but I always passed so I
```

| | | |
|---|---|---|
| 1 | | wasn't sure what the passing grade was. I think |
| 2 | | you had to get over 70 to be recertified. |
| 3 | Q. | You could shoot as many as a thousand bullets to |
| 4 | | attain that score? |
| 5 | A. | I didn't say a thousand, I said a hundred. |
| 6 | Q. | And during the course of your being a police |
| 7 | | officer, did you ever receive any actual |
| 8 | | inservice training in shooting at moving |
| 9 | | vehicles? |
| 10 | A. | No. |
| 11 | Q. | Did you receive any further training in shooting |
| 12 | | at moving targets? |
| 13 | A. | No.  Not that I recall.  I think they were in |
| 14 | | the process of doing the range over to that |
| 15 | | capacity but I don't think it was ever |
| 16 | | completed. |
| 17 | Q. | Did you receive any training in the policy or |
| 18 | | procedures of the Boston police department with |
| 19 | | regard to the use of deadly force? |
| 20 | A. | Yes, we did. |
| 21 | Q. | And particularly with respect to that, did you |
| 22 | | ever receive any training with regard to the |
| 23 | | circumstances under which you would be permitted |
| 24 | | to shoot at a moving or fleeing vehicle? |

|   |   |   |
|---|---|---|
| 1 | Q. | Who was operating the cruiser? |
| 2 | A. | I was. |
| 3 | Q. | And where was Officer Connolly sitting? |
| 4 | A. | Beside me in the passenger seat. |
| 5 | Q. | And did you or he say anything to each other at |
| 6 |    | the point that you made that observation of the |
| 7 |    | white Taurus? |
| 8 | A. | I believe I said something to Officer Connolly. |
| 9 | Q. | What did you say? |
| 10 | A. | That he had just gone through the red light, and |
| 11 |    | I was going to pull him over, attempt to pull |
| 12 |    | him over. |
| 13 | Q. | In connection with that, did you activate your |
| 14 |    | red light, your overhead light? |
| 15 | A. | I did. |
| 16 | Q. | And you proceeded to follow him? |
| 17 | A. | I followed him. |
| 18 | Q. | Now, when you followed him at the moment that he |
| 19 |    | went through the red light and you started to |
| 20 |    | follow him, were you able to make any |
| 21 |    | observations as to how many individuals were in |
| 22 |    | the vehicle? |
| 23 | A. | I knew there were at least three or four people, |
| 24 |    | maybe more in the vehicle. |

| | | |
|---|---|---|
| 1 | A. | I don't know how fast he was going. I don't |
| 2 | | believe he was going faster than 25 but... |
| 3 | Q. | Would it be fair to say he wasn't exceeding the |
| 4 | | speed limit for the area he was in? |
| 5 | | MS. LITSAS: Objection. |
| 6 | A. | Yes. |
| 7 | Q. | I think we have him now on Virginia Street, how |
| 8 | | far behind him were you following? |
| 9 | A. | I was right behind him. Maybe 10, 15 feet |
| 10 | | approximately. I'm really not sure. |
| 11 | Q. | Well, approximately if you can estimate, how |
| 12 | | many cars could fit in between you and him as |
| 13 | | you were following him? |
| 14 | A. | Probably a car, maybe a car, I'm not sure. |
| 15 | | MS. LITSAS: Objection. |
| 16 | Q. | And you continued to follow him with your lights |
| 17 | | on? |
| 18 | A. | Sporadically putting them off and on. |
| 19 | Q. | He didn't stop? |
| 20 | A. | No. |
| 21 | Q. | What did he do next? |
| 22 | A. | He proceeded down Virginia Street towards |
| 23 | | Dudley, at which time I notified operations that |
| 24 | | we were -- he's refusing to stop. He's heading |

1      like he was stopping at Magnolia Street and to

2      pass the car?

3                 MS. LITSAS:  Objection.

4   A.  Approximately four blocks, five blocks.

5   Q.  Then what happened?

6   A.  He proceeded down Magnolia Street.  I continued

7      to notify operations of our location when he

8      took a right onto Wayland Street.

9   Q.  Okay, then what?

10  A.  He still refused to stop.  I still continued to

11     notify operations that he was refusing --

12  Q.  Approximately how much time --

13                MS. LITSAS:  Objection.  Can you let

14     her finish the answer, Andrew?

15  Q.  Approximately how much time had gone by from the

16     time you first began to follow him to this point

17     now where you're on Wayland Street and he still

18     hasn't stopped?

19                MS. LITSAS:  Objection.

20  A.  I don't know how much time.  Not a long time.

21     Probably minutes, but it seemed like forever.

22  Q.  Then what happened?

23  A.  I continued down Wayland Street.  I believe we

24     got to Howard Ave., he took a left towards

| | | |
|---|---|---|
| 1 | | struck, did you make any observations with |
| 2 | | respect to whether or not he withdrew his weapon |
| 3 | | from his holster? |
| 4 | A. | No, I did not make any observations. |
| 5 | Q. | Did you have a clear view of Officer Paillant as |
| 6 | | he was coming across Fayston Street? |
| 7 | | MS. LITSAS: Objection. |
| 8 | A. | I don't know what you mean by a clear view. I |
| 9 | | saw somebody crossing the street. |
| 10 | Q. | If in fact Officer Paillant had removed his |
| 11 | | weapon, okay, and held it, would you have been |
| 12 | | able to see it from that point from your vantage |
| 13 | | point? |
| 14 | | MS. LITSAS: Objection. |
| 15 | A. | I might have, I don't know. |
| 16 | Q. | But you don't know whether he withdrew his |
| 17 | | weapon or not? |
| 18 | A. | I don't. |
| 19 | Q. | And do you know -- you say you saw him making |
| 20 | | hand gestures, that was the first indication you |
| 21 | | had of him after you may have lost sight of him? |
| 22 | | MS. LITSAS: Objection. |
| 23 | A. | After he got struck -- |
| 24 | Q. | Right. |

```
 1   A.   -- I stopped the cruiser because simultaneously
 2        there were gunshots fired.  I stopped to see how
 3        Paillant was to make sure he was all right.  He
 4        made motioning gesture with his hand.
 5   Q.   And please describe the motions Officer Paillant
 6        made when you stopped to see whether or not he
 7        was okay?
 8   A.   He was like beckoning me to go after the car.
 9        That was what I thought he was saying.
10   Q.   Well, as you saw his hands doing that, okay, at
11        that point where you observed his hands doing
12        that, where, if you recall, was the white
13        Taurus?
14   A.   The white Taurus was proceeding down Fayston
15        Street.
16   Q.   And approximately how far away from your vehicle
17        and Officer Paillant was the white Taurus at the
18        point you saw him making the gestures with his
19        hands?
20             MS. LITSAS:  Objection.
21   A.   I don't know how far away.
22   Q.   Well, did you see it in front of you?
23   A.   I could see it on Fayston Street.  How many feet
24        it was or inches, I don't know.
```

```
 1   Q.   At the point where officer --
 2             MS. LITSAS:  I haven't finished
 3        talking, as the same objection as to Exhibit D
 4        as to the other ones, Exhibits A through D.
 5   Q.   Now, on this diagram, please place a little
 6        circle and a P at the point where you saw
 7        Officer Paillant struck, where Officer Paillant
 8        was where you saw him struck?
 9             MS. LITSAS:  Objection.
10   Q.   And please draw a box in the position that you
11        recollect it in for the white Taurus and label
12        that V-1 at the point that that white Taurus
13        struck Officer Paillant, the exact position of
14        the vehicle with respect to the streets?
15             MS. LITSAS:  Objection.
16   A.   What number is the suspect vehicle here, V-1?
17   Q.   Make it V-2 now.
18   A.   V-2, and the circle is Paillant?
19   Q.   Right.
20   A.   Right there.  That's a P, right?
21   Q.   Yes.  Put your vehicle also in the right
22        location with respect to -- and put the F in
23        there for consistency.
24             Now, did you, is that the point --
```

```
 1            strike that.  When in relation to the time that
 2            Officer Paillant was struck did you hear shots
 3            fired?
 4                 -  MS. LITSAS:  Objection.
 5     A.     Immediately.  It was like he got hit and bang,
 6            bang, bang, bang.
 7     Q.     Please place an S on the diagram in the area
 8            that corresponds to the rough location for which
 9            you believe you heard the shots fired?
10                    MS. LITSAS:  Objection.
11     A.     I couldn't tell you what area.  All I heard was
12            shots.
13     Q.     With respect to you're saying they were either
14            behind you or to the left?
15                    MS. LITSAS:  Objection.
16     A.     Put an S?
17     Q.     Well, may I see that?
18                    MR. STOCKWELL-ALPERT:  Please label
19            this E.
20            (Exhibit E marked for identification.)
21                    MS. LITSAS:  Again, I'll renew my
22            objection.
23     Q.     Now, please, with respect to Exhibit E, please
24            put a little box and an F where your vehicle was
```

```
 1                MS. LITSAS:  Objection.
 2      A.    One right after the other.  Bang, bang, bang,
 3            bang.  How much time is that?  I don't know.
 4      Q.    It's your testimony each shot was fired
 5            immediately after the one before it?
 6      A.    Yes.  It was a series of gunshots and I notified
 7            operations that we now had shots fired because
 8            it was bang, bang, bang, bang.
 9      Q.    And then now shots were fired came after you had
10            rounded the corner onto Fayston Street and saw
11            Officer Paillant down, correct?
12                MS. LITSAS:  Objection.
13      A.    Yes.
14                (Question read back as requested.)
15      Q.    Did you at any time make effort to determine
16            from what direction the shots were coming?
17      A.    At that time, no, I didn't.
18      Q.    Did you have any concern about being in the line
19            of fire of the shots?
20      A.    At that time, no, I didn't.
21      Q.    At any time, did you have any concern that you
22            were in the line of fire of the shots?
23      A.    After the fact.
24      Q.    What does that mean?
```

| | | |
|---|---|---|
| 1 | A. | After this all happened, I thought that if I |
| 2 | | hadn't stopped to see how Officer Paillant was, |
| 3 | | I would have been hit if I had continued after |
| 4 | | the car rather than stop to see how the officer |
| 5 | | was. |
| 6 | | MS. LITSAS: Objection. |
| 7 | | MR. STOCKWELL-ALPERT: You objected to |
| 8 | | her answer? |
| 9 | | MS. LITSAS: I was objecting to your |
| 10 | | question. |
| 11 | | MR. STOCKWELL-ALPERT: Can you read |
| 12 | | back the answer? |
| 13 | | (Answer read back as requested.) |
| 14 | Q. | Do I understand you to be saying that if you had |
| 15 | | continued traveling down Fayston Street instead |
| 16 | | of stopping for that period of time, that you |
| 17 | | think that you might have been in the line of |
| 18 | | fire in the bullets? |
| 19 | | MS. LITSAS: Objection. |
| 20 | A. | Say that again, please. |
| 21 | Q. | Do I understand you to be saying, is my |
| 22 | | understanding correct that looking back, you |
| 23 | | think if you hadn't stopped but continued |
| 24 | | traveling down Fayston Street at the time, that |

1    you might have been in the line of fire of the

2    bullets?

3                MS. LITSAS:  Objection.

4    A.   Officer Paillant got hit.  The shots were fired

5    as soon as he got hit.  And if I was still in

6    motion, I thought that I probably would have got

7    hit if I hadn't stopped.

8                He got hit; the shots were fired; my

9    cruiser was stopped, and I thought if I had

10    still been moving, I could have been hit.

11    Q.   How far behind the Taurus were you when you

12    heard the bullets?

13                MS. LITSAS:  Objection.

14    A.   I wasn't, I don't believe I was behind the

15    Taurus when I heard the bullets.

16    Q.   When you heard the first bullet fired, how far

17    behind the Taurus were you?

18                MS. LITSAS:  Objection.

19    A.   I really don't know.  I was at where Officer

20    Paillant was on the ground.

21    Q.   How long --

22                (Exhibit F marked for identification.)

23                (Question read back as requested.)

24                MS. LITSAS:  So there's still a

80

```
1              from what you observed that Officer Paillant's
2              life was threatened?
3                        MS. LITSAS:  Objection.
4    A.   I'm sorry, .say that question again.
5    Q.   Was there anything about the way the vehicle
6              struck Officer Paillant or any of the
7              observations that you made that caused you to
8              think that Officer Paillant's life was in
9              danger?
10                       MS. LITSAS:  Objection.
11   A.   Sure, the guy drove right at him.
12   Q.   After the guy hit him and he fell down, okay,
13             was there anything further about the situation
14             that caused you to think that Officer Paillant's
15             life may be in danger?
16   A.   Shots were being fired.  I had no idea who was
17             firing them.
18   Q.   So was it the shots that caused you to be
19             concerned for his life or was it the actions of
20             the motor vehicle?
21                       MS. LITSAS:  Objection.
22   A.   What's the question?  Was I more concerned his
23             life was in danger from the car or the guns or
24             the fires, the gunshots?
```

# EXHIBIT D

Volume:  1
Pages:  1 to 97
Exhibits:  None

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

C.A. No. 05-11803-MLW

SHENIA DANCY-STEWART as Administratrix
of the Estate of EVELINE BARROS-CEPEDA,
Plaintiff

vs.

THOMAS TAYLOR, JR., AND THE CITY OF
BOSTON,

Defendants

C O N F I D E N T I A L

**DEPOSITION of ROBERT CONNOLLY,**
a witness called on behalf of the
Plaintiff, pursuant to the applicable
provisions of the Federal Rules of Civil
Procedure, before Judith R. Sidel,
Professional Court Reporter and Notary
Public, in and for the Commonwealth of
Massachusetts, at the Office of Andrew
Stockwell-Alpert, 11 Beacon Street, Suite
220, Boston, Massachusetts 02108, on
Friday, February 1, 2008, commencing at
1:55 p.m.

*   *   *   *
WIDOMSKI REPORTING SERVICE
One Sunset Drive
Wakefield, Massachusetts 01880
(781) 246-0710

| | | |
|---|---|---|
| 1 | | MS. LITSAS: Objection. I will |
| 2 | | instruct him not to answer, because it |
| 3 | | goes into attorney/client communication. |
| 4 | | MR. STOCKWELL-ALPERT: That's |
| 5 | | what I thought. Thank you. |
| 6 | Q. | Without discussing whether anybody told |
| 7 | | you to -- strike that. Without making |
| 8 | | any reference to what any lawyer from the |
| 9 | | City of Boston may have discussed with |
| 10 | | you, is there any other reason, separate |
| 11 | | and apart from any conversations you may |
| 12 | | have had with the City of Boston, that |
| 13 | | you reviewed Rule 303? |
| 14 | | MS. LITSAS: Objection. |
| 15 | A. | No. |
| 16 | Q. | Please tell me what is your present |
| 17 | | understanding with regard to when it's |
| 18 | | appropriate to discharge a firearm at a |
| 19 | | moving vehicle? |
| 20 | | MS. LITSAS: Objection. |
| 21 | A. | There isn't. |
| 22 | Q. | Do I understand you to say it's never |
| 23 | | appropriate to shoot at a moving vehicle? |
| 24 | | MS. LITSAS: Objection. |

| | | |
|---|---|---|
| 1 | A. | It's not. |
| 2 | | MR. STOCKWELL-ALPERT: Off the |
| 3 | | record. |
| 4 | | - (Back on the record.) |
| 5 | Q. | Officer, it's possible that I'm not |
| 6 | | picking up a queue properly here, and I |
| 7 | | don't really want to get myself jammed |
| 8 | | up here, okay, in the future. I would |
| 9 | | point out to you that what I believe that |
| 10 | | I'm seeing is that you're periodically |
| 11 | | looking over at counsel when I ask you |
| 12 | | a question, and I would like to just |
| 13 | | reinstruct you that if counsel objects, |
| 14 | | you're still obligated to answer the |
| 15 | | question. |
| 16 | A. | I am. |
| 17 | Q. | And if, in fact, you are looking |
| 18 | | over at her, okay, I don't want to be |
| 19 | | focusing on that. I want you to hear |
| 20 | | the question, and I want you to answer |
| 21 | | the question. And if there is an |
| 22 | | objection, please go ahead and just |
| 23 | | answer the question. Can you do that? |
| 24 | A. | I can do that. |

| | | |
|---|---|---|
| 1 | | anything that counsel was doing anything |
| 2 | | with respect to anything that the officer |
| 3 | | was doing. |
| 4 | Q. | Just so my understanding is correct here, |
| 5 | | did you indicate that presently your |
| 6 | | understanding is there is no circumstance |
| 7 | | that warrants discharging your firearm at |
| 8 | | a moving vehicle? |
| 9 | | MS. LITSAS:  Objection. |
| 10 | A. | Correct. |
| 11 | Q. | Now, to your understanding, was there a |
| 12 | | different policy or rule with expect to |
| 13 | | when you could discharge a firearm at |
| 14 | | a moving vehicle at the time of the |
| 15 | | incident that we're here in this office |
| 16 | | here today? |
| 17 | | MS. LITSAS:  Objection. |
| 18 | A. | There was. |
| 19 | Q. | And do you have an understanding as to |
| 20 | | how the rule -- your own understanding |
| 21 | | as to how the rule changed after this |
| 22 | | incident between -- before the incident |
| 23 | | of today? |
| 24 | | MS. LITSAS:  Objection. |

```
1    A.   Do I have an understanding on why it
2         changed?
3    Q.   No, on how it changed, the way in which
4         it changed.
5    A.   Regarding the Rule 303?
6    Q.   Yes.
7    A.   Before you could.  Now you can't.
8    Q.   And before when you could, do you have an
9         understanding of what the circumstances
10        were that permitted the discharge of a
11        firearm at a moving vehicle?
12                    MS. LITSAS:  Objection.
13   A.   If I can remember it correctly, it is
14        when yourself, or somebody else is going
15        to be coming in contact with the moving
16        vehicle.
17   Q.   Now, was it your understanding that
18        there are limitations imposed on
19        that particular provision?
20   A.   There were.
21   Q.   And what were the limitations, to your
22        understanding?
23   A.   I believe if there was a crowd, if people
24        were nearby, ricocheting bullets -- done.
```

```
 1             violation?
 2    A.   Civil.
 3    Q.   And what was your purpose in following
 4         the vehicle after it went through the red
 5         light?
 6    A.   To stop it, and give it a ticket.
 7    Q.   In connection with that, did your partner
 8         activate the red light or the overhead
 9         light?
10    A.   They were already on.
11    Q.   And why were they on prior to the vehicle
12         going through the red light?
13    A.   Oh, I'm sorry.  Right when they went
14         through the light, Debbie activated.
15    Q.   What was the approximate rate of speed of
16         the vehicle as you were following it?
17    A.   It was not that fast.
18    Q.   And if I said facing on Dunkeld Street,
19         would the names of those streets mean
20         anything to you today, as we're sitting
21         here at this deposition?
22                   MS. LITSAS:  Objection.
23    A.   Those streets I remember.
24    Q.   As we sit here today, do you have any
```

| | | |
|---|---|---|
| 1 | | knowledge or recollection as to where -- |
| 2 | | strike that -- as to what streets or |
| 3 | | intersections the shooting occurred? |
| 4 | A. | I do. |
| 5 | Q. | What streets? |
| 6 | A. | It was on Dunkeld and Fayston. |
| 7 | Q. | And your partner and you in the vehicle |
| 8 | | continued to follow the white Taurus for |
| 9 | | some period of time, right? |
| 10 | A. | We did. |
| 11 | Q. | And would it be fair to say that you made |
| 12 | | various turns along the way on different |
| 13 | | streets? |
| 14 | A. | We did. |
| 15 | Q. | During the course of time that you |
| 16 | | were following that vehicle, do you |
| 17 | | recollect whether it turned onto Fayston |
| 18 | | Street at some point? |
| 19 | A. | It did. |
| 20 | Q. | But prior to it turning onto Fayston |
| 21 | | Street, do you recollect whether or not |
| 22 | | it changed its rate of speed at all? |
| 23 | A. | I don't recall. |
| 24 | Q. | Well, do you recollect whether it went |

| 1 | | faster at all? |
|---|---|---|
| 2 | A. | It was -- it didn't. |
| 3 | Q. | Now, when it turned onto Fayston Street, |
| 4 | | what did your partner do with respect to |
| 5 | | the vehicle? |
| 6 | A. | From Dunkeld onto Fayston? |
| 7 | Q. | I'm sorry, when it turned onto Dunkeld |
| 8 | | Street, what did your partner do? |
| 9 | A. | We were still following the car. |
| 10 | Q. | And it was still proceeding at not too |
| 11 | | fast a rate of speed, right? |
| 12 | | MS. LITSAS: Objection. |
| 13 | Q. | Was it still proceeding at the same rate |
| 14 | | of speed it had been? |
| 15 | | MS. LITSAS: Objection. |
| 16 | A. | I believe so. |
| 17 | Q. | Putting aside familiarity with that |
| 18 | | particular set of intersections and |
| 19 | | streets, do you know if there are |
| 20 | | different speed limits for different |
| 21 | | types of neighborhoods, such as a |
| 22 | | residential neighborhood versus more |
| 23 | | of like a business district or highway? |
| 24 | A. | There are. |

| | | |
|---|---|---|
| 1 | Q. | Does that vary depending on how settled, |
| 2 | | or how populated, or how dense the |
| 3 | | buildings are in the area? |
| 4 | A. | Yes. |
| 5 | Q. | What is your understanding of what the |
| 6 | | speed limit would be in an area, such as |
| 7 | | Fayston and Dunkeld? |
| 8 | | MS. LITSAS: Objection. |
| 9 | A. | I don't know. |
| 10 | Q. | But in any event, at no point did that |
| 11 | | vehicle exceed at that particular point |
| 12 | | what you considered to be the proper |
| 13 | | speed limit, right -- |
| 14 | | MS. LITSAS: Objection. |
| 15 | Q. | Up to the point you got it to Dunkeld |
| 16 | | Street? |
| 17 | | MS. LITSAS: Objection. |
| 18 | A. | At the time on Dunkeld Street it was |
| 19 | | going the same speed. |
| 20 | Q. | Right. That's what I was asking. |
| 21 | A. | But then it was -- |
| 22 | Q. | Don't -- |
| 23 | | MS. LITSAS: Just let him |
| 24 | | finish. He should be able to finish his |

| | | |
|---|---|---|
| 1 | | answers. You're stopping him, and he |
| 2 | | should be able to finish. |
| 3 | A. | At the time we're on Dunkeld Street, it |
| 4 | | was keeping the same speed. As we got |
| 5 | | to the top, and then Tommy and Michael |
| 6 | | appeared, it went fast as it was turning. |
| 7 | Q. | Now, let's try to break that down |
| 8 | | second by second, if we can. |
| 9 | A. | Okay. |
| 10 | Q. | When you got onto Dunkeld Street, |
| 11 | | up until that point the vehicle was |
| 12 | | traveling approximately the same rate |
| 13 | | of speed? |
| 14 | A. | Yes. |
| 15 | Q. | When it turned onto Dunkeld Street, did |
| 16 | | you turn onto Dunkeld Street after it? |
| 17 | A. | Yes, we did. |
| 18 | Q. | Did you maintain more or less the same |
| 19 | | distance behind the vehicle throughout |
| 20 | | all the time you were following it up |
| 21 | | until the point it turned onto Dunkeld |
| 22 | | Street? |
| 23 | | MS. LITSAS: Objection. |
| 24 | A. | We did. |

# EXHIBIT E

1

1          VOL. I
            PAGES 1-197
2          EXHIBITS 1-3

3        IN THE UNITED STATES DISTRICT COURT
          FOR THE DISTRICT OF MASSACHUSETTS
4
   Civil Action No. 05-11803-MLW
5
   _____
   SHENIA DANCY-STEWART
6  as Administratrix of the Estate of
   EVELINE BARROS-CEPEDA
7          Plaintiff
   vs.
8
   THOMAS TAYLOR, JR. AND THE
9  CITY OF BOSTON
            Defendants
10 _____

11        C O N F I D E N T I A L

12        DEPOSITION OF **MICHAEL PAILLANT**, taken on
   behalf of the plaintiff, pursuant to the
13 applicable provisions of the Federal Rules of
   Civil Procedure, before Irma Widomski, a
14 Registered Merit Reporter, and Certified
   Shorthand Reporter, No. 131593 in and for the
15 Commonwealth of Massachusetts, at the Law
   Offices of Andrew Stockwell-Alpert, 11 Beacon
16 Street, Suite 1210, Boston, Massachusetts, on,
   Thursday, January 31, 2008, commencing at 10:00
17 a.m.

18

19

20

21

22        WIDOMSKI COURT REPORTING ASSOCIATES
            ONE SUNSET DRIVE
23        WAKEFIELD, MASSACHUSETTS 01880
            (781) 246-0710

24

57

```
 1    A.   Rules and regulations for the Boston police

 2         department.

 3    Q.   Concerning the discharge of firearms?

 4    A.   Yes, there's updates on that, yes.

 5    Q.   What can you tell us about the rules and.

 6         regulations concerning the discharge of firearms

 7         of the Boston Police Department?

 8    A.   They were updated in 2002.

 9    Q.   From what to what?

10    A.   Excuse me.

11    Q.   From what to what?

12              MS. LITSAS:  Objection.

13    A.   What do you mean?

14    Q.   Do you understand the question?

15    A.   From what?

16    Q.   You said they were updated?

17    A.   Yes.

18    Q.   When you say updated, would it be fair to say

19         that they were amended in some way or revised in

20         some way?

21    A.   Yes.

22    Q.   What were they amended or revised from?

23              MS. LITSAS:  Objection.

24    A.   It was in regards to basically incidents
```

1          involving shooting at moving motor vehicles.

2     Q.   And what was the policy before it was revised in

3          2002 concerning moving vehicles?

4     A.   Basically it was allowed and after that, it

5          changed.

6     Q.   So when you say it was allowed, are you saying

7          it was okay to shoot at moving vehicles before

8          it was changed?

9                   MS. LITSAS:  Objection.

10    Q.   Is that what you said?

11    A.   I'm saying that -- I'm saying that it did have

12         provisions in there that told you when you could

13         and when you couldn't.

14    Q.   Could you tell us what those provisions were?

15    A.   Basically where there was a threat to the

16         officer, you was allowed to do so.

17    Q.   Under any other circumstances could you tell us

18         when it was a permissible for a police officer

19         to shoot at a moving vehicle other than when it

20         presented a threat?

21    A.   Of threat of bodily, death or bodily harm to the

22         officer or to others.

23    Q.   Under any other circumstances, could you explain

24         to us, please, when was it permissible for a

```
 1              Boston police officer to shoot at a moving

 2              vehicle other than what- you have told us?

 3      A.      That's the gist of it right there.

 4      Q.      Then you say it was changed?

 5      A.      That's correct.

 6      Q.      Changed to what?

 7      A.      It was changed to -- the bill changed that the

 8              vehicle was not, the vehicle couldn't be a

 9              specific, couldn't be the threat.  They would

10              advise you the vehicle wouldn't be a threat.

11              That was the main change.

12      Q.      From the time that you became a police officer

13              in 1995 to the present date, Officer, could you

14              explain to us, please, what specific training

15              have you had concerning discharging your firearm

16              at moving vehicles?

17                      MS. LITSAS:   Objection.

18      A.      Basically, a review of the rules and regulations

19              which discussed that.

20      Q.      So other than the review of the rules and

21              regulations, what other training have you had

22              concerning discharging your weapon at moving

23              vehicles?

24      A.      That's basically it.
```

| | | |
|---|---|---|
| - 1 | A. | Yes. |
| 2 | Q. | And that was your right hand or your left hand? |
| 3 | A. | My left hand. |
| 4 | Q. | What did you do with-your right hand, if |
| 5 | | anything? |
| 6 | A. | Nothing. |
| 7 | Q. | Tell us what happened after you raised your left |
| 8 | | hand? |
| 9 | A. | The vehicle continued towards the top of the |
| 10 | | street.  I then withdrew my firearm. |
| 11 | .Q. | When you withdrew your firearm, how close was |
| 12 | | the vehicle to you? |
| 13 | A. | Halfway up the street. |
| 14 | Q. | Halfway up Dunkeld Street? |
| 15 | A. | Yes. |
| 16 | Q. | Where were you on Dunkeld Street when you |
| 17 | | withdrew your weapon? |
| 18 | A. | Dunkeld and Fayston Street. |
| 19 | Q. | You were at the intersection of Dunkeld and |
| 20 | | Fayston Streets? |
| 21 | A. | Yes. |
| 22 | Q. | Your cruiser was directly across from you, where |
| 23 | | you were standing at the intersection of Dunkeld |
| 24 | | and Fayston Streets? |

130

| | | |
|---|---|---|
| 1 | | MS. LITSAS: Objection. |
| 2 | A. | I was too low to do that. |
| 3 | Q. | Where was your head in relationship to the |
| 4 | | windows of the vehicle as you were crouched down |
| 5 | | on the side of the vehicle? |
| 6 | A. | It was below the -- below the window sill. |
| 7 | Q. | How long were you crouched down on the side of |
| 8 | | the window before the vehicle continued moving |
| 9 | | forward? |
| 10 | A. | A couple seconds. |
| 11 | Q. | Where was the vehicle after you rolled over the |
| 12 | | hood? |
| 13 | A. | Still going straight about to turn. That wasn't |
| 14 | | my concentration. |
| 15 | Q. | And where was the vehicle as you, as your left |
| 16 | | elbow struck the door, front door and fender of |
| 17 | | the vehicle? |
| 18 | A. | Where was what? |
| 19 | Q. | Where was the vehicle when -- after your elbow |
| 20 | | struck the door and the fender with the vehicle? |
| 21 | A. | In the process of turning. |
| 22 | Q. | How much of the vehicle was on Dunkeld Street |
| 23 | | and how much of the vehicle was on Fayston |
| 24 | | Street after your elbow hit the side of the |

156

| | | |
|---|---|---|
| 1 | | front of me, so that's a negative. |
| 2 | Q. | How long is Fayston Street? You said a couple |
| 3 | | of blocks? |
| 4 | A. | Yes. It's real long. |
| 5 | Q. | Fayston Street is real long? |
| 6 | A. | Yes. |
| 7 | Q. | How long is Perth Street? |
| 8 | A. | It's short. It's about the length of Dunkeld |
| 9 | | Street. |
| 10 | Q. | Which is how long? |
| 11 | A. | I would have to guess. |
| 12 | Q. | You told us before that Dunkeld Street was about |
| 13 | | 200 feet? |
| 14 | A. | That's what I said before, yes. |
| 15 | Q. | Is Perth Street about the same length as Dunkeld |
| 16 | | Street? |
| 17 | A. | Well, they are adjacent to each other so my |
| 18 | | guess, they would be roughly around the same |
| 19 | | length. |
| 20 | Q. | When the car went to Perth Street, did you make |
| 21 | | any other observations of the vehicle or the |
| 22 | | occupants of that vehicle? |
| 23 | A. | No. |
| 24 | Q. | Did you at any point in time see the occupants |

| | | |
|---|---|---|
| 1 | | exit the vehicle? |
| 2 | A. | Not on Perth Street. |
| 3 | Q. | Where did you make that observation? |
| 4 | A. | On Quincy Street. |
| 5 | Q. | Tell us what you saw. |
| 6 | A. | I saw three occupants exit the vehicle. |
| 7 | Q. | And what happened after you saw the three |
| 8 | | occupants exit the vehicle? |
| 9 | A. | They ran to adjacent yards and then over a |
| 10 | | fence. |
| 11 | Q. | Were these males or females? |
| 12 | A. | It appeared to be males. |
| 13 | Q. | Black males, white males? |
| 14 | A. | They appeared to be dark-skinned males. |
| 15 | Q. | What kind of clothes were they wearing? |
| 16 | A. | They were just dark clothing.  I don't have any |
| 17 | | specifics on these individuals. |
| 18 | Q. | Did you continue walking down Perth Street after |
| 19 | | you saw these vehicles exit the vehicle on |
| 20 | | Quincy? |
| 21 | A. | I continued hobbling down Perth Street, yes. |
| 22 | Q. | As you were walking down Perth Street, or |
| 23 | | hobbling down Perth Street, did you see the |
| 24 | | cruiser, the original cruiser that you saw with |

# EXHIBIT F

Page 1

VOL. I

PAGES 1-100

EXHIBITS -1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

Civil Action No. 05-11803-MLW

SHENIA DANCY-STEWART
as Administratrix of the Estate of
EVELINE BARROS-CEPEDA
     Plaintiff
vs.
THOMAS TAYLOR, JR., AND THE
CITY OF BOSTON
     Defendants

C O N F I D E N T I A L

     DEPOSITION OF LUIS A. CARVALHO, taken
on behalf of the defendant, pursuant to the
applicable provisions of the Federal Rules of
Civil Procedure, before Irma Widomski, a
Registered Merit Reporter, and Certified
Shorthand Reporter, No. 131593 in and for the
Commonwealth of Massachusetts, at the Law
Department, City Hall, Boston, Massachusetts, on
Wednesday, January 16, 2008, commencing at 2:20
p.m.

ORIGINAL

```
1        car was on Dunkeld Street, did you ever see
2        a member of the Boston Police Department?
3     A. On Dunkeld Street?
4     Q. Yes.
5     A. Before we passed the cruiser or while we was
6        on Dunkeld?
7     Q. While you were on Dunkeld Street, did you
8        ever see a member of the Boston Police
9        Department?
10    A. No, I don't recall.
11    Q. What were you doing while you were in the
12       car on Dunkeld Street?
13    A. I was just sitting.  I was ducked down just
14       sitting slouched down.
15    Q. Why were you slouched down?
16    A. That's how I sit in the car basically.
17    Q. What was Maria DeRosa doing in the car?
18    A. I can't tell you.
19    Q. You were in the back seat with her, right?
20    A. Yes.  I was near the passenger's side.
21    Q. What was Eveline Barros-Cepeda doing while
22       you were on Dunkeld Street?
23    A. I couldn't tell you.
24    Q. You were sitting next to her?
```

G&M COURT REPORTERS, LTD.
1.800.655.3663 - www.gmcourtreporters.com

# EXHIBIT G

1

1                           VOL. I
                           PAGES 1-155
2                         EXHIBITS A-F

3         IN THE UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF MASSACHUSETTS
4
       Civil Action No. 05-11803-MLW
5
       _____
       SHENIA DANCY-STEWART
6      as Administratrix of the Estate of
       EVELINE BARROS-CEPEDA
7           Plaintiff
       vs.
8
       THOMAS TAYLOR, JR. AND THE
9      CITY OF BOSTON
            Defendants
10     _____

11          C O N F I D E N T I A L

12          VIDEOTAPED DEPOSITION OF **THOMAS TAYLOR,
       **JR.**, taken on behalf of the plaintiff, pursuant
13     to the applicable provisions of the Federal
       Rules of Civil Procedure, before Irma Widomski,
14     a Registered Merit Reporter, and Certified
       Shorthand Reporter, No. 131593 in and for the
15     Commonwealth of Massachusetts, at the Law
       Offices of Andrew Stockwell-Alpert, 11 Beacon
16     Street, Suite 1210, Boston, Massachusetts, on,
       Monday, February 4, 2008, commencing at 10:00
17     a.m.

18

19

20

21
            WIDOMSKI COURT REPORTING ASSOCIATES
22                 ONE SUNSET DRIVE
            WAKEFIELD, MASSACHUSETTS 01880
23                  (781) 246-0710

24

```
 1                    THE VIDEOGRAPHER:  The time is 11:13.
 2         We are off the record.
 3                    (Recess.)
 4                    THE VIDEOGRAPHER:  The time is 11:20.
 5         We are back on the record.
 6                    MR. STOCKWELL-ALPERT:  May I have this
 7         marked as Exhibit A?
 8                    (Exhibit A marked for identification.)
 9    Q.   Officer Taylor, I have marked a document as
10         Exhibit A.  The title of the document is the
11         subject Rule 303, Use of Deadly Force.  I'm
12         going to ask you to take a look at Exhibit A.
13         I'm going to ask you particularly to look at
14         paragraph or section eight of Exhibit A, and
15         after you have taken a good look at it, I'm
16         going to ask you some questions.
17    A.   Okay.
18    Q.   Do you recognize this to be the policy under
19         Rule 303 that existed at the time of this
20         incident?
21                    MS. LITSAS:  Just one objection,
22         Andrew.  I think that this is not the updated
23         one.
24                    MR. STOCKWELL-ALPERT:  I'm not looking
```

29

1       for the updated one.

2                  MS. LITSAS:  I believe that this was

3            in 1997.

4                  .        I don't think this was the one that.

5            was in effect in 2002.

6                  MR. STOCKWELL-ALPERT:  I think it was,

7            but we can dispute that.

8    Q.    Officer, I would like you to look at that, which

9          is my question.  I would like to ask you if your

10         understanding is that this was the policy as you

11         recollect it that was in effect particularly

12         with respect to section eight which is the only

13         section that I'm really concerned about here?

14   A.    Yes.

15   Q.    And that would be the section eight that you

16         recollect as it was in effect in 2002?

17                 MS. LITSAS:  Actually, I would object,

18           Andrew, because that is not the rule that was in

19           effect in 2002.  The provision of section eight

20           that is presented in that document is not the

21           provision that was in effect in 2000.

22   Q.    Is this your understanding of the rule as it

23         existed and the substance of the rule that you

24         were under at the time in 2002?

                         .

1   A.   It appears to be, yes.

2   Q.   Now, with that in mind --

3                MS. LITSAS:  Again, I object.  I move

4        to strike the answer because the section eight

5        that is provided in that document does not

6        contain the full substance of the rule of

7        section eight that was in effect at the time of

8        the incident in 2002.  There are several

9        sentences that are not included in section eight

10       that is included in, that are missing from

11       Exhibit A.

12  Q.   Well, if you're looking at a document that

13       differs from that that you have in mind, I would

14       like to see what you're looking at and we can go

15       by that one, but in the meantime, the office

16       says this is the rule -- see rental -- in

17       substance at that time and that's what I'm

18       willing to go by.

19                MS. LITSAS:  Here, here we are.

20                MR. STOCKWELL-ALPERT:  Okay.  I think

21       we need to go off the record briefly.

22                THE VIDEOGRAPHER:  The time is 11:24,

23       we are off the record.

24                MR. STOCKWELL-ALPERT:  We're going to

| | | |
|---|---|---|
| 1 | | take a five-minute break. |
| 2 | | (Exhibit B marked for identification. |
| 3 | | THE VIDEOGRAPHER: The time is 11:30. |
| 4 | | We are back on the record. |
| 5 | Q. | Now, I'm going to direct your attention to a |
| 6 | | document marked as Exhibit B which is Use of |
| 7 | | Deadly Force with the date on the upper right of |
| 8 | | August 3, 2000. I'm going to ask you to examine |
| 9 | | that document and particularly draw your |
| 10 | | attention to section eight? |
| 11 | A. | Okay. |
| 12 | Q. | Are you aware from having looked at Exhibit A |
| 13 | | and looked at Exhibit B, of any change in the |
| 14 | | language in paragraph -- in section eight? |
| 15 | A. | Yes. |
| 16 | Q. | So, looking at section eight, what is the title |
| 17 | | on that section, please, could you read that out |
| 18 | | loud? |
| 19 | | MS. LITSAS: Andrew, which? |
| 20 | Q. | Exhibit B. |
| 21 | A. | Section eight, moving fleeing vehicles. |
| 22 | Q. | Would you agree with me that section eight is a |
| 23 | | provision that governs when it's appropriate or |
| 24 | | not appropriate to discharge a firearm at a |

| | | |
|---|---|---|
| 1 | | moving or fleeing vehicle? |
| 2 | | MS. LITSAS: Objection. |
| 3 | A. | I would say it was guidelines. |
| 4 | Q. | Can you, please, read the first paragraph of |
| 5 | | section eight? |
| 6 | A. | Firearms shall not be discharged from or at a |
| 7 | | moving or fleeing vehicle unless the officer or |
| 8 | | another person is currently being threatened |
| 9 | | with deadly force by an occupant of the target |
| 10 | | vehicle. For purposes of this section, the |
| 11 | | moving vehicle itself shall not constitute the |
| 12 | | threatened use of deadly force unless there are |
| 13 | | no reasonable or apparent means of escape. |
| 14 | | Therefore, officers shall move out of the path |
| 15 | | of any oncoming vehicle instead of discharging a |
| 16 | | firearm at it, or at any of its occupants unless |
| 17 | | there are no reasonable or apparent means of |
| 18 | | escape. |
| 19 | | Do you want me to continue? |
| 20 | Q. | No, that's fine. Thank you. Please continue |
| 21 | | reading the section. |
| 22 | A. | Okay. The above prohibition exists for two |
| 23 | | reasons. The probability that bullets will |
| 24 | | ricochet and cause injury to innocent persons, |

1    or B, the probability that the vehicle will

2    crash and cause injury to innocent persons if

3    the bullets do not ricochet but disable the

4    operator.

5  Q. Would you say that the criteria that existed

6    after 2000, August 3, under which an officer was

7    permitted to discharge a firearm at a moving

8    vehicle had gotten more strict than they were

9    before then?

10           MS. LITSAS:  Objection.

11  A.  No.

12  Q. Did the circumstances under which an officer

13    could discharge a firearm at a moving vehicle

14    change in any way to your knowledge -- to your

15    understanding as a result of the language in

16    this section eight?

17           MS. LITSAS:  Objection.

18  A.  Change when?

19  Q. Well, wouldn't it be fair to say that the deadly

20    force being used had to come from something

21    besides the moving vehicle itself under this

22    rule and that wasn't the case previously?

23           MS. LITSAS:  Objection.

24  A.  From what I understand, yes.

1          investigation by the homicide unit, did you --
2          strike that.
3                    Could you, please, mark both of these
4          documents as Exhibit C, please collectively.
5          Maybe we should make it C and D.
6          (Exhibits C-D marked for identification.)
7     Q.   What's the next thing that drew your
8          attention -- strike that.
9                    Why did you draw your gun when you saw
10         Officer Paillant draw his gun?
11    A.   That's what I'm trained to do.
12    Q.   For what reason?
13    A.   He's a trained officer with the same training
14         I've got.  If he felt it necessary to pull his
15         gun out, then I should pull mine out and be
16         ready.
17    Q.   Up until that point, you -- had you made any
18         observations of anything that would cause you to
19         pull your gun out if he hadn't pulled his gun
20         out?
21                   MS. LITSAS:  Objection.
22    A.   No.
23    Q.   What's the next thing that happened?  By that I
24         mean the next second in time?  We are going to

| 1 | | take this second by second. The very next thing |
|---|---|---|
| 2 | | that happened? |
| 3 | | MS. LITSAS: Objection. |
| 4 | A. | I couldn't tell you second by second. |
| 5 | Q. | What's the next thing that happened? |
| 6 | A. | This all unfolded rather quickly. |
| 7 | Q. | What is the next thing that happened? |
| 8 | A. | After I stepped in front of Ms. Cummings and |
| 9 | | told her to stay and pulled my gun out, I saw |
| 10 | | the white car come up Dunkeld and strike Officer |
| 11 | | Paillant as he was trying to move to his left. |
| 12 | Q. | How soon after you pulled your gun out did you |
| 13 | | first see the white car? |
| 14 | A. | It seemed almost as soon as I did. |
| 15 | Q. | And from what direction was the white car |
| 16 | | coming? |
| 17 | A. | It was coming up Dunkeld on to, up to Fayston. |
| 18 | Q. | Did you change your position at all on Fayston |
| 19 | | Street during any of the time that you were |
| 20 | | observing the white car coming down Dunkeld |
| 21 | | Street towards Officer Paillant? |
| 22 | A. | I didn't see it coming towards him. I saw it |
| 23 | | hitting him. |
| 24 | Q. | At any time prior to your seeing the car hit |

98

1    A.    Yes.

2    Q.    And that's when you started shooting, right?

3                MS. LITSAS:  Objection.

4    A.    That's when I lost sight of him.  I raised my

5          arm to shoot, and I could see Mr. Nicholas in

6          the cruiser.

7                MS. LITSAS:  I would ask that you let

8          him finish his answer.

9    A.    I saw Mr. Nicholas, as my arm is raised and I

10         stepped from the parked cars to the street and I

11         started -- I took a breath.

12   Q.    Okay.  Time to take a break.

13   A.    I took a breath.  And I had to aim, I took a

14         breath, and I asked God to be with me.

15   Q.    Yes.

16   A.    And I started shooting.

17   Q.    Let's take a break.

18                THE VIDEOGRAPHER:  The time is 2:23.

19         We're off the record.

20                (Recess.)

21                THE VIDEOGRAPHER:  The time is 2:30.

22         We are back on the record.

23   Q.    Could you read back the last answer, please?

24         (Answer read back as requested.)

100

1    Q.    That's what I was trying to ask.  And how

2          soon --

3                    MS. LITSAS:  Objection.

4    Q.    After you saw his body strike the hood, how soon

5          after that did you lose sight of him?

6    A.    I don't know.

7    Q.    Was it a second?  Was it two seconds?

8    A.    I don't know.  It was quick.

9    Q.    Was it less than five seconds?

10                   MS. LITSAS:  Objection.

11   A.    I just know it was fast.

12   Q.    And was it simultaneously with your losing sight

13         of him that you began -- that you prayed to God

14         and started to shoot?

15                   MS. LITSAS:  Objection.

16   A.    When I lost sight?

17   Q.    Yes.

18   A.    I raised my arm.

19   Q.    Right.

20   A.    I could see Mr. Nicholas, I stepped from the

21         parked cars, and that's when I started shooting.

22   Q.    When you started shooting, you were looking at

23         the vehicle, right?

24                   MS. LITSAS:  Objection.

|     |       |                                                    |
|-----|-------|----------------------------------------------------|
| 1   |       | pray to God and shoot at the vehicle and speak     |
| 2   |       | to Mr. Nicholas?                                   |
| 3   |       | MS. LITSAS:  Objection.                            |
| 4   | A.    | I saw Mr. Nicholas --                              |
| 5   | Q.    | Let him answer, please.                            |
| 6   | A.    | I saw Mr. Nicholas just after I raised my arm, I   |
| 7   |       | was going to shoot.                                |
| 8   | Q.    | Yes.                                               |
| 9   | A.    | I saw him in the back of the cruiser and I saw     |
| 10  |       | his head moving around.                            |
| 11  | Q.    | Yes.                                               |
| 12  | A.    | That's when I stepped from where I was in the      |
| 13  |       | line of the parked cars, that's when I stepped     |
| 14  |       | to the right more into the street but still kind   |
| 15  |       | of tight against the parked cars.  That's when I   |
| 16  |       | took a breath, prayed, and shot.                   |
| 17  | Q.    | Do you recollect other than -- you know who        |
| 18  |       | other than -- that you told at any time after      |
| 19  |       | 2002 that you saw Mr. Nicholas in the vehicle      |
| 20  |       | prior to praying to God and shooting?              |
| 21  |       | MS. LITSAS:  Objection.                            |
| 22  | A.    | I'm sorry.  Can you repeat that?                   |
| 23  | Q.    | Yes.  Do you recollect telling anybody else at     |
| 24  |       | any time with the exceptions that we've            |

108

| | | |
|---|---|---|
| 1 | Q. | Yes, I do. |
| 2 | A. | Okay.  Could I aim where? |
| 3 | Q. | At the inside of the vehicle?  I'll strike the |
| 4 | | question. |
| 5 | | MS. LITSAS:  Objection. |
| 6 | Q. | You never saw -- |
| 7 | | MS. LITSAS:  Andrew, I will ask that |
| 8 | | he sit down unless you're going to ask him to do |
| 9 | | any other physical demonstrations. |
| 10 | | MR. STOCKWELL-ALPERT:  Okay, but I may |
| 11 | | ask him to stand again in time. |
| 12 | | MS. LITSAS:  But to the extent while |
| 13 | | you're questioning him while he's standing. |
| 14 | Q. | Okay.  You can sit down but I may ask you to get |
| 15 | | up in a second. |
| 16 | | MS. LITSAS:  Thank you. |
| 17 | Q. | You had no idea, you hadn't seen any driver of |
| 18 | | the vehicle at any point, had you? |
| 19 | A. | No. |
| 20 | Q. | You hadn't seen any passengers in the vehicle at |
| 21 | | any point, had you? |
| 22 | A. | No, I did not. |
| 23 | Q. | You didn't know how many people were in the |
| 24 | | vehicle, right? |

| 1  | A. | No. |
|----|----|-----|
| 2  | Q. | You didn't know anything about the number or |
| 3  |    | nature of the occupants in the vehicle, did you? |
| 4  | A. | No. |
| 5  | Q. | And you had never received any training in other |
| 6  |    | methods of stopping a moving vehicle? |
| 7  |    | MS. LITSAS: Objection. |
| 8  | Q. | Up to that point, right? |
| 9  | A. | Can you rephrase that? |
| 10 | Q. | You had never received any training with regard |
| 11 |    | to methods of stopping a moving vehicle in the |
| 12 |    | use of a firearm, right? |
| 13 |    | MS. LITSAS: Objection. |
| 14 | A. | No. |
| 15 | Q. | So this was your split second decision that you |
| 16 |    | made about how you thought it was appropriate to |
| 17 |    | stop this vehicle under the circumstances, |
| 18 |    | right? |
| 19 |    | MS. LITSAS: Objection. |
| 20 | A. | It was the only decision I had. |
| 21 | Q. | And it was very important to you to stop this |
| 22 |    | vehicle, right? |
| 23 |    | MS. LITSAS: Objection. |
| 24 | A. | I would say it was important to save a life. |

| 1 | Q. | Now, prior to stepping out into the street, and |

1   Q.   Now, prior to stepping out into the street, and
2        praying to God and aiming your gun and shooting
3        it, you never once called out to your partner,
4        did you? -
5                     MS. LITSAS:  Objection.
6   A.   I don't remember.
7   Q.   Do you remember at any point, anybody other than
8        the designated people that we know that we're
9        not supposed to ask you about that you ever --
10       that you called out to your partner?
11                    MS. LITSAS:  Objection.
12  A.   I'm sorry.  Can you ask that again?
13  Q.   Did you ever tell anybody in connection with any
14       investigation at any time that you made any
15       effort to call out to your partner before
16       shooting?
17                    MS. LITSAS:  Objection.
18  A.   No, no.
19  Q.   Did you attempt to get your partner's attention
20       through the use of your walkie-talkie or
21       communication equipment?
22  A.   At what time?
23  Q.   Prior to your determination and prior to your
24       deciding to shoot into the vehicle?

```
 1   A.   Did I attempt to get his attention on the
 2        walkie-talkie?
 3   Q.   Or other police communication?  Strike that.
 4             Do you have any means -- strike that.
 5             Did you have any means of
 6        communicating through any communication
 7        equipment that was on your person with your
 8        partner at the time you shot at the vehicle?
 9   A.   Yes.
10   Q.   Did you make any attempt to try to contact your
11        partner on that communication equipment prior to
12        shooting into the vehicle?
13             MS. LITSAS:  Objection.
14   A.   No.
15   Q.   Did you make any -- do you have any or did you
16        have at that time, any equipment on your person
17        with which you could communicate with your
18        partner if you wanted to?
19             MS. LITSAS:  Objection.
20   A.   Yes.
21   Q.   What was that equipment?
22   A.   That would be my portable radio.  You may call
23        it a walkie-talkie.
24   Q.   You might use that, for example, if the two of
```

| | | |
|---|---|---|
| 1 | | you were involved in different locations doing |
| 2 | · | different things and wanted to talk back and |
| 3 | | forth with each other? |
| 4 | A. | Yes. |
| 5 | Q. | So that would be the same equipment that you |
| 6 | | could use if you wanted to say, hey, is |
| 7 | | everything okay, for example? |
| 8 | | MS. LITSAS: Objection. |
| 9 | A. | You can use it for that but not in that time |
| 10 | | frame. It's much too slow. |
| 11 | Q. | And did you consider the possibility that -- |
| 12 | | strike that. |
| 13 | | You didn't know at the time you shot |
| 14 | | whether your partner had actually succeeded in |
| 15 | | getting out of the way of the vehicle? |
| 16 | | MS. LITSAS: Objection. |
| 17 | Q. | After he was struck, right? |
| 18 | | MS. LITSAS: Objection. |
| 19 | A. | He didn't get out of the way. He got hit. |
| 20 | Q. | After he got hit, you are aware that he got up |
| 21 | | within seconds after that? |
| 22 | | MS. LITSAS: Objection. |
| 23 | A. | I'm aware that he did get up. |
| 24 | Q. | And you don't know what he did, if anything, on |

| | | |
|---|---|---|
| 1 | | his own to make himself safe from being further |
| 2 | | struck or run over or dragged by the vehicle |
| 3 | | before you shot at it, did you? |
| 4 | | MS. LITSAS: Objection. |
| 5 | A. | No. I don't know where he was. I didn't see |
| 6 | | him. |
| 7 | Q. | And so although he might have been having a |
| 8 | | problem with the vehicle at that point in time, |
| 9 | | he might have been perfectly safe at the point |
| 10 | | you started shooting, right? |
| 11 | | MS. LITSAS: Objection. |
| 12 | A. | I don't know. That's just, that's a |
| 13 | | speculation. |
| 14 | Q. | Well, a woman is dead as a result of your |
| 15 | | shooting, right? |
| 16 | | MS. LITSAS: Objection. |
| 17 | A. | I understand. |
| 18 | Q. | And the question is did you consider the |
| 19 | | possibility that maybe you didn't need to shoot |
| 20 | | because the situation wasn't what you decided it |
| 21 | | was when you immediately decided to shoot? |
| 22 | | MS. LITSAS: Objection. |
| 23 | A. | Everything happened very quickly and we are |
| 24 | | trained to make decisions in a split second. |

```
 1              And if we don't make decisions, people will die,
 2              people can die, but if we freeze, things can
 3              turn out differently.  I didn't know where my
 4              partner was at the time and I'm trained to
 5              react.  I wouldn't be a normal bystander who
 6              could stand there and look and not react because
 7              that would be a neglect of my duty.  I had to
 8              react.
 9    Q.    Wouldn't yelling out to your partner to find out
10          if he was safe kind of reaction that might be
11          more appropriate than immediately shooting?
12                   MS. LITSAS:  Objection.
13    A.    No.
14    Q.    Well, as part of your -- strike that.
15                   You said you're trained to react
16          quickly in situations, right?
17    A.    Yes.
18    Q.    But you have never been trained about the
19          situations in which to react at shooting at a
20          moving vehicle, right?
21                   MS. LITSAS:  Objection.
22    A.    When we're trained, they said this is the job
23          from A to Z.  You'll be called to do many
24          different things and they're going to teach us a
```

```
 1              spot, that the vehicle might actually stop on
 2              top of the officer and you would have succeeded
 3              in killing the officer by killing the driver?
 4                        MS. LITSAS:  Objection.
 5        A.    What was the question?
 6        Q.    Did you consider that if you succeeded in
 7              killing the driver immediately with the first
 8              bullet, that if your concern was that your
 9              partner might be under the vehicle, that you
10              would accomplish your partner being crushed to
11              death by the vehicle?
12                        MS. LITSAS:  Objection.
13        A.    No.
14        Q.    Did you consider it a possibility that bullets
15              might ricochet off the car or building and
16              strike your partner and kill him?
17                        MS. LITSAS:  Objection.
18        A.    Off the buildings?
19        Q.    Yes.
20        A.    No.  I'm a pretty good shot.
21        Q.    How about off the car?
22                        So, I heard you say you're a pretty
23              good shot.  Do you pride yourself on your
24              marksmanship?
```

1                MS. LITSAS: Objection.

2  A.   I think I'm a pretty good shot.

3  Q.   That includes shooting at moving vehicles which

4         you never had an opportunity to shoot at before?

5                MS. LITSAS: Objection.

6  A.   I have not had an opportunity to shoot at a

7         moving vehicle before.

8  Q.   So what made you think that your skills were

9         transferable to shooting at a moving body -- to

10        shooting at a moving vehicle?

11               MS. LITSAS: Objection.

12 A.   Because I'm a good shot.

13 Q.   Well, are you aware, we have three specifically

14        speaks to the issue that it's almost impossible

15        you don't necessarily ever stop a vehicle by

16        shooting at it?

17               MS. LITSAS: Objection.

18 A.   That's not what I'm aware of.

19 Q.   Well, while you were shooting your --

20        discharging your firearm, you weren't keeping

21        track of the alleged sexual assault victim and

22        where she was, were you?

23               MS. LITSAS: Objection.

24 A.   I had told her to stay behind me.

| | | |
|---|---|---|
| 1 | Q. | While you were discharging your firearm and |
| 2 | | paying attention to this car which you wanted to |
| 3 | | stop desperately, you were no longer paying |
| 4 | | attention to where she was; were you? |
| 5 | | MS. LITSAS: Objection. |
| 6 | A. | I told her stay behind me. |
| 7 | Q. | Does that mean if she got killed by a |
| 8 | | ricocheting bullet that it was her fault? |
| 9 | | MS. LITSAS: Objection. |
| 10 | A. | I can't answer that. |
| 11 | Q. | What about James Nicholas, he was still in the |
| 12 | | cruiser, wasn't he? |
| 13 | A. | That's why I stepped up, stepped out. |
| 14 | | MS. LITSAS: Objection. |
| 15 | Q. | Did you ever consider it a fact if you were |
| 16 | | shooting at a vehicle, that you might actually |
| 17 | | cause a ricochet that could kill James Nicholas? |
| 18 | | MS. LITSAS: Objection. |
| 19 | A. | I'm sorry, what was that question? |
| 20 | Q. | Did you consider the possibility that while you |
| 21 | | were shooting at the vehicle, a bullet might |
| 22 | | ricochet and kill James Nicholas in your own |
| 23 | | police vehicle? |
| 24 | | MS. LITSAS: Objection. |

| 1 | A. | I considered James Nicholas, that's why I |
| 2 | | stepped into the street instead of firing from |
| 3 | | standing in the middle of parked cars. |
| 4 | Q. | So you think you cured the possibility of |
| 5 | | ricocheting bullets killing James Nicholas |
| 6 | | because you stepped out into the street? |
| 7 | | MS. LITSAS:  Objection. |
| 8 | A. | I definitely know I took him out of my sight, |
| 9 | | out of the picture which would seriously |
| 10 | | decrease the chances of him getting hit. |
| 11 | Q. | Well, what data do you have to support your |
| 12 | | statement that taking him out of the picture |
| 13 | | meant he was safe from ricocheting bullets? |
| 14 | | MS. LITSAS:  Objection. |
| 15 | A. | I don't have any data on the ricocheting |
| 16 | | bullets. |
| 17 | Q. | In fact, wouldn't it be fair to say your many |
| 18 | | years as a police officer, you're aware of |
| 19 | | instances in which drive-by shootings in the |
| 20 | | streets have resulted in innocent civilians in |
| 21 | | apartment buildings several stories up being |
| 22 | | killed by ricocheting bullets? |
| 23 | | MS. LITSAS:  Objection. |
| 24 | A. | No. |

| | | |
|---|---|---|
| 1 | | slowed down the vehicle as a result of your |
| 2 | | shooting so you stopped? |
| 3 | | MS. LITSAS: Objection. |
| 4 | A. | It was before Perth. |
| 5 | Q. | About how far before? |
| 6 | A. | I don't know, sir. |
| 7 | Q. | How long an interval was there between the first |
| 8 | | shot and the second shot? |
| 9 | | MS. LITSAS: Objection. |
| 10 | A. | I would rather not guess on the time frame but I |
| 11 | | can tell you it's very fast, the shooting. |
| 12 | | We're trained to shoot two or three shots at a |
| 13 | | time, not one. |
| 14 | Q. | Two or three at a time? |
| 15 | A. | At least. |
| 16 | Q. | And then you take a pause? |
| 17 | A. | No.  I'm saying we're not trained to just shoot |
| 18 | | a shot and wait to see what happens and then |
| 19 | | shoot another shot, because if you're being |
| 20 | | attacked, more than likely, one shot would not |
| 21 | | stop someone.  So we're trained to shoot two or |
| 22 | | three very quickly. |
| 23 | Q. | And that's the same training that you applied to |
| 24 | | shooting at a moving vehicle when you were not |

1          being shot at and you were not a target, right?

2                   MS. LITSAS:  Objection.

3   Q.  Did you apply that same training to the

4         situation where the vehicle was moving away from

5         you?

6                   MS. LITSAS:  Objection.

7   A.  I applied the training that we were taught.  You

8         use it to overcome the force that's being --

9         that you're being met with, and as long as the

10        car is still driving, my partner is still in

11        danger so I shot.

12  Q.  Well, let's --

13  A.  Until it stopped.

14  Q.  Let's talk about that.  My understanding from

15        what you told the homicide unit, correct me if

16        I'm wrong, is that the moment you put your gun

17        back down --

18  A.  Hm-mmm.

19  Q.  -- You saw your partner out of the corner of

20        your eye?

21  A.  Correct.

22  Q.  So you shot these bullets, okay?

23  A.  Mm-hmm.

24  Q.  And put the gun down and then you saw your

127

```
 1          partner?

 2    A.    Yes.

 3    Q.    And your partner was getting up?

 4                    MS. LITSAS:  Objection.

 5    Q.    Right.

 6    A.    It appeared he was getting up from the ground.

 7    Q.    Right.  And which eye did you see him out of the

 8          corner of?

 9    A.    My right.

10    Q.    Which means if I'm not mistaken, that you would

11          have been looking down Fayston Street shooting

12          down Fayston Street?

13                    MS. LITSAS:  Objection.

14    Q.    And then saw your partner out of the corner of

15          your eye, right?

16                    MS. LITSAS:  Objection.

17    A.    I saw him in my peripheral vision.

18    Q.    So, would it be fair to say if you had put your

19          gun down before firing a third shot or fourth

20          shot or second shot, you might have been able to

21          determine that your partner was okay before you

22          killed an innocent person?

23                    MS. LITSAS:  Objection.

24    A.    It's not fair to say that.
```

WIDOMSKI COURT REPORTING ASSOCIATES  (781) 246-0710

1                     MS. LITSAS:. Objection.

2    A.    In training, yes.

3    Q.    Would you have shot ten bullets if it was

4          necessary to stop this vehicle?

5                     MS. LITSAS:  Objection.

6    A.    I can't answer that.

7    Q.    Why?  Why can't you answer that?

8    A.    Because you're asking me something that hasn't

9          happened.

10   Q.    Well, you were bent on stopping the vehicle,

11         right, that's what you wanted to do, right?

12                    MS. LITSAS:  Objection.

13   Q.    Correct?

14   A.    I'm sorry.

15   Q.    You were determined to stop the vehicle, right?

16                    MS. LITSAS:  Objection.

17   A.    I was trying to make sure my partner was safe.

18   Q.    And you didn't put your arm down and see that

19         your partner was actually getting up before you

20         discharged five bullets into the vehicle, or at

21         the vehicle, right?

22                    MS. LITSAS:  Objection.

23   A.    No, I did not.

24   Q.    If the vehicle had continued to not be stopped,

| | | |
|---|---|---|
| 1 | A. | I don't remember. |
| 2 | Q. | Do you recollect the distance that you -- strike |
| 3 | | that.  And the walking that you were doing was |
| 4 | | down Fayston Street, right? |
| 5 | A. | Yes. |
| 6 | Q. | So you were walking and firing and walking and |
| 7 | | firing down Fayston Street, right? |
| 8 | | MS. LITSAS:  Objection. |
| 9 | Q. | Right? |
| 10 | | MS. LITSAS:  Objection. |
| 11 | A.. | I'm walking and shooting. |
| 12 | Q. | Down Fayston Street, right? |
| 13 | A. | I'm shooting at the driver's side of the |
| 14 | | vehicle.  I'm walking down Fayston Street. |
| 15 | Q. | Walking down Fayston Street and shooting at the |
| 16 | | vehicle which was in front of you down Fayston |
| 17 | | Street, correct? |
| 18 | | MS. LITSAS:  Objection. |
| 19 | A. | Okay, yes. |
| 20 | Q. | And meanwhile, the last point of contact that |
| 21 | | you had with Officer Paillant was back at the |
| 22 | | intersection of Dunkeld and Fayston where he was |
| 23 | | struck, correct? |
| 24 | A. | A little bit further from the intersection |

136

| | | |
|---|---|---|
| 1 | | because he went out on the hood of the car and _ |
| 2 | | the car was still moving when he disappeared. |
| 3 | Q. | After he disappeared -- |
| -4 | | MS. LITSAS:  Counsel, I would ask you |
| 5 | | to let him finish his answer. |
| 6 | Q. | Fine, okay. |
| 7 | A. | When he disappeared, he would have been on |
| 8 | | Fayston. |
| 9 | Q. | And you continued to walk as you were shooting |
| 10 | | further down Fayston behind the vehicle, right? |
| 11 | | MS. LITSAS:  Objection. |
| 12 | A. | I don't know how far I walked. |
| 13 | Q. | Certainly far enough to know that your partner |
| 14 | | was no longer under the vehicle and being |
| 15 | | dragged by it while you were shooting, right? |
| 16 | | MS. LITSAS:  Objection. |
| 17 | A. | Is that a question? |
| 18 | Q. | Yes. |
| 19 | A. | No. |
| 20 | Q. | No?  And you said you stopped shooting when you |
| 21 | | realized that your efforts had succeeded in |
| 22 | | stopping the vehicle, right? |
| 23 | | MS. LITSAS:  Objection. |
| 24 | A. | I stopped shooting when the car slowed down and |

| | | |
|---|---|---|
| 1 | | one of the doors opened. |
| 2 | Q. | Did the doors open on Fayston Street? |
| 3 | A. | Yes. |
| 4 | Q. | Did you have any idea if or how many people you |
| 5 | | killed by that time? |
| 6 | | MS. LITSAS:  Objection. |
| 7 | A. | I didn't know I killed anyone. |
| 8 | Q. | Did you see whether or not you shot the rear |
| 9 | | windshield out of the vehicle at the time? |
| 10 | A. | Yes. |
| 11 | Q. | You succeeded in shattering the glass in the |
| 12 | | windshield, right? |
| 13 | A. | The rear windshield. |
| 14 | Q. | Which means a bullet any time you fired after |
| 15 | | that could have gone straight through the |
| 16 | | vehicle, right? |
| 17 | | MS. LITSAS:  Objection. |
| 18 | A. | Just because the rear window was shattered -- |
| 19 | | what are you trying to say? |
| 20 | Q. | I think you answered the question.  And the |
| 21 | | vehicle turned onto Perth Street? |
| 22 | A. | I'm sorry. |
| 23 | Q. | The vehicle turned onto Perth Street, right? |
| 24 | A. | After the door opened, yes. |

| 1  | A. | I didn't see him. |
| 2  | Q. | And when you saw him, okay -- strike that. So |
| 3  |    | what did you see him do? Strike that. Did you |
| 4  |    | see him get to the intersection of Fayston and |
| 5  |    | Perth? |
| 6  | A. | I don't remember. I know I saw him get up and |
| 7  |    | just start running. |
| 8  |    | MR. STOCKWELL-ALPERT: One minute. |
| 9  | Q. | Was there any point at all in the rest of that |
| 10 |    | night at which you saw Officer Paillant? |
| 11 | A. | Yes. |
| 12 | Q. | When was the first time after you initially lost |
| 13 |    | contact with him when he was struck by the |
| 14 |    | vehicle did you see him? |
| 15 |    | MS. LITSAS: Objection. |
| 16 | A. | When I lowered my arm and I saw him getting up |
| 17 |    | off the ground. |
| 18 | Q. | When was the next point after you saw him |
| 19 |    | running down Fayston Street? Strike that. |
| 20 |    | Did you ever lose sight of him, okay, |
| 21 |    | as he was running down Fayston Street? |
| 22 | A. | Yes. |
| 23 | Q. | When was the next point at which you lost sight |
| 24 |    | of him? |

# EXHIBIT H

UNITED STATES BANKRUPTCY COURT

DISTRICT OF MASSACHUSETTS



Civil Action

Case No. 05-11803-MLW

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

SHENIA DANCY-STEWART AS                    \*

ADMINISTRATRIX OF THE ESTATE OF    \*

EVELINE BARROS-CEPEDA                      \*

     -v-                                              \*

THOMAS TAYLOR, JR., AND THE            \*

CITY OF BOSTON                                      \*

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*


DEPOSITION OF JAMES NICOLAS


Examination taken at the Offices of the City

Solicitor, One City Hall Plaza, Elm Street,

Manchester, New Hampshire, on Tuesday, January 15,

2008, commencing at 11:45 a.m.



Court Reporter:


Elaine J. Ritsema, CCR, RPR

CCR No. 92 (RSA 331-B)

1   that's the house.  That was the house.  The car

2   (indicating) --

3         Q.    Okay.  Why don't you mark an X where the

4   house was that you were -- where you were in the car,

5   -in the police cruiser.  Can you just mark an X so that

6   we can understand what your testimony is when you --

7   when you are drawing this and when we read this

8   transcript.

9               So why don't we do this --

10        A.    I'm bad in drawing.  It's better for me

11  to talk about it and then -- you know, me drawing, to

12  be honest with you.  'Cause me drawing something, you

13  know -- 'cause I already swear an oath.  What about if

14  I draw something and it's not the right way, you know,

15  the street look like?

16              (Speakers overlap)

17        Q.    We understand that.  We're only asking

18  you to do the best of your ability.  Why don't you

19  tell me what happened; and then if we need to draw it,

20  we can do that.

21        A.    Thank you.

22        Q.    Okay.

23        A.    When I was -- like I said, when I was in

24  the car after he finish talk to me or whatever, you

G&M COURT REPORTERS, LTD.
1.800.655.3663 - www.gmcourtreporters.com

```
 1    know, after the lady -- you know what I'm saying --
 2    see my face, it-wasn't me, he was about to let me go.
 3                 But it was a car who was speeding.  It
 4    was going fast.  I don't remember exactly if they hit
 5    him on his leg, you know; but the car almost take his
 6    leg off.
 7                 So the officer who was with me, I didn't
 8    see him do any shooting.  Okay?  If I told you I see
 9    him shoot, shoot anybody, I be lying to you.  I didn't
10    see him do any shooting.  But I do hear the shotgun.
11    I do hear the shotgun and everything.
12                 So it was -- and after -- after --
13    actually, it was another car, too, who was chasing
14    that car --
15          Q.    And what --
16          A.       -- you know, the officer.  The cruiser
17    who was chasing that car.
18          Q.    Mm-hmm.
19          A.     So it was like everything happened so
20    fast, you know; and it was like after all that
21    happened, I was still --
22                 (Reporter asks to repeat)
23          A.     I was still in the same street.  'Cause
24    after that shooting or whatever it is, I couldn't go
```

# EXHIBIT I



VOLUME I

PAGES:    1 - 92

EXHIBITS: 1 - 4

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

C.A. NO. 05-11803-MLW

```
*   *   *   *   *   *   *   *   *   *        *
                                            *
SHENIA DANCY-STEWART, as                    *
Administratrix of the Estate                *
of EVELINE BARROS-CEPEDA,                   *
                Plaintiffs,                 *
                                            *
vs.                                         *
                                            *
THOMAS TAYLOR, JR., and the                 *
CITY OF BOSTON,                             *
                Defendants.                 *
                                            *
*   *   *   *   *   *   *   *   *   *        *
```

DEPOSITION OF TREVO CARTER,

taken on behalf of the Defendants, pursuant

to the Massachusetts Rules of Civil

Procedure, before Karen Borreson, RPR, Notary

Public within and for the Commonwealth of

Massachusetts, at the law offices of City of

Boston, City Hall, Boston, Massachusetts, on

Thursday, January 17, 2008, commencing at

2:35 p.m.

```
 1    Q. Followed by a police cruiser?

 2    A. Yes.

 3    Q. And what happens next after the car

 4       accelerates?

 5    A. The car -- the cop got hit.  Um,- out of view

 6       for me as he got hit.  He didn't fly in the

 7       air.

 8              MR. STOCKWELL-ALPERT:  I didn't hear

 9       that.

10    A. He was out of view for me, because the other

11       cars were parked in the street.  He didn't

12       fly in the air.  He wasn't a hit like he got

13       flipped in the air.  So I couldn't see after

14       that.  I knew he went to the ground,

15       obviously, and the car went right around

16       him.  Went around where he was at and went

17       on to Fayston.

18    Q. What hits the officer?

19    A. The car.

20    Q. The same car that's the screeching car?

21    A. Yes.

22    Q. And what part of the car hits the officer?

23       And what I'm asking you is it the driver's

24       side or the front seat passenger side, if
```

```
 1      car?
 2   A. No.
 3   Q. What were the occupants of the police
 4      vehicle doing at the time that the officer
 5      moved into the middle of the street who was
 6      eventually hit?
 7            MR. STOCKWELL-ALPERT:  Objection.
 8   A. Meaning?  Say that again, I'm sorry.
 9   Q. I'll rephrase the question.
10            Did you see the occupants of the
11      police car doing anything at the time that
12      the other officer moved into the street?
13   A. No.  He didn't do anything.
14   Q. Were they still inside the vehicle, the
15      police vehicle?
16   A. Yes, they was.
17   Q. At any point did the occupants of the police
18      vehicle move outside the police vehicle that
19      you saw?
20   A. No.
21   Q. After the vehicle collides with the officer,
22      and the officer falls on the ground, what
23      happens next at that point?
24            MR. STOCKWELL-ALPERT:  Objection.
```

| 1  | A. The car takes off onto Fayston. |
| 2  | Q. The screeching car?  -- |
| 3  | A. Yes.  Immediately the officer that got hit |
| 4  |    gets back up and that's when I seen the |
| 5  |    other officer that was attending to |
| 6  |    something I don't know on Fayston is coming |
| 7  |    down.  They both -- the officer that got hit |
| 8  |    ran over, the other officer come running |
| 9  |    down, too. |
| 10 | Q. What happens next? |
| 11 | A. That's when the hear the gun shots. |
| 12 | Q. How much time passes when the officer being |
| 13 |    struck by the screeching car and the shots |
| 14 |    are fired? |
| 15 | A. After -- after the cop got struck?  It was |
| 16 |    seconds.  It all happened so fast. |
| 17 | Q. At the time that you hear the gun shots, |
| 18 |    what is the officer on the ground doing? |
| 19 | A. He already left running the street towards |
| 20 |    Fayston.  He ran down Fayston. |
| 21 | Q. How much time elapses between the time that |
| 22 |    the officer is struck by the vehicle and the |
| 23 |    time that he's on the ground? |
| 24 | A. It was seconds. |

Volume:      II

**COPY**

Pages:    93-171

Exhibits:   NONE

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS COURT

C. A. NO. 05-11803-MLW

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

SHENIA DANCY-STEWART as                   *

Administratrix of the Estate of    *

EVELINE BARROS-CEPEDA,                     *

          Plaintiff,                       *

v.                                         *

THOMAS TAYLOR, JR., and the CITY    *

OF BOSTON,                                 *

          Defendants.                      *

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

          CONTINUED DEPOSITION of TRAVO CARTER, a

witness called on behalf of the Defendants, taken

pursuant to the Federal Rules of Civil Procedure,

before Marie T. Williams, Professional Court Reporter

and Notary Public, in and for the Commonwealth of

Massachusetts, at the City of Boston Law Department,

City Hall, Room 615, Boston, Massachusetts, on

Wednesday, March 12, 2008, commencing at 10:37 a.m.

| | | |
|---|---|---|
| 1 | | believe, that he didn't fly through the air |
| 2 | | over the white car; is that correct? |
| 3 | | MS. LITSAS:  Objection. |
| 4 | A. | He didn't? |
| 5 | ·Q. | He did not fly through the air. |
| 6 | A. | No. |
| 7 | Q. | You also stated, I believe, that at some point |
| 8 | | in time you saw the car go around the |
| 9 | | officer -- |
| 10 | | MS. LITSAS:  Objection. |
| 11 | Q. | -- after the officer was struck?  Do you |
| 12 | | remember saying that? |
| 13 | | MS. LITSAS:  Objection. |
| 14 | A. | Not like going around him completely, but |
| 15 | | moving out of where he's at.  Like, the car |
| 16 | | wasn't trying to run him over.  So just move to |
| 17 | | get around him.  You know what I'm saying? |
| 18 | Q. | Was this before the officer was struck or after |
| 19 | | the officer was struck when you saw this white |
| 20 | | Taurus try to go around the officer? |
| 21 | | MS. LITSAS:  Objection. |
| 22 | A. | It was both. |
| 23 | Q. | Both? |
| 24 | A. | Yes. |

| | | |
|---|---|---|
| 1 | Q. | Let's talk about that, if we could, just for a |
| 2 | | minute.    - |
| 3 | A. | Sure. |
| 4 | Q. | Before the officer was struck, what do you mean |
| 5 | | when you say you saw the car try to go around |
| 6 | | the officer? |
| 7 | A. | To me it seemed like the car really didn't |
| 8 | | really want to hit the cop, but the cop wasn't |
| 9 | | getting out of his way. He was telling him to |
| 10 | | stop. Like, basically they were playing |
| 11 | | chicken, and the cop wasn't letting up. The |
| 12 | | car just kept on going. |
| 13 | Q. | You saw that the car was going left before the |
| 14 | | officer was struck to try to go around him -- |
| 15 | A. | Yeah. |
| 16 | Q. | -- is that what you're saying? |
| 17 | A. | Yeah. |
| 18 | | MS. LITSAS: Objection. |
| 19 | Q. | When the car was going left -- |
| 20 | | MS. LITSAS: Sorry to interrupt, Del. |
| 21 | | I would just ask the witness to just pause |
| 22 | | before answering, just so I can get an |
| 23 | | opportunity to object beforehand. |
| 24 | | THE WITNESS: Okay. |

```
1          for a few seconds?

2                     MS. LITSAS:  Objection.

3    A.    Yes.

4    Q.    At some point in time you saw the officer get

5          up?

6                     MS. LITSAS:  Objection.

7    A.    Yes.

8    Q.    What did you see the officer do next after he

9          got up?

10                    MS. LITSAS:  Objection.

11   A.    Take off down Fayston.

12   Q.    In the direction of the white Taurus --

13                    MS. LITSAS:  Objection.

14   A.    Yes.

15   Q.    -- white car?  Okay.

16                    At some point in time you saw another

17         officer; is that correct?

18   A.    Yes.

19   Q.    After you saw the officer that was struck get

20         up and run down Fayston Street, what did you

21         see the other officer do?

22                    MS. LITSAS:  Objection.

23   A.    Run down Fayston.

24   Q.    Would it be fair to say that when you saw both
```

| | | |
|---|---|---|
| 1 | | officers going down Fayston Street, that the |
| 2 | | motor vehicle, this white car, was in between |
| 3 | | the two officers? |
| 4 | | MS. LITSAS:  Objection. |
| 5 | A. | Yes. |
| 6 | Q. | And after you saw both officers running down |
| 7 | | Fayston Street, what did you hear next, see |
| 8 | | next? |
| 9 | | MS. LITSAS:  Objection. |
| 10 | A. | I heard gun shots. |
| 11 | Q. | Could you see the white Taurus when you heard |
| 12 | | the first gunshot? |
| 13 | A. | No. |
| 14 | Q. | Why not? |
| 15 | A. | Out of sight. |
| 16 | Q. | Which means that the car was traveling down |
| 17 | | Fayston Street? |
| 18 | A. | Yes. |
| 19 | | MS. LITSAS:  Objection to that last |
| 20 | | question. |
| 21 | Q. | After the car went out of your sight on Fayston |
| 22 | | Street, what did you see next? |
| 23 | | MS. LITSAS:  Objection. |
| 24 | A. | Nothing.  Went in the house. |

. . . . . . . . who was struck by the motor

. . . . . . . . correct?

.  DeMIRANDA:  Objection.

  . time that you hear -- are the shots

    .ntaneous to the time that he is

    :e motor vehicle?

  MR. DeMIRANDA:  Objection.

  · like -- it's like basically when

    was fired, they both was out of

  .  .  .  idn't see where they were?

    ..'t see.

  .. . . . don't know what they were doing at the

    .irst hear shots fired?

  :  . out of my sight.

    ice officer, P1, already gotten up

    .nd?

  . . time you first hear shots fired?

    onds elapsed before -- between the

    e officer is struck by the motor

    . . the time that you first hear shots

# EXHIBIT J

1

1               VOL. I
              PAGES 1-36
2             EXHIBITS A-B

3        IN THE UNITED STATES DISTRICT COURT
          FOR THE DISTRICT OF MASSACHUSETTS
4
      Civil Action No. 05-11803-MLW
5

6
      SHENIA DANCY-STEWART
7     as Administratrix of the Estate of
      EVELINE BARROS-CEPEDA
8          Plaintiff

9     vs.

10    THOMAS TAYLOR, JR., AND THE
      CITY OF BOSTON
11         Defendants

12
                    DEPOSITION OF TYRONE CAMPER, taken on
13    behalf of the plaintiff, pursuant to the
      applicable provisions of the Federal Rules of
14    Civil Procedure, before Irma Widomski, a
      Registered Merit Reporter, and Certified
15    Shorthand Reporter, No. 131593 in and for the
      Commonwealth of Massachusetts, at the Law
16    Offices of Andrew Stockwell-Alpert, 11 Beacon
      Street, Suite 1210, Boston, Massachusetts, on
17    Monday, January 28, 2008, commencing at 2:50
      p.m.
18

19

20

21         WIDOMSKI COURT REPORTING ASSOCIATES
                  ONE SUNSET DRIVE
22         WAKEFIELD, MASSACHUSETTS 01880
                  (781) 246-0710
23

24

| 1  |     | MR. OUELLETTE:  Objection. |
|----|-----|----------------------------|
| 2  | A.  | At which point? |
| 3  | Q.  | On September 11 when you recovered? |
| 4  | A.  | Yes, I did look.  . |
| 5  | Q.  | When you looked in the back of the car, you saw |
| 6  |     | a bullet hole, right, you saw a hole consistent |
| 7  |     | with a shot fired going through the back of the |
| 8  |     | car, correct? |
| 9  | A.  | Yes. |
| 10 |     | MR. OUELLETTE:  Objection. |
| 11 | Q.  | And you also saw a hole consistent with a bullet |
| 12 |     | hole coming through the seat in the interior of |
| 13 |     | the rear seat of the car? |
| 14 | A.  | Yes. |
| 15 |     | MR. OUELLETTE:  Objection. |
| 16 | Q.  | Did you yourself pick up the cartridges at the |
| 17 |     | scene or were they handed to you along with the |
| 18 |     | guns? |
| 19 | A.  | I picked them up. |
| 20 | Q.  | When you picked them up, okay, did you do |
| 21 |     | anything with respect to making note of what |
| 22 |     | location you picked them up from? |
| 23 | A.  | Yes. |
| 24 | Q.  | And with respect to that kind of information |

# EXHIBIT K

VOLUME I
PAGES 1 TO 210
EXHIBITS 1 TO 2

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. NO. 05-11803MLW

SHENIA DANCY-STEWART, as      )
Administratrix of the         )
Estate of EVELINE             )
BARROS-CEPEDA,                )
                             )
     Plaintiff,               )          COPY
                             )
vs.                           )
                             )
THOMAS TAYLOR, JR., and       )
the CITY OF BOSTON,           )
                             )
     Defendants.              )


          DEPOSITION OF JOHN C. MURPHY, a witness
called on behalf of the Defendants, pursuant to the
Massachusetts Rules of Civil Procedure before
Lisa Abdo, Certified Shorthand Reporter and Notary
Public in and for the Commonwealth of
Massachusetts, at the offices of City of Boston Law
Department, City Hall, Room 615, Boston,
Massachusetts, on Wednesday, March 26, 2008,
commencing at 10:41 a.m.

| | | |
|---|---|---|
| 1 | | something like that.  After that, they start |
| 2 | | training you how to be a ballistician. |
| 3 | Q. | So after three months beginning in -- the beginning |
| 4 | | of 1977 you received training in ballistics? |
| 5 | A. | Yes, I did. |
| 6 | Q. | And what did that involve, Sergeant? |
| 7 | A. | Ballistics is the type of field where it's |
| 8 | | hands-on training.  There is no school you |
| 9 | | can go to, per se, to learn how to be a |
| 10 | | ballistician.  You have to learn it from |
| 11 | | other ballisticians.  I was assigned to the |
| 12 | | unit under five other ballisticians who were |
| 13 | | part of my training.  For approximately a |
| 14 | | year and a half, they trained me how to be a |
| 15 | | ballistician.  They took me to crime scenes. |
| 16 | | They showed me what to do.  They taught me |
| 17 | | how to use a microscope.  They taught me how |
| 18 | | to fire handguns safely in a water recovery |
| 19 | | tank. |
| 20 | Q. | And who were your supervisors or the ballisticians |
| 21 | | who you trained under at that time? |
| 22 | A. | One's name was Jim McGinnis, one was George |
| 23 | | Windisch, one was -- |
| 24 | Q. | Can you spell the Windisch? |

| 1 | | AFTERNOON SESSION |
|---|---|---|
| 2 | | JOHN C. MURPHY, RESUMED |
| 3 | | DIRECT EXAMINATION (CONTINUED) |
| 4 | | BY MS. LITSAS: |
| 5 | Q. | Prior to coming to today's deposition, Sergeant, |
| 6 | | did you have an opportunity to -- strike that. |
| 7 | | Did you prepare for today's deposition? |
| 8 | A. | What do you mean by prepare? |
| 9 | Q. | Did you do anything to prepare for today's |
| 10 | | deposition, meaning to prepare for your testimony |
| 11 | | today? |
| 12 | A. | I looked over a couple of diagrams. That's |
| 13 | | about it. |
| 14 | Q. | Okay. And you pointed to a couple of documents. |
| 15 | | Can you show me what those documents are? |
| 16 | A. | Sure. |
| 17 | Q. | This is the shooting scene newspaper diagram from |
| 18 | | the Globe; is that correct? |
| 19 | A. | That's correct. |
| 20 | Q. | And this is also the trajectory. These were |
| 21 | | exhibits attached to your expert report? |
| 22 | A. | Yes. |
| 23 | Q. | Okay. Did you look at any other documents other |
| 24 | | than those two documents? |

G&M COURT REPORTERS, LTD.
1.800.655.3663 - www.gmcourtreporters.com

| | | |
|---|---|---|
| 1 | | Officer Taylor is here using their sketch. |
| 2 | | The Taurus starts into his turn. He's at an |
| 3 | | angle. Correct? You look at these diagrams, |
| 4 | | now, the car is coming up Dunkeld. It starts |
| 5 | | to make its turn. Okay. Just like their. |
| 6 | | diagram. Officer Taylor's first shot is |
| 7 | | here. The vehicle is continuing to make its |
| 8 | | turn. The second shot is here. |
| 9 | Q. | Now, for the record, you're going to have to |
| 10 | | identify what you're -- |
| 11 | A. | I can't positively say which order they were |
| 12 | | fired. It's my opinion that "1" was the |
| 13 | | first shot. |
| 14 | Q. | The "1" that's depicted in -- |
| 15 | A. | As "1." |
| 16 | Q. | -- Exhibit A? |
| 17 | A. | Exhibit A. |
| 18 | Q. | That's identified as "1," in your opinion, is -- |
| 19 | A. | The first shot fired. My opinion what's |
| 20 | | depicted as "3" is the second shot was fired |
| 21 | | because the vehicle was making its turn onto |
| 22 | | Fayston Street when the officer is over here. |
| 23 | | And the vehicle starts to almost complete its |
| 24 | | turn, and you have an angle of 75 degrees. |

|     |    |                                                         |
| --- | -- | ------------------------------------------------------- |
| 1   |    | The vehicle has now made its turn. The                  |
| 2   |    | vehicle at this point with the officer here,            |
| 3   |    | if it's going straight ahead on Fayston                 |
| 4   |    | Street, this fourth shot is impossible. It              |
| 5   |    | would have to be at an angle. It's not.                 |
| 6   |    | It's at a 90 degree. In my opinion, the                 |
| 7   |    | vehicle had gone past the officer and was               |
| 8   |    | starting to make its turn. That's when the              |
| 9   |    | fourth shot was fired.                                  |
| 10  | Q. | When you say that was impossible, it would have to      |
| 11  |    | be at an angle, what do you mean by that?               |
| 12  | A. | If this vehicle, if the officer is here where           |
| 13  |    | they depict him to be --                                |
| 14  | Q. | And what you're referring to is Exhibit B and           |
| 15  |    | you're referring to the diagram that's labeled          |
| 16  |    | "Shooting Scene" in Exhibit B and you're referring      |
| 17  |    | to Taylor's location depicted on Fayston Street; is     |
| 18  |    | that correct?                                           |
| 19  | A. | That would be correct. So like I said, if               |
| 20  |    | the vehicle is coming up and it's making its            |
| 21  |    | turn and the officer fires, it makes perfect            |
| 22  |    | sense. The vehicle starts to complete its               |
| 23  |    | turn. Fires a second shot. The vehicle                  |
| 24  |    | makes -- fires his third. Now, these are all            |

| | | |
|---|---|---|
| 1 | | at angles.  He's at an angle.  The car is |
| 2 | | continuing on straight ahead and he fires, it |
| 3 | | has to be at an angle.  If the car is |
| 4 | | starting to make its turn, it's a straight on |
| 5 | | shot. |
| 6 | Q. | Now, when you say when the car is starting to make |
| 7 | | its turn, what do you mean by that? |
| 8 | A. | The vehicle made a turn onto the next street. |
| 9 | Q. | I see.  So you're -- |
| 10 | A. | Either that or he moved the vehicle somehow. |
| 11 | | Or the officer ran into the middle of the |
| 12 | | street or to the other side of the street |
| 13 | | while the vehicle was traversing down the |
| 14 | | road.  From what I read, Officer Taylor |
| 15 | | stated he never left that position when he |
| 16 | | was firing. |
| 17 | Q. | So are you stating to a reasonable degree of |
| 18 | | certainty that shots depicted as "1," "3" and "2" |
| 19 | | in Exhibit B were shots as the vehicle was turning |
| 20 | | from Dunkeld Street onto Fayston Street? |
| 21 | A. | That's my opinion. |
| 22 | Q. | And you're also stating to a reasonable degree of |
| 23 | | certainty that exhibit -- strike that -- that |
| 24 | | what's been depicted as shot No. 4 on Exhibit B was |

| 1 | | made after the vehicle had made a turn? |
| -2 | A. | Correct. |
| 3 | Q. | Do you know how quickly it took the vehicle to make |
| 4 | | the turn from Dunkeld Street to Fayston Street? |
| 5 | A. | I did not. |
| 6 | Q. | Do you know -- strike that. |
| 7 | | Have you made any effort to determine the |
| 8 | | amount of time it took the vehicle to make the turn |
| 9 | | from Dunkeld Street to Fayston Street? |
| 10 | A. | I would have no way of knowing. |
| 11 | Q. | And why is that? |
| 12 | A. | I wasn't there. |
| 13 | Q. | You would agree with me that the amount of time it |
| 14 | | took the vehicle to make the turn is an important |
| 15 | | factor, correct? |
| 16 | A. | An important factor as to what? |
| 17 | Q. | In understanding what occurred that evening. |
| 18 | A. | I can't say.  I wasn't there.  I didn't see |
| 19 | | the vehicle.  I don't know how fast it was |
| 20 | | going. |
| 21 | Q. | And the basis for your determination as to where |
| 22 | | Officer Taylor was located on Fayston Street is |
| 23 | | based on what? |
| 24 | A. | On "B." |

G&M COURT REPORTERS, LTD.
1.800.655.3663 - www.gmcourtreporters.com

        ⟨...⟩    ⟨...⟩ .ere the location of the cartridge

    ⟨...⟩. ..re found with respect to Officer Taylor, -

    ⟨...⟩..

        ⟨...⟩ ⟨...⟩ ur report, Exhibit 1, you state, "In

                    white Ford Taurus was hit by four .


                ⟨...⟩ is the basis for your conclusion

                        · by four projectiles?

                    ⟨...⟩ ..agram and the pictures that I


                    tibit A, Exhibit B, and the

                    .. reviewed?

        ⟨...⟩.. A and the photographs.

            ⟨...⟩ ..the determination that, "There was

                    .ojectile, Officer Taylor having fired


                    What was the basis for that conclusion?

                        ⟨...⟩r fired five shots, we can

                    ⟨...⟩ for four hits on the car.  One


                    .1 shots were fired, Eveline

                        as sitting in the middle rear seat

                        ..and was fatally wounded by shot

```
1        No. 4 as indicated in Exhibit A."
2                 What-was the basis for that conclusion?
3    A.  Because its number here.
4    Q.  Because Exhibit B identifies --
5    A.  The fatal shot as No. 4.
6    Q.  -- the shot as No. 4?
7                 Is there anything else that was the basis
8        of that conclusion?
9    A.  No.
10   Q.  On page 4, Conclusion No. 2 you state, "In my
11       opinion, shot No. 1 hit the car at a 55-degree
12       angle as depicted in Exhibit A and is consistent
13       with Exhibit B which shows the Taurus in the
14       process of turning from Dunkeld Street onto Fayston
15       Street."
16                The basis for that conclusion is what?
17   A.  A and B.
18   Q.  Exhibit A and Exhibit B?
19   A.  Correct.
20   Q.  In Conclusion No. 3 you state, "In my opinion,
21       shots No. 2 and No. 3 as depicted in Exhibit A
22       which hit the Taurus at a 75-degree and 80-degree
23       angle respectively are not consistent with
24       Exhibit B as the Taurus would have been further
```

| 1 | A. | At least. |
| 2 | Q. | And that's, again, based on your review of |
| 3 | | Exhibit A and Exhibit B, correct? |
| 4 | A. | Correct. |
| 5 | Q. | In Conclusion No. 8 you state, Officer Taylor's |
| 6 | | statement 'As I lowered my arm I could see Mike' is |
| 7 | | another basis, in my opinion, that at least at the |
| 8 | | time of the fourth shot, Officer Taylor could have |
| 9 | | seen Officer Paillant"? |
| 10 | A. | Uh-huh. |
| 11 | Q. | What is the basis for that conclusion? |
| 12 | A. | If he lowered his arm, as soon as he lowered |
| 13 | | his arm, he had just fired that fourth shot. |
| 14 | | If he looked over, he could have seen him. |
| 15 | Q. | And what is the basis for that conclusion? |
| 16 | A. | The fact that the fourth shot was fired when |
| 17 | | the vehicle was beyond Officer Paillant. |
| 18 | Q. | Again, could you repeat that? |
| 19 | A. | If you keep Officer Paillant in that position |
| 20 | | and do not change him, this vehicle had to be |
| 21 | | beyond Officer Paillant in order for that |
| 22 | | direct shot to be fired.  If the vehicle is |
| 23 | | here when the last shot is fired, Officer |
| 24 | | Paillant has to be visible to Officer Taylor. |

| | | |
|---|---|---|
| 1 | | Whether he saw him or not, I cannot say. |
| 2 | Q. | You do not know what Officer Taylor saw, correct? |
| 3 | A. | I do not. |
| 4 | Q. | And it's possible that he could not have seen him, |
| 5 | | correct? |
| 6 | A. | Possible. |
| 7 | Q. | Do you know what time of day the incident occurred? |
| 8 | A. | It was at night, I believe. Early morning |
| 9 | | hours. |
| 10 | Q. | And do you know approximately what time? |
| 11 | A. | I believe it was 1:00 a.m., approximately. |
| 12 | Q. | Do you know what the lighting conditions were? |
| 13 | A. | I don't. I've never been there. |
| 14 | Q. | And you don't know what the lighting conditions |
| 15 | | were at the time of the incident? |
| 16 | A. | I do not. |
| 17 | Q. | And the basis for your conclusion that Officer |
| 18 | | Taylor could have seen Officer Paillant is based on |
| 19 | | what you understand from Exhibit B, correct? |
| 20 | A. | Yes. |
| 21 | Q. | Is there anything else? |
| 22 | A. | No -- oh, the angles. |
| 23 | Q. | Depicted in Exhibit A? |
| 24 | A. | "A," yes. |

# EXHIBIT L

1

1                          VOL. I.
                           PAGES 1-105
2                          EXHIBITS -A-C

3            IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF MASSACHUSETTS

4
      Civil Action No. 05-11803-MLW

5     _____
      SHENIA DANCY-STEWART
6     as Administratrix of the Estate of
      EVELINE BARROS-CEPEDA
7           Plaintiff
      vs.

8
      THOMAS TAYLOR, JR. AND THE
9     CITY OF BOSTON
            Defendants
10    _____

11                 DEPOSITION OF ARTHUR J. STRATFORD,
      taken on behalf of the plaintiff, pursuant to
12    the applicable provisions of the Federal Rules
      of Civil Procedure, before Irma Widomski, a
13    Registered Merit Reporter, and Certified
      Shorthand Reporter, No. 131593 in and for the
14    Commonwealth of Massachusetts, at the Law
      Offices of Andrew Stockwell-Alpert, 11 Beacon
15    Street, Suite 1210, Boston, Massachusetts, on
      Monday, January 28, 2008, commencing at 10:00
16    a.m.

17

18

19

20

21
                 WIDOMSKI COURT REPORTING ASSOCIATES
22                      ONE SUNSET DRIVE
                   WAKEFIELD, MASSACHUSETTS 01880
23                       (781) 246-0710

24

| | | |
|---|---|---|
| 1 | | regulation governs the use of deadly force in |
| 2 | | the Boston Police Department? |
| 3 | A. | Rule 200. |
| 4 | Q. | Does 303 mean anything to you? |
| 5 | A. | 303, excuse me. |
| 6 | Q. | What is Rule 200? |
| 7 | A. | That's -- that was -- I don't know the name of |
| 8 | | it off the top of my head. |
| 9 | Q. | Now, when did you first become involved with |
| 10 | | IAD, internal affairs, with the Boston Police |
| 11 | | Department? |
| 12 | A. | Six years ago. |
| 13 | Q. | That would have been what year? |
| 14 | A. | Approximately 2002, January 2002, I believe. |
| 15 | Q. | How did it come about that you became involved |
| 16 | | with IAD? |
| 17 | | MS. LITSAS:  Objection. |
| 18 | A. | There was a posted opening for a lieutenant |
| 19 | | detective in the internal affairs and I |
| 20 | | submitted a resume and went to an interview and |
| 21 | | was selected for that position. |
| 22 | Q. | Now, who interviewed you? |
| 23 | A. | Marie Donahue, Deputy Marie Donahue and |
| 24 | | Superintendent Thomas Dowd. |

|    |     |                                                    |
|----|-----|----------------------------------------------------|
| 1  |     | is your full and complete report or whether       |
| 2  |     | anything is missing or anything.                   |
| 3  | A.  | That's the report I turned in to Marie Donahue.    |
| 4  | Q.  | That report represents your full and complete      |
| 5  |     | and final report with regard to the               |
| 6  |     | investigation of the weapons discharged by         |
| 7  |     | Thomas Taylor?                                      |
| 8  | A.  | Yes.                                               |
| 9  | Q.  | Correct?  Based on the investigation you           |
| 10 |     | conducted which is summarized in that report,      |
| 11 |     | you concluded that the weapons discharge was in    |
| 12 |     | compliance with the provisions of Rule 303?        |
| 13 |     | MS. LITSAS:  Objection.                            |
| 14 | A.  | Yes.                                               |
| 15 | Q.  | And you summarized the materials that you relied   |
| 16 |     | on in reaching this conclusion, right, in that     |
| 17 |     | report?                                            |
| 18 | A.  | Yes.                                               |
| 19 | Q.  | And those materials -- you may look at the         |
| 20 |     | report to refresh your memory.  I would like you   |
| 21 |     | to tell me what materials you relied on, and I     |
| 22 |     | want you to give a full and complete answer.  So   |
| 23 |     | if it refreshes your memory to look at that,       |
| 24 |     | you're more than welcome to.                       |

69

1         every one of those possible adverse outcomes

2         could have occurred in this situation where

3         there were people on the street, buildings close

4         together, and moving vehicles near each other,

5         correct?

6    A.   Correct.

7    Q.   In fact, when the facts as you know them or as

8         you had them presented to you, there was a

9         possibility that Thomas Taylor might have shot

10        into the police cruiser that was following the

11        white vehicle, correct?

12             MS. LITSAS:  Objection.

13    A.   I can't answer that question.

14    Q.   You can't?

15    A.   No.

16    Q.   There's a possibility Thomas Taylor might have

17        killed an innocent bystander, correct?

18             MS. LITSAS:  Objection.

19    A.   There's a possibility -- probability, yes.

20    Q.   Probability that bullet might have ricocheted

21        off the side of a building, right?

22    A.   Off a building?

23    Q.   Yes.

24    A.   Off the car, you mean?

# EXHIBIT M

Page 1

COPY

Volume:       I

Pages:     1-112

Exhibits:  1-11

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

C. A. NO. 05-11803

*********************************

SHENIA DANCY-STEWART as                    *

Administratrix of the Estate of    *

EVELINE BARROS-CEPEDA,                      *

          Plaintiff, .          *

v.                                          *

THOMAS TAYLOR, JR., and the        *

CITY OF BOSTON,                             *

          Defendants.           *

*********************************

          DEPOSITION of JENNIFER K. LIPMAN, M.D., a

witness called on behalf of the Defendants, ·taken

pursuant to the Federal Rules of Civil Procedure,

before Marie T. Williams, Professional Court Reporter

and Notary Public, in and for the Commonwealth of

Massachusetts, at the offices of the City of Boston

Law Department, City Hall, Boston, Massachusetts, on

Tuesday, April 15, 2008, commencing at 12:27 p.m.

| 1 | | chronology -- |
|---|---|---|
| 2 | A. | It doesn't make sense to talk about it.  I |
| 3 | | worked in some labs for a few years deciding |
| 4 | | whether I wanted to go to medical school or |
| 5 | | graduate school.  And I decided to go to |
| 6 | | medical school. |
| 7 | | I went to medical school at Temple |
| 8 | | University, and I graduated from Temple |
| 9 | | University in 1991.  And I did a residency in |
| 10 | | anatomic and clinical pathology at the |
| 11 | | Deaconess Hospital after that, with a |
| 12 | | fellowship as a fifth year in gastrointestinal |
| 13 | | and surgical pathology.  And then I did another |
| 14 | | fellowship at the medical examiner's office in |
| 15 | | Boston in forensic pathology. |
| 16 | Q. | Does that comprise your entire educational -- |
| 17 | | excluding obviously your secondary education? |
| 18 | A. | Yes. |
| 19 | Q. | Is there any other education or training that |
| 20 | | you received that you have not mentioned? |
| 21 | A. | Various courses and seminars and lectures and |
| 22 | | CME things that you have to do when you're a |
| 23 | | physician in Massachusetts. |
| 24 | Q. | And you are a former medical examiner for the |

| | | |
|---|---|---|
| 1 | | Commonwealth of Massachusetts? |
| 2 | A. | Yes. |
| 3 | Q. | Where else have you been employed, other than |
| 4 | | for the Commonwealth of Massachusetts as a |
| 5 | | forensic pathologist? |
| 6 | A. | Nowhere, except for my consulting business that |
| 7 | | I do now.  I don't know if that classifies as |
| 8 | | being employed as a forensic pathologist.  I do |
| 9 | | consulting work in forensic pathology. |
| 10 | Q. | How long have you been doing consulting work in |
| 11 | | forensic pathology? |
| 12 | A. | Since September of 2003. |
| 13 | Q. | And what prompted you to pursue a private |
| 14 | | consulting business in forensic pathology? |
| 15 | A. | Because I left my job with the State, and I |
| 16 | | wanted to keep my hand in forensics.  And that |
| 17 | | was a good way to do it. |
| 18 | Q. | Are you board certified in forensic pathology? |
| 19 | A. | Yeah. |
| 20 | Q. | Do you have any other board certifications? |
| 21 | A. | Before you can be board certified in forensic |
| 22 | | pathology, you have to be board certified in |
| 23 | | anatomic pathology.  And I'm also -- it was a |
| 24 | | joint board between anatomic and clinical |

|     |     |                                                  |
|-----|-----|--------------------------------------------------|
| 1   |     | indicate that it's anything that's having any    |
| 2   |     | effect on the person at the time because it      |
| 3   |     | could be there from beyond the time that it's    |
| 4   |     | present in the blood.                            |
| 5   | Q.  | What information contained in this autopsy       |
| 6   |     | report, which has been marked as Exhibit 11,     |
| 7   |     | what information in this report assisted you in  |
| 8   |     | making your determination for this case?         |
| 9   | A.  | The autopsy report is labeled 5.                 |
| 10  | Q.  | I'm sorry.  The autopsy marked as Exhibit 5.     |
| 11  | A.  | I just want to make sure I'm looking at the      |
| 12  |     | right thing.  I'm sorry.  What was the           |
| 13  |     | question?                                        |
| 14  | Q.  | What information in this autopsy report, which   |
| 15  |     | is marked as Exhibit 5, played a role in your    |
| 16  |     | determination and your opinion rendered in this  |
| 17  |     | case?                                            |
| 18  | A.  | First of all, the description of the wounds and  |
| 19  |     | the path of the bullet through her body and the  |
| 20  |     | changes in the organs that it went through and   |
| 21  |     | the fact that she was healthy prior to that as   |
| 22  |     | far as we can tell from her organs.  She         |
| 23  |     | doesn't have any major problems with any of her  |
| 24  |     | organs.  She appears to have been generally      |

| | | |
|---|---|---|
| 1 | | healthy. And the lack of intoxicating |
| 2 | | substances in her blood and the lack of injury, |
| 3 | | other than this gunshot wound, that could have |
| 4 | | rendered her unconscious prior to having |
| 5 | | received it. |
| 6 | Q. | In your opinion, where were the gunshot wounds? |
| 7 | A. | Well, the entrance wound is on the left upper |
| 8 | | back. I mean, do you want me to say |
| 9 | | specifically? I could tell you -- |
| 10 | Q. | Yes, please. |
| 11 | A. | The entrance wound is the left upper back, 15 |
| 12 | | inches below the top of the head and to the |
| 13 | | left of the posterior midline. And then he |
| 14 | | gives a description of the wound, with the |
| 15 | | abrasion collar being heaviest at the lateral |
| 16 | | aspect, the inferior and lateral aspect, which |
| 17 | | would indicate that the bullet was traveling |
| 18 | | from the left to the right, from the back to |
| 19 | | the front. |
| 20 | Q. | Why is that significant, if at all? |
| 21 | A. | You always mention it when you're describing a |
| 22 | | bullet wound because it gives an indication of |
| 23 | | the path. And the fact that this went through |
| 24 | | a rib -- sometimes when bones hit -- I mean, |

|     |     |                                                  |
| --- | --- | ------------------------------------------------ |
| 1   |     | alive.                                           |
| 2   | Q.  | So I guess you're making a couple of opinions.   |
| 3   |     | One, she was alive when she received the first   |
| 4   |     | gunshot wound?                                   |
| 5   | A.  | Right.                                           |
| 6   | Q.  | Do you know if she received more than one        |
| 7   |     | gunshot wound?                                    |
| 8   | A.  | There's only one gunshot wound listed.  I hope   |
| 9   |     | you didn't -- he called them wounds A and        |
| 10  |     | wounds B, but it's one single gunshot wound      |
| 11  |     | with an entrance labeled A and an exit labeled   |
| 12  |     | B.                                               |
| 13  | Q.  | So your opinion is based on this report, that    |
| 14  |     | there was one gunshot wound, and that was both   |
| 15  |     | labeled A and B, and that that gunshot wound     |
| 16  |     | was the fatal -- was the cause of death --       |
| 17  |     | MR. STOCKWELL-ALPERT:  Objection.                |
| 18  | Q.  | -- correct?                                       |
| 19  | A.  | Yes.                                             |
| 20  | Q.  | At the time that the gunshot wound was           |
| 21  |     | experienced by the decedent, she was alive at    |
| 22  |     | the time that she received the gunshot wound?    |
| 23  | A.  | Correct.                                         |
| 24  | Q.  | And that's what the significance of the          |

| 1 | A. | Well, it would conflict with other evidence |
| 2 | | that she was. |
| 3 | Q. | And the other evidence that she was |
| 4 | | unconscious -- that she was conscious consists |
| 5 | | of the report that's been marked as Exhibit 3 |
| 6 | | in this case, that documents Maria DaRosa's |
| 7 | | interview and the statement that the decedent |
| 8 | | said, "Oh, shit"; is that correct? |
| 9 | | MR. STOCKWELL-ALPERT:  Objection. |
| 10 | A. | That is the witness statement indicating that |
| 11 | | she was conscious, yes. |
| 12 | Q. | Other than Exhibit 3 and the autopsy report, is |
| 13 | | there any other evidence that indicates to you |
| 14 | | that the decedent was conscious at the time? |
| 15 | A. | No, because the only other evidence is after |
| 16 | | they gained access to the car by the people -- |
| 17 | | the officers that made statements about when |
| 18 | | they found her slumped over in the car. |
| 19 | Q. | And you haven't received those reports, |
| 20 | | correct? |
| 21 | A. | I don't have the reports.  I just have what |
| 22 | | they said in here. |
| 23 | Q. | In the course of your review of the -- for this |
| 24 | | case, you didn't receive -- you didn't review |

```
 1        any reports from the emergency medical
 2        personnel that responded by ambulance to the
 3        scene?
 4   A.   No.  I just have their report from the
 5        emergency room saying that -- I mean, the
 6        emergency room personnel say that she was --
 7        somewhere in here it said that she was
 8        unconscious at the scene and she was
 9        nonresponsive at the scene.
10   Q.   I'm going to show you what's Exhibit 4.  Is
11        that the document that you're referring to?
12   A.   Yes.  The Boston Medical Center records, yes.
13   Q.   Could you take me through those records?
14   A.   Okay.  Well, first you have the front sheet.
15        It tells you just a quick sort of summary.
16        Arrest status post gunshot wound.  They don't
17        know the age of the female.  She was arrested
18        at the scene -- not meaning arrested, arrested
19        by the police; meaning arrested, cardiac arrest
20        at the scene -- after a gunshot wound to the
21        chest times two, which is not unusual for --
22        they didn't know one was an exit and one was an
23        entrance.  No signs of life at the scene.
24        Intubated -- I think it says on scene and
```

| 1 | | brought in. If you turn the page -- |
|---|---|---|
| 2 | Q. | Let me just interrupt you. The document that |
| 3 | | you just read was from Exhibit 4? |
| 4 | A. | Correct. |
| 5 | Q. | And that reflects the notes of the emergency |
| 6 | | medical personnel that responded to the scene? |
| 7 | A. | No. This is the emergency department record, |
| 8 | | and they get report from -- when they bring |
| 9 | | someone in in the ambulance, they talk to the |
| 10 | | physicians or the people in the emergency room. |
| 11 | | And then they sort of -- they wouldn't know |
| 12 | | that she arrested at the scene unless they |
| 13 | | spoke to the people who were at the scene. So |
| 14 | | the arrested at the scene and intubated at the |
| 15 | | scene and brought in, that's information that |
| 16 | | they received from the -- |
| 17 | Q. | Emergency medical personnel? |
| 18 | A. | -- the EMS people. I think it's EMS, whatever |
| 19 | | company it was. |
| 20 | Q. | And the emergency medical personnel based on |
| 21 | | your review of that document indicated that at |
| 22 | | the time that they arrived on scene, she was |
| 23 | | unconscious and she had arrested -- |
| 24 | A. | Correct. |

| | | |
|---|---|---|
| 1 | Q. | Your first sentence -- following No. 7 in the |
| 2 | | report, you state, "Based upon my professional |
| 3 | | training and experience, it is my opinion to a |
| 4 | | reasonable degree of medical certainty that |
| 5 | | Eveline Barros-Cepeda died as a result of the |
| 6 | | gunshot wound of the chest, and she experienced |
| 7 | | conscious pain and suffering during the time |
| 8 | | between when she was shot and when she |
| 9 | | expired." |
| 10 | A. | Mm-hmm. |
| 11 | Q. | That's a statement that you made, correct? |
| 12 | A. | Mm-hmm. |
| 13 | | (Reporter interruption.) |
| 14 | A. | Yes. |
| 15 | Q. | Do you know the time between when she was shot |
| 16 | | and when she expired? |
| 17 | A. | No. |
| 18 | Q. | And the gunshot wound to the chest, Doctor, |
| 19 | | that involved a gunshot wound to the heart, |
| 20 | | correct, or part of the heart? |
| 21 | A. | It didn't actually hit the heart.  It went |
| 22 | | through the vessels leading off the heart. |
| 23 | Q. | And it also went through the -- |
| 24 | A. | Pericardium. |

| 1 | Q. | -- the ventricles? |
| 2 | A. | Where does it say it went through the |
| 3 | | ventricles? |
| 4 | Q. | I'm asking you -- |
| 5 | A. | Oh, no, did not. |
| 6 | Q. | -- did the gunshot involve traveling through |
| 7 | | any of the ventricles? |
| 8 | A. | No. |
| 9 | Q. | Did it involve the aorta? |
| 10 | A. | Yes. |
| 11 | Q. | Doctor, you go on to state, "I base this |
| 12 | | opinion upon the following facts:  Number one, |
| 13 | | the path of the bullet was through her left |
| 14 | | lung, the aortic arc, and the pulmonary artery |
| 15 | | resulting in extensive blood loss but not |
| 16 | | direct injury to the heart muscle which could |
| 17 | | have caused a more sudden death." |
| 18 | A. | Mm-hmm. |
| 19 | Q. | That's a statement you made, correct? |
| 20 | A. | Mm-hmm. |
| 21 | | (Reporter interruption.) |
| 22 | A. | Yes. |
| 23 | Q. | What is the basis of your opinion that the path |
| 24 | | of the bullet did not involve direct injury to |

```
 1          unconscious at the time -- or was not

 2          immediately unconscious at the time she

 3          received the gunshot wound?

 4                  MR. STOCKWELL-ALPERT: - Objection.

 5     A.   Yes.  This gunshot wound would not cause

 6          immediate unconsciousness.

 7     Q.   But you would agree with me that it is possible

 8          that it could be immediate?

 9                  MR. STOCKWELL-ALPERT:  Objection.

10     A.   For this wound?

11     Q.   Yes.

12     A.   I don't know how from this wound that it would

13          be immediate.

14     Q.   I guess what I'm trying to understand is what

15          is the time frame in which you believe that

16          Ms. Cepeda was unconscious for -- or excuse me

17          -- conscious for?

18     A.   Very short.

19     Q.   What does that mean?

20     A.   Like maybe less than a minute.  Maybe a minute.

21          I mean, I can't tell you for sure.  I'm saying

22          the inside of it would be, you know, less than

23          a minute on the inside, but it wouldn't be

24          impossible, except that I know that when people
```

```
 1          got to her she apparently was unconscious by
 2          the time the police got to her.  And I don't
 3          know how long a period of time that was.  But
 4          it wouldn't surprise me if by the time someone
 5          got to the car, she was unconscious, but all
 6          I'm saying here is she was not immediately
 7          unconscious.
 8      Q.  And the basis for that opinion is physiology
 9          and the autopsy report?
10      A.  Right.  The fact that what killed her was the
11          blood loss from this gunshot wound and that
12          doesn't cause immediate unconsciousness.
13      Q.  So understanding the basics of anatomy and
14          physiology allow you to make the determination
15          that a gunshot wound suffered by the decedent
16          in this case would not render her immediately
17          unconscious?
18                    MR. STOCKWELL-ALPERT:  Objection.
19      Q.  Correct?
20                    MR. STOCKWELL-ALPERT:  Asked and
21          answered several times.
22      A.  Yes.  And also experience from other cases
23          where people have suffered large vessel
24          injuries, and they are not unconscious
```