1                UNITED STATES DISTRICT COURT

2                 DISTRICT OF MASSACHUSETTS

3                          No. 1:05-cv-11803-MLW

4

5

6   SHENIA DANCY-STEWART, as Administratrix of the Estate of
    Eveline Barros-Cepeda, Maria DaRosa and Luis Carvalho,
                Plaintiff

7

8   vs.

9

10  THOMAS TAYLOR, JR., et al,
                Defendants

11

12                       * * * * * * * * *

13

14

15              For Hearing Before:
                Chief Judge Mark L. Wolf

16

17                 Summary Judgment

18              United States District Court
                District of Massachusetts (Boston)
19              One Courthouse Way
                Boston, Massachusetts 02210
20              Monday, September 22, 2008

21                       * * * * * * * *

22

23         REPORTER: RICHARD H. ROMANOW, RPR
                Official Court Reporter
24              United States District Court
        One Courthouse Way, Room 5200, Boston, MA 02210
25              bulldog@richromanow.com

```
 1                A P P E A R A N C E S

 2

 3   ANDREW STOCKWELL-ALPERT, ESQ.
        Law Office of Andrew Stockwell-Alpert
 4      11 Beacon Street
        Suite 1210
 5      Boston, Massachusetts 02108
        (617) 720-4244
 6  and
     WILLIAM KEEFE, ESQ.
 7      Law Office of William Keefe
        390 Centre Street
 8      Jamaica Plain, Massachusetts 02130
        (617) 983-9200
 9      Email: Wkeefelaw@yahoo.com
        For the plaintiff
10
     HELEN G. LITSAS, ESQ.
11      Law Office of Helen G. Litsas
        Hollett Building
12      38 Main Street
        Boston, Massachusetts 01906
13      (781) 231-8090
        Email: Helen@litsaslaw.com
14  and
     EVAN C. OUELLETTE, ESQ.
15      City of Boston Law Department
        Boston City Hall
16      One City Hall Plaza, Room 615
        Boston, Massachusetts 02201
17      (617) 635-4048
        Email: Evan.ouellette@cityofboston.gov
18      For the Defendants

19

20

21

22

23

24

25
```

```
 1              P R O C E E D I N G S
 2         (Lobby, 2:45 p.m.)
 3         THE CLERK:  Civil Action 05-11803, Shenia
 4  Dancy Stewart, et al versus Thomas Taylor, et al.  The
 5  Court is in session.  You may be seated.
 6         THE COURT:  Good afternoon.  Would counsel
 7  please identify themselves for the Court and for the
 8  record.
 9         MS. LITSAS:  Good afternoon, your Honor.  My
10  name is Hellen Litsas.  I represent the defendants,
11  Thomas Taylor and City of Boston.
12         MR. OUELLETTE:  Your Honor, Evan Ouellette,
13  also, for the defendants, Thomas Taylor and City of
14  Boston.
15         MR. STOCKWELL-ALPERT:  Andrew Stockwell-Alpert
16  for the plaintiff, Shenia Dancy-Stewart, your Honor.
17         MR. KEEFE:  Your Honor, also for the
18  plaintiff, William Keefe, your Honor.
19         THE COURT:  Good afternoon.  We're here today
20  for the argument, and I hope the decision, on the
21  pending motions for summary judgment.  As I understand
22  it from the record, at this point the plaintiff does not
23  oppose the City's motion for summary judgment on Count
24  V, the sole remaining count against the City that the
25  plaintiff calls "The survival action."  Is that
```

```
 1   correct?

 2           MR. STOCKWELL-ALPERT:  Correct.

 3           THE COURT:  Well, I've reviewed that.  I find

 4   it's meritorious.  There's no evidence of an

 5   unconstitutional policy or practice.  So the City's

 6   motion for summary judgment is hereby allowed.

 7       Then before we get to Mr. Taylor's motion for

 8   summary judgment, he has a motion to strike parts of the

 9   plaintiff's Rule 56.1 statement.  Some of the

10   plaintiff's disputes -- some of the matters that the

11   plaintiff asserts are in dispute are not supported by

12   admissible evidence, what they do is dispute the

13   phrasing of a particular point in the defendant's

14   statement of alleged undisputed facts.  For example, I

15   particularly focused on Number 70 concerning whether

16   Mr. Taylor saw any passengers?  There's no evidence

17   placing in dispute the fact that he saw no passengers or

18   indeed the driver, but he did use the same exact words

19   that the defendant uses in the Rule 56.1 statement.

20       It's my inclination not to strike the statement,

21   but rather to disregard the contentions in it to the

22   extent they're not supported by admissible evidence.

23   This is an approach that many of my colleagues have

24   taken in cases like *Change the Climate*, 202 Frd 43 at

25   57, *Preferred Mutual*, 53 F. Supp. 2nd 139 at 145, and
```

1    *Degan*, 2006 Westlaw 300425 at 7.

2         But do the parties want to be heard on that

3    approach?

4              MS. LITSAS:  That's fine, your Honor.

5              MR. STOCKWELL-ALPERT:  That's fine, your

6    Honor.  I think, if I understand correctly -- for

7    example, one of the things you kept taking exception to

8    was use of the word "fleeing vehicle."  Is that an

9    example of what you're referring to?

10             THE COURT:  I'd have to go step by step.

11             MR. STOCKWELL-ALPERT:  Okay.  Well, that's

12   fine, your Honor.

13             THE COURT:  So that's fine.  And so that

14   motion is denied.  And the plaintiff's request for

15   sanctions under Rule 11 is also denied.  But if the

16   plaintiff wanted sanctions under Rule 11, it had an

17   obligation to serve the motion and give 21 days to cure

18   before the motion was filed under Rule 11(c)(2).  That

19   wasn't done.  In addition, I find that the motion to

20   strike was not filed in bad faith or frivolous, it

21   addresses some meaningful issues, so the request for

22   cost or sanctions is also denied.

23        All right.  Now we'll get to the main event.

24             (Pause.)

25             THE COURT:  It's defendant Taylor's motion for

1    summary judgment.  I'm familiar with the pleadings and,

2    I think, the record.  My tentative view is that based on

3    what I perceive to be the undisputed facts, Mr. Taylor

4    is entitled to summary judgment on the Fourth Amendment

5    claim, which is the only Federal claim.  Among other

6    things, I don't think the evidence places generally in

7    dispute that he was making a split-second decision and

8    that he didn't see any passengers in the back and

9    therefore had no intention to stop a passenger who

10   turned out to be Miss Barros-Cepeda.  So at the moment,

11   I don't see a way to distinguish this case between --

12   distinguish this case from *Landol-Rivera* where the First

13   Circuit held there was no Fourth Amendment violation.

14         Although we're on the fourth version of the

15   complaint, I considered, so far, whether there might

16   nevertheless be a violation of the Fourteenth Amendment

17   right to substantive due process, which can exist even

18   when there's not a seizure.  That was discussed in

19   *Landol-Rivera*.  But based on *Landol-Rivera*, and

20   particularly the higher standard than the First Circuit

21   used in *Landol-Rivera* prescribed by *The City of*

22   *Sacramento vs. Lewis*, my present sense is that even if I

23   allowed an amendment, it would be futile because on the

24   undisputed facts Mr. Taylor didn't intend to cause harm

25   for some illegitimate purpose.  Again, he was acting

1    with only a split second to act and he did have a

2    vehicle, which he perceived and the evidence indicates

3    did hit his partner.  So at the moment, I don't see that

4    it would be appropriate to allow an amendment.  And, in

5    fact, a substantive due process claim wasn't made,

6    perhaps deliberately, and it's not even in the case.

7          That would leave, if that analysis holds, the

8    state law claims, which I probably would dismiss without

9    prejudice to being brought in the state court.  The

10   state law provides a year to do that if the plaintiff

11   thought it was worthwhile.

12         I guess I didn't mention that, in my tentative

13   view, if somehow I were wrong and there is a

14   constitutional violation that could be found, Mr. Taylor

15   would be entitled to qualified immunity because this is

16   so close to *Landol-Rivera* that a reasonable police

17   officer would not know that what Mr. Taylor did based on

18   undisputed evidence violated the decedent's

19   constitutional rights.

20         So those are my tentative -- informed, but not

21   final views, certainly.  Since I'm leaning against the

22   plaintiff, perhaps I ought to let the plaintiffs go

23   first to see if you can alter my sense of the proper

24   legal framework or point me to some evidence in the

25   record that might put some material fact in dispute.

1    Would you like to do that, Mr. Stockwell-Alpert?

2         MR. STOCKWELL-ALPERT:  I certainly have no

3    idea what it would take to try to alter your thinking on

4    this, Judge.  I'm actually rather taken aback because I

5    thought we distinguished this case very significantly

6    and appropriately on the facts, even the facts that were

7    in dispute here -- the undisputed facts, rather.  I

8    think that we have a situation, if I understand the

9    holding of the central case that we're talking about, it

10   begins with the premise that if an officer is acting

11   reasonably under the circumstance, but I think I'm --

12        THE COURT:  Well, actually, that isn't where I

13   think the analysis begins either in *Landol-Rivera* or in

14   cases that have clarified this since.  the Fourth

15   Amendment prohibits unreasonable searches or seizures.

16   So the first issue that has to be addressed is whether

17   there was a seizure.  And it's that *Brower* case that was

18   decided shortly before *Landol-Rivera* that prompted the

19   First Circuit to find there was no seizure.  So,

20   actually, on my current analysis, it's not necessary to

21   determine whether the undisputed facts make the conduct

22   objectively reasonable.

23        MR. STOCKWELL-ALPERT:  Well, does your Honor

24   believe that right from the get-go, with regard to the

25   seizure, that there was no seizure under the law?

1     Because I think, if that's the case --

2              THE COURT:  Yes.

3              MR. STOCKWELL-ALPERT:  I think that the fact

4     that an officer says that he was shooting at the driver,

5     to kill the driver, okay, isn't the controlling factor

6     in determining what the conduct actually was or what the

7     conduct turned out to be.  I think this case is very

8     distinguishable from the other because I think we have a

9     situation here where an officer -- and, again, if you

10    look at the totality of all of the facts surrounding the

11    circumstances here, which is why even with the

12    undisputed facts, I think we get over the hurdle.  We

13    have a police car following a vehicle at a reasonable

14    rate of speed, a vehicle, which on its face, is not

15    engaging in any criminal conduct as far as the officer

16    who opens fire on it is concerned --

17             THE COURT:  I thought that the evidence was

18    that the two officers thought that the vehicle was

19    failing to stop for another police car that was

20    following it with its lights on?

21             MR. STOCKWELL-ALPERT:  Well, they didn't have

22    evidence to that effect, Judge, in the pleadings and, in

23    point of fact, is that the siren was not on at the time

24    and so there was no long chase in effect.  And even if,

25    in fact, they saw that happen, on the undisputed facts,

1    we have a police car following this vehicle, again at a

2    reasonable rate of speed, not exceeding the limit, for

3    block after block after block.  We have the vehicle

4    turning the corner and before it turns the corner we

5    have the officer, who is in a position to stop the

6    vehicle, in the best position other than the officers

7    behind him, take out his gun.  At that particular point,

8    Thomas Taylor had every opportunity to either take out

9    his gun or not take out his gun, which was the first

10    choice point along the way.  He took out his gun because

11    he saw Officer Paillant take out his gun.

12        Officer Paillant doesn't shoot at the vehicle.

13    The police officers following the vehicle don't shoot at

14    the vehicle.  These are undisputed facts, by the way.

15    The vehicle turns the corner and Thomas Taylor loses

16    sight of his partner, and before making any

17    determination at all, which would have taken a matter of

18    a few seconds, even under all the undisputed facts of

19    the case, would have been able to determine that his

20    partner was safe and okay.  And therefore, his shooting

21    at the -- but instead, and this gets to the seizure,

22    Judge, he says he was shooting at the driver.  But --

23           THE COURT:  Excuse me.  Let me ask you a

24    question.

25           MR. STOCKWELL-ALPERT.  Sure.

1          THE COURT:  I read this part of the

2     testimony.  I thought he said he didn't see either the

3     driver or the passenger.  Is there someplace that he --

4     now I assume that he inferred that somebody was driving

5     the vehicle, but is there someplace he says that he was

6     shooting at the driver?

7          MR. STOCKWELL-ALPERT:  Is there someplace he

8     says he was shooting at the driver?

9          THE COURT:  Yes.

10         MR. STOCKWELL-ALPERT:  No, not that I know

11    of.  He said he was trying to shoot the driver because

12    it was his intention to kill the driver if he could.

13         THE COURT:  He said that?

14         MR. STOCKWELL-ALPERT:  Yes.  In fact, at the

15    deposition he responded and said he would have killed

16    the driver if he had a chance to, and he was questioned

17    about that as well.

18         THE COURT:  Do you know where I'll find that?

19         MR. STOCKWELL-ALPERT:  I do not, at the

20    present point, your Honor.  But if I may go on at

21    least?

22         THE COURT:  I would like you to.

23         MR. STOCKWELL-ALPERT:  Okay.  He empties five

24    bullets into the vehicle.

25         THE COURT:  I thought the ballistician said

1    four?

2            MR. STOCKWELL-ALPERT:  Okay.  Well, actually,

3    one of them went right through the back and was found

4    inside the vehicle itself and that's the one that went

5    straight through the back.  The point being, Judge, that

6    the officer's testimony and undisputed facts are that

7    this officer continued to shoot at this vehicle when the

8    vehicle was beyond the point that he could see his

9    partner, going straight down the road, at a line of

10   sight really where all he had to do was put the gun down

11   and take a look and he would have seen that the other

12   officers were safe.  The argument in this case, Judge,

13   is that shooting bullets into a vehicle, without knowing

14   who's in it, without really having any crime engagement

15   by any of the people in the vehicle, without being

16   apprised of any of the circumstances surrounding the

17   safety of his partner and what's going on, and shooting

18   at the vehicle, a total of four or five bullets without

19   stopping, is certainly the sort of conduct that I think

20   would rise to a level that should go to the jury with

21   regard to whether it's considered to be a seizure and

22   can't be decided on summary judgment.

23           THE COURT:  Well, you see that *Landol-Rivera*

24   says there has to be an intent to seize the person whose

25   rights were allegedly violated, and there was, in that

1   case, the police knew that there was a hostage in the

2   vehicle with the person they were pursuing and they shot

3   at the vehicle, at the hostage.  And applying the

4   recent, at that time, Supreme Court precedent *Brower,* as

5   I read it, Judge Coffin, writing for the First Circuit,

6   said that doesn't constitute a seizure of the hostage

7   because there wasn't an intention to stop the hostage.

8   And therefore, in the absence of a seizure, it couldn't

9   be a Fourth Amendment violation.

10           MR. STOCKWELL-ALPERT:  But he's shooting at

11   the vehicle and *City of Memphis*, *Fisher v. City of*

12   *Memphis* says that if an officer shoots at a vehicle,

13   that basically it's intended to stop everybody's rights

14   in the vehicle.  There's a seizure of everyone in it.

15           THE COURT:  And here it -- you know, I thought

16   that was the best case for you.  The trouble is that, of

17   course, is a Sixth Circuit case, *Landol-Rivera* is a

18   First Circuit case.  We're in the First Circuit.  I have

19   to follow the law as the First Circuit defined it.  And

20   it actually seems like *Fisher* is something of an

21   outlier, that most of the circuits seem to agree with

22   the First Circuit.  But even if they didn't, I don't

23   have the discretion to follow the law as defined in the

24   Sixth Circuit if it's different than the law in the

25   First Circuit.

1          MR. STOCKWELL-ALPERT:  And I'm trying to point

2     out that it's the facts in this case that significantly

3     and sufficiently distinguish it from the facts in the

4     other case, where we have an officer shooting a series

5     of bullets into a vehicle in rapid succession through

6     the back, through the side, into the vehicle, after the

7     vehicle has made a turn --

8          THE COURT:  How is that materially different

9     than *Landol-Rivera*?

10         MR. STOCKWELL-ALPERT:  Because if the vehicle

11    has turned the corner and is going down the street and

12    the officer is shooting through the back of the vehicle,

13    he can no longer be planning that his intent is simply

14    to shoot the driver.  He's attempting to stop the

15    vehicle indifferent to whoever is in it or how many

16    people are in it and therefore it's a seizure of the

17    vehicle and everyone in it.  He's no longer shooting at

18    the driver if his shot goes straight through the back

19    and kills a passenger in the middle of the back.

20         THE COURT:  But the evidence --

21         MR. STOCKWELL-ALPERT:  And by the way, Judge,

22    he said that he --

23         THE COURT:  Well, hold on just a second.  See

24    I have to focus on the evidence.

25         (Pause.)

```
 1              THE COURT:  Paragraph 68B of the plaintiff --
 2    of the defendant's Rule 56.1 statement says:  "When
 3    Officer Taylor discharged his firearm, he could see the
 4    driver's side of the Wurie vehicle, and aimed his
 5    firearm in that direction because he was attempting to
 6    disable the driver, the driver, Brima Wurie."  It
 7    cites -- oh, actually -- and it cites Taylor's testimony
 8    at Page 106 and it says:  "He was shooting at the
 9    driver's side.  He was asked, 'Were you trying to kill
10    the driver?'  He said, 'I was trying to disable the
11    driver from driving the vehicle.'"  The plaintiff's
12    response to 68B says "Undisputed."  So --
13              MR. STOCKWELL-ALPERT:  The plaintiff has also
14    put in undisputed facts, Judge, and I do believe that --
15              THE COURT:  Okay.
16              MR. STOCKWELL-ALPERT:  And let me just --
17              THE COURT:  No, let me do this.  I'm trying to
18    test -- 68B says it's undisputed that:  "When Officer
19    Taylor discharged his firearm, he could see the driver's
20    side of the Wurie vehicle, and aimed his firearm in that
21    direction because he was attempting to disable the
22    driver, Brima Wurie."  All right.  Now, I think you were
23    beginning to say that there's some other evidence that I
24    should look at?
25              MR. STOCKWELL-ALPERT:  It's undisputed that --
```

1          THE COURT:  Okay.  Now you have to tell me
2     where I find it.
3          MR. STOCKWELL-ALPERT:  Okay.  I'm at a loss
4     because I can't thumb my way through the -- and we have
5     put in our statement of undisputed facts that Officer
6     Taylor -- and, by the way, what we said was Officer
7     Taylor said that that's what he was doing.  Okay.  And
8     that's one of those little corrections that we
9     believe --
10          THE COURT:  And this is where they may have
11     had a meritorious --
12          MR. STOCKWELL-ALPERT:  Right.
13          THE COURT:  I have to decide this based on
14     admissible evidence.
15          MR. STOCKWELL-ALPERT:  Right.
16          THE COURT:  If he said it, you've got to put
17     in something that challenges the credibility of it, that
18     makes it a credibility determination for the jury.
19          MR. STOCKWELL-ALPERT:  He also said he stepped
20     out into the street and he continued to walk up the
21     street firing at the vehicle.
22          THE COURT:  And you'll say I'll find this in
23     your statement?
24          MR. STOCKWELL-ALPERT:  Yes.
25          THE COURT:  Well, then give me a minute and

1    I'll look at it.

2              MR. STOCKWELL-ALPERT:  Yes.

3              THE COURT:  And when you say you can't do it,

4    that's because you can't see it?

5              MR. STOCKWELL-ALPERT:  Yes, Judge, it would

6    take me forever to try to do it.  It's a vision issue.

7              THE COURT:  I know.  I just wanted the record

8    to be clear on that.

9              MR. STOCKWELL-ALPERT:  Right.

10             THE COURT:  So I'll look for it.  And

11   Mr. Keefe can help you, too.

12        Do you have the papers here?

13             MR. KEEFE:  I don't have the papers here, your

14   Honor.

15             MR. STOCKWELL-ALPERT:  No, Judge.

16             THE COURT:  You didn't bring the papers?

17             MR. STOCKWELL-ALPERT:  No, Judge.  I didn't

18   think that he'd be able to do this, so.

19             THE COURT:  Well, all right.  You're doing a

20   nice job.

21             (Pause.)

22             THE COURT:  All right.  (Reads.)  As I

23   understand it, there's an objection to the admissibility

24   of the testimony of Murphy, the ballistician who's --

25   who is Camper?

```
 1            MR. STOCKWELL-ALPERT:  Tyrone Camper is a
 2   ballistician.  He's not -- but there is a --
 3            THE COURT:  No, Camper is a witness and Murphy
 4   is the ballistician.
 5            MR. STOCKWELL-ALPERT:  Right.  Well, Murphy is
 6   our ballistician.
 7            THE COURT:  Right.  And who's Tyrone Camper?
 8            MS. LITSAS:  If I may assist, your Honor?
 9   Tyrone Camper was an officer who went to the scene after
10   the incident and collected the cartridges.
11            THE COURT:  Thank you.
12            (Reads.)
13            THE COURT:  Okay.  So I'll consider the
14   evidence in Plaintiff's J and K along with the evidence.
15            MR. STOCKWELL-ALPERT:  Did you look at the
16   eyewitness, Judge?  There was also an eyewitness --
17            THE COURT:  Can I finish?
18            MR. STOCKWELL-ALPERT:  I'm sorry, Judge.
19            THE COURT:  (Pause.) Okay.  Go ahead.
20            MR. STOCKWELL-ALPERT:  I don't know if your
21   Honor found this, but there was also a civilian witness
22   who gave deposition testimony, and I believe we cited
23   that as well in our own undisputed facts, that indicated
24   that he heard shots fired and he saw the officer follow
25   a vehicle down the street.  That the shots weren't even
```

1    fired until the vehicle turned the corner and went down

2    the street.  So there are conflicting versions, which

3    are undisputed facts, in and of themselves, that tend to

4    dispute Taylor's only recitation about when he shot.

5    They would go to the central issue with regard to

6    whether he was actually seizing the vehicle when the

7    occupants were in it.

8              THE COURT:  Well, then why did you write

9    "undisputed" in response to 68B?

10             MR. STOCKWELL-ALPERT:  Because my

11   understanding of that fact, in the tightly-drawn fashion

12   that it was written, was that Taylor says, in his

13   deposition, that when he originally aided the vehicle,

14   he was attempting to shoot at the driver.  And I can't

15   dispute what Taylor says in his deposition as that which

16   he said.  I can certainly dispute that that's what went

17   on.  And so what I tried to do is put in the facts that

18   would dispute the fact that what he says he was doing

19   was really going on.

20             THE COURT:  Is there anything that you think

21   would place in dispute his assertion that he didn't see

22   any passengers?

23             MR. STOCKWELL-ALPERT:  No.  I also think that

24   he didn't see the driver.  I think the man just shot

25   randomly at this vehicle for some period of time,

1    including when it went around the corner, and shot

2    through the back of it.  And that's why I'm saying, it's

3    like in the probable cause standard, Judge, the fact

4    that the officer says that this was what his intention

5    was is not the standard, it's not the standard to judge

6    whether or not there was a seizure in the vehicle

7    because Taylor says he had all the best intentions in

8    the world and was shooting originally to try the shoot

9    the driver, who he didn't see any better than the

10   passengers.  And a vehicle that nobody else shot at, by

11   the way, even though they were much closer and had a

12   better view of it.

13        THE COURT:  Do you understand that, on my

14   reading, and I think it's repeated a number of times,

15   for there to be a seizure, the First Circuit says there

16   has to be an intention to seize, to essentially to stop

17   the passenger who turned out to be Miss Barros-Cepeda?

18        MR. STOCKWELL-ALPERT:  I think that that's

19   based on the facts of that case because if that were the

20   general rule to govern all cases, then any time -- I

21   mean, here we have a situation where there was nobody in

22   the vehicle doing anything wrong at the time,

23   particularly, warranting the vehicle being shot at and

24   essentially the entire vehicle was being shot at by the

25   officer.  And he's saying that he intended to, you know,

1      shoot the driver, but he didn't see the driver any

2      better than the passenger.  So it doesn't matter what he

3      says about who he was intending to do what with, he was

4      shooting at this vehicle, and therefore he intended it

5      -- under the circumstances, whatever he intended, he

6      seized the vehicle and the occupants in it all equally.

7      And that's why I'm saying, you know, factually, this

8      case is totally distinguishable.  It's a unique set of

9      facts in which an officer fired at a vehicle.

10          And because of that, I don't think that that

11     particular holding, which I think is narrow and limited

12     to the facts in that case applies.  There's no hostage

13     passenger here.  There's no -- I mean, basically he's

14     shooting at nobody to try to stop the vehicle.  He says

15     he tried to shoot at the driver.  And that's why I think

16     it takes it out of the First Circuit's narrow reasoning

17     with regard to that and I think it puts it more on the

18     Sixth Circuit reasoning.

19              THE COURT:  Well, no, but there's another

20     Sixth Circuit case, it's *Claybrook,* and in *Claybrook*,

21     the person who was in the vehicle couldn't be seen and

22     the Sixth Circuit dealt with it different than it did

23     *Fisher.*  It said, "Well, if you can't see a person in

24     the car, you can't intend to seize that person."  So

25     even if we're in the Sixth Circuit --

1      MR. STOCKWELL-ALPERT:  So the defendant seizes

2  no one, because he couldn't see the driver?  So it

3  doesn't matter.  He's just shooting at this vehicle.

4      THE COURT:  And then it gets analyzed under

5  Federal law as a possible Fourteenth Amendment

6  substantive due process violation.  But whether it's

7  logical or not -- and Oliver Wendell Holmes tells us

8  "The life of law is not logic, it's experience," there's

9  a higher standard, I believe, for Fourteenth Amendment

10  purposes because there's an intent requirement.  When

11  you're dealing with a split second -- well, you didn't

12  allege a substantive due process claim.

13      MR. STOCKWELL-ALPERT:  No, I think we'd never

14  get there, Judge.  I don't think we would ever meet the

15  Fourteenth Amendment standard, quite frankly.

16      THE COURT:  Well, thank you for your candor

17  because I -- look, there's somebody dead here and I

18  don't want to make a mistake and, you know, if you

19  failed to plead something because you didn't understand

20  you could, I wanted to make sure your client wasn't

21  prejudiced.  But you're right.  You're right.  I mean,

22  I've analyzed the evidence as if you've pled it, and

23  when split-second decision-making is involved, the

24  Supreme Court in that *City of Sacramento vs. Lewis* case

25  says, you know, you really need a purpose to inflict

1    harm that's independent of some legitimate purpose.  So

2    you're right.  You're right.

3             MR. STOCKWELL-ALPERT:  Judge, I just -- we

4    keep coming back to the split second and I, quite

5    frankly, take exception to the split second.  It was

6    only a split second because the officer made it a split

7    second.  The whole point of this entire case was there

8    never was a need for him to discharge his firearm at

9    this vehicle.  And, I mean, to be quite frank, Judge, if

10   an officer, under these circumstances, can hide behind a

11   First Circuit case in saying, "Well, I was shooting at

12   nobody and therefore the shooting is okay because even

13   if I kill somebody, it doesn't matter," then basically

14   what we're saying, Judge, is a civilian with a gun, a

15   license to carry a gun, if they see a vehicle hit a

16   pedestrian, that they should have a right to shoot the

17   driver because the life of the pedestrian was in danger.

18            THE COURT:  Well, that's -- look, that's not

19   an apt analogy.

20            MR. STOCKWELL-ALPERT:  Okay, let's put it back

21   to the officer.  Okay?  Obviously an officer may be

22   deemed to have a different or a higher standard.  But,

23   Judge, the officer's partner can't be exalted beyond

24   that level of any pedestrian or anybody in the street

25   who the officer loses sight of momentarily that might be

1   hit by a vehicle.  And even assuming that this guy was

2   hit by a vehicle, that doesn't give the officer an

3   automatic right to discharge five bullets in a

4   continuous stream -- including that the vehicle is down

5   the street, okay, in order to stop that vehicle, and

6   then come back and say, "I was trying to kill the driver

7   because the life of my partner was in danger," when the

8   vehicle following the officer on the street, who was

9   actually and supposedly struck by that vehicle, not in

10  that shoot and both of them had the perfect

11  opportunity.  In fact, the one behind the vehicle could

12  have shot.

13       And in their depositions, by the way, they say,

14  "You're not supposed to shoot at a vehicle."  The

15  officer on the street then draws his gun.  He has every

16  opportunity to shoot right into the vehicle.  He doesn't

17  shoot.  But this guy is across the street, doesn't see a

18  thing, loses sight of his partner, and he shoots.  He

19  can't classify that as a split-second decision, and if

20  it was, then that's an unreasonable and wrong split-

21  second decision and it resulted in a seizure that I

22  believe passes muster.

23            THE COURT:  Well, it's split second, I think.

24  Whether his conduct was objectively reasonable might be

25  debatable, but if there's no seizure, it might not be

1    debatable.  Assume, without finding, that it's

2    debatable, if there's no seizure, there's no Fourth

3    Amendment violation.

4          MR. STOCKWELL-ALPERT:  Well, that's true, it

5    does begin with a seizure, Judge.  And I understand that

6    it's a tough case, okay, to get behind, to get by, but I

7    do think, under these circumstances, that the particular

8    conduct in the particular shooting in the particular

9    fashion in the particular vehicle, with nobody in the

10   vehicle being seen and a steady stream of bullets being

11   fired at this vehicle with nobody being seen, down the

12   street, through the back, okay, as it's continuing to

13   go, at a point where it could be clear that, you know,

14   the person who he's trying to protect -- and also,

15   Judge, given the fact that anything he did, okay, under

16   those circumstances, could have killed any one of a

17   number of people on the street or in the vehicle or in

18   the police car that was following, um, it clearly is a

19   seizure.

20         THE COURT:  Well, let me ask you this.

21   Officer Taylor also asserts that he has qualified

22   immunity, that if he's liable -- I mean, if the Fourth

23   Amendment was violated, a reasonable police officer in

24   his position wouldn't know that, in part, because of

25   *Landol-Rivera,* but since *Landol-Rivera*, at least

1     immediately, it seemed to me, is to control this

2     situation, why wouldn't he have qualified immunity?

3           MR. STOCKWELL-ALPERT:  Several reasonable

4     police officers at the scene, two of them were following

5     this vehicle all the way through for blocks and blocks

6     and followed him around the corner didn't shoot because

7     they knew that they shouldn't.  The officer who was

8     struck, to some extent, by the vehicle, pulled his gun

9     and didn't shoot.  There were the reasonable police

10    officers at the scene who didn't shoot.  So I would say

11    right then and there that we have examples of what a

12    reasonable police officer, standing in the position of

13    this officer, would do under the circumstances, they

14    wouldn't shoot a vehicle that hit a pedestrian or hit

15    another police officer.

16          THE COURT:  But the question is would a

17    reasonable police officer, an objective test, know that

18    shooting, in those circumstances, would constitute a

19    seizure of a passenger who might be hit and therefore

20    potentially at least a violation of the Fourth Amendment

21    in view of the First Circuit law, which is consistent

22    with many other circuits, in *Landol-Rivera*?

23          MR. STOCKWELL-ALPERT:  I can't imagine how an

24    officer, shooting at a vehicle that's clearly moving

25    down the street, obviously in a purposeful fashion,

1   obviously being driven by somebody who can't be seen,

2   and then being occupied by a bunch of other people, all

3   whom he doesn't know, none of whom are doing anything

4   unlawful, okay, wouldn't have reason to know that it's

5   unreasonable to shoot at that vehicle, under those

6   circumstances, and that it would be violating the law.

7   And by the way, Judge, he stepped -- and this is also in

8   the facts, okay, in either our statement of the facts or

9   their statement of the facts.  He stepped off the

10  sidewalk into the street, planted his feet, said a

11  prayer, aimed the gun, and shot at the vehicle.  That's

12  not split second.  That's deliberative thought process.

13              THE COURT:  He said a prayer?

14              MR. STOCKWELL-ALPERT:  Yes.  He said, "I hope

15  to God I hit the driver," or whatever, words to that

16  effect.  Off the street, left a pedestrian whom he had

17  been interviewing with regards to a crime -- off the

18  street, into the street, turned around, and shot down

19  Fayston Street after saying a prayer.  I don't think

20  that's split second.

21              THE COURT:  I don't think -- well, are there

22  any cases that would move this from sort of the *City of

23  Sacramento* standard to the *Whitley v. Albers* standard

24  when there's really time to deliberate?  Any case?

25              MR. STOCKWELL-ALPERT:  None that I know of,

1     Judge.  I mean, my point is if this man was aiming to

2     stop the vehicle by shooting at the vehicle, the whole

3     conduct wasn't just to kill the driver, it was to stop

4     the vehicle, and if it was to kill the driver, it should

5     have ended the moment it was very clear that that driver

6     wasn't going to stop.  If the vehicle is traveling down

7     the street and away, that by his moving across the

8     street, it's clear that he's not just shooting to stop

9     the driver.

10           THE COURT:  Well, let me ask you this.  What

11     are your two state law claims?

12           MR. STOCKWELL-ALPERT:  We've got conscious

13     pain and suffering, which is a very short period of

14     time, assuming this woman may have been alive.

15           THE COURT:  That's what you call your survival

16     action?

17           MR. STOCKWELL-ALPERT:  Yeah.

18           THE COURT:  Based on what, an assault and

19     battery?

20           MR. STOCKWELL-ALPERT:  Um, well, it's a

21     derivative claim, it basically for that period that

22     she's alive, because what happens is --

23           THE COURT:  I know, but there has to be some

24     tort that would permit awarding damages.

25           MR. STOCKWELL-ALPERT:  Wrongful death.

1          THE COURT:  What?

2          MR. STOCKWELL-ALPERT:  Their wrongful death

3     claim, the state wrongful death claim.  That conscious

4     pain and suffering would be a separate cause of action

5     for the time that she's alive because those damages go

6     to a different group of people.  So you break out the

7     conscious pain and suffering from the wrongful death

8     because her death may not have been immediate.

9          THE COURT:  Okay.  And what are the elements

10    of the wrongful death claim?  Because this wasn't dealt

11    with much on --

12         MR. STOCKWELL-ALPERT:  The wrongful death

13    claim is simply -- it's a state law claim that says if a

14    person who deliberately or negligently causes the death

15    of another shall be liable for, and it spells out the

16    various elements that they're liable for, the burial

17    expenses, you know, and --

18         THE COURT:  But basically the best theory for

19    the plaintiff would be negligence.

20         MR. STOCKWELL-ALPERT:  The best theory?

21         THE COURT:  On the wrongful death.  You don't

22    have to prove intent, you're saying, that it would be

23    sufficient to prove unreasonable conduct.

24         MR. STOCKWELL-ALPERT:  Right, but I think

25    under the circumstances, it's very clear that the

1    shooting is a deliberate act and so I think that we have

2    every option to go both ways and let the jury sort it

3    out, and we do have the officer in this.  I think the

4    problem with the negligent wrongful death is in the

5    negligent wrongful death, I think the City would be --

6              THE COURT:  The City would be liable.

7              MR. STOCKWELL-ALPERT:  Right.  And we have a

8    claim where the officers shot into this vehicle and the

9    shooting was a deliberate piece of conduct.  And so

10   therefore it falls within that prong.

11             THE COURT:  Intentional.

12             MR. STOCKWELL-ALPERT:  Right.

13             THE COURT:  But I thought the -- let's see.  I

14   thought I just, with your agreement, granted summary

15   judgment for the City because there's no evidence of --

16             MR. STOCKWELL-ALPERT:  Well, that would be the

17   problem with the negligence part of it, Judge, but

18   that's why the prong that still exists would be

19   deliberate.  Wrongful death encompasses both.

20             THE COURT:  But you don't have a wrongful

21   death claim, at the moment, against the City?

22             MR. STOCKWELL-ALPERT:  Well, the wrongful

23   death claim, I believe, is bifurcated basically because

24   it's deliberate or negligence and I think it got broken

25   down separately.  The City --

1          THE COURT:  The only count against the City

2   was Count 5.  Well, let me see.

3          (Pause.)

4          MS. LITSAS:  Your Honor, I believe the only

5   count was Count 5, the survival action, and that was the

6   subject of a motion to dismiss because you had

7   previously ordered dismissal of all other claims under

8   your prior ruling.  In addition, your Honor, in that

9   previous ruling you had also determined that there was

10  no prior negligence claim by the plaintiff.

11          (Pause.)

12          THE COURT:  All right.  Miss Litsas, would you

13  like to be heard?

14          MS. LITSAS:  Very briefly, your Honor.  We

15  would just reiterate your conclusion with respect to

16  *Landol-Rivera*.  Even by the plaintiff's own confessions

17  in his opposition, it's the controlling case in this

18  jurisdiction.  And what is material and dispositive

19  about the facts is whether or not the plaintiff can

20  prove an intentional acquisition of control of the

21  passenger, the decedent, Eveline Barros-Cepeda.  *Landol*

22  makes perfectly clear that shooting at the vehicle is

23  not sufficient to demonstrate and overcome that hurdle.

24  Here there is no evidence that Officer Taylor even knew

25  of the passenger, Eveline Barros-Cepeda, nor any

1    evidence that he intended to seize her.  And without

2    that requisite evidence, there is no seizure claim.

3         And in addition, your Honor, just moving very

4    quickly, even if you do not find a seizure, a lack of

5    seizure, you can rule on qualified immunity very

6    swiftly.  There's no evidence on the clearly

7    established -- and not even getting to the objectively

8    reasonable component, just looking at the seizure

9    component, as the Court has already determined.

10   Seizure, the law would not clearly establish that

11   Officer Taylor's conduct constituted an unlawful seizure

12   at the time he was involved in the incident.  In fact,

13   the case law suggests that his actions were lawful,

14   given the **Landol** ruling.

15        And then your Honor can also find qualified

16   immunity again on the clearly-established component

17   because the Supreme Court, in **Rousseau,** established,

18   looking at all the other cases in similar situations

19   where police officers were shooting at a moving vehicle,

20   established that it was not -- clearly established that

21   a shooting, in this type of scenario, was clearly

22   established as unlawful.

23        So in three different ways, your Honor, you can

24   grant summary judgment very swiftly.  For the remainder,

25   your Honor, we would rest on our briefs.

1          In terms of the couple of points that my opposing

2     counsel made, there's no evidence in the record that

3     Officer Taylor intended to, or stated in any way that he

4     wanted to kill the driver.  He only stated that his

5     intent was to disable the driver and that is an

6     undisputed fact.

7          There's no evidence, of course, in the record that

8     he intended to seize the passenger.  He didn't even know

9     that there was a passenger in the vehicle.

10         And then opposing counsel also makes a point that

11    there were no sirens in the vehicle, the police vehicle

12    behind.  The evidence suggests otherwise.

13              THE COURT:  Well --

14              MS. LITSAS:  It's not necessarily a material

15    fact, but I just pointed it out for clarification.

16         For the remainder, your Honor, we will just rest

17    on our briefs.  And we would ask that the Court grant

18    summary judgment for Officer Taylor.

19              THE COURT:  Well, if I grant summary judgment

20    on the Federal claims, I have to decide what to do with

21    the two state court claims.  Ordinarily I would just

22    dismiss them without prejudice and if they were brought

23    in the state court, they would be litigated there.  Do

24    you understand?

25              MS. LITSAS:  Yes, that's correct, your Honor.

```
 1              THE COURT:  All right.  I'm going to take a

 2     break and then I may be able to give you a decision.

 3              (Short recess, 3:20 p.m.)

 4              (Resumed, 3:45 p.m.)

 5              MR. STOCKWELL-ALPERT:  Your Honor, may I be

 6     heard briefly?

 7              THE COURT:  Yes.

 8              MR. STOCKWELL-ALPERT:  I did want to point

 9     out, as my colleagues wanted me to try to impress upon

10     you, one last time, that if no set of different facts

11     would change the situation and it's this Court's view

12     that the First Circuit statement, or the First Circuit

13     case says that the intention of the officer is what

14     controls under all circumstances, no matter how

15     dissimilar the facts are, then obviously we would lose.

16     But it's hard for me to imagine that all cases that come

17     down, of this type, where police shoot at vehicles,

18     should be or are controlled by the blanket principle

19     that it's the officer's intention at the time he shoots

20     at the vehicle with regard to the person whose rights

21     claim to be violated, that that's what basically

22     controls no matter how dissimilar the facts are.

23              THE COURT:  Well, as a general proposition --

24     here, you can be seated.

25              (Mr. Stockwell-Alpert is seated.)
```

1           THE COURT:  As a general proposition, I agree,

2      but on the evidence in this case, for reasons I'll

3      describe in detail, Officer Taylor is entitled to

4      summary judgment.  There certainly could be a different

5      case with different facts in which the officer would not

6      be entitled to summary judgment.  I have to decide this

7      case based on the established law and the evidence

8      that's presented.

9           The parties have been litigating this for a long

10     time.  They've all done a good job.  When somebody is

11     dead, which is the case here, there's a desire on the

12     part of the Court to be particularly careful where

13     there's generally a -- if there are material facts in

14     dispute, not just a need, but a valuable service

15     rendered when a jury decides a case.  But if there are

16     no material facts in dispute and the defendant is

17     entitled to judgment as a matter of law, judgment must

18     enter for the defendant as a matter of law, no matter

19     how poignant the facts.  This is such a case.

20          I'm going to explain my ruling orally in detail.

21     The fact that it's being given to you orally should not

22     suggest that it is all been -- at all that it's been

23     reached casually, but we're here, we're immersed in

24     this.  The transcript will be one record of the

25     decision.  I'll review the transcript and make any

1    corrections if the Court Reporter misunderstands me.  I

2    may also take the transcript and convert it into a

3    separate memorandum and order.  I'll probably do that if

4    this decision is appealed, so it would be easier to

5    read, it would be in a more familiar format.

6         This case arises out of the shooting death of a

7    woman, Eveline Barros-Cepeda, who was killed when the

8    defendant, Thomas Taylor, a Boston police officer fired

9    into the car in which she was a passenger in an attempt

10   to stop the vehicle.  The plaintiff's third amended

11   complaint asserts six causes of action, all arising from

12   the same facts.

13        A 42 United States Code, Section 1983 claim for

14   wrongful death essentially against Officer Taylor.  A

15   Section 1983 so-called survival action against Officer

16   Taylor, and that's Count 2.  A Section 1983 municipal

17   liability claim against the City of Boston, Count 3,

18   which was previously dismissed.  A Massachusetts General

19   Law, Chapter 229, Section 2, wrongful death action

20   against Officer Taylor.  A survival action for pain and

21   suffering against the City of Boston, Count 5, which,

22   with the agreement of the plaintiff and because it was

23   meritorious, summary judgment has already, earlier

24   today, been granted to the City on.  And a so-called

25   survival action for pain and suffering against Officer

1    Taylor, Count 6.  All of the plaintiff's Federal claims

2    allege a violation of the decedent's Fourth Amendment

3    right to be free from unreasonable seizures.  The state

4    law claims are brought under the pendant jurisdiction of

5    the court.  The plaintiff seeks compensatory and

6    punitive damages, costs, interest and attorneys' fees.

7         The summary judgment standard is both familiar

8    and important.  The Court's discretion to grant summary

9    judgment is governed by Federal Rule of Civil Procedure

10   56.  Rule 56 provides, in pertinent part, that the Court

11   may grant summary judgment only if the pleadings, the

12   depositions, the answers to interrogatories, and the

13   admissions on file, together with the affidavits, if

14   any, show there is no genuine issue as to any material

15   fact and that the moving party is entitled to judgment

16   as a matter of law.  That's Rule 56(c).

17        In addition, the facts are to be viewed in the

18   light most favorable to the nonmoving party.  When a

19   party fails to make a showing sufficient to establish

20   the existence of an element essential to that party's

21   case and on which that party bears the burden of proof

22   at trial, there can no longer be a genuine issue as to

23   any material fact and the moving party is entitled to

24   judgment as a matter of law.

25        In determining the merits of a motion for summary

judgment, the Court is compelled to undertake two inquiries.  One, whether the factual disputes are genuine and, two, whether any fact genuinely in dispute is material.  As to materiality, the substantive law will identify which facts are material.  Only disputes over facts that might affect the outcome of the suit, under the governing law, will properly preclude the entry of summary judgment.

To determine if the dispute about a material fact is genuine, the Court must decide whether the evidence is such that a reasonable factfinder could return a verdict for the nonmoving party.  This decision must be based on the admissible evidence, as the First Circuit explained in **Feliciano vs. State of Rhode Island**, 160 F. 3rd 780 at 787, in 1998.

Unless otherwise noted, viewing the evidence in the light most favorable to the plaintiff, the following facts are not in dispute.  The decedent, Eveline Barros-Cepeda, was a Cape Verdean woman living in Dorchester, Massachusetts.  She was 25 years old at the time of the events at issue in this case.  Plaintiff, Shenia Dancy Stewart, is the administratrix of the estate of Miss Barros-Cepeda by appointment in the Suffolk Probate and Family Court.

At the time of the events giving rise to this

claim, Officer Thomas Taylor, Jr., was a member of the
Boston Police Department, sometimes referred to as the
BPD.  The defendant, City of Boston, is a municipal
corporation duly organized under the laws of the
Commonwealth of Massachusetts and located in Suffolk
County.  The City is the public employer of the
defendant, Officer Taylor.  Witnesses Michael Paillant,
Robert Connolly, and Debra Flaherty were also members of
the Boston Police Department.  Witness Brima Wurie was
the driver of the car in which Miss Barros-Cepeda was
traveling when she was shot.  At the time of the
incident, he was on parole and his driver's license had
been suspended.

        Shortly after midnight on the morning of September
8, 2002, Boston police officers Connolly and Flaherty
were traveling in a marked police cruiser on Columbia
Road in Dorchester, Massachusetts.  While stopped at the
intersection of Columbia Road and Hancock Street, the
officers claim that they observed a white Taurus that
failed to stop at a red traffic light.  Plaintiff
disputes this fact noting that the driver of the
vehicle, Wurie, testified that the traffic light
indicated that he could make a lawful left turn.  The
officers then attempted to stop Mr. Wurie's vehicle.
The parties agree that the officers activated their

1    cruiser's flashing lights, but Wurie claims that he
2    never heard a siren or any other noise from the cruiser.
3         There is considerable dispute about the nature of
4    the pursuit that followed, however this dispute is not
5    material.  The defendant characterizes Wurie's actions
6    as a failure to heed police instruction and his actions,
7    it is claimed, were an attempt to evade the police.  The
8    plaintiff objects to these characterizations of Wurie's
9    actions, noting that Officers Flaherty and Connolly
10   never used their cruiser's loud speakers to issue any
11   verbal instructions and that Wurie's actions were not
12   actually an attempt to evade the police.  The plaintiff
13   notes that the officers testified that Wurie never
14   exceeded the speed limit as they followed him and that
15   the only point at which Wurie went fast was when he
16   turned from Dunkeld Street onto Fayston Street, the
17   intersection where the shooting occurred.  The plaintiff
18   also notes that Officer Flaherty testified that it was
19   not a long time, probably minutes, passed from the time
20   that they first began to follow Wurie to the time that
21   he turned onto Fayston Street.  Officer Flaherty
22   notified the Boston Police Department's Operations
23   Department of their location in an attempt to apprehend
24   Wurie's vehicle.  These broadcasts were not heard by
25   Officers Taylor and Paillant who were assigned to

1    another district and operating on a different radio

2    channel.

3        The parties are in agreement on the reason why

4    Wurie refused to stop for the police.  While Wurie

5    recognized that the Boston police were attempting to

6    pull him over, he stopped -- he refused to stop his

7    vehicle because his driver's license had been suspended,

8    he was on parole, and he did not want to return to

9    incarceration.

10       Throughout the events at issue, Wurie drove the

11   vehicle in question.  Carlos Fernandez was sitting in

12   the front seat of the vehicle.  The decedent, Eveline

13   Barros-Cepeda, was sitting in the back seat of the Wurie

14   vehicle along with Luis Carvalho and Maria DaRosa.

15       During the relevant period, Officers Taylor and

16   Paillant were conducting an unrelated sexual assault

17   investigation near 85 Fayston Street in Dorchester.  At

18   the time that the Wurie vehicle traveled onto Dunkeld

19   Street, Officer Paillant was standing outside his marked

20   police cruiser located on Dunkeld Street at its

21   intersection with Fayston Street.  Sitting inside the

22   cruiser was the suspect in the alleged assault, James

23   Nicholas.  At the time, Officer Taylor was near 85

24   Fayston Street meeting with the alleged victim of the

25   assault.

Officer Paillant immediately noticed the Wurie vehicle and the Boston Police Department cruiser with its lights flashing as they traveled on Dunkeld Street. Determining that the driver of the vehicle had committed the crime of refusing to stop for police, Officer Paillant stepped into the street in front of the Wurie vehicle.  As Officer Paillant stood in the roadway, he directed Wurie to stop his vehicle using verbal and hand commands.  Officer Paillant also pointed a gun at the car at this time.  At the time that Officer Paillant was signaling to Wurie's vehicle from near the intersection of Dunkeld and Fayston Streets, the Wurie vehicle was located approximately halfway up Dunkeld Street.  As the Wurie vehicle approached Officer Paillant, he began to move to his left, the vehicle's right, in an attempt to get out of the way of the car.

Officer Taylor asserts that the front right side of the Wurie vehicle struck Officer Paillant's body and that Officer Paillant moved onto the hood of the vehicle, ultimately falling off to the ground where he remained bent down for several seconds.  This account is supported by the testimony of several witnesses. Officer Flaherty testified that:  "The vehicle I was trying to stop, the white car, he hit Officer Paillant."  Officer Connolly also testified that the

Wurie vehicle hit Officer Paillant.  Officer Taylor
stated that Paillant "got hit, slammed onto the front of
the car, and gasped for air."  Trevo Carter, a
bystander, also testified that he saw the Wurie vehicle
strike Officer Paillant.  In addition, Officer Paillant
himself testified that the Wurie vehicle struck him.

Officer Paillant further testified that his elbow
and leg hit the hood of the Wurie vehicle and he rolled
off.  He testified that his elbow subsequently hit the
fender and front door of the car.  Finally, Officer
Paillant testified that he was on the ground for a
couple of seconds before he stood up.

The plaintiff asserts that Wurie did not hit
Officer Paillant, but as Officer Paillant moved to the
right of the vehicle, he slapped the hood of the vehicle
with his hand and then crouched down on the ground for a
couple of seconds.  Wurie testified that:  "All I
remember is his gun, keep following me, and then he
slapped the hood like 'Stop' and I kept going."  Wurie
also testified that he did not hit Officer Paillant.

While Officer Taylor walked back toward his
cruiser, with the alleged assault victim from 85 Fayston
Street, he noticed Officer Paillant look down Dunkeld
Street and make a startled exclamation, "What the -- "

Officer Taylor moved into Fayston Street and

observed Officer Paillant step in front of the Wurie

vehicle, yelling for it to stop, and putting his hands

up.  Officer Taylor then heard the car's engine "rev up"

and saw Officer Paillant remove his firearm.  At this

point, Officer Taylor removed his own firearm and told

the alleged victim he was with to wait on the sidewalk.

Officer Taylor then saw the Wurie vehicle strike Officer

Paillant on the front passenger side of the hood and

strike him near the knees and Officer Paillant fall

forward onto the car with his torso.

Taylor testified that from his view, when the

Wurie vehicle struck Officer Paillant, the vehicle was

turning onto Fayston Street and Officer Paillant's feet

were kicking "as if he was met with a stronger force and

he was trying to keep himself from being run over, and

Taylor can see his hands on the hood and the car was

turning."

Taylor asserts that at this point he lost sight of

Officer Paillant and did not know if he would be run

over or dragged by the Wurie vehicle.  The plaintiff

objects to this characterization of Officer Taylor's

impressions noting that Officer Taylor did not use the

words "run over" or "drag" in the deposition testimony

cited as support.  This, however, is a semantic

dispute.  It is not material.  When I say a "semantic

1    dispute," I mean that the plaintiff has not introduced

2    evidence to put the substance of Taylor's assertion in

3    genuine dispute.

4        The defendant goes on to dispute that before

5    firing, Officer Taylor noted that the suspect in the

6    sexual assault matter was sitting in his cruiser and

7    stepped into the street to minimize the possibility of

8    hitting him.

9        The plaintiff disputes any characterization of

10   Officer Taylor's actions that suggests a relatively long

11   passage of time, noting that Officer Taylor testified

12   that "everything happened very quickly."  That's in

13   plaintiff's 56.1 response at Paragraph 66.

14       Consistent with that position, the plaintiff also

15   does not dispute the statement that:  "Officer Taylor

16   made the split-second decision to stop the Wurie vehicle

17   by discharging his firearm because he believed that

18   Officer Paillant's life was in danger and he believed

19   that discharging his firearm was the only decision he

20   had."  That is asserted by the defendant in his Rule

21   56.1 statement in Paragraph 74.  It refers accurately to

22   Mr. Taylor's deposition, Defendant's Exhibit H at Page

23   109.  In Plaintiff's 56.1 response at Paragraph 74, the

24   plaintiff states that that assertion is undisputed.

25       The plaintiff also does not dispute the statement

that "Officer Taylor believed that as long as the Wurie

vehicle continued to move, Officer Taylor was still in

danger."  That's Plaintiff's 56.1 response at 67.

At this point, Officer Taylor discharged his

firearm.  Neither party states how many shots Officer

Taylor fired, although the testimony of the plaintiff's

ballistician suggests that there were at least four

shots.  The ballistician being Mr. Murphy, whose

testimony the defendant alleges is not admissible, but

his testimony is not material to the outcome of the

motion for summary judgment.

The plaintiff does not dispute the assertion that,

quote:  "When Officer Taylor discharged his firearm, he

could see the driver's side of the Wurie vehicle and

aimed his firearm in that direction because he was

attempting to disable the driver, Brima Wurie," end

quote.  That is in defendant's 56.1 statement in

Paragraph 68B.  It is Exhibit H of the Taylor deposition

at Page 106.  The plaintiff acknowledges that this is

undisputed in paragraph 68B of his 56.1 response.

Taylor asserts that when he discharged his

firearm, he had not seen any passengers in the vehicle

and was not aware of the presence of any passengers in

the vehicle.  That's in Paragraph 70 of his 56.1

statement.  The plaintiff does not dispute the

1    underlying truth of this statement, but observes that

2    Officer Taylor only testified that he did not see the

3    driver or any passengers of the vehicle at any point.

4         The actual testimony is as follows:  Question,

5    "You had no idea.  You hadn't seen any driver of the

6    vehicle at any point, had you?"  Answer, "No."

7    Question, "You hadn't see any passengers in the vehicle

8    at any point, had you?"  "No, I did not."  Question,

9    "You didn't know how many people were in the vehicle,

10   right?"  Answer, "No."  That's the Taylor deposition,

11   Exhibit H at Pages 108 to 109.

12        There is no admissible evidence to place this in

13   dispute, that is, there's no admissible evidence from

14   which a jury could find that Officer Taylor had seen any

15   passengers in the vehicle at any point.

16        Exhibits J and K, submitted by the plaintiff,

17   excerpts of the testimony of Camper and Murphy, provide

18   evidence sufficient for a jury to find that the

19   defendant shot through the back of the vehicle at least

20   once.  And it's saying -- and I assume, for present

21   purposes, without a finding, that Murphy's testimony is

22   admissible.  However, it remains undisputed that the

23   defendant did not see any passenger in the vehicle.  The

24   jury could not reasonably find that the defendant

25   intended to seize a passenger who turned out to be Miss

1  Barros-Cepeda.

2       The defendant asserts that when Officer Taylor

3  regains sight of Officer Paillant and the vehicle

4  slowed, Officer Taylor ceased discharging his firearm.

5  The plaintiff does not dispute the substance of this

6  statement, but notes:  "More accurately, Taylor

7  testified that at the moment he put down his gun, he saw

8  Paillant getting off the ground."

9       Plaintiff suggests that Officer Taylor saw or

10 should have been able to see Officer Paillant when he

11 fired at the Wurie vehicle.  The implication is that

12 Officer Taylor should have known at the time that he

13 fired that the Wurie vehicle no longer posed a threat to

14 Officer Paillant.  The plaintiff cites the deposition

15 testimony of Trevo Carter who states that he didn't hear

16 gunshots until after Officer Paillant had gotten off the

17 ground and began running toward Officer Taylor.

18      In addition, the plaintiff submits the testimony

19 of John Murphy, who, as I said, is a ballistician hired

20 by the plaintiff, which suggests that Officer Taylor

21 could have seen Officer Paillant when he fired the

22 fourth and fatal shot at the Wurie vehicle.  As I noted,

23 Officer Taylor challenges the admissibility of Murphy's

24 testimony noting that it's based on a graphic from the

25 Boston Globe which he, quote, "assumed," end quote, was

1    correct.  Officer Taylor asserts that this testimony

2    relies on hearsay, the Boston Globe graphic, and is not

3    admissible under **Daubert,** 509 U.S. 579, because Murphy

4    was unaware of what data supported the Globe graphic and

5    whether it was reliable.  However, as I indicated

6    earlier, this dispute is not material.

7         After shots were fired, Wurie continued to drive

8    one block down Fayston Street, turning right on First

9    Street and then exiting the vehicle.  When Officers

10   Flaherty and Connolly caught up to the vehicle, they

11   found Miss Barros-Cepeda unconscious on the back seat

12   and called for an ambulance.  At the hospital, Miss

13   Barros-Cepeda was pronounced dead of gunshot wounds from

14   Officer Taylor's bullets.

15        In the opinion of Dr. Jennifer Lipman, the witness

16   for the defendants, the gunshot wound did not cause

17   immediate unconsciousness, but Miss Barros-Cepeda was

18   likely conscious for less than a minute.  Dr. Lipman

19   also testified that Miss Barros-Cepeda experienced

20   conscious pain and suffering during the time between

21   when she was shot and when she died.

22        It is undisputed that after the incident a

23   forensic examination of the Wurie vehicle revealed black

24   markings on the hood and front side.  After examinations

25   of Officer Paillant's gun and holster, it was determined

1  that the black markings on the Wurie vehicle's hood and

2  the control sample from the bottom of Officer Paillant's

3  holster contained a black polymer consistent in all

4  measured physical and microscopic properties and

5  chemical composition.  It was determined that they could

6  have come from the same source.

7      In connection with the September 2002 incident,

8  Brima Wurie pled guilty to several offenses including

9  assault and battery with a dangerous weapon, operating a

10  motor vehicle to endanger so that the lives or safety of

11  the public might be in danger, leaving the scene after

12  causing personal injury, accessory after the fact to

13  assault by means of a dangerous weapon, and operating a

14  motor vehicle without being licensed.

15      With regard to the analysis relating to those

16  facts that are undisputed, the undisputed facts

17  establish that no seizure of Barros-Cepeda occurred.

18  Therefore, Officer Taylor's actions did not violate the

19  Fourth Amendment.  In essence, I find that this case is

20  analogous on all material respects to *Landol-Rivera vs.*

21  *Cruz Cosme*, 906 F. 2nd 791, a 1990 First Circuit case,

22  which applied the Supreme Court's decision in *Brower vs.*

23  *County of Inyo*, 489 U.S. 593, a 1989 decision, to facts

24  comparable to the facts from this case.

25      As the First Circuit explained in *Landol-Rivera*,

1    the Fourth Amendment protects against unreasonable

2    searches and seizures.  When an alleged violation of the

3    Fourth Amendment is at issue, there is a two-part test

4    to be employed.  First, the court must decide if there

5    was a seizure within the meaning of the Constitution.

6    Second, if so, it must decide whether the seizure was

7    objectively reasonable.  And that two-part test emerges

8    from the Supreme Court's decisions in *Graham vs. Connor*,

9    490 U.S. 386, at 395 to 96, and *Brower*, 489 U.S. at 595

10   to 600.

11        The question of whether there's been a seizure

12   within the meaning of the Fourth Amendment is a

13   threshold question.  If answered in the negative, the

14   use of force is not actionable under the Fourth

15   Amendment no matter how reasonable, as explained in the

16   Federal Judicial Center's 2008 edition of Section 1983

17   litigation at Page 47.

18        In *Brower*, the Supreme Court held that unless the

19   restraint of liberty resulted from an attempt to gain

20   control of the individual who has brought the case,

21   there has been no Fourth Amendment seizure.  *Landol-*

22   *Rivera* was a case brought by a hostage who the police

23   knew was in an automobile when the police shot at it in

24   an effort to stop a robber from fleeing with the

25   hostage.  The First Circuit wrote in *Landol-Rivera*, at

1    Page 795, quote:  "We reject the notion that the

2    intention requirement is met by the deliberateness with

3    which a given action is taken.  A police officer's

4    deliberate decision to shoot at a car containing a

5    robber and a hostage for the purpose of stopping the

6    robber's flight does not result in the sort of willful

7    detention of a hostage that the Fourth Amendment was

8    designed to govern," end quote.

9        Other circuits have agreed with this analysis,

10   including the Sixth Circuit in *Claybrook vs. Birchwell*,

11   199 F. 3rd 350, at 355 and 359, determining the

12   plaintiff who was struck by an errant bullet during a

13   police shootout with her father-in-law was not seized

14   because the officers were aiming at her father-in-law

15   and did not realize she was hiding in a parked car.

16   Also consistent with the reasoning of the First Circuit

17   in *Landol-Rivera* is *Childress vs. City of Arapaho*, 210

18   F. 3rd 1154, at 1156 to 57, a 2000 Tenth Circuit case,

19   finding, in a hostage-shooting case, no Fourth Amendment

20   seizure because the officers intended to restrain the

21   minivan and the fugitives, not the hostages.  Also

22   consistent with the First Circuit's reasoning is the

23   Second Circuit's 1998 decision in *Medeiros vs.*

24   *O'Connell*, which held that where a hostage is struck by

25   an errant bullet, the governing principle is that such

consequences cannot form the basis of a Fourth Amendment violation.  As the First Circuit wrote in ***Landol-Rivera***:  "It is intervention directed at a specific individual that furnishes the basis for a Fourth Amendment claim."  That's at Page 796.

In this case, it is undisputed that Taylor did not know that there were passengers in the car when he made a split-second decision to shoot at it.  That, as I said earlier, is found in Exhibit H, Taylor's deposition at pages 108 to 109, and the plaintiff's response to the defendants' Rule 56.1 statement in Paragraph 7.

This case is actually stronger for the defendant than ***Landol-Rivera*** in which the police knew that a hostage was in the vehicle.  I note that in circumstances less analogous to ***Landol-Rivera*** than this case, other District Courts in the First Circuit have applied the arguably restrictive interpretation of what constitutes a seizure.  I have particularly in mind ***Medeiros vs. Town of South Kingston***, 821 F. Supp. 823, a District of Rhode Island 1993 case, and ***Marrero vs. Toledo***, 968 F. Supp. 27, a 1997 District of Puerto Rico case.

In essence, I also find that no seizure occurred in this case, therefore there was no violation of the Fourth Amendment.  In reaching this conclusion, I

1    recognize that in **Fisher vs. City of Memphis**, 234 F. 3rd

2    312, at 318 to 19, the Sixth Circuit issued a decision

3    that, to some extent, supports the plaintiff's

4    position.

5        In **Fisher,** the Sixth Circuit reasoned that:  "By

6    shooting at the driver of the moving car, the police

7    officer intended to stop the car, effectively seizing

8    everyone inside, including the plaintiff."  However, the

9    First Circuit decision in **Landol-Rivera** is to the

10   contrary.  It does not adopt the reasoning of the Sixth

11   Circuit in **Fisher**.  It's axiomatic that sitting in the

12   District of Massachusetts, part of the First Circuit, I

13   must follow the law as it's been interpreted by the

14   First Circuit.  And because there was no seizure, it is

15   not necessary to analyze whether the undisputed facts

16   demonstrate that the force used by Officer Taylor was

17   objectively reasonable.

18       As I said in the course of the argument today, the

19   third amended complaint does not allege that Officer

20   Taylor violated Miss Barros-Cepeda's Fourteenth

21   Amendment right not to be deprived of life without due

22   process.  It does not assert a substantive due process

23   claim.  Miss Cepeda-Barros is -- well, the plaintiff's

24   counsel stated today that that omission was not

25   accidental, it was deliberate because he felt -- I would

now say recognized that a valid substantive due process claim could not be alleged and proven.  **Landol-Rivera** did assume that when there was no seizure, an excessive use of force claim could properly be analyzed as a possible violation of the Fourteenth Amendment right to substantive due process.

Such a claim was discussed by the Supreme Court in County of **Sacramento vs. Lewis**, 523 U.S. 833, in 1998, particularly at Page 845.  Similarly, in **County of Sacramento,** the Supreme Court said:  "A substantive due process analysis is therefore inappropriate in this case only if the respondent's claim is covered by the Fourth Amendment."  Similarly, the First Circuit said, in **Evans vs. Avery**, 100 F. 3rd 1033, at 1036:  "Outside the context of a seizure, a person injured as a result of police misconduct may prosecute a substantive due process claim under Section 1983."  As I also noted, this possibility was recognized in **Landol-Rivera** at Page 796.

If it appeared the plaintiff had a viable substantive due process claim, I would consider allowing a fourth amended complaint.  Rule 15 does say that leave to amend should be freely given where justice so requires.  However, such an amendment has not been requested and would not be appropriate in this case

1    because it would be futile.  Cases like **Foman vs. Davis**,

2    371 U.S. 178, at 182, and **Palmer vs. Champion Mortgage**,

3    465 F. 3rd 24, at 30, a First Circuit case, make it

4    clear that amendments should not be allowed if they

5    would be futile.  The undisputed facts of this case

6    indicate that such an amendment, even if requested,

7    would be futile as the plaintiff recognizes.

8         The plaintiff bears a heavy burden in attempting

9    to make out an excessive force claim on the theory of a

10   violation of substantive due process.  The underlying

11   question is whether the government conduct in question

12   shocks the conscience, as the Supreme Court reiterated

13   in **County of Sacramento,** at 846.  In applying the

14   "shocks the conscience" standard, the Court has

15   established two parallel tracks for evaluating official

16   action.  In cases in which the defendant has time to

17   deliberate and act, such as in most custodial

18   situations, the standard is that of deliberate

19   indifference.  However, in cases where split-second

20   decision-making is called for, such as in high-speed

21   chases, police conduct will only be sufficiently

22   conscience shocking if it is undertaken with a purpose

23   to cause harm unrelated to the legitimate object of

24   arrest.

25         This was explained by the Supreme Court in **Lewis**

1    at Pages 853 to 854.  The Supreme Court said there:

2    "When unforeseen circumstances demand an officer's

3    instant judgment, even precipitous recklessness fails to

4    inch close enough to harmful purpose to spark the shock

5    that implicates the large concerns of the governors and

6    the governed.  Just as a purpose to cause harm is needed

7    for an Eighth Amendment liability in a riot case, so it

8    ought to be needed for due process liability in a

9    pursuit case."  That was a chase case, but a comparable

10   split-second case.  This is -- these standards were also

11   discussed in the Federal Judicial Center's Section 1983

12   litigation volume at Pages 37 to 38 of the 2008

13   edition.

14        In this case, once again, the key facts are

15   undisputed and make it impossible -- would make it

16   impossible for a reasonable jury to find a violation of

17   the plaintiff's right to substantive due process, even

18   if one were alleged.  The plaintiff, as I explained

19   earlier, does not dispute that Officer Taylor believed

20   that as long as the Wurie vehicle continued to move,

21   Officer Paillant was still in danger.  In addition, the

22   plaintiff does not dispute the statement that Officer

23   Taylor made, the split-second decision to stop the Wurie

24   vehicle by discharging his firearm because he believed

25   that Officer Paillant's life was in danger and he

1    believed that discharging his firearm was the only

2    decision he had.  And that's in defendants' 56.1

3    statement in Paragraph 74 and the plaintiff's response

4    to that paragraph.

5         In these circumstances, a reasonable jury could

6    not conclude that Taylor intentionally inflicted harm on

7    Miss Barros-Cepeda in a way that shocks the conscience.

8    Rather the undisputed facts compel the conclusion that

9    Taylor made a split-second decision to shoot at the

10   driver for legitimate law enforcement reasons which had

11   the very unfortunate effect of killing a passenger.

12        I note that in 1990, the First Circuit reached the

13   conclusion that there was no violation of the right to

14   substantive due process in *Landol-Rivera* using a

15   reckless indifference standard.  That's at Pages 796 to

16   97.  In 1998, the Supreme Court, in *Lewis,* raised the

17   standard to an intent-to-cause-harm standard.  That's at

18   Page 854.

19        Because I find there was no constitutional right

20   violated, it is not necessary to rely on -- for Taylor

21   to rely on qualified immunity.  However, in view of the

22   close analogy between *Landol-Rivera* and this case, if

23   the evidence were sufficiently different to establish a

24   Fourth Amendment or a substantive due process violation,

25   Officer Taylor would be entitled to qualified immunity

1    because a reasonable police officer would not have known

2    his conduct violated Barros-Cepeda's Federal

3    constitutional rights.

4         I note that there's no consensus of cases

5    disagreeing with the First Circuit in *Landol-Rivera*.

6    The Sixth Circuit's *Fisher* case seems to be an outlier.

7    And I take some guidance on this issue from the First

8    Circuit's decision in *Jennings vs. Jones*, 499 F. 3rd at

9    16 to 17.

10        There are two remaining state law claims, Count 4,

11   the wrongful death claim against Officer Taylor, and

12   Count 6, the so-called survival action.  As I wrote in

13   1996, in *Ducas vs. Martin,* 941 F. Supp. 1281, at 1294 to

14   95 and at Note 14:  "While the Court has the power to

15   retain jurisdiction over a plaintiff's pendant state

16   tort claims, if the Federal claims are dismissed before

17   trial, even though not insubstantial in the

18   jurisdictional sense, the state claims should be

19   dismissed as well."  That's *United Mine Workers vs.*

20   *Gibbs*, 383 U.S. 715, at 726.  *Carnegie Mellon University*

21   *vs. Cowhill*, 484 U.S. 343, at 350, is similar.

22        Since the plaintiffs have no surviving Federal

23   claims, I'm exercising my discretion in dismissing the

24   two pendant state law claims without prejudice.  In

25   doing this, I note that pursuing the claims in the

1    courts of the Commonwealth of Massachusetts would not

2    now be barred by the statute of limitations.  Under the

3    Massachusetts renewal statute, M.G.L., Chapter 260,

4    Section 32, the plaintiff can pursue her state law

5    claims in the state court if they are filed within one

6    year after the dismissal without prejudice from the

7    Federal court.  The Massachusetts Appeals Court affirmed

8    that interpretation of the relevant statute in **Liberache**

9    **vs. Conway**, 31 Mass. Appeals Court 48, at 42 to 44.

10            So I will enter a very short order granting

11   summary judgment on the Federal claims against Officer

12   Taylor, granting summary judgment against the City of

13   Boston, and dismissing, without prejudice, the pendant

14   state law claims against Officer Taylor.  That will

15   conclude this case before this court.  If either party

16   would like a record of this decision, you should order

17   the transcript.  As I said earlier, I may or may not

18   convert that transcript into a more formal memorandum

19   and order.

20            Is there anything further in this matter for

21   today?

22            MR. STOCKWELL-ALPERT:  Just briefly, Judge.

23   Dr. Lipman is the plaintiff's witness, not the

24   defendant's witness.  You mentioned it in your --

25            THE COURT:  Okay.  I'm sorry I made that

1    mistake.

2            MS. LITSAS:  There's nothing else, your

3    Honor.  Thank you very much.

4            THE COURT:  All right.  As I said, this was a

5    hard-fought case for high stakes and it's very

6    unfortunate that Miss Cepeda -- Barros-Cepeda was

7    killed, but, like you, I've worked hard to try to get

8    this right, and if you feel I didn't, of course, there's

9    a right to appeal.  The Court is in recess.

10           (Ends, 4:45 p.m.)

11

12           C E R T I F I C A T E

13

14       I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER,

15   do hereby certify that the foregoing record is a true

16   and accurate transcription of my stenographic notes

17   before Chief Judge Mark L. Wolf, on Monday, September

18   22, 2008, to the best of my skill and ability.

19

20

21   /s/ Richard H. Romanow

22   _____
     RICHARD H. ROMANOW

23

24

25